# EXHIBIT 1

# *Declaration of Roger Smith*

The Honorable Thomas S. Zilly

### UNITED STATES DISTRICT COURT
### WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| KIRTI TIWARI, *et al*., | No.: 2:17-cv-00242 (TSZ) |
| Plaintiffs, | **DECLARATION OF** |
| v. | **ROGER SMITH** |
| JAMES MATTIS, Secretary, U.S. Department of Defense, in his official capacity. | |
| Defendant. | |

Pursuant to 28 U.S.C. § 1746, I hereby declare as follows:

1.      I currently serve as the Branch Chief for Personnel Security ("PERSEC"), Policy for the Office of the Under Secretary of Defense for Intelligence ("USD(I)") and am responsible for PERSEC policy within the Department of Defense ("DoD").

2.      I served in the U.S. Army as a Military Intelligence Specialist with the 1st Infantry Division.  During my deployment to Baghdad, Iraq, as part of Operation Iraqi Freedom, where I was responsible for identification, tracking, and targeting of insurgent activity within the Brigade's area of responsibility.  After the military, I was appointed as a National Security Adjudicator with the Defense Industrial Security Clearance Office within DoD's Defense Security Service ("DSS").  As a Certified Adjudicator with due process credentialing, I was responsible for over 40,000 adjudications and several other thousands of denials and revocations. I was then appointed to be a Branch Chief for Operations within the Army Adjudication division with the DoD Consolidated Adjudications Facility ("DoD CAF"), where I was responsible for the implementation of the Military Accessions Vital to National Security ("MAVNI") Program.

DECLARATION OF ROGER SMITH
*Tiwari, et al. v. Mattis*, No. 2:17-cv-00242 (TSZ)

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 305-7667**

After the DoD CAF, I moved to become the Division Chief at the Personnel Security Management Office for Industry within DSS and was responsible for the identification and eligibility determinations on hundreds of thousands of cleared contractors.  I was the Branch Chief for Operations within the Army Adjudication Division of the DoD CAF, where I was responsible for implementation of MAVNI program policies.  I also previously was appointed as a National Security Adjudicator with the Defense Industrial Security Clearance Office within the DSS.

3.      I make this declaration in support of Defendant's Cross-Motion for Summary Judgment and Opposition to Plaintiffs'' Motion for Partial Summary Judgment and Permanent Injunction. This declaration sets forth the background of the MAVNI program and explains how the program has evolved since its inception in 2008, including the provisions challenged in this case that were promulgated in 2016.  In addition, I explain below why Plaintiffs' requested injunction would cause significant harm to the operation of the MAVNI program and thus to the military's ability to maintain this important program in a manner consistent with the strength and quality of the Armed Forces of the United States.

## Overview of the MAVNI Program

4.      Any individual wishing to enlist in the armed forces must generally satisfy citizenship or residency requirements.  *See* 10 U.S.C. § 504(b).  However, 10 U.S.C. § 504(b)(2) authorizes the Secretary of Defense and the Secretaries of the Military Departments to enlist certain individuals who do not meet citizenship and residency requirements when these Secretaries determine that such enlistment is "vital to the national interest."  Pursuant to 8 U.S.C. § 1440, a person who is not a Legal Permanent Resident ("LPR") who enlists in the armed forces during any period "which the President by Executive order shall designate as a period in which Armed Forces of

DECLARATION OF ROGER SMITH  - 2
*Tiwari, et al. v. Mattis*, No. 2:17-cv-00242 (TSZ)

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 305-8902**

the United States are or were engaged in military operations involving armed conflict with a hostile foreign force" may apply to be naturalized as a citizen "whether or not he has been lawfully admitted to the United States for permanent residence" without regard to age, period of residence in the United States, or length of military service.  On July 3, 2002, the President determined, for purposes of 8 U.S.C. § 1440, that the military is engaged in such an armed conflict.  *See Expedited Naturalization of Aliens and Noncitizen Nationals Serving in an Active Duty Status During the War on Terrorism*, Exec. Order No. 13,269, 67 Fed. Reg. 45,287 (July 3, 2002).  This Executive Order remains in effect.

5.     Pursuant to this authority, the Secretary of Defense authorized the creation of the MAVNI pilot program in 2008, which provided the Army, Navy, Marine Corps, and Air Force (collectively the "Military Departments") authority through December 2009 to enlist noncitizen recruits who are determined to be vital to the national interest.  The program was designed to attract two types of recruits, (1) health care professionals ("HCPs") and (2) persons who possess critical foreign language skills ("CFLs"), both of which are necessary to sustain effective military operations.  The MAVNI pilot program was extended in 2012, 2014, and 2016.  Renewal of the program has always remained dependent on periodic reviews and re-authorization by the Office of the Under Secretary of Defense for Personnel and Readiness ("USD(P&R)").  To date, the Military Departments have recruited more than 10,000 noncitizens under the MAVNI program.

6.     The MANVI program is not the only means by which non-citizens may join the military and ultimately become naturalized citizens. While MAVNI is the only program that allows recruits who are not citizens or LPRs to enlist and gain a path to U.S. citizenship, LPRs can also gain expedited citizenship under the provisions of 8 U.S.C. § 1439.  Under this statute, LPRs who have at least one year of honorable service in the military may be naturalized without having

DECLARATION OF ROGER SMITH  - 3
*Tiwari, et al. v. Mattis*, No. 2:17-cv-00242 (TSZ)

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 305-8902**

to fulfill continuous residency requirements. Prior to the inception of the MAVNI program, in 2003, the Army launched the "09L Pilot Program." Under this program, LPRs could enlist in the military to become interpreters and translators. They could then invoke the benefits of 8 U.S.C. § 1440 during the naturalization application process.

7.     From 2001 through September 2015, U.S. Citizenship and Immigration Services ("USCIS") has naturalized a total of 109,321 members of the military. *See* U.S. Citizenship and Immigration Services, *Naturalization Through Military Service: Fact Sheet*, https://www.uscis.gov/news/fact-sheets/naturalization-through-military-service-fact-sheet.   As noted above, only 10,000 of these persons were recruited under and are subject to the requirements of the MAVNI program at issue in this case.

8.     Under the MAVNI program, each Military Department has the discretion to determine whether recruiting an individual applicant is vital to the national interest. HCP recruits must possess skills to fill a critical shortfall in certain medical specialties, while CFL recruits must be proficient in in a target language and must understand the cultural background associated with that language. In addition, all MAVNI recruits must have had a valid visa status for at least two years immediately prior to the enlistment date, and must not have had any single absence from the United States of more than 90 days during the two-year period immediately preceding the date of enlistment. *See* Memorandum from Acting Under Secretary of Defense for Personnel and Readiness to Secretaries of Army, Navy, and Air Force (Sept. 30, 2016) ("Sept. 30, 2016 Memo) (attached to this declaration as Exhibit 1).

9.     In addition to possessing skills eligible for accession under the MAVNI program, MAVNI applicants must meet the minimum enlistment standards applicable to all recruits, *e.g.*, medical screening, physical fitness, and moral conduct/criminal activity screening. MAVNI

DECLARATION OF ROGER SMITH  - 4
*Tiwari, et al. v. Mattis*, No. 2:17-cv-00242 (TSZ)

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 305-8902**

personnel must also undergo additional security checks, as described further below, before they can be accessed into a Military Service.  MAVNI personnel who enlist and who have served honorably for a period of time in the military may submit their application for citizenship to USCIS.  Thus, a key benefit of MAVNI is that it is the only program that allows recruits who are not U.S. citizens or LPRs to enlist and gain a faster path to U.S. citizenship.[1]

**General Overview of Enlistment and Security-Clearance Eligibility Requirements for MAVNIs**

10.     The MAVNI pilot program is limited in scope to the enlistment of foreign nationals and does not create specific military occupations for them.  Although they must possess specialized language- or healthcare-related skills in order to enlist, MAVNI recruits are assigned a variety of military occupations covering the spectrum of specialties necessary to sustain military operations.  Indeed, because citizenship is a basic requirement to be eligible for a security clearance, no MAVNI is assigned an occupational specialty requiring a clearance when he or she first enlists.[2]

11.     A service member's current occupational specialty determines whether he or she requires access to classified information.  Depending on the needs of a particular position, service members are evaluated and recommended for eligibility to access classified national security

---

[1] Normally, a non-citizen wishing to become a U.S. citizen must have five years of legal permanent residency in the United States to apply.  Non-citizens married to a U.S. citizen for at least three years can apply after three years of residency.  During a period of declared hostilities, procedures for naturalization under 8 U.S.C. § 1440 take precedence over procedures for naturalization under § 1439.  DODI 5500.14, Naturalization of Aliens Serving in the Armed Forces of the United States and of Alien Spouses and/or Alien Adopted Children of Military and Civilian Personnel Ordered Overseas ¶ E2.1.5 (Jan 4, 2006).

[2] MAVNI enlistees typically will not be assigned to occupational specialties requiring a security clearance, as they are ineligible to receive a clearance until after they are naturalized.

DECLARATION OF ROGER SMITH  - 5
*Tiwari, et al. v. Mattis*, No. 2:17-cv-00242 (TSZ)

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 305-8902**

information in light of the occupational specialty the soldier holds.  Assignment to a particular

job alone does not mandate a service member's need for a security clearance, but instead is one

consideration to determine whether a service member requires access to classified information.

Consequently, no service member has a right to obtain a security clearance in order to hold a

particular or desired occupational specialty.[3]

12.     The decision to grant a security clearance is discretionary and must ultimately be

premised upon the military's judgment that the individual's receipt of a clearance is consistent

with the interests of national security.  Only U.S. citizens will be granted a security clearance,

assigned to sensitive duties, or granted access to classified information.[4]  Moreover, all officers,

including HCPs, must have a security clearance to serve as a commissioned officer in the United

States Army.[5]  By the very nature of their duties, officers are required to have possession of and

to utilize secret, confidential, and other classified or specially restricted documents.

---

[3]  Each MAVNI is informed of his or her Military Department's relevant policy regarding reclassification of occupational specialties.  In the Army, MAVNI enlistees acknowledge an information paper which details the Army's policies regarding reclassification and commissioning.  *See* Enlisted MAVNI Information Paper 2012, ECF No. 63-1; Enlisted MAVNI Information Paper 2014, ECF No. 63-2.

[4] Executive Order 12,968, Section 2.6, permits a non-U.S. citizen limited access authorization to classified information.  There must be compelling reasons in furtherance of an agency mission, and the individual must possess a special expertise.

[5] *See* Army Regulation 380-67, Personnel Security Program, ¶ 3-14a; Army Regulation 601-100, Appointment of Commissioned and Warrant Officers in the Regular Army, ¶ 1-8a.  Army dentists are among the HCPs required to hold higher-level clearances.  This requirement stems from the fact that dentists provide dental care to patients with high-level security clearances and routinely use medication which could cause security clearance holders to divulge classified information involuntarily while medicated.  As such, dentists must be screened to ensure they do not misuse information that may be disclosed during treatment.

DECLARATION OF ROGER SMITH  - 6
*Tiwari, et al. v. Mattis*, No. 2:17-cv-00242 (TSZ)

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 305-8902**

13.     Once a service member is assigned to an occupational specialty requiring access to classified information, that service member's chain of command initiates a request for a personnel security investigation for the service member to obtain a security clearance.  This request is based on a determination that the service member occupies a position requiring access to classified information and the service member has a need to know classified information in the performance of these duties.  While service members may wish to obtain a security clearance through the duration of their service, they are not authorized to initiate or request a personnel security investigation on their own behalf, as this authority is limited to certain designated officials.[6]  Eligibility to access classified information is based on specific job descriptions and position descriptions and is not a discretionary matter that an individual soldier may request. Soldiers are not permitted to circumvent the chain of command and request a security clearance on their own behalf, and any such direct request made by an individual soldier should be denied by a security manager as a matter of course.

14.     The investigative standard for determining security-clearance eligibility is "whether they are and will remain reliable, trustworthy, of good conduct and character, and loyal to the United States and whether granting or continuing national security eligibility is clearly consistent with the national interest."  DoD Manual 5200.02 ¶ 3.1.  Further, "[d]ecisions regarding eligibility for access to classified information take into account factors that could cause a conflict of interest and place a person in the position of having to choose between his or her commitments to the United States, including the commitment to protect classified information . . . ."  White House

---

[6]  DoD Manual 5200.02, *Procedures for the DoD Personnel Security Program (PSP)*, ¶ 5.2 ("Requests for [personnel security investigations] will be accepted only from designated officials with an approved submitting office number . . . .").

DECLARATION OF ROGER SMITH  - 7
*Tiwari, et al. v. Mattis*, No. 2:17-cv-00242 (TSZ)

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW
Washington, DC 20530
Tel: (202) 305-8902

Memorandum, Intelligence Community Policy Guidance 704.2, Annex A, ¶ I.B, December 29, 2005.

15.     Determining who can be trusted with access to classified information involves balancing the risk to the national security against the trustworthiness of the individual seeking access.  This screening process is designed to capture information about a sufficient period of an individual's life to allow DoD to make an affirmative determination that the person currently presents an acceptable security risk.  Eligibility to gain access to classified information is contingent upon the individual satisfying the adjudicative guidelines, and involves a careful weighing of several variables known as the "whole-person concept."  The whole-person concept involves an examination of all available, reliable information about an individual covering their past and present, whether the information is favorable or unfavorable, and the sum of information will be balanced when making a final eligibility determination.  Any doubt concerning an individual being considered for access to classified information will be resolved in favor of the national security and against issuance of a clearance.

16.     The Office of the Director of National Intelligence developed the adjudicative guidelines for determining eligibility for access to classified information, commonly referred to as the "Thirteen Adjudicative Guidelines" (attached to this declaration as Exhibit 2).  These Guidelines direct an adjudicator to evaluate an individual's (1) allegiance to the United States; (2) foreign influence; (3) foreign preference; (4) sexual behavior; (5) personal conduct; (6) financial considerations; (7) alcohol consumption; (8) drug involvement; (9) psychological conditions; (10) criminal conduct; (11) handling of protected information; (12) outside activities; and (13) use of information and technology systems.  *Id.* ¶ II.C.

DECLARATION OF ROGER SMITH  - 8
*Tiwari, et al. v. Mattis*, No. 2:17-cv-00242 (TSZ)

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 305-8902**

17.     Individuals with significant foreign contacts or ties may present heightened risks if given access to classified information.  As stated in the Guidelines, "[f]oreign contacts and interests may be a security concern if the individual has divided loyalties or foreign financial interests, may be manipulated or induced to help a foreign person, group, organization, or government in a way that is not in U.S. interests, or is vulnerable to pressure or coercion by any foreign interest." *Id.* ¶ III.B.1  Because *adjudicators* weigh the risk of granting access to U.S. secrets to individuals with foreign ties, *investigators* must gather facts showing whether applicants for a clearance may have an unmitigable preference for another country.  "When an individual acts in such a way as to establish a preference for a foreign country over the United States, he or she may provide information or make decisions that are harmful to the interests of the United States.  The principal goal of a Foreign Preferences assessment is to determine the risk based on foreign associations that information may be compromised if access is approved; it is not a measurement of how loyal a subject is to the United States."  *Id.* ¶ III.C.1.  While there is no specific formula for identifying which service members may disclose classified information to foreign nations, individuals with significant ties or contacts are heavily scrutinized in order to allow an adjudicator to have the most comprehensive understanding of the service member's background prior to making a final eligibility determination and taking a great risk with regard to national security.

### Changes in Policy to the Investigative Requirements for MAVNI Personnel

18.     Almost since the MAVNI program's inception, DoD has been aware of security concerns presented by the program that leave it susceptible to potential exploitation by foreign adversaries.  In response, DoD has taken incremental steps designed to strike a delicate balance:  taking action to confront the serious counterintelligence (CI), security, and insider-threat concerns posed by the program due to missing or incomplete information about MAVNI soldiers while at the same

DECLARATION OF ROGER SMITH  - 9
*Tiwari, et al. v. Mattis*, No. 2:17-cv-00242 (TSZ)

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 305-8902**

time retaining the program to serve as a vehicle for qualified foreign-born persons who do not present a security risk to serve in the military and become citizens.  These steps include the following actions:

19.     On August 10, 2010, the Deputy Secretary of Defense issued a Memorandum extending the MAVNI Pilot Program through December 31, 2011.  The memo noted DoD's determination that, "[i]n light of recent events, the MAVNI program requires additional security reviews to assure the safety and security of our personnel, equipment and operations. The program's extension was thus based on the condition that "all MAVNI applicants are subjected to a [Single Scope Background Investigation, or "SSBI"] and each Service established a comprehensive counter-intelligence-focused security review and monitoring program for MAVNI recruits." *See* Memorandum from Deputy Secretary of Defense to Secretaries of Military Departments (Aug. 17, 2010) (attached to this declaration as Exhibit 3).  These measures also applied to MAVNI soldiers who had accessed prior to August 17, 2010.  In further recognition of security concerns with the program, DoD concluded that "MAVNI recruits shall not be considered for security clearances or for positions within the intelligence community until they have served in the military and lived in the U.S. for a sufficient time period whereby a thorough background investigation and monitoring can be conducted." *Id*.

20.     This 2010 policy change was issued to address reports that standard background investigations of MAVNI personnel limited to the information provided in a Standard Form 86 ("SF-86") were deficient in developing and resolving issues, particularly issues of influence by or preference for foreign governments, persons, or organizations.  Consequently, with this policy change, investigators would have greater ability to discover and provide relevant records to meet the investigative scope requirement to make a security-clearance eligibility determination.  While

DECLARATION OF ROGER SMITH  - 10
*Tiwari, et al. v. Mattis*, No. 2:17-cv-00242 (TSZ)

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW
Washington, DC 20530
Tel: (202) 305-8902

the LPR population also presents this foreign-influence/foreign-preference challenge, the risk from LPRs is less significant because that population of soldiers has, on average, resided in the United States for a lengthier period than the MAVNI population. Additionally, unlike with LPRs, gathering information about most individual MAVNI soldiers remains difficult because the U.S. Government lacks access and the ability to conduct standard security screening and interviews with associates, friends, and family members, as many MAVNI soldiers are from nations who remain hostile to the United States or do not have data-sharing agreements with the United States.

