# EXHIBIT 1

*Transcript of Deposition of Margaret Stock*

**In the Matter Of:**

TIWARI, ET AL. v MATTIS

---

**MARGARET STOCK**

*October 15, 2018*

---

**PACIFIC RIM REPORTING**
STENOGRAPHIC COURT REPORTERS
711 M STREET, SUITE 4
ANCHORAGE, ALASKA 99501
907-272-4383
www.courtreportersalaska.com

1          UNITED STATES DISTRICT COURT

2      WESTERN DISTRICT OF WASHINGTON AT SEATTLE

3    _____

Kirti Tiwari, Seung Yoon Yang,
4    Amandeep Singh, Duncan Makau,
Valdeta Mehanja, Luobin Sun,
5    Rui Zhang, and Raj Chettri,

6              Plaintiffs,                    **CERTIFIED**
**TRANSCRIPT**
7    vs.

8    James Mattis, Secretary, U.S.
Department of Defense, in his
9    official capacity,

10             Defendant.
_____/
11
NO. 17-cv-242-TSZ
12

13

14   _____

15           DEPOSITION OF MARGARET STOCK

16   _____

17

18           Pages 1 - 314, inclusive

19

20           Monday, October 15, 2018

21                 9:00 a.m.

22

23        Taken by Counsel for Defendant
at
24      UNITED STATES ATTORNEY'S OFFICE
222 West Seventh Avenue
25              Anchorage, Alaska

```
1              A P P E A R A N C E S
2
3   For Plaintiffs:
4       Neil T. O'Donnell, Esq.
        CASCADIA CROSS BORDER LAW GROUP
5       4141 B Street, Suite 205
        Anchorage, Alaska 99503
6       (907) 242-5800
7
    For Defendant:
8
        Nathan M. Swinton, Esq.
9       U.S. DEPARTMENT OF JUSTICE
        CIVIL DIVISION
10      20 Massachusetts Avenue, NW
        Washington, DC 20001
11      (202) 515-7667
12      Joseph G. Nosse, Esq.
        U.S. ARMY LEGAL SERVICES AGENCY
13      9275 Gunston Road, Room 3026
        Fort Belvoir, Virginia 22060
14      (703) 693-1013
15
    Court Reporter:
16
        Deirdre J.F. Radcliffe
17      Pacific Rim Reporting
        711 M Street, Suite 4
18      Anchorage, Alaska 99501
        (907) 272-4383
19
20
21
22
23
24
25
```

```
1                    I N D E X
2
3   EXAMINATION BY:                              PAGE
4       Mr. Swinton                                 4
5
6                    EXHIBITS
7
8   NO.     DESCRIPTION
9   Exh A   10-5-18 Margaret D. Stock Expert Witness   165
            Report (6 pages)
10
    Exh B   The Military Accessions Vital to the National   241
11          Interest (MAVNI) Program (120 pages)
12  Exh C   Declaration of Stephanie Miller (4 pages)   249
13  Exh D   To Motion for Partial Summary Judgment and   256
            Permanent Injunction (23 pages)
14
    Exh E   Declaration of Roger Smith (32 pages)   256
15
    Exh F   Affidavit of Margaret D. Stock (9 pages)   288
16
    Exh G   Supplemental Affidavit of Margaret Stock   293
17          (16 pages)
18  Exh H   To Plaintiffs' Reply Brief in Support of   297
            Motion for Partial Summary Judgment and
19          Opposition to DoD's Cross-Motion for Summary
            Judgment (22 pages)
20
    Exh I   The Impact and Potential of America's Foreign   305
21          Born Population on Army Recruiting and Force
            2025 (22 pages)
22
    Exh J   Impact & Potential of Recruiting the Foreign   308
23          Born Briefing to Recruiting 2025 Forum
            (16 pages)
24
25
```

1       ANCHORAGE, ALASKA
2       MONDAY, OCTOBER 15, 2018
3       9:09 A.M.
4       -oOo-
5       MARGARET STOCK,
6   deponent herein, being duly sworn upon
7   oath, was examined and testified as follows:
8       EXAMINATION
9   BY MR. SWINTON:
10      Q.   Good morning, Ms. Stock.  We just introduced
11  ourselves a few seconds ago, but for purposes of the
12  record, my name is Nathan Swinton, and I'm an attorney
13  with the United States Department of Justice.  I represent
14  the United States in the case Tiwari versus Mattis
15  currently pending in the Western District of Washington.
16      Are you represented by counsel today?
17      **A.   No.**
18      Q.   Have you ever had your deposition taken before?
19      **A.   I have.**
20      Q.   How many times have you been deposed?
21      **A.   I'm not absolutely sure.**
22      Q.   Do you have an estimate?
23      **A.   Less than a dozen times.**
24      Q.   Have you had your deposition taken in a case
25  concerning the MAVNI program?

1       **A.   No.**
2       Q.   Have you ever been deposed when you've been
3   designated as an expert in a case?
4       **A.   Yes.**
5       Q.   What case was that?
6       **A.   Sister Fahy versus -- I think it was the State**
7   **of New Hampshire as the defendant.**
8       Q.   Can you spell Fahy for me?
9       **A.   I think it is F as in Foxtrot, A as in Alpha, H**
10  **as in Hotel -- I believe it's Y as in Yankee, but it could**
11  **be Echo Yankee.**
12      Q.   Was that case in district court, in federal
13  district court?
14      **A.   I believe it was in federal district court in**
15  **New Hampshire.**
16      Q.   Are there any other cases where you've been
17  deposed as an expert witness?
18      **A.   I don't believe so, but I can't be absolutely**
19  **sure, because I've been practicing law for a long time and**
20  **it's possible that I've forgotten about a deposition.**
21      Q.   These are cases in which you've served as an
22  expert witness, correct?
23      **A.   Well, served as an expert witness.  I've been**
24  **called regularly in Alaska to testify as an expert about**
25  **immigration law, and I don't believe I've been deposed.  I**

1 think it's only been in court.

2　　Q.　So the only case you're able to identify where

3 you were serving as an expert witness and were deposed is

4 the Sister Fahy case?

5　　**A.　Yes, as far as I know.　As far as I can recall.**

6　　Q.　But there were other occasions on which you had

7 your deposition taken before?

8　　**A.　No.　That's what I just said.　I think it's only**

9　**the Fahy case where I've been deposed.　I've been an**

10　**expert in court.　So they wouldn't do a deposition.　They**

11　**would just call me straight in court.**

12　　Q.　I understand.　Have you ever had your deposition

13 taken when you were not serving as an expert witness?

14　　**A.　I don't believe so.**

15　　Q.　Just to remind you -- and I know you're an

16 attorney, so you probably understand how depositions

17 work -- but I'll be asking you a series of questions today

18 and you're under an oath to provide full and complete

19 answers.

20　　　If you don't understand any question I ask you,

21 please let me know before you respond and I'll try to

22 rephrase the question.　Okay?

23　　**A.　Okay.**

24　　Q.　Did you take an oath before we started this

25 morning?

1　　**A.　I did.　Just now.**

2　　Q.　Do you understand the nature of that oath?

3　　**A.　Yes, I do.**

4　　Q.　So that oath requires you to fully answer each

5 question to the extent that you can.　If you're not sure

6 of an answer or if you don't have a complete answer, then

7 you must still answer the question to the extent that you

8 can.

9　　　As you can see, the court reporter is recording

10 all that is said here.　Because she can only record our

11 words and cannot record head nods or hand gestures, please

12 answer each question with a verbal response.　Okay?

13　　**A.　Okay.**

14　　Q.　Please also wait for me to finish my question

15 before you respond so that we can avoid talking over one

16 another.　Okay?

17　　**A.　That's fine.　I'll do that.**

18　　Q.　I like to take breaks approximately every hour

19 and a half, but if you need to take a break before that

20 time, please let me know.　Okay?

21　　**A.　I will let you know.**

22　　Q.　The one thing that I'd ask is that if there's a

23 question pending, please answer that question before we

24 take the break.　Okay?

25　　**A.　Okay.**

1　　Q.　From time to time Mr. O'Donnell may object to

2 questions.　After his objection, I'm going to ask that you

3 go ahead and answer the question unless he instructs you

4 not to.　Do you understand?

5　　**A.　I understand.**

6　　Q.　I'd also like to address one issue that arose

7 during the deposition of Naomi Verdugo.　As my Department

8 of Justice colleague conveyed to Mr. O'Donnell during that

9 deposition, it is inappropriate for deponent and counsel

10 to discuss the deposition during any breaks.　I therefore

11 want to make it clear at the beginning of this deposition

12 that you should not discuss today's deposition with

13 Mr. O'Donnell during any breaks.　Do you understand?

14　　**A.　I understand.**

15　　　MR. O'DONNELL:　I understand that's your

16 position.　I've looked at that and I still disagree with

17 it.

18 BY MR. SWINTON:

19　　Q.　Ms. Stock, have you taken or do you intend to

20 take any medication or controlled substances that would

21 affect your ability to testify accurately or honestly?

22　　**A.　No.**

23　　Q.　And I now am going to turn it over to Mr. Nosse,

24 who has one statement to make on behalf of the Army.

25　　　MR. NOSSE:　Good morning.　I'm Major Joseph

1 Nosse, an attorney with the U.S. Army Litigation Division.

2 I'm present today representing the United States Army as

3 required by 32 CFR Section 516.48.　It is DoD policy that

4 official information should generally be made reasonably

5 available for use in federal and state courts and by other

6 governmental bodies unless the information is classified,

7 privileged, or otherwise protected from public disclosure.

8　　　Because the Army has not received an official

9 request for official -- for disclosure of official

10 information by former DoD personnel, the Army is reserving

11 its objection -- or reserving its right to object to

12 disclosure of official information during the course of

13 the trial in accordance with 32 CFR Section 516.

14 BY MR. SWINTON:

15　　Q.　Okay.　Ms. Stock, please state and spell your

16 full name for the record?

17　　**A.　My name is Margaret Stock.　My first name is**

18　**Margaret, M-a-r-g-a-r-e-t.　My last name is Stock,**

19　**S-t-o-c-k.**

20　　Q.　Did you prepare for your deposition today?

21　　**A.　I did.**

22　　Q.　What did you do to prepare?

23　　**A.　I prepared an expert report.　I reviewed my**

24　**prior affidavits and declarations in this case.　I**

25　**reviewed the reports that I cited in the case.　I**

Page 10

1 reviewed, I think, approximately 30 counterintelligence
2 reports.
3    Q. Did you meet with Mr. O'Donnell?
4    A. I met with Mr. O'Donnell and I gave him the
5 counterintelligence reports, yes.
6    Q. Did you review the reports of any other experts
7 in this case?
8    A. I did read the report of Dr. Naomi Verdugo.
9    Q. Did you review the deposition transcript of
10 Naomi Verdugo?
11    A. No, I did not.
12    Q. Other than counsel, did you talk to anyone as
13 part of your preparation for the deposition?
14    A. No.
15    Q. Did you talk to Naomi Verdugo about her
16 deposition?
17    A. No.
18    Q. Did you participate in preparing responses to
19 any discovery requests in this case?
20    A. No. Well, except expert. I mean, I prepared my
21 expert report. I think that was part of one of your
22 discovery requests.
23    Q. Did you bring any documents with you today?
24    A. I gave them to Mr. O'Donnell. I didn't bring
25 them personally.

Page 11

1    Q. So you don't have any documents that you have
2 access to right now during the deposition?
3    A. Well, there was a subpoena, and I looked at the
4 subpoena and I got everything that I thought was
5 responsive to the subpoena and I gave it to Mr. O'Donnell.
6 I signed an objection to one of the requests.
7    Q. Okay. Ms. Stock, what is your current place of
8 employment?
9    A. I am currently the managing partner at Cascadia
10 Cross Border Law Group in Anchorage, Alaska.
11    Q. How big is that law firm?
12    A. It has 17 employees as of today.
13    Q. How many attorneys are in the law firm?
14    A. Five.
15    Q. Does it have a structure of partners and
16 associates?
17    A. Well, I'm the only owner at the moment, the only
18 partner at the moment. Everyone else is an employee.
19    Q. So you're the owner/managing partner. And the
20 other four attorneys, what are their positions called?
21    A. Associate or of counsel.
22    Q. What does it mean to be the owner of the law
23 firm?
24    A. It means I don't make any money and I am
25 responsible for supervising all the attorneys and the

Page 12

1 staff at the law firm. Making payroll, signing checks,
2 making decisions about who to hire and fire. I also
3 handle cases. I provide legal advice to the junior
4 attorneys. I make decisions about copy machines and
5 computers and things like that.
6    Q. Do you make decisions about which cases to
7 handle?
8    A. Yes. The exception being if somebody joins the
9 firm and brings cases, then I don't make a decision about
10 that. So earlier you were discussing the Safeway case,
11 and I have absolutely no knowledge of the Safeway case and
12 I don't supervise it and I didn't make a decision to bring
13 it to the firm. It was brought by an attorney who joined
14 our firm after taking that case.
15    Q. How many paralegals do you have at your firm?
16    A. We have about -- I have to do the count here.
17 Trying to run through the names in my head, so give me a
18 minute. At the moment we have five.
19    Q. Does the office have a physical location?
20    A. Yes.
21    Q. Is that in Anchorage?
22    A. It is.
23    Q. Are there any other offices of the firm?
24    A. We have no other offices for Cascadia Cross
25 Border Law Group Alaska, but we have an affiliate office

Page 13

1 that is legally independent of ours in Bellingham,
2 Washington.
3    Q. Do you have any control over the Bellingham
4 office?
5    A. I do not.
6    Q. The physical office in Anchorage, do all staff
7 work out of that physical office location?
8    A. No, they don't.
9    Q. Where else would they work?
10    A. We have an attorney who works in Louisiana
11 remotely, and then Neil O'Donnell doesn't actually work in
12 our office.
13    Q. Where does Mr. O'Donnell work?
14    A. He works out of his house.
15    Q. You mentioned that you're the sole owner of the
16 firm.
17    How does that work with profit-sharing?
18    A. Well, there aren't any profits, so there's no
19 profit-sharing.
20    Q. So how does the firm make money?
21    A. Well, we charge clients money and then we take
22 the payments and then we disburse them in the form of
23 salary and so forth. But we basically take an enormous
24 amount of pro bono work, so don't make any money. We
25 don't have a profit.

1    Q.   But employees earn salaries?

2    **A.   Employees earn salaries.  That's correct.**

3    Q.   As the owner and managing partner, is your
4  salary different than the other four attorneys at the
5  firm?

6    **A.   I'm paid by the hour.  I make $10 an hour.**

7    Q.   How is that compensation structure arranged?

8    **A.   What do you mean?**

9    Q.   I guess, who decided your salary?

10    **A.   I did.**

11    Q.   How are the other four attorneys -- what are the
12  other four attorneys' compensation?

13    **A.   They're either paid hourly if they're a**
14  **part-time attorney or they have an annual salary if**
15  **they're a full-time attorney.**

16    Q.   Who founded the firm?

17    **A.   I did.**

18    Q.   When did you found it?

19    **A.   2013.**

20    Q.   How many attorneys did you have at the time of
21  its founding?

22    **A.   Just one.**

23    Q.   When did you add other attorneys?

24    **A.   I added them gradually over the five-year period**
25  **from 2013 until now.**

1    Q.   When did you add the first attorney other than
2  yourself?

3    **A.   I think it was the fall of 2013.  I had a former**
4  **government attorney come to me and ask me for a job,**
5  **wanted a part-time job working for my firm.**

6    Q.   When you founded it, did you intend to have
7  other attorneys in the practice?

8    **A.   I thought at some point I would have other**
9  **attorneys in the practice if I could find competent**
10  **attorneys who were interested in practicing immigration**
11  **law.**

12    Q.   Why did you found the firm?

13    **A.   I was unhappy with the firm that I was working**
14  **at and decided I wanted to go out on my own.**

15    Q.   What is Mr. O'Donnell's salary at the firm?

16    **A.   $10 an hour.**

17    Q.   Do you have a benefits package for yourself?

18    **A.   No.**

19    Q.   Do you receive health insurance?

20    **A.   Yes.  We do have health insurance.  We have**
21  **health insurance for all of our employees.**

22    Q.   Do you have any sort of retirement package as
23  part of your compensation?

24    **A.   We don't.**

25    Q.   Do any attorneys at your firm have a retirement

1  package as part of their compensation?

2    **A.   No.**

3    Q.   When the firm earns money from a case -- or when
4  the firm obtains money from a case, either -- I guess
5  through attorneys' fees, is that -- how is that money
6  then -- let me start over.

7    When a firm is paid fees for its work, does that
8  money go into a common pool which is then used to pay
9  costs, including the hourly salaries of attorneys?

10    **A.   If we earn money from a case, we use it to pay**
11  **our bills, if that's what you mean.  We pay the credit**
12  **line down, we pay payroll, we pay Westlaw, we pay airline**
13  **tickets, things like that.**

14    Q.   Are there any sources of revenue other than
15  attorneys' fees for the firm?

16    **A.   I earn a couple thousand dollars a year in book**
17  **royalties.**

18    Q.   And you use that money to pay firm expenses?

19    **A.   Yes.**

20    Q.   Are there any other sources of revenue other
21  than attorneys' fees and book revenues?

22    **A.   Occasionally I get paid an honorarium to give a**
23  **speech.**

24    Q.   And you'll use the money from the honorarium to
25  pay costs for the firm?

1    **A.   Yes.**

2    Q.   Do any other attorneys earn revenues from books
3  or honorariums?

4    **A.   No.**

5    Q.   So you're the only attorney who would bring in
6  money other than from attorneys' fees?

7    **A.   Right.**

8    Q.   Are there any other sources of revenue other
9  than attorneys' fees, honorariums, and book revenues for
10  the firm?

11    **A.   Not that I know of.  There may be like**
12  **incidental reimbursements for things.**

13    Q.   Are the attorneys' fees -- I'm sorry.  Let me
14  ask a different question.

15    What percentage of the firm's cases are taken
16  pro bono?

17    **A.   I don't know, but it's very large.**

18    Q.   And when you take a case pro bono, do you then
19  seek attorneys' fees if you prevail?

20    **A.   If there are attorneys' fees available, but**
21  **there aren't often in many of the cases I take.**

22    Q.   So if attorneys' fees are available in a case,
23  attorneys in your firm would seek them if they've taken
24  the case pro bono?

25    **A.   If the client directs them to seek them, yeah.**

1    Q.  If you could give an approximation, what
2  percentage of the cases that your firm takes are pro bono?
3    A.  I can't really give you a percentage right now.
4  I would have to go back and look at the total number of
5  cases and how many of them are pro bono.  I don't know off
6  the top of my head.
7    Q.  Would you say it's more than 75 percent?
8    A.  Well, no, because it's -- I don't think you can
9  do it by percentages.  If you're talking about the total
10  revenue versus the number of cases that we have that are
11  pro bono.
12    Q.  Let's ask in terms of attorneys' time, in terms
13  of how attorneys in your firm spend the time.
14        Would you say that they spend their time on
15  pro bono cases -- or more than 75 percent of their time on
16  pro bono cases?
17    A.  I do.
18    Q.  What about the other four attorneys in your
19  office?
20    A.  I try to have them work as much as possible on
21  billable work, but obviously I have one attorney that
22  pretty much only has worked on one pro bono case.
23    Q.  Which attorney is that?
24    A.  His name is David Weber.  It's a pro bono case
25  for an indigenous person from Central America, and he

1  basically spends all his time on it, and the client
2  doesn't have any money.
3    Q.  The other four attorneys in your firm, what are
4  their titles?
5    A.  They're either an associate attorney or of
6  counsel.
7    Q.  How many associates do you have?
8    A.  Right now I think we have three that we term
9  "associate."
10    Q.  And how many of counsel?
11    A.  I think I said five working for me.  So let's
12  see.  Two of counsel.
13    Q.  So there are six attorneys counting yourself at
14  the firm?
15    A.  Yeah.  There's five that work for me and there's
16  me.
17    Q.  How many attorneys are identified on the firm's
18  web page?
19    A.  I don't know.  I have to look at the web page.
20  I haven't paid attention to the web page.
21    Q.  What's the difference between an associate and
22  of counsel?
23    A.  Generally, of counsel means they are more
24  experienced.  They have practiced on their own.  They are
25  not necessarily subject to as much supervision.  Associate

1  is someone who requires mentoring and I have to closely
2  supervise them.
3    Q.  Do you supervise attorneys who are of counsel?
4    A.  No.  Generally, no.
5    Q.  Do you review the work product of attorneys who
6  are of counsel before it's filed?
7    A.  No.
8    Q.  Do you review the work product of associates
9  before it's filed?
10    A.  I do.
11    Q.  What's the role of Mr. O'Donnell at the firm?
12    A.  Mr. O'Donnell is of counsel and he does his own
13  cases and I don't supervise him.
14    Q.  Have you ever awarded any attorneys in your
15  office bonuses?
16    A.  No.
17    Q.  Would it be possible for you to award attorneys
18  in your office bonuses?
19    A.  Only if we made money.  We would have to have
20  the funds to award a bonus to somebody.
21    Q.  And the funds to award bonus would have to come
22  through some sort of litigation victory; is that correct?
23  Let me ask that again.  Actually, never mind.
24        Have you ever used expert witnesses in cases in
25  which you've been an attorney of record?

1    A.  Yes.
2    Q.  How have you used expert witnesses?
3    A.  To testify about conditions in a country, to
4  testify about whether someone would suffer persecution if
5  they went back to their country.
6    Q.  What's your understanding of the role that an
7  expert witness plays in litigation?
8    A.  Well, an expert would testify about the matters
9  to which they have particular expert knowledge.
10    Q.  Does an expert -- to your understanding, does an
11  expert witness need to have a certain area of expertise?
12    A.  Yes.
13    Q.  How can a person acquire expertise in a certain
14  area?
15    A.  They could acquire it through experience,
16  through study, through past jobs that they've held.
17    Q.  You mentioned you are both the owner and the
18  managing partner of Cascadia Cross Border Law Group.
19        Is there a difference between being owner and
20  managing partner?
21    A.  Not at my firm.
22    Q.  Are you using those terms interchangeably?
23    A.  I would use those terms interchangeably.
24    Q.  When you say that you're the owner and the
25  managing partner, is it fair to say that you are using

1 those terms interchangeably?

2    A. Yes. At the moment, yes. I don't have a

3 partner, so...

4    Q. Ms. Stock, are you currently married?

5    A. I am.

6    Q. To whom are you married?

7    A. I'm married to Neil Thomas O'Donnell.

8    Q. How long have you been married to Mr. O'Donnell?

9    A. I believe 26 years. Little more than 26 years.

10    Q. How did you meet Mr. O'Donnell?

11    A. I met Mr. O'Donnell in Alaska, mountain climbing

12 in a snow storm on Arkose Ridge in the Talkeetna

13 mountains.

14    Q. How long did you date Mr. O'Donnell before you

15 married him?

16    A. Four years.

17    Q. So is it fair to say that you've known

18 Mr. O'Donnell since 1988?

19    A. That's correct.

20    Q. Do you have any children through your marriage

21 to Mr. O'Donnell?

22    A. I do.

23    Q. How many?

24    A. One child.

25    Q. And how old is that child?

1    A. 21.

2    Q. Do you have a joint bank account with

3 Mr. O'Donnell?

4    A. I do.

5    Q. Do you have joint retirement investments with

6 Mr. O'Donnell?

7    A. I think I should say yes to that. I have

8 separate ones also, but joint is probably accurate. I

9 don't know. It's complicated.

10    Q. Well, I don't need to get into a lot of details,

11 but are there some joint retirement investments that you

12 have that are joint with Mr. O'Donnell?

13    A. I'd have to ask Mr. O'Donnell.

14    Q. And you have to ask Mr. O'Donnell -- why would

15 you have to ask Mr. O'Donnell?

16    A. Because I haven't looked at all of my retirement

17 accounts. I know some of my retirement is totally

18 separate from Mr. O'Donnell and he has his own retirement.

19 And to answer that question accurately, honestly I would

20 have to go back and look at everything.

21    Q. Would it be fair to say that Mr. O'Donnell

22 manages the finances in your marriage?

23    A. No. But we have a lot of stuff that's separate.

24    Q. Are you aware of what retirement investments you

25 have that are your own that would not be joint?

1    A. Yes.

2    Q. Other than retirement investments, do you have

3 any other joint investments with Mr. O'Donnell?

4    A. We own a house together.

5    Q. Anything else?

6    A. We have a cabin together in McCarthy, Alaska,

7 and land.

8    Q. Other than the cabin and the house, do you have

9 any other joint investments with Mr. O'Donnell?

10    A. We have mutual funds in a mutual fund, but I

11 think technically -- yeah, we're joint on some of them.

12    MR. O'DONNELL: I'd ask you not to speculate --

13    THE WITNESS: Okay.

14    MR. O'DONNELL: -- because you're speculating

15 incorrectly.

16    THE WITNESS: All right. Well, I don't pay a

17 whole lot of attention to retirement because I'm not

18 planning to retire anytime soon. So I shouldn't be

19 speculating.

20 BY MR. SWINTON:

21    Q. You mentioned your house is a joint investment.

22 Does this mean that you and Mr. O'Donnell both

23 own your house?

24    A. We both own our house, yes.

25    Q. Where is that house?

1    A. In Anchorage, Alaska.

2    Q. What's the approximate value of that house?

3    A. I don't know. I'd be speculating. I haven't

4 looked at the property assessment lately.

5    Q. What was the purchase price for the house?

6    A. I don't recall.

7    Q. Do you ever work from your house?

8    A. Occasionally.

9    Q. How often is occasionally?

10    A. I sometimes do work on the evenings or weekends,

11 you know, by e-mail. I try not to work at the house. I

12 try to work mainly at the office.

13    Q. And you mentioned that Mr. O'Donnell works from

14 home.

15    Does he work from home every day that he works?

16    A. Yes.

17    Q. Why does he not use the office space?

18    A. You'd have to ask him.

19    Q. When he works from home, where does he work in

20 your home?

21    A. He has a study.

22    Q. So he set up a home office?

23    A. Yes.

24    Q. Do you have a home office of your own in your

25 house?

Page 26

1    A.  No.

2    Q.  Do you ever use his home office?

3    A.  No.

4    Q.  You've never worked from his home office?

5    A.  No.

6    Q.  Do you discuss the cases you're handling with

7  Mr. O'Donnell?

8    A.  Not typically.  He's busy with his own cases.

9    Q.  But you have discussed cases that you have with

10  Mr. O'Donnell; is that correct?

11    A.  What do you mean by "discussed"?

12    Q.  Has he ever talked to you about the claims that

13  he's bringing in a case?

14    A.  He doesn't talk about the claims.  He talks

15  about, I'm going to Denver on the Safeway case.  In fact,

16  this morning was the first time I heard what the Safeway

17  case was about, other than casual conversation.

18    Q.  Do you inform him about the content and

19  substance of your cases that you're handling?

20    A.  Not unless it's something he's also handling.

21    Q.  So you never discuss the substance of cases

22  you're handling with your husband, who is also of counsel

23  in your law firm?

24    A.  I do if it's a case that we're working on

25  together.  You know, if we're co-counsel in a particular

Page 27

1  case, I might talk to him -- I would talk to him about it.

2  But the vast majority of cases I'm handling, he wouldn't

3  have any interest in, he wouldn't -- same as me and

4  Safeway.  I don't know anything about the Safeway case and

5  it's not something that -- there's not enough hours in a

6  day to talk about all your cases.

7    Q.  Are there cases in which you're co-counsel with

8  Mr. O'Donnell?

9    A.  Yes.

10    Q.  How many?

11    A.  Actually, no.

12    THE WITNESS:  I think I'm not co-counsel with

13  you in anything right now.

14    A.  I have been in the past.

15    Q.  Do you recall how many cases you've been

16  co-counsel with Mr. O'Donnell in the past?

17    A.  No.  I used to work at Atkinson, Conway and

18  Gagnon a long time ago.

19    Q.  How about, thinking only of Cascadia Cross

20  Border Law Group, have you ever served as co-counsel with

21  Mr. O'Donnell in any cases?

22    A.  I don't believe I'm co-counsel with him in any

23  cases right now.

24    Q.  Have you ever been in your time at Cascadia

25  Cross Border?

Page 28

1    A.  Not as far as I know.  He just joined our firm

2  relatively recently.

3    Q.  Is it fair to say that you don't discuss the

4  substance of cases with Mr. O'Donnell unless you're

5  co-counsel with him?

6    A.  Well I'm an expert in this particular case and I

7  have discussed my expert report with him and so that.

8    Q.  Is this case, the Tiwari case, the only case

9  where you've discussed the substance of the case that

10  either you or Mr. O'Donnell are handling?

11    A.  No.  Occasionally we might have a husband-and-

12  wife conversation about a case discussing the substance of

13  the case, but it's not anything extensive.

14    Q.  So is it fair to say that, in your capacity as

15  managing partner of the firm, you've never discussed a

16  case with Mr. O'Donnell that he's handling, the substance

17  of a case?

18    A.  What do you mean by "substance"?

19    Q.  I guess, yeah, that's --

20    A.  I mean, we have conversations like, I'm handling

21  a case, I'm going to X city to do a deposition.  What's

22  the case about?  He might tell me something about it.  You

23  know, I might run into one of his clients at the airport

24  and they say hello to me and we talk about what the case

25  was that they handled.  So I don't think it's fair to say

Page 29

1  I never discuss the substance of any case with him,

2  because I have normal husband-and-wife type conversations

3  about cases.  And I have had that throughout the course of

4  my marriage.

5    Q.  That's fair, Ms. Stock.  Let me phrase the

6  question a little bit differently.  I'm interested in

7  communications between you and Mr. O'Donnell only, not

8  with the clients of a case.

9    Have you ever discussed -- in cases in which you

10  and Mr. O'Donnell are not co-counsel, have you ever

11  discussed case strategy for a case that Mr. O'Donnell is

12  handling?

13    A.  I think I'm going to object to that.  I think

14  that would be common interest privilege.

15    Q.  What's the common interest privilege?

16    A.  Two attorneys handling a case that have a common

17  interest and they would assert a privilege about

18  discussing strategy.

19    Q.  Okay.  I'm actually not interested in the

20  content of the strategy.  I'm just asking a yes-or-no

21  question whether you've discussed strategy in case with

22  Mr. O'Donnell in a case he's handling where you are not

23  co-counsel.

24    A.  It's possible that I have discussed strategy in

25  a case with Mr. O'Donnell in a case that he's handling and

1 I'm not.

2    Q.   In a case that you're handling where you're the

3 attorney of record and you're not co-counsel with

4 Mr. O'Donnell, have you discussed case strategy with

5 Mr. O'Donnell?

6    A.   No.  I wouldn't discuss it with him because he

7 wouldn't be able to provide me with -- no.

8    Q.   He wouldn't be able to provide you with what?

9    A.   He doesn't do immigration law.

10    Q.   Does the firm have a specialty practice?

11    A.   Alaska doesn't have specialties.

12    Q.   Does the firm specialize in any sort of area of

13 law?

14    A.   We concentrate in the area of immigration,

15 national security, military law, citizenship law.  But

16 that's my practice.  That's not Mr. O'Donnell's.

17    Q.   What does it mean to concentrate in those areas?

18    A.   Alaska doesn't recognize specialties.

19    Q.   So when the firm concentrates in those areas,

20 what does that mean?

21    A.   That means if somebody calls us up and tells us

22 they want to hire us to handle a divorce case, we tell

23 them we don't do divorce cases.

24    Q.   Who would tell -- an individual seeking

25 representation, who would convey the message that the firm

1 doesn't do a particular type of case?

2    A.   My executive assistant.

3    Q.   Is the executive assistant a lawyer?  Is the

4 executive assistant an attorney?

5    A.   No.

6    Q.   Would the executive assistant convey that

7 message without consulting any attorneys in the firm?

8    A.   Yes.

9    Q.   So the executive attorney has authorization to

10 say -- I'm sorry.  The executive assistant has

11 authorization to inform an individual that the firm

12 doesn't do certain types of cases?

13    A.   Yes.

14    Q.   How does the executive assistant know what types

15 of cases the firm would handle?

16    A.   Because the executive assistant works under my

17 control and direction.

18    Q.   So you mentioned that Mr. O'Donnell doesn't do

19 immigration work.  Actually, let me move on from that.

20 I want to talk to you about the current case,

21 Tiwari versus Mattis, and your involvement with the case.

22        When did you first become aware of the Tiwari

23 case?

24    A.   When it was filed.

25    Q.   Does it sound correct to you that the complaint

1 in this case was filed in February 2017?

2    A.   I believe so, but I'd have to check the date.  I

3 know it was more than a year ago.

4    Q.   Did you have any knowledge of the intent to file

5 the lawsuit before it was filed?

6    A.   Yes.

7    Q.   When did you first become aware of an intent to

8 file the lawsuit in this case?

9    A.   I can't recall exactly when I became aware of

10 that.

11    Q.   Would it have been in January 2017?

12    A.   You know, sometime before it was filed.

13    Q.   Had you spoken with any of the plaintiffs in

14 this case before the complaint was filed?

15    A.   Yes.

16    Q.   Do you recall how many you spoke with?

17    A.   No.

18    Q.   What did you speak to them about?

19    A.   Various plaintiffs had contacted me about the

20 discrimination that they were experiencing, and they were

21 upset about it, and when they told me what was happening,

22 I realized that what the government was doing to them was

23 patently unconstitutional and illegal and in violation of

24 Department of Defense equal opportunity policy.  So I

25 encouraged them to seek counsel and I eventually sent them

1 to Mr. O'Donnell.

2    Q.   Why did you send them to Mr. O'Donnell?

3    A.   Because he had advised me that he was interested

4 in filing a lawsuit.

5    Q.   Okay.  Had he advised you that he was interested

6 in filing this particular lawsuit?

7    A.   Yes.

8    Q.   How did he become aware of the facts that form

9 the basis of the claims in this case?

10    A.   I believe because he talked to the people that

11 were upset about their discriminatory treatment.

12    Q.   How did Mr. O'Donnell -- do you know how

13 Mr. O'Donnell -- I'm sorry.  Did you refer any of those

14 individuals to Mr. O'Donnell?

15    A.   I think I just mentioned I asked them to call

16 him, said he might be interested in helping them.  I

17 didn't have the capacity to assist them.

18    Q.   Why didn't you have the capacity?

19    A.   Because my law firm was running on a pro bono

20 basis, essentially, and I didn't have the capacity to

21 handle a large class-action lawsuit.

22    Q.   Is it fair to say then that Mr. O'Donnell was

23 part of a firm that had the resources to handle this type

24 of case?

25    A.   That's correct.

Page 34

1    Q.   If you were part of a firm that had the
2  resources to handle this case, would you have handled it?
3    A.   No.
4    Q.   Why not?
5    A.   Because I thought it needed somebody that didn't
6  have my expert knowledge of the case. I was going to need
7  to be an expert in the case.
8    Q.   So did you think before the case was filed that
9  you would need to be an expert in the case?
10   A.   Yes.
11   Q.   Why did you think that?
12   A.   Because very few people have expert knowledge of
13 the MAVNI program, and the case involved the MAVNI
14 program.
15   Q.   Are you an attorney of record in the Tiwari
16 case?
17   A.   No.
18   Q.   What is your understanding of your role in this
19 case?
20   A.   I'm an expert witness.
21   Q.   As an expert witness, what is your understanding
22 of your role -- let me start over.
23        What is your understanding of what you will do
24 in this case as an expert witness?
25   A.   Provide expert testimony.

Page 35

1    Q.   Do you conceive of your role only to provide
2  expert testimony at trial?
3    A.   Yes. And before trial. I provided an expert
4  report and I'm here at a deposition.
5    Q.   Do you consider yourself to have been a
6  consultant in this case?
7    A.   What do you mean by "consultant"?
8    Q.   A litigation consultant.
9    A.   No.
10   Q.   So is it fair to say that your understanding of
11 your role as an expert witness is to provide testimony in
12 the form of affidavits and declaration, to submit an
13 expert report, and to testify at trial?
14   A.   Correct.
15   Q.   Do you believe that you can provide objective
16 testimony in this case?
17   A.   I do.
18   Q.   Why do you think that?
19   A.   I'm an attorney and I'm familiar with the facts
20 of the MAVNI program, and I have been trained, I guess, to
21 see things from both sides.
22   Q.   So you think -- is it fair to say that you
23 believe that as an attorney you're able to see issues from
24 the same side?
25   A.   Not just that. I was a military police officer

Page 36

1  for 28 years. I'm very familiar with the Army. I worked
2  in security and counterterrorism and taught national
3  security law at West Point. Been intimately familiar with
4  the military and intelligence activities. So I believe I
5  can provide objective testimony.
6    Q.   Do you believe that you have any biases that
7  would affect your testimony in this case?
8    A.   Biases? I have a strong sense of the value of
9  diversity in the military and I don't like people being
10 mistreated based on their national origin. And I taught
11 constitutional law, so I guess I'm biased in favor of the
12 law.
13   Q.   So let me go through those.
14        You mentioned the value of diversity in the
15 military. Do you consider that to be a bias then?
16   A.   Well, what do you mean by "bias"?
17   Q.   What's your understanding of "bias"?
18   A.   Well, I think you're asking the question, so
19 you've got to tell me what you think "bias" means.
20   Q.   My question now is, what's your understanding of
21 "bias"?
22   A.   I thought you meant like tendencies to go a
23 certain way on an issue maybe or something. I don't know.
24   Q.   Okay. We can use that definition.
25   A.   I mean, my background and training is in law and

Page 37

1  constitutional law and national security law, and I also
2  am familiar with equal opportunity policies in the Army,
3  and I've been trained that -- leadership values,
4  diversity. That's one of the strong lessons I guess I've
5  learned over the years in the Army.
6    Q.   Have you attended any court appearances in this
7  case?
8    A.   In this case, yes. I was at one hearing in
9  Seattle.
10   Q.   Was that hearing in March 2018?
11   A.   If -- I don't remember exactly when it was, but
12 I remember going down to Seattle. And earlier you said
13 that you saw me at that hearing. So if that was in March,
14 I'll take your word for it.
15   Q.   Why did you attend that hearing?
16   A.   Because it was a hearing where there were going
17 to be arguments made, and I felt I needed to hear what
18 those arguments were.
19   Q.   Why did you need to hear what the arguments
20 were?
21   A.   Because I was an expert in the case.
22   Q.   How would those arguments affect your ability to
23 provide expert testimony in this case?
24   A.   Well, to provide expert testimony, you have to
25 understand what people are arguing in the case. I needed

Page 38

1 to understand what the government was arguing, what
2 evidence the government was presenting, what the
3 plaintiffs were arguing, what evidence the plaintiffs were
4 presenting.
5    Q.  Was there something about attending the argument
6 in person that you thought you could obtain that you
7 couldn't get from reading the pleadings in the case or the
8 transcript of the argument?
9    A.  Yes.
10    Q.  What's that?
11    A.  I could observe the demeanor of the individuals.
12    Q.  What individuals were you particularly
13 interested in observing?
14    A.  The attorneys, the witnesses.
15    Q.  Were there any witnesses at that hearing?
16    A.  I don't believe any of the plaintiffs testified,
17 but there was one of the plaintiffs that attended the
18 hearing and was introduced by the plaintiffs' counsel.
19    Q.  How does -- and when you said observing the
20 demeanor of attorneys, were you referring to observing
21 Mr. O'Donnell?
22    A.  All the attorneys.
23    Q.  So you were interested in observing
24 Mr. O'Donnell as well as the attorneys for the defendants?
25    A.  Yeah.  I wanted to basically see what they were

Page 39

1 going to make as arguments, how they were going to present
2 the arguments, what they were arguing, and I wanted to
3 become familiar with the claims in the case and what the
4 government was saying about the claims.
5    Q.  But again, why could you not get that
6 information from reading the parties' briefs and the court
7 transcript?
8    A.  Because you can't always get the full flavor of
9 what happens at a court hearing by just looking at a bare
10 transcript.  It's really important to have people testify
11 in person and not always have them testify by way of a
12 transcript.
13    Q.  What did you learn from observing that
14 argument -- since there were no witnesses that testified,
15 what did you learn from observing that argument that you
16 wouldn't have learned from reading the briefs or reading
17 the court transcript?
18    A.  I got to observe one of the plaintiffs at
19 firsthand, and I observed that he was a very accomplished
20 individual with an excellent military demeanor who would
21 make a great military officer, but because of the
22 unconstitutional DoD policies, he was being prevented from
23 living up to his full potential in the United States Army.
24    Q.  What was it about interacting with him in person
25 that allowed you to see that, that you wouldn't have been

Page 40

1 able to get from reading his affidavits and declarations
2 in the case?
3    A.  Well, it's pretty well accepted that you can't
4 tell whether somebody has a military bearing unless you
5 physically meet them.  You can't tell whether they have a
6 military bearing from a transcript.
7    Q.  Did you sit at counsel's table with
8 Mr. O'Donnell during the argument?
9    A.  I did.
10    Q.  Why did you sit at counsel's table?
11    A.  He invited me to sit there.
12    Q.  Did you talk to Mr. O'Donnell about the case
13 during breaks in the hearing?
14    A.  No.  I don't believe there were any breaks in
15 the hearing.  I don't remember a break in the hearing.
16    Q.  If I represent to you that the Court took recess
17 for about 20 or 30 minutes and came back and heard further
18 argument, do you have any reason to doubt that?
19    A.  Okay.  No, I remember that now.  But I think I
20 talked mainly to Raj Chettri at that point.
21    Q.  Did you talk to Mr. O'Donnell at all during that
22 break about the argument?
23    A.  No.
24    Q.  Did you take notes during the hearing?
25    A.  Yes.

Page 41

1    Q.  Why did you take notes?
2    A.  To remember what I heard.
3    Q.  Do those notes help you function as an expert
4 witness in this case?
5    A.  Yes.
6    Q.  How so?
7    A.  They help me remember what I heard.
8    Q.  Have you reviewed the transcript of the argument
9 from that hearing?
10    A.  Not today, no.
11    Q.  Have you ever reviewed it?
12    A.  I don't believe so.
13    Q.  Did you pass Mr. O'Donnell any notes during the
14 hearing?
15    A.  Not that I recall.
16    Q.  Did you have to travel to the hearing in order
17 to attend?
18    A.  I did.
19    Q.  How did you pay for your travel expenses?
20    A.  I used the firm credit card.
21    Q.  We talked before -- you mentioned before that
22 you had had communications with some or all of the
23 plaintiffs in this case before the complaint was filed; is
24 that correct?
25    A.  Some of them.

1    Q.   How many have you communicated with?

2    A.   I don't know.

3    Q.   Have you ever had -- have you ever had written
4    communication with any of the plaintiffs?

5    A.   Yes.

6    Q.   Have you ever spoken to any of them by phone?

7    A.   Yes.

8    Q.   Have you ever met with any of them in person?

9    A.   Yes.

10   Q.   So let's take this one by one.

11        With respect to written communications, have you
12   had any written communication with Kirti Tiwari?

13   A.   As far as I know, the only written communication
14   I've had with Kirti Tiwari is occasional Facebook message.
15   I'm not absolutely sure about that, though.

16   Q.   Do you recall who initiated that communication?

17   A.   Kirti.

18   Q.   Do you know why he reached out to you?

19   A.   Well, he's reached out to me about a number of
20   things.  You have to ask him why he did it.

21   Q.   Do you recall when he first reached out to you?

22   A.   No.

23   Q.   What have you discussed in writing with Kirti
24   Tiwari?

25   A.   I can't recall.

1    Q.   Do you recall discussing the filing of a lawsuit
2    in this case with Mr. Tiwari?

3    A.   No.

4    Q.   Did you refer Mr. Tiwari to Mr. O'Donnell?

5    A.   I may have.  I don't recall.

6    Q.   Have you had written correspondence with Seung
7    Yoon Yang?

8    A.   Not that I recall.

9    Q.   Have you had written correspondence with
10   Amandeep Singh?

11   A.   Not that I recall.

12   Q.   Duncan Makau?

13   A.   Yes.

14   Q.   Do you recall when you first had written
15   communication with Duncan Makau?

16   A.   Years ago.

17   Q.   How long ago is years ago?

18   A.   I had communication with Duncan Makau when I was
19   the project officer for the MAVNI program at the Pentagon.

20   Q.   When was that?

21   A.   Sometime between 2007 and 2010.  And then a
22   couple years after that I had multiple written
23   communications with Duncan Makau.

24   Q.   Who initiated that first communication between
25   Mr. Makau and yourself?

1    A.   Cindy Jebb.

2    Q.   Who is Cindy Jebb?

3    A.   She's the dean at the United States Military
4    Academy at West Point, New York.

5    Q.   Did Ms. Jebb refer Mr. Makau to you?

6    A.   Colonel Jebb.

7    Q.   Did Colonel Jebb refer Mr. Makau to you?

8    A.   She did.

9    Q.   Why did she do that?

10   A.   She thought he needed legal assistance.

11   Q.   Did you provide him with legal assistance?

12   A.   I wasn't in a position at that time to provide
13   him with legal assistance, but I attempted to help him by
14   referring him to other people and providing expert help to
15   the Army JAG officers who were trying to help him.

16   Q.   Have you ever provided Mr. Makau with legal
17   assistance?

18   A.   Yes.

19   Q.   What type of legal assistance?

20   A.   Immigration assistance.

21   Q.   What type of immigration assistance?

22   A.   General advice about U.S. immigration law.

23   Q.   Have you represented him in any immigration
24   proceedings?

25   A.   No.

1    Q.   Have you been compensated for your work for
2    Mr. Makau?

3    A.   I can't recall.

4    Q.   Is it possible that you were compensated for
5    your work for Mr. Makau?

6    A.   It's possible that he paid some sum of money at
7    some point to pay for some of the advice I gave him when I
8    was a private attorney years ago.

9    Q.   Did you ever provide legal advice to Kirti
10   Tiwari?

11   A.   Not that I know of.

12   Q.   When was your last communication with
13   Mr. Tiwari?

14   A.   I don't know.

15   Q.   Was it in the last six months?

16   A.   I don't think so.  It's possible that he posts
17   messages on Facebook.  I might have commented on a message
18   or something.

19   Q.   When was your last communication with Mr. Makau?

20   A.   More than a year ago.  I believe it was about
21   the time I told him to go talk to Mr. O'Donnell.

22   Q.   So was your last communication with Mr. Makau
23   before this lawsuit was filed?

24   A.   Yes.

25   Q.   Did Mr. O'Donnell learn about this case -- I'm

Page 46

1 sorry. Did Mr. O'Donnell learn about the allegations
2 underlying the claims in this case from you?
3    **A. I believe he learned them from talking to the**
4 **people I referred to him.**
5    Q. Have you ever had any written communication with
6 Valdeta Mehanja?
7    **A. Not that I'm -- not that I can recall.**
8    Q. Have you ever spoken to Ms. Mehanja?
9    **A. Not that I can recall.**
10    Q. Have you ever had any written communication with
11 Rui Zhang?
12    **A. Not that I can recall.**
13    Q. Have you ever spoken to Mr. Zhang by phone or in
14 person?
15    **A. Not that I can recall.**
16    Q. Have you ever had any written communication with
17 Raj Chettri?
18    **A. Not that I can recall. I've had in-person**
19 **communication with him.**
20    Q. Have you ever spoken to him by phone?
21    **A. Not that I can recall.**
22    Q. What was your in-person -- or when was your
23 in-person communication with Mr. Chettri?
24    **A. At the hearing in March that you just mentioned.**
25    Q. Was that the only time you've spoken to

Page 47

1 Mr. Chettri in person?
2    **A. Yes.**
3    Q. What did you talk about with Mr. Chettri?
4    **A. Talked about his Army career, talked about what**
5 **it was like at his duty station, talked about what he**
6 **wanted to do in the Army, talked about his educational**
7 **background.**
8    Q. Did you discuss this case with Mr. Chettri?
9    **A. I discussed the fact that he was a plaintiff in**
10 **the case.**
11    Q. Have you ever provided legal advice to
12 Mr. Chettri?
13    **A. No.**
14    Q. Have you ever had any written communication with
15 Pingyang Liu?
16    **A. No.**
17    Q. Have you ever spoken to Pingyang Liu either by
18 phone or in person?
19    **A. Not that I can recall.**
20    Q. Have you had any communication with
21 Blerta Mehanja?
22    **A. Not that I can recall.**
23    Q. Have you ever spoken with Ms. Mehanja either by
24 phone or in person?
25    **A. Not that I can recall.**

Page 48

1    Q. Have you ever had any written communication with
2 Mengmeng Cai?
3    **A. Not that I can recall.**
4    Q. Have you ever spoken to Mr. Cai either in person
5 or on the phone?
6    **A. Not that I can recall.**
7    Q. Have you ever had any written communication with
8 Sandeep Singh?
9    **A. It's possible. That name is more familiar to me**
10 **than the other ones.**
11    Q. Do you recall if this communication would have
12 been through Facebook?
13    **A. I don't. I have hundreds and hundreds of MAVNI**
14 **soldiers contacting me all the time, and my memory of**
15 **every single name is not perfect.**
16    Q. Do you recall what you would have discussed with
17 Mr. Singh?
18    **A. No. MAVNIs contact me for all sorts of issues,**
19 **ranging from their pay problems to being discriminated**
20 **against, to how to get promoted, to how to wear a uniform,**
21 **to how do I get my mother a visa. And I apologize, but I**
22 **don't remember every single name of every single MAVNI**
23 **that has contacted me.**
24    Q. Do you recall if you've had any communication
25 with Mr. Singh by phone or in person?

Page 49

1    **A. I don't recall anything specific, no.**
2    Q. Do you recall having any written correspondence
3 with Fleury Ngantchop Keigni Di Satchou?
4    **A. Oh, boy. I don't have any specific recollection**
5 **of anything.**
6    Q. Do you believe that you may have had some sort
7 of written communication with Mr. Keigni Di Satchou?
8    **A. Well, I may have had communication with -- you**
9 **know, I've been to meetings with lots of people and talked**
10 **to a lot of people on the phone. I've had Facebook**
11 **interactions with people. So it's possible. I just don't**
12 **remember it.**
13    Q. So you mentioned Facebook a few times.
14    Is it fair to say that you've communicated with
15 plaintiffs in this case via Facebook?
16    **A. Yes.**
17    Q. Is that through the Facebook Messenger function?
18    **A. It could have been a lot of different ways.**
19 **There's places where people post things and then they**
20 **message me or they message me directly.**
21    Q. Are you part of the MAVNI -- are you aware of a
22 MAVNI group that exists on Facebook?
23    **A. Yes.**
24    Q. Are you part of that group?
25    **A. Yes.**

Page 50

1    Q.  Is that a closed group?

2    A.  I believe so.  I think we have to approve people

3  to join it.

4    Q.  And you said "we have to approve people to join

5  it."

6        Do you have control over that group?

7    A.  I'm one of the administrators.

8    Q.  What does it mean to be an administrator?

9    A.  I approve people to be a member of the group and

10  I can kick them out if they violate the group rules.

11    Q.  Did you start the group?

12    A.  No.

13    Q.  Who started it?

14    A.  James Hwang.

15    Q.  When did you become an administrator?

16    A.  When I was a MAVNI project officer years ago.

17    Q.  Were you asked to be an administrator?

18    A.  Yes.

19    Q.  Who asked you?

20    A.  Somebody in the Army.

21    Q.  Who in the Army asked you?

22    A.  I don't recall.

23    Q.  Have you provided -- let me ask this a different

24  way.

25        Have members of the MAVNI Facebook group asked

Page 51

1  you for legal advice -- let me ask a different question.

2        What is -- what do people discuss in the MAVNI

3  Facebook group?

4    A.  Everything.

5    Q.  Do people ask legal questions in the MAVNI

6  Facebook group?

7    A.  Yes.

8    Q.  Do people ask for legal advice in the MAVNI

9  Facebook group?

10    A.  Yes.

11    Q.  Are there any other attorneys who are

12  administrators?

13    A.  No.

14    Q.  Have you provided legal advice to individuals in

15  response to requests for legal advice via the MAVNI

16  Facebook group?

17    A.  We try not to.  We have a warning on there that

18  they're not supposed to ask for legal advice, and we kind

19  of stop them from doing it if they ask for legal advice.

20  Because they ask for legal advice from other MAVNIs, and

21  the other MAVNIs aren't competent to give them legal

22  advice.

23    Q.  You mentioned individuals came to you with

24  allegations that form the basis of the claims in this

25  case.

Page 52

1        Did those individuals contact you via the MAVNI

2  Facebook group about those allegations?

3    A.  You know, I don't -- I mean, they contact me all

4  different ways.

5    Q.  How do they contact you?

6    A.  They send an e-mail, they call on the phone,

7  they might have messaged me through different social

8  media.

9    Q.  Are there other social media MAVNI groups other

10  than the MAVNI Facebook group?

11    A.  Well, Facebook is a type of social media.

12  There's LinkedIn, WhatsApp, Facebook Messenger.  People

13  text message.  They send e-mails to my firm's website.

14  They call the firm on the phone.  They e-mail the firm.

15  They're e-mailing me at my Army address.

16    Q.  I'm specifically interested in MAVNI groups on

17  social media applications.

18        Is there a LinkedIn MAVNI group?

19    A.  I believe so.

20    Q.  Are you part of that group?

21    A.  I don't know if I'm currently part of that

22  group.

23    Q.  Have you been part --

24    A.  There's lots and lots of different groups out

25  there, and people add me to groups without telling me.

Page 53

1    Q.  Who adds you to groups?

2    A.  People in the Army, people who are other

3  lawyers, people who are MAVNIs.  MAVNIs are creating their

4  own groups and then adding me to the group.  The Army has

5  groups.  The Army has added me -- people in the Army have

6  added me to groups.  The recruiting stations.

7    Q.  Ms. Stock, have you ever had any written

8  communication with Kaushal Wadhwani?

9    A.  Can I look at the name?

10    Q.  Not on my outline.  It's spelled K-a-u-s-h-a-l.

11  Last name is W-a-d-h-w-a-n-i?

12    A.  I am -- don't recall specifically having any

13  written communication with that person, no.

14    Q.  Do you recall having any communication by phone

15  or in person with Mr. Wadhwani?

16    A.  I don't have any specific recollection of that,

17  no.

18    Q.  Have you had any written communication with

19  Angelita Acebes?

20    A.  I believe I have.  But I don't recall when or

21  what the nature of the communication was.  But that name

22  is ringing a bell.

23    Q.  Do you recall whether you had written

24  communication with Ms. Acebes before the filing of the

25  complaint in the case?

1    A.   I don't recall the date or when I had the
2 communication.
3    Q.   Do you recall having any telephonic or in-person
4 communication with Mr. Acebes?
5    A.   I don't specifically recall it, but that name
6 leads me to believe that I probably did, just because it's
7 a more familiar name.
8    Q.   Have you had any written communication with
9 Kusuma Nio?
10   A.   Yes.
11   Q.   Do you recall when the first time was that you
12 had written communication with Mr. Nio?
13   A.   I don't recall the first time.
14   Q.   When was the last time you had written
15 communication with Mr. Nio?
16   A.   I don't recall the last time, but it was many
17 months ago.
18   Q.   What did you discuss with Mr. Nio in these
19 communications?
20   A.   I don't recall.  Probably I referred him to
21 Mr. O'Donnell.
22   Q.   Other than referring him to Mr. O'Donnell, did
23 you discuss anything else with him?
24   A.   I think I discussed the Stars and Stripes
25 article he was in.

1    Q.   Have you had any communication by phone with
2 Mr. Nio?
3    A.   Can't recall.  It's possible.
4    Q.   Have you ever met with Mr. Nio in person?
5    A.   No.
6    Q.   Have you had any written communication with Qi
7 Xiong?  First name is spelled Q-i.  Last name is
8 X-i-o-n-g.
9    A.   She goes by Eva.
10   Q.   Okay.
11   A.   Yes.
12   Q.   When was the first time you had written
13 communication with Eva Xiong?
14   A.   She's one of my clients.
15   Q.   In what case are you representing her?
16   A.   An immigration case.  I should say former
17 client.
18   Q.   Is the case -- is the case over?
19   A.   Yes.
20   Q.   What were the claims in that case?
21   A.   There weren't any claims.  It was an immigration
22 case.
23   Q.   What was the -- was this brought in immigration
24 court?
25   A.   No.

1    Q.   What was the jurisdiction?  Where was the case
2 brought?
3    A.   United States Citizenship and Immigration
4 Services.
5    Q.   What was the proceeding?
6    A.   A naturalization proceeding.
7    Q.   Did you receive compensation for your work in
8 that case?
9    A.   Yes.
10   Q.   For how many years was Eva Xiong your client?
11   A.   A couple of years.
12   Q.   Is that fair to say she was your client for two
13 years?
14   A.   I can't recall the exact dates.
15   Q.   Was it more than one year?
16   A.   Yes.
17   Q.   Was it more than two years?
18   A.   Probably.  I mean, there was additional
19 representation relating to her husband.
20   Q.   In what type of proceeding did you represent her
21 husband?
22   A.   Adjustment of status.
23   Q.   Is that proceeding before a USCIS as well?
24   A.   Yes.
25   Q.   Did you receive compensation for your work on

1 that case?
2    A.   Yes.
3    Q.   Have you represented Ms. Xiong or her husband in
4 any cases other than the two USCIS proceedings we just
5 discussed?
6    A.   No.
7    Q.   When did those cases resolve?
8    A.   I can't recall exactly.  Whenever she
9 naturalized.
10   Q.   Was it in two thousand -- do you recall if it
11 was in 2016?
12   A.   I don't recall.  I would have to look at her
13 certificate to see.
14   Q.   Do you recall the number of plaintiffs that you
15 referred to Mr. O'Donnell before the complaint in this
16 case was filed?
17   A.   I don't recall the number.
18   Q.   Was it more than five?
19   A.   I don't recall.
20   Q.   If you had to estimate, what would you say?
21   A.   I wouldn't want to guess.
22   Q.   Would you estimate that it's more than five?
23   A.   Like I said, I wouldn't want to guess.
24   Q.   Was it more than one?
25   A.   More than one.

Page 58

1    Q.   Do you think it was more than ten?

2    A.   I don't think so.  But like I said, I don't want
3    to speculate on that.  I know it was more than one.

4    Q.   Do you recall when you first referred an
5    individual to Mr. O'Donnell?

6    A.   No.

7    Q.   Are you aware that plaintiffs have been added to
8    this case after the original complaint was filed?

9    A.   Yes.

10   Q.   Did you refer any of the plaintiffs who had been
11   added to the case to Mr. O'Donnell?

12   A.   I would be speculating.  He made his own
13   decisions, I think, about that.  So I don't know the
14   timing.

15         Can we get some water?

16         MR. SWINTON:  Why don't we go off the record and
17   we'll take a break.

18         (Off the record)

19         MR. SWINTON:  Before we go on the break, I just
20   want to reiterate the Department of Justice's view that
21   it's inappropriate to have conversations about the
22   substance of the deposition between counsel and the
23   witness.

24         THE WITNESS:  I'm not leaving the room, so...

25         MR. SWINTON:  Just wanted to put that on the

Page 59

1    record.

2         THE WITNESS:  I just wanted to get water.
3    That's all.  You can keep going.

4         MR. SWINTON:  I'd actually like to take a break
5    as well.  So let's go off the record and take a ten-minute
6    break.

7         (Recess taken)

8    BY MR. SWINTON:

9    Q.   We're back on the record.

10        Mr. Stock, during the break did you discuss the
11   deposition with Mr. O'Donnell?

12        MR. O'DONNELL:  I will object and instruct the
13   witness not to answer.

14        MR. SWINTON:  Again, Mr. O'Donnell, could you
15   just state the basis of your objection?

16        MR. O'DONNELL:  It's communication between my
17   expert and myself.

18        MR. SWINTON:  And do you have any authority for
19   your objection?

20        MR. O'DONNELL:  I'm not going to brief it here,
21   but I do.

22        MR. SWINTON:  Do you have any citations you can
23   provide us with?

24        MR. O'DONNELL:  You want to bring it up with the
25   Court, I'll provide it at that point.

Page 60

1         MR. SWINTON:  Did you review the citations that
2    Mr. Dugan gave you at the Verdugo deposition?

3         MR. O'DONNELL:  I reviewed the last one he gave
4    me.  It's the only one I wrote down.

5         MR. SWINTON:  The transcript reflects, I think,
6    three or four authorities that he cited.  If you have
7    contrary authority, we would be happy to review it.  Until
8    you provide us with that, then our request that you don't
9    discuss the content stands, and I think we'll address this
10   at the end of the deposition.

11   BY MR. SWINTON:

12   Q.   Ms. Stock, I wanted to go back to your role at
13   Cascadia Cross Border Law Group for just a little bit.
14   You said as owner you have certain responsibilities in
15   your position as the owner/managing partner.

16        Do you make employment decisions for the firm?

17   A.   I do.

18   Q.   Do you make hiring decisions?

19   A.   I do.

20   Q.   Do you make decisions about who to terminate?

21   A.   I do.

22   Q.   Have you ever had to terminate anybody?

23   A.   Yes.

24   Q.   Was that person a lawyer?

25   A.   No.

Page 61

1    Q.   And the people who have come on and joined the
2    staff of the firm since you started it in 2013, were you
3    responsible for -- or did you have input on the hiring of
4    those individuals?

5    A.   Yes.

6    Q.   Does anybody else have input on hiring
7    decisions?

8    A.   Yes.

9    Q.   Did you have input on the hiring of
10   Mr. O'Donnell?

11   A.   Yes.

12   Q.   Does anyone else at the firm have the authority
13   to fire an employee of Cascadia Cross Border Law Group?

14   A.   No.

15   Q.   Does anybody else at the firm have the authority
16   to hire an employee for the firm?

17   A.   Subject to my approval.

18   Q.   Thank you.  I'm interested in talking a little
19   bit more about your involvement in this case.

20        Have you reviewed any drafts of the plaintiffs'
21   filings in this case before they were filed?

22   A.   I have occasionally reviewed them for typos,
23   yes.

24   Q.   Did you provide any feedback on the drafts,
25   other than typos?

1    A.  Factual.  I've corrected -- I'm an expert so I
2  notice things that are factually incorrect and I correct
3  those.
4    Q.  Do you have an example of a factual correction
5  that you made?
6    A.  Sure.  For example, I would read Mr. Arendt's
7  affidavit and note factual errors in Mr. Arendt's
8  statements.  Then I would make sure that those factual
9  errors in Mr. Arendt's statements didn't carry over into
10  Mr. O'Donnell's briefs.
11    Q.  Did you review a draft of the original complaint
12  in this case before it was filed?
13    A.  I may have, yes.
14    Q.  Did you review a draft of the first amended
15  complaint in this case before it was filed?
16    A.  Yes.  I did review that.
17    Q.  Did you review a draft of the second amended
18  complaint before it was filed?
19    A.  I don't think I did.
20    Q.  The operative complaint in this case right now
21  is the third amended complaint.
22       Did you review a draft of the third amended
23  complaint before it was filed?
24    A.  I don't think I saw it before it was filed.  I
25  think I saw it after it was filed.

1    Q.  Did you review the first motion for a
2  preliminary injunction that was filed by the plaintiffs in
3  this case?
4    A.  I reviewed it after it was filed, yes.
5    Q.  Did you review it before it was filed?
6    A.  I may have reviewed it for typos.  Can't recall.
7    Q.  Did you review a draft of the second motion for
8  preliminary injunction before it was filed in this case?
9    A.  I cannot recall if I reviewed a draft of that
10  particular document.  I know I reviewed it after it was
11  filed.
12    Q.  Did you review a draft of the motion for class
13  certification in this case before it was filed?
14    A.  No.
15    Q.  Did you review a draft of the plaintiffs'
16  opposition to the government's motion to dismiss before it
17  was filed?
18    A.  I can't recall exactly which documents I
19  reviewed in draft versus after they were filed.  I know I
20  sometimes reviewed different documents to check for typos
21  and for factual errors, but if the document didn't have
22  anything factual or if it was just a legal, it's not
23  likely that I reviewed it before it got filed.  I didn't
24  review every single thing.
25    Q.  Did you review a draft of plaintiffs' motion for

1  summary judgment before it was filed in this case?
2    A.  I probably did because that would have had
3  factual information in it.  So I think I probably would
4  have reviewed that.
5    Q.  Other than typo -- what do you mean by typos?
6  When you said you reviewed for typos, what are you
7  referring to?
8    A.  Well, the common one is the acronym Military
9  Accessions Vital to the National Interest.  The correct
10  acronym is MAVNI, Mike Alpha Victor November India, and
11  Mr. O'Donnell has a regular habit of transposing the V and
12  the N and calling it MANVI, which is not correct.  This is
13  also a common error in the government's filings.  And it
14  bothers me that people get the acronym wrong, so I was
15  constantly correcting that back to the correct acronym,
16  which is MAVNI, not MANVI.
17    Q.  Would you review for any other typos or just
18  MAVNI?
19    A.  Yeah.  I generally review for factual errors,
20  misspellings of people's names, grammatical errors.  I'd
21  just read the factual section and if I saw something
22  wrong, I'd highlight it.
23    Q.  Would you do anything more than highlight an
24  error that you saw?
25    A.  Yeah.  I'd correct it, like MAVNI, and I would

1  put "change throughout."
2    Q.  Have you proposed language on draft filings?
3    A.  No.
4    Q.  Have you proposed that Mr. O'Donnell include
5  certain facts when you review the drafts of any filings?
6    A.  If he needed to correct a fact, I might, yeah.
7  I mean, there's a lot of acronyms in the military and
8  there's a lot of procedures and techniques and everything,
9  and one of the striking things about the government
10  filings is often there are factual errors in those.  So I
11  would have to explain those as the expert to
12  Mr. O'Donnell, that the government has these facts wrong
13  and you need to understand the correct facts.
14    Q.  Did you review plaintiffs' request for
15  production of documents from the Department of Defense
16  before they were served on the government?
17    A.  I'd have to look at the document to tell you
18  whether I looked at it.  Probably.
19    Q.  Do you recall suggesting that plaintiffs request
20  the production of any certain documents from the
21  Department of Defense?
22    A.  I don't recall doing that, but it's possible.
23    Q.  So it's possible that you requested that
24  plaintiffs request certain documents from the government?
25    A.  Well, I'm an expert, so I'm familiar with

Page 66

1  **different facts of the MAVNI program and I might have**
2  **suggested things. That's possible.**
3     Q. Did you review the drafts of the interrogatories
4  **that plaintiffs served on the government in this case?**
5     **A. I don't believe so. It's possible, though.**
6     Q. Did you review plaintiffs' responses to the
7  government's interrogatories that were served on the
8  plaintiffs in this case, before they were served on the
9  government?
10    **A. No.**
11    Q. Did you review the government's request for
12 production of documents in this case?
13    **A. I reviewed my subpoena.**
14    Q. And the request for production of documents that
15 I'm referring to is the request for documents that were
16 served on plaintiffs in the winter or spring of 2018. Did
17 you review --
18    **A. I don't recall reviewing that.**
19    Q. Did you help Mr. O'Donnell prepare for the
20 deposition of Curtis Kingsland?
21    **A. No.**
22    Q. Did you help Mr. O'Donnell prepare for the
23 deposition of Daniel Purtell?
24    **A. No.**
25    Q. Did you help Mr. O'Donnell prepare for the

Page 67

1  deposition of Latrice McSwain?
2     **A. No.**
3     Q. Did you help Mr. O'Donnell prepare for the
4  deposition of Valdeta Mehanja?
5     **A. No.**
6     Q. Did you help Mr. O'Donnell prepare for the
7  deposition of Mary Dandridge?
8     **A. No.**
9     Q. Did you help Mr. O'Donnell prepare for the
10 deposition of Terrell White?
11    **A. No.**
12    Q. Were you aware that Mr. O'Donnell would be
13 taking a deposition of Curtis Kingsland before it was
14 taken?
15    **A. I knew he was flying to D.C. to do depositions.**
16 **I don't think I knew the names of the particular people he**
17 **was deposing.**
18    Q. Do you recall what Mr. O'Donnell told you about
19 those depositions?
20    **A. I don't recall, but -- you know. He told me he**
21 **flew to D.C. and he did a whole bunch of depositions.**
22    Q. Did he tell you about the -- this is just a
23 yes-or-no question.
24       Did he tell you what questions he intended to
25 ask at a deposition?

Page 68

1     **A. No.**
2     Q. Did you suggest any questions that he should ask
3  at the depositions?
4     **A. No.**
5     Q. Have you ever spoken to Valdeta Mehanja about
6  her deposition?
7     **A. No.**
8     Q. Did you review the transcripts of the
9  depositions of Curtis Kingsland?
10    **A. Yes.**
11    Q. And the transcript of the deposition of Daniel
12 Purtell?
13    **A. Yes.**
14    Q. And the transcript for the McSwain deposition?
15    **A. Yes.**
16    Q. And Mehanja?
17    **A. Yes.**
18    Q. And Dandridge?
19    **A. Yes.**
20    Q. And White?
21    **A. Yes.**
22    Q. Why did you review those transcripts?
23    **A. Because I'm an expert in the case and I wanted**
24 **to see what they were saying and I wanted to be familiar**
25 **with the facts of the case.**

Page 69

1     Q. We talked before about your attendance at an
2  argument in court in March 2018, and you mentioned the
3  importance of seeing somebody in person versus reviewing
4  the transcripts.
5        Why didn't you attend the depositions of these
6  individuals?
7     **A. I was extremely busy at work. I didn't have the**
8  **time to fly to D.C. and take a whole week, and I couldn't**
9  **afford it.**
10    Q. Did you help Mr. O'Donnell in any way prepare
11 for the deposition of Raj Chettri?
12    **A. I didn't -- I did not, no.**
13    Q. Did you help Mr. O'Donnell in any way prepare
14 for the deposition of Seung Yoon Yang?
15    **A. No.**
16    Q. Did you help Mr. O'Donnell in any way prepare
17 for the deposition of Kirti Tiwari?
18    **A. No.**
19    Q. Did you help Mr. O'Donnell in any way prepare
20 for the deposition of Amandeep Singh?
21    **A. No.**
22    Q. Have you reviewed the deposition transcript of
23 Raj Chettri?
24    **A. I have not.**
25    Q. Have you reviewed the deposition transcript of

1  Seung Yoon Yang?

2      **A.  No.**

3      Q.  You reviewed the deposition transcript of Kirti

4  Tiwari?

5      **A.  Don't recall reviewing that one, no.**

6      Q.  Have you reviewed the deposition transcript of

7  Amandeep Singh?

8      **A.  No.**

9      Q.  Did you help Mr. O'Donnell in any way prepare

10  his pretrial disclosures that were served on the

11  government last week?

12      **A.  I provided him with an expert report.**

13      Q.  Have you seen the pretrial disclosures that

14  Mr. O'Donnell sent to the government last week?

15      **A.  I have not.**

16      Q.  Ms. Stock, are you aware of other litigation in

17  federal district court that's being brought by MAVNI

18  soldiers?

19      **A.  Yes.**

20      Q.  We said before that -- you said the acronym

21  MAVNI stands for the Military Accessions Vital to the

22  National Interest program within the military.

23          So as we go forward in the deposition today and

24  say MAVNI, I assume we can agree that that's what the

25  acronym stands for?

1      **A.  Yes, we can.**

2      Q.  I just wanted to make that clear for the

3  transcript.

4      **A.  Right.  What concerns me is the mispronunciation**

5  **of the acronym by numerous people within and without the**

6  **Department of Defense.  They call it MANVI, which is not**

7  **the correct acronym.  It's MAVNI.**

8      Q.  Okay.  I was just making sure that the

9  transcript reflected what we both understand the acronym

10  to mean.

11      **A.  Right.**

12      Q.  So the other cases in federal district court

13  that are being brought by MAVNI soldiers, are you an

14  attorney of record in any of those cases?

15      **A.  Yes.**

16      Q.  Which cases are you the attorney -- an attorney

17  of record?

18      **A.  Let's see.  Praveen Gampala.  Xilong Zhu.  Qi**

19  **Wang.  Peter Mathenge.  Vicki Thacker.  And these are just**

20  **current cases, right, not ones that we've dismissed?**

21      Q.  Let's start with current.

22      **A.  There's another one.  I'm drawing a blank on it,**

23  **so let me think about it.  The Yang case, Seattle.**

24      Q.  What's that individual's first name?

25      **A.  It will come to me in a minute.  I'm just**

1  **drawing a blank.  There's too many names.  Sorry.  I can**

2  **look it up.**

3      Q.  Are there any others, current cases?

4      **A.  Current cases.  There are some that haven't been**

5  **filed yet that are in draft.  But they haven't been filed**

6  **yet.**

7      Q.  So I have six current cases.

8      **A.  Let me see.  There's another one.  Vaghela.**

9      Q.  Do you know that individual's first name?

10      **A.  Hansal.**

11      Q.  You mentioned the Gampala case.

12          In what district court is that case proceeding?

13      **A.  California, Northern District.**

14      Q.  The Zhu case?

15      **A.  Seattle, Western District.**

16      Q.  The Vang case?

17      **A.  The which one?**

18      Q.  Vang.

19      **A.  The which one?**

20      Q.  I heard it as Vang.

21      **A.  Wang.  Northern District, California.**

22      Q.  I don't know if I have this one.  The Peter --

23      **A.  Texas.**

24      Q.  Sorry.  What was that?

25      **A.  San Antonio.**

1      Q.  What was that individual's last name?

2      **A.  Mathenge.**

3      Q.  How do you spell Mathenge?

4      **A.  M-a-t-h-e-n-g-e.  Mike Alpha November (sic)**

5  **Tango Hotel Echo November Golf Echo.**

6      Q.  The Thacker case?

7      **A.  Boston.**

8      Q.  And you said the Yang case is in --

9      **A.  Seattle.**

10      Q.  -- the Western District of Washington?

11          And then the Vaghela Case?

12      **A.  Texas, Dallas.**

13      Q.  Is San Antonio, that's -- which district court

14  is that?

15      **A.  I think it's Western District, Texas.**

16      Q.  So I have seven cases -- current cases in which

17  you are an attorney of record that are being brought --

18  were being brought on behalf of MAVNI soldiers?

19      **A.  Yep.**

20      Q.  You mentioned that there are former cases.  Do

21  you recall how many former cases you've had that --

22      **A.  No.  I don't recall how many exactly.  I'd have**

23  **to sit down and go through my files and figure it out.**

24      Q.  Do you think -- is it more than ten?

25      **A.  I don't think so.**

1    Q.   Do you think it's more than five?

2    A.   I can't be sure.

3    Q.   Would a fair estimate be that you've brought

4  between five to ten cases that are now closed on behalf of

5  MAVNI soldiers?

6    A.   It's possible, yeah.

7    Q.   The seven active cases, do those all bring the

8  same -- present the same issue?

9    A.   No.  They're different.  Some of them are -- the

10  vast majority are trying to get their American citizenship

11  and they're stymied by these new DoD policies that prevent

12  people from getting citizenship through military service,

13  but some of them have breach of contract claims or other

14  types of claims.

15    Q.   Is the defendant in all the cases the same

16  government agency?

17    A.   Not always, no.

18    Q.   Which agencies are being sued in these --

19    A.   Sometimes it's DoD, USCIS, the Army.

20    Q.   How did you become involved in these cases?

21    A.   How did I become involved in them?

22    Q.   Uh-huh.

23    A.   Lawyers or potential plaintiffs would contact me

24  and ask me to become involved in them.

25    Q.   Which lawyers have contacted you about these

1  cases?

2    A.   I mean, there's an enormous number of lawyers

3  who have contacted me about these cases.  Do you want me

4  to name them all?

5    Q.   Well, I understood you to say that you became

6  involved in these cases because lawyers contacted you

7  about them.

8         Did lawyers refer you to handle these cases?

9    A.   So typically what happens is some lawyer often

10  will call me and say they know so and so, and so and so is

11  having a problem.  For example, I mentioned earlier

12  Colonel Jebb, Cindy Jebb.  She's the dean at West Point.

13  She's an attorney with -- former JAG.  And she called me

14  because Duncan Makau was having a legal problem and the

15  Army wasn't able to help him.

16         So the Army JAG attorney he'd gone to see didn't

17  know how to help him, and so she called me and said,

18  Duncan has a legal problem.  Can you help him, Margaret?

19  And I would talk to her about the facts of the case and I

20  would say, he can try to find a lawyer who does this or

21  does this or whatever to resolve the problem.  And

22  sometimes I ended up helping the person myself and

23  sometimes I would refer them to somebody else.

24         So it's the same sort of thing with these cases.

25  Sometimes I refer them to an attorney locally who is

1  willing to handle the case and I come in as like the

2  expert, or sometimes I take the case as -- with local

3  counsel.  There's a local counsel that takes the case but

4  I'm co-counsel with them.

5    Q.   When you say "local," when you refer them

6  locally, does that mean you refer them to an attorney in

7  the district where the case is being brought or someone in

8  the Alaska?

9    A.   No.  Somebody in the district where the case is

10  being brought.

11    Q.   Okay.  I just wanted to make sure --

12    A.   I'm not the only one filing these cases.

13  There's other attorneys filing them.  And sometimes

14  another attorney wants to just take it themselves and do

15  it themselves, and sometimes they want to do it but only

16  if I'm willing to be their co-counsel.

17    Q.   Are you serving as an expert witness in any

18  other current MAVNI cases other than Tiwari?

19    A.   MAVNI.  No.

20    Q.   Have you ever served as an expert witness in any

21  other MAVNI cases?

22    A.   MAVNI cases, yeah, but not -- I mean, there's a

23  lot of MAVNI cases.

24    Q.   Okay.  I'm only interested in the ones in which

25  you've served as an expert witness.

1    A.   Okay.  So yes, I've been an expert witness, but

2  not like -- I've been a consulting expert.

3    Q.   Not a testifying expert?

4    A.   Not a testifying expert.

5    Q.   In how many cases have you been a litigation

6  consultant, how many MAVNI cases?

7    A.   Lots of them.

8    Q.   What does that mean to be a litigation

9  consultant?

10    A.   A lawyer who is handling the case calls me and

11  asks me about facts in the case and my expert opinion

12  about what's going on in the case or what the government

13  is doing to the person.

14    Q.   Are you compensated for your work as a

15  litigation consultant?

16    A.   Typically, no.

17    Q.   Have you been compensated for your work as

18  litigation consultant?

19    A.   Not in any of the MAVNI cases, no.

20    Q.   Do you have any sort of contractual agreement

21  where you're acting as litigation consultant?

22    A.   I may.  In some cases I do sign those.

23    Q.   If there's no compensation involved, what -- and

24  these are MAVNI -- do you have a contract in any case --

25  MAVNI cases in which you've been a litigation consultant?

Page 78

1    A.   Not right now, no.

2    Q.   Have you been -- have you been a litigation

3 consultant in any MAVNI cases in which there was a

4 contract in the past?

5    A.   Yes.

6    Q.   And there was a contract between you and the

7 plaintiff's counsel handling the case --

8    A.   Yes.

9    Q.   -- that involved claims on behalf of MAVNI

10 soldiers?

11    A.   Yes.

12    Q.   Did you receive compensation for that work?

13    A.   No.

14    Q.   What was discussed in the contract, then, if you

15 weren't being paid?

16    A.   The general agreement.  Some lawyers like to

17 have a contract that explains in writing -- it's required

18 by bar rules -- who's doing what services and what the

19 lawyer is going to provide and what the rules are.  It's a

20 good practice.

21    Q.   But you don't do it in every case?  You don't

22 have a contract in every case where you're a litigation

23 consultant?

24    A.   Well, it depends on the lawyer I'm dealing with.

25 I mean, I may have like a long-standing relationship with

Page 79

1 them so I don't feel like I need to have a new

2 contract or -- but it's good professional practice for

3 people to have a contract with a consulting expert.

4    Q.   Ms. Stock, are you aware of a case in the

5 district court for D.C. called Kirwa versus the Department

6 of Defense?

7    A.   Yes, I'm aware of that case.

8    Q.   Are you an attorney of record in that case?

9    A.   No, I'm not.

10    Q.   Do you know who represents the plaintiffs?

11    A.   The Fried Frank law firm.

12    Q.   Have you ever spoken to any attorney at Fried

13 Frank?

14    A.   Yes, I have.

15    Q.   Are you a litigation consultant in that case?

16    A.   No.

17    Q.   Do you have any sort of contractual agreement

18 with Fried Frank?

19    A.   Yes, I do.

20    Q.   Are you being compensated by Fried Frank?

21    A.   No.

22    Q.   Are you able to tell me the terms of your

23 contract with Fried Frank?

24    A.   Common interest privilege.

25    Q.   When was the last time you spoke to any attorney

Page 80

1 at Fried Frank about the Kirwa case?

2    A.   I think that would be privileged.

3    Q.   I'm not asking for the substance of the

4 communication.  I'm just asking, when is the last time you

5 spoke to someone, any attorney at Fried Frank?

6    A.   Within the last few days.

7    Q.   How often do you communicate with attorneys at

8 Fried Frank about the Kirwa case?

9    A.   Regularly.

10    Q.   What does "regularly" mean?

11    A.   On a regular basis.

12    Q.   Do you speak to them every week?

13    A.   Probably.

14    Q.   Do you speak to them more than one time a week

15 about the Kirwa case?

16    A.   Yes.

17    Q.   Do you speak to them more than three times a

18 week about the Kirwa case?

19    A.   Depends on the week.

20    Q.   Did you refer any of the plaintiffs in the Kirwa

21 case to Fried Frank?

22    A.   Yes.

23    Q.   How many of the plaintiffs did you refer to

24 Fried Frank?

25    A.   I can't tell you.  It's a class action, so I'm

Page 81

1 aware --

2    Q.   How many of the named plaintiffs did you refer

3 to Fried Frank for the Kirwa case?

4    A.   I can't tell you.

5    Q.   Do you not know?

6    A.   I don't know.

7    Q.   Why did you refer the named plaintiffs in Kirwa

8 to Fried Frank?

9    A.   I knew Fried Frank was bringing a case and I

10 wasn't going to be handling a case, and so if people came

11 to me with a problem, I would send them to the law firm

12 that was going to be handling the case.

13    Q.   Have you ever reviewed drafts of the plaintiffs'

14 court filings in the Kirwa case before they're filed?

15    A.   Yes.

16    Q.   Did you provide feedback on those drafts of the

17 court filings before they were filed?

18    A.   I corrected some typos one time.

19    Q.   Did you do anything other than correct typos?

20    A.   No.

21    Q.   Did you check for factual accuracy?

22    A.   I did check for factual accuracy.

23    Q.   Did you provide any feedback on strategy of the

24 case?

25    A.   No.

Page 82

1    Q.  Have the attorneys with Fried Frank ever
2  provided you with documents that they received from the
3  government in the Kirwa case?
4    A.  No.
5    Q.  Have you ever provided any attorney --
6    A.  Oh wait.  I have to correct that.  They provided
7  me with documents that were filed with the court that they
8  were permitted to provide to me.  Put it that way.
9    Q.  What does that mean, permitted to provide to
10  you?
11    A.  Well, we had joint clients and they had received
12  documents from the government relating to a joint client,
13  and so they would provide the document.
14    Q.  What were those documents?
15    A.  What were those documents?
16    Q.  That Fried Frank provided to you.
17    A.  I think I got a report of the status of a
18  particular client's security screening.
19    Q.  Did you receive any other documents from Fried
20  Frank, documents that -- attorneys at Fried Frank received
21  from the Kirwa case?
22    A.  Okay.  From the Kirwa case or from the
23  government?
24    Q.  So I want to focus only on the Kirwa case.
25       But did you receive from attorneys at Fried

Page 83

1  Frank any documents that they received from the government
2  in the Kirwa case?
3    A.  Okay.  So at one point in the Kirwa case the
4  judge issued a preliminary injunction, and there was a
5  packet of stuff that had to be given to all of the
6  potential plaintiffs, or members of the class in the case,
7  and they sent me a copy of that to distribute to my
8  clients.  So, for example, the government had come up
9  with -- I mean, I don't remember exactly what the packet
10  was, but the government came up with a packet of stuff
11  that they wanted sent out to all the class members, and so
12  the lawyers for the class action were trying to get that
13  information out to all the plaintiffs in the Kirwa case
14  because they didn't have -- the government wouldn't give
15  them a list of all the plaintiffs in the class, the people
16  in the class.  The government was refusing to give them a
17  list of everybody in the class.
18       So they put together a packet that went out
19  to -- they sent it out to lots of different lawyers and
20  said, if you have a client who is a member of the class,
21  this is the packet.  And the same packet went out all over
22  the place.  I mean, the Army sent it out to thousands of
23  people, over 4,000 people.  So that's what I'm talking
24  about.
25    Q.  Have you ever provided any attorney at Fried

Page 84

1  Frank with information that was then used by Fried Frank
2  in the Kirwa case?
3    A.  I think that's like an incredibly overbroad
4  question.
5    Q.  It's a yes-or-no question.  Are you able to
6  answer it?
7    A.  Any information or anything that was used in the
8  case, I gave them a copy of my book.
9    Q.  Have you provided any attorney at Fried Frank
10  with documents that were then used in the Kirwa case?
11    A.  Yes.
12    Q.  What documents?
13    A.  The documents that they're putting in their --
14  documents relating to their class members.
15    Q.  What specific documents did you provide to Fried
16  Frank that were used in the Kirwa case?
17    A.  For example, a CI report that one of my clients
18  got back, e-mails that one of my clients got.
19    Q.  Are you aware of a case in the district of the
20  District of Columbia called Nio versus the Department of
21  Homeland Security?
22    A.  Yes, I am.
23    Q.  Are you an attorney of record in that case?
24    A.  No.
25    Q.  Do you know who represents the plaintiffs?

Page 85

1    A.  Yes.
2    Q.  Who represents the plaintiffs?
3    A.  The Fried Frank law firm.
4    Q.  Are those the same attorneys who represent the
5  plaintiffs in the Kirwa case?
6    A.  Yes.
7    Q.  Have you ever spoken to any attorney at Fried
8  Frank about the Nio case?
9    A.  Yes.
10    Q.  How often do you speak to the attorneys at Fried
11  Frank about Nio?
12    A.  Regularly.
13    Q.  Do you speak to them more than two times a week?
14    A.  Depending on the week, that may happen.
15    Q.  Do you speak with them by phone?
16    A.  I might speak with them by phone, yes.
17    Q.  Have you had written communication with them?
18    A.  Yes.
19    Q.  E-mail?
20    A.  Yes.
21    Q.  Have you met with the Fried Frank attorneys in
22  person about the Nio case?
23    A.  I have.
24    Q.  And about the Kirwa case?
25    A.  Yes.

1    Q.   When did you meet with the Fried Frank attorneys
2   in person?
3    A.   I mean, I occasionally met with them when I go
4   to D.C.  I say hello.  I have lunch.
5    Q.   When was the last time that you met with them in
6   person?
7    A.   I met with them a couple of weeks ago.  I was in
8   Washington, D.C.  I had lunch.
9    Q.   And what do you discuss with the Fried Frank
10  attorneys about the Nio case?
11   A.   I discussed the frustration that many of my
12  clients are experiencing because they can't get
13  information about the status of their background checks
14  and how the government is proceeding at a glacially slow
15  pace, hardly clearing anybody at all, and how the
16  government lawyers are often in court presenting
17  inaccurate information to the Court.  And I expressed my
18  concern that the government lawyers don't seem to be
19  making accurate, factual representations to the Court in
20  the case.
21   Q.   Have you attended any court proceedings in the
22  Nio case?
23   A.   I only recall attending one a very, very long
24  time ago, and I don't remember the month, but it was
25  probably more than a year ago.

1    Q.   Was that in the Nio case?
2    A.   You know, I'm not sure.  I happened to be in
3   D.C. and I heard there was a court hearing that day and I
4   went over to the courthouse and just kind of sat in the
5   back of the courtroom just to see what was going on,
6   because I just happened to know -- somebody sent me an
7   e-mail.  It wasn't them.  It was some MAVNI.  And said
8   they were going to be in the court that day and there was
9   a court hearing and I was curious, so I went over to
10  watch.
11   Q.   Did you meet with any Fried Frank attorneys
12  after you observed that court session?
13   A.   No, not that day.
14   Q.   Did you tell them that you were going to be
15  attending that?
16   A.   I didn't.
17   Q.   Have you referred any of the named plaintiffs in
18  Nio to Fried Frank?
19   A.   Okay.  I'd have to run down the list of all the
20  named plaintiffs, but I regularly get contacted by MAVNIs
21  who are having problems, and I refer everybody to the
22  Nio -- to the Fried Frank firm that has a problem that is
23  lined up with what they've brought claims about.
24       So I've literally had hundreds and hundreds of
25  MAVNIs contacting me, and I assume Fried Frank figured out

1   which ones to make named plaintiffs, but I couldn't tell
2   you for sure.  I would have to go down through the list of
3   named plaintiffs and then check and see.
4    Q.   Did you have any communications with any
5   attorneys at Fried Frank before the Nio case was filed?
6    A.   I did.
7    Q.   How did you first start communicating with
8   attorneys at Fried Frank about the allegations underlying
9   the Nio case?
10   A.   How?
11   Q.   Uh-huh.
12   A.   In person, by telephone, by e-mail.
13   Q.   Sure.  I guess I'm wondering what is the origin
14  of the relationship that you have with the Fried Frank
15  attorneys?  How did you know to start talking to them?
16  Did they reach out to you first?
17   A.   Let me try to remember.  Well, I served on a
18  commission, the American Bar Association Commission on
19  Immigration, with an attorney from Fried Frank.
20   Q.   Who is that attorney from Fried Frank?
21   A.   Karen Grisez.  And I think that's how I know the
22  firm.
23   Q.   When you first became aware of allegations that
24  underlie the claims in the Nio case, did you refer the
25  individuals making those allegations to Fried Frank?

1    A.   Well, I generally referred them to any lawyers I
2   thought could help them.  And at some point Fried Frank
3   announced that they were willing to take a pro bono case.
4   And then I started referring people to them because they
5   had indicated they were going to do a pro bono case.
6    Q.   Have any attorneys with Fried Frank ever
7   provided you with documents that they received from the
8   government in the Nio case?
9    A.   I mean, when you say documents I received from
10  the government, I monitor PACER, so...
11   Q.   And I'm not interested in court filings.  So
12  let's talk only about noncourt filings.
13       So if there are any filings that the government
14  provides only to plaintiff's counsel in Nio, including
15  documents under seal, have you received any of those
16  documents from Fried Frank?
17   A.   They have not provided me with any documents
18  that are under seal.
19   Q.   Have you received any other documents that the
20  government provided to Fried Frank attorneys, that were
21  not public, that were provided as part of the Nio case?
22   A.   I've received documents that relate to my
23  particular clients.
24   Q.   What are those documents?
25   A.   Well, the government publishes a list that has

Page 90

1 when somebody's security clearance cleared and so forth,
2 and they black out the names on the public filing, and
3 Fried Frank has confirmed to me if my client is one of
4 those names when I call them and ask them about a
5 particular client.
6     Q. Have you seen a copy of the administrative
7 record that was filed in Nio?
8     A. Have I seen it? I know I've seen parts of it.
9 I mean, I monitor PACER, and whenever there's anything on
10 PACER, if it got filed on PACER I probably have seen it.
11     Q. If I told you that there is an administrative
12 record filed in Nio that is not available via PACER, have
13 you reviewed any documents from the administrative record
14 in Nio that were not available on PACER?
15     A. Well, you'd have to tell me what was in it,
16 because I've reviewed a lot of documents. I mean, if you
17 gave me a list of all the documents in the administrative
18 record, I could go through and tell you probably if I've
19 seen that document.
20     Q. Has Fried Frank ever sent to you -- have
21 attorneys with Fried Frank ever sent to you documents that
22 you know to not be part of the -- let me start that over.
23     Have Fried Frank attorneys ever sent to you
24 nonpublic documents that you know to be part of the
25 administrative record in Nio?

Page 91

1     A. No.
2     Q. Have you ever signed any forms limiting the use
3 of information -- have you ever signed any forms limiting
4 the use of documents that you received from Fried Frank
5 that are nonpublic documents that were filed in the case?
6     A. I don't recall.
7     Q. Have you ever signed any forms limiting the use
8 of documents in which the caption at the top of the form
9 referred to the Nio case?
10     A. Can you say that again?
11     Q. Sure. So have you ever signed any forms that
12 restrict the use of documents that were exchanged in
13 connection with the Nio case?
14     A. I mean, can you clarify? What are you talking
15 about? Is there a specific document you're thinking I
16 signed?
17     Q. Yeah. There are forms -- I think you're
18 probably aware of this as an attorney -- in which, whether
19 it's in discovery and in other contexts, parties will be
20 restricted for the use of how they can use documents that
21 have been exchanged between the parties. Such a form has
22 been submitted in the Nio case for use of the documents
23 contained in the administrative record.
24     Have you signed such a form limiting disclosure
25 and use of documents that were exchanged as part of the

Page 92

1 Nio case?
2     A. I'm not counsel in the case so I don't -- I
3 mean, you're talking about like would I have signed a
4 protective order in the Nio case?
5     Q. So the document doesn't limit only attorneys, as
6 I think you know, but --
7     A. No, I don't. I don't -- I honestly don't know
8 what you're talking about. So can you show me this
9 document so I can tell you if I signed it --
10     Q. I don't have a copy of the form with me.
11 But I'm asking if you -- do you recall signing
12 any forms in connection with the Nio case?
13     A. Signing any forms?
14     Q. Signing.
15     A. Signing any forms.
16     Q. In connection with the Nio case.
17     A. I may -- no, I don't think I've given them an
18 affidavit. I guess I've got to know what you're talking
19 about, because I don't --
20     Q. So my question is very simple. And it's just a
21 "yes" or "no."
22     Do you recall signing any forms in connection
23 with the Nio case? Any forms.
24     A. Any forms? Yes. I recall signing multiple
25 N-400s for people who are plaintiffs in the Nio case.

Page 93

1     Q. Okay. Do you recall signing any forms --
2     A. And G-28s.
3     Q. Okay. Thank you. Do you recall signing any
4 forms that govern the use of documents --
5     A. No.
6     Q. -- in connection with the Nio case?
7     A. No, but I don't -- I'm not part of that, so I
8 wouldn't have signed any.
9     Q. Okay. That's all I wanted to know.
10     Have you ever provided any attorney at Fried
11 Frank with information to be used in the Nio case?
12     A. Yes.
13     Q. What information have you provided to Fried
14 Frank attorneys?
15     MR. O'DONNELL: I think you're asserting a
16 common interest privilege.
17     A. Yeah. I'm going to assert a common interest
18 privilege. I mean, we represent the same clients and I
19 give them things that relate to my clients.
20     Q. I'm sorry. We're still on the record. Do you
21 need to take a break, Ms. Stock?
22     A. I'm just grabbing some water because my teeth
23 are hurting.
24     Q. Have you ever provided any attorney at Fried
25 Frank with the date of birth of a MAVNI soldier?

Page 94

1     A.  I'm going to object to that as being common
2   interest privileged information.
3     Q.  Have you ever provided any attorney at Fried
4   Frank with the A number of a MAVNI soldier?
5     A.  I'm going to object to that as being common
6   interest privilege.  But -- well, actually, I'll waive
7   that on a particular case.  Yes, I have.  I sent an e-mail
8   to the DOJ at one time and I copied Fried Frank with it.
9   Colin Kisor and I have communicated regularly by e-mail.
10  And in some cases I've been asked by Colin and by Elianis
11  Perez for the A numbers of different members of the Nio
12  case.  So I provided equally to the government and to
13  Fried Frank if I'm asked for that information.  But
14  Elianis Perez has repeatedly asked me for A numbers.
15    Q.  Do you represent any MAVNI soldiers in cases
16  that have been brought in jurisdictions other than federal
17  district court?
18    A.  Can you ask that again?
19    Q.  Do you represent any MAVNI soldiers in cases
20  that have been brought somewhere other than federal
21  district court?
22    A.  So in state court you're asking?
23    Q.  Sure.  Let's start there.
24        Have you brought any state court cases on behalf
25  of MAVNI soldiers?

Page 95

1     A.  I have not brought any state court cases on
2   behalf of any MAVNI soldiers, no.
3     Q.  Have you represented -- I think you said before
4   that you've represented at least one MAVNI soldier and
5   her -- one plaintiff in Tiwari and her husband in a USCIS
6   proceeding.
7         Have you represented other MAVNI soldiers in
8   USCIS proceedings?
9     A.  Yes.
10    Q.  How many have you -- MAVNI soldiers have you
11  represented in USCIS proceedings?
12    A.  Hundreds of them.
13    Q.  More than 500?
14    A.  I'd have to go count.  I can't tell you for
15  sure.  USCIS would know.
16    Q.  I'm just asking if you have an estimate.
17    A.  I don't have an estimate.
18    Q.  Somewhere in the hundreds?
19    A.  Yeah.
20    Q.  Is it more than 1,000?
21    A.  I'm sorry, but I'd have to go count up the
22  files.  I mean, this has been going on from 2009 till now.
23    Q.  Have you represented MAVNI soldiers in any
24  proceedings other than federal district court proceedings
25  and USCIS proceedings?

Page 96

1     A.  Executive Office for Immigration Review
2   proceedings, ICE proceedings, Customs and Border
3   Protection, U.S. Citizenship and Immigration Services.
4   That would be it.  I guess State Department.
5     Q.  So starting with EO -- what's the acronym again?
6   I always forget.
7     A.  Executive Office for Immigration Review.
8     Q.  EOIR.  What type of proceedings have you
9   represented MAVNI soldiers in before EOIR?
10    A.  When their government is trying to deport the
11  MAVNI soldier.
12    Q.  How many such cases have you represented MAVNI
13  soldiers in?
14    A.  A handful.  Less than ten.
15    Q.  What type of proceedings have you represented
16  MAVNI soldiers in in cases before CVP?
17    A.  There are cases where CVP is thinking about
18  excluding somebody from the country or paroling them into
19  the country, and I've represented the person in front of
20  CVP with respect to the parole or the decision to exclude
21  the person.
22    Q.  In how many CVP proceedings have you represented
23  MAVNI soldiers?
24    A.  I'd say less than ten.
25    Q.  What type of ICE proceedings have you

Page 97

1   represented MAVNI soldiers?
2     A.  Cases where ICE is trying to decide whether to
3   deport somebody, take them into custody, put them on an
4   ankle bracelet, send them in front of EOIR.
5     Q.  In how many ICE proceedings have you represented
6   MAVNI soldiers?
7     A.  I would say less than ten.
8     Q.  In what type of State Department proceedings
9   have you represented MAVNI soldiers?
10    A.  Contacting the State Department about a visa
11  issue.
12    Q.  In how many visa issue cases -- or proceedings
13  have you represented MAVNI soldiers?
14    A.  I would say less than ten.
15    Q.  Are there any other types of proceedings with
16  the State Department in which you've represented MAVNI
17  soldiers?
18    A.  Passport cases.
19    Q.  In how many of those have you represented MAVNI
20  soldiers?
21    A.  I'd say less than ten.
22    Q.  So starting with the EOIR proceedings, the
23  deportation proceedings you mentioned, were any of the
24  MAVNI soldiers you represented in any of those contexts
25  plaintiffs in the Tiwari case?

1   A.  No.

2   Q.  The CVP proceedings in which you represented

3  MAVNI soldiers, were any of those individuals plaintiffs

4  in the Tiwari case?

5   A.  No.

6   Q.  In the ICE proceedings that you mentioned, were

7  any of the individuals that you represented in those

8  proceedings plaintiffs in the Tiwari case?

9   A.  No.

10   Q.  And in the State Department cases that you

11  mentioned, were any of the individuals in those cases --

12  proceedings plaintiffs in the Tiwari case?

13   A.  Yes.

14   Q.  Who?

15   A.  Tracy.

16   Q.  And that's Xi Qiong, I believe?  X-i Q-i-o-n-g?

17   A.  No.

18   Q.  Oh, Q-e.  I'm sorry.

19   A.  C-u-i.

20   Q.  C-u-i.  Okay.  What was the proceeding with

21  Ms. Cui?

22   A.  She was applying for a visa.

23   Q.  When did you help her with obtaining a visa?

24   A.  Years ago.  Before she joined the MAVNI program.

25   Q.  Were you able to help her get a visa?

1   A.  Yes.

2   Q.  So you've mentioned that you've represented

3  Ms. Cui in the State Department proceeding and you

4  represented Ms. Xiong in the USCIS proceeding.  You also

5  represented Ms. Xiong's husband in the USCIS proceeding.

6   Have you represented any of the other plaintiffs

7  in the Tiwari case in any context?

8   A.  No.  Just those two.

9   Q.  Did you receive --

10   A.  Well, no.  Duncan.  I would say I represented

11  Duncan.

12   Q.  I think you said before that you provided him

13  legal advice --

14   A.  Yes.

15   Q.  -- and received compensation for that?

16   A.  I don't know that I received compensation, but I

17  did provide him with legal advice.

18   Q.  Did you receive compensation for your work on

19  behalf of Ms. Cui?

20   A.  Her employer paid me, yes.

21   Q.  Did you represent Ms. Cui after you retired from

22  the military?

23   A.  Yeah.  That was the only time I represented her.

24  I didn't represent any of these people before I retired

25  from the military.

1   Q.  Sure.  I just wanted to make sure I had my dates

2  correct.

3   A.  Yeah.  And I represented her -- also I did her

4  spouse case as well.  So that would have been direct

5  compensation from them, the couple.

6   Q.  And I'm sorry.  That's Ms. Cui?

7   A.  Cui got married, and I did the spouse's case.

8   Q.  And what type of proceeding was the spouse's

9  case?

10   A.  USCIS.

11   Q.  And you received direct compensation from the

12  Cuis themselves for the USCIS?

13   A.  The couple.  I'm not sure which one of them was

14  paying the bill, but it was a couple.

15   Q.  Ms. Stock, have you heard of the American

16  Immigration Lawyers Association?

17   A.  I have.

18   Q.  So if I call them the AILA for the rest of the

19  deposition, then --

20   A.  That would be wrong.

21   Q.  Okay.  How would you call it?

22   A.  AILA.

23   Q.  Okay.  So we can call it AILA, and that's

24  referring to the American Immigration Lawyers Association?

25   A.  That's correct.

1   Q.  What is AILA?

2   A.  AILA is an association of immigration lawyers in

3  the United States and elsewhere who practice U.S.

4  immigration law.

5   Q.  Are you a member of the organization?

6   A.  I am.

7   Q.  What do you do for the organization?

8   A.  I pay dues, I attend meetings, I give classes,

9  continuing legal education.

10   Q.  How long have you been a member?

11   A.  I believe since 1993.

12   Q.  You mentioned presentations.

13   Have you ever recorded any videos for the AILA

14  website?

15   A.  I haven't recorded them.  AILA records them.

16   Q.  Are you aware that any videos on the AILA

17  website are of presentations that you're giving?

18   A.  It's possible.

19   Q.  Are you aware of any videos on the AILA website

20  which show you speaking?

21   A.  Yeah.  I'm pretty sure every time I speak they

22  videotape it and put it on their website.

23   Q.  Are you aware of any videos that show you having

24  a conversation with another official with the AILA

25  organization?

1  A. Oh, yes. I'm in multiple videos.

2  Q. Why did you record those videos?

3  A. I don't record them.

4  Q. Why did you participate in the recording of

5  those videos?

6  A. Because AILA recorded them, and they asked me to

7  do a presentation and they record the presentations. I

8  didn't record it. They do.

9  Q. So I understand the technology and I wanted to

10 clarify that. I was asking why you participated in being

11 on those videos.

12 A. Well, I'm not participating in being on the

13 videos. I'm giving a presentation at a continuing legal

14 education event, and the organization sponsoring the

15 continuing legal education event often records the videos

16 so lawyers can watch them and get credit, CLE credit for

17 watching the video.

18 Q. Are there any videos on the AILA website of

19 which you're aware that aren't CLE presentations in which

20 you are featured in the video?

21 A. Probably. I mean, I've been a member since

22 1993, so they've been recording me since 1993, probably.

23 Q. Are you in any videos on the AILA website

24 pertaining to the MAVNI program?

25 A. I'm sure I am.

1  Q. Do you know of any specific videos?

2  A. Well, there's a video of the AILA conference in

3  Boston that features me and the director of U.S.

4  Citizenship and Immigration Services having a dialogue in

5  front of a couple thousand lawyers. I've seen that video

6  numerous times and it's on YouTube.

7  Q. Are you aware of a video on the AILA website in

8  which you're having a one-on-one discussion with another

9  person from AILA about the MAVNI program?

10 A. I'm sure there's such a video, yep.

11 Q. Do you know if there are more than one such

12 videos?

13 A. Probably, yep. I'm the subject matter expert on

14 the MAVNI program in the nation, so everybody is always

15 asking me to do interviews and videos about the MAVNI

16 program so I can explain what's happening with it and

17 what's going on with it, the litigation, the lawsuits, how

18 to file for citizenship for MAVNIs, what MAVNI means.

19 I've done -- this is over a ten-year period. I think I've

20 probably done lots of videos.

21 Q. Did you have any help in preparing the

22 information you presented in the one-on-one conversation

23 about the MAVNI program that's been videotaped by AILA?

24 A. What do you mean by "help"?

25 Q. Did you talk to anybody about the -- in

1  preparing to answer the questions that would be posed to

2  you by the AILA --

3  A. No. I just answer the questions. Whatever

4  they'd ask me, I'd answer.

5  Q. Did you discuss that one-on-one conversation

6  about the MAVNI program that's on the AILA website with

7  any attorneys at Fried Frank?

8  A. No.

9  Q. Do other members of AILA contact you?

10 A. Yes.

11 Q. Do they contact you for help in their cases?

12 A. They do.

13 Q. Have you been contacted for help in MAVNI

14 cases --

15 A. Yes.

16 Q. -- through AILA? Let me ask that again and just

17 let me finish the whole question before you answer it.

18 Have you been contacted by members of AILA for

19 help in a case pertaining to a MAVNI soldier?

20 A. Yes.

21 Q. Have you provided advice to any other AILA

22 members who sought help for cases involving MAVNI

23 soldiers?

24 A. I have. I wrote a book about it. I published a

25 book because I was getting so many calls from people

1  asking for help that I wrote an entire book, which is now

2  in its second edition, that AILA published to try to help

3  the members with all the MAVNI cases that they're

4  handling. I've also written numerous other articles about

5  handling MAVNI cases and how to file lawsuits against the

6  government involving MAVNI cases.

7  Q. It sounds like you'd prefer that the AILA

8  members refer to the books and articles. Okay.

9  So I'd like to ask you a few questions about

10 your military service.

11 When did you enlist in the military?

12 A. I didn't enlist.

13 Q. How did you join the military?

14 A. I joined the Reserve Officer Training Corps when

15 I was a freshman in college. And I was commissioned two

16 years later through the early commissioning program as an

17 officer in the United States Army Reserve.

18 Q. And when did you join the ROTC program? What

19 year was that?

20 A. Freshman year in college. I just said that.

21 Q. I got that. What year was that?

22 A. 1980, I believe. I have to double-check. I got

23 commissioned in 1982, and that was the end of my sophomore

24 year is when I got commissioned. So yeah, it would have

25 been 1980, fall of 1980.

Page 106

1    Q.  Did you always serve in the -- let me start

2  over.

3      Have you ever served as a military police

4  officer?

5    A.  Yes. I served my entire career as a military

6  police officer.

7    Q.  I think you mentioned this before, but could you

8  just remind me again. How many years did you serve as a

9  military police officer?

10    A.  I'm retired military police officer right now.

11  So I'm still technically holding a commission. I'm

12  retired reserve as a military police officer.

13    Q.  How many years before you retired did you serve

14  as a military police officer?

15    A.  28 years and a few days.

16    Q.  What is the role of a military police officer?

17    A.  To protect and to serve, to perform law

18  enforcement functions, to perform combat-related functions

19  assigned to the military police, perform security,

20  military police investigations. Anything to do with law

21  and order security. We also do counterterrorism

22  intelligence work.

23    Q.  Let's go through those one by one. So you

24  mentioned military police investigations.

25      What type of investigations are those?

Page 107

1    A.  Okay. So it could be anything relating to law

2  and order or security on a military installation. I mean,

3  you want me to kind of run down the list of stuff?

4    Q.  Let me ask a few more questions maybe.

5      What do you mean by law and order? So it would

6  be a military police investigation pertaining to law and

7  order?

8    A.  Drugs, domestic violence, murder, rape, assault,

9  child abuse, theft of items at the exchange, working with

10  local police, Alaska State Troopers, Anchorage Police

11  Department, working with other services, anti-terrorism,

12  physical security, suicides, any violations of the Uniform

13  Code of Military Justice, any civilians on post that are

14  violating the law, breaking regulations on post, checking

15  people entering the base, gate guards, fish and wildlife.

16      We investigate things like, you know, hunting

17  violations and fishing violations, and if somebody hit a

18  moose on the highway out in front of Fort Rich, we would

19  go out there and decide what to do with the moose and the

20  car. Traffic accidents, people running red lights.

21    Q.  As a military police officer, would you then

22  participate in these investigations?

23    A.  I would. I was in charge of military police

24  investigations on Fort Richardson.

25    Q.  Where is Fort Richardson?

Page 108

1    A.  It's a couple miles down the road. It's called

2  JBER now, Joint Base Elmendorf-Richardson.

3    Q.  Along with law and order you mentioned security.

4      Are military police investigations pertaining to

5  security different than the type of law and order

6  investigations you just mentioned?

7    A.  Well, military police can be responsible for

8  physical security, so that means we're responsible for

9  figuring out like a physical security plan of a base, how

10  we're going to protect the government buildings on the

11  base, you know, maybe if there's weapons on the base that

12  need kind of special protection. I mean, military police

13  protect nuclear weapons in some cases.

14      There's a whole range of physical security

15  functions that military police -- we guard convoys in

16  battle. We might be the back of the convoy or alongside

17  the convoy to protect the people in the convoy from the

18  insurgents. I mean, I protect helicopters on a base. If

19  they're sitting out there, there might be some military

20  police.

21      We also have prison role. We had a detention

22  center in Fort Richardson and I was responsible for that

23  at one point. We had prisoners in our custody. Prisoners

24  of war is one of our responsibilities.

25    Q.  So you mentioned that your time as a military

Page 109

1  police officer was as part of the reserve.

2      Were you always part of the reserve when you

3  were a military police officer, or were you ever on -- I

4  always forget the terminology -- full-time duty as a

5  military police officer?

6    A.  I was always a reserve officer, but I regularly

7  went on active duty.

8    Q.  How often would you go on active duty?

9    A.  Well, I did my first active duty tour of duty.

10  I volunteered to do three years on active duty at

11  Fort Richardson, Alaska. That's how I got to Alaska. And

12  then repeatedly on and off for the next 28 years I would

13  go on and off active duty. Sometimes it would be just for

14  a couple months and sometimes it would be for a couple

15  days and sometimes it would be for a few weeks.

16    Q.  Thank you. Sometimes I still have a little bit

17  of trouble as a civilian understanding the military and

18  making sure I get the lingo down. I wanted to make sure I

19  understood that.

20      You mentioned your work as counterterrorism as a

21  military police officer.

22      Can you tell me what types of counterterrorism

23  matters you would be working on?

24    A.  Sure. I was supposed to protect whatever base I

25  was assigned to. I was responsible for protecting the

1  base from terrorist activities, and so the Army spent time
2  training me in counterterrorism.  I actually was in charge
3  of the special reaction team at Fort Richardson, the SRT
4  team.  It's like a SWAT team.  And I was sent down to
5  Hurlburt Field in Florida to get special training,
6  counterterrorism, anti-terrorism training.
7      Q.  What was the anti-terrorism training that you
8  received?
9      A.  It was a very substantive course about all the
10  different terrorism threats that the United States was
11  facing at that time.  And they would bring in famous
12  people that had been involved in terrorist incidents to
13  lecture us and teach us about how to deal with terrorism.
14  And we also went out and fired a lot of weapons on the
15  range at a cool time.  They had a whole arsenal full of
16  all different things, like AK-47s and everything, and they
17  let us practice and learn about them.  And we talked about
18  anti-terrorism techniques and how to train the force to be
19  aware, when they're overseas, of how to behave properly so
20  you're not a victim of terrorism and what to do on a plane
21  if it gets hijacked and all that sort of, kind of
22  training.
23      Q.  And then you also mentioned intelligence work as
24  a military police officer.
25          What type of intelligence work would you do?

1      A.  So at one point in my career I was the security
2  officer for United States Forces Japan, and I worked for
3  the provost marshal, who was an Air Force security police
4  officer, full colonel, and he was triple hatted, so he had
5  three responsibilities in Japan at Yokota Air Base.
6          And I was working under him as a security
7  officer side by side with an MI, military intelligence
8  officer, and our responsibility was basically to protect
9  all the U.S. forces in Japan from terrorism threats, which
10  at the time they had the Japanese Red Brigade and people
11  were firing rockets at the base, and there were other
12  incidents going on, and basically the whole range of
13  potential threats in the Pacific.  And that's what I
14  worked on.
15          And I worked closely with the Japanese to try to
16  identify threats to the military forces in the Pacific and
17  to try to figure out how we should respond to those
18  threats.  And it included not just terrorism but
19  espionage.
20          I was also the deputy provost marshal.  I
21  continued and went back there again because they requested
22  me to come back when I got promoted to a higher level.
23      Q.  Did you receive any training for your work that
24  you had to do in Japan, your security officer position?
25      A.  I did.

1      Q.  What training did you receive?
2      A.  Multiple courses that mainly they would try to
3  have me do remotely, but, you know, the Army has like a
4  standard curriculum for these type of jobs and you have to
5  complete a bunch of classes and a lot of it was online
6  stuff that they made me do.  But a lot of it was like when
7  I was there they would give me briefings and so forth.  I
8  went to military police officer basic school and I went to
9  military police officer advanced school and I received
10  training at both those institutions on these kinds of
11  areas.
12      Q.  So in thinking about your time in Japan, is it
13  fair to say that, as a security officer, your primary
14  responsibility was to ensure the physical security of
15  military operations both at your base and other places in
16  the Pacific?
17      A.  Well, it was also counterintelligence,
18  counterespionage.
19      Q.  What did that work involve?
20      A.  I don't think I'm allowed to talk about that in
21  a deposition, but an Army lawyer is here.  Maybe he can
22  tell you.  It was all classified.
23      Q.  I'm not asking you -- and thank you for the
24  clarification.  I'm certainly not asking you to divulge
25  classified information.

1          But I'm just kind of wondering, as a general
2  matter, what types of things you would be looking at in
3  terms of counterintelligence.  How is that different than
4  protecting the physical security of military operations in
5  the base?  So when you say "counterintelligence" and
6  "counterespionage," what do you mean by that?
7      A.  We would look at insider threats.  We would try
8  to prevent people from doing things that were foolish that
9  would create a vulnerability.
10      Q.  What do you mean by "foolish" or "create a
11  vulnerability"?
12      A.  One of the big issues that came up at one point
13  in my career was USB drives.  People were walking in and
14  out of secure locations with USB drives all the time.
15  They would get angry when we stopped them -- tried to stop
16  them.  Because it was inconvenient.  They wanted to have
17  all their data on a USB drive and they thought it was
18  annoying that they had to go through extra steps not to be
19  allowed to have their data on the USB drive and couldn't
20  do their jobs and they would get upset.
21      Q.  As a security officer did your responsibilities
22  include processing requests for security clearances?
23      A.  I did not approve security clearances, but I was
24  frequently involved in whether they were going to grant a
25  clearance to somebody or not.

1    Q.   Can you tell me more about how you were
2    involved?
3        A.   Sure.  They would do background checks on people
4    and they would check records to figure out whether they
5    should get somebody clearance, and they would also ask me
6    about people.  They would check military police reports.
7    They'd check DCII.
8        Q.   When you say "they would check," who was doing
9    the checking?
10       A.   The people who were issuing the clearances would
11   be checking with the military police to check on whether
12   somebody had showed up in our system as a victim, a
13   witness, perpetrator.  And then they would also interview
14   us.  Like people seeking clearances, they would come and
15   ask me, what do I know about so and so because they're
16   looking to getting a clearance.
17       Q.   So is it fair to say that you were involved in
18   the security clearance process because the people making
19   the determination would consult with you about information
20   that the military police officers had?
21       A.   Yes.
22       Q.   Were you involved in any other way in the
23   security clearance process as a military police officer?
24       A.   Well, I got one.  I mean, I went through the
25   process myself.

1        Q.   And I'm thinking about security clearance
2    adjudications for other people other than yourself.
3            Were you involved in any way other than being
4    asked for information that was in the possession of the
5    military police?
6        A.   Yeah.  People would call me to ask me how to
7    interpret information that they were getting from the
8    person that they were trying to get the clearance for.  So
9    they wouldn't understand something and they would call me
10   to try to get me to explain what this person's issue was.
11       Q.   Again, I don't want to ask you to -- I'm not
12   asking you to divulge any classified information or law
13   enforcement protected information, but I'm not quite sure
14   I understand your answer.
15           So what would you be providing?  How would you
16   be able to provide more details?  Was it -- let me see if
17   I can ask this in a better way.
18           Were the people doing the checking asking you
19   for help in interpreting information that they obtained
20   from other sources?
21       A.   Yes.
22       Q.   And how would you be able to help them
23   provide -- how would you be able to provide them with an
24   interpretation?  How would you know -- how would you be
25   able to provide them with more details?

1        A.   Well, they would get information from the person
2    and they wouldn't understand it.  So they would come to me
3    because they thought I would understand what the person
4    was talking about.  Maybe the person was using terminology
5    that they didn't understand.
6        Q.   Did you ever adjudicate individuals for security
7    clearance eligibility?
8        A.   Me personally?  No.  That wasn't my function as
9    a military police officer, was to adjudicate a security
10   clearance, no.  I just provided information to the
11   adjudicator.
12       Q.   Did you ever yourself conduct investigations
13   that were part of security clearance eligibility
14   determinations?
15       A.   Yeah.  If somebody's clearance was getting
16   pulled, I might be involved in the investigation.
17       Q.   How would you be involved?
18       A.   They reported some misconduct and they were
19   pulling their clearance temporarily, and so I would maybe
20   be involved in the investigation to decide whether this
21   person's clearance should be yanked or not.
22       Q.   Were you ever involved in investigations that
23   were used to determine whether somebody should have a
24   security clearance for the first time?
25       A.   Yes.

1        Q.   For the first time?
2        A.   Yes.
3        Q.   How were you involved in those types of
4    investigation?
5        A.   People who were doing the investigation would
6    come to me and ask me about the person.
7        Q.   Okay.  Did you ever conduct investigations that
8    were being used for making security clearance eligibility
9    determinations for individuals for their first clearances?
10       A.   Sure.  I mean, any military police investigation
11   might potentially feed into a security investigation for a
12   clearance.
13       Q.   Okay.  But did you ever conduct any
14   investigations that were specific to security clearance
15   eligibility determinations?
16       A.   Well, I'm not -- I wasn't doing the clearance
17   myself.  So I would conduct an investigation that was a
18   military police investigation and then maybe that
19   particular issue came up in the security clearance.  So
20   one of the things you'll notice when they do security
21   clearance adjudications, they're checking DCII, Defense
22   Central Investigative Index.  And so a military police
23   investigation might show up in DCII and they would come
24   back and want to look at it.
25       Q.   That's a helpful clarification.

1    So it's fair to say that the investigations that
2   you yourself conducted were not for the purposes of
3   determining security clearance eligibility determinations?
4        A.   No.  I didn't conduct those, but often I would
5   have an investigator come to me and flash a badge and go,
6   I'm doing a security clearance investigation on Nathan
7   Swinton.  What do you know about Nathan Swinton?  Can you
8   tell me if he's loyal to the United States?  I see that
9   you were the investigating officer on Nathan Swinton's
10  investigation for whatever it was.  What can you tell me
11  about that?  And that would happen regularly.  If my name
12  was on some report, then people would come and talk to me.
13       Q.   That's helpful.  Thank you for that.
14       Ms. Stock, were you ever assigned to a detail
15  within the Army?
16       A.   Yes.
17       Q.   When were you on detail?
18       A.   Well, I mean, I was on detail lots of times.
19       Q.   Have you ever been on detail to the Army
20  Accessions Command?
21       A.   Yes.
22       Q.   And have you ever been on detail to the
23  assistant secretary for Manpower and Reserve Affairs?
24       A.   Yes.
25       Q.   And were those details at the same time or were

1   those different details?
2        A.   I think they were kind of coterminous.
3        Q.   So you were on detail --
4        A.   Like same period of time, but sometimes I was
5   like on one or the other.
6        Q.   You were on detail to two offices for the same
7   period of time?
8        A.   Well, it -- like one week for one, one week for
9   the other one kind of thing, but over a time period.
10       Q.   Were you at those offices for the same
11  overlapping period of time?  So basically I'm trying to
12  understand if, say, you're at one office for two years, if
13  you were also at the other office for the same two years.
14  Did those two details overlap for the same periods of
15  time?
16       A.   I wasn't -- I mean, what would happen would be I
17  would get told one week to go to one place and one week to
18  go to a different place.  But I wasn't physically in two
19  different places at the same time, no.
20       Q.   Understood.  Do you remember the years that you
21  had these details?  What was the time frame?
22       A.   October 2007 on and off until June 2010.
23       Q.   So starting with the Army Accessions Command,
24  what is the responsibilities -- what are the
25  responsibilities of that office?

1        A.   They were in charge of recruiting people for the
2   Army.
3        Q.   What were --
4        A.   Not exactly recruiting, but there's Army
5   Recruiting Command, which handles enlisted recruiting.
6   But basically they were like the big policy.  They were
7   trying to figure out policy for bringing people into the
8   military.  They call that Accessions.
9        Q.   What were your specific responsibilities?
10       A.   I was tasked with bringing the MAVNI program on,
11  making it functional, and, I mean, initially the general
12  in charge of Army Accessions Command wanted to recruit
13  more immigrants, and he tasked me to be the officer to try
14  to figure out how to recruit more immigrants and get the
15  project approved at the Pentagon.
16       And then once it got approved at the Pentagon,
17  they made me the functional manager for the program on and
18  off to deal with -- they called me the project officer.
19  So I was the Army project officer for the program.  But I
20  also ended up working for the Navy and the Air Force as
21  well.
22       Q.   On MAVNI issues?
23       A.   Yes.
24       Q.   The Army Accessions Command, is that part of the
25  military intelligence community?

1        A.   No.  Well, you wouldn't say it is.  I mean, it
2   should be, in the sense that they should be collecting
3   information and passing it to each other.  But it's not
4   considered part of the intelligence community, no, per se.
5        Q.   And the other office that you were at during
6   this time period was the assistant secretary for Manpower
7   and Reserve Affairs.  I believe that's called M&RA
8   sometimes, shorthand?
9        A.   Yes.
10       Q.   So what are the responsibilities of M&RA?
11       A.   They're supposed to be looking policy-wise at
12  manpower issues for the military.  They also deal with
13  other related things.  But mainly I was working with them
14  on the manpower issues.
15       Q.   And was your work with M&RA also pertaining to
16  the MAVNI program?
17       A.   Pretty much.  Most of it, yep.
18       Q.   How would you describe your responsibilities for
19  your detail with M&RA?
20       A.   I was supposed to get the MAVNI program approved
21  at the Pentagon and do all the coordination with all
22  different agencies relating to the MAVNI program.  I
23  handled press issues.  I do coordination with ODNI, DHS.
24  I did work at the Under Secretary of Defense for Personnel
25  and Readiness.  Basically dealt with -- any issue that

Page 122

1 came up with the MAVNI program, they were having me deal
2 with it.
3 Q. So you mentioned you worked -- you did work with
4 DHS.
5 What was the work that you did with DHS?
6 A. To coordinate with them to try to make sure
7 there weren't any problems when we rolled out the MAVNI
8 program with the immigrants and their families.
9 Q. What were some of the issues that you worked on
10 specifically with DHS?
11 A. They wanted to figure out a way to naturalize
12 them quickly. They wanted to figure out a way to take
13 care of their family members. That was a big concern.
14 They wanted to make sure they weren't getting deported
15 while they were waiting to ship out to training.
16 They wanted -- they needed -- DHS needed help
17 with checking the immigration documents of all the MAVNIs.
18 So I spent a lot of time working with the DHS side of the
19 house that was checking all their immigration documents.
20 Because we didn't want anybody who was coming into the
21 military to be an unauthorized immigrant. And DHS needed
22 help with that, so I would work with them on a daily basis
23 to look at the immigrant's documents and make sure they
24 were valid.
25 And then I'd work with -- Under Secretary of

Page 123

1 Defense, I worked with them a lot. Army G-2, G-1.
2 Q. Let's start with the Under Secretary of Defense.
3 What offices within the Under Secretary of
4 Defense did you work for?
5 A. Well, I worked with military personnel policy.
6 Q. What's the name of that office?
7 A. Military --
8 Q. That is. Sorry. Is that within Personnel and
9 Readiness or is that a separate --
10 A. It was the Under Secretary of Defense for
11 Personnel and Readiness. I worked for -- worked with that
12 office. So anybody under them that was dealing with
13 officer accessions or enlisted accessions.
14 Q. What types of -- what were your responsibilities
15 when you were working with Personnel and Readiness?
16 A. I would go to meetings on a regular basis, but
17 mainly they had me drafting documents and dealing with
18 e-mails.
19 Q. What documents would you be drafting?
20 A. I drafted addenda to the enlistment contracts
21 for the MAVNIs. I drafted press information. I drafted
22 information sheets, frequently-asked-questions sheets.
23 Slide decks. I spent a lot of time working on PowerPoint
24 slide decks. I would proofread products that that office
25 had produced for accuracy and correct inaccurate

Page 124

1 information in them.
2 I would -- when they came out with the list of
3 the visas that were allowed, I would comment on that and
4 try to correct errors. Wasn't always successful.
5 Basically anything to do with the MAVNI program. If they
6 were putting out a press release, they would send it to me
7 and try to get me to fix it before it went out.
8 Letters. I was tasked with drafting a lot of
9 letters from different officers and secretaries, and so
10 forth, to go to other people to talk about the MAVNI
11 program.
12 Q. Were there any other offices within the Office
13 of the Secretary of Defense that you worked in other than
14 Personnel and Readiness?
15 A. Worked in? I didn't really work in any of
16 these. I mean, I would show up at the Pentagon and I
17 would just go wherever they told me to go. So I was all
18 over the place. I didn't have an office at the Pentagon.
19 I was just carrying my briefcase everywhere.
20 Q. Let me be more precise with my question.
21 So how would you describe your work with the
22 Office of the Under Secretary of Defense for Personnel and
23 Readiness? Were you assigned to that office?
24 A. No. I wasn't assigned there. I was assigned to
25 West Point the whole time.

Page 125

1 Q. You were on detail to the other offices in the
2 Army, so was it in your capacity as a detailee that you
3 would work with Personnel and Readiness on these issues
4 pertaining to the MAVNI program?
5 A. Yeah. The whole time this was going on, my
6 official assignment was as a professor at United States
7 Military Academy at West Point. So I never had an office
8 at the Pentagon. I was always assigned to West Point.
9 They would just send me an e-mail and say, show up at the
10 Pentagon in room blah, blah, blah and talk about the MAVNI
11 program and these are the people that you need to talk to.
12 Q. What other offices in the Office of Secretary of
13 Defense did you work with, other than Personnel and
14 Readiness, on the MAVNI program?
15 A. The intel people, Special Operations Command,
16 Navy Seals, Army G-1, Army G-2, DoD IG.
17 Q. So you mentioned the Special Operations Command.
18 What is that office? What is the Special
19 Operations Command?
20 A. They're a combatant command.
21 Q. Are they located within the Office of the
22 Secretary of Defense?
23 A. No. They're in Tampa, Florida. But they have
24 people in the building.
25 Q. So what would you work with them on pertaining

Page 126

1 to the MAVNI program?

2    A.   They wanted the MAVNI program to get approved
3 because they saw that it would benefit Special Operations
4 Command greatly.  They were having grave difficulty
5 finding people to work for Special Operations Command who
6 spoke foreign languages fluently and had cultural
7 expertise, and they were -- and were able to blend in with
8 local populations.  And they had had a lot of difficulty
9 finding folks like that, and they wanted a way to tap into
10 the immigrants in the United States and try to recruit
11 them for Special Operations Command.  They'd been trying
12 to do that for years and had never figured a way to make
13 it happen until the MAVNI program came along.

14    Q.   So is it fair to say that you worked with
15 Special Operations Command on recruitment issues?

16    A.   Well, I worked on security with them too,
17 because they were concerned -- you know, they didn't want
18 their force infiltrated.  So we were talking about
19 security issues as well.  But it was related to bringing
20 in immigrants into the military or trying to work with
21 immigrants or trying to work with indigenous populations
22 in certain parts of the world, and how do you make sure
23 you don't have a threat to the force.  And I tried to help
24 them with that because of my immigration expertise.

25    Q.   You mentioned that you worked with intel people

Page 127

1 about the MAVNI program.  So thinking only about offices
2 within the Office of the Secretary of Defense, who are the
3 intel people that you worked with on the MAVNI program?

4    A.   Well, it would be USDI people.  You say "worked
5 with."  I mean, we'd have big meetings with lots of
6 people, so I don't remember the names of everybody that
7 was there, but they were people that were assigned to the
8 Under Secretary of Defense for Intelligence.

9    Q.   What are they -- again, I'm not asking you to
10 divulge classified information or law enforcement
11 information, but what are the types of intelligence issues
12 that you would address as you were discussing the MAVNI
13 program with officials in USDI?

14    A.   Well, as with every recruiting program, you
15 always worry, when you're bringing people into the
16 military, that some bad guys might kind of try to come
17 into the military.  So they had long-standing concerns
18 based on the fact that native-born American citizens were
19 doing this bad stuff and everything and they thought if we
20 bring immigrants into the military, we might have a threat
21 or whatever, and so everybody wanted to discuss that, and
22 that was the basis of the interactions.

23         We would spend a lot of time talking about
24 potential threats and how do we reduce the threat and that
25 sort of thing, and we came up with some pretty good

Page 128

1 solutions, but later on, apparently, those recommendations
2 got disregarded.

3    Q.   Did you have access to classified information
4 while you were on these details?

5    A.   At times I did, yes.

6    Q.   Do you remember what times you had access to
7 classified information?

8    A.   When I needed to have access for a particular
9 issue that we were dealing with.

10    Q.   Did you have a security clearance during your
11 time on detail?

12    A.   I did.

13    Q.   What level of classification did you have access
14 to?

15    A.   I could have had access, I think, to top secret,
16 but they didn't have anything I needed to review that was
17 top secret.  So I only reviewed secret, that I can recall.
18 But I don't remember exactly.  And I know for sure I
19 didn't look at anything top secret related to MAVNI,
20 because there wasn't anything.

21    Q.   Did you have -- okay.

22         Did you in fact review classified information
23 about the MAVNI program during your time on detail?

24    A.   I did.

25    Q.   And you said that was at a secret level?

Page 129

1    A.   Yes.

2    Q.   Did you review classified information pertaining
3 to individual MAVNI soldiers during your time on detail?

4    A.   No.

5    Q.   Have you at any other point reviewed classified
6 information pertaining to individual MAVNI soldiers?

7    A.   No.

8    Q.   You mentioned Army G-2 is an office that you
9 interacted with as part of your time working on the MAVNI
10 program while on detail.

11         What types of interactions would you have with
12 that office?

13    A.   Patricia Stokes would come to meetings and I
14 would interact with her.  Other people from the G-2 would
15 come to meetings and raise their concerns and we would
16 talk about issues.

17    Q.   You also mentioned the Department of Defense
18 Inspector General.

19         How would you interact with officials from the
20 IG's office?

21    A.   They would come by to chat about complaints that
22 they were getting from MAVNIs about the way they were
23 being discriminated against and treated, and they would
24 want to know how to resolve those complaints.  And they
25 were getting complaints from other people that -- there

1 was an incident where they wrongly identified a bunch of
2 people as supposedly being MAVNIs, but they weren't
3 MAVNIs, and that went up to the IG's office. And somebody
4 was blaming the MAVNI program for these people doing
5 something, but they turned out they weren't MAVNIs. They
6 were other people.
7      There was a lot of confusion about what a MAVNI
8 was and a lot of confusion in the ranks that anybody with
9 a foreign name was a MAVNI or anybody -- there was
10 confusion. People thought anybody who was a linguist was
11 a MAVNI. They were confusing people who were Iraqis and
12 Afghans overseas with being MAVNIs. So we would have to
13 explain that this guy who is a civilian working for a
14 contractor overseas is not a MAVNI. But there was a lot
15 of misinformation about the program that was rampant
16 throughout the building.
17     Q. I think you may have mentioned this before, but
18 just remind me.
19      When did you retire from military service?
20     A. June 2010.
21     Q. You mentioned you still are commissioned as an
22 officer; is that correct?
23     A. I'm a member of the retired reserve. Gray area
24 retiree.
25     Q. What does that mean to be a member of the

1 retired reserve?
2     A. It means I still hold a commission and I can be
3 called up on active duty if there's a declaration of war.
4     Q. Why did you retire in 2010?
5     A. I reached any statutory retirement date.
6     Q. Do you believe that you retired on good terms
7 with the military?
8     A. I know I did, because they tried to retain me on
9 active duty for three years on the date of my retirement,
10 but it was illegal and JAG told me I couldn't do that.
11     Q. So going back to your kind of ongoing
12 involvement with the military as a member of the retired
13 reserve, you mentioned that you could be called up if
14 there's a declaration of war.
15     Are there any other commitments that you have
16 with the military currently?
17     A. No.
18     Q. Do you ever have to report for training or
19 anything?
20     A. No.
21     Q. Do you ever have any sort of official
22 communications with other military officials as part of
23 your capacity as a member of the retired reserve?
24     A. They invite me to come to retiree seminars on a
25 regular basis. I went to one a couple weeks ago.

1     Q. Do you have any involvement with the MAVNI
2 program as a member of the retired reserve?
3     A. I get regular calls from people in the
4 government about the MAVNI program, yes.
5     Q. Is part of your duties as a member of the
6 retired reserve to respond to those calls about the MAVNI
7 program?
8     A. No.
9     Q. So when you receive conversations -- or receive
10 inquiries and requests for information about the MAVNI
11 program, is it fair to say that that's separate from your
12 responsibilities as a member of the retired reserve?
13     A. Well, it's not my responsibility, but people
14 consider it a professional courtesy that I will provide
15 them with the information because I'm a subject matter
16 expert. So they think -- I'm retired, they think I have
17 some obligation -- professional obligation as a retired
18 officer to provide them with the information that they're
19 asking because I'm the one that knows the information.
20     Q. About these communications that you've had with
21 the MAVNI program, who are you communicating with about
22 the MAVNI program? Who is still on active duty with the
23 military?
24     A. MAVNIs?
25     Q. (Nods head)

1     A. JAG officers trying to help the MAVNIs,
2 commanders of the MAVNIs, people working at the Pentagon
3 who are on active duty, people on active duty, recruiters.
4     Q. Are there any individuals who are not on active
5 duty, but who are still members of the military, that you
6 communicate with about the MAVNI program?
7     A. Who are not on active duty but are members of
8 the military?
9     Q. Yes.
10     A. So like reserve?
11     Q. Sure. Who are they?
12     A. Same list of people. I'd add to that
13 congressional staffers, members of Congress, senators,
14 people trying to draft legislation.
15     Q. So I want to go through some of the categories
16 of people who you said you still have communications with.
17     You mentioned JAG officers. What types of
18 discussions would you have with JAG officers?
19     A. They would call me about their clients who are
20 MAVNIs and want to know what to do about them. They would
21 call me because the command doesn't know what a MAVNI is
22 and they want more information about what is a MAVNI.
23 They would go to a continuing legal education event and
24 I'm giving a seminar on MAVNI and they would ask me
25 questions about it. That's pretty common.

1    Q.  Do you ever have conversations with JAG officers
2  about intelligence concerns posed by MAVNI soldiers?
3    A.  Yeah.
4    Q.  What are those conversations?
5    A.  Oh, they're generally along the lines of that
6  one of the reasons why this whole bureaucratic mess has
7  been caused -- has been created is because there's a group
8  of people in the military who are xenophobic and over the
9  years the intelligence community -- years ago they were
10  afraid of the Irish and then they were afraid of African
11  Americans and then they were afraid of women and then they
12  were afraid of gay people, and all those barriers have
13  been overcome over the years, and now the latest group of
14  people that the DoD has targeted are the immigrants.
15        And they say basically one day this will pass,
16  but at the moment the immigrants are the ones being
17  targeted and it's because they aren't able to -- you know,
18  everybody else has proved themselves and now it's time the
19  immigrants -- it's the civil rights movement of the 21st
20  Century, basically, and everybody is xenophobic, and
21  that's what's causing all this.
22    Q.  In your conversations with JAG officers, do you
23  ever discuss any intelligence reporting?
24    A.  We discuss what's been in the newspaper.
25    Q.  Have JAG officers ever communicated to you any

1  nonpublic intelligence reporting?
2    A.  Well, it's not classified, but I have received
3  reports from, like, Homeland Security investigations that
4  allege different things in connection with a particular
5  case, but it's not classified information.  It's...
6    Q.  You receive those DHS reports from JAG officers?
7    A.  Yeah, because we're representing a person and
8  they want to know what it means, you know.
9    Q.  Have you received any classified information
10  from JAG officers?
11    A.  No.  They wouldn't do that, because it's
12  classified and I don't hold a clearance right now.
13    Q.  Aside from --
14    A.  I can give you an example.  So, for example, if
15  somebody is being chaptered out of the Army and the JAG
16  officer is representing the person who is being chaptered
17  out of the Army, they're going to get a big packet from
18  the command that talks about the person, and they don't
19  understand the packet.  So they'll call me to ask me what
20  different terms mean, because they're trying to represent
21  their client.
22    Q.  Have you received from JAG officers any
23  intelligence reporting from either the Army or the
24  Department of Defense?
25    A.  Not classified.  I've gotten the usual newspaper

1  articles and things.
2    Q.  Sure.  Any nonpublic intelligence reporting from
3  the Army or the Department of Defense?  Have you received
4  any from JAG officers?
5    A.  No.
6    Q.  You mentioned that you also keep in touch with
7  commanders?
8        If you could estimate, how many commanders do
9  you still keep in touch with?
10    A.  Well, I don't have -- I don't keep in touch with
11  people.  People contact me and then if I need to follow
12  up, I will.  But it's -- I will talk to one person one
13  time and then maybe never talk to them again or maybe
14  they'll call me two or three times about a particular
15  case.  Usually they're JAG officers calling too.
16    Q.  So I'm interested just in the commanders for
17  now.
18        But what types of issues will the commanders
19  reach out to you about?
20    A.  They're frustrated because their soldier can't
21  get citizenship and they want to know why their soldier
22  can't get citizenship.  They want to know if they can
23  write a letter of recommendation.  They'll say things
24  like, this guy is a great person, I don't understand what
25  the problem is.  They'll ask me what are the bureaucratic

1  obstacles that are preventing their soldier from getting
2  citizenship.
3    Q.  Are the communications always about citizenship
4  questions?
5    A.  No.  Sometimes it's something like security
6  clearances or why can't so and so get a clearance.  A
7  typical one would be I got told this person is a MAVNI and
8  they're not allowed to get a security clearance anymore.
9  And I'll say, that's not correct.  And here is a document
10  that maybe you can look at and talk to your JAG about.
11  But the rumor is rampant throughout the United States
12  military that MAVNIs are not allowed to get security
13  clearances.
14    Q.  In your conversations with commanders have you
15  ever received any nonpublic information about the MAVNI
16  program?
17    A.  Okay.  Well, nonpublic.  If it's -- the
18  commander thinks the guy is a good guy, that's nonpublic.
19  They write a letter of recommendation.  That's not public.
20    Q.  Sure.  Let me rephrase the question.
21        In your conversations with commanders have you
22  ever received any nonpublic documents about the MAVNI
23  program?
24    A.  Nonpublic documents about the MAVNI program?  I
25  mean, are you talking about policy documents?

Page 138

1    Q.   Any nonpublic documents about the MAVNI program.
2    I'm not concerned about a specific individual, but
3    documents that are discussing or pertain to the MAVNI
4    program kind of at large.
5         Have you received any nonpublic documents
6    pertaining to the MAVNI program?
7    A.   From a commander?
8    Q.   From commanders.
9    A.   Not directly.
10   Q.   Have you received any DoD or Army intelligence
11   reporting about the MAVNI program from commanders?
12   A.   I mean, I wouldn't call it from commanders.
13   I've seen e-mails making allegations about problems,
14   intelligence things, but they're not classified. They're
15   just basically somebody making a comment that these are
16   foreigners and they're dangerous and, you know, that kind
17   of thing.
18   Q.   Are those e-mails being written by commanders
19   and sent to you?
20   A.   Well, the commander isn't writing it directly
21   and sending it to me, no. It's usually the -- the e-mail
22   train goes around to jillions of people and then somebody
23   will send it to me.
24   Q.   Is it the commander sending you that e-mail
25   chain or is it somebody else?

Page 139

1    A.   Sometimes, yeah. They just -- I mean, there's a
2    common and unfortunate practice at the Pentagon of people
3    taking an e-mail and forwarding it to somebody else, who
4    forwards it to somebody else, who forwards it to somebody
5    else, and nobody deletes the chain at the bottom so
6    everybody gets the whole entire discussion and adds all
7    their comments. And they have attachments and they don't
8    rip the attachments off or anything. That kind of thing
9    happens on a regular basis.
10   Q.   Have you received any classified information in
11   your discussions with commanders?
12   A.   No.
13   Q.   So you also mentioned that you have had
14   conversations since you retired with people at the
15   Pentagon.
16        Who are the people at the Pentagon who you have
17   had conversations with?
18   A.   Oh, boy. There's a lot of them. Want me to try
19   to list them all?
20   Q.   Why don't you identify them by offices to start.
21   A.   Okay. Office of the Under Secretary Defense for
22   Personnel and Readiness, multiple people. USDI, some
23   people. ASA, M&RA. The Navy equivalent. The Air Force
24   equivalent. DOG IG. Sec Def's office. Am I forgetting
25   anybody? SOCOM, but they're technically in Tampa. Navy

Page 140

1    Seals. Legal assistants. Public Affairs. Congressional
2    Liaison. NSA. They're not at the Pentagon, though.
3    Q.   Okay. So thinking about individuals at P&R,
4    have you had discussions with current P&R employees about
5    the MAVNI program since the time you retired?
6    A.   Yes.
7    Q.   Who have you had discussions with?
8    A.   Christopher Arendt.
9    Q.   What have you discussed with him?
10   A.   The MAVNI program generally.
11   Q.   Anything more specific?
12   A.   Different aspects of the program.
13   Q.   Anybody else at P&R?
14   A.   Yes. Let's see. Since I retired. I don't
15   recall when Bill Carr passed away. I don't know. I think
16   that was after I retired.
17   Q.   Anybody else other than Christopher Arendt and
18   Bill Carr?
19   A.   There have been other people, but I'm not sure I
20   remember their names. I mean, it was incidental, like
21   they would call me about one issue.
22   Q.   Since the time you retired, have you received
23   DoD intelligence reporting about the MAVNI program from
24   anybody at P&R?
25   A.   Well, can you clarify what you mean by DoD

Page 141

1    intelligence reporting?
2    Q.   Sure. Any DoD. I'm thinking of intelligence
3    reports that are specific to the MAVNI program that are
4    created by any offices within OSD?
5    A.   So if it's classified, no, I have not received
6    it.
7    Q.   Have you received any nonclassified intelligence
8    reporting about the MAVNI program?
9    A.   Yeah. I mean, I've heard from people about the
10   DoD IG report.
11   Q.   Have you received those documents?
12   A.   Let me be more specific.
13        Have you received the actual documents?
14   A.   No.
15   Q.   And I guess let's do this. Maybe instead of by
16   office, have you received any documents that are
17   intelligence reporting from any offices within the Office
18   of the Secretary of Defense pertaining to the MAVNI
19   program since the time you retired?
20   A.   Can you clarify what you mean by "intelligence
21   reporting"?
22   Q.   Sure. So this is information that would discuss
23   security concerns about the MAVNI program put together by
24   intelligence officials.
25   A.   Only things put together by intelligence

1 officials?

2 Q. Let's start there.

3 Have you received any of the actual reports?

4 A. No. Not anything put together by intelligence

5 officials, no.

6 Q. Are there other documents that you have received

7 that discuss security concerns with the MAVNI program that

8 were not put together by intelligence officials?

9 A. I mean, I wrote a paper that talked about it. I

10 looked at the documents referenced in the paper. And yes,

11 I've had multiple conversations with people about security

12 concerns relating to the MAVNI program, both before and

13 after I retired.

14 Q. When you have those conversations with people

15 about security concerns with the MAVNI program, do they

16 provide you with any actual documents, any DoD documents

17 that describe those security concerns?

18 A. Sure.

19 Q. What documents do they give you?

20 A. Those CI reports I brought with -- or

21 Mr. O'Donnell brought today.

22 Q. Is it fair to say those CI reports are focused

23 on specific MAVNI soldiers, individual MAVNI soldiers,

24 rather than the program as a general matter?

25 A. Well, okay. So those are one type of document

1 and then there's also --

2 Q. I just want you to answer the question about the

3 CI reports.

4 So are the CI reports focused on to MAVNI

5 program overall or individual MAVNI soldiers?

6 A. They're both.

7 Q. I think I'm getting confused. So maybe let me

8 step back a little bit, because I want to make sure I

9 understand this with certainty. So I'm interested in

10 knowing what documents you've received -- or what

11 documents you viewed since the time you retired from

12 military service.

13 You said you haven't received any intelligence

14 reporting put together by intelligence officials since you

15 retired; is that correct?

16 A. Okay. Well, I would say there are retired

17 intelligence officials who write assessments about the

18 MAVNI program and they send them to me, but they're not

19 classified and they're not currently working for the

20 government.

21 Q. Let's start with the classified.

22 Have you had any access to classified

23 information --

24 A. No.

25 Q. -- since you retired?

1 A. No, because I don't have a clearance and I don't

2 touch classified information.

3 Q. Let me ask you again and just wait until I

4 finish my question before you answer, please, because you

5 answered in the middle of the question.

6 So have you had any access to classified

7 information since you retired?

8 A. No.

9 Q. Thank you. Okay. So I'm not interested in

10 classified information, but have you had access to any

11 intelligence reporting that was written by current DoD or

12 Army officials about the MAVNI program since the time you

13 retired?

14 A. Unclassified information, yes.

15 Q. Are there any documents that you've received

16 other than the CI reports you brought with you today?

17 A. Well, officials write for publication and they

18 post things on the Internet and they send me links to them

19 and say, look what I wrote, and they attach a link. Or

20 sometimes they send me a draft of a document and ask me to

21 review it because they want me to tell them if it's

22 accurate.

23 Q. Anything else?

24 A. Or they tell me that a memo is about to come out

25 and here's the copy of the memo. That happened with the

1 Peter Levine memo. They told me that was about to come

2 out and they wanted me to look at the Peter Levine memo.

3 MR. SWINTON: I think we're at a good spot to

4 take a lunch break. I assume that works for you guys.

5 It's 12:15.

6 So before we go off the record, I'm going to

7 state again that we would ask the witness not to discuss

8 the contents in the deposition with Mr. O'Donnell. The

9 authority is, for DOJ's view, were the ones that were

10 provided in the deposition of Naomi Verdugo. So we'd ask

11 that you not discuss the deposition during the lunch

12 break.

13 THE WITNESS: How long is this lunch break?

14 MR. SWINTON: I was thinking of taking an hour.

15 Does that work for you guys?

16 THE WITNESS: Let's just do ten minutes because

17 I've got to get back to work.

18 MR. O'DONNELL: Let's do an hour.

19 MR. SWINTON: We're going to need more than ten

20 minutes.

21 THE WITNESS: This is down time.

22 MR. SWINTON: So we can go off the record.

23 (Lunch recess taken)

24 MR. O'DONNELL: Nate, you asked about the

25 documents we brought today. One is the Cato Report,

1  Policy Analysis Number 838, Extreme Vetting of Immigrants,
2  Estimating Terrorism Vetting Failures.  That's your copy.
3      And I've also brought with us today four
4  printouts of the University of Northern New Jersey website
5  which is cached on the Wayback Machine, but they've also
6  previously been marked trial exhibits -- plaintiff trial
7  exhibits 86, 87, 88, and 89.  These are also your copies.
8      And then the witness has brought a stack of CI
9  screenings for -- I haven't counted how many people.  But
10  this is my copy.  I just got it.  So you guys are going to
11  have to make copies of this.
12      MR. SWINTON:  Okay.  Are those trial exhibits
13  that you sent to us?  Are any of them trial exhibits?
14      MR. O'DONNELL:  No.  There's that stack, which
15  is eight inches high or so.
16      MR. SWINTON:  These are all CI reports?
17      MR. O'DONNELL:  Correct, as I understand it.
18      THE WITNESS:  And related documents.  Basically
19  put the packet that came to me with whatever other
20  documents were with it in terms of the official government
21  documents.  So like it has the Privacy Act headers and
22  miscellaneous things that were attached to them.
23      MR. SWINTON:  That's everything, right?
24      MR. O'DONNELL:  That's all we brought, right.
25  ///

1  BY MR. SWINTON:
2      Q.  So we're back on the record after a lunch break.
3      Ms. Stock, did you discuss the deposition with
4  Mr. O'Donnell during the lunch break?
5      MR. O'DONNELL:  I object and instruct her not to
6  answer.
7      MR. SWINTON:  Sorry, Neil.  Could you just for
8  the record explain the basis for your objection again.
9      MR. O'DONNELL:  Communications between me and my
10  expert are privileged.
11      MR. SWINTON:  I will ask again, do you have any
12  authority for that proposition?
13      MR. O'DONNELL:  I think there's authority out
14  there, and it also conforms with my practice for the last
15  35 years and all the other attorneys I've practiced with.
16      MR. SWINTON:  Do you have any authority you can
17  point me to?
18      MR. O'DONNELL:  I don't have it with me.
19  BY MR. SWINTON:
20      Q.  Ms. Stock, I want to talk a little bit about
21  your role as an expert in this case specifically.
22      What is your understanding of what this case is
23  about?
24      A.  This case is about unlawful discrimination
25  against people based on their national origin.

1      Q.  Anything else?
2      A.  Well, that's the main claim, but there's
3  individual parts of that.  I can break that down for you
4  if you want.
5      Q.  Sure.
6      A.  Well, the plaintiffs are members of the United
7  States military who are naturalized U.S. citizens, who
8  entered the United States military through the MAVNI
9  program, Military Accessions Vital to the National
10  Interest.  And when they entered the military, they were
11  assured that the normal opportunities available to any
12  American citizen serving in the military would be open to
13  them and they would be treated fairly and equally in
14  accordance with the Department of Defense Equal
15  Opportunity Policy and the general principles of equal
16  protection found in the United States Constitution.
17      And then on September 30th, 2016, or
18  thereabouts, Peter Levine issued a patently
19  unconstitutional memo that laid out an official DoD policy
20  to discriminate against this group of people based on
21  their national origin.  And that policy included a bar to
22  them getting any kind of security clearance during their
23  first term of enlistment.  It also barred them from
24  serving as officers in the Army.
25      They created a policy of continuous monitoring

1  of these individuals throughout their affiliation with
2  DoD.  So even after they left the military, they were
3  going to be monitored if they were with a contractor.  And
4  basically destroyed their careers in the military based on
5  their national origin.
6      Q.  What is your understanding of what your role
7  will be at trial as an expert witness?
8      A.  To testify as to the facts and my expert
9  understanding of the MAVNI program and the facts of the
10  MAVNI program, what happened during the MAVNI program.
11      Q.  Is it your understanding that you'll provide any
12  expert opinions in the case?
13      A.  Yes, it is.
14      Q.  And do you expect to testify to those expert
15  opinions at trial?
16      A.  I do.
17      Q.  So for your involvement in this case, has
18  Mr. O'Donnell asked you to reach any specific conclusions
19  as part of your expert opinions?
20      A.  He asked me to look at the case and come to my
21  own conclusions, and that's what I did.  I wrote my own
22  expert report based on my understanding of the facts and
23  the law.
24      Q.  Did Mr. O'Donnell ask you to make any
25  assumptions for purposes of your report?

1   A.  He did not.

2   Q.  Are you being compensated for your work as an

3   expert in this case?

4   A.  I am not being compensated.

5   Q.  How would you describe the expertise that you're

6   offering in this case?

7   A.  Well, it's general expertise about immigration

8   law, citizenship law, national security law,

9   constitutional law, the genesis of the MAVNI program, the

10  functioning of the MAVNI program, the security concerns

11  created by the MAVNI program, the proper way to deal with

12  those security concerns in a way that meets constitutional

13  muster.

14  Q.  What is your expertise in all these different

15  areas?  What is that based on?

16  A.  That's based on 28 years of me being in the

17  military police as a commissioned officer.  It's based on

18  my experience and expertise as an immigration and

19  citizenship lawyer.  It's based on my expertise teaching

20  on the faculty at the United States Military Academy at

21  West Point, New York where I was the director of the

22  National Security Law Program.

23      It's based on the multiple articles that I have

24  authored, book articles, book chapters, a book about

25  immigrants in the military.  It's based on my experience

1   working at the Pentagon and interacting with the

2   individuals involved in the MAVNI program and my

3   involvement in the start-up of the MAVNI program, the

4   running of the MAVNI program until I retired, and my

5   interactions with individuals after I retired from the

6   Army, and also my review of all the documents in the case,

7   and so forth.

8   Q.  So you've listed quite a number of areas of

9   expertise that you intend to -- that you think you offer

10  in this case.

11      Are there any other experts in these areas of --

12  in these fields that you've mentioned?

13  A.  There aren't any who have the expertise on the

14  MAVNI program, no.

15  Q.  Do you consider yourself to be an expert on the

16  MAVNI program specifically?

17  A.  Yes.

18  Q.  Do you consider yourself to be the only person

19  qualified to serve as a MAVNI expert -- a MAVNI program

20  expert?

21  A.  No.  I think Dr. Naomi Verdugo is qualified to

22  serve as a program expert, but her expertise is slightly

23  different from mine.

24  Q.  How is that?

25  A.  She's not an attorney.

1   Q.  How does that make your expertise different

2   being an attorney?

3   A.  Well, I have expert knowledge of immigration and

4   citizenship law, and we're talking about immigrants, and

5   so that knowledge comes to bear.  In fact, that's why I

6   was selected to be the project officer for the program

7   originally, because I was uniquely qualified to provide

8   expertise to the Department of Defense as a project

9   officer for the program.  They did not have anybody else

10  with that expertise.

11  Q.  How does your experience as an immigration

12  attorney allow you to provide expert opinions in this

13  case?

14  A.  Well, it allows me to understand the immigration

15  background of the individuals in the case, what it means

16  to be a naturalized citizen, the process people go through

17  to become a naturalized citizen, what the law is regarding

18  the treatment of naturalized citizens, what the meaning of

19  national origin discrimination is.  I also can evaluate

20  the security concerns.  I'm considered a national expert

21  on immigration and national security.

22  Q.  Do you think only yourself and Ms. Verdugo are

23  sufficiently qualified to be MAVNI program experts?

24  A.  You know, that's a good question.  There

25  probably are other people that have some expertise related

1   to the MAVNI program who could definitely come in and talk

2   about different aspects of the program, but it would be

3   very difficult to find somebody with expertise on all the

4   intersecting areas that I've just mentioned.  And that's

5   just because there are very few attorneys in the country

6   that do both immigration and national security law, and

7   nobody that was involved in the MAVNI program was an

8   attorney.

9   Q.  Is a MAVNI program expert an official title?

10  A.  It's not an official title, no.  It's a generic

11  title relating to having expertise in the MAVNI program.

12  Q.  Has anybody recognized you as being a MAVNI

13  program expert?

14  A.  Yes.

15  Q.  Other than Mr. O'Donnell?

16  A.  I received an award from the Department of

17  Defense.

18  Q.  What was that award?

19  A.  Joint Forces Commendation Medal from Admiral

20  Eric Olson, Special Operations Command.

21  Q.  Did that award state that you are a MAVNI

22  expert?

23  A.  He didn't mention MAVNI, but he mentioned that I

24  was an expert on immigration law and constitutional law

25  and that had helped in -- if you read the citation for the

Page 154

1  award, you can tell what he's talking about.
2     Q.   What year did you receive the award?
3     A.   I don't recall, but it should be on my CV.
4     Q.   Did you receive the award before you retired
5  from the Army?
6     A.   I did.  And I received other awards, too, but
7  you just mentioned -- I started listing them and you cut
8  me off, so...
9     Q.   Okay.  What other -- how else have you been
10  recognized as a MAVNI program expert?
11     A.   The MacArthur Foundation gave me a MacArthur
12  Fellowship in part because of my role in the MAVNI
13  program.
14     Q.   As part of that fellowship, did they recognize
15  you -- did they that state that you're a MAVNI program
16  expert?
17     A.   Yes.
18     Q.   Did they use that exact phrasing?
19     A.   I don't recall the exact phrasing that they
20  used, but you could check their website and they have a
21  video there describing it on their website.
22     Q.   Anything else?  I don't want to leave anything
23  out.
24     A.   I got other awards from the Army.  I got a coin
25  from the Secretary of the Army.  He gave me a framed

Page 155

1  commendation letter for my role being an expert involved
2  with the MAVNI program.
3     Q.   The commendations and awards that you just made
4  reference to, did any of them specifically state that
5  you're a MAVNI program expert?
6     A.   I don't think they used the exact term, quote,
7  "MAVNI program expert," end quote.  They would say things
8  like "expertise" and they would mention the word "Military
9  Accessions Vital to the National Interests" as the
10  general description of my expertise.  Or in some cases
11  they would talk about immigrant recruiting program.
12     Q.   Have you ever testified under oath in any form,
13  other than the deposition today, about the MAVNI program?
14     A.   I have.
15     Q.   And on what occasions did you testify under oath
16  about the MAVNI program?
17     A.   I testified in front of Congress.
18     Q.   And what part of Congress?  Was that a
19  committee?
20     A.   Well, I -- okay.  So the start of the MAVNI
21  program was technically July 10th, 2006, and I testified
22  in front of the Senate Armed Services Committee.  And we
23  didn't call it the MAVNI program then, but John McCain had
24  called me and asked me to come down to Miami, Florida and
25  testify before the Senate Armed Services Committee.  They

Page 156

1  were having a field hearing in Miami and he wanted me to
2  come down and testify about, essentially, how they could
3  have a MAVNI program.  We didn't call it MAVNI then, but
4  how we could use 10 United States Code 504(b)(2) to
5  recruit more immigrants into the United States military.
6  And so I would say starting at that point, that was kind
7  of the beginning of what became the MAVNI program.
8     Q.   Other than Congressional testimony, have you
9  ever testified under oath about the MAVNI program?
10     A.   I testified in a criminal case last year in
11  Virginia about the MAVNI program.
12     Q.   What was your role in that case?
13     A.   The defense attorney in the case asked me to
14  come in and testify generally, first in front of a
15  judge-tried case and then in front of a jury, as to what
16  the MAVNI program was and what was going on with the MAVNI
17  program.
18     Q.   Were you designated an expert witness in that
19  case?
20     A.   I don't know if I was designated as an expert.
21     Q.   Did you have to complete an expert report for
22  that case?
23     A.   No.
24     Q.   Were you aware whether you were listed in any
25  expert witness disclosures as part of that case?

Page 157

1     A.   It was a local criminal trial, and I have no
2  idea what got submitted.  I didn't review any pleadings.
3  I simply got asked to show up at the courthouse on a
4  certain day and time, and I was sequestered and then I was
5  brought into the courtroom and asked a bunch of questions,
6  and then I was told that I could leave or remain and watch
7  the rest of the trial.  But I didn't do any written
8  reports that I can recall, and I don't know what the
9  criminal defense lawyer submitted.
10     Q.   I'm interested to know -- and feel free to list
11  these if it's easier.  But I'd just be interested to know
12  if you could go through one by one what expert opinions
13  are you offering in this case?
14     A.   Sure.  You have my expert report.  I'll go
15  through them.
16     Q.   Well, without the report in front of you, I just
17  would like you to tell me, what are your expert opinions
18  that you intend to offer in this case.
19     A.   I would offer that Department of Defense has
20  been engaging in an unconstitutional discriminatory policy
21  against naturalized U.S. citizens who have entered the
22  military through the MAVNI program, and that policy
23  includes a number of sub things.  And some of those
24  policies started with the Peter Levine memo but have since
25  been reversed summarily by the department, apparently

1 because the department is aware that the policies are
2 unconstitutional, so they aren't even attempting to defend
3 them.
4     In the course of the litigation they reversed
5 those -- some of those policies, but there are a couple
6 that still remain that are unconstitutional, national
7 origin discrimination.
8     Q.  Anything else?
9     A.  I mean, I would offer general facts about the
10 MAVNI program and how it's being administered or managed
11 at the moment, my observation of those facts.
12     Q.  Anything else?
13     A.  All my other facts and conclusions about
14 the issues that are being raised in the case.
15     Q.  Anything else?
16     A.  Let me think.  I will go through my expert
17 report.  I could talk about the history of the MAVNI
18 program, the claims in the case.
19     Q.  I just want to remind you I'm interested to know
20 what expert opinions are you intending to offer.  So I'll
21 differentiate those between factual summaries or summaries
22 of policies or pleadings in the case.  But what expert
23 opinions do you intend to offer?
24     A.  I will offer the opinion that the security
25 screening that is being done is both overinclusive and

1 underinclusive and doesn't meet the goals that the
2 department supposedly has laid out, which proves that it's
3 national origin discrimination.  That the department
4 hasn't taken sufficient steps to inform people throughout
5 DoD and the services about changes in the policy, such
6 that people are still continuing to experience
7 discrimination even after DoD allegedly withdrew or
8 reversed some of the memos.
9     And that the plans to do continued
10 discriminatory continuous monitoring of the MAVNIs after
11 they naturalize and after they've cleared all the regular
12 background checks constitute national origin
13 discrimination, as well as the ongoing desire after the
14 naturalized citizens have finished their MSSD to subject
15 them to additional extreme vetting without any
16 individualized suspicion, even though such vetting isn't
17 done on other people who are citizens.
18     Q.  Are there any other expert opinions?  Is that a
19 comprehensive list?
20     A.  I mean, I can also offer that -- the opinion the
21 memos that Peter Levine put out were, on their face,
22 unconstitutional.  Probably should have shocked a
23 constitutional attorney.  Should have been flagged by the
24 DoD general counsel as inappropriate and unconstitutional
25 and violative of Department of Defense equal opportunity

1 policy.
2     Q.  Is that the complete list?
3     A.  And the ongoing discrimination against the
4 MAVNIs has caused a negative effect on their morale.  The
5 CI screenings that are being conducted on the MAVNIs
6 appear to be conducted by people who are not trained, and
7 there's not a high level of quality control such that many
8 of the reports contain factual inaccuracies, incorrect
9 assumptions, and cases where there's been a deep
10 misunderstanding of immigration law, which is leading to
11 bad outcomes for the government in those reviews.
12     Q.  Anything else?
13     A.  The named plaintiffs in the class continue to
14 suffer harm due to the unconstitutional policies.  And the
15 harms don't just apply to them when they're in the
16 military, but because DoD has a policy of continuing to
17 monitor people even after they leave the military and
18 become contractors, that this is going to continue to harm
19 them throughout their military careers even after they
20 leave the military, if they're employed by a contractor or
21 anybody affiliated with the Department of Defense.
22     Q.  Anything else?
23     A.  This has hurt all of them in their careers and
24 they can't perform the jobs for which they are supposed to
25 bring their special skills to bear in the military.  The

1 things they were recruited for they can't actually do,
2 because Department of Defense has made it impossible for
3 them to carry out those jobs in many cases.
4     So, for example, somebody is not allowed to join
5 Special Forces, even though one of the original purposes
6 of the MAVNI program was to bring people into Special
7 Forces, but DoD just says no.  Now, that policy has been
8 reversed as a part of this lawsuit, but the lingering
9 effects of that continue and they're still continuing
10 negative effects on people's careers.
11     Q.  Any other expert opinions that you intend to
12 offer in this case?
13     A.  I'll rely on the opinions in my expert report.
14 I'm happy to read it to you if you'd like.
15     Q.  No.  I appreciate you going through it.  It was
16 a little hard for me to pull out what the different
17 opinions were that were being offered, so I wanted to have
18 the conversation with you.
19     A.  We can go through it line by line and I can
20 explain what I meant, if you want.
21     Q.  Sure.  I'm interested, when you talk about these
22 different opinions that you just went through, was there a
23 particular methodology that you used to reach these
24 opinions?
25     A.  Sure.  I used critical thinking.

Page 162

1    Q.   What do you mean by that?
2    A.   I also used my training and expertise as a
3    lawyer and a military police officer.  And I used the
4    education I received at the institutions that I have
5    attended, to include Harvard College, the John F. Kennedy
6    School of Government, Harvard Law School and the Army War
7    College and the Commander and General Staff College and
8    the Combined Armed Services Staff School.  And throughout
9    all these educational institutions over the years I've
10   been repeatedly trained on problem solving, cost-benefit
11   analysis, analysis of numbers, and looking at data and
12   coming to logical conclusions.
13   Q.   So is it fair to say that by critical thinking
14   you mean applying the experiences and knowledge you've
15   acquired from your professional career and from your
16   education?
17   A.   Yes.
18   Q.   Was there any other methodology that you applied
19   when you -- to reach these expert conclusions?
20   A.   Well, I'm trained as an attorney, so I applied
21   the standard methodologies that attorneys use.
22   Q.   What's that methodology?
23   A.   Reviewing laws, statutes, thinking critically as
24   lawyers do, and then I used standard, typical cost-benefit
25   analysis sometimes.

Page 163

1    Q.   When you talk about applying the -- using the
2    methodology that you -- from your experience as being an
3    attorney, how did researching laws, statutes -- and
4    statutes help you reach these expert conclusions -- expert
5    opinions, I should say?
6    A.   Well, because I'm familiar with constitutional
7    law, I know what national origin discrimination is.
8    Q.   How did the cost-benefit analysis play into
9    reaching your expert opinions for this case?
10   A.   Well, when Mr. Levine's memo came out and I saw
11   it, I realized that no one had done any sort of cost-
12   benefit analysis on the case, on the memo.  There had
13   apparently been no cost estimates done of how much it was
14   going to cost to carry out the alleged monitoring that was
15   being ordered.
16        It was clear that the government hadn't figured
17   that out and hadn't done any analysis of what the impact
18   was going to be on the individuals involved, the harm to
19   their military careers, and that should have been done,
20   but apparently it wasn't done when the memo was rolled
21   out.
22   Q.   And how is the cost-benefit methodology -- how
23   is that specifically tied to the opinions you intend to
24   offer as an expert in this case?
25   A.   Well, one of the things that you're supposed to

Page 164

1    do is, when you do national origin discrimination, you're
2    supposed to -- you know, it's strict scrutiny.  So the
3    rule is it has to be narrowly tailored, and that wasn't
4    what they were doing with the memo.  They were classifying
5    this entire group of people.  More than 10,000 people were
6    going to be discriminated against.  And they were going to
7    be discriminated against with an overly inclusive, and
8    underly inclusive, set of security screenings that wasn't
9    actually going to deal with what DoD apparently thought
10   was the problem.  And it was going to cost a tremendous
11   amount of money.  It was going to hurt the military to do
12   what they were going to do.  And it was also going to be
13   illegal.
14   Q.   So is it fair to say that you used cost-benefit
15   analysis to reach the conclusion that the policies being
16   challenged in this case constitute unconstitutional
17   national origin discrimination?
18   A.   Well, no.  I didn't use cost-benefit to figure
19   that out.  That's a legal issue.  But I used my legal
20   training and my knowledge of constitutional law.
21   Q.   Then is it fair to say that you used cost-
22   benefit analysis to determine whether the policies are
23   narrowly tailored?
24   A.   It helps to inform that, yeah.
25   Q.   And your conclusion is that the policies are not

Page 165

1    narrowly tailored?
2    A.   It's obvious they're not narrowly tailored.
3    Q.   We'll mark this as A.
4        (Exhibit A marked)
5    Q.   So Ms. Stock, I just handed you a six-page
6    document dated October 5th, 2018.  It's been marked as
7    Exhibit A.  The document has your name at the top and says
8    "Expert Witness Report."
9        Have you seen this document before?
10   A.   Yes, I have.
11   Q.   And is this your expert report for the case?
12   A.   It is.
13   Q.   Did you prepare this report?
14   A.   I did.
15   Q.   Did you receive any help in preparing your
16   expert report?
17   A.   No.
18   Q.   Did anybody review a draft of it?
19   A.   I had people at my office review it for typos.
20   Q.   How many people at your office reviewed it?
21   A.   I don't know.  I had sent it to somebody and
22   said, check it for typos.
23   Q.   Other than typos, did anybody provide any
24   feedback on the draft?
25   A.   Feedback on the draft?  No.

1    Q.   How long did it take you to prepare this report?

2    **A.   It probably took me five or six hours, but I**

3    **didn't keep track of my time.**

4    Q.   We're going to look at different sections of it,

5    but I actually want you to start by turning to the last

6    page, which has your signature on it.  And the last

7    paragraph with the heading -- the heading is "Compensation

8    for Study and Testimony in this Case," and the last

9    sentence in that paragraph says, "I am providing my time

10   and testimony on a 'pro bono' basis."

11       What do you mean by "pro bono" in that sentence?

12   **A.   Means I'm not being compensated.  I'm**

13   **volunteering to provide my time and testimony.**

14   Q.   Is that time coming from time you would have

15   otherwise spent working for -- on cases with your law

16   firm?

17   **A.   Yes, it is.**

18   Q.   So I'd like to turn to the first page under

19   "Opinions," and the third paragraph says, "To date, there

20   has been no public information indicating that any

21   naturalized United States citizen from the MAVNI program

22   MAVNI program has engaged in any actual or attempted

23   espionage or terrorism activity."

24       What is the basis for this statement?

25   **A.   I review the Department of Justice press feed**

1    **every day.  I review military newspapers.  Every day I get**

2    **a feed on Military Times, Army Times, so forth.  I**

3    **reviewed the RAND report that was produced in this case.**

4    Q.   Anything else that you reviewed in order to

5    reach this conclusion?

6    **A.   Newspaper articles.**

7    Q.   So I want to ask you about some of the phrases

8    in this sentence.

9        What do you mean by "actual or attempted"?

10   **A.   Actual or attempted.  You know, spying,**

11   **terrorism.**

12   Q.   And I'm actually just interested only in the

13   phrase "actual or attempted."

14       What do you mean by "actual or attempted"?

15   **A.   "Actual" meaning they actually did it, or**

16   **attempting to do it, but not actually carrying it out.  I**

17   **think that's what I meant.**

18   Q.   What do you mean by "espionage"?

19   **A.   Spying.**

20   Q.   Is "espionage" synonymous with "spying," to your

21   understanding?

22   **A.   It would be gathering information that you're**

23   **going to send to a foreign adversary, you know, collecting**

24   **information that you're going to send to the bad guys on**

25   **purpose.**

1    Q.   Does "espionage" include any other type of

2    conduct?

3    **A.   I mean, typically it means spying, looking at**

4    **information and passing it to the bad guys, basically.**

5    Q.   And that's the meaning that you intended for it

6    to have in this sentence?

7    **A.   I intended to use the common dictionary meaning.**

8    Q.   What did you mean by "terrorism activity"?

9    **A.   The definition of "terrorism" is hotly debated,**

10   **but I think I meant it in the generic sense of what the**

11   **public understands to be "terrorism."**

12   Q.   What's that?

13   **A.   Having a shooting, killing, trying to hurt**

14   **people for political purposes.  You know, Major Nidal**

15   **Malik Hasan at Fort Hood I would consider to be terrorism,**

16   **because he was apparently radicalized over the Internet**

17   **and was killing people in the name of his purported**

18   **political or religious beliefs.  But the definition of**

19   **"terrorism" gets hotly debated and I meant it in the**

20   **generic, common sense understanding.**

21   Q.   Since it's hotly debated, is there a generic and

22   common sense understanding of the word "terrorism"?

23   **A.   There's a lot of debate about it, but I think**

24   **most people understand it when they see it.  You know,**

25   **they think it's somebody that's motivated rather than**

1    **personal like, you know, domestic violence, versus yelling**

2    **"Allahu akbar" when you kill people.**

3    Q.   Ms. Stock, are you aware of any planned or

4    implemented acts of espionage or terrorism by non-U.S.

5    citizen MAVNIs?

6    **A.   I'm aware of one case involving Chaoqun Ji, but**

7    **he is not a naturalized United States citizen.**

8    Q.   What are you aware of with Mr. Ji's case?

9    **A.   Well, a few weeks ago he hit the news when he**

10   **got charged by the federal government with failure to**

11   **register as a foreign agent, and I read the criminal case**

12   **that was published -- I read the Department of Justice**

13   **press release about it, and I read the document that the**

14   **government produced on the web and that they posted on the**

15   **web about him.**

16   Q.   As a retired Army officer, would you have any

17   reason today to be informed about planned or implemented

18   acts of espionage by MAVNI soldiers, other than what you

19   read from publicly available information?

20   **A.   Yeah.  People might e-mail me or call me or tell**

21   **me they saw something or they heard something.**  I've had

22   that happen in the past.  Not MAVNIs, but like people

23   trying to get into the MAVNI program, and that happened

24   relatively recently.  And I can tell you more about that,

25   if you're interested.

1    Q.   Not right now.  But I do want to ask a little
2  bit more about your answer.
3        So other than publicly available information,
4  such as news articles, my understanding is that you would
5  hear about planned or implemented acts of espionage by
6  MAVNI soldiers through word of mouth, effectively; is that
7  correct?
8    A.   I don't know word of mouth.  People have tried
9  to get into the MAVNI program who are sketchy characters,
10  so to speak, and people alert me to the fact that people
11  are trying to get into the MAVNI program who are sketchy
12  characters, and it's not necessarily word of mouth.
13  Sometimes they see something posted somewhere on social
14  media.
15    Q.   And then if they see something posted on social
16  media, they will contact you about it?
17    A.   They contact me about it because they don't know
18  who to report it to and they ask me who to report it to.
19    Q.   Do you report that information?
20    A.   I do, yeah.  I have in the past.  It's not just
21  the MAVNI program.  It's people who think sketchy
22  characters are trying to get into the military.  Sometimes
23  they'll call me and ask me, who do you report it to?  Not
24  just MAVNIs, but U.S. citizens trying to come into the
25  military who are sketchy and other folks trying to come

1  in.
2    Q.   Are you aware of any evidence that's come to
3  light since you left your position -- since you retired
4  from the Army in 2010 relating to security threats
5  associated with the MAVNI program?
6    A.   Well, I've read numerous documents indicating
7  that the Chinese government is unhappy with the fact that
8  Chinese citizens are -- or have enlisted in the Army
9  through the MAVNI program.
10    Q.   What are those documents?
11    A.   Well, there are various newspapers that are
12  published in China and elsewhere that are -- talk about
13  the MAVNI program.  There are threats posted against
14  members of the MAVNI program on the Internet in China.
15  There are threats posted on Chinese-language websites that
16  contain direct threats against members of the MAVNI
17  program who are presumably of Chinese descent.
18    Q.   What are the threats?
19    A.   Kill the MAVNIs.  The MAVNIs should be killed.
20  Traitors.  You know, stuff like that.  Capitalists.  Pig
21  MAVNI.  I mean, there's a lot of threats using pretty
22  terrible language.
23    Q.   What is your understanding of why these threats
24  are being made?
25    A.   My understanding is that the Chinese government

1  at first didn't realize that the U.S. government was
2  recruiting Chinese-language MAVNIs, and when they realized
3  that large numbers of Chinese in the United States were
4  joining the U.S. military, they got upset about that and
5  they started blocking the search term "MAVNI" on the
6  Internet in China so you couldn't do searches for the term
7  "MAVNI."
8        They allowed attacks to take place on Chinese
9  language websites where a newspaper article appeared in
10  English and it got translated into Chinese and put on a
11  Chinese language website.  They would allow people in
12  China to attack the MAVNIs on those websites.  And the
13  Chinese government kind of controls what people are and
14  are not allowed to say in China about certain topics, and
15  it was perfectly okay in China to attack MAVNIs who had
16  entered the United States military through the MAVNI
17  program who could do that openly and there was no problem
18  with doing that.  That was okay.  And then there were just
19  like lots of attacks on MAVNIs on Chinese-language
20  websites and so forth.
21    Q.   So other than the threats you've described to
22  individuals who enlisted in the military through the MAVNI
23  program, are you aware of any evidence that's come to
24  light since you retired from the Army that relate to
25  security threats posed by the MAVNI program?

1    A.   Well, I mean, I've read all of DoD's
2  announcements and newspaper articles talking about how the
3  MAVNIs are a threat.  I read Christopher Arendt's
4  affidavits and other people's affidavits where they talk
5  about the threats posed by the MAVNIs.  I get reports from
6  different people telling me that people at DoD are
7  claiming that there's a threat from the MAVNI program.
8  I've talked to retired CIA officers who have discussed the
9  threats from the MAVNI program with me.
10    Q.   Anything else?
11    A.   I don't know.  I read a lot of reports and
12  information about -- you know, newspaper articles.
13    Q.   You said you get reports from different people.
14        What type of reports do you get from people and
15  who are the people you're getting them from?  Let's start
16  with who are the people you're getting this information
17  from?
18    A.   Well, former DoD officials have contacted me to
19  tell me that people at DoD have been claiming that there's
20  a threat posed by the MAVNI program.  And I've discussed
21  that with them.
22    Q.   Anyone other than former DoD officials?
23    A.   I mean, that -- DoD, intelligence community
24  people.
25    Q.   What intelligence -- what agencies in the

1 intelligence community have you had discussions about in
2 terms of the reports that you're getting about the MAVNI
3 program and the threats that it poses?
4 **A. Well, I haven't had a discussion with the**
5 **agency. I've had discussions with people that work for**
6 **the agency or have worked for the agency in the past.**
7 Q. I apologize that that was poorly worded.
8 I'm interested to know to what agencies the
9 individuals in the intelligence community belong, who
10 you've discussed the threats posed by the MAVNI program?
11 **A. Department of Defense, Homeland Security, Office**
12 **of the Director of National Intelligence, National**
13 **Security Council, State Department, CIA.**
14 Q. Again, I want to contain this line of
15 questioning only to discussions you've had since you
16 retired from the Army.
17 But the individuals you're talking to in the
18 intelligence community, are you talking to officials who
19 are currently employed by these agencies when you refer to
20 that?
21 **A. In some cases, yeah.**
22 Q. Which agencies have you talked to -- to what
23 agencies do individuals who are currently employed belong,
24 when you've had these discussions?
25 **A. All these agencies.**

1 Q. So you've talked to current employees at the
2 Department of Homeland Security?
3 **A. Uh-huh.**
4 Q. How many?
5 **A. A lot of them. I mean, they're -- I interact**
6 **with them on a regular basis.**
7 Q. These conversations again are specifically about
8 security threats posed by the MAVNI program.
9 How many officials -- how many current officials
10 of the Department of Homeland Security have you talked to
11 about threats posed by the MAVNI program?
12 **A. Since I retired?**
13 Q. Correct.
14 **A. Probably more than 25.**
15 Q. How many current officials at ODNI have you
16 talked to about threats posed by the MAVNI program since
17 you retired?
18 **A. Since I retired, probably three to five.**
19 Q. How many officials at the State Department have
20 you talked to about threats posed by the MAVNI program
21 since you retired?
22 **A. Probably -- probably the same, three to five.**
23 Q. How many officials of the CIA have you talked to
24 about threats posed by the MAVNI program since the time
25 you retired?

1 **A. I don't know for sure. I don't know for sure**
2 **about that one, because I'm not sure if they were**
3 **currently working or not.**
4 Q. So the current employees at the Department of
5 Homeland Security, ODNI, the State Department, the CIA who
6 you've talked to about programs -- or about security
7 concerns with the MAVNI program, have they provided you
8 with any evidence about the security concerns?
9 **A. Well, the context is I'm at a meeting and they**
10 **talk to me about the security concerns of the MAVNI**
11 **program. So it's not a court proceeding. So nobody is**
12 **giving me evidence. They're discussing what, you know,**
13 **the concerns are and what they've heard. They're asking**
14 **me what I know.**
15 Q. I didn't mean evidence in terms of a legal
16 proceeding. I just meant factual information.
17 Have they provided you with factual information
18 about security concerns posed by the MAVNI program?
19 **A. Sure. They tell me that somebody said**
20 **something, and maybe they point to a newspaper article and**
21 **they say, what about this? Or they say, Chris Arendt at**
22 **DoD said blah-blah-blah or there was a DoD IG report that**
23 **said blah-blah-blah or there's a RAND report that says**
24 **this, this, and this. But nobody is, like, handing me**
25 **evidence. I mean, that's not how the conversations go.**

1 Q. Sure. Are they telling you any information --
2 actually, let me ask a different question.
3 Let's go back to your expert report. So the
4 fourth paragraph is very lengthy. And I'm interested in
5 the second sentence, which starts, "The available public
6 data demonstrates."
7 What is the available public data that you're
8 referring to here?
9 **A. This would be reports about prosecutions,**
10 **charges. A big source of information I think is the**
11 **Department of Justice news feed. They have a very handy**
12 **feature at the Department of Justice where you can get a**
13 **press release every day whenever DOJ charges somebody with**
14 **national security.**
15 **I also subscribe to various databases and**
16 **reports that send me reports, and there's a group of --**
17 **and I was a national security law professor, so I belong**
18 **to different national security law professors' groups**
19 **where we get feeds on prosecutions and indictments, so**
20 **forth.**
21 Q. And you keep saying the word "reports."
22 Are you referring to news articles?
23 **A. News articles and sometimes like an aggregate**
24 **report, you know, kind of like what the Cato report --**
25 **Cato did.**

1    Q.   So news articles and other articles from public
2  interest organizations?
3    A.   No.  Sometimes they're internal.  Like the CIA
4  has a website and you can go to their website and they
5  list stuff on there and they talk about espionage and what
6  causes espionage.  You know, they have articles where they
7  give examples of espionage cases that have different
8  advice articles and historical documents and that sort of
9  thing.
10   Q.   So what reports and other public data
11 specifically did you rely on to reach the conclusion that
12 native-born U.S. citizens are often recruited by foreign
13 adversaries to spy on or attack the United States?
14   A.   Well, I relied on my general knowledge.  I've
15 been studying this area for years and I read a lot about
16 it.  For example, I have read in the last year Jim
17 Clapper's book Facts and Fears, where he talks about
18 foreign adversaries spying on or attacking the United
19 States; and he goes through a whole bunch of famous cases
20 involving native-born Americans who are doing bad things,
21 including Nidal Malik Hassan, Chelsea Manning.  He talks
22 about Edward Snowden.  I didn't mention Edward Snowden in
23 here because he wasn't a member of the military at the
24 time he carried out his bad act.  He was a former member
25 of the military.

1        But I read a lot of reports about people in the
2  military and what they're doing.  It's my profession, so I
3  am very much interested in it.  I'm interested in national
4  security threats posed by immigrants because I've written
5  widely on that topic and studied that topic.  And I've
6  worked extensively with the Department of Homeland
7  Security to try to prevent that sort of thing with the
8  MAVNI program when it started.
9    Q.   If I were to ask you to create an exhaustive
10 list of the public data that you relied upon to reach this
11 conclusion, would you be able to do that?
12   A.   It would take me quite a long time.
13   Q.   Why is that?
14   A.   Because I've been a military police officer for
15 28 years and I've collected a lot of information.
16   Q.   Is that information you got from being a
17 military police officer public?
18   A.   I'm talking about like books and -- I mean, I
19 have a whole stack of books at home that I've read, like
20 Jim Clapper's book Facts and Fears.  I read memoirs by Bob
21 Gates.  He was CIA -- he was Secretary of Defense.  I
22 read -- comprehensively read up on who is trying to attack
23 the United States and why.
24       I taught national security law, so I spent a lot
25 of time reading accounts of things that are court cases

1  relating to national security.  I've contributed to books,
2  national security law textbooks.  So I've read the entire
3  textbook.  That sort of thing.
4    Q.   So I guess I'm asking, if someone wanted to
5  verify the accuracy of the statement that "native-born
6  United States citizens are often recruited by foreign
7  adversaries to spy on or attack the United States" and
8  wanted to check your work, what work did Ms. Stock -- what
9  available public data did Ms. Stock consider when she
10 reached the conclusion in the sentence, could you provide
11 an exhaustive list of that?
12   A.   Well, it would be extremely long and it would
13 have to -- you know, it would be an enormous amount of
14 materials.  It would probably be extraordinarily
15 burdensome to give you all the books I have in my basement
16 on people spying on the U.S. and trying to attack the U.S.
17 I mean, it dates back to 1775 when the Brits recruited
18 Benedict Arnold.  You know, American military history
19 books, espionage books, articles.  And it's my profession
20 to look at that kind of thing.  It would be
21 extraordinarily burdensome, yes, for me to come up with a
22 comprehensive list of everything I've written in 28 years
23 relating to --
24   Q.   Sure.  And I'm not actually asking you to do it.
25 I'm just asking if it's possible to do.  I understand

1  you're saying it's burdensome.  So I just want to make
2  sure I understand that you answered the question.
3        From what you're saying, I understand your
4  answer is, no, that you're not able to come up with an
5  exhaustive list of the public data that the sentence we've
6  been examining is based on.
7    A.   I mean, I could come up with articles that talk
8  about native-born American citizens being recruited by
9  foreign adversaries, yes.  Can I come up with every single
10 thing I've read in my whole life that talks about that?
11 I've been on the planet for more than 50 years, so that
12 would be extremely difficult, burdensome.  I would have to
13 take a whole year and think of every book I've ever read
14 in my life.
15   Q.   So let's go on to the next page.  Page 2.  And
16 the top paragraph which continues over from the first
17 page, the last sentence in that paragraph starts, "If the
18 Department of Defense has concerns about the bad behavior
19 of a particular naturalized U.S. citizen MAVNI."
20       What do you mean by "bad behavior"?
21   A.   Well, from reading the court documents that DoD
22 filed, they apparently are afraid of -- it appears they're
23 afraid of espionage or terrorism behavior, and if in fact
24 somebody who is a naturalized U.S. citizen MAVNI committed
25 espionage or engaged in terrorism activity, what you would

Page 182

1 do is the normal thing that you do with any military
2 member who engages in such activity, you do an
3 investigation and you determine the facts and you
4 prosecute that person pursuant to long-standing
5 authorities. You don't just decide that you're going to
6 discriminate against everybody who shares one
7 characteristic with that particular individual who did the
8 bad thing.
9       And I gave examples of that in the following
10 paragraph. Nidal Malik Hasan was born in America, native-
11 born American citizen. He committed the atrocity at Fort
12 Hood. He killed 13 fellow soldiers, including three
13 immigrants who had been recruited into the military at one
14 point and had earned their citizenship through military
15 service. So three of his victims were naturalized U.S.
16 citizens serving in the military.
17       Rather than responding to that incident by
18 enhanced screening or doing continuous monitoring of every
19 single member of the military with an Arabic name, the
20 military presumably should have taken steps to prevent an
21 individual who is visiting radical websites and making
22 comments to his fellow soldiers from being able to get a
23 security clearance and be in the military. That would
24 have been a more narrowly tailored thing to investigate
25 that guy rather than spending millions and millions of

Page 183

1 taxpayer dollars on screening of everybody with an Arabic
2 name.
3    Q. So I want to go back to something you said at
4 the start of your answer. You said that it appears DoD is
5 afraid of espionage and terrorism.
6       Do you think the Department of Defense has
7 reason to be concerned about espionage?
8    A. Oh, absolutely. Yep.
9    Q. Do you think DoD has reason to be concerned
10 about terrorism?
11    A. Absolutely. Look at Nidal Malik Hasan.
12    Q. Also in that sentence and then the next one, I
13 want to look at two phrases that appear -- or a phrase
14 that appears in both sentences. So in this first
15 paragraph at the top of the page that's continued over,
16 you say, "The narrowly tailored and lawful way to address
17 those issues," and then the first sentence in the next
18 paragraph you say, "If there's a risk here, what DoD is
19 doing is not narrowly tailored."
20       Is that "narrowly tailored" phrasing -- does it
21 mean the same thing in both paragraphs?
22    A. I think so. Narrowly tailored. I don't think I
23 was coming up with a new meaning for "narrowly tailored."
24    Q. What do you mean by "narrowly tailored"?
25    A. The common legal meaning of that in a

Page 184

1 constitutional strict scrutiny test.
2    Q. What's your understanding of that phrasing?
3 What does it mean to be narrowly tailored?
4    A. Well, the government is not supposed to do
5 something that's overly broad, overinclusive, or
6 underinclusive either, frankly. If they're going to
7 discriminate against people who are in a protected
8 category, they have to tailor their discrimination in a
9 way that causes the least harm in a way to the group.
10    Q. So you're using it in the legal sense as it
11 pertains to the strict scrutiny analysis?
12    A. The strict scrutiny test, right.
13    Q. The next paragraph says, "If DoD has an
14 individual concern about a particular MAVNI soldier, DoD
15 can investigate that individual."
16       What do you mean by "investigation" in this
17 sentence?
18    A. DoD can approach the individual and ask him
19 questions. They can use normal investigative methods.
20 They could polygraph the person potentially, depending on
21 the situation. They could charge him with a crime if
22 they've committed a crime. They could call them in for a
23 CI screening, the normal thing that they would do if they
24 think somebody has done something related to espionage.
25       Normally the counterintelligence folks would

Page 185

1 come in and start asking questions. They might get a
2 search warrant. They might read somebody their Article 31
3 rights and ask them questions. They might call the FBI.
4 They might coordinate with other intelligence agencies or
5 Department of Homeland Security to gather information.
6    Q. The next paragraph, the phrase at the end after
7 the comma says, "DoD could add narrowly tailored
8 additional screening to MAVNI recruits from that country."
9       Is the narrowly tailored language there the
10 same -- do you mean it in the same sense as the previous
11 two references on this page?
12    A. I did.
13    Q. And again, that's the legal meaning of narrowly
14 tailored as it pertains to the strict scrutiny analysis?
15    A. Yes.
16    Q. The fifth paragraph, the second sentence is very
17 short. It says, "Yet this is simply not true." And I
18 think it's responding to the first sentence where you say,
19 "DoD has stated repeatedly that enhanced group screening
20 of all MAVNI program participants is necessary because
21 MAVNI program recruits have spent less time in the United
22 States than other recruits."
23       What's the basis on which you state that your
24 characterization of DoD's prior statements is not true?
25    A. Well, it's not the case that MAVNI program

1 recruits have necessarily spent less time in the United
2 States than other recruits.
3    Q.  How do you know that?
4    A.  I know that because I'm familiar with people
5 coming into the Army, and there are lots of people who
6 come into the Army who have spent less time in the United
7 States than MAVNI program recruits.
8    Q.  The third sentence says, "Many native-born
9 military recruits have spent very little time in the
10 United States."
11       How many native-born military recruits do you
12 mean by "many"?
13    A.  Well, we don't know because DoD doesn't announce
14 that information.  They only announce the citizenship of
15 the person.  But from talking to lots of recruits, I know
16 that many of them have spent very little time in the
17 United States.
18    Q.  Can you provide an estimate of how many
19 native-born recruits have spent very little time in the
20 United States?
21    A.  Hundreds.  Hundreds per year.
22    Q.  Is it more than 500?
23    A.  Can't tell you because DoD doesn't release the
24 data.  They just put people as citizens or not.
25    Q.  How many do you have firsthand knowledge of --

1 how many native-born military recruits do you have
2 firsthand knowledge of that they spent very little time in
3 the United States?
4    A.  Lots, but I can't give you a firm number.
5    Q.  Would you say it's --
6    A.  I mean, I'm an immigration lawyer so I usually
7 hear about it because the person came over to the United
8 States to join the military, and I hear either because
9 they're trying to get their family members' papers or they
10 just came over and now they're in the military or they
11 spent a lot of time overseas.
12    Q.  Is it fair to say that this is a generalization
13 based on your work as an immigration lawyer?
14    A.  Well, it's also based on my experience as a
15 military officer.  I mean, I've talked to lots of people
16 in ranks that -- we live in a global world right now, and
17 so it's fairly common for somebody to be born in the U.S.
18 and not spend much time in the U.S.  After they're born,
19 their parents take them overseas and they grow up outside
20 the United States, and then when they get older, they come
21 back to the U.S.
22       That's a really common pattern these days,
23 particularly folks from Mexico.  There have been an
24 enormous number of people born in America who have
25 basically grown up in Mexico who then come back as adults

1 and they join the U.S. military.  They've had to teach
2 them English in many cases because they don't speak
3 English very fluently.
4       And it's not just the case with Mexico, but it's
5 pretty common.  Canada.  There's a lot of people that
6 derive U.S. citizenship overseas through a parent or a
7 grandparent.  Ted Cruz is an example.  So somebody like
8 Ted Cruz, he was born in Canada.  He's a U.S. citizen at
9 birth because he derived it from his mother but he was not
10 born in the United States.  And there's an enormous number
11 of people who are American citizens at birth who weren't
12 born in the United States and then come back to the U.S.
13 You know, they're American citizens on a passport and they
14 join the U.S. military.  Those are fairly common in
15 today's global world.
16    Q.  Are you aware of any statistics that show that
17 many native-born military recruits have spent very little
18 time in the United States?
19    A.  As far as I can tell, DoD doesn't track it.  And
20 so I'm not aware of statistics.  I know when working with
21 the Defense Manpower Data Center, at one point we tried to
22 get that data when I was the program officer for MAVNI and
23 they told us they couldn't get it because they didn't have
24 fidelity on the data.
25    Q.  So is it fair to say that the conclusions in

1 this sentence are based on your personal experience as
2 well as anecdotal information you've heard from other
3 people?
4    A.  And also my expert work.
5    Q.  And in that same sentence, you say, "Very little
6 time in the United States."
7       What do you mean by very little time?
8    A.  Well, it's possible to derive American
9 citizenship through a parent or a grandparent and you
10 might have never been in the United States at all your
11 entire life, but you're an American citizen.  And then you
12 can fly back to the United States and join the military as
13 a U.S. citizen.  You've had a U.S. passport since your
14 birth, but you've never lived in America, might never even
15 have been in America at all.
16    Q.  Are native-born military recruits who spent five
17 years in the United States prior to joining, is that very
18 little time?
19    A.  I think that's a substantial amount of time.
20 I'm thinking more of less than that, I think.
21    Q.  How much are you thinking of when you say "very
22 little time" in this part of your report?
23    A.  It could be less than five years, less than two
24 years.  They might have only been here a few weeks.
25 That's possible.

1  Q.  Is there a cut-off range by what you mean by
2  "very little time"?
3  A.  Well, I think, you know, DoD has not been clear
4  on what they mean by substantial time in the United
5  States.  But my thinking would be less than five years,
6  probably.
7  Q.  So by "very little time" in this sentence, you
8  mean less than five years; is that correct?
9  A.  Well, I mean very little time.  So they might
10 have been here for two weeks and they just flew over to
11 join the military and that's it.  It might be much less
12 than five years.
13 Q.  Sure.  I think you can appreciate that "very
14 little time" is a somewhat ambiguous statement --
15 A.  It is.
16 Q.  -- so I'm trying to figure out what you mean by
17 "very little time."
18 A.  Well, the example I gave here was a guy that was
19 in the newspaper and the Army allowed him to enlist in the
20 military and they shipped him out to training without any
21 kind of vetting of any serious kind.  They did the regular
22 enlistment checks that they do on any military recruit and
23 he apparently cleared all those.  They didn't do a Tier 3.
24 They didn't do a CI-focused security screening and
25 certainly didn't do a Tier 5 or an SSBI.

1  And he shipped off to training and the only
2  reason they found out about him is because the Washington
3  Post decided to do a story about how he had spent time
4  fighting with Russian separatists in Ukraine and was
5  working with these anti-American extremist groups in
6  Europe.
7  And he would never have come to light except for
8  the Washington Post doing a story.  And it turned out he
9  was serving in an infantry unit and had spent very little
10 time in the United States.  He apparently derived his
11 American citizenship through his mother.  So I don't know
12 the sum total of how much time he spent in America, but it
13 was very little time.
14 And then the next sentence points to the fact
15 that --
16 Q.  Sorry.  I'm actually going to stop you here,
17 because I have the report.  I want to keep the focus on
18 the "very little time" language.
19 Are you aware of any statistics that show the
20 amount of time native-born military recruits have spent in
21 the United States before they enlist?
22 A.  Am I aware of any statistics?
23 Q.  Uh-huh.
24 A.  No, because the DoD doesn't track that.
25 Q.  Same question --

1  A.  Except for the Pacific Islanders.  We know they
2  haven't spent any time.  Because they're recruited
3  overseas and they only show up in the United States to
4  show up for training.  So they have no time in the United
5  States before they pop over.  Maybe there's an isolated
6  case of a person that's visited the U.S. or something, but
7  the Pacific Islanders are -- that number -- I don't know
8  what that number is.  They could pull it off DMDC.  But
9  those folks have spent zero time in the United States
10 before they enlist.
11 Q.  The last sentence in this paragraph states,
12 "Many green card holders have spent only a few days or
13 weeks in the United States before they're permitted to
14 enlist."
15 Do you know how many green card holders have
16 spent only a few days or weeks in the United States before
17 they're permitted to enlist?
18 A.  Okay.  So green card holders have been enlisting
19 in the military for a really long time.  You're asking if
20 I know in the history of the country?
21 Q.  I'm asking if you have a numerical support for
22 the statement "many green card holders" in this sentence.
23 A.  Well, it's somewhere between probably, you know,
24 in the last -- see, we've had over a hundred thousand
25 enlisted post-9/11 who have gotten their citizenship.  It

1  would be in the tens of thousands.
2  Q.  Okay.  The next paragraph says, in the first
3  sentence, "Many MAVNI recruits have been in the United
4  States a very long time."  I think that's, many MAVNI
5  recruits have been in the United States for a very long
6  time.
7  When you say "a very long time" in this
8  sentence, what do you mean by "a very long time"?
9  A.  More than a couple of weeks.  More than five
10 years, I would say.  It's a range.  A very long time by
11 common sense standards.  Year and years.
12 Q.  You're using it here then -- as I understand
13 from what you're saying, you're using it here to mean --
14 "a very long time" to mean more than five years?
15 A.  Well, okay.  So here I'm talking about the
16 DACAs, okay, at first and the DACAs --
17 Q.  I'm sorry.  So the first sentence just says,
18 "Many MAVNI recruits have been in the United States a very
19 long time."
20 Is that sentence limited to DACA recruits?
21 A.  No.  It covers the whole range of MAVNIs.
22 Q.  Okay.  So I want to understand, though, what you
23 mean by "a very long time."
24 Do you mean it to be that it's -- MAVNI recruits
25 have been in the United States for more than five years?

Page 194

1    A.   Well, it could be.  That could be.  It could
2    be -- I think three years in some cases could be a very
3    long time.
4    Q.   Why would it be three years for some people and
5    five years for others?
6    A.   Because it's not -- I'm not pinning it down to a
7    particular time frame.  I'm just giving an estimate.
8    Q.   And what is the estimate?  What is the numerical
9    value for the estimate?
10   A.   I didn't put a numerical value on the estimate
11   in my report.
12   Q.   As I'm understanding what you're saying now is
13   that for some people five years could be a very long time
14   and for other people three years could be a very long
15   time.  Am I understanding you correctly?
16   A.   Well, it depends on the purpose for what you
17   mean "a very long time," but the MAVNIs --
18   Q.   How you use it in that sentence.
19   A.   I meant a very long time, that it would be five
20   years or more.  I think what I had in my head here was the
21   original MAVNI program, when we designed it, we asked only
22   for people that were in the U.S. for five years or more.
23   That was part of the original proposal.  And then DoD cut
24   it down to two years.  So to me, "a very long time" is
25   like five years or more.

Page 195

1    Q.   Okay.  That's helpful.
2         You start the sentence by saying, "Many MAVNI
3    recruits have been in the United States for a very long
4    time."  And we understand now "for a very long time" means
5    more than five years.
6    How many MAVNI recruits are you aware of that
7    have been in the United States for more than five years
8    before they enlisted in the military?
9    A.   Hundreds of them, if not thousands.  There's
10   more than 10,000 of them.
11   Q.   And all of those have been in -- all those were
12   in the United States for more than five years before they
13   enlisted?
14   A.   I didn't say all of them.  I said out of the
15   10,000, hundreds if not thousands of them had been in the
16   United States for more than five years.
17   Q.   Is it more than 1,000, your estimate?
18   A.   Sure.  Say more than 1,000.
19   Q.   Is it more than 2,000, in your estimate?
20   A.   I don't know.  I'd have to go back and look at
21   the data, but the Army had collected data on that.
22   Q.   What do you mean when you say -- I guess I'm
23   trying to figure out what precisely you mean by "many
24   MAVNI recruits" here.
25        Do you mean more than 1,000 but less than 2,000?

Page 196

1    A.   I mean "many" as the common phrase is many --
2    Q.   But again, I think you can appreciate that --
3    A.   -- lots and lots of people.
4    Q.   -- it's a very ambiguous term that can have very
5    different meanings to different people.  So I'm trying to
6    understand how you used it here specifically.
7    A.   I used it to mean lots and lots of MAVNI
8    recruits.
9    Q.   And as I understand it, that means more than
10   1,000.
11        But does it mean more than 2,000?
12   A.   Well, I just used it in the generic sense of
13   "many."
14   Q.   Actually, I'm sorry.  I want to go back to my
15   original question, which was, how many MAVNI recruits are
16   you aware of, do you have firsthand knowledge of, who were
17   in the United States for more than five years before they
18   enlisted in the military?
19   A.   I would have to go back and look at the reports.
20   Q.   Can you provide an estimate for me?
21   A.   Not off the top of my head, no.  I'd have to go
22   back and look at the reports.
23   Q.   Do you think it would be more than 500?
24   A.   Like I said, I'd have to go back and look at the
25   reports and figure that out.  Nobody has asked me to pin

Page 197

1    it down to my estimate of the exact number, and I'd have
2    to go back and scrub the data.
3    Q.   So is it fair to say when you said, "Many MAVNI
4    recruits have been in the United States for a very long
5    time" in this sentence, you don't have a numerical number
6    supporting the "many MAVNI recruits" language?
7    A.   I have a numerical number if I go scrub the
8    data, but if you're asking -- you're trying to get me to
9    give you a number, a specific number, and I can't do that
10   right now because I have to go back and look at all the
11   historical data that was collected on how many years
12   people had been in the country before.
13   Q.   Did you scrub the data before you wrote this
14   report?
15   A.   No.
16   Q.   So you didn't have a numerical value in mind
17   when you wrote "many MAVNI recruits"?
18   A.   Not a specific number, no.  I had the idea of
19   "many" as it's commonly understood.
20   Q.   What is the common understanding of "many"?
21   Getting a lot of semantics here, but I'm interested to
22   know.  What do you mean, when you say "commonly
23   understood" meaning of "many," what is the commonly
24   understood --
25   A.   Lots.

1    Q.   So at the top of page 3, the last sentence in
2  that paragraph says, "Many MAVNI program recruits" --
3  again, we see that language again -- "have extensive and
4  longstanding presence and ties to the United States."  So
5  we already, I think, discussed a little bit about the
6  "many MAVNI program recruits" language.
7        Did you have a numerical value in mind when you
8  said "many MAVNI program recruits" here?
9    A.   Okay.  Well, I'll help you out a little bit
10  here.  Okay.  So they recruited about 900 DACAs, and the
11  DACAs, by definition, had to have at least five years in
12  the United States before they were recruited, by virtue of
13  it being the DACA program.  So it would be well over 1,000
14  MAVNI recruits that had longstanding ties, because the
15  DACAs were only 900 out of the 10,000 plus.
16    Q.   What do you mean by "extensive and longstanding
17  presence and ties"?
18    A.   I meant that they have gone to school here,
19  they've worked here, their family members live here.  They
20  have been in our society for a very long time.  They have
21  relatives and friends in the military.  People who work at
22  the Pentagon have recruited them.
23        In some cases, many -- one of the interesting
24  things about the early days of the MAVNI program was that
25  a lot of the recruits we were getting were recommended by

1  U.S. government officials who thought they would make good
2  recruits.  So, for example, a colonel at the Pentagon
3  would send a MAVNI to a recruiter and say, this person has
4  ties to the United States.
5        They also recruited a lot of people who worked
6  for the U.S. overseas.  So people had worked in Iraq or
7  Afghanistan or Europe, Japan, Asia for the United States
8  and they would be recommended for the MAVNI program by
9  some official at the Pentagon, and their longstanding ties
10  weren't just inside the U.S. but they had, like, worked
11  for U.S. defense contractor overseas or worked for the
12  U.S. government overseas, or they had received a
13  scholarship to come to the United States through the U.S.
14  Department of State.
15        So it means -- "extensive and longstanding
16  presence and ties" means that they have family, friends,
17  social ties, connections, employment, that sort of thing.
18    Q.   How do you specifically know that many MAVNI
19  recruits have extensive and longstanding presence and ties
20  to the United States?
21    A.   Because I know them and I've reviewed their
22  files and their records and interviewed them and talked to
23  them on the phone.
24    Q.   So you have firsthand knowledge from reviewing
25  their documents and from talking to them?

1    A.   Uh-huh.
2    Q.   How many MAVNI recruits would you say you have
3  such knowledge for about their extensive and longstanding
4  presence and ties to the United States?
5    A.   Hundreds of them.
6    Q.   Does that mean more than 500?
7    A.   Probably more than 500 MAVNIs that I've
8  interacted with, yes.
9    Q.   Is it more than 600?
10    A.   Probably.
11    Q.   Is it less than 1,000?
12    A.   I have probably interacted with thousands of
13  MAVNIs over the course of the program.
14    Q.   So I'm not actually asking about the number you
15  interacted with.  I'm asking about the number of MAVNI
16  program recruits who you have firsthand knowledge of, of
17  their extensive and longstanding presence and ties to the
18  U.S.
19    A.   I think I should clarify here that I was the
20  original project officer for the program, so I pretty much
21  saw everybody's file the first year of the program.  And
22  then the second year of the program I continued to have
23  firsthand knowledge.  I would review files on a regular
24  basis, I would talk to people on a regular basis.  So
25  hundreds.

1    Q.   So I'm going to move on to actually the footnote
2  at the bottom of the page.  Footnote 2, which is footnoted
3  in the second paragraph.  You say, the first sentence,
4  "Presumably the difficulty of doing a background
5  investigation on someone."
6        How are you evaluating the difficulty of doing a
7  background investigation on someone?
8    A.   Well, I would look at whether DoD has a file on
9  them, whether we have -- as a country who has access to
10  investigative databases on people who reside in that
11  country, whether we share databases.  For example, we
12  share a lot of police information with the Canadians.  So
13  it's relatively easier to do a background check on
14  somebody who has lived in Canada their whole life than it
15  is to do a background check on somebody who has lived in
16  China.
17        Somebody in Europe, we may have Interpol
18  databases.  If we have a State Department presence in a
19  country and the State Department has records on a persons,
20  it might be relatively easy to do a background check on
21  them.  If they lived on a military base, we're going to
22  have a lot of records.  If they were, for example, working
23  in Iraq or Afghanistan on a U.S. military base, we're
24  going to have a lot of records on them and a lot of
25  background-checking information already in our database.

1  So it's not -- it's not the case that every single country
2  is equally difficult.
3      Q.  And you say "presumably" as the introductory
4  clause in this sentence.
5          What do you mean by "presumably" here?
6      A.  Common English term "presumably."
7      Q.  And what is that?  What's your understanding of
8  the word "presumably"?
9      A.  It means that the difficulty of doing a
10 background investigation would depend on the country where
11 the person resided, as well as the circumstances of their
12 residence overseas.  Not just the fact that they lived in
13 a foreign country.
14     Q.  When you say "presumably," are you making
15 assumptions in this sentence?
16     A.  That's based on my factual knowledge of what
17 sits in the U.S. government computer when somebody lives
18 on a base in Japan versus living on a base in -- I mean,
19 when I was in Japan, we had investigative reports on
20 everybody who lived on the base.  So it's easy to get
21 those.  You just order them up.
22     Q.  Just to be clear, as we go through your report,
23 these are the words that you chose to put down on the
24 page, and I'm trying to ask you these questions to help me
25 understand what you mean by these a little bit more.  So I

1  really want to focus on the language that you chose to use
2  here.
3      A.  So you don't know what the word "presumably"
4  means?
5      Q.  Actually, I don't know how you intended it to
6  be -- what you intended by using the word "presumably."
7      A.  I intended to introduce the sentence.
8      Q.  What does "presumably" mean in the context of
9  this sentence?
10     A.  It means that DoD didn't -- they basically are
11 claiming that it's difficult to do a background check on
12 anybody who lives in a foreign country.  And it's not.  It
13 depends on what country it is and where they live.  Were
14 they sitting on a military base in Iraq or Afghanistan and
15 subject to the control of DoD the whole time, in which
16 case you are probably going to have a lot of information
17 on them.
18         If they were sitting in Japan, they were born on
19 a military base in Japan and they lived there for much of
20 their life because their parent was stationed overseas --
21 maybe their parent was a civilian employee of the United
22 States military in Japan for a really long time -- we're
23 probably going to have less of a problem doing a
24 background check on that person than somebody who was born
25 in the U.S. as an infant to somebody on a tourist visit

1  and they flew back to China and the person has lived in
2  China their whole life, and we have no U.S. government
3  information on the individual until they apply for their
4  U.S. passport as an adult and fly back to the U.S. and
5  join the military.
6          We're just not going to have any of that
7  information on the person in China, but we would have
8  information on somebody who grew up on a U.S. military
9  base in Japan.
10     Q.  So based on your testimony, my understanding is
11 you're not making any assumptions in the first sentence of
12 the footnote, despite your use of the word "presumably."
13 Is that fair to say?
14     A.  I don't understand what you're saying.
15     Q.  I'm asking whether you made any assumptions in
16 making the statement in the first sentence of this
17 footnote as indicated by the word "presumably."  I
18 understand your testimony to be no, I didn't use any -- I
19 didn't make any assumptions --
20     A.  That's not what I'm testifying to.  I don't
21 understand your question.
22     Q.  Well, I've asked you before if you made any
23 assumptions in reaching the conclusions in this first
24 sentence of the footnote.
25     A.  Yeah.  I made the assumption that DoD didn't

1  think about the fact that not everybody who is overseas is
2  somebody that we can't get a background check on.  We can
3  get a background check on some people who are overseas.
4  It's just not the case that everybody overseas, you can't
5  get any background information on them.  That's not the
6  case.
7      Q.  How do you know that?  How do you know -- how do
8  you personally know whether a background investigation is
9  difficult?
10     A.  Because I've asked people for information on
11 people who have lived overseas, and I've gotten
12 information from them -- from people if the person like
13 worked for the U.S. government overseas.  Or maybe they
14 went to a DoD school in Germany.  I can get a lot of
15 information.
16     Q.  And how do you know that that's the information
17 that a person running a background investigation for
18 purposes of security clearance want to obtain?
19     A.  Because I've read the reports.  That's what
20 they're trying to -- they want to know, where did you go
21 to school, do you have a criminal record, did you ever get
22 arrested for anything.  That whole stack of reports I gave
23 you, they're trying to answer all those questions.
24     Q.  So is it fair to say that your understanding of
25 whether a background investigation is difficult is based

Page 206

1 on the CI reports that you've read for the -- that you
2 provided me with today?
3     A. No. It's also based on my reading of a lot of
4 single-scope background investigations as well. I mean,
5 you say "background investigation," you're not just
6 talking about CIs. Right? Presumably you're talking
7 about NACLC, NACs, SSBIs, Tier 3, Tier 5. You're talking
8 about the whole range of different background
9 investigations.
10     So it's data-driven and it depends on whether
11 you can check databases to check information that the
12 person is telling you about. And if you can check a
13 database because the information is out there, you can
14 verify the person was enrolled in a Department of Defense
15 school overseas. You know, it's not going to be so
16 difficult to do the background investigation on them.
17     Q. Is your assessment of whether it's difficult to
18 do a background investigation based on any personal
19 experience of actually conducting background
20 investigations?
21     A. Yes.
22     Q. Did you conduct those background investigations
23 as a military police officer?
24     A. Sometimes I did, yes.
25     Q. And have you ever -- I think we talked about

Page 207

1 this before, but for purposes of this sentence, is your
2 assessment of the difficulty of doing a background
3 investigation based on your experience conducting
4 background investigations for purposes of a security
5 clearance determination?
6     A. I was not an adjudicator for security clearance
7 investigations. As I mentioned before, I've been involved
8 in them when somebody comes to me to verify the
9 information about somebody or to collect a report on
10 somebody.
11     Q. So let's go back up to the main text in this
12 page. The last paragraph -- I think it's the fourth one
13 on the page -- says, "DoD's public treatment of
14 naturalized U.S. citizens who have entered the U.S.
15 military through the MAVNI program has created a black
16 cloud of suspicion over all MAVNIs."
17     What do you mean by "black cloud of suspicion"?
18     A. DoD tagged the entire group of MAVNIs with being
19 threats, national security threats, and used that as a
20 justification for doing all this extra background
21 screening and treating them badly during their first term
22 of enlistment, and refusing to let them have security
23 clearances even if they passed all the background
24 screening. Basically, DoD sent a message out publicly
25 that everybody who came into the military through the

Page 208

1 MAVNI program is potentially a threat to the military,
2 regardless of their background, regardless of their
3 performance, regardless of how well they've been doing in
4 the military.
5     Q. What firsthand knowledge do you have that MAVNI
6 soldiers are uniquely suspicious within the military?
7     A. I don't have any firsthand knowledge that they
8 are. I don't think they're suspicious at all, uniquely
9 suspicious. I think there are equally problems with
10 native-born Americans in the military, with green card
11 holders coming into the military, Pacific Islanders coming
12 into the military. The MAVNIs don't have -- aren't
13 uniquely dangerous.
14     Q. What firsthand information do you have that
15 people think the MAVNIs are suspicious?
16     A. I read the Public Affairs things that have been
17 put out by officials at DoD, and the justification for the
18 Peter Levine memo was basically all these people are
19 suspicious. We failed in our background screening of all
20 them. We now have to go back and screen them all again.
21 And we have to prevent them from becoming officers, from
22 getting security clearances. I mean, that was a public
23 statement by DoD that they thought the entire program --
24 everybody in the program was dangerous.
25     And then Stephanie Miller has been -- has

Page 209

1 occasionally given press conferences and told selected
2 news media that this particular program represents a
3 threat. But I disagree with her. I don't think she's
4 correct in that assessment.
5     Q. The Public Affairs statements that you're
6 talking about, did those use the words "black cloud of
7 suspicion"?
8     A. No.
9     Q. Did the justification for the policies that you
10 referenced use the word "black cloud of suspicion"?
11     A. No.
12     Q. Has Stephanie Miller, to your knowledge, ever
13 used the phrase "black cloud of suspicion" to describe the
14 MAVNI soldiers?
15     A. No.
16     Q. Is that your own phrasing?
17     A. That's my terminology. Yep.
18     Q. And you chose that phrasing based on your
19 reading of the Public Affairs statements, DoD's stated
20 justifications for its policies, and statements Stephanie
21 Miller has made?
22     A. No. I've also talked to MAVNIs who have felt
23 that they were targeted. And I've had a lot of
24 conversations with MAVNIs who were very upset when the
25 policy came out. They were calling me. They were saying

Page 210

1  things like, what did I do?  I've always done my best and
2  now all of a sudden they think I'm dangerous.
3      I talked in particular to one doctor who was
4  lieutenant colonel in the Army and was thinking about
5  resigning because DoD had now tagged all the MAVNIs with
6  suspicion that they were all dangerous, and he felt he had
7  been trying really hard, working really hard.  He loved
8  his military job.  He'd been promoted to lieutenant
9  colonel.  He's a doctor at Veterans Administration.
10      And he was very, very upset about this
11  announcement that all of a sudden nobody trusts you
12  anymore, and even though you passed all this background
13  screening, we don't think there's anything you can do to
14  make us happy, and we have to continuously monitor you for
15  the rest of your military career and throughout your
16  affiliation with the Department of Defense.
17      And it just made him very upset about the fact
18  that, for the rest of his life, he was going to be
19  considered less -- a second-class citizen because he had
20  come into the military through the MAVNI program.
21      Q.  How many MAVNI soldiers have told you that they
22  feel suspicious because they're MAVNI soldiers?
23      A.  Hundreds of them.
24      Q.  How many MAVNI soldiers have told you that they
25  feel singled out as being suspicious because of the

Page 211

1  policies challenged in this case?
2      A.  I would say hundreds of them.
3      Q.  That same paragraph says, "MAVNIs have been
4  singled out by DoD as inherently suspicious.  No matter
5  how long they serve, they are, by explicit DoD policy,
6  deemed inherently untrustworthy because of their national
7  origin."
8      On what basis do you reach the conclusion that
9  MAVNIs have been, quote, "deemed inherently
10  untrustworthy"?
11      A.  I read the Peter Levine memo.
12      Q.  Anything else?
13      A.  I read the subsequent memos and the Public
14  Affairs announcements coming out of the Department of
15  Defense and the Stephanie Miller interview.
16      Q.  Anything else?
17      A.  I've read various e-mails.  I've had MAVNI
18  soldiers tell me that people have made comments to them.
19      Q.  Anything else?
20      A.  I've had DoD officials tell me that DoD Under
21  Secretary of Defense for Personnel and Readiness is
22  xenophobic and has targeted the MAVNIs.
23      Q.  When you say "Public Affairs statements from
24  DoD," do they use the language "deemed inherently
25  untrustworthy"?

Page 212

1      A.  No.
2      Q.  Does the Levine memo or any of the supporting
3  documents for the Levine memo use the phrasing "deemed
4  inherently untrustworthy"?
5      A.  No, but they, as a sum total of the intent of
6  the memo, were targeting this particular group of people
7  who came into the military through the MAVNI program.
8  They are suspicious, therefore, putting all these new
9  vetting requirements into effect.  We're not doing this
10  for anybody else.  We're only doing it for these people.
11      Naturalized citizens who come into the military
12  through other programs don't have to go through any of
13  this.  People born in the United States or born in foreign
14  countries who have similar characteristics, like they
15  haven't lived in the United States very long, don't have
16  to go through any of this.  It's only the MAVNIs.
17      Q.  So is it fair to say the phrasing "deemed
18  inherently untrustworthy" is your own language that you
19  use based on your review of the Levine memo, Public
20  Affairs statements, public statements made by Stephanie
21  Miller, various e-mails, conversations you've had with
22  individual MAVNI soldiers and select -- or certain DoD
23  officials who -- or conversations you've had with certain
24  DoD officials?
25      A.  That probably pretty much covers it.  And other

Page 213

1  people from other agencies.
2      Q.  On the next page -- I just have a couple more
3  questions and then I think we'd like to take a break.
4      The first paragraph of the top of the page,
5  which is a continuation of the previous paragraph, says,
6  the last sentence, "Naturalized U.S. citizens who enter
7  the military through the MAVNI program have expressed to
8  me that they are distressed and saddened by this DoD
9  policy."
10      Did they specifically -- did any MAVNI solders,
11  in conversations or communications with you, use the words
12  "distressed" or "saddened"?
13      A.  They cried.  So I discerned from the fact they
14  were crying that they were distressed, because I perceive
15  tears as a sign of distress and sadness.
16      Q.  And is this based on -- then I assume this is
17  based -- is it fair to say that these are based on
18  in-person conversations you had with MAVNI soldiers in
19  which they conveyed these feelings to you?
20      A.  Sometimes.  Sometimes I was on Skype or Facetime
21  so I could see them crying.
22      Q.  Are there any written communications with MAVNI
23  soldiers in which they've in some way conveyed what you
24  believe to be distress and sadness due to DoD policy?
25      A.  Yes.  On Facebook they've publicly expressed

Page 214

1    their distress and sadness.
2        Q.   How many MAVNI soldiers have communicated to
3    you, in your understanding, that they are distressed and
4    saddened by DoD policy?
5        A.   I couldn't give you an exact numerical value.  A
6    lot.
7        Q.   How many is a lot?
8        A.   Many.
9        Q.   If you had to estimate, how many would it be?
10       A.   I would have a hard time estimating it.
11       Q.   Why is that?
12       A.   Because it's so frequent.
13       Q.   How many specific in-person conversations do you
14   recall where MAVNI soldiers conveyed to you that they were
15   distressed and saddened by DoD policies?
16       A.   Specific that I recall.  Many.
17       Q.   What's a specific number that you can recall of
18   in-person conversations in which MAVNI soldiers expressed
19   to you that they're distressed and saddened by DoD
20   policies?
21       A.   I don't know.  I would have to think about it.
22       Q.   Would it be more than ten?
23       A.   Yeah, more than ten for sure.
24       Q.   Would it be more than 50?
25       A.   Could be, if I thought about it.

Page 215

1        Q.   These are in-person conversations with MAVNI
2    soldiers in which --
3        A.   Well, I have to sit there and think about where
4    was I, who did I talk to it, was it Skype, FaceTime, was
5    it at a meeting where a bunch of MAVNIs were there.
6        Q.   Is it more than 100?
7        A.   Yeah, it's probably more than 100.
8        Q.   Is it more than 200?
9        A.   You know, I don't want to speculate at this
10   point.
11       Q.   So in other words, you can't tell me -- the best
12   you can say is it's a number between ten and 100 is the
13   number of conversations you had --
14       A.   No.  It could be more than that.  It's just that
15   I don't know which one of them -- you know, I can't recall
16   specifically how many people I've seen crying versus
17   making faces versus posting things on Facebook versus the
18   distress in their voice when they call on the phone and I
19   refer them to another lawyer to join a lawsuit, that sort
20   of thing.  But it's a lot of people.
21           The program took a gut punch from the Peter
22   Levine memo in terms of the morale of people in the
23   program.  It dropped significantly.  I'm sure when they
24   come out with a new DoD study of the morale of the MAVNIs,
25   they will see a significant drop after the Peter Levine

Page 216

1    and the Stephanie Miller pronouncements.
2        Q.   So the next paragraph starts with the sentence,
3    "Ironically, U.S. citizens who entered the military
4    through the MAVNI program are the 'most vetted' recruits
5    who join the United States Armed Forces."
6            What do you mean by "most vetted" in this
7    sentence?
8        A.   They are the recruits who have been through the
9    most background checking of any recruits who join the U.S.
10   Armed Forces.
11       Q.   Is that an official determination?
12       A.   It's just facts.  They have more background
13   checking done on them than any other recruits who join the
14   U.S. Armed Forces.
15       Q.   What do you mean by "background checking"?
16       A.   Any official attempt to obtain information about
17   the person for the purposes of determining whether they're
18   any kind of threat to the United States, or security
19   threat or they have a criminal record or record of doing
20   anything bad.
21       Q.   What do you mean by "doing anything bad"?
22       A.   It's broad.  The State Department and Department
23   of Homeland Security ask extraordinarily broad questions
24   when people apply for a visa and check numerous government
25   databases before handing our visas overseas.

Page 217

1        Q.   The vetting that you're referring to in the
2    first sentence, when you say the MAVNI recruits are the
3    most vetted recruits who join the Armed Forces, is the
4    vetting that you're referring to there the same as the
5    vetting that any soldier must go through in order to
6    obtain the security clearance?
7        A.   No.  They go through more vetting.
8        Q.   They go through more vetting for?
9        A.   Okay.  Well, first of all, the MAVNI program,
10   when it started, was limited to legal immigrants who had
11   been in the United States for at least two years and only
12   people in specific categories.  And all of the people in
13   those specific categories had been accorded that status in
14   that category by one or more agencies of the United States
15   government, whose job is to stop people who are going to
16   pose a security threat to the United States from entering
17   the United States or getting any immigration benefits.
18           And so by virtue of the fact that these
19   individuals had been accorded, for example, F-1 student
20   status, we knew that that individual had gone through a
21   significant amount of vetting with the Department of State
22   as well as the Department of Homeland Security before they
23   even sat foot in the United States, and they had been
24   continuously monitored by the Department of Homeland
25   Security for the two years prior to walking up to a

1 recruiting station. No other recruit had gone through
2 that, who approaches a recruiter. So that's what we were
3 talking about.
4         And then on top of that, they added additional
5 vetting before they would let them sign an enlistment
6 contract. They had to go through an additional vetting,
7 including Department of Homeland Security review of all
8 their immigration documents, which isn't something done on
9 any other recruits. So we would collect all the
10 immigration documents on each individual person that was
11 attempting to enlist in the Army through the MAVNI program
12 and we would send all those documents up to the Department
13 of Homeland Security and they would check all their
14 databases yet again and they would review all the
15 documents. And often we would have individual discussions
16 about the person. And they don't do that with any other
17 recruiter that walks in a recruiting station. It was only
18 done with the MAVNIs.
19         They also made the MAVNIs go through additional
20 screening. When we started the MAVNI program, we only
21 opened it in New York City, and the reason we did it in
22 New York City was because the commander of the recruiting
23 battalion in New York City was an MI officer, military
24 intelligence officer, and he had special expertise in
25 figuring out whether people are a security threat. And

1 only the MAVNIs would be going through that kind of
2 screening before being allowed to sign an enlistment
3 contract.
4         And as I said, they'd also gone through -- I
5 mentioned the post-9/11 Department of State and Department
6 of Homeland Security security screening process. It's
7 extraordinarily rigorous. And that's referenced in the
8 Cato report that I gave you today. The quote is, "The
9 United States already practices 'extreme vetting.' While
10 people of all types -- foreign-born or U.S.-born -- will
11 always pose certain risks to the country, the country has
12 maxed out its capacity to improve immigration vetting.
13 Fortunately, vetting failures are very rare and pose a
14 small risk to the United States."
15         So what he's talking about there is the post-
16 9/11 security screening process, which is extremely
17 rigorous. No other recruits who come into the U.S.
18 recruiting station go through that kind of vetting. This
19 is all done before they even contact a recruiter.
20     Q.  Has anyone else reached the conclusion that
21 MAVNI recruits are the most vetted recruits who join the
22 U.S. Armed Forces?
23     A.  I know people in the Army thought so when we
24 started the program and people at DoD thought so when we
25 started the program.

1     Q.  Is there any sort of official determination of
2 that, that MAVNI recruits are the most vetted recruits who
3 join the Armed Forces?
4     A.  As I recall, it was in a number of PowerPoint
5 slide presentations that were given at various points in
6 time about the program. And it was also the conclusion of
7 folks at ODNI at one point when I went over and
8 coordinated with them on the issue.
9     Q.  SO it's fair to say that it was a shared opinion
10 among certain individuals at DoD and the Army?
11     A.  It was a shared opinion, yeah.
12     Q.  The last sentence in this paragraph says, "MAVNI
13 is a particularly difficult program to infiltrate because
14 the checking done on MAVNIs is more extensive than the
15 checking done on all other recruits."
16         What's the basis for your conclusion in this
17 sentence?
18     A.  That's based on my experience with people
19 infiltrating the military who aren't MAVNIs. It's very
20 common. For example, there have been hundreds of people
21 who are born in foreign countries who have gotten into the
22 military as American citizens due to false birth
23 certificates or birth certificates that were issued based
24 on wrong information. And they could not get through the
25 MAVNI program because they wouldn't have -- they would

1 have failed the initial screening by Department of
2 Homeland Security that was done on all the MAVNIs.
3         I can give you a specific example. But I've
4 talked to dozens and dozens of people who have come into
5 the military with a U.S. birth certificate, and so they
6 walked in a recruiting station with a U.S. birth
7 certificate, and they were allowed to enlist in the
8 military based on their U.S. birth certificate, and they
9 themselves believed that they were born in the United
10 States, but they weren't. They were born in a foreign
11 country. But the military allowed them in.
12         And it wasn't until years later, many times
13 after they had obtained a secret clearance or even a top
14 secret clearance, that somebody figured out, typically
15 when they were applying for an American passport, that
16 they were not born in the United States and they've been
17 in the United States their whole lives purporting to be
18 born in America. And they had gotten a secret or top
19 secret clearance and they managed to get in the military
20 with basically what was an improper birth certificate.
21     Q.  So is it fair to say that your conclusion in
22 this sentence is based on anecdotal knowledge that you
23 acquired throughout your military service?
24     A.  I don't know if it's anecdotal. It was a
25 problem that I had discussed repeatedly with Department of

1  Homeland Security. And they confirmed to me that was the
2  case. The Navy told me at one point that they had, quote,
3  an entire submarine full of people like this that somehow
4  had gotten assigned to a submarine and they were trying to
5  figure out what to do with it, and we ended up
6  naturalizing them all. But everybody thought they were
7  all American citizens and it turned out that they weren't.
8      Q.  Are you aware of any studies that examine
9  whether the MAVNI program is a difficult program to
10 infiltrate?
11     A.  Studies?  DoD does not seem to have any
12 comparative data, so I don't think anybody's done a study
13 on that.  I mean, I could be wrong.  Maybe they have some
14 study, but --
15     Q.  You're not aware of any studies done?
16     A.  Well, okay.  Aware of any studies?  I know
17 it's --
18     Q.  I'm sorry.  Let me ask the question separately
19 because that --
20     A.  I know you can infiltrate the military a lot of
21 different ways, okay, and I don't know that anybody has
22 done any particular study on it's easier to do it this way
23 or that way, but --
24     Q.  Your statement in this paragraph that MAVNI is a
25 particular difficult program to infiltrate --

1      A.  It is.
2      Q.  -- is that based on any studies?
3      A.  It's based on my study of seeing what people are
4  coming into the military who don't -- have used fake
5  documents and they've gotten in.
6      Q.  So the statement is based on -- as I understand
7  it, is it fair to say, that your statement in this
8  sentence is based on anecdotal evidence and information
9  you acquired throughout your military experience?
10     A.  I don't know if that's fully accurate, but you
11 can leave it at that.
12     Q.  Is there anything I left out that this
13 statement --
14     A.  Well, I don't know that it's totally anecdotal,
15 but I think I acquired information when I was working as a
16 project officer that we concluded, based on the
17 characteristics of the MAVNIs, that it would be more
18 difficult for people to infiltrate the military through
19 the MAVNI program than through other programs.
20     Q.  Okay.
21         MR. SWINTON:  Why don't we go ahead and take a
22 break now.
23         Before we go off the record, I'd again like to
24 state that the witness should not be discussing the
25 contents of the deposition at all with Mr. O'Donnell.

1      Off record.
2      (Recess taken)
3  BY MR. SWINTON:
4      Q.  We're returning from a short afternoon break.
5      Ms. Stock, did you discuss the deposition with
6  anybody during the break?
7          MR. O'DONNELL:  Object and same instruction.
8          MR. SWINTON:  Neil, I'm interested if you could
9  just state for the record.  Is it your position that an
10 attorney can discuss the contents of a deposition with an
11 expert witness during any breaks?
12         MR. O'DONNELL:  Yes.
13         MR. SWINTON:  And again, I'd ask, do you have
14 any authority for that position that you're willing to
15 share with me?
16         MR. O'DONNELL:  I think the one case I wrote
17 down that Joe Dugan cited holds that.
18         MR. SWINTON:  Which case was that?
19         MR. O'DONNELL:  The last one he cited.
20         MR. SWINTON:  I think he cited to you at least
21 two cases and a treatise.  Have you reviewed those legal
22 authorities?
23         MR. O'DONNELL:  There seems to be disagreement
24 among the small number of cases that have addressed the
25 issue.  Following my practice for the last 35 years, it's

1  not a question I would be asking, and it's not a type of
2  examination I would permit from my witnesses.
3  BY MR. SWINTON:
4      Q.  So Ms. Stock, let's continue looking at some
5  statements you made in your expert report.  The pages
6  aren't numbered, but we're on the fourth page, and the
7  very last paragraph states, "As of the date of this
8  report, I have reviewed numerous MAVNI
9  'Counterintelligence' (CI) reports prepared by the DoD on
10 various MAVNI soldiers."
11         Have you provided me with a copy of all of
12 those -- or have you provided me the originals of all of
13 those reports today?
14     A.  All the ones that I reviewed in preparation for
15 this particular deposition, yes.
16     Q.  So I have in my possession currently all of the
17 CI reports which you considered in preparing the opinions
18 stated in this expert report?
19     A.  Correct.
20     Q.  So on the next page this paragraph continues
21 over.  And you say, "These reports are not only replete
22 with factual errors, but they contain numerous illogical
23 adverse CI recommendations."  So I'd just like to
24 understand this sentence a little bit more.
25         First, you say the reports are replete with

Page 226

1 factual errors. What do you mean by "replete"?

2    A.   Lots of them. There are a lot of fact errors in

3 the reports.

4    Q.   Is that looking at the reports collectively as a

5 sum total or are you referring to there's a replete number

6 of errors in one singular report?

7    A.   Both.

8    Q.   Do all of the reports have multiple errors?

9    A.   There might be one that only has one error.

10    Q.   How do you know that these are factual errors?

11    A.   Because I'm familiar with the facts and I know

12 that, for example, if a person is a female, you say "she"

13 rather than "he," and I see that in reports. I see the

14 wrong name. So, for example, the person's name is one

15 thing and they're called by a different name in the

16 report. I see things like so and so owns a -- has a bank

17 account in the United States, but the place where the

18 person has a bank account is -- or outside the United

19 States. The report says the person has a bank account

20 outside the United States, but the person's bank account

21 is actually inside the United States.

22    Q.   In that hypothetical, how do you know where the

23 person's bank account is located?

24    A.   It says in the report. So there's contradictory

25 information in the report. On one page it says one thing

Page 227

1 and then it says a completely different thing in another

2 page. Another example, the person owns an apartment

3 building it says in one page of the report, but in the

4 other page of the report, they own an apartment, not a

5 building.

6    Q.   Is it fair to say that some of the things you

7 describe as factual errors are typos?

8    A.   No. They appear to be used as a basis for

9 claiming that the person is a security threat. They don't

10 appear to be typos.

11    Q.   So you gave one example of using "he" when it

12 should be "she" or kind of having the wrong gender for a

13 pronoun.

14       Do you consider that to be a factual error upon

15 which there's an assessment that a person is a security

16 threat?

17    A.   I did in that case because it appeared they had

18 the person mixed up with somebody else. In some cases it

19 might be a typo, but in that particular case it looked

20 like they had confused different people.

21    Q.   You also state in this sentence that the reports

22 "contain numerous illogical adverse CI recommendations."

23       What do you mean by "adverse CI

24 recommendations"?

25    A.   Well, they are deeming the person to be a

Page 228

1 security threat and that is causing them to be discharged

2 from the military. So the specific information in the

3 report, the information is not accurate, is being used to

4 take adverse personnel action against the person in order

5 to summarily discharge them from the military based on

6 faulty factual information.

7    Q.   What do you mean by "illogical"? How are the

8 adverse CI recommendations illogical?

9    A.   Well, I mean, I'd have to go into some detail,

10 but, for example, they're supposed to be evaluating

11 whether this person is some kind of threat. And they take

12 information that would indicate that the person is not a

13 threat and they illogically use that information to assume

14 that the person is a threat.

15    Q.   How do you know that these recommendations are

16 illogical?

17    A.   Because I read the facts, and the fact -- the

18 particular fact would indicate that the person is not a

19 security threat, but they infer that they are a security

20 threat, even though the fact would indicate that they're

21 not. So that is illogical. It's backwards.

22    Q.   Is it fair to say that your interpretation of

23 the facts in the report lead you to conclude that these

24 individuals are not security threats?

25    A.   No. Sometimes it's right in the report. One

Page 229

1 part of the report says the person is not a threat and the

2 other part says they are a major threat. So they just

3 completely contradict.

4    Q.   How many reports did you provide me with today?

5    A.   More than 30.

6    Q.   What's the exact number?

7    A.   I can grab them and start counting.

8    Q.   And that's okay. I can count them myself.

9       But do you know off the top of your head the --

10    A.   I don't know off the top of my head. I think

11 it's more than 30.

12    Q.   How did you obtain these CI reports?

13    A.   People sent them to me.

14    Q.   Did individual MAVNI soldiers to whom the

15 reports pertain send them to you?

16    A.   They did.

17    Q.   Did the individual MAVNI soldiers to whom the

18 reports pertain point out what they believe to be factual

19 errors?

20    A.   In some cases. In some cases I discerned it

21 myself.

22    Q.   Did the MAVNI soldiers to whom the reports

23 pertain and who provided you with the reports point out

24 what they believe to be illogical adverse CI

25 recommendations?

Page 230

1    A.   No.  I discerned that myself.

2         I should clarify.  Some of them were given to me

3    by journalists.

4    Q.   Why did individual MAVNI soldiers provide you

5    with these reports?

6    A.   They were upset about the reports because they

7    perceived them to be unfair and lacking and they were not

8    factually accurate.  And in some cases they didn't

9    understand them and they were upset about being discharged

10   from the military without having any chance to contest the

11   wrong information in the reports.

12   Q.   Have you used these reports in cases brought on

13   behalf of MAVNI soldiers in which you're an attorney of

14   record?

15   A.   Yes.

16   Q.   Have you shared these reports with other

17   attorneys who are handling cases brought on behalf of

18   MAVNI soldiers?

19   A.   In some cases, yes.

20   Q.   Have you shared these reports with attorneys at

21   Fried Frank?

22   A.   In some cases, yes.  I filed -- I gave them one

23   of the reports so they could file it in litigation.  I

24   believe they did.

25   Q.   So yes, you have -- it's fair to say that you

Page 231

1    have provided --

2    A.   I have.  I think you were complaining about it

3    in a deposition.  It was you or Colin, one of you.  I read

4    the transcript.  You used my name and were complaining

5    about the fact that I had given these reports to Fried

6    Frank.

7    Q.   Okay.  I haven't taken any depositions in any

8    MAVNI case --

9    A.   No.  It was a transcript of a court hearing.

10   Q.   Okay.  Let me move on with some questions.

11   A.   I'm sorry.  I read a transcript of a court

12   hearing in which a Department of Justice attorney, whom I

13   believe to be either you or Colin Kisor, was complaining

14   about the fact that I shared this --

15   Q.   So let me get back to questions, Ms. Stock.  I

16   want to make sure we stay on track, because I know you're

17   trying to get to a dental appointment after this

18   deposition.

19   A.   No, I don't have one today.  I canceled it for

20   today.  It's next Monday.

21   Q.   Okay.  All right.  I'll take my time then.

22   A.   It's just my teeth hurt right now.

23   Q.   Sure.  I don't want to keep you here any longer

24   than necessary.

25        Let me get back on my train of thought.  Other

Page 232

1    than for purposes of -- actually, never mind.

2         Later on in this paragraph you say, "It appears

3    to me that the reports are often done by CI personnel who

4    were inadequately trained and supervised."

5         What leads you to believe that these CI

6    personnel to whom you refer were inadequately trained and

7    supervised?

8    A.   Well, I've read the reports and they contain

9    numerous factual errors and logical errors and they --

10   it's obvious that some of the interviewers doing the

11   interviewing didn't understand things like immigration

12   law, people's immigration statuses.  They didn't

13   understand that people from foreign countries will have

14   foreign parents.  They were asking questions that didn't

15   make any sense if you're interviewing an immigrant.  So it

16   appeared that they weren't trained.

17        And then I did do some Internet checking and I

18   looked at the website for the employees for the company

19   that's doing a lot of the background checks, and they were

20   complaining about the company that hired them, indicating

21   that they were not necessarily trained and supervised.

22   Q.   So one source of your opinion that these CI

23   personnel were inadequately trained and supervised comes

24   from complaints made by employees on a website about the

25   company that runs the background investigations?

Page 233

1    A.   Yeah.

2    Q.   And you said another reason why you are of the

3    opinion that the CI personnel who write these CI reports

4    were inadequately trained and supervised is because they

5    didn't seem to know much about immigration law.

6         If that is the case, how does that lead you to

7    the conclusion that they're inadequately trained and

8    supervised?

9    A.   Well, because I would have expected the

10   Department of Defense, if it was conducting legitimate

11   background investigations on people, to want to get

12   correct information about whether the person was actually

13   a security threat, rather than just simply trying to

14   discharge a bunch of people and have some excuse for doing

15   so that wasn't going to see the light of day.

16        And it looked like they weren't legitimately

17   attempting to figure out whether people were a threat or

18   not.  They were simply going through the motions of asking

19   a bunch of questions, and then somebody was reviewing the

20   report, and in some cases, almost randomly checking a box

21   and coming to a conclusion that somebody was a threat or

22   not a threat.

23        And nobody was overseeing it or there wasn't

24   anybody in a position to say, well, wait a minute, this

25   information is not correct.  And they had no channel for

1 the individual to challenge the information or correct it
2 if it wasn't correct. And so under normal due process
3 standards, you know, normally if you're in the military
4 and you apply for a security clearance and some adverse
5 information comes up, they come to you and they say, you
6 have a due process right to address that. And that was
7 not happening with any of this at all.
8 That came up in the latest lawsuit that has been
9 filed, Calixto, the Calixto lawsuit. So there was no due
10 process being applied in any of these cases. And as a
11 result of that, the government collected a lot of
12 information that wasn't correct and they weren't giving
13 the individual a chance to explain it or mitigate it or
14 anything like that. So they got inadequate reports.
15 And that would be a failure of leadership,
16 because if you set up a program to screen people, you
17 know, you're trying to do background screening on people,
18 you want to make sure the information that you're getting
19 is accurate.
20 And they set up a program and they appeared to
21 be doing background checks on people, but in fact they
22 were not doing proper background checks. They were just
23 kind of going through the motions of doing them,
24 apparently. And they made a lot of mistakes. So that
25 tells me they're inadequately trained and supervised.

1 Q. Have you ever been involved in training CI
2 personnel who put together CI reports?
3 A. I have.
4 Q. Have you trained -- have you conducted training
5 for CI personnel who put together CI reports?
6 A. I have, although it wasn't for how to do the CI
7 report. It was training on immigration. I gave a seminar
8 on national security -- or NSA invited me to come and
9 teach their people about immigration law so they could
10 better do this kind of stuff, and members of the 902nd
11 were at that training.
12 Q. So it fair to say that you've never trained CI
13 personnel about how to fill out the report itself?
14 A. No, I have not done that. No.
15 Q. Have you ever supervised CI personnel who are
16 filling out CI reports?
17 A. No. I don't think anybody is apparently
18 supervising them, from what I can tell.
19 Q. But it's fair to say that you yourself have
20 never supervised --
21 A. I have not.
22 Q. -- CI personnel who fill out the reports?
23 A. I have not. I have reviewed the instructions
24 that they're given, and I was asked to comment on them at
25 one point, and I commented on the fact that the

1 instructions were not accurate and they should fix the
2 instructions.
3 Q. Did you provide comment when you were -- prior
4 to your retirement from the Army?
5 A. No. It was post-retirement. They asked me to
6 review the instructions.
7 Q. What year was that?
8 A. It would have been 2016 -- no. 2017 sometime.
9 Q. On this same page in your expert report under
10 "Facts and Data," you say, in the second paragraph, "In
11 addition, I am relying on the DoD discovery in this case."
12 What discovery are you relying on?
13 A. I looked at the charts that showed the flow.
14 There were a bunch of charts that showed the flow of the
15 background checks. Then there was a document that showed
16 the CI instructions that were given to people, among other
17 things.
18 Q. What else did you -- are you relying on for your
19 expert report?
20 A. I reviewed deposition transcripts from people
21 who got deposed.
22 Q. I want to be clear. You say, "I'm relying on
23 the DoD discovery." I'm curious about what DoD discovery
24 specifically you're relying on for your expert report, not
25 what you've reviewed.

1 A. What do you believe to be the difference between
2 the word "rely" and the word "review"?
3 Q. Something that forms the basis for your opinion
4 for the expert report. And again, "relying" is your
5 language here in the report. So I'm interested in
6 understanding what you mean when you say "I am relying on
7 the DoD discovery."
8 My question is, what DoD discovery specifically
9 are you relying on in this report?
10 A. I just recited what I relied on.
11 Q. Okay. And then I think you started to say what
12 you had reviewed and I wanted to make sure that we stayed
13 focused on what you were relying on.
14 A. Can you tell me what you think is the difference
15 between the word "rely" and the word "review"?
16 Q. So first, I'm not the one whose deposition is
17 being taken. And again, I just want to use what your
18 words are saying here. I want to make sure I understand
19 them.
20 So you say, "I am relying on DoD discovery in
21 this case," and I was just interested in getting an
22 exhaustive list of what DoD discovery you're relying on
23 for purposes of forming the opinions that you make in this
24 expert report.
25 A. All of the relevant discovery that DoD provided

1 in this case.

2 Q. Is that all of the discovery that DoD provided?

3 A. I think I looked at pretty much everything at

4 some point in time.

5 Q. And you're relying on all of that to make your

6 expert opinions in this case?

7 A. I felt it was my duty as an expert to review all

8 of the DoD discovery in the case, yes.

9 Q. Also on this same page under "Exhibits," the

10 last exhibit listed is "Cached University of North

11 New Jersey Website," and I believe you brought a copy of

12 that with you today. I'm just interested.

13 Who cached the website?

14 A. There's this thing called the Wayback Machine.

15 Q. Okay. Did a person do something to cache it?

16 A. Yeah. You go online and you go back in time and

17 you check for what the website looked at a certain point

18 in time.

19 Q. Who did the checking? What person did the

20 checking?

21 A. I directed one of my assistants to do the

22 checking.

23 Q. So did you have someone -- is it fair to say

24 that you had someone do the checking for the website for

25 you?

1 A. Yeah. It was under my supervision and control.

2 Q. Sure. Did you verify the accuracy of the

3 caching yourself?

4 A. I had a second person verify the accuracy of the

5 caching.

6 Q. Who was the second person?

7 A. One of my clients.

8 Q. What's the name of the client who verified the

9 checking?

10 A. I don't think I can say that. I think I'd have

11 to claim attorney-client privilege. But he's a tech

12 expert.

13 MR. O'DONNELL: We listed him as an expert -- I

14 mean, a witness.

15 THE WITNESS: No, we didn't. I don't think so.

16 MR. O'DONNELL: I did.

17 THE WITNESS: Oh, you did. Okay. Then never

18 mind. I can say. Sagar Dubey. He works for Accenture.

19 I wanted to make sure we had two --

20 MR. O'DONNELL: No. I've never talked to him.

21 Who is your guy in Seattle?

22 THE WITNESS: Okay. No. That's a different

23 guy.

24 MR. O'DONNELL: I listed the guy in Seattle.

25 THE WITNESS: I'm getting mixed up. Okay.

1 Yeah, I had -- whoever is listed is the guy that

2 did it. I had two people check it, basically. One guy

3 worked at my office and then I had another guy check it.

4 You're right. I said the wrong name.

5 BY MR. SWINTON:

6 Q. Why did you have that website cached?

7 A. I don't have it cached. It's on the Internet.

8 It's the Wayback Machine.

9 Q. What do you mean when you say "the Wayback

10 Machine"?

11 A. You can go on the Internet and if you want to

12 see what a website looked on a certain day in time, you

13 can go back in time and get that website from on that day,

14 see what it looked like.

15 Q. So I'm using the word "cached" because you used

16 the word "cache" when you listed it as an exhibit.

17 A. Well, yeah. It's basically saved out there in

18 the worldwide web. You can get full -- you can get a

19 website that information has been taken down that today

20 you wouldn't be able to find it, but you have to go back

21 in time and --

22 Q. Sure. So I think you understand what I mean

23 when I say "cached" because I'm reciting your own language

24 here.

25 So I'm wondering, why did someone create a

1 cached version of that website?

2 A. The tech companies do that routinely of

3 everything.

4 Q. Why did you have it done?

5 A. I didn't have it done.

6 Q. Why did you access a copy of that website?

7 A. Because I wanted to see what the web pages

8 looked like a long time ago.

9 Q. Was it part of your expert work in this case?

10 A. It was part of my expert work in this case, but

11 also part of another case that I'm handling.

12 Q. Why does it relate to your work in this case?

13 A. Because one of the allegations in this case that

14 Christopher Arendt and other people were making was that

15 MAVNIs had attended universities that did not exist.

16 Q. When did you have someone at your firm access

17 the website?

18 A. When I was preparing the expert report.

19 Q. Was that in September 2018?

20 A. Late September or early October.

21 Q. Okay.

22 A. I don't remember the exact date.

23 (Exhibit B marked)

24 Q. Ms. Stock, I'm handing you a document that's

25 been marked as Exhibit B for this deposition. It has a

1 separate exhibit on it from prior depositions. This
2 document is titled "The Military Accessions Vital to the
3 National Interest (MAVNI) Program."
4     Have you seen this document before?
5 A. Yes.
6 Q. When did you see it?
7 A. I saw it when it was released as part of the DoD
8 discovery in the Tiwari litigation.
9 Q. To the best of your knowledge, what was the
10 primary objective of the RAND study?
11 A. As it says, the RAND Corporation was asked to
12 study the MAVNI program and "to provide information to the
13 Army on the performance and cost of U.S. Army MAVNI versus
14 non-MAVNI recruits, an estimate of the number of potential
15 MAVNI enlistees, and an assessment of the potential
16 security risks associated with the program."
17 Q. Just so the record is clear, which page are you
18 looking at when you read that information?
19 A. I think it's the preface. Page iii.
20 Q. To your knowledge, did the RAND report take into
21 account classified information in reaching its
22 conclusions?
23 A. No. They specifically excluded any classified
24 information.
25 Q. In your mind, does the lack of access to

1 classified information by the RAND researchers diminish
2 the value of the study --
3 A. No.
4     -- as a resource -- I'm sorry, let me finish the
5 question -- as a resource for assessing the security
6 threat posed by the MAVNI population?
7 A. It doesn't.
8 Q. Why not?
9 A. Because the risks that DoD is concerned about,
10 if they exist, would become public. So, for example, if a
11 MAVNI had been prosecuted for terrorism or espionage, or
12 indicted or convicted or fined or anything for espionage,
13 it would be a public record, and RAND would have found
14 that information.
15     Also, if a MAVNI had behaved badly in such a way
16 as to pose a significant security threat to the United
17 States, the MAVNI -- if the MAVNI had been naturalized,
18 the MAVNI would have been denaturalized, and that's public
19 and there would have been a Department of Justice press
20 release about that.
21 Q. Is it your opinion that security threats -- that
22 security threats to the military -- let me start over.
23     Is it your opinion that legitimate threats to
24 the military should always rise to the level where they
25 would warrant an indictment or a conviction?

1 A. No.
2 Q. So why is it your opinion that the lack of
3 classified information doesn't affect the conclusions from
4 the RAND report because if there was a sufficient threat
5 to the -- from the MAVNI soldiers it would have been made
6 public through an indictment or a conviction?
7 A. Well, you said two different things there. I
8 mean, lots of threats to the military have nothing to do
9 with the MAVNI program. They come from enemy forces, they
10 come from Chinese hackers overseas, they come from
11 Iranians overseas.
12 Q. Is it your opinion that a threat to the MAVNI
13 program would -- to be legitimate would always rise to the
14 level of resulting in some sort of an indictment or other
15 criminal proceeding?
16 A. A threat to the MAVNI program. The MAVNI
17 program is shut down.
18 Q. Is it your opinion that a threat posed by the
19 MAVNI program to the military -- actually, is it your
20 opinion that any threats posed by MAVNI soldiers, to be
21 legitimate, would always rise to the level of resulting in
22 some sort of criminal proceeding?
23 A. Okay. I have to unpack that question, because
24 I'm not sure I understood it.
25 Q. I'm trying to understand. You said that the

1 lack of classified information doesn't affect the RAND
2 report, because if it was serious enough, it would have
3 resulted in an indictment or some sort of a criminal
4 proceeding?
5 A. No. What I'm saying is -- okay. The DoD is
6 claiming that the whole entire, every single MAVNI is some
7 kind of potential security threat to the United States.
8 Okay. But there's no comparative data on that. They
9 don't -- DoD hasn't announced how many citizens who are
10 native-born pose a security threat, and they haven't
11 implemented measures, to counteract the dangers from
12 people like Nidal Malik Hasan, on whole classes of people
13 like they have done with the MAVNI program.
14     And DoD claims that somehow every single person
15 in the MAVNI program is some kind of national security
16 threat that requires DoD to impose this extraordinarily
17 high level of unconstitutional vetting on every single
18 person in the program. And based on the RAND report, it's
19 clear to me that that's not the case, because RAND was
20 asked to look at the security elements of program. They
21 looked at unclassified information, but in my opinion,
22 generally speaking, if there had been a MAVNI that had
23 done something bad, it would have ended up in the news.
24 That's what happens.
25     That's what happened with all the native-born

Page 246

1  Americans who have been a threat.  They've ended up in the
2  news.  Somehow when there's a court-martial, it's in the
3  news.  When there's an indictment, it's in the news.  When
4  General Mike Flynn got busted for failure to register as a
5  foreign agent, it was in the news.
6       So what I'm trying to say is that, if there was
7  a very serious threat to the extent that DoD claims there
8  is, it would have been in the news.
9     Q.  Is it possible for there to be a security threat
10 that doesn't end up in the news?
11    A.  A threat, yeah.  I mean, there's a threat to --
12 you know, before the threat is carried out, things cannot
13 be in the news.
14    Q.  Is it possible for there to be a security threat
15 posed by MAVNI soldiers that doesn't end up in the news?
16    A.  Not by the whole entire group, no.
17    Q.  Is it possible that individual MAVNI soldiers
18 pose security threats that information about those threats
19 would never end up in the news?
20    A.  I think it would end up in the news eventually
21 if it was serious.
22    Q.  Is it your opinion that only -- security threats
23 are only serious if they end up in the news?
24    A.  No.  You know, Chinese hackers hacked OPM and
25 that didn't end up in the news until after it happened,

Page 247

1  but that was a serious threat before it happened.  It will
2  take a while for something to end up in the news.
3     Q.  Is it your opinion that a threat posed by a
4  non-U.S. citizen who enlists in the military is only
5  serious if it results in a denaturalization proceeding?
6     A.  I think you're making a lot of assumptions
7  there.
8     Q.  So let me clarify.  You said before that --
9  when, again, we were talking about the lack of classified
10 information accessed by the RAND researchers, that you
11 said it didn't trouble you because, in addition to there
12 not being any news about MAVNI security programs, you said
13 it would have resulted in a denaturalization proceeding
14 for a MAVNI soldier.
15      So I'm trying to understand, what's the basis
16 for that opinion?
17    A.  I don't think that I said that was my opinion.
18    Q.  Can you correct me?  Maybe could you tell me
19 again?  How does your view about denaturalization
20 proceedings play into the question about classified
21 information and the absence of it from the RAND report?
22    A.  Well, denaturalizations are public.  They're not
23 classified.
24    Q.  I understand that.
25      So you said before, that if the security threat

Page 248

1  was significant enough, you think it would have led to the
2  denaturalization proceeding of a MAVNI soldier?
3     A.  Okay.  It's not the security threat.  Okay.  I
4  mean, the threat exists out there in the world.
5     Q.  I understand.  Maybe could you -- what is your
6  basis for saying that information about a MAVNI soldier
7  that poses a security concern would result in a
8  denaturalization proceeding?
9     A.  Okay.  So if somebody is naturalized as a U.S.
10 citizen and it turns out that they were a spy or a
11 terrorist and they lied on their naturalization
12 application, then the Department of Homeland Security
13 would tell the Department of Justice, and the U.S.
14 Department of Justice would denaturalize that person for
15 lying on their citizenship application, and it would
16 probably be done in conjunction with a criminal proceeding
17 of some sort, and they would be denaturalized and that
18 would be public, and the criminal case would be public and
19 so would -- the denaturalization would be public, and they
20 would put out a press release like they always do on
21 denaturalizations.
22    Q.  In your experience from your time with the Army,
23 was it common for security and intelligence information to
24 be shared in an unclassified format?
25    A.  If it was unclassified, sure.

Page 249

1     Q.  If there was classified information -- if there
2  was classified security and intelligence information,
3  would there be -- in your experience, would there
4  typically be an unclassified version of that classified
5  reporting?
6     A.  Often there would be, yeah.
7        (Exhibit C marked)
8     Q.  Ms. Stock, I just handed you a document that's
9  been marked as Exhibit C.  It states that it's a
10 declaration from Stephanie Miller that was filed in this
11 case and executed on May 31st, 2018.
12      Do you know a person named Stephanie Miller?
13    A.  I don't know her personally.
14    Q.  Do you know who she is?
15    A.  Yes.  She's -- at the time she wrote this, she
16 was the director, Accessions Policy Directorate, in the
17 Office of the Under Secretary of Defense for Personnel and
18 Readiness, P&R.
19    Q.  Did you ever interact with Stephanie Miller when
20 you were -- prior to your retirement?
21    A.  I do not recall interacting with her.
22    Q.  Have you ever interacted with her since the time
23 of your retirement?
24    A.  Not that I can recall.
25    Q.  I think you said earlier that you were -- you

Page 250

1 mentioned public statements that she had made.

2     Are you familiar with statements she's made to

3 the press?

4     A. I am familiar with those, yes.

5     Q. Have you seen this declaration before?

6     A. I have.

7     Q. When did you first review this declaration?

8     A. Let's see. When did I first review it? I don't

9 recall the exact date that I reviewed it, but I have seen

10 it before.

11     Q. Did you review it as part of your expert work

12 for this case?

13     A. Yes.

14     Q. So Ms. Stock, I'm actually going to ask you to

15 read a paragraph. It's paragraph 4, which is on the

16 second page of the declaration. Go ahead and read that

17 out loud when you locate it.

18     A. "However, it is important to note that the RAND

19 researchers who performed the analysis and wrote the

20 report only received access to unclassified information

21 and data, meaning that the report does not take into

22 consideration classified data about the program, including

23 a 2017 DoD Inspector General classified review and a 2017

24 Defense Intelligence Agency classified assessment. In

25 addition, although the RAND study and report analyzed

Page 251

1 unclassified information on counterterrorism risks

2 presented by soldiers who enlist via the MAVNI program, it

3 did not meaningfully address the security and

4 counterintelligence risk presented by the program."

5     Q. Do you have any reason to doubt the information

6 that's been stated by Stephanie Miller in paragraph 4 of

7 her declaration?

8     A. Yes.

9     Q. Which parts?

10     A. The part that it did not meaningful address the

11 security and counterintelligence risks. It did

12 meaningfully address them and they have a whole section in

13 their report that meaningfully addresses those risks.

14     Q. Is there anything else in paragraph 4 of the

15 Miller declaration that you dispute?

16     A. That's the main thing in that paragraph.

17     Q. So the only thing you -- is it fair to say the

18 only thing you dispute in this paragraph is the last

19 clause that says, "It did not meaningful address security

20 and counterintelligence risks presented by the program"?

21     A. Yeah. I mean, she's saying, in her opinion, it

22 didn't address it. But it did. I mean, you can just read

23 in black and white that RAND did in fact address that.

24     Q. How could RAND have -- is it possible for RAND

25 to have fully addressed the security and

Page 252

1 counterintelligence risks presented by the program if it

2 didn't have access to the classified information?

3     A. It's possible for them to fully address it based

4 on unclassified, yes. And I think to understand this, you

5 have to understand that just because something is

6 classified doesn't mean it necessarily is reliable or that

7 it creates more risk to the program or anything like that.

8 I mean, it's not inherently the case that just because

9 something is classified it's more worthy of study than

10 things that aren't classified.

11     And RAND did a thorough job of meaningfully

12 addressing the security and counterintelligence risks

13 presented by the program within the parameters that they

14 were given, which is, you can't get classified

15 information.

16     Q. I want to ask you to turn the page to

17 paragraph 6, and go ahead, if you don't mind, please read

18 aloud the first sentence of paragraph 6.

19     A. Well, I have to contrast it, so maybe I should

20 read 5 and talk about 5. Because it says, "By contrast."

21 So I can't talk about the contrast unless I talk about 5.

22 So 5 says, "Given that" -- Stephanie Miller says, "Given

23 the deficiencies and limitations in the report, DoD

24 considers the conclusions drawn by the RAND report not to

25 be credible." That's the end of her quote. This is a

Page 253

1 startling statement because RAND is a recognized --

2     Q. So Ms. Stock, actually, I want to make sure we

3 stay on track, because I know you're sensitive about time.

4 I'm really interested in one -- maybe I'll take over the

5 reading.

6     So paragraph 6, the first sentence says, "By

7 contrast, DoD's assessments about the MAVNI Pilot Program

8 and its decisions about what policies best meet the needs

9 and goals of the military are based on all available

10 classified and unclassified information and data about the

11 program."

12     So I'm interested -- do you see that sentence

13 there --

14     A. I do.

15     Q. -- at the beginning of paragraph 6? Okay.

16     Do you have any reason to doubt Ms. Miller's

17 statement that DoD's assessments about the MAVNI Pilot

18 Program and its decisions about what policies best meet

19 the needs and goals of the military are based on all

20 available classified and unclassified information and data

21 about the program?

22     A. Yeah, I do doubt that.

23     Q. Why is that?

24     A. Because it appears that they didn't consider --

25 DoD doesn't consider -- DoD is pretty one-sided in terms

Page 254

1 of their decisions about the MAVNI program recently.

2     Q. How do you know that -- what forms the basis of

3 your opinion that DoD is one-sided about their MAVNI

4 program recently?

5     A. People in the Pentagon told me that there was a

6 small group of people up at DoD P&R who didn't like the

7 MAVNI program and they were xenophobic and they were

8 trying to come up with an excuse to get rid of the

9 program, and one of the reasons they didn't publish the

10 RAND report was because it favorably viewed the program.

11 And they were attempting to quash the RAND report, didn't

12 want it published because it said too many good things

13 about the MAVNI program.

14     And there was a dispute within the building

15 about the security people and -- between the security

16 people and the people that wanted these high-quality

17 performing recruits in the military. And the way that DoD

18 bureaucrats were winning the bureaucratic fight was to

19 quash the RAND report and not let it get out.

20     Q. Is there any other information that forms the

21 basis of your opinion that DoD -- to dispute the statement

22 made by Ms. Miller in paragraph 6?

23     A. Yeah. Basically people said there was a

24 political agenda at work here and that they offered the

25 possibility of allowing RAND to have access to the

Page 255

1 classified information and DoD refused to allow that,

2 claiming they didn't have the money to do that, and they

3 just didn't want the report to come out.

4     Basically, the bottom line was that the RAND

5 report was too favorable to the MAVNI program and they

6 didn't want a favorable report. They wanted one that was

7 going to show that the MAVNI program was unfavorable, and

8 since RAND hadn't done that, they weren't going to let the

9 report be published.

10     Q. And is it correct to say that these are things

11 that current DoD officials told you?

12     A. Current and past.

13     Q. Going back to paragraph 4 in the Miller

14 declaration, she references two documents here, a 2017

15 Inspector General Classified Review and a 2017 Defense

16 Intelligence Agency Classified Assessment.

17     Have you reviewed the 2017 DoD Inspector General

18 classified review?

19     A. I have not.

20     Q. Have you reviewed the 2017 Defense Intelligence

21 Agency Classified Assessment?

22     A. I have not.

23     Q. If you haven't read certain recent reports about

24 the security concerns with the MAVNI program, how are you

25 in a position to opine on whether the MAVNI program

Page 256

1 presents a significant risk from a counterintelligence and

2 insider threat perspective?

3     A. Because I talked to other people who had read

4 the reports.

5     Q. So your understanding of those reports is based

6 on what other people have told you about them?

7     A. They told me that there was no significant

8 threat, but it was being overblown by a small number of

9 people at the Department of Defense who had an interest

10 in -- they didn't like foreigners serving in the military

11 and they were trying to prevent foreigners from coming

12 into the military.

13     Q. Do you think you're in a position to opine on --

14 actually, never mind. Let's move on.

15     (Exhibit D marked)

16     Q. So Ms. Stock, I just handed you a document

17 marked as Exhibit D. Actually, we're going to set that

18 aside. I'm sorry. I gave you the wrong one. We're going

19 to come back to that one later.

20     (Exhibit E marked)

21     Q. So Ms. Stock, I just handed you an exhibit -- a

22 document marked as Exhibit E. This states that it's the

23 declaration of Roger Smith, which was filed in this case

24 and executed on April 30th, 2018.

25     Have you seen this declaration before?

Page 257

1     A. Yes.

2     Q. When did you first see this document?

3     A. I don't recall.

4     Q. Would it have been around the time that it was

5 filed in the case?

6     A. It may have been. It may have been later.

7     Q. Do you know a person named Roger Smith?

8     A. I don't believe I know him personally, no. At

9 least I can't recall whether I know him personally.

10     Q. Do you recall having any interactions with

11 Mr. Smith on any occasion?

12     A. I don't have a specific recollection of having

13 interactions with Mr. Smith, but it's a common name, so I

14 may have had interactions with him.

15     Q. So I'd like to turn to paragraph 26, which is on

16 page 14. Paragraph 26 says, "More recent reviews

17 conducted by representatives of DoD and the Department of

18 Army in May 2016 confirm the inadequacy of standard

19 vetting tools for the MAVNI program. For example, further

20 examination of the MAVNI program from USD (P&R) revealed

21 that since 2013 more than 20 individuals who accessed via

22 the MAVNI program have become the subjects of DoD and/or

23 FBI counterintelligence and/or criminal investigations.

24 As of September 2016, there were 16 open

25 counterintelligence investigations involving individuals

Page 258

1 from the MAVNI program.  Notably, despite the fact that
2 soldiers who accessed via MAVNI occupy only approximately
3 .4 percent of the DoD national security positions
4 (11,000 MAVNI soldiers out of 2.7 million total), they
5 comprised approximately 15 percent of open DoD
6 counterintelligence investigations.  Thus, soldiers who
7 accessed via the MAVNI program have a significantly higher
8 rate of reported counterintelligence and security concerns
9 than the overall DoD national security population."
10       Ms. Stock, have you reviewed yourself any
11 reviews of the MAVNI program that were conducted in May
12 2016?
13       A.  Okay.  I don't understand what you're asking.
14       Q.  I'm asking whether you've reviewed any
15 reviews -- any DoD reviews of the MAVNI program that were
16 conducted in May 2016.
17       A.  Are you saying there was a DoD review of the
18 MAVNI program in May 2016?
19       Q.  So --
20       A.  Because I don't remember that report in
21 discovery.
22       Q.  Well, in paragraph 26, it says, "More recent
23 reviews conducted by representatives of DoD and the
24 Department of Army in May 2016."
25       My question to you is, have you seen any reviews

Page 259

1 conducted by DoD of the MAVNI program in May 2016?
2       A.  I don't know what they mean by reviews, but a
3 review could be just somebody sitting in an office, you
4 know, talking to each other.
5       Q.  Are you aware of any reviews conducted by DoD of
6 the MAVNI program in May 2016, other than what it says in
7 paragraph 26?
8       A.  Reviews.  Well, I mean, there have been various
9 affidavits people filed saying they were talking about the
10 MAVNI program.  Have I -- I wasn't present at those
11 reviews, so I don't know what they did.
12       Q.  It also says that there are reviews conducted by
13 the Department of Army.
14       Are you aware of any reviews conducted by the
15 Department of Army in May 2016?
16       A.  Well, it depends what you mean by reviews.  Are
17 you talking about like two guys sitting in an office
18 talking about the program?  Are you talking about like a
19 PowerPoint presentation?  Are you talking about a fact
20 sheet?  It's extraordinarily vague and it's impossible for
21 me to tell what exactly they're talking about.  They
22 previously reference specific reports, and they don't
23 reference a specific report here.  So it could just be two
24 guys talking in an office.
25       Q.  Is it fair to say, then, that you aren't aware

Page 260

1 of any other reviews that were conducted by DoD in the
2 Department of Army in May 2016?
3       A.  No.  I'm aware of it because I've read his
4 affidavit where he says they were talking about it
5 somehow.
6       Q.  Is it fair to say that, outside of this
7 declaration, you're not aware of any reviews conducted by
8 DoD and the Department of Army of the MAVNI program in May
9 2016?
10       A.  I can't say that, because I did talk to people
11 right before -- or about the time the Peter Levine memo
12 was issued, and I was told by people at DoD that there was
13 a bureaucratic struggle going on between the security
14 people and the human resources people about the MAVNI
15 program and they were -- these discussions, I guess -- or
16 he calls them reviews -- culminated in the issuance of the
17 Peter Levine memo in September 2016.
18       Q.  If these reviews resulted in documentation,
19 reports of some sort, is it fair to say that you haven't
20 reviewed those documents that came from this -- you
21 haven't seen the documents that came from these reviews by
22 DoD and the Department of the Army?
23       A.  I haven't seen -- I haven't seen all of them,
24 but I've seen some of them, yeah.
25       Q.  And I'm specifically talking about the reviews

Page 261

1 referenced here in May 2016.
2       If there were any documents generated, is it
3 fair to say that you haven't seen those documents?
4       A.  It's not fair to say that, because I might have
5 seen them.
6       Q.  But you're not aware of having seen any
7 documents that refer to reviews of the MAVNI program by
8 DoD and the Department of Army in May 2016?
9       A.  Well, I'm aware of seeing documents that
10 apparently were discussed in the reviews that he's talking
11 about here.
12       Q.  But if there were reports generated -- if there
13 were documents generated by the reviews themselves, the
14 reviews that took place in May 2016, have you seen those
15 documents?
16       A.  I could very well have seen them, yeah.
17       Q.  But you don't know for certain if you have?
18       A.  Well, I know I've seen documents that likely
19 were considered in these reviews.
20       Q.  Okay.
21       A.  I mean, based on what everybody is saying in all
22 their affidavits, I'm pretty sure I know what they're
23 talking about.  I mean, it's in the prior paragraph.
24       Q.  Okay.  Well, if you --
25       A.  I'll give you an example --

Page 262

1    Q.   Actually, so I don't want to get us off track,
2  Ms. Stock. I want to make sure I respect your time --
3    A.   I'm trying to answer your question. Okay. So
4  have --
5    Q.   I think you are. My question was about whether
6  you'd seen the documents. So let me move on and ask a
7  different question.
8    A.   Well, I have seen the documents relating to item
9  number 1 in paragraph 25.
10   Q.   I actually wasn't asking about paragraph 25. I
11  appreciate your willingness to be helpful.
12   A.   That's what they're talking about. They're
13  leading into that.
14   Q.   Okay. I want to move on to different questions.
15       Do you have any reason to doubt the sworn
16  statements of Mr. Smith in paragraph 26?
17   A.   The factual statements, no. The conclusions,
18  yes.
19   Q.   Which conclusions do you doubt in paragraph 26?
20   A.   Okay. So these are MAVNIs. They're not
21  native-born citizens. And it was my experience as a
22  military police officer that if somebody is, quote, a
23  foreigner in the military and they do something bad, it
24  gets referred to the counterintelligence people. And if
25  it's a native-born person and they do something bad, they

Page 263

1  don't refer it to the counterintelligence people. They
2  refer it to the military police or CID.
3        So, for example, when I read this, I said, okay,
4  but he's not explaining that out of 500 cases of
5  misconduct among general officers in the Army during the
6  same time period, much higher rate. It's natural that if
7  you're a foreigner, people are going to -- if you do
8  something that somebody thinks is suspicious, you're going
9  to become the subject of a counterintelligence
10  investigation because you're a foreigner. You're not
11  going to become the subject of a standard military police
12  investigation. I mean, that happens. It's a bias in the
13  system.
14       And then he's saying there the subjects -- you
15  know, it says "accessed" and I don't know if he means
16  actually got into the program. But then he says subjects
17  of and/or criminal investigations, but then he goes down
18  below and he seems to only be talking about
19  counterintelligence. So he's trying to bias the
20  statistics to make it sound like the people are really
21  dangerous when we have security threats throughout the
22  force. And USA Today had a big headline the same time
23  period about 500 general officers being under
24  investigation. Out of a population of how many general
25  officers, the percentage is much higher, that general

Page 264

1  officers are much more dangerous than MAVNIs.
2    Q.   Any other reasons that you doubt the statements
3  in paragraph 26?
4    A.   I don't doubt the factual statements, but I
5  doubt the conclusion that this means the MAVNI program
6  itself is particularly dangerous compared to other
7  recruiting programs. I don't think it is. I think it's
8  definitely a possibility that people are going to try to
9  sneak into the Army through the MAVNI program.
10       It was something that I was concerned about when
11  I was the project officer for the MAVNI program initially.
12  But we set up procedures in place to try to prevent that
13  as much as possible, and I don't think it's the case that
14  this is the only dangerous avenue that people can come
15  into the military through. The bad guys are trying to
16  enter the military through every single kind of recruiting
17  program. I mean, it's just a fact. And if you focus only
18  on the MAVNI program, you're going to miss all the other
19  people trying to come in.
20       And you're also overly inclusive,
21  underinclusive. In terms of this mass tagging of the
22  entire population of MAVNIs as being dangerous, it's
23  extraordinarily bad for security to do that. It's also
24  illegal and unconstitutional.
25       But getting back to this, just because they're

Page 265

1  the subjects of an investigation doesn't mean -- you know,
2  and just because it's open doesn't mean anybody actually
3  did anything bad. People are often found to be not guilty
4  or it was a mistake or somebody overheard something. So
5  it doesn't mean necessarily that there's any particular
6  threat from this program as compared to other programs.
7        Also, I'm well aware that there's some foreign
8  governments that don't like the program and they were
9  trying to shut the program down. So who knows where this
10  information is coming from. Maybe the Russians fed it to
11  the DoD in order to shut down the program. Who knows. Or
12  the Chinese.
13   Q.   Do you have a reason to believe that the
14  Department of Defense is -- do you have reason to believe
15  that DoD or the Army is making policy based on fake
16  information provided by foreign nations?
17   A.   Well, they've done -- the foreign nations have
18  done that in other realms, so it wouldn't surprise me if
19  that were happening.
20   Q.   Do you have concrete information that says -- do
21  you have -- do you know whether any information upon which
22  DoD or the Army has made policies for the MAVNI program is
23  based on fake information provided by foreign nations?
24   A.   I don't know that.
25   Q.   So to your knowledge, neither DoD nor the Army

1  has made policies about the MAVNI program based on fake
2  information from foreign nations?
3      A.  I don't know that either.
4      Q.  I said "to your knowledge."
5          To your knowledge, neither DoD -- you're not
6  aware of any fake information provided by foreign nations
7  that DoD or the Army has used to make policy decisions for
8  the MAVNI program?
9      A.  Not for the MAVNI program.  I know they have
10 relied on false information in the past to make decisions.
11     Q.  Okay.  I just wanted to make sure that I
12 understand your --
13     A.  I mean, they often get false information from
14 foreign countries that are trying to influence U.S.
15 policy --
16     Q.  You mentioned at the beginning of your answer
17 before -- you said that you are aware of security threats
18 when you were working on the MAVNI program before you
19 retired; is that correct?
20     A.  Uh-huh.
21     Q.  And you said that you had put procedures in
22 place to address those security threats; is that correct?
23     A.  Right.
24     Q.  What were the security threats that you are
25 aware of and what were the procedures that you set up to

1  address those threats?
2      A.  Well, we were worried, just as with any
3  recruiting program, that people with ill intent might try
4  to get into the program.  You know, that's any time you
5  set up a recruiting program from the United States
6  military or for any security agency.  There are people
7  that are going to try to come in that are not appropriate.
8          The big one that we were worried about was the
9  unauthorized, undocumented immigrants would try to get
10 into the military through the program.  And we expected
11 that to happen, and in fact, we had people showing up at
12 recruiting stations with fake documents thinking that they
13 could get into the military through the MAVNI program.
14 And that's why we set up a procedure for DHS to check
15 everybody's documents.  And we did routinely turn people
16 away who showed up at recruiting stations with fake
17 documents.
18         But we had procedures in place to catch it.
19 That's why it didn't happen.  Nobody came in with a fake
20 visa.  Contrary to what Chris Arendt said, there was never
21 anybody who came into the MAVNI program with a fake visa.
22 And that was a patently false statement that was made in
23 one or more affidavits.  The visas were all issued by the
24 U.S. Department of State.  Not a single one of them was
25 fake.  Chris got confused.  He doesn't understand --

1      Q.  Sorry.  Again, I want to make sure we stay on
2  track, Ms. Stock.
3      A.  Right.  So --
4      Q.  You tend to veer.
5      A.  -- anyway, we also had people that were trained
6  to screen people coming in.  So, for example, if somebody
7  that people thought was potentially a security threat
8  talked to a recruiter, the recruiter was trained to report
9  that, and I was responsible for training the recruiters to
10 try to flag security-threat people.  And so I personally
11 went to New York City to train the New York City
12 recruiting battalion together with Paul Cook, who was an
13 MI officer.  And he was in charge of the recruiting
14 battalion, and we talked openly with the recruiters about
15 the fact that this is a new recruiting program.  We're
16 going to have bad guys trying to sneak into the military
17 through the program.  You guys are the front line of
18 defense against bad guys trying to sneak into the
19 military.  Nobody has a right to join the United States
20 military.  If you feel uncomfortable with somebody, just
21 tell them no.  Tell them to go away.  And you won't let
22 them in the military.
23         We also had procedures for reviewing individuals
24 that if recruiters felt nervous.  But that all kind of
25 went away when they decided to go nationwide with the

1  program, which is something I had argued that they
2  shouldn't do.  I thought they should keep it local and
3  specialized where they had adequate means to interview the
4  recruits properly and so forth.
5          And of course, we knew from open source
6  information that foreign governments were interested in
7  the MAVNI program.  The Russians copied us.  They created
8  their own MAVNI program shortly after we did.  And it was
9  obvious that they were watching our program because they
10 created their own program.
11     Q.  Let's move on to paragraph 27 of the Smith
12 declaration.  Just go ahead and read that to yourself for
13 a second and let me know when you're done.
14     A.  Okay.  I finished reading it.
15     Q.  So this paragraph talks about gaps and missing
16 information from MAVNI soldiers during background
17 investigations, and those gaps, according to the
18 declaration, pertain to the subject's residency,
19 employment, and character references due to the short
20 period of time that most MAVNI soldiers have resided in
21 the United States.
22         So based on your experience and knowledge, what
23 tools, if any, would more precisely or effectively fill
24 those investigative gaps than the tools that are currently
25 in place?

Page 270

1    A.  First of all, this statement is not correct.
2  He's saying, "This review showed that the completed
3  investigations for MAVNI soldiers were, in most cases,
4  significantly lacking information about the subject's
5  residency, employment, and character references."  They
6  weren't significantly lacking, but the gaps were often
7  attributed not to the short period of time they were in
8  the U.S.  It was attributed to the fact that the way the
9  Army had the SF 86 completed was that they had the
10  recruiters submitting the SF 86s.
11      So the recruiter would sit down with the recruit
12  and would say, you have to fill out this huge form, SF 86.
13  It's the one that Jared Kushner had trouble filling out.
14  I think he tried to fill it out three times and kept
15  putting in wrong information and making mistakes,
16  according to news articles.  So it's a very lengthy,
17  difficult form and the recruiters were told they couldn't
18  enlist somebody until they filled out this form.
19      So the recruiters were often filling out the
20  form and submitting it.  And there were gaps and missing
21  information that were often attributable not to the short
22  period of time they were in the U.S., but the recruiter
23  not putting information on the form, being rushed, being
24  in a hurry, copying information over from one person's
25  form to another so that the information was incorrect.

Page 271

1      So it didn't have anything to do with DoD's
2  inability to conduct investigations in foreign countries.
3  It had to do with -- the gaps and missing information had
4  to do with a real global problem we had with these SF 86
5  forms having wrong information.  And it was
6  extraordinarily common when they did the SSBI for the
7  SSBI investigator to sit down with the MAVNI and go
8  through the SF 86 and find all kinds of errors.
9      So if you see the SSBIs, you see discrepant,
10  discrepant, discrepant because they were constantly
11  correcting errors.  And one of the common ones, the
12  character references, a lot of times they would copy over
13  the same people's names from one form to the other because
14  the recruiter was in a really big hurry.
15      And then you talk about the comparison, the less
16  than one percent, I mean, the majority of people coming
17  into the military don't do an SSBI.  So they simply don't
18  check anything to this level.  It's like screening people
19  for breast cancer.  If you don't screen anybody, you don't
20  get any reports of breast cancer.  But they were screening
21  the MAVNIs using these tools and so they were getting this
22  13 percent figure.  If they had done the rest of the
23  force, it would have been a lot higher because they would
24  have a lot of gaps and wrong information.
25      And then they talk about criminal activity.

Page 272

1  Well, the general population, if you did this, you would
2  get huge numbers of people with criminal activity because
3  you're allowed to get a waiver of some of that to get in
4  the military.  So we have a lot people coming in who are
5  native born who have criminal activity in their past, but
6  they're not being told the fill out an SSBI.
7    Q.  Let me ask my question a little bit more
8  specifically and without reference to the Smith
9  declaration.
10      So assuming that DoD has security concerns about
11  individuals who enlist in the MAVNI program, are you aware
12  of any tools that would be more narrowly tailored than the
13  screening tools that are being challenged in this case?
14    A.  Sure.
15    Q.  What are those?
16    A.  First of all, you give everybody a
17  counterintelligence screening and you say, I want to know
18  if you've had any of the following things happen, if
19  you've ever been contacted by a foreign government that
20  asks you to download Intelius reports and give them to us.
21  I want you to report that to me.  I want you to tell me
22  about that.  Where you're coming into the military, you're
23  a foreigner coming into the military, we're concerned that
24  foreign governments might try to exploit you.
25      You know, you read them the riot act about the

Page 273

1  naturalization process, how they can lose their
2  naturalization if they are found out to have lied about
3  anything.  And that's basically what we did early on in
4  the program.  And then you warn them that they may be
5  targeted by foreign governments, foreign intelligence
6  services.  And you ask them to report it.
7      The traditional tools that we've used in the
8  past are pretty adequate for that purpose.  You do the
9  normal screening that you do on any recruit, which pops up
10  a lot of stuff.  You do the DHS checks, which DHS
11  doesn't give people an F-1 visa without checking criminal
12  databases.  So if somebody is in valid F-1 status, we're
13  going to catch them for anything they did prior to that
14  date.  Later on, if they do something afterwards, we're
15  going to have to do some follow-up.
16      But you don't have to subject 10,000 people to
17  continuous monitoring and post-naturalization extreme
18  vetting.  I mean, that's just not necessary.  It's
19  overinclusive.  It's underinclusive.  It doesn't get to
20  the fact that the Chinese are using every possible avenue
21  to try to get information about the government.  They're
22  hacking.  They're going over the Internet and getting
23  information.  They're taking advantage of the fact that
24  people are sloppy with data.
25      Jim Clapper had a saying, "Don't collect what

Page 274

1 you can't protect." Well, we collect lots and lots of
2 information and then we send it out by e-mail unsecured
3 all the time. That happened multiple times --
4     Q. Sorry. I just want to make sure we stay focused
5 on what security screening measures you think are more
6 narrowly tailored than the ones being challenged in --
7     A. Well, I think the first thing you do is you have
8 to educate the force about the fact that foreign
9 governments may try to use them to attack the United
10 States and they need to report these things to people.
11 And that's the most important thing, is to educate the
12 troops coming in about the threat.
13         And then if you have reason to believe that an
14 individual poses a significant threat, you do special
15 screening on that particular individual to try to get at
16 that, figure that out.
17     Q. So Ms. Stock, when you say if you have reason to
18 suspect a certain individual and then do further screening
19 of that individual, what type of screening do you imagine
20 would be -- do you think would be appropriate for the
21 further screen for that individual?
22     A. Well, in a particular case, just like we do with
23 the rest of the force, you might bring them in and
24 polygraph them.
25     Q. Anything else?

Page 275

1     A. Read them their rights, ask them questions, get
2 the FBI involved, perhaps get a search warrant, check
3 their e-mails. I mean, the normal investigative tools
4 that you would use in any counterintelligence screening
5 that you would do on anybody else in the military. Maybe
6 get a FISA warrant. There's a whole range of tools that
7 are out there that we already have that work pretty well.
8     Q. Do you think it would be appropriate if the
9 military is aware of an individual MAVNI solder who poses
10 a security threat, to make that MAVNI soldier be subjected
11 to additional screening before having a security
12 clearance?
13     A. Absolutely.
14     Q. What type of additional screening do you think
15 would be appropriate to undergo before making a security
16 clearance eligibility determination?
17     A. Okay. So nobody has a constitutional right to a
18 security clearance. Okay? So if an individual person
19 poses some kind of special threat, you can deny them a
20 security clearance if you don't think they can overcome,
21 mitigate the factors. But it should be done on a case-by-
22 case basis. So what you should do is try to figure out
23 whether the individual poses some kind of threat. You
24 don't broadly tar every single gay person in the military
25 as being a security threat in their for deserving special

Page 276

1 screening. You don't broadly tar every single woman in
2 the United States military as a special security threat
3 in --
4     Q. Once you identify them as being a security
5 threat, then what do you do for purposes of security
6 clearance adjudication?
7     A. Well, it would depend on the case. In some
8 cases you would let them explain themselves, give them the
9 due process, which is required under the security
10 clearance rules. They might be able to appeal if they got
11 denied. In some cases you might open a criminal
12 investigation if something came to light that would lead
13 you in that direction. But it should be individual. You
14 shouldn't just broad brush paint the whole entire group
15 with being some kind of threat.
16     Q. I'd like to go back to Exhibit D, which I handed
17 you before. Exhibit D is a document that's titled
18 "Declaration of Margaret D. Stock." This was signed and
19 executed on May 20th, 2018.
20         Now, Ms. Stock, in your expert report you stated
21 that you were incorporating your prior declarations and
22 the attachments to those declarations in this case; is
23 that correct?
24     A. Yes. In paragraph 1, I said, "I incorporate by
25 reference the opinions, and the basis and reasons for

Page 277

1 those opinions, as stated in my previously filed affidavit
2 dated April 5th, 2017; my Supplemental Affidavit dated
3 May 19th, 2017; my Declaration dated March 27th, 2018; and
4 my Declaration dated May 21st, 2018." And I think this
5 one is --
6     Q. I think I read you the wrong date.
7     A. Wait. Looks like I got the wrong date. 26.
8 March 26. I actually signed this on March 26. So there's
9 a typo in my expert report.
10     Q. I think when I described the document, I was
11 describing the wrong one anyway. So we both have --
12     A. Anyway, what I meant to describe was when it
13 says, "My declaration dated March 27, 2018," I should
14 correct that to March 26.
15     Q. Sure.
16     A. Oh, it was filed on the 27th. That's why.
17     Q. Exhibit D, just to clarify, is a declaration
18 signed and executed by you on March 26, 2018.
19         So I --
20     A. But filed on March 27th.
21     Q. Filed on March 27th.
22         Is it correct that you've seen this document
23 before?
24     A. Yes, I have seen this document before. I wrote
25 it and signed it.

1    Q.   Did anybody help you with the drafting of this
2  declaration?
3    **A.   Helped me, yes.  I had somebody format it for**
4  **me.  I had Mr. O'Donnell review it before I filed it and**
5  **did the final version of it.**
6    Q.   Are there any opinions in this declaration that
7  aren't also contained in your expert report?
8    **A.   It's incorporated into my expert report.**
9    Q.   Sure.  And are there any opinions in the
10  declaration that aren't stated in the six-page document
11  that's titled your expert report?
12    **A.   Sure, because this is -- I didn't reprint the**
13  **whole entire affidavit.  I incorporated it by reference.**
14    Q.   So what opinions are in this declaration that
15  are not in the six-page document that's titled your expert
16  report?
17    **A.   Paragraph 2, paragraph 3, paragraph 4, paragraph**
18  **5, paragraph 6, paragraph 7, paragraph 8, paragraph 9.**
19    Q.   Okay.  So maybe let's take those one by one.
20  What's the paragraph -- I'm sorry.
21    In paragraph 2, what's the opinion that you're
22  asserting there that is not contained in the six-page
23  document that's titled your expert report?
24    **A.   Well, all of those sentences I did not simply**
25  **cut and paste and put them into my expert report.  I**

1  **incorporated them by reference.**
2    Q.   And I'm interested in understanding what your
3  opinions are that you're offering in this case.
4    Is there an opinion in paragraph 2 of this
5  declaration that is not contained in the six-page report
6  titled your expert report?
7    **A.   Sure.  My opinion is, "When the MAVNI program**
8  **began in 2008, the program only accepted recruits who were**
9  **foreigners in the United States legally and who had been**
10  **in the United States legally for at least two years.  As a**
11  **result, every person who enlisted through the MAVNI**
12  **program had already undergone numerous background checks**
13  **with the United States Department of State ("DOS") and/or**
14  the United States Department of Homeland Security (or its
15  predecessor agency, the United States Department of
16  Justice's Immigration and Naturalization Service) before
17  enlisting in the U.S. Armed Forces."
18    Q.   So Ms. Stock, is it your understanding that that
19  first sentence in paragraph 2 would be offered as an
20  expert opinion in this case?
21    **A.   Uh-huh.**
22    Q.   Why is that?  How is that an expert opinion?
23    **A.   It's my expert opinion that every person who**
24  **enlisted through the MAVNI program had already undergone**
25  **numerous background checks with the United States**

1  **Department of State --**
2    Q.   And I asked only about the first sentence in
3  paragraph 2.  "When the MAVNI program began in 2008, the
4  program only accepted recruits who were foreigners in the
5  United States legally."
6    **A.   Well, that's my expert opinion that that was the**
7  **case.**
8    Q.   What's the difference to you between a factual
9  statement and an expert opinion?
10    **A.   The expert opinion is informed by the person's**
11  **experience, education.  And I'm an immigration attorney,**
12  **and so I can tell whether somebody was in the United**
13  **States legally in contrast to people who aren't experts**
14  **who can't tell whether somebody is in the United States**
15  **legally.**
16    Q.   So maybe to save us time, Ms. Stock, because I
17  know you care about that.
18    Would it be safe to say that every sentence in
19  this declaration in paragraphs 2 through 9 you consider to
20  be your expert opinions in this case?
21    **A.   Well, that's why I incorporated it into my**
22  **expert report.**
23    Q.   So is your answer "yes"?
24    **A.   I don't think paragraph 1 is necessarily expert.**
25    Q.   And I actually only asked about paragraphs 2

1  through 9.
2    **A.   I would include them all as part of my expert**
3  **report.**
4    Q.   That's not my question.  I want to make sure you
5  understand my question and you answer it specifically.
6    My question is, is every sentence in paragraphs
7  2 through 9 of this declaration an expert opinion that
8  you're offering in this case?
9    **A.   Yes.**
10    Q.   So let's take a look at one specific paragraph.
11  I just asked -- you just testified that every paragraph in
12  this declaration between paragraphs 2 and 9 and every
13  sentence of that constitute your expert opinion in this
14  case.  Paragraph 9 says, "After enlistment, DoD now also
15  further vets MAVNI soldiers by requiring that they undergo
16  an SSBI (now called a Tier 5 investigation), a
17  counterintelligence screening, and a National Intelligence
18  Agency check (NIAC)."  End paragraph.
19    How is that an expert opinion?
20    **A.   Because when the program first began, not all of**
21  **those checks were required, which is something that's not**
22  **in the common knowledge.**
23    Q.   How is that an opinion?
24    **A.   It's my opinion that that's what DoD is now**
25  **requiring.  Well, not now, because they don't take any**

1  more MAVNIs.  But that was at the point that the program
2  changed to require additional checks.  When the program
3  started, they didn't require all of these checks to be
4  done.
5      Q.  Would you testify at trial before Judge Zilly in
6  this case that paragraph 9 constitutes your expert
7  opinion?
8      A.  It's part of my expert opinion.  It's not my
9  whole expert opinion.  It's information supporting my
10  expert opinion.  I mean, I wrote it, so it's part of my
11  opinion.
12      Q.  Okay.  So Ms. Stock, what I'm trying to
13  discern -- I asked you before to identify the expert
14  opinions you're offering in this case, and the government
15  is entitled to know that.  I'm sure you're aware of that
16  from your time as an attorney.  And I'm asking you what
17  opinions are you offering in this declaration that you
18  aren't offering in the six-page document that you entitled
19  your expert report.
20      Are you able to identify for me any expert
21  opinions that are in the March 26, 2018, declaration that
22  are not contained in your six-page expert report?
23      A.  Sure.  As I said before, I incorporated --
24      Q.  I'm asking about specific expert opinions.
25      Are you able to point me to any specific expert

1  opinions in this document that are not contained in your
2  six-page expert report?
3      A.  Well, in this report I didn't go through the
4  background of the MAVNI program.  I didn't explain the
5  evolution of the expert -- or the background checks.  I
6  didn't explain the details of all the different background
7  checks that people have to undergo --
8      Q.  Ms. Stock, I'm not asking for explanations.  I'm
9  asking for expert opinions.  I'm asking for what are your
10  opinions as an expert in this case.  You've cited to these
11  declarations in your expert report.
12      I'm asking, are there any expert opinions in the
13  March 26, 2018, declaration that are not contained in your
14  six-page expert report?
15      A.  Yes.
16      Q.  What are they?
17      A.  When I talked about the most vetted -- I talked
18  about the fact in my expert report that these are the most
19  vetted recruits.  If I can find you the section.  Page 4.
20  So this is an explanation that explains the basis for my
21  expert opinion regarding the most vetted recruits who join
22  the U.S. Armed Forces, why these are the most vetted
23  recruits.
24      Q.  I appreciate that, and I'm not asking for the
25  basis for the opinions contained in your six-page expert

1  report.
2      I'm asking whether there are any separate expert
3  opinions in the declaration that aren't in your six-page
4  expert report.
5      A.  Yes.  This is a separate expert opinion about
6  the vetting, why they're the most vetted.
7      Q.  What in your -- maybe we have a fundamental
8  misunderstanding about what is an expert opinion.
9      What is your understanding -- and I know you're
10  a trained lawyer who has used experts in other cases.
11  What's your understanding from that experience of what
12  expert testimony is?
13      A.  Expert testimony is testimony that explains the
14  facts, and in this particular case, the basis for the
15  plaintiffs' claims that they are being discriminated
16  against on the basis of national origin.  National origin
17  discrimination is happening here, and in order to
18  understand what DoD is doing, you have to understand the
19  security screening that the MAVNIs went through.
20      So in order to provide my expert opinion, I have
21  to explain it.  I've got to explain what most vetted
22  means, which is in my expert report, and this is expert
23  opinion evidence about the vetting that the MAVNIs go
24  through, including these exhibits talking about the
25  vetting that...

1      Q.  So it fair to say from what you just said that
2  you consider expert opinion to provide factual summaries?
3      A.  Well, experts rely on facts about things like
4  vetting.  What is the vetting that the MAVNIs are going
5  through?  The average person isn't going to know anything
6  about the CLASS system or the Terrorist Screening Center
7  or TECS or anything like that, and so in order to support
8  my opinion, I've got to explain the basis for the opinion.
9  That's required.  And so here I'm explaining the basis for
10  my opinion.
11      Q.  So I just want the record to reflect that when
12  Ms. Stock referred to "opinion" she pointed her hand to
13  the six-page document referred as expert report, and then
14  when she referred to explain the basis for that opinion,
15  she pointed her hand to the March 26, 2018, declaration.
16      A.  Correct.  That's because --
17      Q.  So I think you understand the difference between
18  opinions and the explanation for those opinions.  My
19  question --
20      A.  Well, I was pointing to --
21      Q.  Ms. Stock, I'm sorry.  I haven't asked --
22      A.  -- I was pointing to this because it
23  incorporates --
24      Q.  Ms. Stock, I haven't asked you a question.
25  Please wait.

Page 286

1    My question to you -- and I think you understand
2  the difference between an expert opinion and the basis for
3  that opinion is, are there any expert opinions -- are
4  there any expert opinions in your March 26, 2018,
5  declaration?  Are there any expert opinions in here?
6    **A.  Yes, there are.**
7    Q.  What are they?  Don't point me to them.  Just
8  tell me what they are.  What is your opinion testimony
9  that's in the March 26, 2018, declaration?
10   **A.  My opinion testimony is that the MAVNIs are**
11 **vetted extraordinarily by various government agencies**
12 **before they even walk into a recruiting station.**
13   Q.  Anything else?
14   **A.  Yes.  And I explained that in the declaration.**
15 **I went into great detail about the different vettings, the**
16 **different security systems that are applied.  This is**
17 **expert opinion evidence.  And then I incorporated it into**
18 **my expert report.  That's why I didn't want to just repeat**
19 **wholesale paragraphs from prior declarations.  I suppose I**
20 **could have done that, but I didn't for the sake of**
21 **convenience.  I simply referred --**
22   Q.  Whose convenience?
23   **A.  My convenience.**
24   Q.  Whose convenience was that?
25   **A.  My convenience.**

Page 287

1    Q.  Is it hard to cut and paste?
2    **A.  It takes time and it seemed like an unnecessary**
3  **burden on you because you already had the information, so**
4  **I was simply going to be giving you more paperwork.**
5    Q.  You referred twice to "expert opinion evidence."
6    What's expert opinion evidence?
7    **A.  Well, an expert report is evidence in a case.**
8    Q.  Do you consider your declarations to be expert
9  opinion evidence?
10   **A.  They're expert opinions.**
11   Q.  Do you consider them to be expert opinion
12 evidence?
13   **A.  What's your definition of "expert opinion**
14 **evidence"?**
15   Q.  So you used twice the phrase "expert opinion
16 evidence."
17     Is there a difference to you between expert
18 opinions and expert opinion evidence?
19   **A.  I think you used it.**
20   Q.  I'm sorry.  Actually, you used it twice, and I'm
21 trying to understand what you meant by that.
22   **A.  I'm trying to understand what you're meaning.  I**
23 **mean, I'm having a hard time with your questions.  I'm**
24 **sorry.**
25   Q.  That's okay.

Page 288

1    MR. SWINTON:  Why don't we take a break.
2    Before we go off the record, I'll ask the
3  witness again not to talk to Mr. O'Donnell about the
4  deposition.
5    (Recess taken)
6  BY MR. SWINTON:
7    Q.  We're back on the record.
8    Ms. Stock, did you discuss the deposition during
9  the break with Mr. O'Donnell?
10   MR. O'DONNELL:  Same instruction.
11   MR. SWINTON:  Mr. O'Donnell, I'll again ask, do
12 you have any authority to cite me to for your objection?
13   MR. O'DONNELL:  Not with me, but you could look
14 at the last case that Joe Dugan read to me which agrees
15 with my position.
16   MR. SWINTON:  Do you have any other authority
17 other than that case?
18   MR. O'DONNELL:  I haven't spent much time
19 looking at it.
20 BY MR. SWINTON:
21   Q.  Ms. Stock, let's move on from the declaration we
22 looked at before.  I'm going to hand you a new exhibit.
23     (Exhibit F marked)
24   Q.  I just handed you a document marked as
25 Exhibit F.  This is labeled -- or titled "Affidavit of

Page 289

1  Margaret D. Stock."  It's dated April 1st, 2017.
2    Is it correct that you've seen this document
3  before because you wrote it?
4    **A.  Yes, I've seen it before.  Okay.  And so it was**
5  **filed April 5th.  So the dates in the opinion are the**
6  **dates the document was filed.**
7    Q.  Thank you for the clarification.
8    Were you asked to provide this affidavit in the
9  Tiwari case?
10   **A.  Yes.**
11   Q.  Why did you provide it?
12   **A.  As part of my expert opinion.**
13   Q.  Were you serving as an expert witness in April
14 2017 in the Tiwari case?
15   **A.  Yes.**
16   Q.  When did you begin serving as an expert witness
17 in the case?
18   **A.  I can't recall the exact date.**
19   Q.  Was it before the complaint was filed?
20   **A.  I can't recall the exact date.**
21   Q.  Do you recall whether it was before the
22 complaint was filed in the case?
23   **A.  I don't recall.**
24   Q.  Does this affidavit contain expert opinions?
25   **A.  Yes.**

1    Q.   What are those expert opinions?

2    A.   2.  Paragraph 2.

3    Q.   And I'm sorry.  Instead of identifying the

4  paragraphs, can you tell me what the expert opinions are?

5    A.   "The project began with a briefing I gave to the

6  Secretary of the Army in the fall of 2007.  The MAVNI

7  program was designed to address critical shortages of

8  personnel in the U.S. Armed Forces by allowing noncitizens

9  to enlist in the military if they were legally present in

10  the United States and did not yet have 'green cards'

11  (lawful permanent residence) but met certain other

12  requirements."

13       Paragraph 3.  "Army MAVNI enlistees were

14  required to meet all of the usual requirements for

15  enlistment except they were required to score higher on

16  the Armed Forces Qualification Test than other military

17  recruits and were ineligible for any 'moral' or conduct

18  waivers."

19       Paragraph 4.  "MAVNI recruits were required to

20  apply for naturalization as United States citizens, and

21  were advised of this requirement as part of the enlistment

22  contract process.  The naturalization process requires the

23  noncitizen to complete USCIS Form N-400, undergo extensive

24  Department of Homeland Security background checks

25  (including an FBI name check), pass an English and civics

1  test, be interviewed by a United States Citizenship and

2  Immigration Services officer, and participate in a

3  naturalization oath ceremony."

4       "The MAVNI program" -- paragraph 5.  "The MAVNI

5  program initially began recruiting people in 2009.

6  Recruits enlisted through the MAVNI program were assured

7  repeatedly, in writing and orally, that they would have

8  the same career opportunities, once naturalized, as any

9  other United States Citizen serving in the United States

10  Armed Forces."

11       Paragraph 6.  "To have a successful long-term

12  career in the United States Armed Forces today, a person

13  must be a United States citizen" --

14    Q.   Ms. Stock, I'm sorry.  I'm going to interrupt

15  you.

16       Is it your testimony that paragraphs 2 through

17  19 constitute your expert opinion that was provided in

18  this affidavit?

19    A.   There's a couple of places where I would omit

20  sentences here and there.

21    Q.   Maybe it's easier -- why don't you tell us what

22  sentences you would omit.

23    A.   It's easier for me to read the part that's my

24  expert opinion and then skip the ones that aren't.

25    Q.   I'm interested again in making sure that we stay

1  on time.  So it sounds like it's going to be shorter if

2  you identify -- and maybe -- I'd like to ask the question.

3       What parts of this affidavit do you consider not

4  to be part -- to not be expert opinion testimony?

5    A.   "As one example, the U.S. Army Soldier of the

6  Year in 2012, Saral Shrestha, was recruited through the

7  MAVNI program.  The DoD commissioned an independent

8  consulting firm, Human Resources Research Organization

9  (HumRRO), to review and evaluate the program.  Their

10  February 20th, 2013, report concluded variously that:

11       Based on characteristics in our analyses, MAVNI

12  soldiers compare exceptionally well to non-MAVNI soldiers.

13  They bring a significantly higher level of language

14  proficiency to the Army than do their Army Special

15  Operations Forces (ARSOF)-trained and Defense Language

16  Institute-tested counterparts, thereby increasing the

17  Army's capability in critical languages.  They have a

18  higher predicted performance than non-MAVNI soldiers based

19  on the GT score even when the model controls for

20  education, sex, and race.

21       "The majority of supervisors indicated that

22  proficiency in reading, writing, speaking, and

23  understanding English among Critical Foreign

24  Language-MAVNI solders was the same as or better than

25  native-English speaking soldiers.  Evaluation results

1  indicate that CFL-MAVNI soldiers are of high 'quality' --

2  findings that are consistent with the selection of a

3  CFL-MAVNI recruit as the Army's 2012 Soldier of the Year.

4       "More than half of MAVNIs indicated they would

5  probably or definitely stay in the Army until retirement."

6       That's a fact of a report that I relied on for

7  my opinion.  I didn't write the report.

8    Q.   Do you consider facts to be different than

9  expert opinions?

10    A.   Sometimes, but opinions rely on facts, and so

11  it's a little bit fuzzy.  That's a fact that the report

12  said that.  That's not my opinion.  But I relied on that.

13    Q.   Okay.

14    A.   You want me to keep going?

15    Q.   No.  I'm not enjoying this.  I'm sure you know.

16    A.   You seem to be enjoying it.

17    Q.   Let's move on, Ms. Stock, to another affidavit

18  that you filed.

19       (Exhibit G marked)

20    Q.   So Ms. Stock, I just handed you a document

21  that's been marked as Exhibit G.  This is titled

22  "Supplemental Affidavit of Margaret Stock."  This was

23  signed and executed on May 19th, 2017.

24       And is it correct to say that you've seen this

25  document before because you wrote it?

1    A.  Yes, I have seen it before.  Yes.

2    Q.  Why did you provide this supplemental affidavit

3  in the case?

4    A.  Let's see.  I would have to see the filings of

5  that day to recall exactly why I filed it.  But presumably

6  I filed it to address an issue in the case that required

7  my expert opinion.

8    Q.  Did you file the supplemental affidavit in your

9  capacity as an expert in the case?

10    A.  I did.

11    Q.  Do you consider this supplemental affidavit to

12  contain expert testimony?

13    A.  I do.

14    Q.  Are there any expert opinions contained in this

15  affidavit that are not contained in the six-page document

16  that you've called your expert report?

17    A.  Yes.

18    Q.  Can you tell me what those expert opinions are

19  that are in this supplemental affidavit that are not in

20  the six-page document that is called your expert report?

21    A.  Paragraph 2 goes to my qualifications as an

22  expert.

23    Q.  Again, I'm interested in your expert opinion.

24  So I'd be interested if you pointed me to sections which

25  contain your expert opinions.

1    A.  Okay.  Paragraph 3, paragraph 4, paragraph 5,

2  paragraph 6.  Paragraph 8 contains a sentence, "These

3  lengthy residences in the United States are not unusual

4  for MAVNI recruits.  Many MAVNIs have attended high school

5  and/or college in the U.S. for four or more years and then

6  worked in the U.S. under work visas for several years

7  before joining one of the U.S. Armed Forces through the

8  MAVNI program."

9        Question 9 -- or paragraph 9, paragraph 10,

10  paragraph 11, paragraph 12, paragraph 13, paragraph 14,

11  paragraph 15, paragraph 16, paragraph 17, paragraph 18,

12  paragraph 19, paragraph 20, paragraph 21, paragraph 22,

13  paragraph 23, paragraph 24, paragraph 25, paragraph 26,

14  paragraph 28, the section that offers my opinion.  29 is

15  basically facts.

16    Q.  If you don't mind, I'd actually like to go back

17  to Exhibit F, which is your declaration from -- signed on

18  April 1st, 2017.  I think it's actually helpful and

19  efficient to go through it by paragraph number, which you

20  were doing before and then I cut you off.  So I apologize

21  for that.  I think you had reviewed this already.

22        Would you mind going through and identifying by

23  paragraph number which paragraphs contain your expert

24  opinion for this affidavit?

25    A.  "The project began with a briefing I gave to the

1  Secretary of the Army in the fall of 2007.  The MAVNI

2  program was designed to address critical shortages of

3  personnel in the U.S. Armed Forces by allowing noncitizens

4  to enlist in the U.S. military if they were legally

5  present in the United States and did not yet have 'green

6  cards' (lawful permanent residence) but met certain other

7  requirements."

8    Q.  And I'm sorry.  I think it might be more

9  efficient if you just identify the paragraph numbers that

10  contain your --

11    A.  Paragraph 2.  You want me to continue?

12    Q.  Yes, for the whole document, please.

13    A.  Paragraph 3.  "The MAVNI program was initially

14  authorized by Secretary of Defense Robert Gates in

15  November 2008.  Secretary Gates authorized the U.S. Armed

16  Services to recruit two categories of MAVNI enlistees:

17  1. Health Care Professionals (HCPs), who were legally

18  present noncitizens with certain U.S. medical licenses or

19  credentials, and 2. language enlistees who were legally

20  present noncitizens who had demonstrated expertise in

21  certain strategic foreign languages.

22        "Army MAVNI enlistees were required to meet all

23  of the usual requirements for enlistment except that they

24  were required to score higher on the Armed Forces

25  Qualification Test (AFQT) than other military recruits and

1  were ineligible for any 'moral' or conduct waivers."

2        Paragraph 4.  "MAVNI recruits were required to

3  apply for naturalization as United States citizens and

4  were advised of this requirement as part of the enlistment

5  contract process.  The naturalization process requires the

6  noncitizen to complete USCIS Form N-44, undergo extensive

7  Department of Homeland Security background checks

8  (including an FBI name check), pass an English and civics

9  test, be interviewed by a United States Citizenship and

10  Immigration Services officer, and participate in a

11  naturalization oath ceremony."

12    Q.  Ms. Stock, I don't need you actually to read

13  every paragraph that contains your expert opinion.  I just

14  would like you to identify by paragraph number which

15  paragraphs contain your expert opinion.

16    A.  Okay.  So paragraph 2 contains some of my expert

17  opinion.  3, 4, 5, 6, 7, 8.  First sentence in 9.  11, 12,

18  13, 14.  15 contains information on which I relied in

19  making my expert opinion, but it's not my opinion.  It's

20  factual.  16.  17 is one of the unconstitutional guidance

21  documents that's not part of my expert opinion, but of

22  course I rely on it.  18 and 19.

23        (Exhibit H marked)

24    Q.  Ms. Stock, I just handed you a document that's

25  been marked as Exhibit H.  This is titled "Declaration of

1 Margaret B. Stock."  It was signed and executed on
2 May 20th, 2018.
3      Is it fair to say that you've seen this document
4 before because you wrote it?
5    A.  Yes, that's correct.
6    Q.  And as we did with the other declarations and
7 affidavits, I'd like you to identify for me by paragraph
8 number which paragraphs contain your expert opinion in
9 this declaration.
10    A.  Paragraph 3, paragraph 4, paragraph 5,
11 paragraph 6.  I should qualify 6 by saying that, since the
12 date I signed this affidavit, I've become aware of more
13 MAVNIs who have been the subject of deportation
14 proceedings.  None of them are naturalized citizens,
15 though.
16        Paragraph 7, paragraph 8.  And paragraph 9, I
17 should qualify that by saying that I'm not aware of any
18 against any naturalized MAVNI, but there is one that was
19 in the news recently that we discussed earlier, Chaoqun
20 Ji.  For the reporter, that's C-h-a-o-q-u-n J-i spelled in
21 English letters.  That was made public because DOJ
22 prosecuted the individual for failure to register as a
23 foreign agent.  Paragraph 10.
24    Q.  So if I understand what you just said correctly,
25 the only paragraph -- it's fair to say that the only two

1 paragraphs in this declaration that do not contain your
2 expert opinion are 1 and 2?
3    A.  Well, 2 explains the basis for my expert
4 opinion.  And there are sentences here and there that
5 wouldn't be opinion.  They're factual, but those are the
6 paragraphs that contain parts of my expert opinion.  But
7 like, for example, paragraph 6 largely consists of a quote
8 from a court case, and obviously the court opinion is not
9 my opinion.  It's just something I'm relying on for making
10 my opinion.
11    Q.  What's your opinion in paragraph 6?
12    A.  "DHS has to my knowledge only instituted
13 deportation proceedings against two students who enrolled
14 at UNNJ: Specialist Zhu and a civilian named Srikanth
15 Kasim Reddy.  In the deportation case against Mr. Reddy, a
16 federal immigration judge determined that there was no
17 fraud on the part of the student."
18    Q.  So those first two sentences are your expert
19 opinion in paragraph 6?
20    A.  Uh-huh.  My opinion, yep.  But I said I qualify
21 that now because I found out after that that they've
22 started proceedings against additional people who are
23 enrolled at UNNJ.
24    Q.  What's your expert opinion in paragraph 7?
25    A.  "DHS has commenced removal proceedings against

1 Specialist Zhu.  DHS, however, has not charged him with
2 visa fraud.  Rather, DHS has charged him with failure to
3 maintain his F-1 student status because he joined the
4 Army.  Specialist Zhu has filed an independent mandamus
5 action against DHS seeking to compel DHS to process Zhu's
6 citizenship application."
7        I mean, that's an expert opinion because it's
8 not possible for somebody unfamiliar with the immigration
9 court system to understand what charges are unless you're
10 an expert.  And therefore, that's how Chris Arendt, I
11 think, got mixed up and claimed people were committing
12 visa fraud when they weren't committing visa fraud.
13        He was apparently referring to people who had
14 attended UNNJ, and, in fact, those people hadn't committed
15 visa fraud.  They weren't charged with visa fraud.  They
16 were charged with failure to maintain student status.  But
17 unless you're familiar with immigration law, you might
18 easily get confused about that.
19    Q.  Ms. Stock, I want to make sure we stay on track
20 here.  I have just a couple more questions for you.
21        Ms. Stock, actually, before we go on to a few
22 more documents, I have just a couple questions for you.
23        If DoD has security concerns about soldiers who
24 enlist via the MAVNI program, should DoD be able to
25 conduct background checks before MAVNI soldiers are

1 shipped to basic training?
2    A.  They should be able to conduct them and complete
3 them before they enlist them.
4    Q.  Should DoD -- if DoD has security concerns about
5 soldiers who enlist via the MAVNI program, should DoD be
6 able to conduct background checks before MAVNI soldiers
7 naturalize as U.S. citizens?
8    A.  I don't think that's an issue in this case.
9 These are all -- this case is all naturalized American
10 citizens.
11    Q.  Sure.  And I'm asking you a question about
12 whether, if DoD has security concerns about soldiers who
13 enlist via the MAVNI program, should be able to conduct
14 background checks before MAVNI soldiers naturalize as U.S.
15 citizens?
16      MR. O'DONNELL:  Incomplete hypothetical.
17      THE WITNESS:  I just don't understand the
18 relevance to this particular case.
19 BY MR. SWINTON:
20    Q.  That's fine.  As I'm sure you know, a relevance
21 objection isn't a basis to not answer a question.  So I
22 would ask you to answer the question.
23    A.  Well, it's an extraordinarily broad question.
24 DoD doesn't naturalize people.
25    Q.  And that's -- I'm not asking you to assume that

1 to be true for the purposes of my question. Let me repeat
2 it again to make sure you understand it.
3     If DoD has security concerns about soldiers who
4 enlist via the MAVNI program, should DoD be able to
5 conduct background checks before MAVNI soldiers naturalize
6 as U.S. citizens?
7     MR. O'DONNELL: Object to the form of the
8 question.
9     THE WITNESS: I guess I'm -- can you clarify
10 what you're trying to get at with regard to this lawsuit?
11 BY MR. SWINTON:
12     Q. Again, the relevancy isn't a basis to not answer
13 a question. So I would ask you to answer the question.
14     A. Well, I mean, as a factual matter, DoD conducts
15 background checks on all MAVNIs, and they can't
16 naturalize -- if they're naturalizing through military
17 service based on their enlistment into the military, which
18 not all of them are, then that would always happen as a
19 factual matter.
20     Q. I'm asking, in your opinion, based on your
21 experience with the MAVNI program, if DoD has security
22 concerns about soldiers who enlist via the MAVNI program,
23 should DoD be able to conduct background checks before
24 MAVNI soldiers naturalize as U.S. citizens?
25     MR. O'DONNELL: Same objection.

1     THE WITNESS: Yeah. I mean, that --
2 Mr. Swinton, the problem is, that always happens, because
3 you can't get into the military without background checks,
4 and until you're in the military and you're trying to
5 naturalize as a MAVNI, you -- you don't apply for
6 citizenship. So you always have DoD background checks.
7     At least -- I mean, the exception would be if
8 you're a MAVNI who didn't follow through, you dropped out,
9 you got discharged. Then you might naturalize as a
10 civilian. And no, DoD would not have any right to conduct
11 any background check on you because you're naturalizing as
12 a civilian.
13 BY MR. SWINTON:
14     Q. Should DoD -- if DoD has security concerns about
15 soldiers who enlist via the MAVNI program, should DoD be
16 able to complete background checks before MAVNI soldiers
17 naturalize as U.S. citizens?
18     A. That's what happens.
19     Q. So do I understand your answer to be "yes"?
20     A. Well, again, I think you've got to tell me about
21 the fact situation, because not everybody naturalizes
22 through the military through the MAVNI program. Okay. So
23 DoD has no role to play in doing background checks on a
24 civilian who is naturalizing. They just don't do that,
25 so --

1     Q. So how about for individuals -- I'm talking
2 about individuals who enlist via the MAVNI program and
3 naturalize via -- due to their enlistment in the MAVNI
4 program.
5     If DoD has security concerns about such
6 individuals, should it be able to conduct background
7 checks before they naturalize as U.S. citizens?
8     A. They always do. It's not possible for it to
9 happen. You can't get into the military without
10 background checks. So DoD is always doing background
11 checks before they let somebody into the military.
12     Q. Okay. Let me ask it a little bit differently.
13     If DoD has security concerns about soldiers who
14 enlist via the MAVNI program, should it be able to
15 complete military suitability screening determinations
16 before those MAVNI soldiers naturalize as U.S. citizens?
17     A. Okay. Once again, I mean, you know, you're
18 assuming that the security concerns have something to do
19 with the particular individual? Is that your assumption?
20     Q. Yes. If DoD has security concerns about MAVNI
21 soldiers.
22     A. But as a group, I don't agree that DoD should
23 hold up the naturalization of every single MAVNI because
24 they think somebody -- some foreign government might try
25 to infiltrate the MAVNI program, no. I mean, for one

1 thing, the problem is that they can never get their
2 citizenship if that's the case, because DoD never
3 finishes -- I mean, you know the glacial rate at which
4 they're processing these MSSDs. They're just not doing
5 them on people. How many have you -- I think you were in
6 court the other day, and I read the transcript and it's
7 been just a --
8     Q. I want to make sure we stay on track, Ms. Stock.
9     A. Just a handful of people have had them done,
10 so --
11     Q. Let me ask you another question.
12     If DoD becomes aware of information that it
13 conducts from its own background checks, in your opinion,
14 should DoD be able to share that information with USCIS to
15 use as part of the naturalization determination?
16     A. Absolutely. But they don't.
17     (Exhibit I marked)
18     Q. Ms. Stock, I just handed you a document marked
19 as Exhibit I. It's titled "The Impact and Potential of
20 America's Foreign Born Population on Army Recruiting and
21 Force 2025." And below that it says, "Naomi Verdugo and
22 Margaret Stock."
23     Have you seen this document before?
24     A. Yes.
25     Q. What is it?

Page 306

1    A.   It's a paper that Naomi Verdugo and I wrote to
2  present to U.S. Army Recruiting Command at their
3  invitation.  They invited me to come to Fort Knox,
4  Kentucky and present the paper at a conference that a lot
5  of DoD officials attended -- Army officials and DoD
6  officials attended.
7    Q.   Has this paper been made -- have you used this
8  paper in any situation other than the recruiting event in
9  Fort Knox, Kentucky that you just mentioned?
10    A.   I have e-mailed it to people who ask me for
11  copies of it.
12    Q.   Has it been published anywhere?
13    A.   Army Recruiting Command published it.
14    Q.   Where did they publish it?
15    A.   They put it on their website.
16    Q.   When did you write this document?
17    A.   Do you have that slide show?  Whatever the date
18  of the slide show is.
19    Q.   We'll look at the slide show in a minute.
20    A.   It was post-retirement.
21    Q.   Were the slide show and the paper written at the
22  same time?
23    A.   The paper was written before the slide show.  I
24  had to finish the paper -- they had basically rules about
25  when they wanted the papers to be presented.  And it was

Page 307

1  peer-reviewed, so I had to present a draft of the paper to
2  people at Army Recruiting Command, and then they had
3  anonymous peer reviewers review it.  And then they made
4  comments and gave it back to me, and I had to make changes
5  to it.
6        And then I had to send it in by a deadline for
7  the conference that they were having.  And the slides I
8  had to do right before the conference, and I had to send
9  them in.  And then I officially presented the final
10  version of the paper after the conference because the idea
11  was we would discuss everything at the conference and then
12  there would be a final version of the paper and then they
13  put -- there was a video that they put up on their
14  website, and they put the papers up on their website.
15    Q.   The 2025 in the title of the paper, does that
16  refer to the year 2025?
17    A.   It refers to force 2025, which is the projected
18  force in the future.  We were looking ahead to see what
19  challenges we were going to have recruiting people in the
20  future.
21    Q.   If you look and just flip through pages 7 to 12,
22  page 7 has a heading that's underlined that says, "MAVNI
23  Program Recommendations," and it looks like that section
24  continues to page 12.  Do you see that?
25    A.   Yes.

Page 308

1    Q.   Who are the recommendations for?
2    A.   They were recommendations for DoD and Army
3  leaders who were attending the conference.
4    Q.   Were you asked to make recommendations in this
5  paper?
6    A.   Yes, I was.
7    Q.   Did you and Naomi Verdugo analyze any security
8  issues presented by the MAVNI program as part of this
9  paper?
10    A.   We looked at them somewhat.  I don't think we --
11  I mean, that wasn't really a focus of the paper because we
12  expected the security screening to continue the way it had
13  been, and it had been successful.  But we do talk about
14  security screening in the paper.  You will find that on
15  page 10, paragraph 3.
16        And then we talked about that extensively at
17  the -- the slides have a lot of information, the back-up
18  slides.  Because it was always the topic of discussion
19  among people who were discussing the MAVNI program.
20    Q.   One more exhibit.
21        (Exhibit J marked)
22    Q.   Ms. Stock, I just handed you a PowerPoint
23  presentation that's been marked as Exhibit J.  It appears
24  to be a PowerPoint presentation titled "Impact and
25  Potential of Recruiting the Foreign Born Briefing" -- I'm

Page 309

1  sorry -- "Impact and Potential of Recruiting the Foreign
2  Born Briefing to Recruiting 2025 Forum."
3    A.   That's correct.  That's the name of the
4  conference.  It was called Recruiting 2025 Forum.
5    Q.   And at the bottom it has the names Naomi Verdugo
6  and Margaret Stock.
7        Did you prepare this document?
8    A.   I believe Dr. Verdugo prepared it, but I had
9  input.  We would send it back and forth.  It's the typical
10  thing that people do when they're presenting at a
11  conference.  Somebody comes up with the first version of
12  the slide deck and they send it to the other person and
13  they make changes and, I think, as I recall, that's how we
14  went back and forth.
15    Q.   Is this the PowerPoint presentation that you
16  referenced earlier that you presented at the conference at
17  Fort Knox, Kentucky?
18    A.   I believe so, yes.  At least this is the version
19  that I happened to have on my computer when I was
20  preparing my expert report.
21    Q.   Has this document been published anywhere?
22    A.   Yes.  Well, the official version of it,
23  whichever version they had, the Army Recruiting Command
24  put it on their website after the conference or around the
25  time of the conference.

1    Q.    You mentioned back-up slides, which I think
2    start at -- well, it's labeled page 11 but then it goes to
3    page 7, so I'm not sure --
4    A.    Right.
5    Q.    -- the pagination is the same.
6        But what's the purpose of the back-up section?
7    A.    Well, the normal way you give a presentation is
8    you have the main points that you want to talk about
9    within the limited time available, but then it's
10   traditional at the Pentagon if you think issues are going
11   to come up that need to be addressed in more detail, you
12   put them in something they call back-up slides in case you
13   have to pull them up to talk about them.
14       And we expected there would be significant
15   discussion about security issues at the conference,
16   because there always were significant discussions about
17   security issues.  So we wanted some back-up slides to talk
18   about the security issues.  And that's why they're all
19   related to security issues.
20   Q.    What were the security issues that were
21   discussed at the conference?
22   A.    What kind of security checks are MAVNIs going
23   through before they enlist, what kind of security checks
24   should be done after they enlist.  This has been kind of a
25   constant theme.  There was always a struggle in the MAVNI

1    program between, as I said, the security people and the
2    human resources people.  And very few people understood
3    much about immigration law, and fewer people understood
4    exactly what the MAVNIs were.
5        So we were constantly having to explain to
6    people that these are not undocumented immigrants, and
7    talking to people about what a H-1B visa is, what an F-1
8    visa is, what kind of security checks the State Department
9    goes through with people when they issue them a visa
10   overseas.  So this was intended to help explain to people
11   that these were not undocumented immigrants.
12       It was a common problem throughout the program
13   that lots of people, for whatever reason, thought the
14   MAVNI program was unauthorized immigrants coming into the
15   military.  And it was not at all about unauthorized
16   immigrants coming into the military.  But lots of people
17   in the building seemed to think these people were
18   undocumented immigrants, so we were constantly fighting
19   that battle with people in the military, explaining that,
20   no, they're not unauthorized immigrants.
21       Just to add to that, the vast majority of people
22   in the general public don't appreciate the differences
23   between somebody with a green card and somebody with some
24   other legal status.  They just think everybody is all the
25   same and they don't understand the differences between the

1    different types of visas.  So it was common whenever I
2    gave a presentation I had to explain that to people,
3    because they didn't understand it.
4        MR. SWINTON:  Ms. Stock, I think that's all my
5    questions for now.
6        MR. O'DONNELL:  No questions.
7        MR. SWINTON:  Before we go off the record, I do
8    want to make two points.  First, I just want to make sure
9    we memorialize and document our agreement about the
10   documents, the CI reports I guess specifically, that were
11   brought here today.
12       You brought the originals, Neil, and I
13   understand that you've asked for those to be returned.
14   We've agreed to have you take those with you today,
15   subject to you providing them to us with either hard
16   copies or electronic copies of those documents by the end
17   of this week, which is October 19th.
18       MR. O'DONNELL:  My plan would be to scan them
19   and send you a thumb drive.
20       MR. SWINTON:  And that works fine for us, again,
21   as long as we can receive that by October 19th.  And we
22   would reserve our right to reopen the deposition in the
23   event that we don't receive the documents by then.  But
24   otherwise, it seems like we have an agreement.
25       The second point I want to make clear on the

1    record is that we reserve the right to reopen the
2    deposition based on any discussions between counsel and
3    the witness during breaks, including the lunch break.
4    We've pointed you to multiple authorities which state that
5    once the deposition begins, counsel is not able to confer
6    with the witness about the subject of the deposition,
7    except to determine whether a privilege applies.
8        You've asserted -- you've objected and
9    instructed the witness not to answer questions pertaining
10   to discussions during breaks, which we believe is
11   improper, and so we reserve the right to reopen the
12   deposition if necessary to address any impermissible
13   coaching.
14       That's all.  Thank you.
15       (Proceedings concluded at 5:40 p.m.)
16       (Signature reserved)
17
18
19
20
21
22
23
24
25

Page 314

1                    REPORTER'S CERTIFICATE

2

3          I, DEIRDRE J.F. RADCLIFFE, Verbatim Shorthand

4    Reporter, and Notary Public in and for the State of

5    Alaska, do hereby certify that the witness in the

6    foregoing proceedings was duly sworn; that the proceedings

7    were taken before me at the time and place herein set

8    forth; that the testimony and proceedings were reported

9    stenographically by me and later transcribed by computer

10   transcription; that the foregoing is a true record of the

11   testimony and proceedings taken at that time; and that I

12   am not a party to nor have I any interest in the outcome

13   of the action herein contained.

14         IN WITNESS WHEREOF, I have hereunto set my hand

15   this 18th day of October 2018.

16

17

18

19   _____

20

21                    DEIRDRE J.F. RADCLIFFE

22                    My Commission Expires 5/31/22

23

24

25

Page 315

1    Errata Sheet

2

3    NAME OF CASE: TIWARI, ET AL. v MATTIS

4    DATE OF DEPOSITION: 10/15/2018

5    NAME OF WITNESS: MARGARET STOCK

6    Reason Codes:

7          1. To clarify the record.

8          2. To conform to the facts.

9          3. To correct transcription errors.

10   Page _____ Line _____ Reason _____

11   From _____ to _____

12   Page _____ Line _____ Reason _____

13   From _____ to _____

14   Page _____ Line _____ Reason _____

15   From _____ to _____

16   Page _____ Line _____ Reason _____

17   From _____ to _____

18   Page _____ Line _____ Reason _____

19   From _____ to _____

20   Page _____ Line _____ Reason _____

21   From _____ to _____

22

23

24         _____  _____

25              Signature          Date

**Exhibits**

STOCK, MARGARET 10-15-18 EX A 3:9 165:4,7

STOCK, MARGARET 10-15-18 EX B 3:10 241:23,25

STOCK, MARGARET 10-15-18 EX C 3:12 249:7,9

STOCK, MARGARET 10-15-18 EX D 3:13 256:15,17 276:16,17 277:17

STOCK, MARGARET 10-15-18 EX E 3:14 256:20,22

STOCK, MARGARET 10-15-18 EX F 3:15 288:23,25 295:17

STOCK, MARGARET 10-15-18 EX G 3:16 293:19,21

STOCK, MARGARET 10-15-18 EX H 3:18 297:23,25

STOCK, MARGARET 10-15-18 EX I 3:20 305:17,19

STOCK, MARGARET 10-15-18 EX J 3:22 308:21,23

**"**

"DOS 279:13

**$**

$10 14:6 15:16

**(**

(arsof)-trained 292:15

**-**

-ooo- 4:4

**1**

1 262:9 276:24 280:24 296:17 299:2

1,000 95:20 195:17,18,25 196:10 198:13 200:11

10 156:4 295:9 298:23 308:15

10,000 164:5 195:10,15 198:15 273:16

100 215:6,7,12

10th 155:21

11 295:10 297:17 310:2

11,000 258:4

12 295:10 297:17 307:21,24

12:15 145:5

13 182:12 271:22 295:10 297:18

14 257:16 295:10 297:18

15 4:2 258:5 295:11 297:18

16 257:24 295:11 297:20

17 11:12 295:11 297:20

1775 180:17

18 295:11 297:22

19 291:17 295:12 297:22

1980 105:22,25

1982 105:23

1988 22:18

1993 101:11 102:22

19th 277:3 293:23 312:17,21

1st 289:1 295:18

**2**

2 181:15 201:2 278:17,21 279:4,19 280:3,19,25 281:7,12 290:2 291:16 294:21 296:11,19 297:16 299:2,3

2,000 195:19,25 196:11

2.7 258:4

20 40:17 257:21 295:12

200 215:8

2006 155:21

2007 43:21 119:22 290:6 296:1

2008 279:8 280:3 296:15

2009 95:22 291:5

2010 43:21 119:22 130:20 131:4 171:4

2012 292:6 293:3

2013 14:19,25 15:3 61:2 257:21 292:10

2016 57:11 148:17 236:8 257:18,24 258:12,16,18,24 259:1,6,15 260:2,9, 17 261:1,8,14

2017 32:1,11 236:8 250:23 255:14,15, 17,20 277:2,3 289:1,14 293:23 295:18

2018 4:2 37:10 66:16 69:2 165:6 241:19 249:11 256:24 276:19 277:3,4, 13,18 282:21 283:13 285:15 286:4,9 298:2

2025 305:21 307:15,16,17 309:2,4

20th 276:19 292:10 298:2

21 23:1 295:12

21st 134:19 277:4

22 295:12

23 295:13

25 175:14 262:9,10 295:13

26 22:9 257:15,16 258:22 259:7 262:16,19 264:3 277:7,8,14,18 282:21 283:13 285:15 286:4,9 295:13

27 269:11 277:13 295:13

27th 277:3,16,20,21

28 36:1 106:15 109:12 150:16 179:15 180:22 295:14

29 295:14

**3**

3 190:23 198:1 206:7 278:17 290:13 295:1 296:13 297:17 298:10 308:15

30 10:1 40:17 229:5,11

30th 148:17 256:24

31 185:2

31st 249:11

32 9:3,13

35 147:15 224:25

**4**

4 250:15 251:6,14 255:13 258:3 278:17 283:19 290:19 295:1 297:2,17

298:10

**4,000** 83:23

---

**5**

**5** 190:25 206:7 252:20,21,22 278:18 281:16 291:4 295:1 297:17 298:10

**50** 181:11 214:24

**500** 95:13 186:22 196:23 200:6,7 263:4,23

**504(b)(2)** 156:4

**516** 9:13

**516.48** 9:3

**5:40** 313:15

**5th** 165:6 277:2 289:5

---

**6**

**6** 252:17,18 253:6,15 254:22 278:18 291:11 295:2 297:17 298:11 299:7,11, 19

**600** 200:9

---

**7**

**7** 278:18 297:17 298:16 299:24 307:21,22 310:3

**75** 18:7,15

---

**8**

**8** 278:18 295:2 297:17 298:16

**838** 146:1

**86** 146:7 270:9,12 271:4,8

**86s** 270:10

**87** 146:7

**88** 146:7

**89** 146:7

---

**9**

**9** 278:18 280:19 281:1,7,12,14 282:6 295:9 297:17 298:16

**9/11** 219:16

**900** 198:10,15

**902nd** 235:10

**9:09** 4:3

---

**A**

**A.M.** 4:3

**ability** 8:21 37:22

**absence** 247:21

**absolutely** 4:21 5:18 12:11 42:15 183:8,11 275:13 305:16

**abuse** 107:9

**Academy** 44:4 125:7 150:20

**Accenture** 239:18

**accepted** 40:3 279:8 280:4

**access** 11:2 128:3,6,8,13,15 143:22 144:6,10 201:9 241:6,16 242:25 250:20 252:2 254:25

**accessed** 247:10 257:21 258:2,7 263:15

**accessions** 64:9 70:21 118:20 119:23 120:8,12,24 123:13 148:9 155:9 242:2 249:16

**accidents** 107:20

**accomplished** 39:19

**accordance** 9:13 148:14

**accorded** 217:13,19

**account** 23:2 226:17,18,19,20,23 242:21

**accounts** 23:17 179:25

**accuracy** 81:21,22 123:25 180:5 239:2,4

**accurate** 23:8 86:19 144:22 223:10 228:3 230:8 234:19 236:1

**accurately** 8:21 23:19

**Acebes** 53:19,24 54:4

**acquire** 21:13,15

**acquired** 162:15 221:23 223:9,15

**acronym** 64:8,10,14,15 70:20,25 71:5,7,9 96:5

**acronyms** 65:7

**act** 146:21 178:24 272:25

**acting** 77:21

**action** 80:25 83:12 228:4 300:5

**active** 74:7 109:7,8,9,10,13 131:3,9 132:22 133:3,4,7

**activities** 36:4 110:1

**activity** 166:23 168:8 181:25 182:2 271:25 272:2,5

**acts** 169:4,18 170:5

**actual** 141:13 142:3,16 166:22 167:9, 10,13,14,15

**add** 14:23 15:1 52:25 133:12 185:7 311:21

**added** 14:24 53:5,6 58:7,11 218:4

**addenda** 123:20

**adding** 53:4

**addition** 236:11 247:11 250:25

**additional** 56:18 159:15 185:8 218:4, 6,19 275:11,14 282:2 299:22

**address** 8:6 52:15 60:9 127:12 183:16 234:6 251:3,10,12,19,22,23 252:3 266:22 267:1 290:7 294:6 296:2 313:12

**addressed** 224:24 251:25 310:11

**addresses** 251:13

**addressing** 252:12

**adds** 53:1 139:6

**adequate** 269:3 273:8

**adjudicate** 116:6,9

**adjudication** 276:6

**adjudications** 115:2 117:21

**adjudicator** 116:11 207:6

**Adjustment** 56:22

**administered** 158:10

**Administration** 210:9

**administrative** 90:6,11,13,17,25 91:23

**administrator** 50:8,15,17

**administrators** 50:7 51:12

**Admiral** 153:19

**adult** 204:4

**adults** 187:25

**advanced** 112:9

**advantage** 273:23

**adversaries** 178:13,18 180:7 181:9

**adversary** 167:23

**adverse** 225:23 227:22,23 228:4,8 229:24 234:4

**advice** 12:3 44:22 45:7,9 47:11 51:1, 8,14,15,18,19,20,22 99:13,17 104:21 178:8

**advised** 33:3,5 290:21 297:4

**Affairs** 118:23 121:7 140:1 208:16 209:5,19 211:14,23 212:20

**affect** 8:21 36:7 37:22 244:3 245:1

**affidavit** 62:7 92:18 260:4 277:1,2 278:13 288:25 289:8,24 291:18 292:3 293:17,22 294:2,8,11,15,19 295:24 298:12

**affidavits** 9:24 35:12 40:1 173:4 259:9 261:22 267:23 298:7

**affiliate** 12:25

**affiliated** 160:21

**affiliation** 149:1 210:16

**affiliation** 149:1 210:16

**afford** 69:9

**Afghanistan** 199:7 201:23 203:14

**Afghans** 130:12

**AFQT** 296:25

**afraid** 134:10,11,12 181:22,23 183:5

**African** 134:10

**afternoon** 224:4

**agencies** 74:18 121:22 173:25 174:8, 19,22,23,25 185:4 213:1 217:14 286:11

**agency** 74:16 174:5,6 250:24 255:16, 21 267:6 279:15 281:18

**agenda** 254:24

**agent** 169:11 246:5 298:23

**aggregate** 177:23

**agree** 70:24 304:22

**agreed** 312:14

**agreement** 77:20 78:16 79:17 312:9, 24

**agrees** 288:14

**ahead** 8:3 223:21 250:16 252:17 269:12 307:18

**AILA** 100:18,22,23 101:1,2,13,15,16, 19,24 102:6,18,23 103:2,7,9,23 104:2, 6,9,16,18,21 105:2,7

**Air** 111:3,5 120:20 139:23

**airline** 16:12

**airport** 28:23

**AK-47S** 110:16

**akbar** 169:2

**Alaska** 4:1 5:24 11:10 12:25 22:11 24:6 25:1 30:11,18 76:8 107:10 109:11

**alert** 170:10

**Allahu** 169:2

**allegations** 46:1 51:24 52:2 88:8,23, 25 138:13 241:13

**allege** 135:4

**alleged** 163:14

**allegedly** 159:7

**allowed** 39:25 112:20 113:19 124:3 137:8,12 161:4 172:8,14 190:19 219:2 221:7,11 272:3

**allowing** 254:25 290:8 296:3

**alongside** 108:16

**aloud** 252:18

**Alpha** 5:9 64:10 73:4

**Amandeep** 43:10 69:20 70:7

**ambiguous** 190:14 196:4

**amended** 62:14,17,21,22

**America** 18:25 182:10 187:24 189:14,15 191:12 221:18

**America's** 305:20

**American** 74:10 88:18 100:15,24 127:18 148:12 180:18 181:8 182:11 188:11,13 189:8,11 191:11 220:22

**221**:15 222:7 301:9

**Americans** 134:11 178:20 208:10 246:1

**amount** 13:24 164:11 180:13 189:19 191:20 217:21

**analyses** 292:11

**analysis** 146:1 162:11,25 163:8,12, 17 164:15,22 184:11 185:14 250:19

**analyze** 308:7

**analyzed** 250:25

**Anchorage** 4:1 11:10 12:21 13:6 25:1 107:10

**and/or** 257:22,23 263:17 279:13 295:5

**anecdotal** 189:2 221:22,24 223:8,14

**Angelita** 53:19

**angry** 113:15

**ankle** 97:4

**announce** 186:13,14

**announced** 89:3 245:9

**announcement** 210:11

**announcements** 173:2 211:14

**annoying** 113:18

**annual** 14:14

**anonymous** 307:3

**answers** 6:19

**anti-american** 191:5

**anti-terrorism** 107:11 110:6,7,18

**Antonio** 72:25 73:13

**anybody's** 222:12

**anymore** 137:8 210:12

**anytime** 24:18

**apartment** 227:2,4

**apologize** 48:21 174:7 295:20

**apparently** 128:1 157:25 163:13,20 164:9 168:16 181:22 190:23 191:10 234:24 235:17 261:10 300:13

**appeal** 276:10

**appearances** 37:6

**appeared** 172:9 227:17 232:16 234:20

**appears** 181:22 183:4,14 232:2 253:24 308:23

**application** 248:12,15 300:6

**applications** 52:17

**applied** 162:18,20 234:10 286:16

**applies** 313:7

**apply** 160:15 204:3 216:24 234:4 290:20 297:3 303:5

**applying** 98:22 162:14 163:1 221:15

**appointment** 231:17

**approach** 184:18

**approaches** 218:2

**approval** 61:17

**approve** 50:2,4,9 113:23

**approved** 120:15,16 121:20 126:2

**approximate** 25:2

**approximately** 7:18 10:1 258:2,5

**approximation** 18:1

**April** 256:24 277:2 289:1,5,13 295:18

**Arabic** 182:19 183:1

**area** 21:11,14 30:12,14 130:23 178:15

**areas** 30:17,19 112:11 150:15 151:8, 11 153:4

**Arendt** 140:8,17 176:21 241:14 267:20 300:10

**Arendt's** 62:6,7,9 173:3

**argued** 269:1

**arguing** 37:25 38:1,3 39:2

**argument** 38:5,8 39:14,15 40:8,18,22 41:8 69:2

**arguments** 37:17,18,19,22 39:1,2

**Arkose** 22:12

**Armed** 155:22,25 162:8 216:5,10,14 217:3 219:22 220:3 279:17 283:22 290:8,16 291:10,12 295:7 296:3,15,24

**Army** 8:24 9:1,2,8,10 36:1 37:2,5 39:23 44:15 47:4,6 50:20,21 52:15 53:2,4,5 74:19 75:15,16 83:22 105:17 110:1 112:3,21 118:15,19 119:23 120:2,4,12,19,24 123:1 125:2,16 129:8 135:15,17,23 136:3 138:10 144:12 148:24 151:6 154:5,24,25 162:6 167:2 169:16 171:4,8 172:24 174:16 186:5,6 190:19 195:21 210:4 218:11 219:23 220:10 236:4 242:13 248:22 257:18 258:24 259:13,15 260:2,8,22 261:8 263:5 264:9 265:15, 22,25 266:7 270:9 290:6,13 292:5,14 293:5 296:1,22 300:4 305:20 306:2,5, 13 307:2 308:2 309:23

**Army's** 292:17 293:3

**Arnold** 180:18

**arose** 8:6

**arranged** 14:7

**arrested** 205:22

**arsenal** 110:15

**article** 54:25 172:9 176:20 185:2

**articles** 105:4,8 136:1 150:23,24 167:6 170:4 173:2,12 177:22,23 178:1,6,8 180:19 181:7 270:16

**ASA** 139:23

**Asia** 199:7

**asks** 77:11 272:20

**aspects** 140:12 153:2

**assault** 107:8

**assert** 29:17 93:17

**asserted** 313:8

**asserting** 93:15 278:22

**assessing** 243:5

**assessment** 25:4 206:17 207:2 209:4 227:15 242:15 250:24 255:16, 21

**assessments** 143:17 253:7,17

**assigned** 106:19 109:25 118:14 124:23,24 125:8 127:7 222:4

**assignment** 125:6

**assist** 33:17

**assistance** 44:10,11,13,17,19,20,21

**assistant** 31:2,3,4,6,10,14,16 118:23 121:6

**assistants** 140:1 238:21

**associate** 11:21 19:5,9,21,25

**associates** 11:16 19:7 20:8

**association** 88:18 100:16,24 101:2

**assume** 70:24 87:25 145:4 213:16 228:13 301:25

**assuming** 272:10 304:18

**assumption** 204:25 304:19

**assumptions** 149:25 160:9 202:15 204:11,15,19,23 247:6

**assured** 148:11 291:6

**Atkinson** 27:17

**atrocity** 182:11

**attach** 144:19

**attached** 146:22

**attachments** 139:7,8 276:22

**attack** 172:12,15 178:13 179:22 180:7,16 274:9

**attacking** 178:18

**attacks** 172:8,19

**attempt** 216:16

**attempted** 44:13 166:22 167:9,10,13, 14

**attempting** 158:2 167:16 218:11 233:17 254:11

**attend** 37:15 41:17 69:5 101:8

**attendance** 69:1

**attended** 37:6 38:17 86:21 162:5 241:15 295:4 300:14 306:5,6

**attending** 38:5 86:23 87:15 308:3

**attention** 19:20 24:17

**attorney** 4:12 6:16 9:1 12:13 13:10 14:14,15 15:1,4 17:5 18:21,23 19:5 20:25 30:3 31:4,9 34:15 35:19,23 45:8 71:14,16 73:17 75:13,16,25 76:6,14 79:8,12,25 80:5 82:5 83:25 84:9,23 85:7 88:19,20 91:18 93:10,24 94:3 151:25 152:2,12 153:8 156:13 159:23 162:20 163:3 224:10 230:13 231:12 280:11 282:16

**attorney-client** 239:11

**attorneys** 11:13,20,25 12:4 14:4,11, 20,23 15:7,9,10,25 16:9 17:2,23

18:13,18 19:3,13,17 20:3,5,14,17
29:16 31:7 38:14,20,22,24 51:11
76:13 80:7 82:1,20,25 85:4,10,21
86:1,10 87:11 88:5,8,15 89:6,20
90:21,23 92:5 93:14 104:7 147:15
153:5 162:21 230:17,20

**attorneys'** 14:12 16:5,15,21 17:6,9,
13,19,20,22 18:12

**attributable** 270:21

**attributed** 270:7,8

**authored** 150:24

**authorities** 60:6 182:5 224:22 313:4

**authority** 59:18 60:7 61:12,15 145:9
147:12,13,16 224:14 288:12,16

**authorization** 31:9,11

**authorized** 296:14,15

**avenue** 264:14 273:20

**average** 285:5

**avoid** 7:15

**award** 20:17,20,21 153:16,18,21
154:1,2,4

**awarded** 20:14

**awards** 154:6,24 155:3

**aware** 23:24 31:22 32:7,9 33:8 49:21
58:7 67:12 70:16 79:4,7 81:1 84:19
88:23 91:18 101:16,19,23 102:19
103:7 110:19 156:24 158:1 169:3,6,8
171:2 172:23 188:16,20 191:19,22
195:6 196:16 222:8,15,16 259:5,14,25
260:3,7 261:6,9 265:7 266:6,17,25
272:11 275:9 282:15 298:12,17
305:12

**B**

**back** 18:4 21:5 23:20 40:17 59:9
60:12 64:15 84:18 87:5 108:16
111:21,22 117:24 131:11 143:8
145:17 147:2 177:3 180:17 183:3
187:21,25 188:12 189:12 195:20
196:14,19,22,24 197:2,10 204:1,4
207:11 208:20 231:15,25 238:16
240:13,20 255:13 256:19 264:25
276:16 288:7 295:16 307:4 309:9,14

**back-up** 308:17 310:1,6,12,17

**background** 36:25 47:7 86:13 114:3
152:15 159:12 201:4,7,13,15,20
202:10 203:11,24 205:2,3,5,8,17,25
206:4,5,8,16,18,19,22 207:2,4,20,23
208:2,19 210:12 216:9,12,15 232:19,
25 233:11 234:17,21,22 236:15
269:16 279:12,25 283:4,5,6 290:24
297:7 300:25 301:6,14 302:5,15,23
303:3,6,11,16,23 304:6,10 305:13

**background-checking** 201:25

**backwards** 228:21

**bad** 127:16,19 160:11 167:24 168:4
178:20,24 181:18,20 182:8 216:20,21
245:23 262:23,25 264:15,23 265:3
268:16,18

**badge** 118:5

**badly** 207:21 243:15

**bank** 23:2 226:16,18,19,20,23

**bar** 78:18 88:18 148:21

**bare** 39:9

**barred** 148:23

**barriers** 134:12

**base** 107:15 108:2,9,11,18 109:24
110:1 111:5,11 112:15 113:5 201:21,
23 202:18,20 203:14,19 204:9

**based** 36:10 127:18 147:25 148:20
149:4,22 150:15,16,17,19,23,25 181:6
187:13,14 189:1 202:16 204:10
205:25 206:3,18 207:3 209:18 212:19
213:16,17 220:18,23 221:8,22 223:2,
3,6,8,16 228:5 245:18 252:3 253:9,19
256:5 261:21 265:15,23 266:1 269:22
292:11,18 302:17,20 313:2

**basement** 180:15

**basic** 112:8 301:1

**basically** 13:23 19:1 38:25 111:8,12
119:11 120:6 121:25 124:5 134:15,20
138:15 146:18 149:4 168:4 187:25
203:10 207:24 208:18 221:20 240:2,
17 254:23 255:4 273:3 295:15 306:24

**basis** 33:9,20 51:24 59:15 80:11
122:22 123:16 127:22 131:25 139:9
147:8 166:10,24 175:6 185:23 200:24
211:8 220:16 227:8 237:3 247:15
248:6 254:2,21 275:22 276:25 283:20,
25 284:14,16 285:8,9,14 286:2 299:3
301:21 302:12

**battalion** 218:23 268:12,14

**battle** 108:16 311:19

**bear** 152:5 160:25

**bearing** 40:4,6

**began** 279:8 280:3 281:20 290:5
291:5 295:25

**begin** 289:16

**beginning** 8:11 156:7 253:15 266:16

**begins** 313:5

**behalf** 8:24 73:18 74:4 78:9 94:24
95:2 99:19 230:13,17

**behave** 110:19

**behaved** 243:15

**behavior** 181:18,20,23

**beliefs** 168:18

**believed** 221:9

**bell** 53:22

**Bellingham** 13:1,3

**belong** 174:9,23 177:17

**Benedict** 180:18

**benefit** 126:3 163:12 164:22

**benefits** 15:17 217:17

**bias** 36:15,16,17,19,21 263:12,19

**biased** 36:11

**biases** 36:6,8

**big** 11:11 113:12 120:6 122:13 127:5
135:17 177:10 263:22 267:8 271:14

**bill** 100:14 140:15,18

**billable** 18:21

**bills** 16:11

**birth** 93:25 188:9,11 189:14 220:22,
23 221:5,6,8,20

**bit** 29:6 60:13 61:19 109:16 143:8
147:20 170:2 198:5,9 202:25 225:24
272:7 293:11 304:12

**black** 90:2 207:15,17 209:6,10,13
251:23

**blah** 125:10

**blah-blah-blah** 176:22,23

**blaming** 130:4

**blank** 71:22 72:1

**blend** 126:7

**Blerta** 47:21

**blocking** 172:5

**Bob** 179:20

**bodies** 9:6

**bono** 13:24 17:16,18,24 18:2,5,11,15, 16,22,24 33:19 89:3,5 166:10,11

**bonus** 20:20,21

**bonuses** 20:15,18

**book** 16:16,21 17:9 84:8 104:24,25 105:1 150:24 178:17 179:20 181:13

**books** 17:2 105:8 179:18,19 180:1, 15,19

**Border** 11:10 12:25 21:18 27:20,25 60:13 61:13 96:2

**born** 182:10,11 187:17,18,24 188:8, 10,12 203:18,24 212:13 220:21 221:9, 10,16,18 272:5 305:20 308:25 309:2

**Boston** 73:7 103:3

**bothers** 64:14

**bottom** 139:5 201:2 255:4 309:5

**box** 233:20

**boy** 49:4 139:18

**bracelet** 97:4

**breach** 74:13

**break** 7:19,24 40:15,22 58:17,19 59:4, 6,10 93:21 145:4,12,13 147:2,4 148:3 213:3 223:22 224:4,6 288:1,9 313:3

**breaking** 107:14

**breaks** 7:18 8:10,13 40:13,14 224:11 313:3,10

**breast** 271:19,20

**briefcase** 124:19

**briefing** 290:5 295:25 308:25 309:2

**briefings** 112:7

**briefs** 39:6,16 62:10

**Brigade** 111:10

**bring** 10:23,24 12:12 17:5 59:24 74:7 110:11 127:20 160:25 161:6 274:23 292:13

**bringing** 26:13 81:9 120:7,10 126:19 127:15

**brings** 12:9

**Brits** 180:17

**broad** 184:5 216:22,23 276:14 301:23

**broadly** 275:24 276:1

**brought** 12:13 55:23 56:2 70:17 71:13 73:17,18 74:3 76:7,10 87:23 94:16,20,24 95:1 142:20,21 144:16 145:25 146:3,8,24 157:5 230:12,17 238:11 312:11,12

**brush** 276:14

**building** 125:24 130:16 227:3,5 254:14 311:17

**buildings** 108:10

**bunch** 67:21 112:5 130:1 157:5 178:19 215:5 233:14,19 236:14

**burden** 287:3

**burdensome** 180:15,21 181:1,12

**bureaucratic** 134:6 136:25 254:18 260:13

**bureaucrats** 254:18

**busted** 246:4

**busy** 26:8 69:7

---

## C

**C-H-A-O-Q-U-N** 298:20

**C-U-I** 98:19,20

**cabin** 24:6,8

**cache** 238:15 240:16

**cached** 146:5 238:10,13 240:6,7,15, 23 241:1

**caching** 239:3,5

**Cai** 48:2,4

**California** 72:13,21

**Calixto** 234:9

**call** 6:11 33:15 52:6,14 71:6 75:10 90:4 100:18,21,23 115:6,9 120:8 133:19,21 135:19 136:14 138:12 140:21 155:23 156:3 169:20 170:23 184:22 185:3 215:18 310:12

**called** 5:24 11:20 75:13,17 79:5 84:20 108:1 120:18 121:7 131:3,13 155:24 226:15 238:14 281:16 294:16,20 309:4

**calling** 64:12 136:15 209:25

**calls** 30:21 77:10 104:25 132:3,6 260:16

**Canada** 188:5,8 201:14

**Canadians** 201:12

**canceled** 231:19

**cancer** 271:19,20

**capability** 292:17

**capacity** 28:14 33:17,18,20 125:2 131:23 219:12 294:9

**Capitalists** 171:20

**caption** 91:8

**car** 107:20

**card** 41:20 192:12,15,18,22 208:10 311:23

**cards** 290:10

**cards'** 296:6

**care** 122:13 280:17 296:17

**career** 47:4 106:5 111:1 113:13 162:15 210:15 291:8,12

**careers** 149:4 160:19,23 161:10 163:19

**Carr** 140:15,18

**carried** 178:24 246:12

**carry** 62:9 161:3 163:14

**carrying** 124:19 167:16

**Cascadia** 11:9 12:24 21:18 27:19,24 60:13 61:13

**case** 4:14,24 5:3,5,12 6:2,4,9 9:24,25 10:7,19 12:10,11,14 16:3,4,10 17:18, 22,24 18:22,24 26:13,15,17,24 27:1,4 28:6,8,9,12,13,16,17,21,22,24 29:1,8, 11,16,21,22,25 30:2,4,22 31:1,20,21, 23 32:1,8,14 33:9,24 34:2,6,7,8,9,13, 16,19,24 35:6,16 36:7 37:7,8,21,23,25 38:7 39:3 40:2,12 41:4,23 43:2 45:25 46:2 47:8,10 49:15 51:25 53:25 55:15, 16,18,20,22 56:1,8 57:1,16 58:8,11 61:19,21 62:12,15,20 63:3,8,13 64:1 66:4,8,12 68:23,25 71:23 72:11,12,14,

16 73:6,8,11 75:19 76:1,2,3,7,9 77:10,
11,12,24 78:7,21,22 79:4,7,8,15 80:1,
8,15,18,21 81:3,9,10,12,14,24 82:3,
21,22,24 83:2,3,6,13 84:2,8,10,16,19,
23 85:5,8,22,24 86:10,20,22 87:1
88:5,9,24 89:3,5,8,21 91:5,9,13,22
92:1,2,4,12,16,23,25 93:6,11 94:7,12
97:25 98:4,8,12 99:7 100:4,7,9 104:19
135:5 136:15 147:21,22,24 149:12,17,
20 150:3,6 151:6,10 152:13,15
156:10,12,13,15,19,22,25 157:13,18
158:14,18,22 161:12 163:9,12,24
164:16 165:11 166:8 167:3 169:6,8,11
185:25 188:4 192:6 202:1 203:16
205:4,6 211:1 222:2 224:16,18
227:17,19 231:8 233:6 236:11 237:21
238:1,6,8 241:9,10,11,12,13 245:19
248:18 249:11 250:12 252:8 256:23
257:5 264:13 272:13 274:22 275:22
276:7,22 279:3,20 280:7,20 281:8,14
282:6,14 283:10 284:14 287:7 288:14,
17 289:9,14,17,22 294:3,6,9 299:8,15
301:8,9,18 305:2 310:12

**case-by-** 275:21

**cases** 5:16,21 12:3,6,9 17:15,21 18:2,
5,10,15,16 20:13,24 26:6,8,9,19,21
27:2,6,7,15,21,23 28:4 29:3,9 30:23
31:12,15 57:4,7 71:12,14,16,20 72:3,
4,7 73:16,20,21 74:4,7,15,20 75:1,3,6,
8,24 76:12,18,21,22,23 77:5,6,19,22,
25 78:3 94:10,15,19,24 95:1 96:12,16,
17 97:2,12,18 98:10,11 104:11,14,22
105:3,5,6 108:13 155:10 160:9 161:3
166:15 174:21 178:7,19 179:25 188:2
194:2 198:23 224:21,24 227:18
229:20 230:8,12,17,19,22 233:20
234:10 263:4 270:3 276:8,11 284:10

**casual** 26:17

**catch** 267:18 273:13

**categories** 133:15 217:12,13 296:16

**category** 184:8 217:14

**Cato** 145:25 177:24,25 219:8

**caused** 134:7 160:4

**causing** 134:21 228:1

**center** 108:22 188:21 285:6

**Central** 18:25 117:22

**Century** 134:20

**ceremony** 291:3 297:11

**certainty** 143:9

**certificate** 57:13 221:5,7,8,20

**certificates** 220:23

**certification** 63:13

**CFL-MAVNI** 293:1,3

**CFR** 9:3,13

**chain** 138:25 139:5

**challenge** 234:1

**challenged** 164:16 211:1 272:13
274:6

**challenges** 307:19

**chance** 230:10 234:13

**change** 65:1

**changed** 282:2

**channel** 233:25

**Chaoqun** 169:6 298:19

**chaptered** 135:15,16

**chapters** 150:24

**character** 269:19 270:5 271:12

**characteristic** 182:7

**characteristics** 212:14 223:17
292:11

**characterization** 185:24

**characters** 170:9,12,22

**charge** 13:21 107:23 110:2 120:1,12
184:21 268:13

**charged** 169:10 300:1,2,15,16

**charges** 177:10,13 300:9

**charts** 236:13,14

**chat** 129:21

**check** 32:2 63:20 81:21,22 88:3
114:4,6,7,8,11 154:20 165:22 180:8
201:13,15,20 203:11,24 205:2,3
206:11,12 216:24 218:13 238:17
240:2,3 267:14 271:18 275:2 281:18
290:25 297:8 303:11

**checking** 107:14 114:9,11 115:18
117:21 122:17,19 216:9,13,15 220:14,
15 232:17 233:20 238:19,20,22,24
239:9 273:11

**checks** 12:1 86:13 114:3 159:12
190:22 232:19 234:21,22 236:15
273:10 279:12,25 281:21 282:2,3
283:5,7 290:24 297:7 300:25 301:6,14
302:5,15,23 303:3,6,16,23 304:7,10,
11 305:13 310:22,23 311:8

**Chelsea** 178:21

**Chettri** 40:20 46:17,23 47:1,3,8,12
69:11,23

**child** 22:24,25 107:9

**children** 22:20

**China** 171:12,14 172:6,12,14,15
201:16 204:1,2,7

**Chinese** 171:7,8,17,25 172:3,8,10,11,
13 244:10 246:24 265:12 273:20

**Chinese-language** 171:15 172:2,19

**chose** 202:23 203:1 209:18

**Chris** 176:21 267:20,25 300:10

**Christopher** 140:8,17 173:3 241:14

**CI** 84:17 142:20,22 143:3,4 144:16
146:8,16 160:5 184:23 206:1 225:9,
17,23 227:22,23 228:8 229:12,24
232:3,5,22 233:3 235:1,2,5,6,12,15,
16,22 236:16 312:10

**CI-FOCUSED** 190:24

**CIA** 173:8 174:13 175:23 176:5 178:3
179:21

**CID** 263:2

**Cindy** 44:1,2 75:12

**circumstances** 202:11

**CIS** 206:6

**citation** 153:25

**citations** 59:22 60:1

**cite** 288:12

**cited** 9:25 60:6 224:17,19,20 283:10

**citizen** 148:12 152:16,17 166:21
169:5,7 181:19,24 182:11 188:8
189:11,13 210:19 247:4 248:10 291:9,
13

**citizens** 127:18 148:7 152:18 157:21
159:14,17 170:24 171:8 178:12 180:6
181:8 182:16 186:24 188:11,13
207:14 212:11 213:6 216:3 220:22
222:7 245:9 262:21 290:20 297:3

298:14 301:7,10,15 302:6,24 303:17
304:7,16

**citizenship** 30:15 56:3 74:10,12 96:3
103:4,18 136:21,22 137:2,3 150:8,19
152:4 182:14 186:14 188:6 189:9
191:11 192:25 248:15 291:1 297:9
300:6 303:6 305:2

**city** 28:21 218:21,22,23 268:11

**civics** 290:25 297:8

**civil** 134:19

**civilian** 109:17 130:13 203:21 299:14
303:10,12,24

**civilians** 107:13

**claim** 148:2 239:11

**claimed** 300:11

**claiming** 173:7,19 203:11 227:9
245:6 255:2

**claims** 26:12,14 33:9 39:3,4 46:2
51:24 55:20,21 74:13,14 78:9 87:23
88:24 158:18 245:14 246:7 284:15

**Clapper** 273:25

**Clapper's** 178:17 179:20

**clarification** 112:24 117:25 289:7

**clarify** 91:14 102:10 140:25 141:20
200:19 230:2 247:8 277:17 302:9

**class** 63:12 80:25 83:6,11,12,15,16,
17,20 84:14 160:13 285:6

**class-action** 33:21

**classes** 101:8 112:5 245:12

**classification** 128:13

**classified** 9:6 112:22,25 115:12
127:10 128:3,7,22 129:2,5 135:2,5,9,
12,25 138:14 139:10 141:5 143:19,21,
22 144:2,6,10 242:21,23 243:1 244:3
245:1 247:9,20,23 249:1,2,4 250:22,
23,24 252:2,6,9,10,14 253:10,20
255:1,15,16,18,21

**classifying** 164:4

**clause** 202:4 251:19

**CLE** 102:16,19

**clear** 8:11 71:2 163:16 190:3 202:22
236:22 242:17 245:19 312:25

**clearance** 90:1 113:25 114:5,16,18,

23 115:1,8 116:7,10,13,15,19,21,24
117:8,12,14,16,19,21 118:3,6 128:10
135:12 137:6,8 144:1 148:22 182:23
205:18 207:5,6 217:6 221:13,14,19
234:4 275:12,16,18,20 276:6,10

**clearances** 113:22,23 114:10,14
117:9 137:6,13 207:23 208:22

**cleared** 90:1 159:11 190:23

**clearing** 86:15

**client** 17:25 19:1 55:17 56:10,12
82:12 83:20 90:3,5 135:21 239:8

**client's** 82:18

**clients** 13:21 28:23 29:8 55:14 82:11
83:8 84:17,18 86:12 89:23 93:18,19
133:19 239:7

**climbing** 22:11

**closed** 50:1 74:4

**closely** 20:1 111:15

**cloud** 207:16,17 209:6,10,13

**co-counsel** 26:25 27:7,12,16,20,22
28:5 29:10,23 30:3 76:4,16

**coaching** 313:13

**Code** 107:13 156:4

**coin** 154:24

**Colin** 94:9,10 231:3,13

**colleague** 8:8

**collect** 207:9 218:9 273:25 274:1

**collected** 179:15 195:21 197:11
234:11

**collecting** 121:2 167:23

**collectively** 226:4

**college** 105:15,20 162:5,7 295:5

**colonel** 44:6,7 75:12 111:4 199:2
210:4,9

**Columbia** 84:20

**combat-related** 106:18

**combatant** 125:20

**Combined** 162:8

**comma** 185:7

**command** 118:20 119:23 120:5,12,
24 125:15,17,19,20 126:4,5,11,15

133:21 135:18 153:20 306:2,13 307:2
309:23

**commander** 137:18 138:7,20,24
162:7 218:22

**commanders** 133:2 136:7,8,16,18
137:14,21 138:8,11,12,18 139:11

**commenced** 299:25

**commendation** 153:19 155:1

**commendations** 155:3

**comment** 124:3 138:15 235:24 236:3

**commented** 45:17 235:25

**comments** 139:7 182:22 211:18
307:4

**commission** 88:18 106:11 131:2

**commissioned** 105:15,23,24 130:21
150:17 292:7

**commissioning** 105:16

**commitments** 131:15

**committed** 181:24 182:11 184:22
300:14

**committee** 155:19,22,25

**committing** 300:11,12

**common** 16:8 29:14,15,16 64:8,13
79:24 93:16,17 94:1,5 133:25 139:2
168:7,20,22 183:25 187:17,22 188:5,
14 193:11 196:1 197:20 202:6 220:20
248:23 257:13 271:6,11 281:22
311:12 312:1

**commonly** 197:19,22,23

**communicate** 80:7 133:6

**communicated** 42:1 49:14 94:9
134:25 214:2

**communicating** 88:7 132:21

**communication** 42:4,12,13,16
43:15,18,24 45:12,19,22 46:5,10,16,
19,23 47:14,20 48:1,7,11,24 49:7,8
53:8,13,14,18,21,24 54:2,4,8,12,15
55:1,6,13 59:16 80:4 85:17

**communications** 29:7 41:22 42:11
43:23 54:19 88:4 131:22 132:20
133:16 137:3 147:9 213:11,22

**community** 120:25 121:4 134:9
173:23 174:1,9,18

**companies** 241:2

**company** 232:18,20,25

**comparative** 222:12 245:8

**compare** 292:12

**compared** 264:6 265:6

**comparison** 271:15

**compel** 300:5

**compensated** 45:1,4 77:14,17 79:20
150:2,4 166:12

**compensation** 14:7,12 15:23 16:1
56:7,25 77:23 78:12 99:15,16,18
100:5,11 166:7

**competent** 15:9 51:21

**complaining** 231:2,4,13 232:20

**complaint** 31:25 32:14 41:23 53:25
57:15 58:8 62:11,15,18,20,21,23
289:19,22

**complaints** 129:21,24,25 232:24

**complete** 6:18 7:6 112:5 156:21
160:2 290:23 297:6 301:2 303:16
304:15

**completed** 270:2,9

**completely** 227:1 229:3

**complicated** 23:9

**comprehensive** 159:19 180:22

**comprehensively** 179:22

**comprised** 258:5

**computer** 202:17 309:19

**computers** 12:5

**conceive** 35:1

**concentrate** 30:14,17

**concentrates** 30:19

**concern** 86:18 122:13 184:14 248:7

**concerned** 126:17 138:2 183:7,9
243:9 264:10 272:23

**concerns** 71:4 127:17 129:15 134:2
141:23 142:7,12,15,17 150:10,12
152:20 176:7,8,10,13,18 181:18
255:24 258:8 272:10 300:23 301:4,12
302:3,22 303:14 304:5,13,18,20

**conclude** 228:23

**concluded** 223:16 292:10 313:15

**conclusion** 164:15,25 167:5 178:11
179:11 180:10 211:8 219:20 220:6,16
221:21 233:7,21 264:5

**conclusions** 149:18,21 158:13
162:12,19 163:4 188:25 204:23
242:22 244:3 252:24 262:17,19

**concrete** 265:20

**conditions** 21:3

**conduct** 116:12 117:7,13,17 118:4
168:2 206:22 271:2 290:17 297:1
300:25 301:2,6,13 302:5,23 303:10
304:6

**conducted** 118:2 160:5,6 235:4
257:17 258:11,16,23 259:1,5,12,14
260:1,7

**conducting** 206:19 207:3 233:10

**conducts** 302:14 305:13

**confer** 313:5

**conference** 103:2 306:4 307:7,8,10,
11 308:3 309:4,11,16,24,25 310:15,21

**conferences** 209:1

**confirm** 257:18

**confirmed** 90:3 222:1

**conforms** 147:14

**confused** 143:7 227:20 267:25
300:18

**confusing** 130:11

**confusion** 130:7,8,10

**Congress** 133:13 155:17,18

**congressional** 133:13 140:1 156:8

**conjunction** 248:16

**connection** 91:13 92:12,16,22 93:6
135:4

**connections** 199:17

**consideration** 250:22

**considered** 121:4 152:20 210:19
225:17 261:19

**considers** 252:24

**consistent** 293:2

**consists** 299:7

**constant** 310:25

**constantly** 64:15 271:10 311:5,18

**constitute** 159:12 164:16 281:13
291:17

**constitutes** 282:6

**Constitution** 148:16

**constitutional** 36:11 37:1 150:9,12
153:24 159:23 163:6 164:20 184:1
275:17

**consult** 114:19

**consultant** 35:6,7,8 77:6,9,15,18,21,
25 78:3,23 79:15

**consulting** 31:7 77:2 79:3 292:8

**contact** 48:18 52:1,3,5 74:23 104:9,
11 136:11 170:16,17 219:19

**contacted** 32:19 48:23 74:25 75:3,6
87:20 104:13,18 173:18 272:19

**contacting** 48:14 87:25 97:10

**contained** 91:23 278:7,22 279:5
282:22 283:1,13,25 294:14,15

**content** 26:18 29:20 60:9

**contents** 145:8 223:25 224:10

**contest** 230:10

**context** 99:7 176:9 203:8

**contexts** 91:19 97:24

**continuation** 213:5

**continue** 160:13,18 161:9 225:4
296:11 308:12

**continued** 111:21 159:9 183:15
200:22

**continues** 181:16 225:20 307:24

**continuing** 101:9 102:13,15 133:23
159:6 160:16 161:9

**continuous** 148:25 159:10 182:18
273:17

**continuously** 210:14 217:24

**contract** 74:13 77:24 78:4,6,14,17,22
79:2,3,23 218:6 219:3 290:22 297:5

**contractor** 130:14 149:3 160:20
199:11

**contractors** 160:18

**contracts** 123:20

**contractual** 77:20 79:17

**contradict** 229:3

**contradictory** 226:24

**contrary** 60:7 267:20

**contrast** 252:19,20,21 253:7 280:13

**contributed** 180:1

**control** 13:3 31:17 50:6 160:7 203:15 239:1

**controlled** 8:20

**controls** 172:13 292:19

**convenience** 286:21,22,23,24,25

**conversation** 26:17 28:12 101:24 103:22 104:5 161:18

**conversations** 28:20 29:2 58:21 132:9 134:1,4,22 137:14,21 139:14,17 142:11,14 175:7 176:25 209:24 212:21,23 213:11,18 214:13,18 215:1, 13

**convey** 30:25 31:6

**conveyed** 8:8 213:19,23 214:14

**convicted** 243:12

**conviction** 243:25 244:6

**convoy** 108:16,17

**convoys** 108:15

**Conway** 27:17

**Cook** 268:12

**cool** 110:15

**coordinate** 122:6 185:4

**coordinated** 220:8

**coordination** 121:21,23

**copied** 94:8 269:7

**copies** 146:7,11 306:11 312:16

**copy** 12:4 83:7 84:8 90:6 92:10 144:25 146:2,10 225:11 238:11 241:6 271:12

**copying** 270:24

**Corporation** 242:11

**Corps** 105:14

**correct** 5:22 14:2 20:22 22:19 26:10 31:25 33:25 35:14 41:24 62:2 64:9,12, 15,25 65:6,13 71:7 81:19 82:6 100:2, 25 123:25 124:4 130:22 137:9 143:15 146:17 170:7 175:13 190:8 209:4 225:19 233:12,25 234:1,2,12 247:18 255:10 266:19,22 270:1 276:23 277:14,22 285:16 289:2 293:24 298:5 309:3

**corrected** 62:1 81:18

**correcting** 64:15 271:11

**correction** 62:4

**correctly** 194:15 298:24

**correspondence** 43:6,9 49:2

**cost** 163:13,14 164:10 242:13

**cost-** 163:11 164:21

**cost-benefit** 162:10,24 163:8,22 164:14,18

**costs** 16:9,25

**coterminous** 119:2

**Council** 174:13

**counsel** 4:16 8:9 10:12 11:21 19:6, 10,12,22,23 20:3,6,12 26:22 32:25 38:18 58:22 76:3 78:7 89:14 92:2 159:24 313:2,5

**counsel's** 40:7,10

**count** 12:16 95:14,21 229:8

**counted** 146:9

**counteract** 245:11

**counterespionage** 112:18 113:6

**counterintelligence** 10:1,5 112:17 113:3,5 184:25 225:9 251:4,11,20 252:1,12 256:1 257:23,25 258:6,8 262:24 263:1,9,19 272:17 275:4 281:17

**counterparts** 292:16

**counterterrorism** 36:2 106:21 109:20,22 110:2,6 251:1

**counting** 19:13 229:7

**countries** 212:14 220:21 232:13 266:14 271:2

**country** 21:3,5 96:18,19 153:5 185:8 192:20 197:12 201:9,11,19 202:1,10, 13 203:12,13 219:11 221:11

**couple** 16:16 43:22 56:11 86:7 100:5, 13,14 103:5 108:1 109:14 131:25 158:5 193:9 213:2 291:19 300:20,22

**courses** 112:2

**court** 5:12,13,14 6:1,10,11 7:9 37:6 39:6,9,17 40:16 55:24 59:25 69:2 70:17 71:12 72:12 73:13 79:5 81:14, 17 82:7 86:16,17,19,21 87:3,8,9,12 89:11 94:17,21,22,24 95:1,24 176:11 179:25 181:21 231:9,11 299:8 300:9 305:6

**court-martial** 246:2

**courtesy** 132:14

**courthouse** 87:4 157:3

**courtroom** 87:5 157:5

**courts** 9:5

**covers** 193:21 212:25

**create** 113:9,10 179:9 240:25

**created** 134:7 141:4 148:25 150:11 207:15 269:7,10

**creates** 252:7

**creating** 53:3

**credentials** 296:19

**credible** 252:25

**credit** 16:11 41:20 102:16

**cried** 213:13

**crime** 184:21,22

**criminal** 156:10 157:1,9 169:11 205:21 216:19 244:15,22 245:3 248:16,18 257:23 263:17 271:25 272:2,5 273:11 276:11

**critical** 161:25 162:13 290:7 292:17, 23 296:2

**critically** 162:23

**Cross** 11:10 12:24 21:18 27:19,25 60:13 61:13

**Cruz** 188:7,8

**crying** 213:14,21 215:16

**Cui** 98:21 99:3,19,21 100:6,7

**Cuis** 100:12

**culminated** 260:16

**cultural** 126:6

**curious** 87:9 236:23

**current** 11:7 31:20 71:20,21 72:3,4,7 73:16 76:18 140:4 144:11 175:1,9,15 176:4 255:11,12

**curriculum** 112:4

**Curtis** 66:20 67:13 68:9

**custody** 97:3 108:23

**Customs** 96:2

**cut** 154:7 194:23 278:25 287:1 295:20

**cut-off** 190:1

**CV** 154:3

**CVP** 96:16,17,20,22 98:2

## D

**D.C.** 67:15,21 69:8 79:5 86:4,8 87:3

**DACA** 193:20 198:13

**DACAS** 193:16 198:10,11,15

**daily** 122:22

**Dallas** 73:12

**Dandridge** 67:7 68:18

**dangerous** 138:16 208:13,24 210:2,6 263:21 264:1,6,14,22

**dangers** 245:11

**Daniel** 66:23 68:11

**data** 113:17,19 162:11 177:6,7 178:10 179:10 180:9 181:5 186:24 188:21,22, 24 195:21 197:2,8,11,13 222:12 236:10 245:8 250:21,22 253:10,20 273:24

**data-driven** 206:10

**database** 201:25 206:13

**databases** 177:15 201:10,11,18 206:11 216:25 218:14 273:12

**date** 22:14 32:2 54:1 93:25 131:5,9 166:19 225:7 241:22 250:9 273:14 277:6,7 289:18,20 298:12 306:17

**dated** 165:6 277:2,3,4,13 289:1

**dates** 56:14 100:1 180:17 289:5,6

**David** 18:24

**day** 25:15 27:6 87:3,8,13 134:15 157:4 167:1 177:13 233:15 240:12,13 294:5 305:6

**days** 80:6 106:15 109:15 187:22 192:12,16 198:24

**DCII** 114:7 117:21,23

**deadline** 307:6

**deal** 110:13 120:18 121:12 122:1 150:11 164:9

**dealing** 78:24 123:12,17 128:9

**dealt** 121:25

**dean** 44:3 75:12

**debate** 168:23

**debated** 168:9,19,21

**decide** 97:2 107:19 116:20 182:5

**decided** 14:9 15:14 191:3 268:25

**decision** 12:9,12 96:20

**decisions** 12:2,4,6 58:13 60:16,18,20 61:7 253:8,18 254:1 266:7,10

**deck** 309:12

**decks** 123:23,24

**declaration** 35:12 131:3,14 249:10 250:5,7,16 251:7,15 255:14 256:23,25 260:7 269:12,18 272:9 276:18 277:3, 4,13,17 278:2,6,10,14 279:5 280:19 281:7,12 282:17,21 283:13 284:3 285:15 286:5,9,14 288:21 295:17 297:25 298:9 299:1

**declarations** 9:24 40:1 276:21,22 283:11 286:19 287:8 298:6

**deemed** 211:6,9,24 212:3,17

**deeming** 227:25

**deep** 160:9

**Def's** 139:24

**defend** 158:2

**defendant** 5:7 74:15

**defendants** 38:24

**defense** 32:24 65:15,21 71:6 79:6 117:21 121:24 123:1,2,4,10 124:13,22 125:13,22 127:2,8 129:17 135:24 136:3 139:21 141:18 148:14 152:8 153:17 156:13 157:9,19 159:25 160:21 161:2 174:11 179:21 181:18

**day** 183:6 188:21 199:11 206:14 210:16 211:15,21 233:10 249:17 250:24 255:15,20 256:9 265:14 268:18 292:15 296:14

**deficiencies** 252:23

**definition** 36:24 168:9,18 198:11 287:13

**deletes** 139:5

**demeanor** 38:11,20 39:20

**demonstrated** 296:20

**demonstrates** 177:6

**denaturalization** 247:5,13,19 248:2, 8,19

**denaturalizations** 247:22 248:21

**denaturalize** 248:14

**denaturalized** 243:18 248:17

**denied** 276:11

**dental** 231:17

**Denver** 26:15

**deny** 275:19

**department** 4:13 8:7 32:24 58:20 65:15,21 71:6 79:5 84:20 96:4 97:8, 10,16 98:10 99:3 107:11 129:17 135:24 136:3 148:14 152:8 153:16 157:19,25 158:1 159:2,3,25 160:21 161:2 166:25 169:12 174:11,13 175:2, 10,19 176:4,5 177:11,12 179:6 181:18 183:6 185:5 199:14 201:18,19 206:14 210:16 211:14 216:22 217:21,22,24 218:7,12 219:5 221:1,25 231:12 233:10 243:19 248:12,13,14 256:9 257:17 258:24 259:13,15 260:2,8,22 261:8 265:14 267:24 279:13,14,15 280:1 290:24 297:7 311:8

**depend** 202:10 276:7

**depending** 85:14 184:20

**depends** 78:24 80:19 194:16 203:13 206:10 259:16

**deponent** 4:6 8:9

**deport** 96:10 97:3

**deportation** 97:23 298:13 299:13,15

**deported** 122:14

**deposed** 4:20 5:2,17,25 6:3,9 236:21

**deposing** 67:17

**deposition** 4:18,24 5:20 6:7,10,12
8:7,9,10,11,12 9:20 10:9,13,16 11:2
28:21 35:4 58:22 59:11 60:2,10 66:20,
23 67:1,4,7,10,13,25 68:6,11,14
69:11,14,17,20,22,25 70:3,6,23
100:19 112:21 145:8,10,11 147:3
155:13 223:25 224:5,10 225:15 231:3,
18 236:20 237:16 241:25 288:4,8
312:22 313:2,5,6,12

**depositions** 6:16 67:15,19,21 68:3,9
69:5 231:7 242:1

**deputy** 111:20

**derive** 188:6 189:8

**derived** 188:9 191:10

**descent** 171:17

**describe** 121:18 124:21 142:17 150:5
209:13 227:7 277:12

**describing** 154:21 277:11

**description** 155:10

**deserving** 275:25

**designated** 5:3 156:18,20

**designed** 194:21 290:7 296:2

**desire** 159:13

**destroyed** 149:4

**detail** 118:14,17,18,19,22 119:3,6
121:19 125:1 128:11,23 129:3,10
228:9 286:15 310:11

**detailee** 125:2

**details** 23:10 115:16,25 118:25 119:1,
14,21 128:4 283:6

**detention** 108:21

**determination** 114:19 207:5 216:11
220:1 275:16 305:15

**determinations** 116:14 117:9,15
118:3 304:15

**determine** 116:23 164:22 182:3
313:7

**determined** 299:16

**determining** 118:3 216:17

**DHS** 121:23 122:4,5,10,16,18,21
135:6 267:14 273:10 299:12,25 300:1,
2,5

**Di** 49:3,7

**dialogue** 103:4

**dictionary** 168:7

**difference** 19:21 21:19 237:1,14
280:8 285:17 286:2 287:17

**differences** 311:22,25

**differentiate** 158:21

**differently** 29:6 304:12

**difficult** 153:3 181:12 202:2 203:11
205:9,25 206:16,17 220:13 222:9,25
223:18 270:17

**difficulty** 126:4,8 201:4,6 202:9 207:2

**diminish** 243:1

**direct** 100:4,11 171:16

**directed** 238:21

**direction** 31:17 276:13

**directly** 49:20 138:9,20

**director** 103:3 150:21 174:12 249:16

**Directorate** 249:16

**directs** 17:25

**disagree** 8:16 209:3

**disagreement** 224:23

**disburse** 13:22

**discern** 282:13

**discerned** 213:13 229:20 230:1

**discharge** 228:5 233:14

**discharged** 228:1 230:9 303:9

**disclosure** 9:7,9,12 91:24

**disclosures** 70:10,13 156:25

**discovery** 10:19,22 91:19 236:11,12,
23 237:7,8,20,22,25 238:2,8 242:8
258:21

**discrepant** 271:9,10

**discriminate** 148:20 182:6 184:7

**discriminated** 48:19 129:23 164:6,7
284:15

**discrimination** 32:20 147:24 152:19
158:7 159:3,7,13 160:3 163:7 164:1,
17 184:8 284:17

**discriminatory** 33:11 157:20 159:10

**discuss** 8:10,12 26:6,21 28:3 29:1
30:6 47:8 51:2 54:18,23 59:10 60:9
86:9 104:5 127:21 134:23,24 141:22
142:7 145:7,11 147:3 224:5,10 288:8
307:11

**discussed** 26:9,11 28:7,9,15 29:9,11,
21,24 30:4 42:23 47:9 48:16 54:24
57:5 78:14 86:11 140:9 173:8,20
174:10 198:5 221:25 261:10 298:19
310:21

**discussing** 12:10 28:12 29:18 43:1
127:12 138:3 176:12 223:24 308:19

**discussion** 103:8 139:6 174:4
308:18 310:15

**discussions** 133:18 139:11 140:4,7
174:1,5,15,24 218:15 260:15 310:16
313:2,10

**dismiss** 63:16

**dismissed** 71:20

**dispute** 251:15,18 254:14,21

**disregarded** 128:2

**distress** 213:15,24 214:1 215:18

**distressed** 213:8,12,14 214:3,15,19

**distribute** 83:7

**district** 4:15 5:12,13,14 70:17 71:12
72:12,13,15,21 73:10,13,15 76:7,9
79:5 84:19,20 94:17,21 95:24

**diversity** 36:9,14 37:4

**Division** 9:1

**divorce** 30:22,23

**divulge** 112:24 115:12 127:10

**DMDC** 192:8

**doctor** 210:3,9

**document** 63:10,21 65:17 82:13
90:19 91:15 92:5,9 137:9 142:25
144:20 165:6,7,9 169:13 236:15
241:24 242:2,4 249:8 256:16,22 257:2
276:17 277:10,22,24 278:10,15,23
282:18 283:1 285:13 288:24 289:2,6
293:20,25 294:15,20 296:12 297:24
298:3 305:18,23 306:16 309:7,21
312:9

**documentation** 260:18

**documents** 10:23 11:1 63:18,20 65:15,20,24 66:12,14,15 82:2,7,12,14, 15,19,20 83:1 84:10,12,13,14,15 89:7, 9,15,16,17,19,22,24 90:13,16,17,21, 24 91:4,5,8,12,20,22,25 93:4 122:17, 19,23 123:17,19 137:22,24,25 138:1, 3,5 141:11,13,16 142:6,10,16,19 143:10,11 144:15 145:25 146:18,20, 21 151:6 171:6,10 178:8 181:21 199:25 212:3 218:8,10,12,15 223:5 255:14 260:20,21 261:2,3,7,9,13,15, 18 262:6,8 267:12,15,17 297:21 300:22 312:10,16,23

**Dod** 9:3,10 39:22 74:11,19 125:16 134:14 138:10 140:23,25 141:2,10 142:16 144:11 148:19 149:2 159:5,7, 24 160:16 161:7 164:9 173:6,18,19, 22,23 176:22 181:21 183:4,9,18 184:13,14,18 185:7,19 186:13,23 188:19 190:3 191:24 194:23 201:8 203:10,15 204:25 205:14 207:18,24 208:17,23 210:5 211:4,5,20,24 212:22,24 213:8,24 214:4,15,19 215:24 219:24 220:10 222:11 225:9 236:11,23 237:7,8,20,22,25 238:2,8 242:7 243:9 245:5,9,14,16 246:7 250:23 252:23 253:25 254:3,6,17,21 255:1,11,17 257:17,22 258:3,5,9,15, 17,23 259:1,5 260:1,8,12,22 261:8 265:11,15,22,25 266:5,7 272:10 281:14,24 284:18 292:7 300:23,24 301:4,5,12,24 302:3,4,14,21,23 303:6, 10,14,15,23 304:5,10,13,20,22 305:2, 12,14 306:5 308:2

**Dod's** 173:1 185:24 207:13 209:19 253:7,17 271:1

**DOG** 139:24

**DOJ** 94:8 177:13 298:21

**DOJ's** 145:9

**dollars** 16:16 183:1

**domestic** 107:8 169:1

**double-check** 105:22

**doubt** 40:18 251:5 253:16,22 262:15, 19 264:2,4,5

**download** 272:20

**dozen** 4:23

**dozens** 221:4

**draft** 62:11,14,17,22 63:7,9,12,15,19, 25 65:2 72:5 133:14 144:20 165:18,

24,25 307:1

**drafted** 123:20,21

**drafting** 123:17,19 124:8 278:1

**drafts** 61:20,24 65:5 66:3 81:13,16

**drawing** 71:22 72:1

**drawn** 252:24

**drive** 113:17,19 312:19

**drives** 113:13,14

**drop** 215:25

**dropped** 215:23 303:8

**Drugs** 107:8

**Dubey** 239:18

**due** 160:14 213:24 220:22 234:2,6,9 269:19 276:9 304:3

**dues** 101:8

**Dugan** 60:2 224:17 288:14

**duly** 4:6

**Duncan** 43:12,15,18,23 75:14,18 99:10,11

**duties** 132:5

**duty** 47:5 109:4,7,8,9,10,13 131:3,9 132:22 133:3,5,7 238:7

---

## E

**e-mail** 25:11 52:6,14 85:19 87:7 88:12 94:7,9 125:9 138:21,24 139:3 169:20 274:2

**e-mailed** 306:10

**e-mailing** 52:15

**e-mails** 52:13 84:18 123:18 138:13, 18 211:17 212:21 275:3

**earlier** 12:10 37:12 75:11 249:25 298:19 309:16

**early** 105:16 198:24 241:20 273:3

**earn** 14:1,2 16:10,16 17:2

**earned** 182:14

**earns** 16:3

**easier** 157:11 201:13 222:22 291:21, 23

**easily** 300:18

**easy** 201:20 202:20

**Echo** 5:11 73:5

**edition** 105:2

**educate** 274:8,11

**education** 101:9 102:14,15 133:23 162:4,16 280:11 292:20

**educational** 47:6 162:9

**Edward** 178:22

**effect** 160:4 212:9

**effectively** 170:6 269:23

**effects** 161:9,10

**efficient** 295:19 296:9

**electronic** 312:16

**elements** 245:20

**Elianis** 94:10,14

**eligibility** 116:7,13 117:8,15 118:3 275:16

**Elmendorf-richardson** 108:2

**employed** 160:20 174:19,23

**employee** 11:18 61:13,16 203:21

**employees** 11:12 14:1,2 15:21 140:4 175:1 176:4 232:18,24

**employer** 99:20

**employment** 11:8 60:16 199:17 269:19 270:5

**encouraged** 32:25

**end** 60:10 105:23 155:7 185:6 246:10, 15,19,20,23,25 247:2 252:25 281:18 312:16

**ended** 75:22 120:20 222:5 245:23 246:1

**enemy** 244:9

**enforcement** 106:18 115:13 127:10

**engaged** 166:22 181:25

**engages** 182:2

**engaging** 157:20

**English** 172:10 188:2,3 202:6 290:25 292:23 297:8 298:21

**enhanced** 182:18 185:19

**enjoying** 293:15,16

**enlist** 105:11,12 190:19 191:21
192:10,14,17 218:11 221:7 251:2
270:18 272:11 290:9 296:4 300:24
301:3,5,13 302:4,22 303:15 304:2,14
310:23,24

**enlisted** 120:5 123:13 166:21 171:8
172:22 192:25 195:8,13 196:18
279:11,24 291:6

**enlistees** 242:15 290:13 296:16,19,
22

**enlisting** 192:18 279:17

**enlistment** 123:20 148:23 190:22
207:22 218:5 219:2 281:14 290:15,21
296:23 297:4 302:17 304:3

**enlists** 247:4

**enormous** 13:23 75:2 180:13 187:24
188:10

**enrolled** 206:14 299:13,23

**ensure** 112:14

**enter** 213:6 264:16

**entered** 148:8,10 157:21 172:16
207:14 216:3

**entering** 107:15 217:16

**entire** 105:1 106:5 139:6 164:5 180:2
189:11 207:18 208:23 222:3 245:6
246:16 264:22 276:14 278:13

**entitled** 282:15,18

**EO** 96:5

**EOIR** 96:8,9 97:4,22

**equal** 32:24 37:2 148:14,15 159:25

**equally** 94:12 148:13 202:2 208:9

**equivalent** 139:23,24

**Eric** 153:20

**error** 64:13,24 226:9 227:14

**errors** 62:7,9 63:21 64:19,20 65:10
124:4 225:22 226:1,2,6,8,10 227:7
229:19 232:9 271:8,11

**espionage** 111:19 166:23 167:18,20
168:1 169:4,18 170:5 178:5,6,7
180:19 181:23,25 183:5,7 184:24
243:11,12

**essentially** 33:20 156:2

**estimate** 4:22 57:20,22 74:3 95:16,17
136:8 186:18 194:7,8,9,10 195:17,19
196:20 197:1 214:9 242:14

**estimates** 163:13

**estimating** 146:2 214:10

**Europe** 191:6 199:7 201:17

**Eva** 55:9,13 56:10

**evaluate** 152:19 292:9

**evaluating** 201:6 228:10

**Evaluation** 292:25

**evenings** 25:10

**event** 102:14,15 133:23 306:8 312:23

**eventually** 32:25 246:20

**everybody's** 200:21 267:15

**evidence** 38:2,3 171:2 172:23 176:8,
12,15,25 223:8 284:23 286:17 287:5,
6,7,9,12,14,16,18

**evolution** 283:5

**exact** 56:14 154:18,19 155:6 197:1
214:5 229:6 241:22 250:9 289:18,20

**examination** 4:8 225:2 257:20

**examine** 222:8

**examined** 4:7

**examining** 181:6

**examples** 178:7 182:9

**excellent** 39:20

**exception** 12:8 303:7

**exceptionally** 292:12

**exchange** 107:9

**exchanged** 91:12,21,25

**exclude** 96:20

**excluded** 242:23

**excluding** 96:18

**excuse** 233:14 254:8

**executed** 249:11 256:24 276:19
277:18 293:23 298:1

**executive** 31:2,3,4,6,9,10,14,16 96:1,
7

**exhaustive** 179:9 180:11 181:5
237:22

**exhibit** 165:4,7 238:10 240:16
241:23,25 242:1 249:7,9 256:15,17,
20,21,22 276:16,17 277:17 288:22,23,
25 293:19,21 295:17 297:23,25
305:17,19 308:20,21,23

**exhibits** 146:6,7,12,13 238:9 284:24

**exist** 241:15 243:10

**exists** 49:22 248:4

**expect** 149:14

**expected** 233:9 267:10 308:12
310:14

**expenses** 16:18 41:19

**experience** 21:15 150:18,25 152:11
159:6 163:2 187:14 189:1 206:19
207:3 220:18 223:9 248:22 249:3
262:21 269:22 280:11 284:11 302:21

**experienced** 19:24

**experiences** 162:14

**experiencing** 32:20 86:12

**expert** 5:3,17,22,23,24 6:3,10,13 9:23
10:20,21 20:24 21:2,7,8,9,10,11 28:6,
7 34:6,7,9,12,20,21,24,25 35:2,3,11,
13 37:21,23,24 41:3 44:14 59:17 62:1
65:11,25 68:23 70:12 76:2,17,20,25
77:1,2,3,4,11 79:3 103:13 132:16
147:10,21 149:7,8,12,14,19,22 150:3
151:15,19,20,22 152:3,12,20 153:9,
13,22,24 154:10,16 155:1,5,7 156:18,
20,21,25 157:12,14,17 158:16,20,22
159:18 161:11,13 162:19 163:4,9,24
165:8,11,16 177:3 189:4 224:11
225:5,18 236:9,19,24 237:4,24 238:6,
7 239:12,13 241:9,10,18 250:11
276:20 277:9 278:7,8,11,15,23,25
279:6,20,22,23 280:6,9,10,20,22,24
281:2,7,13,19 282:6,8,9,10,13,19,20,
22,24,25 283:2,5,9,10,11,12,14,18,21,
25 284:2,4,5,8,12,13,20,22 285:2,13
286:2,3,4,5,17,18 287:5,6,7,8,10,11,
13,15,17,18 289:12,13,16,24 290:1,4
291:17,24 292:4 293:9 294:7,9,12,14,
16,18,20,22,23,25 295:23 297:13,15,
16,19,21 298:8 299:2,3,6,18,24 300:7,
10 309:20

**expertise** 21:11,13 126:7,24 150:5,7,
14,18,19 151:9,13,22 152:1,8,10,25
153:3,11 155:8,10 162:2 218:24

296:20

**experts** 10:6 151:11 152:23 280:13 284:10 285:3

**explain** 65:11 103:16 115:10 130:13 147:8 161:20 234:13 276:8 283:4,6 284:21 285:8,14 311:5,10 312:2

**explained** 286:14

**explaining** 263:4 285:9 311:19

**explains** 78:17 283:20 284:13 299:3

**explanation** 283:20 285:18

**explanations** 283:8

**explicit** 211:5

**exploit** 272:24

**expressed** 86:17 213:7,25 214:18

**extensive** 28:13 198:3,16 199:15,19 200:3,17 220:14 290:23 297:6

**extensively** 179:6 308:16

**extent** 7:5,7 246:7

**extra** 113:18 207:20

**extraordinarily** 180:14,21 216:23 219:7 245:16 259:20 264:23 271:6 286:11 301:23

**extreme** 146:1 159:15 219:9 273:17

**extremely** 69:7 180:12 181:12 219:16

**extremist** 191:5

---

**F**

**F-1** 217:19 273:11,12 300:3 311:7

**face** 159:21

**Facebook** 42:14 45:17 48:12 49:10, 13,15,17,22 50:25 51:3,6,9,16 52:2, 10,11,12 213:25 215:17

**faces** 215:17

**Facetime** 213:20 215:4

**facing** 110:11

**fact** 26:15 47:9 65:6 127:18 128:22 152:5 170:10 171:7 181:23 191:14 202:12 205:1 210:17 213:13 217:18 226:2 228:17,18,20 231:5,14 234:21 235:25 251:23 258:1 259:19 264:17 267:11 268:15 270:8 273:20,23 274:8 283:18 293:6,11 300:14 303:21

**factors** 275:21

**facts** 33:8 35:19 65:5,12,13 66:1 68:25 75:19 77:11 149:8,9,22 158:9, 11,13 178:17 179:20 182:3 216:12 226:11 228:17,23 236:10 284:14 285:3 293:8,10 295:15

**factual** 62:1,4,7,8 63:21,22 64:3,19, 21 65:10 81:21,22 86:19 158:21 160:8 176:16,17 202:16 225:22 226:1,10 227:7,14 228:6 229:18 232:9 262:17 264:4 280:8 285:2 297:20 299:5 302:14,19

**factually** 62:2 230:8

**faculty** 150:20

**Fahy** 5:6,8 6:4,9

**failed** 208:19 221:1

**failure** 169:10 234:15 246:4 298:22 300:2,16

**failures** 146:2 219:13

**fair** 21:25 22:17 23:21 28:3,14,25 29:5 33:22 35:10,22 49:14 56:12 74:3 112:13 114:17 118:1 126:14 132:11 142:22 162:13 164:14,21 187:12 188:25 197:3 204:13 205:24 212:17 213:17 220:9 221:21 223:7 227:6 228:22 230:25 235:12,19 238:23 251:17 259:25 260:6,19 261:3,4 285:1 298:3,25

**fairly** 148:13 187:17 188:14

**fake** 223:4 265:15,23 266:1,6 267:12, 16,19,21,25

**fall** 15:3 105:25 290:6 296:1

**false** 220:22 266:10,13 267:22

**familiar** 35:19 36:1,3 37:2 39:3 48:9 54:7 65:25 68:24 163:6 186:4 226:11 250:2,4 300:17

**families** 122:8

**family** 122:13 187:9 198:19 199:16

**famous** 110:11 178:19

**faulty** 228:6

**favor** 36:11

**favorable** 255:5,6

**favorably** 254:10

**FBI** 185:3 257:23 275:2 290:25 297:8

**Fears** 178:17 179:20

**feature** 177:12

**featured** 102:20

**features** 103:3

**February** 32:1 292:10

**fed** 265:10

**federal** 5:12,14 9:5 70:17 71:12 94:16,20 95:24 169:10 299:16

**feed** 117:11 166:25 167:2 177:11

**feedback** 61:24 81:16,23 165:24,25

**feeds** 177:19

**feel** 79:1 157:10 210:22,25 268:20

**feelings** 213:19

**fees** 16:5,7,15,21 17:6,9,13,19,20,22

**fellow** 182:12,22

**fellowship** 154:12,14

**felt** 37:17 209:22 210:6 238:7 268:24

**female** 226:12

**fewer** 311:3

**fidelity** 188:24

**field** 110:5 156:1

**fields** 151:12

**fight** 254:18

**fighting** 191:4 311:18

**figure** 73:23 111:17 114:4 120:7,14 122:11,12 164:18 190:16 195:23 196:25 222:5 233:17 271:22 274:16 275:22

**figured** 87:25 126:12 163:16 221:14

**figuring** 108:9 218:25

**file** 32:4,8 103:18 105:5 200:21 201:8 230:23 294:8

**filed** 20:6,9 31:24 32:1,5,12,14 34:8 41:23 45:23 57:16 58:8 61:21 62:12, 15,18,23,24,25 63:2,4,5,8,11,13,17, 19,23 64:1 72:5 81:14,17 82:7 88:5 90:7,10,12 91:5 181:22 230:22 234:9 249:10 256:23 257:5 259:9 277:1,16, 20,21 278:4 289:5,6,19,22 293:18 294:5,6 300:4

**files** 73:23 95:22 199:22 200:23

**filing** 33:4,6 43:1 53:24 76:12,13 90:2

**filings** 61:21 64:13 65:2,5,10 81:14, 17 89:11,12,13 294:4

**fill** 235:13,22 269:23 270:12,14 272:6

**filled** 270:18

**filling** 235:16 270:13,19

**final** 278:5 307:9,12

**finances** 23:22

**find** 15:9 75:20 153:3 240:20 271:8 283:19 308:14

**finding** 126:5,9

**findings** 293:2

**fine** 7:17 301:20 312:20

**fined** 243:12

**finish** 7:14 104:17 144:4 243:4 306:24

**finished** 159:14 269:14

**finishes** 305:3

**fire** 12:2 61:13

**fired** 110:14

**firing** 111:11

**firm** 11:11,13,23 12:1,9,13,14,15,23 13:16,20 14:5,16 15:5,12,13,15,25 16:3,4,7,15,18,25 17:10,23 18:2,13 19:3,14 20:11 21:21 26:23 28:1,15 30:10,12,19,25 31:7,11,15 33:19,23 34:1 41:20 52:14 60:16 61:2,12,15,16 79:11 81:11 85:3 87:22 88:22 166:16 187:4 241:16 292:8

**firm's** 17:15 19:17 52:13

**firsthand** 39:19 186:25 187:2 196:16 199:24 200:16,23 208:5,7,14

**FISA** 275:6

**fish** 107:15

**fishing** 107:17

**five-year** 14:24

**fix** 124:7 236:1

**flag** 268:10

**flagged** 159:23

**flash** 118:5

**flavor** 39:8

**Fleury** 49:3

**flew** 67:21 190:10 204:1

**flip** 307:21

**Florida** 110:5 125:23 155:24

**flow** 236:13,14

**fluently** 126:6 188:3

**fly** 69:8 189:12 204:4

**flying** 67:15

**Flynn** 246:4

**focus** 82:24 191:17 203:1 264:17 308:11

**focused** 142:22 143:4 237:13 274:4

**folks** 126:9 170:25 184:25 187:23 192:9 220:7

**follow** 136:11 303:8

**follow-up** 273:15

**foolish** 113:8,10

**foot** 217:23

**footnote** 201:1,2 204:12,17,24

**footnoted** 201:2

**force** 110:18 111:3 120:20 126:18,23 139:23 263:22 271:23 274:8,23 305:21 307:17,18

**forces** 111:2,9,16 153:19 161:5,7 216:5,10,14 217:3 219:22 220:3 244:9 279:17 283:22 290:8,16 291:10,12 292:15 295:7 296:3,24

**foreign** 126:6 130:9 167:23 169:11 178:12,18 180:6 181:9 202:13 203:12 212:13 220:21 221:10 232:13,14 246:5 265:7,16,17,23 266:2,6,14 269:6 271:2 272:19,24 273:5 274:8 292:23 296:21 298:23 304:24 305:20 308:25 309:1

**foreign-born** 219:10

**foreigner** 262:23 263:7,10 272:23

**foreigners** 138:16 256:10,11 279:9 280:4

**forget** 96:6 109:4

**forgetting** 139:24

**forgotten** 5:20

**form** 13:22 33:8 35:12 51:24 91:8,21, 24 92:10 155:12 270:12,17,18,20,23, 25 271:13 290:23 297:6 302:7

**format** 248:24 278:3

**forming** 237:23

**forms** 91:2,3,7,11,17 92:12,13,15,22, 23,24 93:1,4 237:3 254:2,20 271:5

**Fort** 107:18,24,25 108:22 109:11 110:3 168:15 182:11 306:3,9 309:17

**Fortunately** 219:13

**Forum** 309:2,4

**forward** 70:23

**forwarding** 139:3

**forwards** 139:4

**found** 14:18 15:12 148:16 191:2 243:13 265:3 273:2 299:21

**Foundation** 154:11

**founded** 14:16 15:6

**founding** 14:21

**fourth** 177:4 207:12 225:6

**Foxtrot** 5:9

**frame** 119:21 194:7

**framed** 154:25

**Frank** 79:11,13,18,20,23 80:1,5,8,21, 24 81:3,8,9 82:1,16,20 83:1 84:1,9,16 85:3,8,11,21 86:1,9 87:11,18,22,25 88:5,8,14,19,20,25 89:2,6,16,20 90:3, 20,21,23 91:4 93:11,14,25 94:4,8,13 104:7 230:21 231:6

**frankly** 184:6

**fraud** 299:17 300:2,12,15

**free** 157:10

**frequent** 214:12

**frequently** 113:24

**frequently-asked-questions** 123:22

**freshman** 105:15,20

**Fried** 79:11,12,18,20,23 80:1,5,8,21, 24 81:3,8,9 82:1,16,19,20,25 83:25 84:1,9,15 85:3,7,10,21 86:1,9 87:11, 18,22,25 88:5,8,14,19,20,25 89:2,6, 16,20 90:3,20,21,23 91:4 93:10,13,24

94:3,8,13 104:7 230:21 231:5

**friends** 198:21 199:16

**front** 96:19 97:4 103:5 107:18 155:17, 22 156:14,15 157:16 268:17

**frustrated** 136:20

**frustration** 86:11

**full** 6:18 9:16 39:8,23 110:15 111:4 222:3 240:18

**full-time** 14:15 109:4

**fully** 7:4 223:10 251:25 252:3

**function** 41:3 49:17 116:8

**functional** 120:11,17

**functioning** 150:10

**functions** 106:18 108:15

**fund** 24:10

**fundamental** 284:7

**funds** 20:20,21 24:10

**future** 307:18,20

**fuzzy** 293:11

**G**

**G-1** 123:1 125:16

**G-2** 123:1 125:16 129:8,14

**G-28S** 93:2

**Gagnon** 27:18

**Gampala** 71:18 72:11

**gaps** 269:15,17,24 270:6,20 271:3,24

**gate** 107:15

**Gates** 179:21 296:14,15

**gather** 185:5

**gathering** 167:22

**gave** 10:4,24 11:5 45:7 60:2,3 84:8 90:17 154:11,25 182:9 190:18 205:22 219:8 227:11 230:22 235:7 256:18 290:5 295:25 307:4 312:2

**gay** 134:12 275:24

**gender** 227:12

**general** 44:22 78:16 113:1 120:11 129:18 142:24 148:15 150:7 155:10

158:9 159:24 162:7 178:14 246:4 250:23 255:15,17 263:5,23,24,25 272:1 311:22

**generalization** 187:12

**generally** 9:4 19:23 20:4 64:19 89:1 134:5 140:10 156:14 245:22

**generated** 261:2,12,13

**generic** 153:10 168:10,20,21 196:12

**genesis** 150:9

**Germany** 205:14

**gestures** 7:11

**give** 12:17 16:22 18:1,3 51:21 83:14, 16 93:19 101:8 112:7 135:14 142:19 178:7 180:15 187:4 197:9 214:5 221:3 261:25 272:16,20 273:11 276:8 310:7

**giving** 101:17 102:13 133:24 176:12 194:7 234:12 287:4

**glacial** 305:3

**glacially** 86:14

**global** 187:16 188:15 271:4

**goals** 159:1 253:9,19

**Golf** 73:5

**good** 4:10 8:25 78:20 79:2 127:25 131:6 137:18 145:3 152:24 199:1 254:12

**govern** 93:4

**government** 15:4 32:22 38:1,2 39:4 65:9,12,16,24 66:4,9 70:11,14 74:16 77:12 82:3,12,23 83:1,8,10,14,16 86:14,16,18 89:8,10,13,20,25 94:12 96:10 105:6 108:10 132:4 143:20 146:20 160:11 162:6 163:16 169:10, 14 171:7,25 172:1,13 184:4 199:1,12 202:17 204:2 205:13 216:24 217:15 234:11 272:19 273:21 282:14 286:11 304:24

**government's** 63:16 64:13 66:7,11

**governmental** 9:6

**governments** 265:8 269:6 272:24 273:5 274:9

**grab** 229:7

**grabbing** 93:22

**gradually** 14:24

**grammatical** 64:20

**grandparent** 188:7 189:9

**grant** 113:24

**grave** 126:4

**Gray** 130:23

**great** 39:21 136:24 286:15

**greatly** 126:4

**green** 192:12,15,18,22 208:10 290:10 296:5 311:23

**grew** 204:8

**Grisez** 88:21

**group** 11:10 12:25 21:18 27:20 49:22, 24 50:1,6,9,10,11,25 51:3,6,9,16 52:2, 10,18,20,22 53:4 60:13 61:13 134:7, 13 148:20 164:5 177:16 184:9 185:19 207:18 212:6 246:16 254:6 276:14 304:22

**groups** 52:9,16,24,25 53:1,4,5,6 177:18 191:5

**grow** 187:19

**grown** 187:25

**GT** 292:19

**guard** 108:15

**guards** 107:15

**guess** 14:9 16:4 28:19 35:20 36:11 37:4 57:21,23 88:13 92:18 96:4 141:15 180:4 195:22 260:15 302:9 312:10

**guidance** 297:20

**guilty** 265:3

**gut** 215:21

**guy** 130:13 136:24 137:18 182:25 190:18 239:21,23,24 240:1,2,3

**guys** 127:16 145:4,15 146:10 167:24 168:4 259:17,24 264:15 268:16,17,18

**H**

**H-1B** 311:7

**habit** 64:11

**hacked** 246:24

**hackers** 244:10 246:24

**hacking** 273:22

**half** 7:19 293:4

**Hampshire** 5:7,15

**hand** 7:11 285:12,15 288:22

**handed** 165:5 249:8 256:16,21 276:16 288:24 293:20 297:24 305:18 308:22

**handful** 96:14 305:9

**handing** 176:24 216:25 241:24

**handle** 12:3,7 30:22 31:15 33:21,23 34:2 75:8 76:1

**handled** 28:25 34:2 121:23

**handles** 120:5

**handling** 26:6,19,20,22 27:2 28:10, 16,20 29:12,16,22,25 30:2 77:10 78:7 81:10,12 105:4,5 230:17 241:11

**handy** 177:11

**Hansal** 72:10

**happen** 85:14 118:11 119:16 126:13 169:22 267:11,19 272:18 302:18 304:9

**happened** 87:2,6 144:25 149:10 169:23 245:25 246:25 247:1 274:3 309:19

**happening** 32:21 103:16 234:7 265:19 284:17

**happy** 60:7 161:14 210:14

**hard** 161:16 210:7 214:10 287:1,23 312:15

**harm** 160:14,18 163:18 184:9

**harms** 160:15

**Harvard** 162:5,6

**Hasan** 168:15 182:10 183:11 245:12

**Hassan** 178:21

**hatted** 111:4

**HCPS** 296:17

**head** 7:11 12:17 18:6 132:25 194:20 196:21 229:9,10

**headers** 146:21

**heading** 166:7 307:22

**headline** 263:22

**health** 15:19,20,21 296:17

**hear** 37:17,19 170:5 187:7,8

**heard** 26:16 40:17 41:2,7 72:20 87:3 100:15 141:9 169:21 176:13 189:2

**hearing** 37:8,10,13,15,16 38:15,18 39:9 40:13,15,24 41:9,14,16 46:24 87:3,9 156:1 231:9,12

**held** 21:16

**helicopters** 108:18

**helped** 153:25 278:3

**helpful** 117:25 118:13 195:1 262:11 295:18

**helping** 33:16 75:22

**helps** 164:24

**high** 146:15 160:7 245:17 293:1 295:4

**high-quality** 254:16

**higher** 111:22 258:7 263:6,25 271:23 290:15 292:13,18 296:24

**highlight** 64:22,23

**highway** 107:18

**hijacked** 110:21

**hire** 12:2 30:22 61:16

**hired** 232:20

**hiring** 60:18 61:3,6,9

**historical** 178:8 197:11

**history** 158:17 180:18 192:20

**hit** 107:17 169:9

**hold** 131:2 135:12 304:23

**holders** 192:12,15,18,22 208:11

**holding** 106:11

**holds** 224:17

**home** 25:14,15,19,20,22,24 26:2,4 179:19

**Homeland** 84:21 135:3 174:11 175:2, 10 176:5 179:6 185:5 216:23 217:22, 24 218:7,13 219:6 221:2 222:1 248:12 279:14 290:24 297:7

**honestly** 8:21 23:19 92:7

**honorarium** 16:22,24

**honorariums** 17:3,9

**Hood** 168:15 182:12

**Hotel** 5:10 73:5

**hotly** 168:9,19,21

**hour** 7:18 14:6 15:16 145:14,18

**hourly** 14:13 16:9

**hours** 27:5 166:2

**house** 13:14 24:4,8,21,23,24,25 25:2, 5,7,11,25 122:19

**huge** 270:12 272:2

**human** 260:14 292:8 311:2

**Humrro** 292:9

**hundred** 192:24

**hundreds** 48:13 87:24 95:12,18 186:21 195:9,15 200:5,25 210:23 211:2 220:20

**hunting** 107:16

**Hurlburt** 110:5

**hurry** 270:24 271:14

**hurt** 160:23 164:11 168:13 231:22

**hurting** 93:23

**husband** 26:22 56:19,21 57:3 95:5 99:5

**husband-and-** 28:11

**husband-and-wife** 29:2

**Hwang** 50:14

**hypothetical** 226:22 301:16

**I**

**ICE** 96:2,25 97:2,5 98:6

**idea** 157:2 197:18 307:10

**identified** 19:17 130:1

**identify** 6:2 111:16 139:20 276:4 282:13,20 292:2 296:9 297:14 298:7

**identifying** 290:3 295:22

**IG** 125:16 139:24 141:10 176:22

**IG's** 129:20 130:3

**iii** 242:19

**ill** 267:3

**illegal** 32:23 131:10 164:13 264:24

**illogical** 225:22 227:22 228:7,8,16,21 229:24

**illogically** 228:13

**imagine** 274:19

**immigrant** 122:21 155:11 232:15

**immigrant's** 122:23

**immigrants** 120:13,14 122:8 126:10, 20,21 127:20 134:14,16,19 146:1 150:25 152:4 156:5 179:4 182:13 217:10 267:9 311:6,11,14,16,18,20

**immigration** 5:25 15:10 30:9,14 31:19 44:20,21,22,23 55:16,21,23 56:3 88:19 96:1,3,7 100:16,24 101:2,4 103:4 122:17,19 126:24 150:7,18 152:3,11,14,21 153:6,24 160:10 187:6,13 217:17 218:8,10 219:12 232:11,12 233:5 235:7,9 279:16 280:11 291:2 297:10 299:16 300:8,17 311:3

**impact** 163:17 305:19 308:24 309:1

**impermissible** 313:12

**implemented** 169:4,17 170:5 245:11

**importance** 69:3

**important** 39:10 250:18 274:11

**impose** 245:16

**impossible** 161:2 259:20

**improper** 221:20 313:11

**improve** 219:12

**in-person** 46:18,22,23 54:3 213:18 214:13,18 215:1

**inability** 271:2

**inaccuracies** 160:8

**inaccurate** 86:17 123:25

**inadequacy** 257:18

**inadequate** 234:14

**inadequately** 232:4,6,23 233:4,7 234:25

**inappropriate** 8:9 58:21 159:24

**inches** 146:15

**incident** 130:1 182:17

**incidental** 17:12 140:20

**incidents** 110:12 111:12

**include** 65:4 113:22 162:5 168:1 281:2

**included** 111:18 148:21

**includes** 157:23

**including** 16:9 89:14 178:21 182:12 218:7 250:22 284:24 290:25 297:8 313:3

**inclusive** 164:7,8 264:20

**Incomplete** 301:16

**inconvenient** 113:16

**incorporate** 276:24

**incorporated** 278:8,13 279:1 280:21 282:23 286:17

**incorporates** 285:23

**incorporating** 276:21

**incorrect** 62:2 160:8 270:25

**incorrectly** 24:15

**increasing** 292:16

**incredibly** 84:3

**independent** 13:1 292:7 300:4

**Index** 117:22

**India** 64:10

**indicating** 166:20 171:6 232:20

**indicted** 243:12

**indictment** 243:25 244:6,14 245:3 246:3

**indictments** 177:19

**indigenous** 18:25 126:21

**individual** 30:24 31:11 39:20 58:5 129:3,6 138:2 142:23 143:5 148:3 182:7,21 184:14,15,18 204:3 212:22 217:20 218:10,15 229:14,17 230:4 234:1,13 246:17 274:14,15,18,19,21 275:9,18,23 276:13 298:22 304:19

**individual's** 71:24 72:9 73:1

**individualized** 159:16

**individuals** 33:14 38:11,12 51:14,23 52:1 61:4 69:6 88:25 98:3,7,11 116:6 117:9 133:4 140:3 149:1 151:2,5

152:15 163:18 172:22 174:9,17,23 217:19 220:10 228:24 257:21,25 268:23 272:11 304:1,2,6

**ineligible** 290:17 297:1

**infant** 203:25

**infantry** 191:9

**infer** 228:19

**infiltrate** 220:13 222:10,20,25 223:18 304:25

**infiltrated** 126:18

**infiltrating** 220:19

**influence** 266:14

**inform** 26:18 31:11 159:4 164:24

**information** 9:4,6,10,12 39:6 64:3 83:13 84:1,7 86:13,17 91:3 93:11,13 94:2,13 103:22 112:25 114:19 115:4, 7,12,13,19 116:1,10 121:3 123:21,22 124:1 127:10,11 128:3,7,22 129:2,6 132:10,15,18,19 133:22 135:5,9 137:15 139:10 141:22 143:23 144:2,7, 10,14 166:20 167:22,24 168:4 169:19 170:3,19 173:12,16 176:16,17 177:1, 10 179:15,16 185:5 186:14 189:2 201:12,25 203:16 204:3,7,8 205:5,10, 12,15,16 206:11,13 207:9 208:14 216:16 220:24 223:8,15 226:25 228:2, 3,6,12,13 230:11 233:12,25 234:1,5, 12,18 240:19 242:12,18,21,24 243:1, 14 244:3 245:1,21 246:18 247:10,21 248:6,23 249:1,2 250:20 251:1,5 252:2,15 253:10,20 254:20 255:1 265:10,16,20,21,23 266:2,6,10,13 269:6,16 270:4,15,21,23,24,25 271:3, 5,24 273:21,23 274:2 282:9 287:3 297:18 305:12,14 308:17

**informed** 169:17 280:10

**inherently** 211:4,6,9,24 212:4,18 252:8

**initial** 221:1

**initially** 120:11 264:11 291:5 296:13

**initiated** 42:16 43:24

**injunction** 63:2,8 83:4

**input** 61:3,6,9 309:9

**inquiries** 132:10

**inside** 199:10 226:21

**insider** 113:7 256:2

**Inspector** 129:18 250:23 255:15,17

**installation** 107:2

**Institute-tested** 292:16

**instituted** 299:12

**institutions** 112:10 162:4,9

**instruct** 59:12 147:5

**instructed** 313:9

**instruction** 224:7 288:10

**instructions** 235:23 236:1,2,6,16

**instructs** 8:3

**insurance** 15:19,20,21

**insurgents** 108:18

**intel** 125:15 126:25 127:3

**Intelius** 272:20

**intelligence** 36:4 106:22 110:23,25
111:7 120:25 121:4 127:8,11 134:2,9,
23 135:1,23 136:2 138:10,14 140:23
141:1,2,7,17,20,24,25 142:4,8 143:13,
14,17 144:11 173:23,25 174:1,9,12,18
185:4 218:24 248:23 249:2 250:24
255:16,20 273:5 281:17

**intend** 8:19 15:6 151:9 157:18 158:23
161:11 163:23

**intended** 67:24 168:5,7 203:5,6,7
311:10

**intending** 158:20

**intent** 32:4,7 212:5 267:3

**interact** 129:14,19 175:5 249:19

**interacted** 129:9 200:8,12,15 249:22

**interacting** 39:24 151:1 249:21

**interactions** 49:11 127:22 129:11
151:5 257:10,13,14

**interchangeably** 21:22,23 22:1

**interest** 27:3 29:14,15,17 64:9 70:22
79:24 93:16,17 94:2,6 148:10 178:2
242:3 256:9

**interested** 15:10 29:6,19 33:3,5,16
38:13,23 52:16 61:18 76:24 89:11
136:16 143:9 144:9 157:10,11 158:19
161:21 167:12 169:25 174:8 177:4
179:3 197:21 224:8 237:5,21 238:12
253:4,12 269:6 279:2 291:25 294:23,
24

**interesting** 198:23

**Interests** 155:9

**internal** 178:3

**Internet** 144:18 168:16 171:14 172:6
232:17 240:7,11 273:22

**Interpol** 201:17

**interpret** 115:7

**interpretation** 115:24 228:22

**interpreting** 115:19

**interrogatories** 66:3,7

**interrupt** 291:14

**intersecting** 153:4

**interview** 114:13 211:15 269:3

**interviewed** 199:22 291:1 297:9

**interviewers** 232:10

**interviewing** 232:11,15

**interviews** 103:15

**intimately** 36:3

**introduce** 203:7

**introduced** 4:10 38:18

**introductory** 202:3

**investigate** 107:16 182:24 184:15

**investigating** 118:9

**investigation** 107:6 116:16,20 117:4,
5,10,11,17,18,23 118:6,10 182:3
184:16 201:5,7 202:10 205:8,17,25
206:5,16,18 207:3 263:10,12,24 265:1
276:12 281:16

**investigations** 106:20,24,25 107:22,
24 108:4,6 116:12,22 117:7,14 118:1
135:3 206:4,9,20,22 207:4,7 232:25
233:11 257:23,25 258:6 263:17
269:17 270:3 271:2

**investigative** 117:22 184:19 201:10
202:19 269:24 275:3

**investigator** 118:5 271:7

**investment** 24:21

**investments** 23:5,11,24 24:2,3,9

**invitation** 306:3

**invite** 131:24

**invited** 40:11 235:8 306:3

**involve** 112:19

**involved** 34:13 74:20,21,24 75:6
77:23 78:9 110:12 113:24 114:2,17,22
115:3 116:16,17,20,22 117:3 151:2
153:7 155:1 163:18 207:7 235:1 275:2

**involvement** 31:21 61:19 131:12
132:1 149:17 151:3

**involving** 104:22 105:6 169:6 178:20
257:25

**Iranians** 244:11

**Iraq** 199:6 201:23 203:14

**Iraqis** 130:11

**Irish** 134:10

**Ironically** 216:3

**Islanders** 192:1,7 208:11

**isolated** 192:5

**issuance** 260:16

**issue** 8:6 36:23 74:8 97:11,12 115:10
117:19 121:25 128:9 140:21 164:19
220:8 224:25 294:6 301:8 311:9

**issued** 83:4 148:18 220:23 260:12
267:23

**issues** 35:23 48:18 113:12 120:22
121:12,14,23 122:9 125:3 126:15,19
127:11 129:16 136:18 158:14 183:17
308:8 310:10,15,17,18,19,20

**issuing** 114:10

**item** 262:8

**items** 107:9

**J**

**J-l** 298:20

**JAG** 44:15 75:13,16 131:10 133:1,17,
18 134:1,22,25 135:6,10,15,22 136:4,
15 137:10

**James** 50:14

**January** 32:11

**Japan** 111:2,5,9,24 112:12 199:7
202:18,19 203:18,19,22 204:9

**Japanese** 111:10,15

**Jared** 270:13

**JBER** 108:2

**Jebb** 44:1,2,5,6,7 75:12

**Jersey** 146:4 238:11

**Ji** 169:6 298:20

**Ji's** 169:8

**jillions** 138:22

**Jim** 178:16 179:20 273:25

**job** 15:4,5 210:8 217:15 252:11

**jobs** 21:16 112:4 113:20 160:24 161:3

**Joe** 224:17 288:14

**John** 155:23 162:5

**join** 50:3,4 105:13,18 161:4 187:8
188:1,14 189:12 190:11 204:5 215:19
216:5,9,13 217:3 219:21 220:3 268:19
283:21

**joined** 12:13 28:1 61:1 98:24 105:14
300:3

**joining** 172:4 189:17 295:7

**joins** 12:8

**joint** 23:2,5,8,11,12,25 24:3,9,11,21
82:11,12 108:2 153:19

**Joseph** 8:25

**journalists** 230:3

**judge** 83:4 282:5 299:16

**judge-tried** 156:15

**judgment** 64:1

**July** 155:21

**June** 119:22 130:20

**junior** 12:3

**jurisdiction** 56:1

**jurisdictions** 94:16

**jury** 156:15

**Justice** 4:13 8:8 107:13 166:25
169:12 177:11,12 231:12 243:19
248:13,14

**Justice's** 58:20 279:16

**justification** 207:20 208:17 209:9

**justifications** 209:20

## K

**K-A-U-S-H-A-L** 53:10

**Karen** 88:21

**Kasim** 299:15

**Kaushal** 53:8

**Keigni** 49:3,7

**Kennedy** 162:5

**Kentucky** 306:4,9 309:17

**kick** 50:10

**kill** 169:2 171:19

**killed** 171:19 182:12

**killing** 168:13,17

**kind** 51:18 87:4 107:3 108:12 110:21
113:1 119:2,9 127:16 131:11 138:4,16
139:8 148:22 156:6 172:13 177:24
180:20 190:21 216:18 219:1,18
227:12 228:11 234:23 235:10 245:7,
15 264:16 268:24 275:19,23 276:15
310:22,23,24 311:8

**kinds** 112:10 271:8

**Kingsland** 66:20 67:13 68:9

**Kirti** 42:12,14,17,23 45:9 69:17 70:3

**Kirwa** 79:5 80:1,8,15,18,20 81:3,7,14
82:3,21,22,24 83:2,3,13 84:2,10,16
85:5,24

**Kisor** 94:9 231:13

**knew** 67:15,16 81:9 217:20 269:5

**knowing** 143:10

**knowledge** 12:11 21:9 32:4 34:6,12
152:3,5 162:14 164:20 178:14 186:25
187:2 196:16 199:24 200:3,16,23
202:16 208:5,7 209:12 221:22 242:9,
20 265:25 266:4,5 269:22 281:22
299:12

**Knox** 306:3,9 309:17

**Kushner** 270:13

**Kusuma** 54:9

## L

**labeled** 288:25 310:2

**lack** 242:25 244:2 245:1 247:9

**lacking** 230:7 270:4,6

**laid** 148:19 159:2

**land** 24:7

**language** 65:2 171:22 172:9,11 185:9
191:18 197:6 198:3,6 203:1 211:24
212:18 237:5 240:23 292:13,15
296:19

**Language-mavni** 292:24

**languages** 126:6 292:17 296:21

**large** 17:17 33:21 138:4 172:3

**largely** 299:7

**Late** 241:20

**latest** 134:13 234:8

**Latrice** 67:1

**law** 5:19,25 11:10,11,13,22 12:1,25
15:11 21:18 26:23 27:20 30:9,13,15
33:19 36:3,11,12,25 37:1 44:22 60:13
61:13 79:11 81:11 85:3 101:4 106:17,
20 107:1,5,6,14 108:3,5 115:12
127:10 149:23 150:8,9,22 152:4,17
153:6,24 160:10 162:6 163:7 164:20
166:15 177:17,18 179:24 180:2
232:12 233:5 235:9 300:17 311:3

**lawful** 183:16 290:11 296:6

**laws** 162:23 163:3

**lawsuit** 32:5,8 33:4,6,21 43:1 45:23
161:8 215:19 234:8,9 302:10

**lawsuits** 103:17 105:5

**lawyer** 31:3 60:24 75:9,20 77:10
78:19,24 112:21 150:19 157:9 162:3
187:6,13 215:19 284:10

**lawyers** 53:3 74:23,25 75:2,6,8 78:16
83:12,19 86:16,18 89:1 100:16,24
101:2 102:16 103:5 162:24

**lead** 228:23 233:6 276:12

**leaders** 308:3

**leadership** 37:3 234:15

**leading** 160:10 262:13

**leads** 54:6 232:5

**learn** 39:13,15 45:25 46:1 110:17

**learned** 37:5 39:16 46:3

**leave** 154:22 157:6 160:17,20 223:11

**leaving** 58:24

**lecture** 110:13

**led** 248:1

**left** 149:2 171:3 223:12

**legal** 12:3 44:10,11,13,16,19 45:9 47:11 51:1,5,8,14,15,18,19,20,21 63:22 75:14,18 99:13,17 101:9 102:13,15 133:23 140:1 164:19 176:15 183:25 184:10 185:13 217:10 224:21 311:24

**legally** 13:1 279:9,10 280:5,13,15 290:9 296:4,17,19

**legislation** 133:14

**legitimate** 233:10 243:23 244:13,21

**legitimately** 233:16

**lengthy** 177:4 270:16 295:3

**lessons** 37:4

**letter** 136:23 137:19 155:1

**letters** 124:8,9 298:21

**level** 111:22 128:13,25 160:7 243:24 244:14,21 245:17 271:18 292:13

**Levine** 145:1,2 148:18 157:24 159:21 208:18 211:11 212:2,3,19 215:22,25 260:11,17

**Levine's** 163:10

**Liaison** 140:2

**licenses** 296:18

**lied** 248:11 273:2

**lieutenant** 210:4,8

**life** 181:10,14 189:11 201:14 203:20 204:2 210:18

**light** 171:3 172:24 191:7 233:15 276:12

**lights** 107:20

**limit** 92:5

**limitations** 252:23

**limited** 193:20 217:10 310:9

**limiting** 91:2,3,7,24

**lined** 87:23

**lines** 134:5

**lingering** 161:8

**lingo** 109:18

**linguist** 130:10

**link** 144:19

**Linkedin** 52:12,18

**links** 144:18

**list** 83:15,17 87:19 88:2 89:25 90:17 107:3 124:2 133:12 139:19 157:10 159:19 160:2 178:5 179:10 180:11,22 181:5 237:22

**listed** 151:8 156:24 238:10 239:13,24 240:1,16

**listing** 154:7

**literally** 87:24

**litigation** 9:1 20:22 21:7 35:8 70:16 77:5,8,15,18,21,25 78:2,22 79:15 103:17 158:4 230:23 242:8

**Liu** 47:15,17

**live** 187:16 198:19 203:13

**lived** 189:14 201:14,15,21 202:12,20 203:19 204:1 205:11 212:15

**lives** 202:17 203:12 221:17

**living** 39:23 202:18

**local** 76:2,3,5 107:10 126:8 157:1 269:2

**locally** 75:25 76:6

**locate** 250:17

**located** 125:21 226:23

**location** 12:19 13:7

**locations** 113:14

**logical** 162:12 232:9

**long** 5:19 22:8,14 27:18 43:17 86:23 101:10 145:13 166:1 179:12 180:12 192:19 193:4,5,7,8,10,14,19,23 194:3, 13,14,17,19,24 195:3,4 197:4 198:20 203:22 211:5 212:15 241:8 312:21

**long-standing** 78:25 127:17 182:4

**long-term** 291:11

**longer** 231:23

**longstanding** 198:4,14,16 199:9,15, 19 200:3,17

**looked** 8:16 11:3 23:16 25:4 65:18 142:10 227:19 232:18 233:16 236:13 238:3,17 240:12,14 241:8 245:21 288:22 308:10

**lose** 273:1

**lot** 23:10,23 24:17 49:10,18 65:7,8 76:23 90:16 110:14 112:5,6 122:18 123:1,23 124:8 126:8 127:23 130:7,8, 14 139:18 168:23 171:21 173:11 175:5 178:15 179:1,15,24 187:11 188:5 197:21 198:25 199:5 201:12,22, 24 203:16 205:14 206:3 209:23 214:6, 7 215:20 222:20 226:2 232:19 234:11, 24 247:6 271:12,23,24 272:4 273:10 306:4 308:17

**lots** 49:9 52:24 77:7 83:19 103:20 118:18 127:5 172:19 186:5,15 187:4, 15 196:3,7 197:25 226:2 244:8 274:1 311:13,16

**loud** 250:17

**Louisiana** 13:10

**loved** 210:7

**loyal** 118:8

**lunch** 86:4,8 145:4,11,13,23 147:2,4 313:3

**lying** 248:15

---

**M**

**M&ra** 121:7,10,15,19 139:23

**M-A-R-G-A-R-E-T** 9:18

**M-A-T-H-E-N-G-E** 73:4

**Macarthur** 154:11

**Machine** 146:5 238:14 240:8,10

**machines** 12:4

**made** 9:4 20:19 37:17 58:12 62:5 112:6 120:17 155:3 161:2 171:24 204:15,22,25 209:21 210:17 211:18 212:20 218:19 225:5 232:24 234:24 244:5 250:1,2 254:22 265:22 266:1 267:22 298:21 306:7 307:3

**main** 148:2 207:11 251:16 310:8

**maintain** 300:3,16

**major** 8:25 168:14 229:2

**majority** 27:2 74:10 271:16 292:21 311:21

**Makau** 43:12,15,18,23,25 44:5,7,16 45:2,5,19,22 75:14

**make** 8:11,24 11:24 12:4,6,9,12 13:20,24 14:6 39:1,21 60:16,18,20 62:8 71:2 76:11 88:1 100:1 109:18 122:6,14,23 126:12,22 143:8 146:11 149:24 152:1 181:1 199:1 204:19 210:14 231:16 232:15 234:18 237:12, 18,23 238:5 239:19 253:2 262:2 263:20 266:7,10,11 268:1 274:4 275:10 281:4 300:19 302:2 305:8 307:4 308:4 309:13 312:8,25

**making** 12:1,2 71:8 86:19 88:25 109:18 114:18 117:8 120:11 138:13, 15 182:21 202:14 204:11,16 215:17 241:14 247:6 265:15 270:15 275:15 291:25 297:19 299:9

**Malik** 168:15 178:21 182:10 183:11 245:12

**managed** 158:10 221:19

**manager** 120:17

**manages** 23:22

**managing** 11:9 14:3 21:18,20,25 28:15

**mandamus** 300:4

**Manning** 178:21

**manpower** 118:23 121:6,12,14 188:21

**MANVI** 64:12,16 71:6

**March** 37:10,13 46:24 69:2 277:3,8, 13,14,18,20,21 282:21 283:13 285:15 286:4,9

**Margaret** 4:5 9:17,18 75:18 276:18 289:1 293:22 298:1 305:22 309:6

**mark** 165:3

**marked** 146:6 165:4,6 241:23,25 249:7,9 256:15,17,20,22 288:23,24 293:19,21 297:23,25 305:17,18 308:21,23

**marriage** 22:20 23:22 29:4

**married** 22:4,6,7,8,15 100:7

**marshal** 111:3,20

**Mary** 67:7

**mass** 264:21

**materials** 180:14

**Mathenge** 71:19 73:2,3

**matter** 103:13 113:2 132:15 142:24 211:4 302:14,19

**matters** 21:8 109:23

**Mattis** 4:14 31:21

**MAVNI** 4:25 34:13 35:20 43:19 48:13, 22 49:21,22 50:16,25 51:2,5,8,15 52:1,9,10,16,18 64:10,16,18,25 66:1 70:17,21,24 71:7,13 73:18 74:5 76:18, 19,21,22,23 77:6,19,24,25 78:3,9 87:7 93:25 94:4,15,19,25 95:2,4,7,10,23 96:9,11,12,16,23 97:1,6,9,13,16,19,24 98:3,24 102:24 103:9,14,15,18,23 104:6,13,19,22 105:3,5,6 120:10,22 121:16,20,22 122:1,7 124:5,10 125:4, 10,14 126:1,2,13 127:1,3,12 128:19, 23 129:3,6,9 130:4,7,9,11,14 132:1,4, 6,10,21,22 133:6,21,22,24 134:2 137:7,15,22,24 138:1,3,6,11 140:5,10, 23 141:3,8,18,23 142:7,12,15,23 143:4,5,18 144:12 148:8 149:9,10 150:9,10,11 151:2,3,4,14,16,19 152:23 153:1,7,9,11,12,21,23 154:10, 12,15 155:2,5,7,13,16,20,23 156:3,7, 9,11,16 157:22 158:10,17 161:6 166:22 169:18,23 170:6,9,11,21 171:5,9,13,14,16,21 172:5,7,16,22,25 173:7,9,20 174:2,10 175:8,11,16,20, 24 176:7,10,18 179:8 181:19,24 184:14 185:8,20,21,25 186:7 188:22 193:3,4,18,24 194:21 195:2,6,24 196:7,15 197:3,6,17 198:2,6,8,14,24 199:3,8,18 200:2,15 207:15 208:1,5 209:14 210:20,21,22,24 211:17 212:7, 22 213:7,10,18,22 214:2,14,18 215:1 216:4 217:2,9 218:11,20 219:21 220:2,12,25 222:9,24 223:19 225:8,10 229:14,17,22 230:4,13,18 231:8 242:3,12,13,15 243:6,11,15,17,18 244:5,9,12,16,19,20 245:6,13,15,22 246:15,17 247:12,14 248:2,6 251:2 253:7,17 254:1,3,7,13 255:5,7,24,25 257:19,20,22 258:1,2,4,7,11,15,18 259:1,6,10 260:8,14 261:7 264:5,9,11, 18 265:22 266:1,8,9,18 267:13,21 269:7,8,16,20 270:3 271:7 272:11

275:9,10 279:7,11,24 280:3 281:15 283:4 290:6,13,19 291:4,6 292:7,11 295:4,8 296:1,13,16,22 297:2 298:18 300:24,25 301:5,6,13,14 302:4,5,21, 22,24 303:5,8,15,16,22 304:2,3,14,16, 20,23,25 307:22 308:8,19 310:25 311:14

**MAVNIS** 48:18 51:20,21 53:3 87:20, 25 103:18 122:17 123:21 129:22 130:2,3,5,12 132:24 133:1,2,20 137:12 159:10 160:4,5 169:5,22 170:24 171:19 172:2,12,15,19 173:3,5 193:21 194:17 200:7,13 207:16,18 208:12,15 209:22,24 210:5 211:3,9,22 212:16 215:5,24 218:18,19 219:1 220:14,19 221:2 223:17 241:15 262:20 264:1,22 271:21 282:1 284:19, 23 285:4 286:10 293:4 295:4 298:13 302:15 310:22 311:4

**maxed** 219:12

**Mccain** 155:23

**Mccarthy** 24:6

**Mcswain** 67:1 68:14

**meaning** 152:18 167:15 168:5,7 183:23,25 185:13 197:23 250:21 287:22

**meaningful** 251:10,19

**meaningfully** 251:3,12,13 252:11

**meanings** 196:5

**means** 11:24 19:23 30:21 36:19 103:18 108:8 131:2 135:8 152:15 166:12 168:3 195:4 196:9 199:15,16 202:9 203:4,10 263:15 264:5 269:3 284:22

**meant** 36:22 161:20 167:17 168:10, 19 176:16 194:19 198:18 277:12 287:21

**measures** 245:11 274:5

**Medal** 153:19

**media** 52:8,9,11,17 170:14,16 209:2

**medical** 296:18

**medication** 8:20

**meet** 10:3 22:10 40:5 86:1 87:11 159:1 253:8,18

**meet all** 290:14 296:22

**meeting** 176:9 215:5

**meetings** 49:9 101:8 123:16 127:5 129:13,15

**meets** 150:12

**Mehanja** 46:6,8 47:21,23 67:4 68:5, 16

**member** 50:9 83:20 101:5,10 102:21 130:23,25 131:12,23 132:2,5,12 178:23,24 182:2,19

**members** 50:25 83:6,11 84:14 94:11 104:9,18,22 105:3,8 122:13 133:5,7, 13 148:6 171:14,16 198:19 235:10

**members'** 187:9

**memo** 144:24,25 145:1,2 148:19 157:24 163:10,12,20 164:4 208:18 211:11 212:2,3,6,19 215:22 260:11,17

**memoirs** 179:20

**memorialize** 312:9

**memory** 48:14

**memos** 159:8,21 211:13

**Mengmeng** 48:2

**mention** 153:23 155:8 178:22

**mentioned** 13:15 21:17 24:21 25:13 31:18 33:15 36:14 41:21 46:24 49:13 51:23 69:2 72:11 73:20 75:11 97:23 98:6,11 99:2 101:12 106:7,24 108:3,6, 25 109:20 110:23 122:3 125:17 126:25 129:8,17 130:17,21 131:13 133:17 136:6 139:13 151:12 153:4,23 154:7 207:7 219:5 250:1 266:16 306:9 310:1

**mentoring** 20:1

**mess** 134:6

**message** 30:25 31:7 42:14 45:17 49:20 52:13 207:24

**messaged** 52:7

**messages** 45:17

**Messenger** 49:17 52:12

**met** 10:4 22:11 42:8 55:4 85:21 86:3, 5,7 290:11 296:6

**methodologies** 162:21

**methodology** 161:23 162:18,22 163:2,22

**methods** 184:19

**Mexico** 187:23,25 188:4

**MI** 111:7 218:23 268:13

**Miami** 155:24 156:1

**middle** 144:5

**Mike** 64:10 73:4 246:4

**miles** 108:1

**military** 30:15 35:25 36:4,9,15 39:20, 21 40:4,6 44:3 64:8 65:7 70:21,22 74:12 99:22,25 105:10,11,13 106:3,5, 9,10,12,14,16,19,20,24 107:2,6,13,21, 23 108:4,7,12,15,19,25 109:3,5,17,21 110:24 111:7,16 112:8,9,15 113:4 114:6,11,20,23 115:5 116:9 117:10, 18,22 120:8,25 121:12 122:21 123:5,7 125:7 126:20 127:16,17,20 130:19 131:7,12,16,22 132:23 133:5,8 134:8 137:12 143:12 148:7,8,9,10,12 149:2, 4 150:17,20,25 155:8 156:5 157:22 160:16,17,19,20,25 162:3 163:19 164:11 167:1,2 170:22,25 172:4,16,22 178:23,25 179:2,14,17 180:18 182:1, 13,14,16,19,20,23 186:9,11 187:1,8, 10,15 188:1,14,17 189:12,16 190:11, 20,22 191:20 192:19 195:8 196:18 198:21 201:21,23 203:14,19,22 204:5, 8 206:23 207:15,25 208:1,4,6,10,11, 12 210:8,15,20 212:7,11 213:7 216:3 218:23 220:19,22 221:5,8,11,19,23 222:20 223:4,9,18 228:2,5 230:10 234:3 242:2 243:22,24 244:8,19 247:4 253:9,19 254:17 256:10,12 262:22,23 263:2,11 264:15,16 267:6,10,13 268:16,19,20,22 271:17 272:4,22,23 275:5,9,24 276:2 290:9,16 296:4,25 302:16,17 303:3,4,22 304:9,11,15 311:15,16,19

**Miller** 208:25 209:12,21 211:15 212:21 216:1 249:10,12,19 251:6,15 252:22 254:22 255:13

**Miller's** 253:16

**million** 258:4

**millions** 182:25

**mind** 20:23 197:16 198:7 232:1 239:18 242:25 252:17 256:14 295:16, 22

**mine** 151:23

**minute** 12:18 71:25 233:24 306:19

**minutes** 40:17 145:16,20

**miscellaneous** 146:22

**misconduct** 116:18 263:5

**misinformation** 130:15

**mispronunciation** 71:4

**missing** 269:15 270:20 271:3

**misspellings** 64:20

**mistake** 265:4

**mistakes** 234:24 270:15

**mistreated** 36:10

**misunderstanding** 160:10 284:8

**mitigate** 234:13 275:21

**mixed** 227:18 239:25 300:11

**model** 292:19

**moment** 11:17,18 12:18 22:2 134:16 158:11

**Monday** 4:2 231:20

**money** 11:24 13:20,21,24 16:3,4,5,8, 10,18,24 17:6 19:2 20:19 45:6 164:11 255:2

**monitor** 89:10 90:9 160:17 210:14

**monitored** 149:3 217:24

**monitoring** 148:25 159:10 163:14 182:18 273:17

**month** 86:24

**months** 45:15 54:17 109:14

**moose** 107:18,19

**moral** 290:17 297:1

**morale** 160:4 215:22,24

**morning** 4:10 6:25 8:25 26:16

**mother** 48:21 188:9 191:11

**motion** 63:1,7,12,16,25

**motions** 233:18 234:23

**motivated** 168:25

**mountain** 22:11

**mountains** 22:13

**mouth** 170:6,8,12

**move** 31:19 201:1 231:10 256:14 262:6,14 269:11 288:21 293:17

**movement** 134:19

**MSSD** 159:14

**MSSDS** 305:4

**multiple** 43:22 92:24 102:1 112:2 139:22 142:11 150:23 226:8 274:3 313:4

**murder** 107:8

**muster** 150:13

**mutual** 24:10

**N**

**N-400** 290:23

**N-400S** 92:25

**N-44** 297:6

**NACLC** 206:7

**NACS** 206:7

**named** 81:2,7 87:17,20 88:1,3 160:13 249:12 257:7 299:14

**names** 12:17 64:20 67:16 72:1 90:2,4 127:6 140:20 271:13 309:5

**Naomi** 8:7 10:8,10,15 145:10 151:21 305:21 306:1 308:7 309:5

**narrowly** 164:3,23 165:1,2 182:24 183:16,19,20,22,23,24 184:3 185:7,9, 13 272:12 274:6

**Nate** 145:24

**Nathan** 4:12 118:6,7,9

**nation** 103:14

**national** 30:15 36:2,10 37:1 64:9 70:22 147:25 148:9,21 149:5 150:8,22 152:19,20,21 153:6 155:9 158:6 159:3,12 163:7 164:1,17 174:12 177:14,17,18 179:3,24 180:1,2 207:19 211:6 235:8 242:3 245:15 258:3,9 281:17 284:16

**nations** 265:16,17,23 266:2,6

**nationwide** 268:25

**native** 272:5

**native-** 182:10

**native-born** 127:18 178:12,20 180:5 181:8 186:8,11,19 187:1 188:17 189:16 191:20 208:10 245:10,25

262:21,25

**native-english** 292:25

**natural** 263:6

**naturalization** 56:6 248:11 273:1,2 279:16 290:20,22 291:3 297:3,5,11 304:23 305:15

**naturalize** 122:11 159:11 301:7,14,24 302:5,16,24 303:5,9,17 304:3,7,16

**naturalized** 57:9 148:7 152:16,17,18 157:21 159:14 166:21 169:7 181:19, 24 182:15 207:14 212:11 213:6 243:17 248:9 291:8 298:14,18 301:9

**naturalizes** 303:21

**naturalizing** 222:6 302:16 303:11,24

**nature** 7:2 53:21

**Navy** 120:20 125:16 139:23,25 222:2

**necessarily** 19:25 170:12 186:1 232:21 252:6 265:5 280:24

**needed** 34:5 37:17,25 44:10 65:6 122:16,21 128:8,16

**negative** 160:4 161:10

**Neil** 13:11 22:7 147:7 224:8 312:12

**nervous** 268:24

**news** 169:9 170:4 177:11,22,23 178:1 209:2 245:23 246:2,3,5,8,10,13,15,19, 20,23,25 247:2,12 270:16 298:19

**newspaper** 134:24 135:25 167:6 172:9 173:2,12 176:20 190:19

**newspapers** 167:1 171:11

**Ngantchop** 49:3

**NIAC** 281:18

**Nidal** 168:14 178:21 182:10 183:11 245:12

**Nio** 54:9,12,15,18 55:2,4 84:20 85:8, 11,22 86:10,22 87:1,18,22 88:5,9,24 89:8,14,21 90:7,12,14,25 91:9,13,22 92:1,4,12,16,23,25 93:6,11 94:11

**nods** 7:11 132:25

**non-mavni** 242:14 292:12,18

**non-u.s.** 169:4 247:4

**noncitizen** 290:23 297:6

**noncitizens** 290:8 296:3,18,20

**nonclassified** 141:7

**noncourt** 89:12

**nonpublic** 90:24 91:5 135:1 136:2 137:15,17,18,22,24 138:1,5

**normal** 29:2 148:11 182:1 184:19,23 234:2 273:9 275:3 310:7

**North** 238:10

**Northern** 72:13,21 146:4

**Nosse** 8:23,25 9:1

**Notably** 258:1

**note** 62:7 250:18

**notes** 40:24 41:1,3,13

**notice** 62:2 117:20

**November** 64:10 73:4,5 296:15

**NSA** 140:2 235:8

**nuclear** 108:13

**number** 18:4,10 42:19 57:14,17 75:2 94:4 146:1 151:8 157:23 187:4,24 188:10 192:7,8 197:1,5,7,9,18 200:14, 15 214:17 215:12,13 220:4 224:24 226:5 229:6 242:14 256:8 262:9 295:19,23 297:14 298:8

**numbered** 225:6

**numbers** 94:11,14 162:11 172:3 272:2 296:9

**numerical** 192:21 194:8,10 197:5,7, 16 198:7 214:5

**numerous** 71:5 103:6 105:4 171:6 216:24 225:8,22 227:22 232:9 279:12, 25

**O**

**O'DONNELL** 8:1,8,13,15 10:3,4,24 11:5 13:11,13 20:11,12 22:7,8,10,11, 14,18,21 23:3,6,12,13,14,15,18,21 24:3,9,12,14,22 25:13 26:7,10 27:8, 16,21 28:4,10,16 29:7,10,11,22,25 30:4,5 31:18 33:1,2,12,13,14,22 38:21,24 40:8,12,21 41:13 43:4 45:21, 25 46:1 54:21,22 57:15 58:5,11 59:11, 12,14,16,20,24 60:3 61:10 64:11 65:4, 12 66:19,22,25 67:3,6,9,12,18 69:10, 13,16,19 70:9,14 93:15 142:21 145:8, 18,24 146:14,17,24 147:4,5,9,13,18 149:18,24 153:15 223:25 224:7,12,16,

19,23 239:13,16,20,24 278:4 288:3,9, 10,11,13,18 301:16 302:7,25 312:6,18

**O'Donnell's** 15:15 30:16 62:10

**oath** 4:7 6:18,24 7:2,4 155:12,15 156:9 291:3 297:11

**object** 8:1 9:11 29:13 59:12 94:1,5 147:5 224:7 302:7

**objected** 313:8

**objection** 8:2 9:11 11:6 59:15,19 147:8 288:12 301:21 302:25

**objective** 35:15 36:5 242:10

**obligation** 132:17

**observation** 158:11

**observe** 38:11 39:18

**observed** 39:19 87:12

**observing** 38:13,19,20,23 39:13,15

**obstacles** 137:1

**obtain** 38:6 205:18 216:16 217:6 229:12

**obtained** 115:19 221:13

**obtaining** 98:23

**obtains** 16:4

**obvious** 165:2 232:10 269:9

**occasion** 257:11

**occasional** 42:14

**occasionally** 16:22 25:8,9 28:11 61:22 86:3 209:1

**occasions** 6:6 155:15

**occupy** 258:2

**October** 4:2 119:22 165:6 241:20 312:17,21

**ODNI** 121:23 175:15 176:5 220:7

**offer** 151:9 157:18,19 158:9,20,23,24 159:20 161:12 163:24

**offered** 161:17 254:24 279:19

**offering** 150:6 157:13 279:3 281:8 282:14,17,18

**offers** 295:14

**office** 12:19,25 13:4,6,7,12 18:19 20:15,18 25:12,17,22,24 26:2,4 96:1,7 119:12,13,25 121:5 123:6,12,24 124:12,18,22,23 125:7,12,18,21 127:2 129:8,12,20 130:3 139:21,24 141:16, 17 165:19,20 174:11 240:3 249:17 259:3,17,24

**officer** 35:25 39:21 43:19 50:16 105:14,17 106:4,6,9,10,12,14,16 107:21 109:1,3,5,6,21 110:24 111:2,4, 7,8,24 112:8,9,13 113:21 114:23 116:9 118:9 120:13,18,19 123:13 130:22 132:18 135:16 150:17 152:6,9 162:3 169:16 179:14,17 187:15 188:22 200:20 206:23 218:23,24 223:16 262:22 264:11 268:13 291:2 297:10

**officers** 44:15 114:20 124:9 133:1,17, 18 134:1,22,25 135:6,10,22 136:4,15 148:24 173:8 208:21 263:5,23,25 264:1

**offices** 12:23,24 119:6,10 123:3 124:12 125:1,12 127:1 139:20 141:4, 17

**official** 9:4,8,9,12 101:24 125:6 131:21 146:20 148:19 153:9,10 199:9 216:11,16 220:1 309:22

**officially** 307:9

**officials** 127:13 129:19 131:22 141:24 142:1,5,8 143:14,17 144:12,17 173:18,22 174:18 175:9,15,19,23 199:1 208:17 211:20 212:23,24 255:11 306:5,6

**older** 187:20

**Olson** 153:20

**omit** 291:19,22

**one-on-one** 103:8,22 104:5

**one-sided** 253:25 254:3

**ongoing** 131:11 159:13 160:3

**online** 112:5 238:16

**open** 148:12 257:24 258:5 265:2 269:5 276:11

**opened** 218:21

**openly** 172:17 268:14

**operations** 112:15 113:4 125:15,17, 19 126:3,5,11,15 153:20 292:15

**operative** 62:20

**opine** 255:25 256:13

**opinion** 77:11 158:24 159:20 220:9, 11 232:22 233:3 237:3 243:21,23 244:2,12,18,20 245:21 246:22 247:3, 16,17 251:21 254:3,21 278:21 279:4, 7,20,22,23 280:6,9,10 281:7,13,19,23, 24 282:7,8,9,10,11 283:21 284:5,8,20, 23 285:2,8,10,12,14 286:2,3,8,10,17 287:5,6,9,11,13,15,18 289:5,12 291:17,24 292:4 293:7,12 294:7,23 295:14,24 297:13,15,17,19,21 298:8 299:2,4,5,6,8,9,10,11,19,20,24 300:7 302:20 305:13

**opinions** 149:12,15,19 152:12 157:12,17 158:20,23 159:18 161:11, 13,17,22,24 163:5,9,23 166:19 225:17 237:23 238:6 276:25 277:1 278:6,9,14 279:3 280:20 282:14,17,21,24 283:1, 9,10,12,25 284:3 285:18 286:3,4,5 287:10,18 289:24 290:1,4 293:9,10 294:14,18,25

**OPM** 246:24

**opportunities** 148:11 291:8

**opportunity** 32:24 37:2 148:15 159:25

**opposition** 63:16

**orally** 291:7

**order** 41:16 92:4 106:21 107:2,5,7 108:3,5 167:4 202:21 217:5 228:4 265:11 284:17,20 285:7

**ordered** 163:15

**organization** 101:5,7,25 102:14 292:8

**organizations** 178:2

**origin** 36:10 88:13 147:25 148:21 149:5 152:19 158:7 159:3,12 163:7 164:1,17 211:7 284:16

**original** 58:8 62:11 161:5 194:21,23 196:15 200:20

**originally** 152:7

**originals** 225:12 312:12

**OSD** 141:4

**outcomes** 160:11

**outline** 53:10

**overblown** 256:8

**overbroad** 84:3

**overcome** 134:13 275:20

**overheard** 265:4

**overinclusive** 158:25 184:5 273:19

**overlap** 119:14

**overlapping** 119:11

**overly** 164:7 184:5 264:20

**overseas** 110:19 130:12,14 187:11, 19 188:6 192:3 199:6,11,12 202:12 203:20 205:1,3,4,11,13 206:15 216:25 244:10,11 311:10

**overseeing** 233:23

**owner** 11:17,22 13:15 14:3 21:17,19, 24 60:14

**owner/managing** 11:19 60:15

**owns** 226:16 227:2

---

**P**

**P&r** 140:3,4,13,24 249:18 254:6 257:20

**p.m.** 313:15

**pace** 86:15

**PACER** 89:10 90:9,10,12,14

**Pacific** 111:13,16 112:16 192:1,7 208:11

**package** 15:17,22 16:1

**packet** 83:5,9,10,18,21 135:17,19 146:19

**pages** 225:5 241:7 307:21

**pagination** 310:5

**paid** 14:6,13 16:7,22 19:20 45:6 78:15 99:20

**paint** 276:14

**paper** 142:9,10 306:1,4,7,8,21,23,24 307:1,10,12,15 308:5,9,11,14

**papers** 187:9 306:25 307:14

**paperwork** 287:4

**paragraph** 166:7,9,19 177:4 181:16, 17 182:10 183:15,18 184:13 185:6,16 192:11 193:2 198:2 201:3 207:12 211:3 213:4,5 216:2 220:12 222:24 225:7,20 232:2 236:10 250:15 251:6, 14,16,18 252:17,18 253:6,15 254:22 255:13 257:15,16 258:22 259:7 261:23 262:9,10,16,19 264:3 269:11, 15 276:24 278:17,18,20,21 279:4,19 280:3,24 281:10,11,14,18 282:6 290:2,13,19 291:4,11 294:21 295:1,2, 9,10,11,12,13,14,19,23 296:9,11,13 297:2,13,14,16 298:7,10,11,16,23,25 299:7,11,19,24 308:15

**paragraphs** 183:21 280:19,25 281:6, 12 286:19 290:4 291:16 295:23 297:15 298:8 299:1,6

**paralegals** 12:15

**parameters** 252:13

**parent** 188:6 189:9 203:20,21

**parents** 187:19 232:14

**parole** 96:20

**paroling** 96:18

**part** 10:13,21 15:23 16:1 33:23 34:1 49:21,24 52:20,21,23 89:21 90:22,24 91:25 93:7 109:1,2 116:13 120:24 121:4 129:9 131:22 132:5 149:19 154:12,14 155:9,18 156:25 161:8 189:22 194:23 229:1,2 241:9,10,11 242:7 250:11 251:10 281:2 282:8,10 289:12 290:21 291:23 292:4 297:4,21 299:17 305:15 308:8

**part-time** 14:14 15:5

**participants** 185:20

**participate** 10:18 102:4 107:22 291:2 297:10

**participated** 102:10

**participating** 102:12

**parties** 91:19,21

**parties'** 39:6

**partner** 11:9,18,19 14:3 21:18,20,25 22:3 28:15 60:15

**partners** 11:15

**parts** 90:8 126:22 148:3 251:9 292:3 299:6

**pass** 41:13 134:15 290:25 297:8

**passed** 140:15 207:23 210:12

**passing** 121:3 168:4

**passport** 97:18 188:13 189:13 204:4 221:15

**past** 21:16 27:14,16 78:4 169:22 170:20 174:6 255:12 266:10 272:5 273:8

**paste** 278:25 287:1

**patently** 32:23 148:18 267:22

**Patricia** 129:13

**pattern** 187:22

**Paul** 268:12

**pay** 16:8,10,11,12,18,25 24:16 41:19 45:7 48:19 101:8

**paying** 100:14

**payments** 13:22

**payroll** 12:1 16:12

**peer** 307:3

**peer-reviewed** 307:1

**pending** 4:15 7:23

**Pentagon** 43:19 120:15,16 121:21 124:16,18 125:8,10 133:2 139:2,15,16 140:2 151:1 198:22 199:2,9 254:5 310:10

**people** 33:10 34:12 36:9 37:25 39:10 44:14 46:4 49:9,10,11,19 50:2,4,9 51:2,5,8 52:12,25 53:2,3,5 61:1 64:14 67:16 71:5 74:12 79:3 81:10 83:15,23 89:4 92:25 99:24 104:25 107:15,20 108:17 110:12 111:10 113:8,13 114:3, 6,10,14,18 115:2,6,18 117:5 118:12 120:1,7 124:10 125:11,15,24 126:5,25 127:3,4,6,7,15 129:14,25 130:2,4,6, 10,11 132:3,13 133:2,3,12,14,16 134:8,12,14 136:11 138:22 139:2,14, 16,22,23 140:19 141:9 142:11,14 146:9 147:25 148:20 152:16,25 159:4, 6,17 160:6,17 161:6 164:5 165:19,20 168:14,17,24 169:2,20,22 170:8,10,21 172:11,13 173:6,13,14,15,16,19,24 174:5 179:1 180:16 184:7 186:4,5,24 187:15,24 188:5,11 189:3 194:4,13, 14,22 196:3,5 197:12 198:21 199:5,6 200:24 201:10 205:3,10,11,12 208:15, 18 211:18 212:6,10,13 213:1 215:16, 20,22 216:24 217:12,15 218:25 219:10,23,24 220:18,20 221:4 222:3 223:3,18 227:20 229:13 232:13 233:11,14,17 234:16,17,21 235:9 236:16,20 240:2 241:14 245:12 254:5, 6,15,16,23 256:3,6,9 259:9 260:10,12, 14 262:24 263:1,7,20 264:8,14,19 265:3 267:3,6,11,15 268:5,6,7,10

271:16,18 272:2,4 273:11,16,24 274:10 280:13 283:7 291:5 299:22 300:11,13,14 301:24 305:5,9 306:10 307:2,19 308:19 309:10 311:1,2,3,6,7, 9,10,13,16,17,19,21 312:2

**people's** 64:20 161:10 173:4 232:12 271:13

**perceive** 213:14

**perceived** 230:7

**percent** 18:7,15 258:3,5 271:16,22

**percentage** 17:15 18:2,3 263:25

**percentages** 18:9

**Perez** 94:11,14

**perfect** 48:15

**perfectly** 172:15

**perform** 106:17,18,19 160:24

**performance** 208:3 242:13 292:18

**performed** 250:19

**performing** 254:17

**period** 14:24 103:19 119:4,7,9,11 121:6 263:6,23 269:20 270:7,22

**periods** 119:14

**permanent** 290:11 296:6

**permit** 225:2

**permitted** 82:8,9 192:13,17

**perpetrator** 114:13

**persecution** 21:4

**person** 18:25 21:13 38:6 39:11,24 42:8 46:14 47:1,18,24 48:4,25 53:13, 15 55:4 60:24 69:3 75:22 77:13 85:22 86:2,6 88:12 96:19,21 103:9 115:8 116:1,3,4 117:6 135:7,16,18 136:12, 24 137:7 151:18 182:4 184:20 186:15 187:7 192:6 199:3 202:11 203:24 204:1,7 205:12,17 206:12,14 216:17 218:10,16 226:12,18,19 227:2,9,15, 18,25 228:4,11,12,14,18 229:1 233:12 238:15,19 239:4,6 245:14,18 248:14 249:12 257:7 262:25 275:18,24 279:11,23 285:5 291:12 309:12

**person's** 115:10 116:21 226:14,20,23 270:24 280:10

**personal** 169:1 189:1 206:18

**personally** 10:25 116:8 205:8 249:13 257:8,9 268:10

**personnel** 9:10 121:24 123:5,8,11,15 124:14,22 125:3,13 139:22 211:21 228:4 232:3,6,23 233:3 235:2,5,13,15, 22 249:17 290:8 296:3

**persons** 201:19

**perspective** 256:2

**pertain** 138:3 229:15,18,23 269:18

**pertaining** 102:24 104:19 107:6 108:4 121:15 125:4,25 129:2,6 138:6 141:18 313:9

**pertains** 184:11 185:14

**Peter** 71:19 72:22 145:1,2 148:18 157:24 159:21 208:18 211:11 215:21, 25 260:11,17

**phone** 42:6 46:13,20 47:18,24 48:5, 25 49:10 52:6,14 53:14 55:1 85:15,16 199:23 215:18

**phrase** 29:5 167:13 183:13 185:6 196:1 209:13 287:15

**phrases** 167:7 183:13

**phrasing** 154:18,19 183:20 184:2 209:16,18 212:3,17

**physical** 12:19 13:6,7 107:12 108:8, 9,14 112:14 113:4

**physically** 40:5 119:18

**Pig** 171:20

**Pilot** 253:7,17

**pin** 196:25

**Pingyang** 47:15,17

**pinning** 194:6

**place** 11:7 83:22 119:17,18 124:18 172:8 226:17 261:14 264:12 266:22 267:18 269:25

**places** 49:19 112:15 119:19 291:19

**plaintiff** 47:9 95:5 146:6

**plaintiff's** 78:7 89:14

**plaintiffs** 32:13,19 38:3,16,17 39:18 41:23 42:4 49:15 57:14 58:7,10 63:2 65:19,24 66:4,8,16 74:23 79:10 80:20, 23 81:2,7 83:6,13,15 84:25 85:2,5 87:17,20 88:1,3 92:25 97:25 98:3,8,12 99:6 148:6 160:13

**plaintiffs'** 38:18 61:20 63:15,25 65:14 66:6 81:13 284:15

**plan** 108:9 312:18

**plane** 110:20

**planet** 181:11

**planned** 169:3,17 170:5

**planning** 24:18

**plans** 159:9

**play** 163:8 247:20 303:23

**plays** 21:7

**pleadings** 38:7 157:2 158:22

**point** 15:8 36:3 40:20 44:4 45:7 59:25 75:12 83:3 89:2 108:23 111:1 113:12 124:25 125:7,8 129:5 147:17 150:21 156:6 176:20 182:14 188:21 215:10 220:7 222:2 229:18,23 235:25 238:4, 17 282:1,25 286:7 312:25

**pointed** 285:12,15 294:24 313:4

**pointing** 285:20,22

**points** 191:14 220:5 310:8 312:8

**police** 35:25 106:3,6,9,10,12,14,16, 19,20,24 107:6,10,21,23 108:4,7,12, 15,20 109:1,3,5,21 110:24 111:3 112:8,9 114:6,11,20,23 115:5 116:9 117:10,18,22 150:17 162:3 179:14,17 201:12 206:23 262:22 263:2,11

**policies** 37:2 39:22 74:11 157:24 158:1,5,22 160:14 164:15,22,25 209:9,20 211:1 214:15,20 253:8,18 265:22 266:1

**policy** 9:3 32:24 120:6,7 123:5 137:25 146:1 148:15,19,21,25 157:20,22 159:5 160:1,16 161:7 209:25 211:5 213:9,24 214:4 249:16 265:15 266:7, 15

**policy-wise** 121:11

**political** 168:14,18 254:24

**polygraph** 184:20 274:24

**pool** 16:8

**poorly** 174:7

**pop** 192:5

**pops** 273:9

**population** 243:6 258:9 263:24

264:22 272:1 305:20

**populations** 126:8,21

**pose** 217:16 219:11,13 243:16 245:10 246:18

**posed** 104:1 134:2 172:25 173:5,20 174:10 175:8,11,16,20,24 176:18 179:4 243:6 244:18,20 246:15 247:3

**poses** 174:3 248:7 274:14 275:9,19, 23

**position** 8:16 44:12 60:15 111:24 171:3 224:9,14 233:24 255:25 256:13 288:15

**positions** 11:20 258:3

**possession** 115:4 225:16

**possibility** 254:25 264:8

**post** 49:19 107:13,14 144:18 191:3,8

**post-** 219:15

**post-9/11** 192:25 219:5

**post-naturalization** 273:17

**post-retirement** 236:5 306:20

**posted** 169:14 170:13,15 171:13,15

**posting** 215:17

**posts** 45:16

**potential** 39:23 74:23 83:6 111:13 127:24 242:14,15 245:7 305:19 308:25 309:1

**potentially** 117:11 184:20 208:1 268:7

**Powerpoint** 123:23 220:4 259:19 308:22,24 309:15

**practice** 15:7,9 30:10,16 78:20 79:2 101:3 110:17 139:2 147:14 224:25

**practiced** 19:24 147:15

**practices** 219:9

**practicing** 5:19 15:10

**Praveen** 71:18

**precise** 124:20

**precisely** 195:23 269:23

**predecessor** 279:15

**predicted** 292:18

**preface** 242:19

**prefer** 105:7

**preliminary** 63:2,8 83:4

**preparation** 10:13 225:14

**prepare** 9:20,22 66:19,22,25 67:3,6,9 69:10,13,16,19 70:9 165:13 166:1 309:7

**prepared** 9:23 10:20 225:9 309:8

**preparing** 10:18 103:21 104:1 165:15 225:17 241:18 309:20

**presence** 198:4,17 199:16,19 200:4, 17 201:18

**present** 9:2 39:1 74:8 259:10 290:9 296:5,18,20 306:2,4 307:1

**presentation** 102:7,13 259:19 308:23,24 309:15 310:7 312:2

**presentations** 101:12,17 102:7,19 220:5

**presented** 103:22 251:2,4,20 252:1, 13 306:25 307:9 308:8 309:16

**presenting** 38:2,4 86:16 309:10

**presents** 256:1

**press** 121:23 123:21 124:6 166:25 169:13 177:13 209:1 243:19 248:20 250:3

**pretrial** 70:10,13

**pretty** 18:22 40:3 101:21 121:17 127:25 133:25 171:21 188:5 200:20 212:25 238:3 253:25 261:22 273:8 275:7

**prevail** 17:19

**prevent** 74:11 113:8 179:7 182:20 208:21 256:11 264:12

**prevented** 39:22

**preventing** 137:1

**previous** 185:10 213:5

**previously** 146:6 259:22 277:1

**price** 25:5

**primary** 112:13 242:10

**principles** 148:15

**printouts** 146:4

**prior** 9:24 185:24 189:17 217:25 236:3 242:1 249:20 261:23 273:13 276:21 286:19

**prison** 108:21

**prisoners** 108:23

**Privacy** 146:21

**private** 45:8

**privilege** 29:14,15,17 79:24 93:16,18 94:6 239:11 313:7

**privileged** 9:7 80:2 94:2 147:10

**pro** 13:24 17:16,18,24 18:2,5,11,15, 16,22,24 33:19 89:3,5 166:10,11

**problem** 75:11,14,18,21 81:11 87:22 136:25 162:10 164:10 172:17 203:23 221:25 271:4 303:2 305:1 311:12

**problems** 48:19 87:21 122:7 138:13 208:9

**procedure** 267:14

**procedures** 65:8 264:12 266:21,25 267:18 268:23

**proceeding** 56:5,6,20,23 72:12 86:14 95:6 98:20 99:3,4,5 100:8 176:11,16 244:15,22 245:4 247:5,13 248:2,8,16

**proceedings** 44:24 57:4 86:21 95:8, 11,24,25 96:2,8,15,22,25 97:5,8,12, 15,22,23 98:2,6,8,12 247:20 298:14 299:13,22,25 313:15

**process** 114:18,23,25 152:16 219:6, 16 234:2,6,10 273:1 276:9 290:22 297:5 300:5

**processing** 113:22 305:4

**produced** 123:25 167:3 169:14

**product** 20:5,8

**production** 65:15,20 66:12,14

**products** 123:24

**profession** 179:2 180:19

**professional** 79:2 132:14,17 162:15

**Professionals** 296:17

**professor** 125:6 177:17

**professors'** 177:18

**proficiency** 292:14,22

**profit** 13:25

**profit-sharing** 13:17,19

**profits** 13:18

**program** 4:25 34:13,14 35:20 43:19 66:1 70:22 98:24 102:24 103:9,14,16, 23 104:6 105:16,18 120:10,17,19 121:16,20,22 122:1,8 124:5,11 125:4, 11,14 126:1,2,13 127:1,3,13,14 128:23 129:10 130:4,15 132:2,4,7,11, 21,22 133:6 137:16,23,24 138:1,4,6, 11 140:5,10,12,23 141:3,8,19,23 142:7,12,15,24 143:5,18 144:12 148:9 149:9,10 150:9,10,11,22 151:2,3,4,14, 16,19,22 152:6,9,23 153:1,2,7,9,11,13 154:10,13,15 155:2,5,7,11,13,16,21, 23 156:3,7,9,11,16,17 157:22 158:10, 18 161:6 166:22 169:23 170:9,11,21 171:5,9,13,14,17 172:17,23,25 173:7, 9,20 174:3,10 175:8,11,16,20,24 176:7,11,18 179:8 185:20,21,25 186:7 188:22 194:21 198:2,6,8,13,24 199:8 200:13,16,20,21,22 207:15 208:1,23, 24 209:2 210:20 212:7 213:7 215:21, 23 216:4 217:9 218:11,20 219:24,25 220:6,13,25 222:9,25 223:19 234:16, 20 242:3,12,16 244:9,13,16,17,19 245:13,15,18,20 250:22 251:2,4,20 252:1,7,13 253:7,11,18,21 254:1,4,7, 9,10,13 255:5,7,24,25 257:19,20,22 258:1,7,11,15,18 259:1,6,10,18 260:8, 15 261:7 263:16 264:5,9,11,17,18 265:6,8,9,11,22 266:1,8,9,18 267:3,4, 5,10,13,21 268:15,17 269:1,7,8,9,10 272:11 273:4 279:7,8,12,24 280:3,4 281:20 282:1,2 283:4 290:7 291:4,5,6 292:7,9 295:8 296:2,13 300:24 301:5, 13 302:4,21,22 303:15,22 304:2,4,14, 25 307:23 308:8,19 311:1,12,14

**programs** 176:6 212:12 223:19 247:12 264:7 265:6

**project** 43:19 50:16 120:15,18,19 152:6,8 200:20 223:16 264:11 290:5 295:25

**projected** 307:17

**promoted** 48:20 111:22 210:8

**pronoun** 227:13

**pronouncements** 216:1

**proofread** 123:24

**proper** 150:11 234:22

**properly** 110:19 269:4

**property** 25:4

**proposal** 194:23

**proposed** 65:2,4

**proposition** 147:12

**prosecute** 182:4

**prosecuted** 243:11 298:22

**prosecutions** 177:9,19

**protect** 106:17 108:10,13,17,18 109:24 111:8 274:1

**protected** 9:7 115:13 184:7

**protecting** 109:25 113:4

**protection** 96:3 108:12 148:16

**protective** 92:4

**proved** 134:18

**proves** 159:2

**provide** 6:18 12:3 30:7,8 34:25 35:1, 11,15 36:5 37:23,24 44:11,12 45:9 59:23,25 60:8 61:24 78:19 81:16,23 82:8,9,13 84:15 99:17 115:16,23,25 132:14,18 142:16 149:11 152:7,12 165:23 166:13 180:10 186:18 196:20 229:4 230:4 236:3 242:12 284:20 285:2 289:8,11 294:2

**provided** 35:3 44:16 47:11 50:23 51:14 70:12 82:2,5,6,16 83:25 84:9 89:7,17,20,21 93:10,13,24 94:3,12 99:12 104:21 116:10 145:10 176:7,17 206:2 225:11,12 229:23 231:1 237:25 238:2 265:16,23 266:6 291:17

**providing** 44:14 115:15 166:9 312:15

**provost** 111:3,20

**public** 9:7 89:21 90:2 137:19 140:1 166:20 168:11 177:5,7 178:1,10 179:10,17 180:9 181:5 207:13 208:16, 22 209:5,19 211:13,23 212:19,20 243:10,13,18 244:6 247:22 248:18,19 250:1 298:21 311:22

**publication** 144:17

**publicly** 169:19 170:3 207:24 213:25

**publish** 254:9 306:14

**published** 104:24 105:2 169:12 171:12 254:12 255:9 306:12,13 309:21

**publishes** 89:25

**pull** 161:16 192:8 310:13

**pulled** 116:16

**pulling** 116:19

**punch** 215:21

**purchase** 25:5

**purported** 168:17

**purporting** 221:17

**purpose** 167:25 194:16 273:8 310:6

**purposes** 4:11 118:2 149:25 161:5 168:14 205:18 207:1,4 216:17 232:1 237:23 276:5 302:1

**pursuant** 182:4

**Purtell** 66:23 68:12

**put** 58:25 65:1 82:8 83:18 97:3 101:22 141:23,25 142:4,8 143:14 146:19 159:21 172:10 186:24 194:10 202:23 208:17 235:2,5 248:20 266:21 278:25 306:15 307:13,14 309:24 310:12

**putting** 84:13 124:6 212:8 270:15,23

## Q

**Q-E** 98:18

**Q-I** 55:7

**Q-I-O-N-G** 98:16

**Qi** 55:6 71:18

**Qiong** 98:16

**Qualification** 290:16 296:25

**qualifications** 294:21

**qualified** 151:19,21 152:7,23

**qualify** 298:11,17 299:20

**quality** 160:7 293:1

**quash** 254:11,19

**question** 6:20,22 7:5,7,12,14,23 8:3 17:14 23:19 29:6,21 36:18,20 51:1 67:23 84:4,5 92:20 104:17 124:20 137:20 143:2 144:4,5 152:24 177:2 181:2 191:25 196:15 204:21 222:18 225:1 237:8 243:5 244:23 247:20 258:25 262:3,5,7 272:7 281:4,5,6 285:19,24 286:1 292:2 295:9 301:11, 21,22,23 302:1,8,13 305:11

**questioning** 174:15

**questions** 6:17 8:2 51:5 67:24 68:2
104:1,3 105:9 107:4 133:25 137:4
157:5 184:19 185:1,3 202:24 205:23
213:3 216:23 231:10,15 232:14
233:19 262:14 275:1 287:23 300:20,
22 312:5,6 313:9

**quickly** 122:12

**quote** 155:6,7 211:9 219:8 222:2
252:25 262:22 299:7

---

**R**

**race** 292:20

**radical** 182:21

**radicalized** 168:16

**raise** 129:15

**raised** 158:14

**Raj** 40:20 46:17 69:11,23

**rampant** 130:15 137:11

**RAND** 167:3 176:23 242:10,11,20
243:1,13 244:4 245:1,18,19 247:10,21
250:18,25 251:23,24 252:11,24 253:1
254:10,11,19,25 255:4,8

**randomly** 233:20

**range** 108:14 110:15 111:12 190:1
193:10,21 206:8 275:6

**ranging** 48:19

**ranks** 130:8 187:16

**rape** 107:8

**rare** 219:13

**rate** 258:8 263:6 305:3

**reach** 88:16 136:19 149:18 161:23
162:19 163:4 164:15 167:5 178:11
179:10 211:8

**reached** 42:18,19,21 131:5 180:10
219:20

**reaching** 163:9 204:23 242:21

**reaction** 110:3

**read** 10:8 62:6 64:21 153:25 161:14
169:11,12,13,19 171:6 173:1,3,11
178:15,16 179:1,19,20,22 180:2
181:10,13 185:2 205:19 206:1 208:16
211:11,13,17 228:17 231:3,11 232:8

**read** (cont.) 242:18 250:15,16 251:22 252:17,20
255:23 256:3 260:3 263:3 269:12
272:25 275:1 277:6 288:14 291:23
297:12 305:6

**Readiness** 121:25 123:9,11,15
124:14,23 125:3,14 139:22 211:21
249:18

**reading** 38:7 39:6,16 40:1 179:25
181:21 206:3 209:19 253:5 269:14
292:22

**real** 271:4

**realize** 172:1

**realized** 32:22 163:11 172:2

**realms** 265:18

**reason** 40:18 169:17 183:7,9 191:2
218:21 233:2 251:5 253:16 262:15
265:13,14 274:13,17 311:13

**reasons** 134:6 254:9 264:2 276:25

**recall** 6:5 25:6 27:15 32:9,16 41:15
42:16,21,25 43:1,5,8,11,14 45:3 46:7,
9,12,15,18,21 47:19,22,25 48:3,6,11,
16,24 49:1,2 50:22 53:12,14,20,23
54:1,3,5,11,13,16,20 55:3 56:14 57:8,
10,12,14,17,19 58:4 63:6,9,18 65:19,
22 66:18 67:18,20 70:5 73:21,22
86:23 91:6 92:11,22,24 93:1,3 128:17
140:15 154:3,19 157:8 214:14,16,17
215:15 220:4 249:21,24 250:9 257:3,
9,10 289:18,20,21,23 294:5 309:13

**receive** 15:19 56:7,25 78:12 82:19,25
99:9,18 111:23 112:1 132:9 135:6
154:2,4 165:15 312:21,23

**received** 9:8 82:2,11,20 83:1 89:7,9,
15,19,22 91:4 99:15,16 100:11 110:8
112:9 135:2,9,22 136:3 137:15,22
138:5,10 139:10 140:22 141:5,7,11,
13,16 142:3,6 143:10,13 144:15
153:16 154:6 162:4 199:12 250:20

**recent** 255:23 257:16 258:22

**recently** 28:2 169:24 254:1,4 298:19

**recess** 40:16 59:7 145:23 224:2 288:5

**recited** 237:10

**reciting** 240:23

**recognize** 30:18 154:14

**recognized** 153:12 154:10 253:1

**recollection** 49:4 53:16 257:12

**recommendation** 136:23 137:19

**recommendations** 128:1 225:23
227:22,24 228:8,15 229:25 307:23
308:1,2,4

**recommended** 198:25 199:8

**record** 4:12 7:10,11 9:16 20:25 30:3
34:15 58:16,18 59:1,5,9 71:14,17
73:17 79:8 84:23 90:7,12,13,18,25
91:23 93:20 102:2,3,7,8 145:6,22
147:2,8 205:21 216:19 223:23 224:1,9
230:14 242:17 243:13 285:11 288:2,7
312:7 313:1

**recorded** 101:13,15 102:6

**recording** 7:9 102:4,22

**records** 101:15 102:15 114:4 199:22
201:19,22,24

**recruit** 120:12,14 126:10 156:5
190:22 218:1 270:11 273:9 293:3
296:16

**recruited** 161:1 178:12 180:6,17
181:8 182:13 192:2 198:10,12,22
199:5 292:6

**recruiter** 199:3 218:2,17 219:19
268:8 270:11,22 271:14

**recruiters** 133:3 268:9,14,24 270:10,
17,19

**recruiting** 53:6 120:1,4,5 127:14
155:11 172:2 218:1,17,22 219:18
221:6 264:7,16 267:3,5,12,16 268:12,
13,15 286:12 291:5 305:20 306:2,8,13
307:2,19 308:25 309:1,2,4,23

**recruitment** 126:15

**recruits** 185:8,21,22 186:1,2,7,9,11,
15,19 187:1 188:17 189:16 191:20
193:3,5,18,20,24 195:3,6,24 196:8,15
197:4,6,17 198:2,6,8,14,25 199:2,19
200:2,16 216:4,8,9,13 217:2,3 218:9
219:17,21 220:2,15 242:14 254:17
269:4 279:8 280:4 283:19,21,23
290:17,19 291:6 295:4 296:25 297:2

**red** 107:20 111:10

**Reddy** 299:15

**reduce** 127:24

**refer** 33:13 43:4 44:5,7 58:10 75:8,23,
25 76:5,6 80:20,23 81:2,7 87:21 88:24
105:8 174:19 215:19 232:6 261:7
263:1,2 307:16

**reference** 155:4 259:22,23 272:8 276:25 278:13 279:1

**referenced** 142:10 209:10 219:7 261:1 309:16

**references** 185:11 255:14 269:19 270:5 271:12

**referred** 46:4 54:20 57:15 58:4 87:17 89:1 91:9 262:24 285:12,13,14 286:21 287:5

**referring** 38:20 44:14 54:22 64:7 66:15 89:4 100:24 177:8,22 217:1,4 226:5 300:13

**refers** 307:17

**reflect** 285:11

**reflected** 71:9

**reflects** 60:5

**refused** 255:1

**refusing** 83:16 207:22

**regard** 302:10

**register** 169:11 246:4 298:22

**regular** 64:11 80:11 123:16 131:25 132:3 139:9 159:11 175:6 190:21 200:23,24

**regularly** 5:24 80:9,10 85:12 87:20 94:9 109:6 118:11

**regulations** 107:14

**reimbursements** 17:12

**reiterate** 58:20

**relate** 89:22 93:19 172:24 241:12

**related** 121:13 126:19 128:19 146:18 152:25 184:24 310:19

**relating** 56:19 82:12 84:14 107:1 121:22 142:12 153:11 171:4 180:1,23 262:8

**relationship** 78:25 88:14

**relatives** 198:21

**release** 124:6 169:13 177:13 186:23 243:20 248:20

**released** 242:7

**relevance** 301:18,20

**relevancy** 302:12

**relevant** 237:25

**reliable** 252:6

**relied** 178:14 179:10 237:10 266:10 293:6,12 297:18

**religious** 168:18

**rely** 161:13 178:11 237:2,15 285:3 293:10 297:22

**relying** 236:11,12,18,22,24 237:4,6,9, 13,20,22 238:5 299:9

**remain** 157:6 158:6

**remember** 37:11,12 40:15,19 41:2,7 48:22 49:12 83:9 86:24 88:17 119:20 127:6 128:6,18 140:20 241:22 258:20

**remind** 6:15 106:8 130:18 158:19

**remotely** 13:11 112:3

**removal** 299:25

**reopen** 312:22 313:1,11

**repeat** 286:18 302:1

**repeatedly** 94:14 109:12 162:10 185:19 221:25 291:7

**rephrase** 6:22 137:20

**replete** 225:21,25 226:1,5

**report** 9:23 10:8,21 28:7 35:4,13 70:12 82:17 84:17 118:12 131:18 141:10 145:25 149:22,25 156:21 157:14,16 158:17 161:13 165:8,11,13, 16 166:1 167:3 170:18,19,23 176:22, 23 177:3,24 189:22 191:17 194:11 197:14 202:22 207:9 219:8 225:5,8,18 226:6,16,19,24,25 227:3,4 228:3,23, 25 229:1 233:20 235:7,13 236:9,19,24 237:4,5,9,24 241:18 242:20 244:4 245:2,18 247:21 250:20,21,25 251:13 252:23,24 254:10,11,19 255:3,5,6,9 258:20 259:23 268:8 272:21 273:6 274:10 276:20 277:9 278:7,8,11,16, 23,25 279:5,6 280:22 281:3 282:19,22 283:2,3,11,14,18 284:1,4,22 285:13 286:18 287:7 292:10 293:6,7,11 294:16,20 309:20

**reported** 116:18 258:8

**reporter** 7:9 298:20

**reporting** 134:23 135:1,23 136:2 138:11 140:23 141:1,8,17,21 143:14 144:11 249:5

**reports** 9:25 10:2,5,6 114:6 135:3,6 141:3 142:3,20,22 143:3,4 144:16 146:16 157:8 160:8 173:5,11,13,14 174:2 177:9,16,21 178:10 179:1 196:19,22,25 202:19 205:19,22 206:1 225:9,13,17,21,25 226:3,4,8,13 227:21 229:4,12,15,18,22,23 230:5,6, 11,12,16,20,23 231:5 232:3,8 233:3 234:14 235:2,5,16,22 255:23 256:4,5 259:22 260:19 261:12 271:20 272:20 312:10

**represent** 4:13 40:16 56:20 85:4 93:18 94:15,19 99:21,24 135:20

**representation** 30:25 56:19

**representations** 86:19

**representatives** 257:17 258:23

**represented** 4:16 44:23 57:3 95:3,4, 7,11,23 96:9,12,15,19,22 97:1,5,9,13, 16,19,24 98:2,7 99:2,4,5,6,10,23 100:3

**representing** 9:2 55:15 135:7,16

**represents** 79:10 84:25 85:2 209:2

**reprint** 278:12

**request** 9:9 60:8 65:14,19,24 66:11, 14,15

**requested** 65:23 111:21

**requests** 10:19,22 11:6 51:15 113:22 132:10

**require** 282:2,3

**required** 9:3 78:17 276:9 281:21 285:9 290:14,15,19 294:6 296:22,24 297:2

**requirement** 290:21 297:4

**requirements** 212:9 290:12,14 296:7,23

**requires** 7:4 20:1 245:16 290:22 297:5

**requiring** 281:15,25

**Research** 292:8

**researchers** 243:1 247:10 250:19

**researching** 163:3

**reserve** 105:14,17 106:12 109:1,2,6 118:23 121:7 130:23 131:1,13,23 132:2,6,12 133:10 312:22 313:1,11

**reserved** 313:16

**reserving** 9:10,11

**reside** 201:10

**resided** 202:11 269:20

**residence** 202:12 290:11 296:6

**residences** 295:3

**residency** 269:18 270:5

**resigning** 210:5

**resolve** 57:7 75:21 129:24

**resource** 243:4,5

**resources** 33:23 34:2 260:14 292:8 311:2

**respect** 42:11 96:20 262:2

**respond** 6:21 7:15 111:17 132:6

**responding** 182:17 185:18

**response** 7:12 51:15

**responses** 10:18 66:6

**responsibilities** 60:14 108:24 111:5 113:21 119:24,25 120:9 121:10,18 123:14 132:12

**responsibility** 111:8 112:14 132:13

**responsible** 11:25 61:3 108:7,8,22 109:25 268:9

**responsive** 11:5

**rest** 100:18 157:7 210:15,18 271:22 274:23

**restrict** 91:12

**restricted** 91:20

**result** 234:11 248:7 279:11

**resulted** 245:3 247:13 260:18

**resulting** 244:14,21

**results** 247:5 292:25

**retain** 131:8

**retire** 24:18 130:19 131:4

**retired** 99:21,24 106:10,12,13 130:23 131:1,6,12,23 132:2,6,12,16,17 139:14 140:5,14,16,22 141:19 142:13 143:11,15,16,25 144:7,13 151:4,5 154:4 169:16 171:3 172:24 173:8 174:16 175:12,17,18,21,25 266:19

**retiree** 130:24 131:24

**retirement** 15:22,25 23:5,11,16,17, 18,24 24:2,17 131:5,9 236:4 249:20, 23 293:5

**returned** 312:13

**returning** 224:4

**revealed** 257:20

**revenue** 16:14,20 17:8 18:10

**revenues** 16:21 17:2,9

**reversed** 157:25 158:4 159:8 161:8

**review** 10:6,9 20:5,8 60:1,7 62:11,14, 16,17,22 63:1,5,7,12,15,24,25 64:17, 19 65:5,14 66:3,6,11,17 68:8,22 96:1, 7 128:16,22 129:2 144:21 151:6 157:2 165:18,19 166:25 167:1 200:23 212:19 218:7,14 236:6 237:2,15 238:7 250:7,8,11,23 255:15,18 258:17 259:3 270:2 278:4 292:9 307:3

**reviewed** 9:23,25 10:1 41:8,11 60:3 61:20,22 63:4,6,9,10,19,20,23 64:4,6 66:13 69:22,25 70:3,6 81:13 90:13,16 128:17 129:5 165:20 167:3,4 199:21 224:21 225:8,14 235:23 236:20,25 237:12 250:9 255:17,20 258:10,14 260:20 295:21

**reviewers** 307:3

**reviewing** 66:18 69:3 70:5 162:23 199:24 233:19 268:23

**reviews** 160:11 257:16 258:11,15,23, 25 259:2,5,8,11,12,14,16 260:1,7,16, 18,21,25 261:7,10,13,14,19

**Rich** 107:18

**Richardson** 107:24,25 108:22 109:11 110:3

**rid** 254:8

**Ridge** 22:12

**rights** 134:19 185:3 275:1

**rigorous** 219:7,17

**ringing** 53:22

**riot** 272:25

**rip** 139:8

**rise** 243:24 244:13,21

**risk** 183:18 219:14 251:4 252:7 256:1

**risks** 219:11 242:16 243:9 251:1,11, 13,20 252:1,12

**road** 108:1

**Robert** 296:14

**rockets** 111:11

**Roger** 256:23 257:7

**role** 20:11 21:6 34:18,22 35:1,11 60:12 106:16 108:21 147:21 149:6 154:12 155:1 156:12 303:23

**rolled** 122:7 163:20

**room** 58:24 125:10

**ROTC** 105:18

**routinely** 241:2 267:15

**royalties** 16:17

**Rui** 46:11

**rule** 164:3

**rules** 50:10 78:18,19 276:10 306:24

**rumor** 137:11

**run** 12:17 28:23 87:19 107:3

**running** 33:19 107:20 151:4 205:17

**runs** 232:25

**rushed** 270:23

**Russian** 191:4

**Russians** 265:10 269:7

**S**

**S-T-O-C-K** 9:19

**saddened** 213:8,12 214:4,15,19

**sadness** 213:15,24 214:1

**safe** 280:18

**Safeway** 12:10,11 26:15,16 27:4

**Sagar** 239:18

**sake** 286:20

**salaries** 14:1,2 16:9

**salary** 13:23 14:4,9,14 15:15

**San** 72:25 73:13

**Sandeep** 48:8

**Saral** 292:6

**sat** 87:4 217:23

**Satchou** 49:3,7

**save** 280:16

**saved** 240:17

**scan** 312:18

**scholarship** 199:13

**school** 112:8,9 162:6,8 198:18 205:14,21 206:15 295:4

**score** 290:15 292:19 296:24

**screen** 208:20 234:16 268:6 271:19 274:21

**screening** 82:18 158:25 182:18 183:1 184:23 185:8,19 190:24 207:21, 24 208:19 210:13 218:20 219:2,6,16 221:1 234:17 271:18,20 272:13,17 273:9 274:5,15,18,19 275:4,11,14 276:1 281:17 284:19 285:6 304:15 308:12,14

**screenings** 146:9 160:5 164:8

**scrub** 197:2,7,13

**scrutiny** 164:2 184:1,11,12 185:14

**seal** 89:15,18

**Seals** 125:16 140:1

**search** 172:5 185:2 275:2

**searches** 172:6

**Seattle** 37:9,12 71:23 72:15 73:9 239:21,24

**Sec** 139:24

**second-class** 210:19

**seconds** 4:11

**secret** 128:15,17,19,25 221:13,14,18, 19

**secretaries** 124:9

**secretary** 118:23 121:6,24 122:25 123:2,3,10 124:13,22 125:12,22 127:2,8 139:21 141:18 154:25 179:21 211:21 249:17 290:6 296:1,14,15

**section** 9:3,13 64:21 251:12 283:19 295:14 307:23 310:6

**sections** 166:4 294:24

**secure** 113:14

**security** 30:15 36:2,3 37:1 82:18 84:21 90:1 106:19,21 107:2,12 108:3, 5,8,9,14 111:1,3,6,24 112:13,14 113:4,21,22,23 114:18,23 115:1 116:6,9,13,24 117:8,11,14,19,20 118:3,6 126:16,19 128:10 135:3 137:5,8,12 141:23 142:7,11,15,17 148:22 150:8,10,12,22 152:20,21 153:6 158:24 164:8 171:4 172:25 174:11,13 175:2,8,10 176:5,6,8,10,18 177:14,17,18 179:4,7,24 180:1,2 182:23 185:5 190:24 205:18 207:4,6, 19,22 208:22 216:18,23 217:6,16,22, 25 218:7,13,25 219:6,16 221:2 222:1 227:9,15 228:1,19,24 233:13 234:4 235:8 242:16 243:5,16,21,22 245:7, 10,15,20 246:9,14,18,22 247:12,25 248:3,7,12,23 249:2 251:3,11,19,25 252:12 254:15 255:24 258:3,8,9 260:13 263:21 264:23 266:17,22,24 267:6 268:7 272:10 274:5 275:10,11, 15,18,20,25 276:2,4,5,9 279:14 284:19 286:16 290:24 297:7 300:23 301:4,12 302:3,21 303:14 304:5,13, 18,20 308:7,12,14 310:15,17,18,19, 20,22,23 311:1,8

**security-threat** 268:10

**seek** 17:19,23,25 32:25

**seeking** 30:24 114:14 300:5

**select** 212:22

**selected** 152:6 209:1

**selection** 293:2

**semantics** 197:21

**seminar** 133:24 235:7

**seminars** 131:24

**Senate** 155:22,25

**senators** 133:13

**send** 33:2 52:6,13 81:11 97:4 124:6 125:9 138:23 143:18 144:18,20 167:23,24 177:16 199:3 218:12 229:15 274:2 307:6,8 309:9,12 312:19

**sending** 138:21,24

**sense** 36:8 121:2 168:10,20,22 184:10 185:10 193:11 196:12 232:15

**sensitive** 253:3

**sentence** 166:9,11 167:8 168:6 177:5 180:10 181:5,17 183:12,17 184:17 185:16,18 186:8 189:1,5 190:7 191:14

**sentences** 183:14 278:24 291:20,22 299:4,18

**separate** 23:8,18,23 123:9 132:11 242:1 284:2,5

**separately** 222:18

**separatists** 191:4

**September** 148:17 241:19,20 257:24 260:17

**sequestered** 157:4

**series** 6:17

**serve** 106:1,8,13,17 151:19,22 211:5

**served** 5:21,23 27:20 65:16 66:4,7,8, 16 70:10 76:20,25 88:17 106:3,5

**service** 74:12 105:10 130:19 143:12 182:15 221:23 279:16 302:17

**services** 56:4 78:18 96:3 103:4 107:11 155:22,25 159:5 162:8 273:6 291:2 296:16 297:10

**serving** 6:3,13 76:17 148:12,24 182:16 191:9 256:10 289:13,16 291:9

**session** 87:12

**set** 25:22 164:8 234:16,20 256:17 264:12 266:25 267:5,14

**Seung** 43:6 69:14 70:1

**sex** 292:20

**SF** 270:9,10,12 271:4,8

**share** 201:11,12 224:15 305:14

**shared** 220:9,11 230:16,20 231:14 248:24

**shares** 182:6

**sheet** 259:20

**sheets** 123:22

**ship** 122:15

**shipped** 190:20 191:1 301:1

**shocked** 159:22

**shooting** 168:13

**192:11,22 193:3,8,17,20 194:18 195:2 197:5 198:1 201:3 202:4,15 203:7,9 204:11,16,24 207:1 213:6 216:7,2 217:2 220:12,17 221:22 223:8 225:24 227:21 252:18 253:6,12 279:19 280:2, 18 281:6,13 295:2 297:17**

**short** 185:17 224:4 269:19 270:7,21

**shortages** 290:7 296:2

**shorter** 292:1

**shorthand** 121:8

**shortly** 269:8

**show** 92:8 101:20,23 117:23 124:16 125:9 157:3 188:16 191:19 192:3,4 255:7 306:17,18,19,21,23

**showed** 114:12 236:13,14,15 267:16 270:2

**showing** 267:11

**Shrestha** 292:6

**shut** 244:17 265:9,11

**sic** 73:4

**side** 35:24 111:7 122:18

**sides** 35:21

**sign** 77:22 213:15 218:5 219:2

**signature** 166:6 313:16

**signed** 11:6 91:2,3,7,11,16,24 92:3,9 93:8 276:18 277:8,18,25 293:23 295:17 298:1,12

**significant** 215:25 217:21 243:16 248:1 256:1,7 274:14 310:14,16

**significantly** 215:23 258:7 270:4,6 292:13

**signing** 12:1 92:11,13,14,15,22,24 93:1,3

**similar** 212:14

**simple** 92:20

**simply** 157:3 185:17 233:13,18 271:17 278:24 286:21 287:4

**Singh** 43:10 48:8,17,25 69:20 70:7

**single** 48:15,22 63:24 181:9 182:19 202:1 245:6,14,17 264:16 267:24 275:24 276:1 304:23

**single-scope** 206:4

**singled** 210:25 211:4

**singular** 226:6

**Sister** 5:6 6:4

**sit** 40:7,10,11 73:23 215:3 270:11 271:7

**sits** 202:17

**sitting** 108:19 203:14,18 259:3,17

**situation** 184:21 303:21 306:8

**six-page** 165:5 278:10,15,22 279:5 282:18,22 283:2,14,25 284:3 285:13 294:15,20

**sketchy** 170:9,11,21,25

**skills** 160:25

**skip** 291:24

**Skype** 213:20 215:4

**slide** 123:23,24 220:5 306:17,18,19, 21,23 309:12

**slides** 307:7 308:17,18 310:1,12,17

**slightly** 151:22

**sloppy** 273:24

**slow** 86:14

**small** 219:14 224:24 254:6 256:8

**Smith** 256:23 257:7,11,13 262:16 269:11 272:8

**sneak** 264:9 268:16,18

**snow** 22:12

**Snowden** 178:22

**social** 52:7,9,11,17 170:13,15 199:17

**society** 198:20

**SOCOM** 139:25

**solders** 213:10 292:24

**soldier** 93:25 94:4 95:4 96:11 104:19 136:20,21 137:1 184:14 217:5 247:14 248:2,6 275:9,10 292:5 293:3

**soldiers** 48:14 70:18 71:13 73:18 74:5 78:10 94:15,19,25 95:2,7,10,23 96:9,13,16,23 97:1,6,9,13,17,20,24 98:3 104:23 129:3,6 134:2 142:23 143:5 169:18 170:6 182:12,22 208:6 209:14 210:21,22,24 211:18 212:22 213:18,23 214:2,14,18 215:2 225:10 229:14,17,22 230:4,13,18 244:5,20 246:15,17 251:2 258:2,4,6 269:16,20 270:3 281:15 292:12,18,25 293:1 300:23,25 301:5,6,12,14 302:3,5,22, 24 303:15,16 304:13,16,21

**sole** 13:15

**solutions** 128:1

**solving** 162:10

**somebody's** 90:1 116:15

**sophomore** 105:23

**sort** 15:22 20:22 30:12 49:6 75:24 77:20 79:17 110:21 127:25 131:21 163:11 178:8 179:7 180:3 199:17 215:19 220:1 244:14,22 245:3 248:17 260:19

**sorts** 48:18

**sought** 104:22

**sound** 31:25 263:20

**sounds** 105:7 292:1

**source** 177:10 232:22 269:5

**sources** 16:14,20 17:8 115:20

**space** 25:17

**speak** 32:18 80:12,14,17 85:10,13,15, 16 101:21 170:10 188:2

**speaking** 101:20 245:22 292:22,25

**special** 108:12 110:3,5 125:15,17,18 126:3,5,11,15 153:20 160:25 161:5,6 218:24 274:14 275:19,25 276:2 292:14

**Specialist** 299:14 300:1,4

**specialize** 30:12

**specialized** 269:3

**specialties** 30:11,18

**specialty** 30:10

**specific** 49:1,4 53:16 84:15 91:15 103:1 117:14 120:9 138:2 140:11 141:3,12 142:23 149:18 197:9,18 214:13,16,17 217:12,13 221:3 228:2 257:12 259:22,23 281:10 282:24,25

**specifically** 52:16 53:12 54:5 122:10 147:21 151:16 155:4 163:23 175:7 178:11 196:6 199:18 213:10 215:16 236:24 237:8 242:23 260:25 272:8 281:5 312:10

**speculate** 24:12 58:3 215:9

**speculating** 24:14,19 25:3 58:12

**speech** 16:23

**spell** 5:8 9:15 73:3

**spelled** 53:10 55:7 298:20

**spend** 18:13,14 127:23 187:18

**spending** 182:25

**spends** 19:1

**spent** 110:1 122:18 123:23 166:15 179:24 185:21 186:1,6,9,16,19 187:2, 11 188:17 189:16 191:3,9,12,20 192:2,9,12,16 288:18

**spoke** 32:16 79:25 80:5 126:6

**spoken** 32:13 42:6 46:8,13,20,25 47:17,23 48:4 68:5 79:12 85:7

**sponsoring** 102:14

**spot** 145:3

**spouse** 100:4

**spouse's** 100:7,8

**spring** 66:16

**spy** 178:13 180:7 248:10

**spying** 167:10,19,20 168:3 178:18 180:16

**Srikanth** 299:14

**SRT** 110:3

**SSBI** 190:25 271:6,7,17 272:6 281:16

**SSBIS** 206:7 271:9

**stack** 146:8,14 179:19 205:22

**staff** 12:1 13:6 61:2 162:7,8

**staffers** 133:13

**standard** 112:4 162:21,24 257:18 263:11

**standards** 193:11 234:3

**stands** 60:9 70:21,25

**Stars** 54:24

**start** 16:6 34:22 50:11 71:21 88:7,15 90:22 94:23 106:1 123:2 139:20 142:2 143:21 155:20 166:5 173:15 183:4 185:1 195:2 229:7 243:22 310:2

**start-up** 151:3

**started** 6:24 50:13 61:2 89:4 154:7 157:24 172:5 179:8 217:10 218:20 219:24,25 237:11 282:3 299:22

**starting** 96:5 97:22 119:23 156:6

**startling** 253:1

**starts** 177:5 181:17 216:2

**state** 5:6 9:5,15 59:15 94:22,24 95:1 96:4 97:8,10,16 98:10 99:3 107:10 145:7 153:21 154:15 155:4 174:13 175:19 176:5 185:23 199:14 201:18, 19 216:22 217:21 219:5 223:24 224:9 227:21 267:24 279:13 280:1 311:8 313:4

**stated** 185:19 209:19 225:18 251:6 276:20 277:1 278:10

**statement** 8:24 166:24 180:5 190:14 192:22 204:16 208:23 222:24 223:6,7, 13 253:1,17 254:21 267:22 270:1 280:9

**statements** 62:8,9 185:24 209:5,19, 20 211:23 212:20 225:5 250:1,2 262:16,17 264:2,4

**states** 4:13,14 9:2 39:23 44:3 56:3 101:3 105:17 110:10 111:2 118:8 125:6 126:10 137:11 148:7,8,16 150:20 156:4,5 166:21 169:7 172:3,16 178:13,19 179:23 180:6,7 185:22 186:2,7,10,17,20 187:3,8,20 188:10, 12,18 189:6,10,12,17 190:5 191:10,21 192:3,5,9,11,13,16 193:4,5,18,25 195:3,7,12,16 196:17 197:4 198:4,12 199:4,7,13,20 200:4 203:22 212:13,15 216:5,18 217:11,14,16,17,23 219:9,14 221:10,16,17 225:7 226:17,19,20,21 243:17 245:7 249:9 256:22 267:5 268:19 269:21 274:10 276:2 279:9,10, 13,14,15,25 280:5,13,14 290:10,20 291:1,9,12,13 295:3 296:5 297:3,9

**station** 47:5 218:1,17 219:18 221:6 286:12

**stationed** 203:20

**stations** 53:6 267:12,16

**statistics** 188:16,20 191:19,22 263:20

**status** 56:22 82:17 86:13 217:13,20 273:12 300:3,16 311:24

**statuses** 232:12

**statutes** 162:23 163:3,4

**statutory** 131:5

**stay** 231:16 253:3 268:1 274:4 291:25 293:5 300:19 305:8

**stayed** 237:12

**step** 143:8

**Stephanie** 208:25 209:12,20 211:15 212:20 216:1 249:10,12,19 251:6 252:22

**steps** 113:18 159:4 182:20

**Stock** 4:5,10 8:19 9:15,17,18 11:7 22:4 29:5 53:7 59:10 60:12 70:16 79:4 93:21 100:15 118:14 147:3,20 165:5 169:3 180:8,9 224:5 225:4 231:15 241:24 249:8 250:14 253:2 256:16,21 258:10 262:2 268:2 274:17 276:18,20 279:18 280:16 282:12 283:8 285:12, 21,24 288:8,21 289:1 291:14 293:17, 20,22 297:12,24 298:1 300:19,21 305:8,18,22 308:22 309:6 312:4

**Stokes** 129:13

**stop** 51:19 113:15 191:16 217:15

**stopped** 113:15

**storm** 22:12

**story** 191:3,8

**straight** 6:11

**strategic** 296:21

**strategy** 29:11,18,20,21,24 30:4 81:23

**strict** 164:2 184:1,11,12 185:14

**striking** 65:9

**Stripes** 54:24

**strong** 36:8 37:4

**structure** 11:15 14:7

**struggle** 260:13 310:25

**student** 217:19 299:17 300:3,16

**students** 299:13

**studied** 179:5

**studies** 222:8,11,15,16 223:2

**study** 21:16 25:21 166:8 215:24 222:12,14,22 223:3 242:10,12 243:2 250:25 252:9

**studying** 178:15

**stuff** 23:23 83:5,10 107:3 112:6 127:19 171:20 178:5 235:10 273:10

**stymied** 74:11

**subject** 19:25 61:17 103:13 132:15 159:14 203:15 263:9,11 273:16 298:13 312:15 313:6

**subject's** 269:18 270:4

**subjected** 275:10

**subjects** 257:22 263:14,16 265:1

**submarine** 222:3,4

**submit** 35:12

**submitted** 91:22 157:2,9

**submitting** 270:10,20

**subpoena** 11:3,4,5 66:13

**subscribe** 177:15

**subsequent** 211:13

**substance** 26:19,21 28:4,9,12,16,18 29:1 58:22 80:3

**substances** 8:20

**substantial** 189:19 190:4

**substantive** 110:9

**successful** 124:4 291:11 308:13

**sudden** 210:2,11

**sued** 74:18

**suffer** 21:4 160:14

**sufficient** 159:4 244:4

**sufficiently** 152:23

**suggest** 68:2

**suggested** 66:2

**suggesting** 65:19

**suicides** 107:12

**suitability** 304:15

**sum** 45:6 191:12 212:5 226:5

**summaries** 158:21 285:2

**summarily** 157:25 228:5

**summary** 64:1

**supervise** 12:12 20:2,3,13

**supervised** 232:4,7,21,23 233:4,8 234:25 235:15,20

**supervising** 11:25 235:18

**supervision** 19:25 239:1

**supervisors** 292:21

**supplemental** 277:2 293:22 294:2,8, 11,19

**support** 192:21 285:7

**supporting** 197:6 212:2 282:9

**suppose** 286:19

**supposed** 51:18 109:24 121:11,20 160:24 163:25 164:2 184:4 228:10

**supposedly** 130:2 159:2

**surprise** 265:18

**suspect** 274:18

**suspicion** 159:16 207:16,17 209:7, 10,13 210:6

**suspicious** 208:6,8,9,15,19 210:22, 25 211:4 212:8 263:8

**SWAT** 110:4

**Swinton** 4:9,12 8:18 9:14 24:20 58:16,19,25 59:4,8,14,18,22 60:1,5,11 118:7 145:3,14,19,22 146:12,16,23 147:1,7,11,16,19 223:21 224:3,8,13, 18,20 225:3 240:5 288:1,6,11,16,20 301:19 302:11 303:2,13 312:4,7,20

**Swinton's** 118:9

**sworn** 4:6 262:15

**synonymous** 167:20

**system** 114:12 263:13 285:6 300:9

**systems** 286:16

---

**T**

**table** 40:7,10

**tagged** 207:18 210:5

**tagging** 264:21

**tailor** 184:8

**tailored** 164:3,23 165:1,2 182:24 183:16,19,20,22,23,24 184:3 185:7,9, 14 272:12 274:6

**takes** 18:2 76:3 287:2

**taking** 12:14 67:13 139:3 145:14 273:23

**talk** 10:12,15 26:14 27:1,6 28:24 31:20 40:12,21 45:21 47:3 75:19 89:12 103:25 112:20 118:12 124:10 125:10,11 129:16 136:12,13 137:10 147:20 153:1 155:11 158:17 161:21 163:1 171:12 173:4 176:10 178:5 181:7 200:24 215:4 252:20,21 260:10 271:15,25 288:3 308:13 310:8,13,17

**talked** 26:12 33:10 40:20 41:21 47:4, 5,6 49:9 69:1 110:17 142:9 173:8 174:22 175:1,10,16,20,23 176:6 187:15 199:22 206:25 209:22 210:3 221:4 239:20 256:3 268:8,14 283:17 308:16

**Talkeetna** 22:12

**talking** 7:15 18:9 46:3 61:18 83:23 88:15 91:14 92:3,8,18 116:4 126:18 127:23 137:25 152:4 154:1 173:2 174:17,18 179:18 186:15 193:15 199:25 206:6,7 209:6 218:3 219:15 247:9 259:4,9,17,18,19,21,24 260:4, 25 261:10,23 262:12 263:18 284:24 304:1 311:7

**talks** 26:14 135:18 178:17,21 181:10 269:15

**Tampa** 125:23 139:25

**Tango** 73:5

**tap** 126:9

**tar** 275:24 276:1

**targeted** 134:14,17 209:23 211:22 273:5

**targeting** 212:6

**tasked** 120:10,13 124:8

**taught** 36:2,10 179:24

**taxpayer** 183:1

**teach** 110:13 188:1 235:9

**teaching** 150:19

**team** 110:3,4

**tears** 213:15

**tech** 239:11 241:2

**technically** 24:11 106:11 139:25 155:21

**techniques** 65:8 110:18

**technology** 102:9

**TECS** 285:7

**Ted** 188:7,8

**teeth** 93:22 231:22

**telephone** 88:12

**telephonic** 54:3

**telling** 52:25 173:6 177:1 206:12

**tells** 30:21 234:25

**temporarily** 116:19

**ten** 58:1 73:24 74:4 96:14,24 97:7,14, 21 145:16,19 214:22,23 215:12

**ten-minute** 59:5

**ten-year** 103:19

**tend** 268:4

**tendencies** 36:22

**tens** 193:1

**term** 19:8 148:23 155:6 172:5,6 196:4 202:6 207:21

**terminate** 60:20,22

**terminology** 109:4 116:4 209:17

**terms** 18:12 21:22,23 22:1 79:22 113:3 131:6 135:20 146:20 174:2 176:15 215:22 253:25 264:21

**Terrell** 67:10

**terrible** 171:22

**terrorism** 110:10,13,20 111:9,18 146:2 166:23 167:11 168:8,9,11,15, 19,22 169:4 181:23,25 183:5,10 243:11

**terrorist** 110:1,12 248:11 285:6

**test** 184:1,12 290:16 291:1 296:25 297:9

**testified** 4:7 38:16 39:14 155:12,17, 21 156:9,10 281:11

**testify** 5:24 8:21 21:3,4,8 35:13 39:10,11 149:8,14 155:15,25 156:2,14 282:5

**testifying** 77:3,4 204:20

**testimony** 34:25 35:2,11,16 36:5,7 37:23,24 156:8 166:8,10,13 204:10,18 284:12,13 286:8,10 291:16 292:4 294:12

**Texas** 72:23 73:12,15

**text** 52:13 207:11

**textbook** 180:3

**textbooks** 180:2

**Thacker** 71:19 73:6

**theft** 107:9

**theme** 310:25

**thereabouts** 148:18

**thing** 7:22 63:24 75:24 119:9 127:25 138:17 139:8 178:9 179:7 180:3,20 181:10 182:1,8,24 183:21 184:23 199:17 215:20 226:15,25 227:1 238:14 251:16,17,18 274:7,11 305:1 309:10

**things** 12:5 16:13 17:12 35:21 42:20 49:19 62:2 65:9 66:2 93:19 107:16 110:16 113:2,8 117:20 121:13 135:4 136:1,23 138:14 141:25 144:18 146:22 155:7 157:23 161:1 163:25 178:20 179:25 198:24 208:16 210:1 215:17 226:16 227:6 232:11 236:17 244:7 246:12 252:10 254:12 255:10 272:18 274:10 285:3

**thinking** 27:19 91:15 96:17 112:12 115:1 127:1 140:3 141:2 145:14 161:25 162:13,23 189:20,21 190:5 210:4 267:12

**thinks** 137:18 263:8

**Thomas** 22:7

**thought** 11:4 15:8 34:5 36:22 38:6 44:10 89:2 113:17 116:3 127:19 130:10 164:9 199:1 208:23 214:25 219:23,24 222:6 231:25 268:7 269:2 311:13

**thousand** 16:16 57:10 103:5 192:24

**thousands** 83:22 193:1 195:9,15 200:12

**threat** 126:23 127:20,24 173:3,7,20 208:1 209:3 216:18,19 217:16 218:25 227:9,16 228:1,11,13,14,19,20 229:1, 2 233:13,17,21,22 243:6,16 244:4,12, 16,18 245:7,10,16 246:1,7,9,11,12,14 247:1,3,25 248:3,4 256:2,8 265:6 268:7 274:12,14 275:10,19,23,25 276:2,5,15

**threats** 110:10 111:9,13,16,18 113:7 127:24 171:4,13,15,16,18,21,23 172:21,25 173:5,9 174:3,10 175:8,11, 16,20,24 179:4 207:19 228:24 243:21, 22,23 244:8,20 246:18,22 263:21

266:17,22,24 267:1

**thumb** 312:19

**tickets** 16:13

**tied** 163:23

**Tier** 190:23,25 206:7 281:16

**ties** 198:4,14,17 199:4,9,16,17,19 200:4,17

**till** 95:22

**time** 5:19 7:20 8:1 14:20 18:12,13,14, 15 19:1 26:16 27:18,24 44:12 45:21 46:25 48:14 54:11,13,14,16 55:12 69:8 79:25 80:4,14 81:18 86:5,24 94:8 99:23 101:21 108:25 110:1,11,15 111:10 112:12 113:14 116:24 117:1 118:25 119:4,7,9,11,15,19,21 121:6 122:18 123:23 124:25 125:5 127:23 128:11,23 129:3,9 134:18 136:13 140:5,22 141:19 143:11 144:12 145:21 157:4 166:3,9,13,14 175:24 178:24 179:12,25 185:21 186:1,6,9, 16,19 187:2,11,18 188:18 189:6,7,18, 19,22 190:2,4,7,9,14,17 191:3,10,12, 13,18,20 192:2,4,9,19 193:4,6,7,8,10, 14,19,23 194:3,7,13,15,17,19,24 195:4 197:5 198:20 203:15,22 214:10 220:6 231:21 238:4,16,18 240:12,13, 21 241:8 248:22 249:15,22 253:3 257:4 260:11 262:2 263:6,22 267:4 269:20 270:7,22 274:3 280:16 282:16 287:2,23 288:18 292:1 306:22 309:25 310:9

**times** 4:20,23 49:13 80:17 85:13 103:6 118:18 128:5,6 136:14 167:2 221:12 270:14 271:12 274:3

**timing** 58:14

**title** 153:9,10,11 307:15

**titled** 242:2 276:17 278:11,15,23 279:6 288:25 293:21 297:25 305:19 308:24

**titles** 19:4

**Tiwari** 4:14 28:8 31:21,22 34:15 42:12,14,24 43:2,4 45:10,13 69:17 70:4 76:18 95:5 97:25 98:4,8,12 99:7 242:8 289:9,14

**today** 4:16 6:17 9:2,20 10:23 11:12 41:10 70:23 142:21 144:16 145:25 146:3 155:13 169:17 206:2 219:8 225:13 229:4 231:19,20 238:12 240:19 263:22 291:12 312:11,14

**today's** 8:12 188:15

**told** 32:21 45:21 67:18,20 90:11
119:17 124:17 131:10 137:7 145:1
157:6 188:23 209:1 210:21,24 222:2
254:5 255:11 256:6,7 260:12 270:17
272:6

**tools** 257:19 269:23,24 271:21
272:12,13 273:7 275:3,6

**top** 18:6 91:8 128:15,17,19 165:7
181:16 183:15 196:21 198:1 213:4
218:4 221:13,18 229:9,10

**topic** 179:5 308:18

**topics** 172:14

**total** 18:4,9 191:12 212:5 226:5 258:4

**totally** 23:17 223:14

**touch** 136:6,9,10 144:2

**tour** 109:9

**tourist** 203:25

**track** 166:3 188:19 191:24 231:16
253:3 262:1 268:2 300:19 305:8

**Tracy** 98:15

**traditional** 273:7 310:10

**Traffic** 107:20

**train** 110:18 138:22 231:25 268:11

**trained** 35:20 37:3 160:6 162:10,20
232:4,6,16,21,23 233:4,7 234:25
235:4,12 268:5,8 284:10

**training** 36:25 105:14 110:2,5,6,7,22
111:23 112:1,10 122:15 131:18 162:2
164:20 190:20 191:1 192:4 235:1,4,7,
11 268:9 301:1

**Traitors** 171:20

**transcript** 10:9 38:8 39:7,10,12,17
40:6 41:8 60:5 68:11,14 69:22,25
70:3,6 71:3,9 231:4,9,11 305:6

**transcripts** 68:8,22 69:4 236:20

**translated** 172:10

**transposing** 64:11

**travel** 41:16,19

**treated** 129:23 148:13

**treating** 207:21

**treatise** 224:21

**treatment** 33:11 152:18 207:13

**tremendous** 164:10

**trial** 9:13 35:2,3,13 146:6,12,13 149:7,
15 157:1,7 282:5

**triple** 111:4

**Troopers** 107:10

**troops** 274:12

**trouble** 109:17 247:11 270:13

**true** 185:17,24 302:1

**trusts** 210:11

**turn** 8:23 166:18 252:16 257:15
267:15

**turned** 130:5 191:8 222:7

**turning** 166:5

**turns** 248:10

**type** 29:2 31:1 33:23 44:19,21 52:11
56:20 96:8,15,25 97:8 100:8 106:25
108:5 110:25 112:4 142:25 168:1
173:14 225:1 274:19 275:14

**types** 31:12,14 74:14 97:15 109:22
113:2 117:3 123:14 127:11 129:11
133:17 136:18 219:10 312:1

**typical** 137:7 162:24 309:9

**typically** 26:8 75:9 77:16 168:3
221:14 249:4

**typo** 64:5 227:19 277:9

**typos** 61:22,25 63:6,20 64:5,6,17
81:18,19 165:19,22,23 227:7,10

---

**U**

**U.S.** 9:1 44:22 96:3 101:3 103:3 111:9
148:7 157:21 170:24 172:1,4 178:12
180:16 181:19,24 182:15 187:17,18,
21 188:1,6,8,12,14 189:13 192:6
194:22 199:1,6,10,11,12,13 200:18
201:23 202:17 203:25 204:2,4,8
205:13 207:14 213:6 216:3,9,14
219:17,22 221:5,6,8 242:13 248:9,13
266:14 267:24 270:8,22 279:17
283:22 290:8 292:5 295:5,6,7 296:3,4,
15,18 301:7,14 302:6,24 303:17
304:7,16 306:2

**U.s.-born** 219:10

**Uh-huh** 74:22 88:11 175:3 191:23
200:1 266:20 279:21 299:20

**Ukraine** 191:4

**unauthorized** 122:21 267:9 311:14,
15,20

**unclassified** 144:14 245:21 248:24,
25 249:4 250:20 251:1 252:4 253:10,
20

**uncomfortable** 268:20

**unconstitutional** 32:23 39:22
148:19 157:20 158:2,6 159:22,24
160:14 164:16 245:17 264:24 297:20

**undergo** 275:15 281:15 283:7 290:23
297:6

**undergone** 279:12,24

**underinclusive** 159:1 184:6 264:21
273:19

**underlie** 88:24

**underlined** 307:22

**underly** 164:8

**underlying** 46:2 88:8

**understand** 6:12,16,20 7:2 8:4,5,13,
14,15 37:25 38:1 65:13 71:9 102:9
115:9,14 116:2,3,5 119:12 135:19
136:24 143:9 146:17 152:14 168:24
180:25 181:2,3 193:12,22 195:4
196:6,9 202:25 204:14,18,21 223:6
225:24 230:9 232:11,13 237:18
240:22 244:25 247:15,24 248:5 252:4,
5 258:13 266:12 267:25 281:5 284:18
285:17 286:1 287:21,22 298:24 300:9
301:17 302:2 303:19 311:25 312:3,13

**understanding** 21:6,10 34:18,21,23
35:10 36:17,20 109:17 147:22 149:6,
9,11,22 167:21 168:20,22 170:4
171:23,25 184:2 194:12,15 197:20
202:7 204:10 205:24 214:3 237:6
256:5 279:2,18 284:9,11 292:23

**understands** 168:11

**understood** 75:5 109:19 119:20
197:19,23,24 244:24 311:2,3

**undocumented** 267:9 311:6,11,18

**unfair** 230:7

**unfamiliar** 300:8

**unfavorable** 255:7

**unfortunate** 139:2

**unhappy** 15:13 171:7

**uniform** 48:20 107:12

**uniquely** 152:7 208:6,8,13

**unit** 191:9

**United** 4:13,14 9:2 39:23 44:3 56:3
101:3 105:17 110:10 111:2 118:8
125:6 126:10 137:11 148:6,8,16
150:20 156:4,5 166:21 169:7 172:3,16
178:13,18 179:23 180:6,7 185:21
186:1,6,10,17,20 187:3,7,20 188:10,
12,18 189:6,10,12,17 190:4 191:10,21
192:3,4,9,13,16 193:3,5,18,25 195:3,
7,12,16 196:17 197:4 198:4,12 199:4,
7,13,20 200:4 203:21 212:13,15
216:5,18 217:11,14,16,17,23 219:9,14
221:9,16,17 226:17,18,20,21 243:16
245:7 267:5 268:19 269:21 274:9
276:2 279:9,10,13,14,15,25 280:5,12,
14 290:10,20 291:1,9,12,13 295:3
296:5 297:3,9

**universities** 241:15

**University** 146:4 238:10

**unlawful** 147:24

**unnecessary** 287:2

**UNNJ** 299:14,23 300:14

**unpack** 244:23

**unsecured** 274:2

**untrustworthy** 211:6,10,25 212:4,18

**unusual** 295:3

**upset** 32:21 33:11 113:20 172:4
209:24 210:10,17 230:6,9

**USA** 263:22

**USB** 113:13,14,17,19

**USCIS** 56:23 57:4 74:19 95:5,8,11,15,
25 99:4,5 100:10,12 290:23 297:6
305:14

**USD** 257:20

**USDI** 127:4,13 139:22

**usual** 135:25 290:14 296:23

---

**V**

**Vaghela** 72:8 73:11

**vague** 259:20

**Valdeta** 46:6 67:4 68:5

**valid** 122:24 273:12

**values** 37:3

**Vang** 72:16,18,20

**variously** 292:10

**vast** 27:2 74:10 311:21

**veer** 268:4

**verbal** 7:12

**Verdugo** 8:7 10:8,10,15 60:2 145:10
151:21 152:22 305:21 306:1 308:7
309:5,8

**verified** 239:8

**verify** 180:5 206:14 207:8 239:2,4

**version** 241:1 249:4 278:5 307:10,12
309:11,18,22,23

**versus** 4:14 5:6 18:10 31:21 63:19
69:3 79:5 84:20 169:1 202:18 215:16,
17 242:13

**Veterans** 210:9

**vets** 281:15

**vetted** 216:4,6 217:3 219:21 220:2
283:17,19,21,22 284:6,21 286:11

**vetting** 146:1,2 159:15,16 190:21
212:9 217:1,4,5,7,8,21 218:5,6 219:9,
12,13,18 245:17 257:19 273:18 284:6,
23,25 285:4

**vettings** 286:15

**Vicki** 71:19

**victim** 110:20 114:12

**victims** 182:15

**Victor** 64:10

**victory** 20:22

**video** 102:17,20 103:2,5,7,10 154:21
307:13

**videos** 101:13,16,19,23 102:1,2,5,11,
13,15,18,23 103:1,12,15,20

**videotape** 101:22

**view** 58:20 145:9 247:19

**viewed** 143:11 254:10

**violate** 50:10

**violating** 107:14

**violation** 32:23

**violations** 107:12,17

**violative** 159:25

**violence** 107:8 169:1

**Virginia** 156:11

**virtue** 198:12 217:18

**visa** 48:21 97:10,12 98:22,23,25
216:24 267:20,21 273:11 300:2,12,15
311:7,8,9

**visas** 124:3 216:25 267:23 295:6
312:1

**visit** 203:25

**visited** 192:6

**visiting** 182:21

**Vital** 64:9 70:21 148:9 155:9 242:2

**voice** 215:18

**volunteered** 109:10

**volunteering** 166:13

**vulnerability** 113:9,11

---

**W**

**W-A-D-H-W-A-N-I** 53:11

**Wadhwani** 53:8,15

**wait** 7:14 82:6 144:3 233:24 277:7
285:25

**waiting** 122:15

**waive** 94:6

**waiver** 272:3

**waivers** 290:18 297:1

**walk** 286:12

**walked** 221:6

**walking** 113:13 217:25

**walks** 218:17

**Wang** 71:19 72:21

**wanted** 15:5,14 38:25 39:2 47:6
58:25 59:2 60:12 68:23,24 71:2 76:11
83:11 93:9 100:1 102:9 109:18 113:16

120:12 122:11,12,14,16 126:2,9
127:21 145:2 156:1 161:17 180:4,8
237:12 239:19 241:7 254:16 255:6
266:11 306:25 310:17

**war** 108:24 131:3,14 162:6

**warn** 273:4

**warning** 51:17

**warrant** 185:2 243:25 275:2,6

**Washington** 4:15 13:2 73:10 86:8
191:2,8

**watch** 87:10 102:16 157:6

**watching** 102:17 269:9

**water** 58:15 59:2 93:22

**Wayback** 146:5 238:14 240:8,9

**ways** 49:18 52:4 222:21

**weapons** 108:11,13 110:14

**wear** 48:20

**web** 19:18,19,20 169:14,15 240:18
241:7

**Weber** 18:24

**website** 52:13 101:14,17,19,22
102:18,23 103:7 104:6 146:4 154:20,
21 172:11 178:4 232:18,24 238:11,13,
17,24 240:6,12,13,19 241:1,6,17
306:15 307:14 309:24

**websites** 171:15 172:9,12,20 182:21

**week** 69:8 70:11,14 80:12,14,18,19
85:13,14 119:8,17 312:17

**weekends** 25:10

**weeks** 86:7 109:15 131:25 169:9
189:24 190:10 192:13,16 193:9

**West** 36:3 44:4 75:12 124:25 125:7,8
150:21

**Western** 4:15 72:15 73:10,15

**Westlaw** 16:12

**Whatsapp** 52:12

**whichever** 309:23

**white** 67:10 68:20 251:23

**wholesale** 286:19

**widely** 179:5

**wife** 28:12

**wildlife** 107:15

**willingness** 262:11

**winning** 254:18

**winter** 66:16

**withdrew** 159:7

**witnesses** 20:24 21:2 38:14,15 39:14
225:2

**woman** 276:1

**women** 134:11

**wondering** 88:13 113:1 240:25

**word** 37:14 155:8 168:22 170:6,8,12
177:21 202:8 203:3,6 204:12,17
209:10 237:2,15 240:15,16

**worded** 174:7

**words** 7:11 202:23 209:6 213:11
215:11 237:18

**work** 6:17 13:7,9,11,13,17,24 16:7
18:20,21 19:15 20:5,8 25:7,10,11,12,
15,19 27:17 31:19 45:1,5 56:7,25 69:7
77:14,17 78:12 99:18 106:22 109:20
110:23,25 111:23 112:19 121:15,24
122:3,5,22,25 123:4 124:15,21 125:3,
13,25 126:5,20,21 145:15,17 150:2
174:5 180:8 187:13 189:4 198:21
241:9,10,12 250:11 254:24 275:7
295:6

**worked** 18:22 26:4 36:1 111:2,14,15
122:3,9 123:1,5,11 124:13,15 126:14,
16,25 127:3,4 174:6 179:6 198:19
199:5,6,10,11 205:13 240:3 295:6

**working** 15:5,13 19:11 26:24 107:9,
11 109:23 111:6 120:20 121:13
122:18 123:15,23 129:9 130:13 133:2
143:19 151:1 166:15 176:3 188:20
191:5 201:22 210:7 223:15 266:18

**works** 13:10,14 25:13,15,19 31:16
145:4 239:18 312:20

**world** 126:22 187:16 188:15 248:4

**worldwide** 240:18

**worried** 267:2,8

**worry** 127:15

**worthy** 252:9

**write** 136:23 137:19 143:17 144:17
233:3 293:7 306:16

**writing** 42:23 78:17 138:20 291:7
292:22

**written** 42:3,11,12,13 43:6,9,14,22
46:5,10,16 47:14,20 48:1,7 49:2,7
53:7,13,18,23 54:8,12,14 55:6,12
85:17 105:4 138:18 144:11 157:7
179:4 180:22 213:22 306:21,23

**wrong** 64:14,22 65:12 100:20 220:24
222:13 226:14 227:12 230:11 240:4
256:18 270:15 271:5,24 277:6,7,11

**wrongly** 130:1

**wrote** 60:4 104:24 105:1 142:9 144:19
149:21 197:13,17 224:16 249:15
250:19 277:24 282:10 289:3 293:25
298:4 306:1

---

**X**

**X-I** 98:16

**X-I-O-N-G** 55:8

**xenophobic** 134:8,20 211:22 254:7

**Xi** 98:16

**Xilong** 71:18

**Xiong** 55:7,13 56:10 57:3 99:4

**Xiong's** 99:5

---

**Y**

**Yang** 43:7 69:14 70:1 71:23 73:8

**yanked** 116:21

**Yankee** 5:10,11

**year** 16:16 32:3 45:20 56:15 86:25
105:19,20,21,24 154:2 156:10 178:16
181:13 186:21 193:11 200:21,22
236:7 292:6 293:3 307:16

**years** 22:9,16 36:1 37:5 43:16,17,22
45:8 50:16 56:10,11,13,17 98:24
105:16 106:8,13,15 109:10,12 119:12,
13,20 126:12 131:9 134:9,13 147:15
150:16 162:9 178:15 179:15 180:22
181:11 189:17,23,24 190:5,8,12
193:10,11,14,25 194:2,4,5,13,14,20,
22,24,25 195:5,7,12,16 196:17 197:11
198:11 217:11,25 221:12 224:25
279:10 295:5,6

**yelling** 169:1

**yes-or-no** 29:20 67:23 84:5

**Yokota** 111:5

**Yoon** 43:7 69:14 70:1

**York** 44:4 150:21 218:21,22,23
268:11

**Youtube** 103:6

---

### Z

---

**Zhang** 46:11,13

**Zhu** 71:18 72:14 299:14 300:1,4

**Zhu's** 300:5

**Zilly** 282:5