21.    Additional security review requirements were added in subsequent years. On February 16, 2012, USD(I) issued a policy designed to strengthen the program and mitigate evolving counter-intelligence, security, and insider threat concerns. *See* Memorandum from Under Secretary of Defense for Intelligence to Secretaries of the Military Departments (Feb. 16, 2012) (attached to this declaration as Exhibit 4). This policy added the requirement that all MAVNI applicants must undergo a SSBI as part of a suitability-for-military-service determination and advised the Military Departments that they were responsible for establishing comprehensive counter-intelligence focused security reviews and ongoing monitoring programs for the length of each MAVNI recruit's enlistment. The policy further required MAVNI soldiers to be enrolled in a monitoring program which includes an SSBI, a National Intelligence Agency Check ("NIAC"), a completed CI-focused security review ("CIFSR"), and an issue-oriented CI interview and/or issue-oriented polygraph, as needed, to resolve any foreign influence or foreign preference concerns. These measures were applied retroactively to soldiers who entered the Army prior to the policy change. The 2012 Memo further stated that MAVNI soldiers could not be assigned to fields that required security clearances at the time of their enlistment and that soldiers must have lived in the United States for at least two years in order to be eligible for a

DECLARATION OF ROGER SMITH  - 11
*Tiwari, et al. v. Mattis*, No. 2:17-cv-00242 (TSZ)

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 305-8902**

security clearance.

22.     In 2014, the MAVNI program again was reauthorized.  The 2014 reauthorization retained the SSBI requirement for MAVNI enlistees and reinforced that qualified MAVNI applicants be subjected to a monitoring program.  *See* Memorandum from Under Secretary of Defense for Personnel and Readiness to Secretaries of Army, Navy, and Air Force (Sept. 25, 2014) (attached to this declaration as Exhibit 5).  The 2014 reauthorization retained all of the security screening requirements from the 2014 reauthorization memo, and the results of these reviews were to be considered to make the military suitability determination.  Thus, each of the policy requirements that Plaintiffs challenge, or close variants, have been mandatory aspects of the MAVNI program for years.

## **Identified Threats Posed by the MAVNI Program and Response**

23.     By design, the MAVNI pilot program permits foreign nationals, including some from hostile countries, to enlist in the military in exchange for the opportunity to become naturalized citizens.  Unsurprisingly, there are security risks inherent in this arrangement.  Indeed, as the MAVNI program continued to grow, senior leadership within DoD became aware of significant counter-intelligence concerns involving MAVNI soldiers.[7]  As a basic matter, sufficiently vetting individuals with significant foreign influence and foreign preference concerns requires the ability to verify information provided by the MAVNI soldiers themselves because (as noted) most MAVNI soldiers' home countries do not have security information-sharing agreements with the United States, and some have national priorities that conflict with U.S. priorities.  Therefore, the tools and protocols that the military would ordinarily employ for purposes of evaluating a security

---

[7] Some of DoD's counter-intelligence concerns are documented in classified reports.

DECLARATION OF ROGER SMITH  - 12
*Tiwari, et al. v. Mattis*, No. 2:17-cv-00242 (TSZ)

clearance applicant, *e.g.*, a Tier 3 background investigation, fall well short of providing sufficient information for DoD to make a final suitability determination for the MAVNI population.

24.     Despite DoD's efforts to address the security issues previously identified, subsequent reviews of the MAVNI program determined that the screening measures implemented in the 2010 and 2014 program reauthorizations did not sufficiently address the unique risks presented by the program. Through a review led by USD(P&R) and USD(I) from June through September 2016, DoD learned that some MAVNI soldiers had entered the Program without completed background checks and that the Military Departments did not adequately track MAVNI soldiers post-accession, in violation of then-existing policy.[8]   As a result, some MAVNIs with a positively adjudicated military-service determination had been granted access to classified information without first receiving a formal determination that they were eligible to have such access.   The review also showed that some MAVNI soldiers may have engaged in pre-accession criminal activity (e.g., the making and/or possession of fraudulent student visas) and/or posed a significant counter-intelligence security threat.

25.     For example, the review uncovered that (1) a number of individuals accessed into the military based on receiving fraudulent visas to attend universities that did not exist; (2) some MAVNI recruits attended, and later falsified transcripts from, universities owned by a Foreign National Security Agency and a State Sponsored Intelligence Organization (notably, most of the university classmates of one MAVNI recruit later worked for the same State Sponsored Intelligence Organization); and (3) one MAVNI recruit who entered the United States on a

---

[8] Because of a backlog in conducting these investigations, in February 2013 the Chief, Accessions Division, was authorized to "grant exceptions to policy on a case-by case basis to ship MAVNI Future Soldiers to training who are not in receipt of SSBI results, but who have received favorable NIAC results."

DECLARATION OF ROGER SMITH  - 13
*Tiwari, et al. v. Mattis*, No. 2:17-cv-00242 (TSZ)

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW
Washington, DC 20530
Tel: (202) 305-8902

student visa professed support for 9/11 terrorists and said he would voluntarily help China in a crisis situation.  In addition, the review uncovered a case where a MAVNI applicant failed to list foreign contacts from Eastern Europe and Russia, even though the recruit's father manages the military department of a foreign factory and his brother-in-law worked for a foreign political party.  In DoD's judgment, these examples indicated that sufficient vetting of MAVNI personnel was not occurring at the accessions stage, contrary to the goal of avoiding altogether the accessions of individuals who present potential counter-intelligence, security, or insider threats.

26.     More recent reviews conducted by representatives of DoD and the Department of the Army in May 2016 confirmed the inadequacy of standard vetting tools for the MAVNI program.  For example, further examination of the MAVNI program from USD(P&R) revealed that, since 2013, more than 20 individuals who accessed via the MAVNI program have become the subjects of DoD and/or FBI counterintelligence and/or criminal investigations.  As of September 2016, there were 16 open counterintelligence investigations involving individuals from the MAVNI program.  Notably, despite the fact that soldiers who accessed via MAVNI occupy only approximately 0.4 percent of the DoD national security positions (11,000 MAVNI soldiers out of 2.7 million total), they comprised approximately 15 percent of open DoD counterintelligence investigations.  Thus, soldiers who accessed via the MAVNI program have a significantly higher rate of reported counterintelligence and security concerns than the overall DoD national security population.

27.     Moreover, a review of completed clearance investigative records at the DoD CAF underscored the insufficiency of using only SSBI/Tier 5 results to vet MAVNI soldiers.  In particular, this review showed that the completed investigations for MAVNI soldiers were, in most cases, significantly lacking in information about the subject's residency, employment, and

DECLARATION OF ROGER SMITH  - 14
*Tiwari, et al. v. Mattis*, No. 2:17-cv-00242 (TSZ)

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 305-8902**

character references.  The gaps in missing information are attributable to the short period of time most MAVNI soldiers have resided in the United States and DoD's inability to conduct investigations in foreign countries or subsequently verify information with foreign partners.  The review of completed investigations further revealed that approximately 13 percent of MAVNI soldiers were deemed by the CAF to be unsuitable for military service or not eligible to have access to classified information, compared to less than 1 percent in the general DoD national security population.  Individuals who access through the MAVNI program were deemed unfit due to such issues as criminal activity, falsification of their purpose for being in the United States, or counterintelligence concerns, such as having connections to a known or suspected foreign intelligence entity.

28.     From these reviews, it became apparent that the MAVNI enlistment program was vulnerable to exploitation by foreign nations.  Accessing these individuals into the military quickly, with little understanding of their personal backgrounds, all while facilitating their ability to become U.S. citizens, as some Military Departments had been doing, gave potentially hostile actors access to sensitive information about military installations, weapon systems, and operations, including classified information.  The lack of appropriate safeguards on the program placed service members, the military, and the nation at risk of inside attacks that could be easily executed.  Accordingly, DoD recognized the need to take specific steps to address these CI security concerns using the available investigative tools it had at the time, while also trying maintain the MAVNI program as a viable accessions program for qualified recruits.

29.     The first of these steps was on September 30, 2016, when USD(P&R) issued a memorandum extending the MAVNI pilot program through September 30, 2017.  Following a period of comprehensive review, USD(P&R) implemented several program revisions designed

DECLARATION OF ROGER SMITH  - 15
*Tiwari, et al. v. Mattis*, No. 2:17-cv-00242 (TSZ)

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW
Washington, DC 20530
Tel: (202) 305-8902

to strengthen and improve the execution of the MAVNI program. Among other things, the September 30, 2016 Memo requires that, prior to shipping to basic training or for serving for any period of time on active duty, all MAVNI soldiers must complete the following screening requirements: a NIAC (comprising a check of a minimum of seven law-enforcement, counterintelligence, foreign travel, and public records databases), a CIFSR, and a military suitability determination. The memo further states that foreign linguist MAVNIs must complete a Tier 5 background investigation, a requirement that has subsequently been construed to apply to health care professionals as well. If derogatory information is detected through either the background investigation or the NIAC and cannot be mitigated, the DoD CAF may request a polygraph examination as necessary. These requirements reflect DoD's efforts to use the best available investigative tools to address the identified CI and national security risks identified in the MAVNI program.

30.     In addition to these screening requirements, the September 30, 2016 Memo required the Military Departments to conduct counterintelligence continuous monitoring. If derogatory information is revealed from continuous monitoring that cannot be mitigated, services may request a CI-security interview and/or a polygraph examination as necessary in order to resolve any issues identified. With respect to security clearances, the Memo imposed a prohibition on MAVNI soldiers becoming eligible to access classified information during their first term of enlistment. That particular prohibition was rescinded on June 21, 2017.

31.     The screening requirements outlined in the September 30, 2016 Memo were implemented to help decrease and identify the CI risk to the Military Departments associated with previous MAVNI personnel who may have entered the Program with fraudulent credentials or who posed other counter-intelligence, security, and insider-threat concerns. By conducting a complete

DECLARATION OF ROGER SMITH  - 16
*Tiwari, et al. v. Mattis*, No. 2:17-cv-00242 (TSZ)

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 305-8902**

counter-intelligence focused review, the Military Departments are able to identify risks associated with MAVNI soldiers prior to placing them in positions in which they are required to have access to classified information.  These changes are consistent with previous changes to the program that were designed to strengthen the program and to eliminate risk related to counter-intelligence, security, and insider threat concerns.   The MAVNI program, in and of itself, presents unique vulnerabilities that are less prevalent in other DoD programs.  For example, MAVNI applicants often have significantly more foreign contacts and associates, or the information they provide as part of their background check cannot be verified using traditional investigative tools.  Also, MAVNI soldiers are uniquely susceptible to exploitation by foreign powers:  their extensive and recent ties and contacts to foreign nations combined with their ability to become U.S. citizens serving in the military makes them attractive targets for U.S. adversaries.  By implementing the enhanced investigative tools, DoD can make a thorough final suitability determination based on complete and verified information.

32.     On January 6, 2017, the Department of the Army issued a memorandum implementing the changes to the MAVNI Pilot Program first announced in the September 30, 2016 Memo.  See Memorandum from Department of the Army, Office of the Assistant Secretary, Manpower and Reserve Affairs to Army Deputy Chiefs of Staff (Jan. 6, 2017) (attached to this declaration as Exhibit 6).  As of April 5, 2017, following the completion of screening procedures outlined in the September 30, 2016 Memo, recruits undergoing a military-suitability determination must meet the eligibility-for-access-to-classified-information standard.  *See* Memorandum from the Under Secretary of Defense (Personnel & Readiness) to Director, Department of Defense Consolidated Adjudications Facility (Apr. 5, 2017) (attached to this declaration as Exhibit 7).

33.     On June 21, 2017, DoD eliminated the prohibition on MAVNIs being eligible for security

DECLARATION OF ROGER SMITH  - 17
*Tiwari, et al. v. Mattis*, No. 2:17-cv-00242 (TSZ)

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW
Washington, DC 20530
Tel: (202) 305-8902

1   clearances in their first term of enlistment (attached to this declaration as Exhibit 8).  The June

2   21 Memo made clear that MAVNI soldiers who have successfully completed boot camp/basic

3   military training and who have become U.S. citizens are eligible for security clearances on the

4   same terms, conditions, and criteria as any other U.S. citizen.

5   34.     On October 13, 2017, USD(P&R) issued a memorandum providing supplemental policy

6   guidance about the management of MAVNI soldiers (attached to this declaration as Exhibit 9).

7   Acknowledging that the actions taken via the September 30, 2016 Memo "contributed

8   significantly to the mitigation of security risks," the memo nonetheless concluded that continued

9   progress in addressing security concerns depends upon "a consistent, sustained, and responsive

10  approach."  The October 13, 2017 Memo retains the screening requirements from the September

11  30, 2016 Memo (the NIAC, CIFSR, and Tier 5 investigation).  For MAVNI soldiers who

12  completed security and suitability screening using the vetting protocols in place prior to

13  September 30, 2016, the relevant military department is required to complete a passive analytical

14  CI and security assessment ("PASCA").  Where derogatory information is discovered, these

15  soldiers are required to complete a CI security referral.

16  35.     The October 13, 2017 Memo also addresses continuous monitoring.  Continuous

17  monitoring for MAVNI soldiers consists of (1) enrollment in DoD's Continuous Evaluation

18  program for the entirety of the soldier's military career, and (2) an analytical counterintelligence

19  and security assessment and a NIAC every two years.

20  36.     On April 27, 2018, USD(P&R) further refined the policies for MAVNI eligibility for

21  security clearances.  Specifically, USD(P&R) issued a memorandum (attached to this declaration

22  as Exhibit 10) eliminating the requirement from the June 21, 2017 Memo that a MAVNI soldier

23  to have completed basic military training (e.g., boot camp or its equivalent) before being eligible

DECLARATION OF ROGER SMITH  - 18
*Tiwari, et al. v. Mattis*, No. 2:17-cv-00242 (TSZ)

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 305-8902**

to have a security clearance.

## Overview of Screening Requirements Challenged by Plaintiffs

37.     I understand that Plaintiffs in this case are challenging certain screening requirements for MAVNI soldiers.  Below is an overview and summary of each requirement that I understand to be at issue in this case.

*Single Scope Background Investigation/Tier 5 Investigation and Tier 3 Investigation*

38.     All service members and civilians in the military must successfully complete, at a minimum, a Tier 3 background investigation.  Generally speaking, Tier 3 investigations are used for positions designated as non-critical/sensitive, military accessions of U.S. citizens and lawful permanent residents, and/or individuals requiring eligibility for access to Confidential or Secret information.  A Tier 3 background investigation consists of date and place of birth verification, examining prior and current investigative records, conducting a criminal background check, examining terrorist watch lists, a citizenship/legal status check, local law enforcement agency checks, and reviews of foreign activities, foreign born immediate family, education records, employment records, and credit/financial history.  If the Office of Personnel Management's National Background Investigation Bureau (NBIB) investigator flags potential issues, the investigator may conduct a Subject interview, but such an interview is not required.

39.     Tier 5 investigations, on the other hand, are required for positions designated as critical/sensitive, special sensitive, or that require access to Top Secret or Secret Compartmented Information (SCI).  A Tier 5 background investigation (formerly known as a SSBI) covers multiple issues, including the following:  date and place of birth verification, prior and current investigative records, criminal records history, a check through intelligence indices, social security number check, and reviews for terrorist and subversive activities, selective service

DECLARATION OF ROGER SMITH  - 19
*Tiwari, et al. v. Mattis*, No. 2:17-cv-00242 (TSZ)

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 305-8902**

registration, U.S. military discharge (if applicable), and citizenship/legal status.   A Tier 5 investigation also involves a review of local law enforcement agency records, public records, the subject's credit/financial history, and the subject's foreign activities, including foreign born immediate family members.  A Tier 5 investigation verifies the subject's educational background, employment history, and former spouse (if divorced within the last five years).  The subject's social references and neighbors, as listed on a Standard Form 86 ("SF 86"), are also interviewed. The subject's spouse/cohabitant is assessed to determine if they have engaged in activity that may have implications for the subject's eligibility for access to classified information or suitability for employment, and the spouse/cohabitation's prior and current investigative records (including criminal/Federal Bureau of Investigation records) are screened, to include their citizenship/legal status as well as any potential terrorist or subversive activities.   A Tier 5 background investigation typically culminates with an interview with an investigator trained to detect fraud in order to obtain any outstanding information or clarify any conflicting information presented in background records or related interviews.

40.     On balance, a Tier 3 investigation is not as extensive as a Tier 5 investigation.  Most relevant here, a Tier 3 investigation excludes certain checks highly relevant for MAVNI recruits, such as developed reference interviews, which are necessary for those personnel whose lack of extended presence in the United States will cause the period of their investigation to overlap with time spent living abroad.  The starting point for every investigation is a SF-86, and one question on this form asks the individual to provide information that covers the last 7 to 10 years (or "ever" in some cases).   For those individuals whose responses to this question contain information related to a foreign country—virtually every MAVNI soldier—the investigator may not have the capability to validate their responses, as the investigator has no authority or capability to conduct

investigations in foreign countries.  Because it is comprised of more investigative tools, a Tier 5 investigation allows an investigator to fill in these gaps left by information that cannot be validated, whereas a Tier 3 investigation does not.

41.     Further, a Tier 3 investigation does not permit the investigator to conduct checks on the applicant's spouse or cohabitant.  A Tier 5 investigation, by contrast, permits the investigator to perform checks on the subject's spouse or cohabitant to determine if he or she has engaged in activity that may have implications as to the subject's eligibility for access to classified information or suitability for employment.  This difference is notable because a subject's spouse or cohabitant may have foreign preference or contacts that may impact the subject's vulnerability to exploitation.  In addition, a Tier 5 investigation includes a check of two social references, one of whom must have known the subject for at least five years, as well as an interview of one of the subject's neighbors who can observe the subject's conduct and activities.

42.     Overall, a Tier 5 investigation helps DoD validate a significantly greater amount of information than a Tier 3 investigation, including issues that pertain to the foreign contacts- and foreign influence-related concerns that were the impetus for enhancing screening requirements for the MAVNI program.  Prior to the changes adopted in 2016, DoD relied upon Tier 3 or Tier 5 investigations to vet MAVNI soldiers.  Review of MAVNI background investigations identified significant missing, or conflicting, information from MAVNIs' backgrounds; particularly troubling was the inadequacy of existing methods to investigate MAVNIs' extensive foreign contacts.  DoD could not account for such missing information when determining a soldier's trustworthiness to hold a national security position, and DoD was unable to verify information provided by a MAVNI soldier about his or her foreign contacts.  Thus, requiring all MAVNI soldiers to complete a Tier 5 investigation was necessary to enable DoD to gather additional

information to compensate for missing investigative records and to validate the Subject's claimed

identify and history.

*National Intelligence Agency Check*

43.     As thorough as a Tier 5 background investigation may be, it is not possible for DoD to

obtain all necessary information about a MAVNI soldier using that tool only.  DoD therefore

requires that a NIAC be conducted for every MAVNI soldier as well.  A NIAC is the most

efficient way to learn about intelligence or law enforcement threats for individuals who have

spent considerable time outside the United States, and it is used to quickly identify red flags

which may warrant follow up for MAVNI soldiers.  A NIAC checks the MAVNI's claimed

identity against multiple national intelligence and law enforcement databases:   the Joint

Personnel Adjudication System, National Crime Information Center, Defense Central Index of

Investigations, and additional data available at the FBI Terrorism Tracking Task Force.  It also

includes a check of a MAVNI soldier's foreign travel (through the Advance Passenger

Information system or similar system when available) as well as a check of public records,

commercial data, and social media, as appropriate.  This check was added to the enhanced vetting

because it was impossible to tell (using prior investigative tools) which MAVNI soldiers were

targeting the program maliciously.  This investigative tool requires no participation from the

subject and allows investigators to start to gain a more comprehensive understanding of the

MAVNI soldier's background.  In some instances, investigators may be able to use a NIAC to

validate certain self-reported information from an SF-86 that they cannot identify with Tier 3 or

Tier 5 investigations, such as whether an individual has a criminal record in a foreign country.

*Counter-Intelligence Focused Security Review (CIFSR)*

44.     Although a Tier 5 background investigation and a NIAC provide highly relevant

DECLARATION OF ROGER SMITH  - 22
*Tiwari, et al. v. Mattis*, No. 2:17-cv-00242 (TSZ)

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 305-8902**

information about a MAVNI soldier, these tools alone do not allow investigators to fully understand a MAVNI soldier's foreign contacts or foreign preference. The key information-gathering tool in this regard is the CIFSR, which combines the results of the NIAC with additional checks of relevant intelligence and open-source databases as well as a search of military records. A trained CI analyst reviews the results from these checks and generates a comprehensive analytic assessment of any potential CI risk apparent from the applicant records and database check results. Risks are based on the Thirteen Adjudicative Guidelines and the CI risk indicators outlined in Army Regulation 381-12, the Army Threat Awareness and Reporting Program.

45.     The CIFSR culminates with an in-person interview in which a CI investigator meets with the MAVNI soldier and interviews the soldier about his or her background to gain more information about the applicant and to address any issues or gaps of information identified in the analytic process. The interviewer follows a standard list of 75 questions, including topics about citizenship, military service, legal and criminal conduct, security clearance, motivations, allegiance to the United States, foreign influences, conflicts of interest, personal conduct, and financial considerations.

46.     A CIFSR provides an investigator with important additional information to make a final suitability determination.  Unlike the other screening requirements, a CIFSR involves an interactive component where an investigator is able to speak to the subject directly and ask the subject certain questions. The investigator is thus given the opportunity to evaluate the results of the Tier 5 background investigation and the NIAC and make any necessary follow-up inquiries. Importantly, this interview provides a subject with the opportunity to explain any discrepancies and to address any derogatory information discovered during the background

DECLARATION OF ROGER SMITH  - 23
*Tiwari, et al. v. Mattis*, No. 2:17-cv-00242 (TSZ)

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 305-8902**

investigation.  If necessary, an investigator can also request that the subject complete an issue-specific polygraph examination, although such an examination is not required of all MAVNI soldiers and is used on a case-by-case basis.

47.     Pursuant to the most recent policy guidance dated October 13, 2017, MAVNI soldiers who completed security and suitability screening using the vetting protocols in place prior to September 30, 2016 will undergo a passive analytical CI and security assessment ("PACSA"). A PACSA is less intrusive than a CIFSR:  it involves a review of the same materials (results from intelligence and open-source database checks, NIAC) but does not include an interview with the subject.  As with a CIFSR, a trained CI analyst reviews the results of these checks and generates a comprehensive analytic assessment of any potential risk, using the Thirteen Adjudicative Guidelines, and CI risk indicators outlined in Army Regulation 381-12, the Army Threat Awareness and Reporting Program.  The 902nd Intelligence Group in the Army is responsible for conducting PACSA and has requested them for all MAVNI soldiers who are required to have them.  As of April 12, 2018, the Army has completed PACSAs for all MAVNI soldiers who required one under the terms of the October 13, 2017 memo.

*Continuous Monitoring*

48.     The above policies are designed to identify and address security issues close in time to the enlistment of MAVNI soldiers.  However, reviews of the MAVNI pilot program revealed that MAVNI soldiers present threats throughout the duration of their career.  Most notably, reviews of the MAVNI program revealed that MAVNI soldiers may become *more* attractive targets to foreign adversaries after they access and receive security clearances because of their access to classified and other sensitive military information.  Many MAVNI soldiers may maintain ties with family members in their birth country, and these relationships can be leveraged by foreign

DECLARATION OF ROGER SMITH  - 24
*Tiwari, et al. v. Mattis*, No. 2:17-cv-00242 (TSZ)

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW
Washington, DC 20530
Tel: (202) 305-8902

adversaries.

49.     To address this specific risk, DoD requires all MAVNI soldiers to be subjected to continuous monitoring throughout their military career.  Continuous monitoring consists of two components.   First, MAVNI soldiers are enrolled in DoD's Continuous Evaluation ("CE") program, which is currently required of all members of the military who are eligible to access classified information.[9]   Second, the Military Department in which a MAVNI soldier serves conducts an analytic (document-based) CI and security review and NIAC every two years.  The continuous monitoring program for MAVNIs is thus in most instances a passive policy:  MAVNI soldiers are not involved directly in the review process themselves, unless it is determined that further investigative measures are necessary based on the information obtained via the passive review.

50.     The MAVNI program is not the only accessions program for which DoD conducts ongoing monitoring.   Executive Order 13,467 requires all Executive Branch agencies to implement a CE program for *all* individuals who are determined to be eligible to have access to classified information, regardless of their national origin.  Pursuant to this authority, DoD has created the CE Program for all members of the military with national security positions (*i.e.*, all enlisted positions).  CE runs certain checks on those individuals to determine if there is any new derogatory information about the subject that may impact their ability to properly safeguard classified information or information that may impact their trustworthiness, reliability or credibility.  DoD is expanding the depth of the CE population as well the information and data that is examined so as to ensure that those individuals in national security position do not pose a

---

[9] *See* DoD Manual 5200.02-M § 7.6(b)(1) ("All military members will undergo PRs, maintain a favorable adjudication, and be subject to continuous evaluation.").

DECLARATION OF ROGER SMITH  - 25
*Tiwari, et al. v. Mattis*, No. 2:17-cv-00242 (TSZ)

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW
Washington, DC 20530
Tel: (202) 305-8902

national security risk to DoD.  All members of the military who enlisted after 2010 have agreed to such monitoring.

51.     Importantly, none of the screening requirements described above—the Tier 5 investigation, NIAC, CIFSR, or continuous monitoring—subject MAVNI soldiers to a different or more onerous adjudicative standard.  Instead, they simply allow investigators to compensate for the unique challenge of vetting a security clearance applicant who has resided for a relatively short time in the United States.  In other words, these requirements ensure adequate fact-finding, but they do not alter the standards used to evaluate a soldier's fitness to access classified information.  Those standards are uniform.

### Necessity of Screening Requirements to the MAVNI Pilot Program

52.     The Tier 5 investigation, NIAC, CIFSR, and continuous monitoring requirements are all designed to supplement DoD's standard investigative methods with programs specifically designed to addresses the shortcomings of other investigative tools.  These additional investigative and information-gathering tools are intended to bolster the limited data that DoD is able to learn about MAVNI soldiers through a conventional Tier 3 investigation and to fill information gaps about soldiers' backgrounds.

53.     MAVNI soldiers are not the only U.S. citizen soldiers subject to enhanced vetting.  For example, an Army program known as 09L consists of U.S. citizen contractor personnel and LPRs with language skills to serve as interpreters and translators in the Army.  Program participants— nearly all of whom have significant foreign cultural or financial connections—have access through these positions to Army military personnel, facilities, and information systems.  To mitigate any risks presented by the participants' foreign connections, the Army requires that participants undergo additional screening measures.  Program participants who are U.S. citizens

DECLARATION OF ROGER SMITH  - 26
*Tiwari, et al. v. Mattis*, No. 2:17-cv-00242 (TSZ)

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW
Washington, DC 20530
Tel: (202) 305-8902

must complete a favorable counterintelligence screening prior to attending basic military training. Program participants who are LPRs must likewise undergo enhanced screening, including checks of certain databases and a screening interview. Furthermore, *all* individuals possessing a security clearance are subject to continuous evaluation, which includes periodic reinvestigations, intermittent event-based investigations, and continuous vetting.

55.      Not only do these tools facilitate DoD's ability to make informed determinations about the potential security risk presented by MAVNI soldiers, but many soldiers benefit from these policies. Without the enhanced vetting and the information obtained using these tools, few, if any, MAVNI soldiers would receive a favorable security clearance adjudication due to the lack of available information about the applicant in the absence of these information-gathering tools. This is because adjudication standards mandate that the adjudicator always errs on the side of the national security, and the inability to clarify or confirm the information in an individual's past typically leads to a denial of a security clearance because the risk is deemed too great.[10]  The investigative tools that DoD has selected thus not only help to address national security concerns and unique vulnerabilities that are inherently present in the MAVNI program but also ensure that responsible, trustworthy MAVNI soldiers may have an opportunity to serve across a range of occupational specialties, to include those that require a security clearance.

56.      By compiling the investigative information from a Tier 5 with the information obtained by the NIAC and CIFSR, DoD is able to make a final national security determination. Without these additional investigative tools, DoD would not able to address the unique vulnerabilities identified in the MAVNI program. It is not possible to require these additional investigative tools

---

[10] *See* Security Executive Agent Directive 4 (June 8, 2017) ("Eligibility for access to classified information or eligibility to occupy a sensitive position shall only be granted when the evaluation of all such information demonstrates that such eligibility is clearly consistent with the interests of the United States; any doubt shall be resolved in favor of the national security.").

DECLARATION OF ROGER SMITH  - 27
*Tiwari, et al. v. Mattis*, No. 2:17-cv-00242 (TSZ)

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW
Washington, DC 20530
Tel: (202) 305-8902

on a case-by-case basis since some of the disqualifying information may only be obtained through the additional checks. The existence of derogatory information, in some cases, can only be obtained through these investigative tools, *i.e.*, DoD is aware that it is lacking critical information about MAVNI soldiers.  For example, if an applicant does not provide complete and accurate information on their SF 86, a Tier 3 investigation may not identify or accurately capture some false or misleading information concerning foreign issues (*e.g.*, convictions/associates). Thus, additional investigative tools are necessary due to the unique circumstances and inherent risk surrounding the MAVNI population.  Case-by-case review would not adequately address the CI concerns and potential for exploitation presented by this population. Applying the enhanced techniques to the population as whole makes DoD better equipped to gather essential information and identify potential derogatory information that would not be otherwise available.  If the Court were to restrict the use of these investigative tools, national security concerns would arise, and DoD likely would grant fewer security clearances to MAVNI applicants, as missing information would reduce the likelihood that a MAVNI applicant would receive a favorable final suitability determination, and this in turn could ultimately limit the career path of the individual.

57.     In addition to the security screening requirements discussed above, DoD has considered other available options to gather information about MAVNI soldiers necessary to combat the risk posed by the MAVNI program, but has not implemented them.  Additional measures that could have been required of all MAVNI soldiers include a polygraph examination, psychological evaluations, reviews of financial statements and tax records, and checks of databases maintained by the Financial Crimes Enforcement Network within the Department of Treasury.  Although these tools remain available to investigators to use on an individual basis, DoD decided against requiring them for all MAVNI soldiers.  Other investigatory tools that are available but are not

DECLARATION OF ROGER SMITH  - 28
*Tiwari, et al. v. Mattis*, No. 2:17-cv-00242 (TSZ)

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW
Washington, DC 20530
Tel: (202) 305-8902

required of MAVNIs include adjudication of references who observe a subject's conduct and activities, intelligence checks of the subject's immediate family members, intelligence indices checks on close associates who are non-citizens, and review of all current and expired passports, regardless of the country of issuance.  Thus, DoD did not bluntly impose onerous investigative requirements on this population.  Rather, it chose— from among the many tools available—those tools it deemed most effective to address investigative deficits and gaps unique to the MAVNI program.

58.     It is essential for these additional investigative tools to apply to all MAVNIs, because even if a particular MAVNI soldier has been in the United States for many years and does not have as many foreign contacts as a MAVNI soldier in country for a shorter period, that soldier's participation in the MAVNI program *in and of itself* may make him or her susceptible to exploitation.  As DoD knows from reports detailing the national security concerns with the program, foreign adversaries sometimes target MAVNI soldiers for exploitation, including after a MAVNI has enlisted and become a naturalized citizen.  DoD must therefore use screening tools to help both verify information provided by a MAVNI soldiers and to learn of any additional information relevant to a MSSD and NSD as well as to guard against any risk of exploitation after the soldier has been naturalized and given access to classified information.

**DoD Would be Greatly Harmed if the Court Were to Enjoin Enforcement of the Above-Described Requirements**

59.     Any decision that halts the enhanced requirements for MAVNI soldiers would create significant risk and potential harm to the military in several ways.  First, such an injunction would restrict DoD's ability to address the known and significant counter-intelligence, security, and insider threat concerns posed by the MAVNI pilot program in a manner that DoD has judged is necessary based on years of experience with the program.  Although the MAVNI pilot program

DECLARATION OF ROGER SMITH  - 29
*Tiwari, et al. v. Mattis*, No. 2:17-cv-00242 (TSZ)

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW
Washington, DC 20530
Tel: (202) 305-8902

has provided many benefits to the Armed Services, it has also presented unique security concerns, which have been the subject of DoD review and deliberation for years. DoD cannot assess risk and take appropriate action to mitigate what are known CI threats without closely examining each individual in the MAVNI program. A court order requiring DoD to operate the MAVNI pilot program in a particular fashion would upset the careful balance DoD has struck between accessing highly skilled recruits in a timely fashion while simultaneously ensuring that the program is not exploited by foreign powers, criminal elements, or other threats—a balance that DoD has found necessary to address the national security concerns posed by the program.

60.     Second, enjoining the enhanced vetting procedures for MAVNI soldiers would undercut DoD's ability to fully vet and screen soldiers who are seeking to gain access to classified information. DoD's review of the MAVNI pilot program has revealed a need to conduct additional screening measures for MAVNI soldiers given that, as a whole, they have spent significantly more time in foreign countries and have more foreign contacts than do other naturalized soldiers. Tailoring security screening requirements to individual MAVNI soldiers would jeopardize the security of the program as well as the military overall. By its very nature, the MAVNI program is intended to bring foreign-born persons into the military and, while this is on balance a favorable policy for the military, it presents unique security threats. In the majority of cases, DoD is simply unable to verify a subject's claim to citizenship, education, residence, loyalty, and good character absent use of additional information-gathering tools. DoD therefore requires additional information from this group of soldiers in order to ensure that it has complete and accurate information when making a determination about whether an individual should have access to classified information. Depriving DoD of the ability to require these

DECLARATION OF ROGER SMITH  - 30
*Tiwari, et al. v. Mattis*, No. 2:17-cv-00242 (TSZ)

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 305-8902**

1  minimal screening requirements of every MAVNI soldier would increase the risk that a soldier

2  is erroneously granted a security clearance.

3  61.       Precluding the use of MAVNI-specific screening requirements would likewise cause

4  harm to MAVNI soldiers.  Although these screening tools are used to learn of derogatory

5  information about an individual soldier that may minimize that soldier's ability to receive a

6  clearance, they are also used to verify information and fill in gaps that might otherwise disqualify

7  a soldier from having access to classified information.  Absent the ability to verify information

8  provided by a MAVNI soldier as part of a background investigation or to fill in missing pieces

9  of information, an investigator is much more likely to recommend against an individual receiving

10  a clearance due to concerns about unverified or missing information.  The screening requirements

11  thus in many cases help investigators and adjudicators obtain the information they need to make

12  favorable determinations for MAVNI soldiers.  As noted above, reverting to use of additional

13  screening requirements on a case-by-case basis could result in MAVNI soldiers being denied

14  clearances for lack of information where they might have otherwise been adjudicated favorably

15  if the additional tools were applied, and could limit the careers of MAVNI soldiers.

16
17
18
19
20  I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and

21  correct.  Executed on April 30, 2018.

22
23
24  _____
     ROGER SMITH
25
26
27
28

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW
Washington, DC 20530
Tel: (202) 305-8902

# SMITH DECLARATION

# EXHIBIT 1



**UNDER SECRETARY OF DEFENSE**
4000 DEFENSE PENTAGON
WASHINGTON, D.C. 20301-4000

PERSONNEL AND
READINESS

SEP 30 2016

MEMORANDUM FOR SECRETARY OF THE ARMY
SECRETARY OF THE NAVY
SECRETARY OF THE AIR FORCE

SUBJECT: Military Accessions Vital to the National Interest Pilot Program Extension

The Military Accessions Vital to the National Interest (MAVNI) pilot program is currently set to expire on September 30, 2016. This memorandum was developed in coordination with the Under Secretary of Defense for Intelligence and extends the MAVNI pilot program through September 30, 2017, and implements revised eligibility requirements. This guidance will serve as a single source document for the administration of the MAVNI program and replaces all previously issued program guidance.

The application of the limited authority under section 504(b)(2) of title 10, United States Code, allows the Services to expand the military recruiting market to include certain non-immigrant aliens. The authority is contingent upon a case-by-case determination by the Secretary of the Military Department concerned that each such enlistment is vital to the national interest. The exercise of such authority regarding health care professionals shall be limited to those holding medical specialties for which a Service has a critical shortfall. The recruitment of persons with special language and associated cultural backgrounds shall be limited to those with qualifications necessary to support current and projected future military operations, and for which the Military Service concerned currently has a critical shortfall. Persons enlisted under this program shall be screened and identified for eligibility for special operations and special operations support career fields, and if eligible, assignment priority will be given to those units.

Changes reflected in the enclosed guidance will strengthen and improve the execution of the MAVNI program. These changes are the result of a comprehensive review of the program and include specific security and mission requirements outlined below and also in the enclosure. The Secretaries of the Military Departments will ensure adequate controls and audit processes are in place for compliance with all administrative, security, and suitability requirements outlined in this memorandum.

The Service MAVNI program allocations for the maximum number of annual accessions will be: Army – 1,200; Navy - 65; Marine Corps - 65; and Air Force – 70. Within 60 days of the date of this memorandum, the Secretaries of the Military Departments will provide a report to the Assistant Secretary for Manpower and Reserve Affairs detailing the methodology supporting requested accession allotments against critical manpower gaps and operational requirements.

In execution of the enclosed guidance, the Secretaries of the Military Departments shall:

- limit the accession of individuals with language/culture skills to not more than 10 percent of the total Service allocation for reserve accessions;
- access medical personnel for Active and Reserve enlistments as needed;

TIWARI_PROD_00000378

- limit the number of annual accessions for any one language/associated culture capabilities to not more than 10 percent of total MAVNI Service authorization.
- prohibit Category 2 language/associated culture applicants from shipping to basic training or serving for any period of time on active duty until the Military Service certifies in writing to the Under Secretary of Defense for Personnel and Readiness (USD (P&R)) and the Under Secretary of Defense for Intelligence (USD(I)) their ability to meet administrative, security, and suitability protocols mandated herein prior to accessing any new applicants into the Delayed Entry Pool (DEP).

Updated guidance regarding program eligibility, languages, security reviews, and screening processes, eligibility for a security clearance, suitability determination, and military endorsement for naturalization are necessary to ensure the security, success and sustainability of the MAVNI program. Specific policy details and methodologies are outlined in the enclosed guidance.

- The guidance within this memorandum applies to all MAVNIs currently in the DEP, all future applicants, and all Reserve accessions who enter Service or ship to basic training on or after the date of this memorandum. Those persons in the DEP who were recruited under the eligible language list in effect since 2014 may continue in the accession process, but they must be satisfactorily screened under the revised screening protocols found in this memorandum.
- All personnel accessed through the MAVNI program since its inception in 2009 must be continuously monitored and accounted for throughout the duration of their affiliation with the Department of Defense (e.g. active duty, Reserve, government civilian, or contractor).
- No Service member accessed under language/associated culture MAVNI eligibility is eligible for a security clearance until they have satisfied time in service requirements and have received an updated and favorable determination by the Consolidated Adjudications Facility.

All costs associated with the accession of MAVNI applicants are borne by the contracting Service. Services recruiting under MAVNI will provide to USD(P&R) and USD(I) a MAVNI report by accession cohort at the end of each quarter and annually following the end of each fiscal year. Complete reports listing all MAVNIs in service will be provided to USD(P&R) and USD(I) on an annual basis. The Services shall notify USD(P&R), USD(I), and United States Citizenship and Immigration Services (USCIS) when individuals become classified as "unsatisfactory participants" and/or are administratively separated from the military.

Any clarification required concerning this guidance shall be requested prior to program implementation by the Military Departments concerned. Services may not deviate from these requirements without a written approval to do so from the USD(P&R) in coordination with USD(I).

Peter Levine
Acting

Attachments:
As stated

TIWARI_PROD_00000379

cc:
Chairman of the Joint Chiefs of Staff
Under Secretary of Defense for Intelligence
Chief of the National Guard Bureau
Assistant Secretary of the Army for
    Manpower and Reserve Affairs
Assistant Secretary of the Navy for
    Manpower and Reserve Affairs
Assistant Secretary of the Air Force for
    Manpower and Reserve Affairs

TIWARI_PROD_00000380

**Program Eligibility**

**Overall Eligibility:**

1.   Eligibility is extended to aliens in one of the following categories at time of enlistment:

    a.   Asylee, refugee, Temporary Protected Status (TPS), or

    b.   Nonimmigrant categories E, F, H, I, J, K, L, M, O, P, Q, R, S, T, TC, TD, TN, U, or V.

2.   Additionally, program applicants:

    a.   Must have been in a valid status in one of those categories for at least the 2 years immediately prior to the enlistment date. However, it does not have to be the same category as the one held on the date of enlistment;

    b.   Must not have had any single absence from the United States of more than 90 days during the 2-year period immediately preceding the date of enlistment; and

    c.   Are rendered ineligible by virtue of having a pending application for adjustment of status to lawful permanent residence. In the specific case of an alien with H nonimmigrant status at the time of filing a pending application for adjustment of status who has lost such status while his or her application for adjustment was pending, and who is otherwise eligible for enlistment under the MAVNI program, the military Service may on a case by case basis waive the requirement that the alien be in a status described in paragraph 1 above at the time of enlistment; however, the Service will ensure the applicant in DEP maintains an immigration status or obtains Deferred Action from the Department of Homeland Security (DHS) or the applicant in DEP will no longer qualify for enlistment.

3.   Individuals who have been granted deferred action by the DHS pursuant to the Deferred Action for Childhood Arrivals process are eligible.

**Program Specific Eligibility (Services may add additional requirements)**

**1.  Health Care Professionals**

    a.   Applicants must be recruited specifically to fill medical specialties wherein the Service has a critical shortfall.

    b.   Applicants must meet all qualification criteria required for their medical specialty.

    c.   Applicants must meet the criteria required for foreign-trained Department of Defense medical personnel recruited under other authorities.

    d.   Applicants must demonstrate proficiency in English – reading, speaking, and listening – on a standardized test in accordance with all existing Service criteria for commissioned officers.

Attachment 1

TIWARI_PROD_00000381

e.  Enlistments must be for at least 3 years of Active Duty or 6 years of SELRES service.

## 2. Enlisted Individuals with Special Language and Culture Backgrounds

Enlistments must be for at least 3 years of Active Duty or 6 years of SELRES service, and enlistees must:

a.  Possess capability in a specific language with the associated cultural background from the list of critical eligible languages (below), and

b.  Demonstrate language proficiency at the 2/2/2 level on the Defense Language Proficiency Test or 2/2 on the Oral Proficiency Interview; or as needed for the career field, but not at less than 1+ on any modality.

### Eligible Languages

Services may recommend additional languages to meet emerging needs or request exceptions to policy for especially meritorious individual cases to the Office of the Deputy Assistant Secretary of Defense for Military Personnel Policy.

### Category 1

| | | |
|---|---|---|
| Albanian | Dhivehi (language of | Portuguese |
| Bengali | Maldives) | Sinhalese |
| Bulgarian | Haitian-Creole | Tagalog |
| Cebuano | Hungarian | Tamil |
| Czech | Malayalam | Thai |
| | Polish | |

### Category 2

| | | |
|---|---|---|
| Amharic | Igbo | Sindhi |
| Arabic | Indonesian | Somali |
| Azerbaijani | Kashmiri | Swahili |
| Burmese | Kurdish | Tajik |
| Cambodian-Khmer | Lao | Turkish |
| French (limited to | Malay | Turkmen |
| individuals possessing | Moro | Ukrainian |
| citizenship from an | Nepalese | Urdu |
| African country) | Pahari | Uzbek |
| Georgian | Punjabi | Yoruba |
| Hausa | Pushtu (aka Pashto) | |
| Hindi | Serbo-Croatian | |

TIWARI_PROD_00000382

**Security and Suitability Screening Requirements**

1. Applicability. Services may not deviate from the following requirements without written approval from the Under Secretary of Defense for Personnel and Readiness (USD(P&R)) in coordination with the Under Secretary of Defense for Intelligence (USD(I)).

2. Initial Screening. Prior to shipping to basic training or serving for any period of time on active duty in the Armed Forces, each MAVNI applicant must satisfactorily complete all security screening requirements. Services shall clearly annotate MAVNI in all Service Component Accessions Systems and use the Joint Personnel Adjudication System (JPAS) (or its successor, the Defense Information System for Security (DISS)) Agency Use Block and indicate MAVNI to ensure the Department's ability to track MAVNI's period of military service. Sequencing of security screening (NIACs, Counterintelligence (CI)-Security Interviews, Tier 3 or Tier 5 background investigations, polygraphs) as applicable is critical and provided at Enclosure 2.

    a. National Intelligence Agency Check (NIAC): The NIAC will include at a minimum a name check of the following databases:

        i.    CIA External Name Trace System
        ii.   PORTICO (USD(I)-approved CI information system)
        iii.  National Crime Information Center
        iv.  Defense Central Index of Investigations
        v.   FBI Checks (Name and Foreign Terrorism Tracking Task Force)
        vi.  Foreign Travel (Advance Passenger Information System or similar system when available)
        vii. Public Records, Commercial Data, Social Media (as appropriate)

Services will forward the results of the NIAC to the DoD Consolidated Adjudications Facility (CAF) leading to a National Security Determination in support of a suitability for service determination.

    b. CI-Security Interview: The Service counterintelligence element will conduct the CI-Security Interview. The CI-Security Interview will be based upon the findings of the completed NIAC, a review of the subjects SF-86, and standard questions from the Services and the DoD CAF. Results of the CI-Security Interview will be forwarded to the DoD CAF to support the National Security Determination.

    c. Military Suitability Determination: The DoD CAF will render a National Security Determination based on 13 National Adjudicative Guidelines. JPAS will then be coded as "No Determination Made" (MAVNIs are not eligible for a security clearance during their initial accession, see Para 4 below for security clearance eligibility requirements). The DoD CAF will forward a notification to the Service recruiting command, via the Case Adjudication Tracking System, with one of the following decisions: 1) The subject has an non-favorable national security determination based on unmitigated derogatory or missing information or; 2) A non-favorable national security determination solely because of citizenship with the absence, or successful mitigation, of other derogatory information. If derogatory information was revealed, the DoD CAF will provide information to the accessing service via the Case Adjudication Tracking System. The accessing service will use this information to then render the final military suitability determination in accordance with DoDI 1304.26 and any service specific policies.

TIWARI_PROD_00000383

d.   Health Care Professionals and Category 1 Language Requirements:  Will have a completed Tier 3 background investigation, a completed NIAC, a completed CI-security interview,  a National Security Determination by the DoD CAF, and a favorable military suitability determination rendered by the Service accession organization.  If derogatory information is revealed in the background investigation or NIAC and cannot be mitigated, the DoD CAF may request a polygraph examination as applicable.  The Military Service may either administer a polygraph to resolve the issue or separate the individual.  Applicants refusing to consent to a polygraph examination will be separated.  A Category 1 MAVNI's country of origin should be taken into consideration to determine whether at Tier 5 investigation is more appropriate vice a Tier 3 investigation.

e.   Category 2 Language Requirements:  Will have a completed Tier 5 background investigation, a completed NIAC, a completed CI-security interview,  a  National Security Determination by the DoD CAF, and a favorable military suitability determination rendered by the service accession organization.  If derogatory information is revealed in the background investigation or NIAC and cannot be mitigated, the DoD CAF may request a polygraph examination as applicable.  The Military Service may either administer a polygraph to resolve the issue or separate the individual.  Applicants refusing to consent to a polygraph examination will be separated.

3.  Continuous Monitoring (CM).  The Services will execute annual comprehensive counterintelligence CM throughout each MAVNI's period of military service.  Services shall use the JPAS (or its successor DISS) to record completion of annual CM and vetting status throughout their periods of military and government service.

a.   Continuous Monitoring requirements: The Service CI-element will conduct, at a minimum, a NIAC on each MAVNI serving, annually.  Any derogatory information identified by CM (or separately by the unit) will be reported per DoDI 5200.02.  If the CAF cannot mitigate derogatory information, the DoD CAF may request a CI-security interview and/or a polygraph examination, as applicable.  The Military Service may administer a polygraph and/or interview to resolve the issue or separate the individual.  Service members refusing to consent to a polygraph examination and/or interview will be separated.  This process will serve as CM until further capabilities are available.

b.   Reporting requirements: Annually in September, each Service Deputy Chief of Staff for Manpower and Personnel will submit a comprehensive report of all MAVNIs serving in all Components to its Service CI-element, USD(I), and USD(P&R).  An initial submission is due to those organizations within 60 days of the date of this memorandum.  The listing shall include at a minimum the name, DoD ID number, job title, unit of assignment, country of origin, native language, and security clearance classification if any.  This reporting requirement is intended to inform and facilitate Service CI-elements execution of CM.

4.  Security Clearance Eligibility Requirements.  MAVNIs will be designated in JPAS (or its successor DISS) as not eligible for an interim security clearance or access until the completion of first enlistment and a positive national security eligibility determination is made by the DoD CAF.  Commands may request eligibility for a clearance for MAVNIs through its Service security manager after ensuring MAVNIs have completed the first enlistment and meet all other requirements for a clearance.  The DoD CAF is responsible for adjudicating completed personnel security background investigations to render a determination of each individual's eligibility to access classified information and may require the Military Components to submit a request for an updated background investigation, updated CI-security interview, or NIAC as

4

applicable, prior to rendering a security clearance eligibility determination. If the CAF cannot mitigate derogatory information, the DoD CAF may request a CI-security interview and/or a polygraph examination, as applicable. The Military Service may administer a polygraph and/or interview to resolve the issue or separate the individual.

TIWARI_PROD_00000385

## DoD MAVNI Security and Suitability Sequence Map



Attachment 2

TIWARI_PROD_00000386

# SMITH DECLARATION

# EXHIBIT 2



## SECURITY EXECUTIVE AGENT DIRECTIVE 4

### NATIONAL SECURITY ADJUDICATIVE GUIDELINES

### (EFFECTIVE: 08 JUNE 2017)

**A. AUTHORITY:** The National Security Act of 1947, as amended; Intelligence Reform and Terrorism Prevention Act of 2004 (IRTPA), as amended; Executive Order (EO) 10450, Security Requirements for Government Employment, as amended; EO 12968, Access to Classified Information, as amended; EO 13467, Reforming Processes Related to Suitability for Government Employment, Fitness for Contractor Employees, and Eligibility for Access to Classified National Security Information; EO 13549, Classified National Security Information Program for State, Local, Tribal and Private Sector Entities; Performance Accountability Council memorandum, Assignment of Functions Relating to Coverage of Contractor Employee Fitness in the Federal Investigative Standards, 6 December 2012; and other applicable provisions of law.

**B. PURPOSE:** This Security Executive Agent (SecEA) Directive establishes the single, common adjudicative criteria for all covered individuals who require initial or continued eligibility for access to classified information or eligibility to hold a sensitive position. The Guidelines reflected herein supersede all previously issued national security adjudicative criteria or guidelines.

**C. APPLICABILITY:** This Directive applies to any executive branch agency authorized or designated to conduct adjudications of covered individuals to determine eligibility for initial or continued access to classified national security information or eligibility to hold a sensitive position.

**D. DEFINITIONS:** As used in this Directive, the following terms have the meanings set forth below:

   1. "Agency": Any "Executive agency" as defined in Section 105 of Title 5, United States Code (USC), including the "military departments," as defined in Section 102 of Title 5, USC and any other entity within the Executive Branch that comes into possession of classified information or has positions designated as sensitive.

   2. "Authorized adjudicative agency": An agency authorized by law, executive order, or designation by the SecEA to determine eligibility for access to classified information in accordance with EO 12968, as amended, or eligibility to hold a sensitive position.

   3. "Authorized investigative agency": An agency authorized by law, executive order, or designation by the SecEA to conduct a background investigation of individuals who are proposed for access to classified information or eligibility to hold a sensitive position or to

TIWARI_PROD_00002327

ascertain whether such individuals continue to satisfy the criteria for retaining access to such information or eligibility to hold such positions.

4. "Classified national security information" or "classified information": Information that has been determined pursuant to EO 13526 or any predecessor or successor order, or the Atomic Energy Act of 1954, as amended, to require protection against unauthorized disclosure.

5. "Covered individual":

a. A person who performs work for or on behalf of the executive branch or who seeks to perform work for or on behalf of the executive branch, but does not include the President or (except to the extent otherwise directed by the President) employees of the President under 3 USC 105 or 107, the Vice President, or (except to the extent otherwise directed by the Vice President) employees of the Vice President under 3 USC 106 or annual legislative branch appropriations acts;

b. A person who performs work for or on behalf of a state, local, tribal, or private sector entity as defined in EO 13549 requiring eligibility for access to classified information;

c. A person working in or for the legislative or judicial branches requiring eligibility for access to classified information and the investigation or determination is conducted by the executive branch, but does not include members of Congress; Justices of the Supreme Court; and Federal judges appointed by the President.

d. Covered individuals are not limited to government employees and include all persons, not excluded under paragraphs (a), (b), or (c) of this definition, who require eligibility for access to classified information or eligibility to hold a sensitive position, including, but not limited to, contractors, subcontractors, licensees, certificate holders, grantees, experts, consultants, and government employees.

6. "Foreign Intelligence Entity": Known or suspected foreign state or non-state organizations or persons that conduct intelligence activities to acquire U.S. information, block or impair U.S. intelligence collection, influence U.S. policy, or disrupt U.S. systems and programs. The term includes foreign intelligence and security services and international terrorists.

7. "National Security Eligibility": Eligibility for access to classified information or eligibility to hold a sensitive position, to include access to sensitive compartmented information, restricted data, and controlled or special access program information.

8. "Sensitive Position": Any position within or in support of an agency in which the occupant could bring about, by virtue of the nature of the position, a material adverse effect on the national security regardless of whether the occupant has access to classified information, and regardless of whether the occupant is an employee, military service member, or contractor.

**E. POLICY:**

1. The National Security Adjudicative Guidelines in Appendix A shall be used by all authorized adjudicative agencies when rendering a determination for initial or continued eligibility for access to classified information or initial or continued eligibility to hold a sensitive position.

TIWARI_PROD_00002328

UNCLASSIFIED

2.  Appendix B sets forth statutory restrictions on agencies making certain eligibility determinations for access to classified information, as well as waiver and congressional reporting requirements.  These amendments to the IRTPA are commonly referred to as the Bond Amendment.  By definition, the risk to national security is equivalent for covered individuals with access to classified information and covered individuals occupying a sensitive position. Occupants of sensitive positions could bring about, by virtue of the nature of the position, a material adverse effect on the national security regardless of whether the occupant has access to classified information.  Due to the equivalent adverse effect on the national security and to ensure uniformity, consistency, and reciprocity of national security background investigations and adjudications, the statutory restrictions imposed by the Bond Amendment are extended to apply to all covered individuals who require initial or continued eligibility for access to classified information or eligibility to hold a sensitive position.  Authorized adjudicative agencies shall maintain a record of the number and type of meritorious waivers granted under Bond Amendment criteria, to include the rationale for each waiver, and shall report this data annually to the SecEA in advance of the annual report to Congress.  Authorized adjudicative agencies will also maintain a record of all disqualifications due to Bond Amendment criteria.

3.  Exceptions, as provided for in Appendix C, shall be used when a favorable adjudicative decision to grant initial or continued eligibility for access to classified information or to hold a sensitive position is made, despite failure to meet adjudicative or investigative standards.

4.  Eligibility shall be determined by appropriately trained adjudicative personnel through the evaluation of all information bearing on an individual's loyalty and allegiance to the United States, including any information relevant to strength of character, honesty, discretion, sound judgment, reliability, ability to protect classified or sensitive information, and trustworthiness. Eligibility for access to classified information or eligibility to occupy a sensitive position shall only be granted when the evaluation of all such information demonstrates that such eligibility is clearly consistent with the interests of the United States; any doubt shall be resolved in favor of the national security.

5.  All adjudicative determinations, including any associated exceptions, shall be recorded in either Scattered Castles, the Joint Personnel Adjudication System within the Department of Defense, or the Central Verification System database within U.S. Office of Personnel Management or successor databases, unless authorized by the SecEA to withhold information from the database for national security purposes.

6.  When an adjudicative determination is made to deny or revoke eligibility for access to classified information or eligibility to hold a sensitive position, review proceedings, to the extent they are made available in EO 12968, as amended, Part 5, shall be afforded covered individuals at a minimum.

7.  The agency with adjudicative authority remains responsible for the final determination.

8.  Agencies shall update internal policies and replace existing national security adjudicative criteria or guidelines with the guidelines in Appendix A no later than the effective date of this Directive.

3

UNCLASSIFIED

TIWARI_PROD_00002329

9.   This Directive is not intended to, and does not, create any right to administrative or judicial review, or any other right or benefit, or trust responsibility substantive or procedural, enforceable by a party against the United States, its agencies or instrumentalities, its officers or employees, or any other person.

**F.   EFFECTIVE DATE:** This Directive becomes effective 180 days after the date of signature.


_James R Clapper_
Security Executive Agent

_10 Dec 2016_
Date

4

TIWARI_PROD_00002330

UNCLASSIFIED

# APPENDIX A

## NATIONAL SECURITY ADJUDICATIVE GUIDELINES

## FOR DETERMINING ELIGIBILITY FOR ACCESS TO CLASSIFIED INFORMATION

## OR ELIGIBILITY TO HOLD A SENSITIVE POSITION

### 1. Introduction.

(a) The following National Security Adjudicative Guidelines ("guidelines") are established as the single common criteria for all U.S. Government civilian and military personnel, consultants, contractors, licensees, certificate holders or grantees and their employees, and other individuals who require initial or continued eligibility for access to classified information or eligibility to hold a sensitive position, to include access to sensitive compartmented information, restricted data, and controlled or special access program information (hereafter referred to as "national security eligibility"). These guidelines shall be used by all Executive Branch Agencies when rendering any final national security eligibility determination.

(b) National security eligibility determinations take into account a person's stability, trustworthiness, reliability, discretion, character, honesty, and judgment. Individuals must be unquestionably loyal to the United States. No amount of oversight or security procedures can replace the self-discipline and integrity of an individual entrusted to protect the nation's secrets or occupying a sensitive position. When a person's life history shows evidence of unreliability or untrustworthiness, questions arise as to whether the individual can be relied upon and trusted to exercise the responsibility necessary for working in an environment where protecting the national security is paramount.

(c) The U.S. Government does not discriminate on the basis of race, color, religion, sex, national origin, disability, or sexual orientation in making a national security eligibility determination. No negative inference concerning eligibility under these guidelines may be raised solely on the basis of mental health counseling. No adverse action concerning these guidelines may be taken solely on the basis of polygraph examination technical calls in the absence of adjudicatively significant information.

(d) In accordance with EO 12968, as amended, eligibility for covered individuals shall be granted only when facts and circumstances indicate that eligibility is clearly consistent with the national security interests of the United States, and any doubt shall be resolved in favor of national security.

5

UNCLASSIFIED

TIWARI_PROD_00002331

UNCLASSIFIED

**2. The Adjudicative Process**.

(a) The adjudicative process is an examination of a sufficient period and a careful weighing of a number of variables of an individual's life to make an affirmative determination that the individual is an acceptable security risk. This is known as the whole-person concept. All available, reliable information about the person, past and present, favorable and unfavorable, should be considered in reaching a national security eligibility determination.

(b) Each case must be judged on its own merits, and the final determination remains the responsibility of the authorized adjudicative agency. Any doubt concerning personnel being considered for national security eligibility will be resolved in favor of the national security.

(c) The ultimate determination of whether the granting or continuing of national security eligibility is clearly consistent with the interests of national security must be an overall common sense judgment based upon careful consideration of the following guidelines, each of which is to be evaluated in the context of the whole person.

    (1) GUIDELINE A: Allegiance to the United States
    (2) GUIDELINE B: Foreign Influence
    (3) GUIDELINE C: Foreign Preference
    (4) GUIDELINE D: Sexual Behavior
    (5) GUIDELINE E: Personal Conduct
    (6) GUIDELINE F: Financial Considerations
    (7) GUIDELINE G: Alcohol Consumption
    (8) GUIDELINE H: Drug Involvement and Substance Misuse
    (9) GUIDELINE I: Psychological Conditions
  (10) GUIDELINE J: Criminal Conduct
  (11) GUIDELINE K: Handling Protected Information
  (12) GUIDELINE L: Outside Activities
  (13) GUIDELINE M: Use of Information Technology

(d) In evaluating the relevance of an individual's conduct, the adjudicator should consider the following factors:

    (1) the nature, extent, and seriousness of the conduct;
    (2) the circumstances surrounding the conduct, to include knowledgeable participation;
    (3) the frequency and recency of the conduct;
    (4) the individual's age and maturity at the time of the conduct;
    (5) the extent to which participation is voluntary;
    (6) the presence or absence of rehabilitation and other permanent behavioral changes;
    (7) the motivation for the conduct;
    (8) the potential for pressure, coercion, exploitation, or duress; and
    (9) the likelihood of continuation or recurrence.

6

UNCLASSIFIED

TIWARI_PROD_00002332

(e) Although adverse information concerning a single criterion may not be sufficient for an unfavorable eligibility determination, the individual may be found ineligible if available information reflects a recent or recurring pattern of questionable judgment, irresponsibility, or unstable behavior.  However, a single criterion may be sufficient to make an unfavorable eligibility determination even in the absence of a recent occurrence or a recurring pattern. Notwithstanding the whole-person concept, pursuit of further investigation may be terminated by an appropriate adjudicative agency in the face of reliable, significant, disqualifying, adverse information.

(f) When information of security concern becomes known about an individual who is currently eligible for access to classified information or eligible to hold a sensitive position, the adjudicator should consider whether the individual:

    (1) voluntarily reported the information;
    (2) was truthful and complete in responding to questions;
    (3) sought assistance and followed professional guidance, where appropriate;
    (4) resolved or appears likely to favorably resolve the security concern;
    (5) has demonstrated positive changes in behavior; and
    (6) should have his or her national security eligibility suspended pending final adjudication of the information.

(g) If after evaluating information of security concern, the adjudicator decides the information is serious enough to warrant a recommendation of denial or revocation of the national security eligibility, but the specific risk to national security can be managed with appropriate mitigation measures, an adjudicator may recommend approval to grant initial or continued eligibility for access to classified information or to hold a sensitive position with an exception as defined in Appendix C.

(h) If after evaluating information of security concern, the adjudicator decides that the information is not serious enough to warrant a recommendation of denial or revocation of the national security eligibility, an adjudicator may recommend approval with a warning that future incidents of a similar nature or other incidents of adjudicative concern may result in revocation of national security eligibility.

(i) It must be noted that the adjudicative process is predicated upon individuals providing relevant information pertaining to their background and character for use in investigating and adjudicating their national security eligibility.  Any incident of intentional material falsification or purposeful non-cooperation with security processing is of significant concern.  Such conduct raises questions about an individual's judgment, reliability, and trustworthiness and may be predictive of their willingness or ability to protect the national security.

TIWARI_PROD_00002333

UNCLASSIFIED


# GUIDELINES

## GUIDELINE A:  ALLEGIANCE TO THE UNITED STATES

3. *The Concern*.  The willingness to safeguard classified or sensitive information is in doubt if there is any reason to suspect an individual's allegiance to the United States.  There is no positive test for allegiance, but there are negative indicators.  These include participation in or support for acts against the United States or placing the welfare or interests of another country above those of the United States.  Finally, the failure to adhere to the laws of the United States may be relevant if the violation of law is harmful to stated U.S. interests.  An individual who engages in acts against the United States or provides support or encouragement to those who do has already demonstrated willingness to compromise national security.

4. *Conditions that could raise a security concern and may be disqualifying include:*

(a) involvement in, support of, training to commit, or advocacy of any act of sabotage, espionage, treason, terrorism, or sedition against the United States;

(b) association or sympathy with persons who are attempting to commit, or who are committing, any of the above acts; and

(c) association or sympathy with persons or organizations that advocate, threaten, or use force or violence, or use any other illegal or unconstitutional means, in an effort to:

> (1) overthrow or influence the U.S. Government or any state or local government;
> (2) prevent Federal, state, or local government personnel from performing their official duties;
> (3) gain retribution for perceived wrongs caused by the Federal, state, or local government; and
> (4) prevent others from exercising their rights under the Constitution or laws of the United States or of any state.

5. *Conditions that could mitigate security concerns include:*

(a) the individual was unaware of the unlawful aims of the individual or organization and severed ties upon learning of these;

(b) the individual's involvement was humanitarian and permitted under U.S. law;

(c) involvement in the above activities occurred for only a short period of time and was attributable to curiosity or academic interest; and

8

UNCLASSIFIED

(d) the involvement or association with such activities occurred under such unusual circumstances, or so much time has elapsed, that it is unlikely to recur and does not cast doubt on the individual's current reliability, trustworthiness, or allegiance.

## GUIDELINE B:  FOREIGN INFLUENCE

6. *The Concern.* Foreign contacts and interests, including, but not limited to, business, financial, and property interests, are a national security concern if they result in divided allegiance.  They may also be a national security concern if they create circumstances in which the individual may be manipulated or induced to help a foreign person, group, organization, or government in a way inconsistent with U.S. interests or otherwise made vulnerable to pressure or coercion by any foreign interest.  Assessment of foreign contacts and interests should consider the country in which the foreign contact or interest is located, including, but not limited to, considerations such as whether it is known to target U.S. citizens to obtain classified or sensitive information or is associated with a risk of terrorism.

7. *Conditions that could raise a security concern and may be disqualifying include:*

(a) contact, regardless of method, with a foreign family member, business or professional associate, friend, or other person who is a citizen of or resident in a foreign country if that contact creates a heightened risk of foreign exploitation, inducement, manipulation, pressure, or coercion;

(b) connections to a foreign person, group, government, or country that create a potential conflict of interest between the individual's obligation to protect classified or sensitive information or technology and the individual's desire to help a foreign person, group, or country by providing that information or technology;

(c) failure to report or fully disclose, when required, association with a foreign person, group, government, or country;

(d) counterintelligence information, whether classified or unclassified, that indicates the individual's access to classified information or eligibility for a sensitive position may involve unacceptable risk to national security;

(e) shared living quarters with a person or persons, regardless of citizenship status, if that relationship creates a heightened risk of foreign inducement, manipulation, pressure, or coercion;

(f) substantial business, financial, or property interests in a foreign country, or in any foreign-owned or foreign-operated business that could subject the individual to a heightened risk of foreign influence or exploitation or personal conflict of interest;

(g) unauthorized association with a suspected or known agent, associate, or employee of a foreign intelligence entity;

9

TIWARI_PROD_00002335

UNCLASSIFIED

(h) indications that representatives or nationals from a foreign country are acting to increase the vulnerability of the individual to possible future exploitation, inducement, manipulation, pressure, or coercion; and

(i) conduct, especially while traveling or residing outside the U.S., that may make the individual vulnerable to exploitation, pressure, or coercion by a foreign person, group, government, or country.

8. *Conditions that could mitigate security concerns include:*

(a) the nature of the relationships with foreign persons, the country in which these persons are located, or the positions or activities of those persons in that country are such that it is unlikely the individual will be placed in a position of having to choose between the interests of a foreign individual, group, organization, or government and the interests of the United States;

(b) there is no conflict of interest, either because the individual's sense of loyalty or obligation to the foreign person, or allegiance to the group, government, or country is so minimal, or the individual has such deep and longstanding relationships and loyalties in the United States, that the individual can be expected to resolve any conflict of interest in favor of the U.S. interest;

(c) contact or communication with foreign citizens is so casual and infrequent that there is little likelihood that it could create a risk for foreign influence or exploitation;

(d) the foreign contacts and activities are on U.S. Government business or are approved by the agency head or designee;

(e) the individual has promptly complied with existing agency requirements regarding the reporting of contacts, requests, or threats from persons, groups, or organizations from a foreign country; and

(f) the value or routine nature of the foreign business, financial, or property interests is such that they are unlikely to result in a conflict and could not be used effectively to influence, manipulate, or pressure the individual.

## GUIDELINE C:  FOREIGN PREFERENCE

9. *The Concern.*  When an individual acts in such a way as to indicate a preference for a foreign country over the United States, then he or she may provide information or make decisions that are harmful to the interests of the United States.  Foreign involvement raises concerns about an individual's judgment, reliability, and trustworthiness when it is in conflict with U.S. national interests or when the individual acts to conceal it.  *By itself,* the fact that a U.S. citizen is also a citizen of another country is not disqualifying without an objective showing of such conflict or attempt at concealment.  The same is true for a U.S. citizen's exercise of any right or privilege of foreign citizenship and any action to acquire or obtain recognition of a foreign citizenship.

10. *Conditions that could raise a security concern and may be disqualifying include:*

10

UNCLASSIFIED

TIWARI_PROD_00002336

UNCLASSIFIED

(a) applying for and/or acquiring citizenship in any other country;

(b) failure to report, or fully disclose when required, to an appropriate security official, the possession of a passport or identity card issued by any country other than the United States;

(c) failure to use a U.S. passport when entering or exiting the U.S.;

(d) participation in foreign activities, including but not limited to:

> (1) assuming or attempting to assume any type of employment, position, or political office in a foreign government or military organization; and
> (2) otherwise acting to serve the interests of a foreign person, group, organization, or government in any way that conflicts with U.S. national security interests;

(e) using foreign citizenship to protect financial or business interests in another country in violation of U.S. law; and

(f) an act of expatriation from the United States such as declaration of intent to renounce U.S. citizenship, whether through words or actions.

11. *Conditions that could mitigate security concerns include:*

(a) the foreign citizenship is not in conflict with U.S. national security interests;

(b) dual citizenship is based solely on parental citizenship or birth in a foreign country, and there is no evidence of foreign preference;

(c) the individual has expressed a willingness to renounce the foreign citizenship that is in conflict with U.S. national security interests;

(d) the exercise of the rights, privileges, or obligations of foreign citizenship occurred before the individual became a U.S. citizen;

(e) the exercise of the entitlements or benefits of foreign citizenship do not present a national security concern;

(f) the foreign preference, if detected, involves a foreign country, entity, or association that poses a low national security risk;

(g) civil employment or military service was authorized under U.S. law, or the employment or service was otherwise consented to as required by U.S. law; and

(h) any potentially disqualifying activity took place after receiving the approval by the agency head or designee.

11

UNCLASSIFIED

TIWARI_PROD_00002337

UNCLASSIFIED

## GUIDELINE D:  SEXUAL BEHAVIOR

12. *The Concern.*  Sexual behavior that involves a criminal offense; reflects a lack of judgment or discretion; or may subject the individual to undue influence of coercion, exploitation, or duress. These issues, together or individually, may raise questions about an individual's judgment, reliability, trustworthiness, and ability to protect classified or sensitive information. Sexual behavior includes conduct occurring in person or via audio, visual, electronic, or written transmission.  No adverse inference concerning the standards in this Guideline may be raised solely on the basis of the sexual orientation of the individual.

13. *Conditions that could raise a security concern and may be disqualifying include:*

(a) sexual behavior of a criminal nature, whether or not the individual has been prosecuted;

(b) a pattern of compulsive, self-destructive, or high-risk sexual behavior that the individual is unable to stop;

(c) sexual behavior that causes an individual to be vulnerable to coercion, exploitation, or duress; and

(d) sexual behavior of a public nature or that reflects lack of discretion or judgment.

14. *Conditions that could mitigate security concerns include:*

(a) the behavior occurred prior to or during adolescence and there is no evidence of subsequent conduct of a similar nature;

(b) the sexual behavior happened so long ago, so infrequently, or under such unusual circumstances, that it is unlikely to recur and does not cast doubt on the individual's current reliability, trustworthiness, or judgment;

(c) the behavior no longer serves as a basis for coercion, exploitation, or duress;

(d) the sexual behavior is strictly private, consensual, and discreet; and

(e) the individual has successfully completed an appropriate program of treatment, or is currently enrolled in one, has demonstrated ongoing and consistent compliance with the treatment plan, and/or has received a favorable prognosis from a qualified mental health professional indicating the behavior is readily controllable with treatment.

## GUIDELINE E:  PERSONAL CONDUCT

15. *The Concern.*  Conduct involving questionable judgment, lack of candor, dishonesty, or unwillingness to comply with rules and regulations can raise questions about an individual's

UNCLASSIFIED

TIWARI_PROD_00002338

reliability, trustworthiness, and ability to protect classified or sensitive information. Of special interest is any failure to cooperate or provide truthful and candid answers during national security investigative or adjudicative processes. The following will normally result in an unfavorable national security eligibility determination, security clearance action, or cancellation of further processing for national security eligibility:

(a) refusal, or failure without reasonable cause, to undergo or cooperate with security processing, including but not limited to meeting with a security investigator for subject interview, completing security forms or releases, cooperation with medical or psychological evaluation, or polygraph examination, if authorized and required; and

(b) refusal to provide full, frank, and truthful answers to lawful questions of investigators, security officials, or other official representatives in connection with a personnel security or trustworthiness determination.

16. *Conditions that could raise a security concern and may be disqualifying include:*

(a) deliberate omission, concealment, or falsification of relevant facts from any personnel security questionnaire, personal history statement, or similar form used to conduct investigations, determine employment qualifications, award benefits or status, determine national security eligibility or trustworthiness, or award fiduciary responsibilities;

(b) deliberately providing false or misleading information; or concealing or omitting information, concerning relevant facts to an employer, investigator, security official, competent medical or mental health professional involved in making a recommendation relevant to a national security eligibility determination, or other official government representative;

(c) credible adverse information in several adjudicative issue areas that is not sufficient for an adverse determination under any other single guideline, but which, when considered as a whole, supports a whole-person assessment of questionable judgment, untrustworthiness, unreliability, lack of candor, unwillingness to comply with rules and regulations, or other characteristics indicating that the individual may not properly safeguard classified or sensitive information;

(d) credible adverse information that is not explicitly covered under any other guideline and may not be sufficient by itself for an adverse determination, but which, when combined with all available information, supports a whole-person assessment of questionable judgment, untrustworthiness, unreliability, lack of candor, unwillingness to comply with rules and regulations, or other characteristics indicating that the individual may not properly safeguard classified or sensitive information. This includes, but is not limited to, consideration of:

    (1) untrustworthy or unreliable behavior to include breach of client confidentiality, release of proprietary information, unauthorized release of sensitive corporate or government protected information;
    (2) any disruptive, violent, or other inappropriate behavior;

13

TIWARI_PROD_00002339

(3) a pattern of dishonesty or rule violations; and
(4) evidence of significant misuse of Government or other employer's time or resources;

(e) personal conduct, or concealment of information about one's conduct, that creates a vulnerability to exploitation, manipulation, or duress by a foreign intelligence entity or other individual or group. Such conduct includes:

(1) engaging in activities which, if known, could affect the person's personal, professional, or community standing;
(2) while in another country, engaging in any activity that is illegal in that country;
(3) while in another country, engaging in any activity that, while legal there, is illegal in the United States;

(f) violation of a written or recorded commitment made by the individual to the employer as a condition of employment; and

(g) association with persons involved in criminal activity.

17. *Conditions that could mitigate security concerns include:*

(a) the individual made prompt, good-faith efforts to correct the omission, concealment, or falsification before being confronted with the facts;

(b) the refusal or failure to cooperate, omission, or concealment was caused or significantly contributed to by advice of legal counsel or of a person with professional responsibilities for advising or instructing the individual specifically concerning security processes.  Upon being made aware of the requirement to cooperate or provide the information, the individual cooperated fully and truthfully;

(c) the offense is so minor, or so much time has passed, or the behavior is so infrequent, or it happened under such unique circumstances that it is unlikely to recur and does not cast doubt on the individual's reliability, trustworthiness, or good judgment;

(d) the individual has acknowledged the behavior and obtained counseling to change the behavior or taken other positive steps to alleviate the stressors, circumstances, or factors that contributed to untrustworthy, unreliable, or other inappropriate behavior, and such behavior is unlikely to recur;

(e) the individual has taken positive steps to reduce or eliminate vulnerability to exploitation, manipulation, or duress;

(f) the information was unsubstantiated or from a source of questionable reliability; and

14

TIWARI_PROD_00002340

(g) association with persons involved in criminal activities was unwitting, has ceased, or occurs under circumstances that do not cast doubt upon the individual's reliability, trustworthiness, judgment, or willingness to comply with rules and regulations.

## GUIDELINE F:  FINANCIAL CONSIDERATIONS

18. *The Concern.*  Failure to live within one's means, satisfy debts, and meet financial obligations may indicate poor self-control, lack of judgment, or unwillingness to abide by rules and regulations, all of which can raise questions about an individual's reliability, trustworthiness, and ability to protect classified or sensitive information.  Financial distress can also be caused or exacerbated by, and thus can be a possible indicator of, other issues of personnel security concern such as excessive gambling, mental health conditions, substance misuse, or alcohol abuse or dependence.  An individual who is financially overextended is at greater risk of having to engage in illegal or otherwise questionable acts to generate funds.  Affluence that cannot be explained by known sources of income is also a security concern insofar as it may result from criminal activity, including espionage.

19. *Conditions that could raise a security concern and may be disqualifying include:*

(a) inability to satisfy debts;

(b) unwillingness to satisfy debts regardless of the ability to do so;

(c) a history of not meeting financial obligations;

(d) deceptive or illegal financial practices such as embezzlement, employee theft, check fraud, expense account fraud, mortgage fraud, filing deceptive loan statements and other intentional financial breaches of trust;

(e) consistent spending beyond one's means or frivolous or irresponsible spending, which may be indicated by excessive indebtedness, significant negative cash flow, a history of late payments or of non-payment, or other negative financial indicators;

(f) failure to file or fraudulently filing annual Federal, state, or local income tax returns or failure to pay annual Federal, state, or local income tax as required;

(g) unexplained affluence, as shown by a lifestyle or standard of living, increase in net worth, or money transfers that are inconsistent with known legal sources of income;

(h) borrowing money or engaging in significant financial transactions to fund gambling or pay gambling debts; and

(i) concealing gambling losses, family conflict, or other problems caused by gambling.

15

TIWARI_PROD_00002341

UNCLASSIFIED

20. *Conditions that could mitigate security concerns include:*

(a) the behavior happened so long ago, was so infrequent, or occurred under such circumstances that it is unlikely to recur and does not cast doubt on the individual's current reliability, trustworthiness, or good judgment;

(b) the conditions that resulted in the financial problem were largely beyond the person's control (e.g., loss of employment, a business downturn, unexpected medical emergency, a death, divorce or separation, clear victimization by predatory lending practices, or identity theft), and the individual acted responsibly under the circumstances;

(c) the individual has received or is receiving financial counseling for the problem from a legitimate and credible source, such as a non-profit credit counseling service, and there are clear indications that the problem is being resolved or is under control;

(d) the individual initiated and is adhering to a good-faith effort to repay overdue creditors or otherwise resolve debts;

(e) the individual has a reasonable basis to dispute the legitimacy of the past-due debt which is the cause of the problem and provides documented proof to substantiate the basis of the dispute or provides evidence of actions to resolve the issue;

(f) the affluence resulted from a legal source of income; and

(g) the individual has made arrangements with the appropriate tax authority to file or pay the amount owed and is in compliance with those arrangements.

## GUIDELINE G:  ALCOHOL CONSUMPTION

21. *The Concern.*  Excessive alcohol consumption often leads to the exercise of questionable judgment or the failure to control impulses, and can raise questions about an individual's reliability and trustworthiness.

22. *Conditions that could raise a security concern and may be disqualifying include:*

(a) alcohol-related incidents away from work, such as driving while under the influence, fighting, child or spouse abuse, disturbing the peace, or other incidents of concern, regardless of the frequency of the individual's alcohol use or whether the individual has been diagnosed with alcohol use disorder;

(b) alcohol-related incidents at work, such as reporting for work or duty in an intoxicated or impaired condition, drinking on the job, or jeopardizing the welfare and safety of others, regardless of whether the individual is diagnosed with alcohol use disorder;

16

UNCLASSIFIED

TIWARI_PROD_00002342

(c) habitual or binge consumption of alcohol to the point of impaired judgment, regardless of whether the individual is diagnosed with alcohol use disorder;

(d) diagnosis by a duly qualified medical or mental health professional (e.g., physician, clinical psychologist, psychiatrist, or licensed clinical social worker) of alcohol use disorder;

(e) the failure to follow treatment advice once diagnosed;

(f) alcohol consumption, which is not in accordance with treatment recommendations, after a diagnosis of alcohol use disorder; and

(g) failure to follow any court order regarding alcohol education, evaluation, treatment, or abstinence.

23. *Conditions that could mitigate security concerns include:*

(a) so much time has passed, or the behavior was so infrequent, or it happened under such unusual circumstances that it is unlikely to recur or does not cast doubt on the individual's current reliability, trustworthiness, or judgment;

(b) the individual acknowledges his or her pattern of maladaptive alcohol use, provides evidence of actions taken to overcome this problem, and has demonstrated a clear and established pattern of modified consumption or abstinence in accordance with treatment recommendations;

(c) the individual is participating in counseling or a treatment program, has no previous history of treatment and relapse, and is making satisfactory progress in a treatment program; and

(d) the individual has successfully completed a treatment program along with any required aftercare, and has demonstrated a clear and established pattern of modified consumption or abstinence in accordance with treatment recommendations.

## GUIDELINE H:  DRUG INVOLVEMENT[1] AND SUBSTANCE MISUSE

24. *The Concern.*  The illegal use of controlled substances, to include the misuse of prescription and non-prescription drugs, and the use of other substances that cause physical or mental impairment or are used in a manner inconsistent with their intended purpose can raise questions about an individual's reliability and trustworthiness, both because such behavior may lead to physical or psychological impairment and because it raises questions about a person's ability or willingness to comply with laws, rules, and regulations.  *Controlled substance* means any

---

[1] Reference Appendix B of this document regarding statutory requirements contained in Public Law 110-118 (Bond Amendment) applicable to this guideline.

17

TIWARI_PROD_00002343

"controlled substance" as defined in 21 U.S.C. 802. *Substance misuse* is the generic term adopted in this guideline to describe any of the behaviors listed above.

25. *Conditions that could raise a security concern and may be disqualifying include:*

(a) any substance misuse (see above definition);

(b) testing positive for an illegal drug;

(c) illegal possession of a controlled substance, including cultivation, processing, manufacture, purchase, sale, or distribution; or possession of drug paraphernalia;

(d) diagnosis by a duly qualified medical or mental health professional (e.g., physician, clinical psychologist, psychiatrist, or licensed clinical social worker) of substance use disorder;

(e) failure to successfully complete a drug treatment program prescribed by a duly qualified medical or mental health professional;

(f) any illegal drug use while granted access to classified information or holding a sensitive position; and

(g) expressed intent to continue drug involvement and substance misuse, or failure to clearly and convincingly commit to discontinue such misuse.

26. *Conditions that could mitigate security concerns include:*

(a) the behavior happened so long ago, was so infrequent, or happened under such circumstances that it is unlikely to recur or does not cast doubt on the individual's current reliability, trustworthiness, or good judgment;

(b) the individual acknowledges his or her drug involvement and substance misuse, provides evidence of actions taken to overcome this problem, and has established a pattern of abstinence, including, but not limited to:

> (1) disassociation from drug-using associates and contacts;
> (2) changing or avoiding the environment where drugs were used; and
> (3) providing a signed statement of intent to abstain from all drug involvement and substance misuse, acknowledging that any future involvement or misuse is grounds for revocation of national security eligibility;

(c) abuse of prescription drugs was after a severe or prolonged illness during which these drugs were prescribed, and abuse has since ended; and

TIWARI_PROD_00002344

(d) satisfactory completion of a prescribed drug treatment program, including, but not limited to, rehabilitation and aftercare requirements, without recurrence of abuse, and a favorable prognosis by a duly qualified medical professional.

## GUIDELINE I:  PSYCHOLOGICAL CONDITIONS[2]

27. *The Concern.*  Certain emotional, mental, and personality conditions can impair judgment, reliability, or trustworthiness.  A formal diagnosis of a disorder is not required for there to be a concern under this guideline.  A duly qualified mental health professional (e.g., clinical psychologist or psychiatrist) employed by, or acceptable to and approved by the U.S. Government, should be consulted when evaluating potentially disqualifying and mitigating information under this guideline and an opinion, including prognosis, should be sought.  No negative inference concerning the standards in this guideline may be raised solely on the basis of mental health counseling.

28. *Conditions that could raise a security concern and may be disqualifying include:*

(a) behavior that casts doubt on an individual's judgment, stability, reliability, or trustworthiness, not covered under any other guideline and that may indicate an emotional, mental, or personality condition, including, but not limited to, irresponsible, violent, self-harm, suicidal, paranoid, manipulative, impulsive, chronic lying, deceitful, exploitative, or bizarre behaviors;

(b) an opinion by a duly qualified mental health professional that the individual has a condition that may impair judgment, stability, reliability, or trustworthiness;

(c) voluntary or involuntary inpatient hospitalization;

(d) failure to follow a prescribed treatment plan related to a diagnosed psychological/psychiatric condition that may impair judgment, stability, reliability, or trustworthiness, including, but not limited to, failure to take prescribed medication or failure to attend required counseling sessions; and

(e) pathological gambling, the associated behaviors of which may include unsuccessful attempts to stop gambling; gambling for increasingly higher stakes, usually in an attempt to cover losses; concealing gambling losses; borrowing or stealing money to fund gambling or pay gambling debts; and family conflict resulting from gambling.

29. *Conditions that could mitigate security concerns include:*

(a) the identified condition is readily controllable with treatment, and the individual has demonstrated ongoing and consistent compliance with the treatment plan;

---

[2] Reference Appendix B of this document regarding statutory requirements contained in Public Law 110-118 (Bond Amendment) applicable to this guideline.

TIWARI_PROD_00002345

UNCLASSIFIED

(b) the individual has voluntarily entered a counseling or treatment program for a condition that is amenable to treatment, and the individual is currently receiving counseling or treatment with a favorable prognosis by a duly qualified mental health professional;

(c) recent opinion by a duly qualified mental health professional employed by, or acceptable to and approved by, the U.S. Government that an individual's previous condition is under control or in remission, and has a low probability of recurrence or exacerbation;

(d) the past psychological/psychiatric condition was temporary, the situation has been resolved, and the individual no longer shows indications of emotional instability;

(e) there is no indication of a current problem.

## GUIDELINE J:  CRIMINAL CONDUCT[3]

30. *The Concern.*  Criminal activity creates doubt about a person's judgment, reliability, and trustworthiness.  By its very nature, it calls into question a person's ability or willingness to comply with laws, rules, and regulations.

31. *Conditions that could raise a security concern and may be disqualifying include:*

(a) a pattern of minor offenses, any one of which on its own would be unlikely to affect a national security eligibility decision, but which in combination cast doubt on the individual's judgment, reliability, or trustworthiness;

(b) evidence (including, but not limited to, a credible allegation, an admission, and matters of official record) of criminal conduct, regardless of whether the individual was formally charged, prosecuted, or convicted;

(c) individual is currently on parole or probation;

(d) violation or revocation of parole or probation, or failure to complete a court-mandated rehabilitation program; and

(e) discharge or dismissal from the Armed Forces for reasons less than "Honorable."

32. *Conditions that could mitigate security concerns include:*

(a) so much time has elapsed since the criminal behavior happened, or it happened under such unusual circumstances, that it is unlikely to recur and does not cast doubt on the individual's reliability, trustworthiness, or good judgment;

---

[3] Reference Appendix B of this document regarding statutory requirements contained in Public Law 110-118 (Bond Amendment) applicable to this guideline.

20

UNCLASSIFIED

TIWARI_PROD_00002346

UNCLASSIFIED

(b) the individual was pressured or coerced into committing the act and those pressures are no longer present in the person's life;

(c) no reliable evidence to support that the individual committed the offense; and

(d) there is evidence of successful rehabilitation; including, but not limited to, the passage of time without recurrence of criminal activity, restitution, compliance with the terms of parole or probation, job training or higher education, good employment record, or constructive community involvement.

## GUIDELINE K:  HANDLING PROTECTED INFORMATION

33. *The Concern.*  Deliberate or negligent failure to comply with rules and regulations for handling protected information—which includes classified and other sensitive government information, and proprietary information—raises doubt about an individual's trustworthiness, judgment, reliability, or willingness and ability to safeguard such information, and is a serious security concern.

34. *Conditions that could raise a security concern and may be disqualifying include:*

(a) deliberate or negligent disclosure of protected information to unauthorized persons, including, but not limited to, personal or business contacts, the media, or persons present at seminars, meetings, or conferences;

(b) collecting or storing protected information in any unauthorized location;

(c) loading, drafting, editing, modifying, storing, transmitting, or otherwise handling protected information, including images, on any unauthorized equipment or medium;
(d) inappropriate efforts to obtain or view protected information outside one's need to know;

(e) copying or modifying protected information in an unauthorized manner designed to conceal or remove classification or other document control markings;

(f) viewing or downloading information from a secure system when the information is beyond the individual's need-to-know;

(g) any failure to comply with rules for the protection of classified or sensitive information;

(h) negligence or lax security practices that persist despite counseling by management; and

(i) failure to comply with rules or regulations that results in damage to the national security, regardless of whether it was deliberate or negligent.

35. *Conditions that could mitigate security concerns include:*

21

UNCLASSIFIED

TIWARI_PROD_00002347

UNCLASSIFIED

(a) so much time has elapsed since the behavior, or it has happened so infrequently or under such unusual circumstances, that it is unlikely to recur and does not cast doubt on the individual's current reliability, trustworthiness, or good judgment;

(b) the individual responded favorably to counseling or remedial security training and now demonstrates a positive attitude toward the discharge of security responsibilities;

(c) the security violations were due to improper or inadequate training or unclear instructions; and

(d) the violation was inadvertent, it was promptly reported, there is no evidence of compromise, and it does not suggest a pattern.

## GUIDELINE L:  OUTSIDE ACTIVITIES

36. *The Concern.*  Involvement in certain types of outside employment or activities is of security concern if it poses a conflict of interest with an individual's security responsibilities and could create an increased risk of unauthorized disclosure of classified or sensitive information.

37. *Conditions that could raise a security concern and may be disqualifying include:*

(a) any employment or service, whether compensated or volunteer, with:

    (1) the government of a foreign country;
    (2) any foreign national, organization, or other entity;
    (3) a representative of any foreign interest; and
    (4) any foreign, domestic, or international organization or person engaged in analysis, discussion, or publication of material on intelligence, defense, foreign affairs, or protected technology; and

(b) failure to report or fully disclose an outside activity when this is required.

38. *Conditions that could mitigate security concerns include:*

(a) evaluation of the outside employment or activity by the appropriate security or counterintelligence office indicates that it does not pose a conflict with an individual's security responsibilities or with the national security interests of the United States; and

(b) the individual terminated the employment or discontinued the activity upon being notified that it was in conflict with his or her security responsibilities.

UNCLASSIFIED

TIWARI_PROD_00002348

UNCLASSIFIED

## GUIDELINE M:  USE OF INFORMATION TECHNOLOGY

39. *The Concern.*  Failure to comply with rules, procedures, guidelines, or regulations pertaining to information technology systems may raise security concerns about an individual's reliability and trustworthiness, calling into question the willingness or ability to properly protect sensitive systems, networks, and information.  Information Technology includes any computer-based, mobile, or wireless device used to create, store, access, process, manipulate, protect, or move information.  This includes any component, whether integrated into a larger system or not, such as hardware, software, or firmware, used to enable or facilitate these operations.

40. *Conditions that could raise a security concern and may be disqualifying include:*

(a) unauthorized entry into any information technology system;

(b) unauthorized modification, destruction, or manipulation of, or denial of access to, an information technology system or any data in such a system;

(c) use of any information technology system to gain unauthorized access to another system or to a compartmented area within the same system;

(d) downloading, storing, or transmitting classified, sensitive, proprietary, or other protected information on or to any unauthorized information technology system;

(e) unauthorized use of any information technology system;

(f) introduction, removal, or duplication of hardware, firmware, software, or media to or from any information technology system when prohibited by rules, procedures, guidelines, or regulations or when otherwise not authorized;

(g) negligence or lax security practices in handling information technology that persists despite counseling by management; and

(h) any misuse of information technology, whether deliberate or negligent, that results in damage to the national security.

41. *Conditions that could mitigate security concerns include:*

(a) so much time has elapsed since the behavior happened, or it happened under such unusual circumstances, that it is unlikely to recur and does not cast doubt on the individual's reliability, trustworthiness, or good judgment;

(b) the misuse was minor and done solely in the interest of organizational efficiency and effectiveness;

23

UNCLASSIFIED

TIWARI_PROD_00002349

(c) the conduct was unintentional or inadvertent and was followed by a prompt, good-faith effort to correct the situation and by notification to appropriate personnel; and

(d) the misuse was due to improper or inadequate training or unclear instructions.

24

TIWARI_PROD_00002350

UNCLASSIFIED

# APPENDIX B

### BOND AMENDMENT GUIDANCE

On 28 January 2008, Congress amended the IRTPA of 2004, adding statutory restrictions on certain eligibility determinations and establishing waiver and congressional reporting requirements. These modifications are collectively referred to as the "Bond Amendments" and were made effective on 1 January 2008.[4] For the reasons identified in paragraph E.2 above, application of the Bond Amendment's statutory restrictions will be applied to all adjudications covered under this Directive.

1. **PROHIBITION**: Heads of agencies are prohibited from granting or renewing national security eligibility for any covered individual who is an unlawful user of a controlled substance or is an addict as defined below. If an authorized adjudicative agency has a case pending review that involves an unlawful user of a controlled substance or an addict, the statutory prohibition must be applied and the individual will receive the agency's established administrative review procedures. A meritorious waiver may not be authorized with reference to this prohibition. For purposes of this prohibition:

(a) an "addict" is any individual who habitually uses any narcotic drug so as to endanger the public morals, health, safety, or welfare; or is so far addicted to the use of narcotic drugs as to have lost the power of self-control with reference to his addiction.

(b) a "controlled substance" means any "controlled substance" as defined in 21 USC 802.

2. **DISQUALIFICATION**: The Bond Amendment also contains disqualification provisions which apply only to those covered individuals seeking access to Sensitive Compartmented Information (SCI), Special Access Programs (SAP), or Restricted Data (RD). Heads of agencies may not grant or renew access to SCI, SAP, or RD to a covered individual who:

(a) has been convicted in any court of the U.S. of a crime, was sentenced to imprisonment for a term exceeding one year, and was incarcerated as a result of that sentence for not less than one year;

(b) has been discharged or dismissed from the Armed Forces under dishonorable conditions; or

(c) is determined to be mentally incompetent; an individual is "mentally incompetent" when he or she has been declared mentally incompetent as determined by competency proceedings conducted in a court or administrative agency with proper jurisdiction.

3. **WAIVER STANDARD AND PROCEDURES**: When a disqualifier reflected in paragraph 2(a) – (c) above exists, the adjudicator will proceed with the adjudication using the appropriate

---

[4] IRTPA of 2004 § 3002, 50 USC § 3343.

25

UNCLASSIFIED

UNCLASSIFIED

mitigation conditions found in these adjudicative guidelines.  If the adjudicator would have arrived at a favorable decision but for the Bond Amendment disqualification, a meritorious waiver may be appropriate.

(a) Meritorious waivers will be considered an "Exception" to the adjudicative guidelines and will be annotated as a "Waiver" in the adjudicative decision recorded in the appropriate databases listed in para. E.5.  Adjudicators will provide a detailed justification for the meritorious waiver in the final adjudicative report.

(b) If, after applying the appropriate mitigating factors listed in these adjudicative guidelines, a meritorious waiver is not appropriate, the SCI, SAP, or RD access will be denied or revoked with a written explanation that cites the adjudicative guidelines applied and the Bond Amendment disqualifier.  The authorized adjudicative agency's established administrative review procedures shall be followed in all such cases.

(c) Each authorized adjudicative agency shall maintain a record of the number and type of meritorious waivers granted, to include the rationale for each waiver, and shall report this data annually to the SecEA in advance of the annual report to Congress.  Authorized adjudicative agencies will also maintain a record of all disqualifications, broken down by type, due to Bond Amendment requirements.

4. Authorized adjudicative agencies often have no ability to predict whether the covered individual for whom national security eligibility determinations are being made will also require access to SCI, SAP, or RD.  Accordingly, the following guidance applies to all national security adjudicative determinations:

(a) All adjudicators will determine whether any of the Bond Amendment disqualifiers in paragraphs 2(a) – (c) apply to the case being adjudicated.

(b) If a disqualifier exists, adjudicators shall annotate that fact in one of the databases identified in paragraph E.5 to ensure that any subsequent requests for access to SCI, SAP, or RD for the individual will undergo appropriate re-adjudication and waiver procedures in meritorious cases.

26

UNCLASSIFIED

TIWARI_PROD_00002352

UNCLASSIFIED

# APPENDIX C

## EXCEPTIONS

Exceptions are an adjudicative decision to grant initial or continued eligibility for access to classified information or to hold a sensitive position despite failure to meet the full adjudicative or investigative standards. The authorized exceptions are defined below and supersede the definitions in Office of Management and Budget memorandum, *Reciprocal Recognition of Existing Personnel Security Clearances*, 14 November 2007.

Waiver (W):      Eligibility granted or continued despite the presence of substantial issue information that would normally preclude eligibility. Approval authorities may approve a waiver only when the benefit of initial or continued eligibility clearly outweighs any security concerns. A waiver may also require conditions for eligibility as described below.

Condition (C):      Eligibility granted or continued, despite the presence of issue information that can be partially but not completely mitigated, with the provision that additional security measures shall be required to mitigate the issue(s). Such measures include, but are not limited to, additional security monitoring, access restrictions, submission of periodic financial statements, or attendance at counseling sessions.

Deviation (D):      Eligibility granted or continued despite either a significant gap in coverage or scope of the investigation. "Significant gap" for this purpose means either complete lack of coverage for a period of six months or longer within the most recent five years investigated or the lack of one or more relevant investigative scope components (e.g., employment checks, financial review, or a subject interview) in its entirety.

Out of Scope (O):      Reinvestigation is overdue.

27

UNCLASSIFIED

TIWARI_PROD_00002353

# SMITH DECLARATION

# EXHIBIT 3



**DEPUTY SECRETARY OF DEFENSE**
1010 DEFENSE PENTAGON
WASHINGTON, DC 20301-1010

AUG 1 7 2010

MEMORANDUM FOR SECRETARIES OF THE MILITARY DEPARTMENTS

SUBJECT:  Two-Year Extension of Military Accessions Vital to National Interest
(MAVNI) Pilot Program

The MAVNI pilot program is extended to December 31, 2011.  It appears that the early results from the pilot program are promising and that this timely initiative may yield needed improvements in the areas of health care and specific language/associated culture capabilities required to sustain effective military operations.  In light of recent events, the MAVNI program requires additional security reviews to assure the safety and security of our personnel, equipment and operations.  Services may extend the MAVNI pilot program provided that all MAVNI applicants are subjected to a Single Scope Background Investigation, and each Service establishes a comprehensive counterintelligence-focused security review and monitoring program for MAVNI recruits.  Each Service shall submit a security review and monitoring plan to the Office of the Under Secretary of Defense for Intelligence for review and approval within 60 days of this memo.  These measures shall also be applied to all Accessions that have been recruited under the MAVNI pilot program to date.

As in the first year of the pilot program, the application of this limited authority under title 10, U.S. Code, §504(b)(2), is contingent upon a case-by-case determination that each such enlistment is vital to the national interest.  Your exercise of this authority regarding health care professionals shall be limited to those holding medical specialties for which a Service has a critical shortfall.  The recruitment of persons with special language and associated cultural backgrounds shall be limited to those with qualifications necessary for present and future military operations, and for which the Department currently has a critical shortfall.  Persons enlisted under this program may be screened and identified for special operations and special operations support career fields eligibility and, if eligible, assignment priority shall be to such a unit.  Persons under this program shall not be assigned to career fields that require security clearances at the time of enlistment.  MAVNI recruits shall not be considered for security clearances or for positions within the intelligence community until they have served in the military and lived within the U.S. for a sufficient time period whereby a thorough background investigation and monitoring can be conducted.  The attachments provide further guidance regarding eligibility for participation in this pilot program.





OSD 04464-10

As stated, pilot authority under this program shall continue through December, 2011, with annual authorizations as stated in Attachment 1. The Under Secretary of Defense for Personnel and Readiness shall develop guidelines to ensure that each of you and interested parties external to the Department remain abreast of program execution.

Attachments:
As stated

cc:
CJCS
USD(P)
USD(P&R)

2

TIWARI_PROD_00001419

**Attachment 1**
**Annual MAVNI Maximum Accessions:**

- Army – 1,000 (Health Care Professionals and Enlisted with Language/Culture)

- Navy – 250 (Health Care Professionals and Enlisted with Language/Culture)

- Marine Corps – 125 (Enlisted with Language/Culture only)

- Air Force – 125 (Health Care Professionals and Enlisted with Language/Culture)

Secretaries of the Military Departments shall determine the distribution of the authorizations between health care professionals and enlistments of persons with specific language/associated culture capabilities, with health care professionals comprising at least 10 percent of all accessions for Army and Navy. At least one half of enlistments of persons with language skills must be at least level 2 on all modalities tested.

**Attachment 2**
**Program Eligibility**

**Overall Eligibility:**

1. The alien must be in one of the following categories at time of enlistment

   a. asylee, refugee, Temporary Protected Status, or
   b. nonimmigrant categories E, F, H, I, J, K, L, M, O, P, Q, R, S, T, TC, TD, TN, U, or V.

2. The alien must have been in valid status in one of those categories for at least the 2 years immediately prior to the enlistment date, but it does not have to be the same category as the one held on the date of enlistment.

3. An alien who may be eligible on the basis of a nonimmigrant category at time of enlistment (see 1.b. above) must not have had any single absence from the United States of more than 90 days during the 2 year period immediately preceding the date of enlistment.

4. An applicant who is eligible under 1-3 above is not rendered ineligible by virtue of having a pending application for adjustment of status to lawful permanent residence. In the specific case of an alien with H nonimmigrant status at the time of filing a pending application for adjustment of status who has lost such status while his or her application for adjustment was pending, and who is otherwise eligible for enlistment under the MAVNI program, the military Service may on a case by case basis waive the requirement that the alien be in a status described in 1 above at the time of enlistment.

**Program Specific Eligibility (Services may add additional requirements)**

- **Health Care Professionals**
  - Applicants must be recruited specifically to fill medical specialties wherein the Service has a critical shortfall.
  - Applicants must meet all qualification criteria required for their medical specialty.
  - Applicants must meet the criteria required for foreign-trained DoD medical personnel recruited under other authorities.

- Applicants must demonstrate proficiency in English – reading, speaking, and listening – on a standardized test in accordance with all existing Service criteria for Commissioned Officers.

- Applicants must commit to at least three years of active duty or at least 6 years in the Selected Reserve.

- **Enlisted Individuals with Special Language and Culture Backgrounds**

  - Enlistments must be for at least four years of active duty service, and enlistees must:

    - Possess specific language with associated culture capabilities in a language critical to DoD (attachment 3), and

    - Demonstrate language proficiency at the 2/2/2 level on the Defense Language Proficiency Test or 2/2 on the Oral Proficiency Interview; or as needed for the career field, but not at less than 1+ on any modality.

TIWARI_PROD_00001422

**Attachment 3**
**Eligible Languages**

Services may recommend additional languages to meet emerging needs or request exceptions to policy for especially meritorious individual cases to the ODUSD (MPP).

| | |
|---|---|
| Albanian | Malayalam |
| Amharic | Moro |
| Arabic | Nepalese |
| Azerbaijani | Persian [Dari & Farsi] |
| Bengali | Polish |
| Burmese | Portuguese |
| Cambodian-Khmer | Punjabi |
| Cebuano | Pushtu (aka Pashto) |
| Chinese | Russian |
| Czech | Serbo-Croatian |
| French (limited to individuals possessing citizenship from an African country) | Sindhi |
| | Sinhalese |
| | Somali |
| Haitian-Creole | Swahili |
| Hausa | Tagalog |
| Hindi | Tajik |
| Hungarian | Tamil |
| Igbo | Thai |
| Indonesian | Turkish |
| Korean | Turkmen |
| Kurdish | Urdu |
| Lao | Uzbek |
| Malay | Yoruba |

TIWARI_PROD_00001423

# SMITH DECLARATION

# EXHIBIT 4



UNDER SECRETARY OF DEFENSE
5000 DEFENSE PENTAGON
WASHINGTON, DC 20301-5000

FEB 16 2012

INTELLIGENCE

MEMORANDUM FOR SECRETARIES OF THE MILITARY DEPARTMENTS

SUBJECT:  Military Accessions Vital to the National Interest (MAVNI) Program Security
Reviews and Monitoring Programs

The August 17, 2010, Deputy Secretary of Defense memorandum authorized a 2-year
extension to the MAVNI pilot program through December 31, 2011 (TAB A) and the Office of the
Under Secretary of Defense (Personnel and Readiness) is pursuing a further extension. The 2010
extension contains a number of provisions designed to strengthen the program and mitigate
potential counterintelligence (CI) and security concerns, to include initiating a single scope
background investigation (SSBI) for all MAVNI applicants. The Military Departments are
responsible for establishing comprehensive CI-focused security reviews and ongoing monitoring
programs for the length of each MAVNI recruit's enlistment in accordance with the attached
guidelines (TAB B).

As prescribed in the Deputy Secretary's memorandum, MAVNI applicants shall not be
assigned to duties that require a security clearance at the time of enlistment or induction, nor
shall they be considered for security clearances or for positions in the intelligence community
until they have served in the military and lived in the United States for a sufficient time period
whereby a thorough background investigation and monitoring can be conducted. MAVNI
participants will be eligible for Secret clearances upon meeting the following minimum
requirements in accordance with DoD 5200.2-R, Personnel Security Program:

- Attainment of U.S. citizenship.

- Favorable adjudication of an SSBI.

- Residency in the United States for 2 years prior to enlistment, plus a minimum of 1
year of military service (the military service requirement does not apply to health care
professionals commissioned under MAVNI).

- For assignment to positions in the Intelligence Community or positions requiring a
Top Secret security clearance (including access to sensitive compartmented
information), the U.S. residency requirement is 5 years, of which 2 must be in
military service. In addition to the above citizenship and investigative requirements,
MAVNI personnel requiring Top Secret security clearances may be subject to a
polygraph.

The SSBI must provide full investigative coverage if a MAVNI participant's assigned
duties include providing assistance in a military mission where the unauthorized disclosure or
manipulation of information could:  (1) jeopardize human life or safety, (2) cause grave damage
to intelligence sources and methods vital to national security, or (3) compromise technologies,



operational plans, or security procedures vital to the strategic advantage of the United States and its allies. If the SSBI reveals derogatory information that cannot be mitigated, an issue-specific polygraph examination to resolve any remaining personnel security issues may be offered to applicants, subject to their voluntary consent.

Component Senior Intelligence Officials or Combatant Commands may waive the clearance-specific residency and time in service requirements under compelling operational needs. The Military Departments and Combatant Commands will provide the Office of the Under Secretary of Defense for Intelligence a copy of all waivers granted under this authority. The original eligibility requirement of 2 years' U.S. residency for all MAVNI program applicants may not be waived. Component Senior Intelligence Officials will ensure their component's MAVNI screening and monitoring plan conforms to these guidelines prior to implementing the MAVNI program.

My point of contact for MAVNI background investigations is Mr. Steve Lewis at (703) 604-2768 or stephen.lewis@osd.mil. For CI screening and monitoring of MAVNI personnel, please contact Ms. Angela Recker at (703) 697-4853 or Angela.Recker@osd.mil.

Michael G. Vickers

Attachments:
As stated

cc:
Joint Staff
Combatant Commands

# SMITH DECLARATION

# EXHIBIT 5



PERSONNEL AND
READINESS

UNDER SECRETARY OF DEFENSE
4000 DEFENSE PENTAGON
WASHINGTON, D.C. 20301-4000

SEP 2 5 2014

MEMORANDUM FOR SECRETARY OF THE ARMY
SECRETARY OF THE NAVY
SECRETARY OF THE AIR FORCE

SUBJECT: Military Accessions Vital to National Interest Program Changes

The Military Accessions Vital to National Interest pilot program is currently set to expire on September 30, 2014. This memorandum extends the Military Accessions Vital to National Interest pilot program through the end of Fiscal Year 2016, and expands the categories of individuals who are eligible to be considered for enlistment under the Military Accessions Vital to National Interest program.

In addition to the categories of individuals specified as eligible in the Military Accessions Vital to National Interest program memorandum dated May 16, 2012, individuals who have been granted deferred action by the Department of Homeland Security pursuant to the Deferred Action for Childhood Arrivals process are now also eligible for consideration. All other eligibility criteria remain in force. The Military Departments shall review and ensure that all program guidelines have been implemented and are in effect before commencing Military Accessions Vital to National Interest recruiting programs for Fiscal Year 2015.

If a Military Service desires an increase to its previously approved maximum number of accessions under this program, a written request should be submitted to the Under Secretary of Defense for Personnel and Readiness.

Jessica L. Wright

cc:
Chairman of the Joint Chiefs of Staff
Chief of the National Guard Bureau
Assistant Secretary of the Army for
    Manpower and Reserve Affairs
Assistant Secretary of the Navy for
    Manpower and Reserve Affairs
Assistant Secretary of the Air Force for
    Manpower and Reserve Affairs

# SMITH DECLARATION

# EXHIBIT 6



DEPARTMENT OF THE ARMY
OFFICE OF THE ASSISTANT SECRETARY
MANPOWER AND RESERVE AFFAIRS
111 ARMY PENTAGON
WASHINGTON, DC 20310-0111

SAMR

6 JAN 2017

MEMORANDUM FOR

Deputy Chief of Staff, G-1, 300 Army Pentagon, Washington, DC 20310-0300

Deputy Chief of Staff, G-2, 1000 Army Pentagon, Washington, DC 20310-1000

SUBJECT: Authority to Reinstate the Military Accessions Vital to the National Interest Pilot Program

1. References:

    a. Memorandum, Under Secretary of Defense (Personnel and Readiness), 30 September 2016, subject: Military Accessions Vital to the National Interest Pilot Program Extension.

    b. Memorandum, Under Secretary of Defense (Personnel and Readiness), 30 September 2016, subject: Military Accessions Vital to the National Interest Pilot Program.

2. In accordance with reference, 1a, I hereby authorize the Deputy Chief of Staff (DCS), G-1 to reinstate the Military Accessions Vital to the National Interest (MAVNI) program for 2017 only after the currently enlisted MAVNI population (in the: permanent party, training base, and Delayed Entry Pool) have received the required background investigations and have received a favorably adjudicated suitability determination or have initiated the separation process. This authority will expire on 30 September 2017 unless rescinded earlier.

3. Additionally, per reference 1a, the DCS G-2 must ensure that all individuals who enlisted via the MAVNI program are subjected to continuous monitoring (annual NIAC check) throughout their period of service.

4. Until such time as the DCS G-1 has notified me, in writing, that all individuals who enlisted via the MAVNI program prior to 30 September 2016 have received a favorable military suitability determination or have initiated the separation process; and the DCS G-2 has notified me, in writing, that continuous monitoring is underway; no new MAVNI enlistments are authorized.

5. All MAVNI applicants must submit to a National Intelligence Agency Check (NIAC), a Tier 3 (formerly National Agency Check with Law and Credit) or Tier 5 (formerly Single Scope Background Investigation) Personnel Security Investigation (as applicable), completion of a Counterintelligence (CI) - Security Interview, a polygraph examination as applicable and a favorable military suitability recommendation rendered by the DoD Consolidated Adjudications Facility (DoD CAF).

TIWARI_PROD_00000986

SAMR
SUBJECT: Authority to Reinstate the Military Accessions Vital to the National Interest Pilot
Program

6. In accordance with reference, 1b, in order to remain eligible to ship to basic training, all
MAVNI applicants must remain in a valid immigration status until they enter active duty or
active duty for training.

7. I direct that Soldiers who do not receive a favorable NIAC result or a favorable military
suitability determination from their background investigation (Tier 3 or Tier 5) be processed
for separation IAW AR 625-200 or AR 135-178. Additionally, if a Soldier is determined to be
unfit for citizenship by the United States Citizenship and Immigration Service (USCIS), the
Soldier will be processed for separation. I further direct that any Soldier discharged under
these authorities receive a Re-Entry (RE) code of 4.

8. MAVNI enlistees must receive favorable NIAC results and a favorable military suitability
determination before being authorized to ship to Basic Training. Exceptions are not
authorized except through written authorization by the Deputy Assistant Secretary of the
Army (Military Personnel/Quality of Life) (DASA-MPQ).

9. MAVNI enlistees (excluding HCPs and Chaplains) are ineligible to reclassify, apply for
officer producing programs or positions/programs that require a security clearance during
their initial term of enlistment. For purposes of reenlistment into a Military Occupational
Specialty requiring a security clearance or access, individuals must have a favorably
adjudicated Tier 3 or Tier 5 background investigation rendered by the DoD CAF, a completed
CI-Security Interview and favorable annual continuous monitoring results. Exceptions to
reclassify are not authorized except through written approval by the Deputy Assistant
Secretary of the Army (Military Personnel/Quality of Life) (DASA-MPQ).

10. The DCS G-1 and DCS G-2 will factor in associated costs for screening, background
investigations and CI-Security Interviews into their annual budget. Ensure that the Army
Budget Office is informed of all associated costs.

11. The DCS G-1 is required to submit a quarterly report, as well as an annual report NLT 30
September each year, through the DASA MPQ, to this office that addresses the following:
 • Annual MAVNI accession numbers by language and MOS.
 • Number of MAVNI applicants who failed to receive favorable adjudication
 • Results of the Army's continuous monitoring program (separate report may be
required due to potentially sensitive material).
 • A consolidated list that contains: Name, DoD ID number, job title, unit of assignment,
country of origin, native language, and security clearance classification if any.

12. Point of contact for this action is Mr. Lin H. St. Clair, linden.h.stclair.civ@mail.mil or 703-
695-4423.

DEBRA S. WADA

2

TIWARI_PROD_00000987

# SMITH DECLARATION

# EXHIBIT 7



**OFFICE OF THE UNDER SECRETARY OF DEFENSE**
4000 DEFENSE PENTAGON
WASHINGTON, D.C. 20301-4000

PERSONNEL AND
READINESS

APR  5 2017

MEMORANDUM FOR DIRECTOR, DEPARTMENT OF DEFENSE CONSOLIDATED
ADJUDICATIONS FACILITY

SUBJECT:  Military Accessions Vital to the National Interest Pilot Program Suitability

In order to facilitate process efficiency and the appropriate sharing of information for risk based suitability decisions for the accession of individuals under the Military Accessions Vital to the National Interest (MAVNI) pilot program, we request, in coordination with the Under Secretary of Defense for Intelligence (USD(I)), that the Department of Defense Consolidated Adjudications Facility (DoD CAF) take the following actions:

a. Following the completion of the MAVNI screening procedures outlined in the September 30, 2016, Under Secretary of Defense for Personnel and Readiness memorandum, "Military Accessions Vital to the National Interest Pilot Program Extension," the DoD CAF will apply the thirteen Adjudicative Guidelines, which are generally used for determining eligibility for access to classified information in USD(I) memorandum dated August 30, 2006, "Implementation of Adjudicative Guidelines for Determining Eligibility for Access to Classified Information," in lieu of the military service standard outlined in DoD 5200.2-R, "DoD Personnel Security Program," to inform the sponsoring command's MAVNI suitability determination. The sponsoring command will also consider the standards outlined in Department of Defense Instruction (DoDI) 1304.26, "Qualification Standards for Enlistment, Appointment, and Induction," in rendering its determination.

b. To clarify the DoD CAF decision is for MAVNI suitability purposes and not for the purpose of a national security determination, the DoD CAF will enter a "No Determination Made" or "NDM" in the Joint Personnel Adjudication System in the national security determination field.  The DoD CAF will prepare and upload a suitability recommendation memorandum in the Case Adjudication Tracking System portal to document the suitability recommendation.  The suitability recommendation memorandum will contain one of the following security determinations:

(1) Subject has a non-favorable national security determination based on unmitigated derogatory or missing information (the DoD CAF does not recommend the Service continue its suitability determination in accordance with DoDI 1304.26 for the MAVNI program).

(2) Subject has a non-favorable national security determination based solely on lack of U.S. citizenship (the DoD CAF recommends the Service continue its suitability determination in accordance with DoDI 1304.26 for the MAVNI program).

UPR200 0922-14

TIWARI_PROD_00000007

c.  Further, under this accessions pilot, due process provisions in DoD 5200.2-R do not apply.

Thank you in advance for your support of this effort which is critical to the sustainment of the MAVNI program and the welfare of its participants.

A. M. Kurta
Performing the Duties of the Under Secretary of
Defense for Personnel and Readiness

cc:
Chairman of the Joint Chiefs of Staff
Under Secretary of Defense for Intelligence
Chief, National Guard Bureau
Assistant Secretary of the Army
    for Manpower and Reserve Affairs
Assistant Secretary of the Navy
    for Manpower and Reserve Affairs
Assistant Secretary of the Air Force
    for Manpower and Reserve Affairs

2

TIWARI_PROD_00000008

# SMITH DECLARATION

# EXHIBIT 8



OFFICE OF THE UNDER SECRETARY OF DEFENSE
4000 DEFENSE PENTAGON
WASHINGTON, D.C. 20301-4000

JUN 21 2017

PERSONNEL AND
READINESS

MEMORANDUM FOR SECRETARY OF THE ARMY
                          SECRETARY OF THE NAVY
                          SECRETARY OF THE AIR FORCE

SUBJECT:  Military Accessions Vital to the National Interest Pilot Program

    The Under Secretary of Defense for Personnel and Readiness memorandum, "Military Accessions Vital to the National Interest Pilot Program Extension," dated September 30, 2016, precluded a Service member accessed under the Military Accessions Vital to the National Interest (MAVNI) Pilot Program from being considered for a security clearance until he/she had completed the first enlistment.  This memorandum eliminates that prohibition.

    Effective immediately, individuals enlisted under the MAVNI Pilot Program who have successfully completed basic military training/boot camp (completion of formal skills training is not required), and have become naturalized U.S. citizens based on their military service, may be considered for a security clearance under the same terms, conditions, and criteria as any other U.S. citizen.  A member's consideration for a security clearance is contingent on a favorable command endorsement associated with the Service member applying for, or being assigned to, a military occupational specialty, rating, career field, or duty position that requires a security clearance.

    All other program guidance set forth in the September 30, 2016, memorandum remains in effect.  Direct all requests for clarification concerning this guidance to the Office of the Under Secretary of Defense for Personnel and Readiness.

                                    A. M. Kurta
                                    Performing the Duties of the Under Secretary of
                                    Defense for Personnel and Readiness

cc:
Chairman of the Joint Chiefs of Staff
Under Secretary of Defense for Intelligence
Chief, National Guard Bureau
Assistant Secretary of the Army
   for Manpower and Reserve Affairs
Assistant Secretary of the Navy
   for Manpower and Reserve Affairs
Assistant Secretary of the Air Force
   for Manpower and Reserve Affairs

TIWARI_PROD_00000393

# SMITH DECLARATION

# EXHIBIT 9



**OFFICE OF THE UNDER SECRETARY OF DEFENSE**
4000 DEFENSE PENTAGON
WASHINGTON, D.C. 20301-4000

OCT 1 3 2017

MEMORANDUM FOR SECRETARIES OF THE MILITARY DEPARTMENTS
DIRECTOR, DEFENSE INTELLIGENCE AGENCY
DIRECTOR, DEPARTMENT OF DEFENSE CONSOLIDATED
ADJUDICATIONS FACILITY

SUBJECT: Military Accessions Vital to the National Interest Pilot Program

References: (a) Memorandum "Military Accessions Vital to the National Interest Pilot Program Extension," September 30, 2016
(b) Memorandum "Military Accessions Vital to the National Interest Pilot Program," June 21, 2017
(c) DoD Manual 5200.02, "Procedures for the DoD Personnel Security Program (PSP)," April 3, 2017
(d) Security Executive Agent Directive 4, National Security Adjudicative Guidelines, June 8, 2017

      Over the course of the last year, the Department of Defense (DoD) has taken direct actions to mitigate the security risks to mission presented by the previous practices of vetting Service Members accessed under the Military Accessions Vital to the National Interest (MAVNI) Pilot Program. While the actions taken have contributed significantly to the mitigation of security risks, continued progress depends on a consistent, sustained, and responsive approach. As such, this memorandum provides supplemental policy guidance regarding the management of Service members accessed through the MAVNI Pilot Program.

**Vetting Requirements:**

      <u>Completion of Vetting Requirements.</u> The Secretaries of the Military Departments (MilDeps) will complete vetting requirements as outlined in reference (a), and modified by this memorandum, with the exception of the Office of Personnel Management Tier 5 background investigation for all MAVNI Service Members, to include applicants in the Delayed Entry Program (DEP), no later than 180 days from the date of this memorandum.

      <u>Service Members Accessed Prior to September 30, 2016.</u> The MilDeps will initiate and complete a passive analytical CI and security assessment for MAVNI Service Members who completed security and suitability screening using vetting protocols in place prior to the issuance of reference (a), no later than 180 days from the date of this memorandum. In cases in which derogatory information relative to reference (d) is discovered, standard CI security referral protocol will be followed.

**Continuous Monitoring:**

      The MilDeps will execute continuous monitoring for all MAVNI Service Members to include, at a minimum: enrollment in DoD's Continuous Evaluation (CE) program for the

TIWARI_PROD_00000390

entirety of the MAVNI Service Member's military career; and an analytical counterintelligence and security assessment, and a National Intelligence Agency Check (NIAC) every two years.

**Interdepartmental Cooperation:**

In an effort to expedite the security and suitability screening prescribed in reference (a), as well as the vetting requirements prescribed above, the Department must leverage the full complement of CI and adjudicative assets available to it. The Secretaries of the Navy and Air Force, and the Director, Defense Intelligence Agency, will provide support to the Secretary of the Army in executing MAVNI Pilot Program related mission requirements. This may include, but is not limited to, providing screening and berthing locations, transportation assistance, CI analytical support, special agents to conduct interviews, and adjudicative manpower.

**Initial National Security Determination (NSD) and Military Service Suitability Determination (MSSD):**

To comply with requirements for the initial vetting of MAVNI applicants and DTP Service Members, in accordance with references (b) and (c), the DoD Consolidated Adjudications Facility (DoD CAF) will attempt to render a NSD and a MSSD recommendation in accordance with reference (d).

* In the event that derogatory information cannot be mitigated in accordance with reference (d), or when derogatory information is discovered that was not previously known to the Military Service of which the MAVNI applicant or Service Member will be or is a member, the DoD CAF will refer that information to the designated office of responsibility within the MAVNI applicant/DTP Service Member's Military Service. The designated official with responsibility for making MSSDs for MAVNI applicants will take appropriate action to mitigate the derogatory information or discontinue applicant processing for the individual concerned. With regard to DTP Service Members, the designated official will take appropriate action to mitigate the derogatory information, or will initiate administrative separation proceedings in accordance with existing procedures. Such determinations should be made, and appropriate action initiated, within 90 days from the date of the DoD CAF referral on the basis of military service suitability disqualification.

* If the Military Service mitigates the derogatory information and/or grants a waiver to MSSD standards, the case and any mitigating information will be returned to the DoD CAF to begin the NSD review process. If, after review, an adverse NSD is rendered, the DoD CAF will notify the Military Service, which will discontinue applicant processing for the individual concerned. With regard to DTP Service Members, the designated official will initiate administrative separation proceedings in accordance with existing procedures. This guidance modifies Office of the Under Secretary of Defense for Personnel and Readiness memorandum, "Military Accessions Vital to the National Interest Pilot Program Suitability," April 5, 2017. In cases in which a MAVNI Service Member is not yet a U.S. citizen, but has obtained a favorable NSD in accordance with reference (c), the Joint Personnel Adjudication System will be annotated to state that the

TIWARI_PROD_00000391

individual is not eligible for access to classified information until U.S. citizenship is granted, and then only if the individual's position and/or duties require access to classified information.

The MilDep Secretaries shall direct immediate implementation of this guidance and report compliance to the Office of the Under Secretary of Defense for Personnel and Readiness and the Office of the Under Secretary of Defense for Intelligence. Initial reports will be submitted within 45 days from the date of this memorandum and thereafter semi-annually, not later than June 30 and December 31 of each calendar year. Direct all requests for clarification and waivers or exceptions to this guidance in writing to the Office of the Under Secretary of Defense for Personnel and Readiness.


A.M. Kurta
Performing the Duties of
   Under Secretary of Defense
   for Personnel and Readiness

Kari A. Bingen
Acting Under Secretary of Defense
   for Intelligence


cc:
Chairman of the Joint Chiefs of Staff
Under Secretary of Defense for Intelligence
Under Secretary of Defense for Personnel and Readiness
Chief, National Guard Bureau
Assistant Secretary of the Army
   for Manpower and Reserve Affairs
Assistant Secretary of the Navy
   for Manpower and Reserve Affairs
Assistant Secretary of the Air Force
   for Manpower and Reserve Affairs
Director, Washington Headquarters Services

TIWARI_PROD_00000392

# SMITH DECLARATION

# EXHIBIT 10



**OFFICE OF THE UNDER SECRETARY OF DEFENSE**
**4000 DEFENSE PENTAGON**
**WASHINGTON, D.C. 20301-4000**

PERSONNEL AND
READINESS

APR **27** 2018

MEMORANDUM FOR SECRETARY OF THE ARMY
SECRETARY OF THE NAVY
SECRETARY OF THE AIR FORCE

SUBJECT: Military Accessions Vital to the National Interest Pilot Program

The Under Secretary of Defense for Personnel and Readiness (USD(P&R)) memorandum, *Military Accessions Vital to the National Interest (MAVNI) Pilot Program Extension*, dated September 30, 2016, precluded a Service member accessed under the Military Accessions Vital to the National Interest (MAVNI) Pilot Program from being considered for a security clearance until completion of the first period of enlistment. The security clearance prohibition was replaced on June 21, 2017, with a requirement to complete initial training prior to consideration for a security clearance. This memorandum removes the latter requirement.

Effective immediately, individuals who enlist, or were previously enlisted, under the MAVNI Pilot Program, and become, or have already become, naturalized U.S. citizens based on their military service, may be considered for a security clearance (to include an interim security clearance) under the same terms, conditions, and criteria as any other U.S. citizen. Consideration for a security clearance is contingent on a positive command endorsement for a security clearance, and associated with the Service member applying for or being assigned to a military occupational specialty, rating, career field, or duty position that requires a security clearance.

Direct all requests for clarification concerning this guidance to the Office of the USD(P&R).

Stephanie Barna
Performing the Duties of the Under Secretary of
Defense for Personnel and Readiness

cc:
Chairman of the Joint Chiefs of Staff
Under Secretary of Defense for Intelligence
Chief of the National Guard Bureau
Assistant Secretary of the Army
    For Manpower and Reserve Affairs
Assistant Secretary of the Navy
    For Manpower and Reserve Affairs
Assistant Secretary of the Air Force
    for Manpower and Reserve Affairs