# EXHIBIT 5

*Expert Witness Report of Margaret Stock*

October 5, 2018
Margaret D. Stock
Expert Witness Report
<u>Tiwari v. Mattis</u>, 2:17-cv-242-TSZ

**<u>Opinions</u>**

I incorporate by reference the opinions, and the basis and reasons for those opinions, as stated in my previously filed Affidavit dated April 5, 2017; my Supplemental Affidavit dated May 19, 2017; my Declaration dated March 27, 2018; and my Declaration dated May 21, 2018.

In addition to the opinions stated previously, I have the following opinions:

To date, there has been no public information indicating that any naturalized United States citizen who enlisted through the MAVNI program has engaged in any actual or attempted espionage or terrorism activity.

Although the US Department of Defense has repeatedly implied that military members recruited through the MAVNI program are, as a group, a national security threat to the United States, there has been no public comparative data showing that MAVNI program participants, and in particular US citizens recruited through the MAVNI program, are any more of a security risk than persons recruited through other US military recruiting programs. The available public data demonstrates that native-born US citizens are often recruited by foreign adversaries to spy on or attack the United States. Native-born United States citizens have been repeatedly investigated, charged, indicted, convicted, and imprisoned for espionage and terrorism-related activity. Some of the more notorious native-born citizens in the US military who have engaged in such activity include Nidal Malik Hasan, a native-born American who joined the US Army and murdered thirteen of his comrades in an infamous attack at Fort Hood, Texas on November 5, 2009; Ikaika Erik Kang, a US Army soldier who was arrested in 2017 after he pledged allegiance to the Islamic State and planned terrorist attacks in Hawaii; Chelsea (nee Bradley) Manning, a native-born US citizen who in 2013 was convicted, while in the US Army, of violations of the Espionage Act after disclosing hundreds of thousands of classified and sensitive documents to Wikileaks; John Anthony Walker, a native-born US citizen and US Navy chief warrant officer who was convicted of spying for the Soviet Union from 1968 to 1985; and Clayton J. Lonetree, a US Marine who served nine years in prison for espionage after selling documents to the Russians in the 1980s. Recently, the US Navy has been rocked by the "Fat Leonard" scandal in which authorities have filed numerous criminal charges against native-born US citizens serving in the US Navy—and investigated hundreds of other native-born US citizens—for taking bribes to feed classified or inside information to Leonard Glenn Francis, a Malaysian defense contractor. A criminal case remains pending against native-born US citizen and retired Rear Admiral Bruce Loveless, the former director of intelligence operations for the US Navy.

Besides being very accomplished, successful people, all MAVNIs who naturalize through military service are subject to having their United States citizenship revoked and rescinded,

unlike native-born United States citizens or naturalized US citizens who have not naturalized through military service. Under 18 USC 1425, a naturalized MAVNI who lies on a citizenship application can be subjected to prosecution and stripped of his or her citizenship. Under 8 USC 1440(c), a naturalized MAVNI who fails to serve honorably for five years in the United States military can be stripped of his or her citizenship even if he or she told the truth on the citizenship application. If the Department of Defense has concerns about the bad behavior of a particular naturalized US citizen MAVNI, the "narrowly tailored" and lawful way to address those issues would be an investigation and prosecution of the individual MAVNI, pursuant to these longstanding statutes, rather than institutionalized discrimination against all naturalized US citizens who entered the military through the MAVNI program.

If there is a risk here, what DoD is doing is not narrowly tailored. DOD's MAVNI policy is akin to subjecting all Catholics in the military to enhanced screening because Oklahoma City Federal Building bomber and Army veteran Timothy McVeigh was a Catholic, or subjecting all Arab American soldiers to enhanced screening because Nidal Malik Hasan is of Arabic heritage.

If DOD has an individual concern about a particular MAVNI soldier, DOD can investigate that individual, just as it would investigate any other American citizen in the ranks.

If DOD is concerned about infiltration of the military by potential recruits from a specific country, DOD could add narrowly-tailored additional screening to MAVNI recruits from that country.

DOD has stated repeatedly that enhanced group screening of all MAVNI program participants is necessary because MAVNI program recruits have spent less time in the United States than other recruits. Yet this is simply not true. Many native-born military recruits have spent very little time in the United States. An example is Guillaume Cuvelier, a recent Army recruit and US citizen at birth who had spent most of his life overseas, having been born overseas to a U.S. citizen mother. Cuvelier was not subjected to any enhanced screening and was permitted to enlist despite having spent very little time in the United States prior to his enlistment. Later, a Washington Post article revealed that he had spent time fighting with Russian separatists in Ukraine, and was affiliated with anti-American extremist groups. DOD also regularly enlists recruits from the Pacific Island nations of Palau, Micronesia, and the Republic of the Marshall Islands, and does not subject these recruits to enhanced screening despite the fact that they have spent no time in the United States at all before they enlist.[1] Many green card holders have spent only a few days or weeks in the United States before they are permitted to enlist, but they are not subjected to the enhanced screening that US citizen MAVNIs are subjected.

Many MAVNI recruits have been in the United States a very long time. Persons recruited for the MAVNI program who have held "Deferred Action for Childhood Arrivals" (DACA) status have often been in the United States since they were infants. Others who have held F-1 or H-1B or J-1 status have attended high school and college and graduate school in the United States. Plaintiff

---

[1] Starting in October 2017, DOD issued a memo ordering Tier 3 screening on new recruits from Palau, Micronesia, and the Republic of the Marshall Islands; it is not clear that such screening is being done yet.

Amandeep Singh has lived in the United States since 2001, Plaintiff Raj Chettri since 2002. Plaintiff Dr. Kusuma Nio, a trauma surgeon, came to US in 2011 to attend medical school and obtained his undergraduate degree in Canada, a close ally with many cultural and social ties to the United States. Other MAVNIs have worked closely with US government agencies before coming to this country; Plaintiff Valdeta Mehanja has an extensive history overseas working for Dyncorp, a U.S. defense contractor. Plaintiff Duncan Makau attended the United States Military Academy at West Point for four years and graduated from there. Many MAVNI program recruits have extensive and longstanding presence and ties to the US.

DOD has indicated that it has concerns related to the length of time that a naturalized US citizen may have lived outside the United States. If DOD wants to do additional, unusual vetting because a citizen may have lived out of country longer than other citizens, making it allegedly harder to do background investigations,[2] DOD could obviously more narrowly and precisely tailor its enhanced background checking to decide that, say, all military recruits who have lived in the United States for less than the last 5 or 10 years will be subject to this additional intrusive screening. However, such screening would exclude numerous MAVNI program recruits.

DOD's treatment of naturalized US citizens who entered the US military through the MAVNI program is both overinclusive and underinclusive, given the stated purpose of the screening—which indicates that DOD is engaging in national origin discrimination, rather than pursuing the screening for legitimate national security reasons.

DOD's public treatment of naturalized US citizens who have entered the US military through the MAVNI program has created a black cloud of suspicion over all MAVNIs, including naturalized US citizen MAVNIs, including those naturalized MAVNIs who have passed all of DOD's enhanced screening. MAVNIs have been singled out by DOD as inherently suspicious, since throughout their careers, no matter how much screening they have undergone, and no matter how long they serve, they are—by explicit DOD policy—deemed inherently untrustworthy because of their national origin. Notably, DOD policy provides that naturalized US citizens who entered the US Armed Services through the MAVNI program will be "continuously monitored and accounted for throughout the duration of their affiliation with Department of Defense (e.g. active duty, Reserve, government civilian, or contractor)." DOD will potentially be subjecting them to

---

[2] Presumably, the difficulty of doing a background investigation on someone would depend on the country wherein the person resided, as well as the circumstances of their residence overseas, not merely based on the fact that the person resided in a foreign country. Due to the large number of U.S. military bases overseas and the global mobility of the modern world, thousands of US citizen service members were born overseas or have resided for long periods of time outside the United States, or in "friendly" countries, under circumstances in which it might be quite easy to do a DOD background check on the person. In some cases, it might be easier to do a background check on the person's time outside the United States than on the person's time inside the United States. Example: Plaintiff Valdeta Mehanja worked for years on U.S. military bases in Iraq and Afghanistan, and it therefore should be relatively easy for DOD to do a background check on her time "overseas" on those bases. In contrast, it might be quite difficult for DOD to do a background check on a U.S. citizen born in the United States whose parents took him to China when he was an infant.

continuous monitoring for decades. Throughout this time, no matter how well they perform, they be tagged as inherently untrustworthy—and they can never overcome this open discrimination by DOD. Naturalized US citizens who entered the military through the MAVNI program have expressed to me that they are distressed and saddened by this DOD policy because it declares openly that MAVNIs are less trustworthy than other US citizens in the Armed Forces—and all because of their national origin.

Ironically, US citizens who entered the military through the MAVNI program are the "most vetted" recruits who join the US Armed Forces. Unlike other recruits, MAVNIs have been through the "post 9/11" DOS and DHS security screening process.[3] Unlike most other US citizen military recruits, MAVNIs have undergone a Single Scope Background Investigation (SSBI, now called a "Tier 5" investigation). Since September 2016, DOD has required all accessing MAVNIs to successfully complete a NIAC, SSBI, and CIFSR, as well as specialized MSSR, NSD, and MSSD adjudications, before they are permitted to attend their initial entry training and before they are allowed to naturalize as US citizens. All MAVNI military members accessed prior to September 2016 are required to undergo a "passive analytical CI and security assessment"—in lieu of a CIFSR—and a NIAC to obtain a security clearance, even if they are now US citizens. Other US citizens have no such requirements to obtain a security clearance. Unlike native-born recruits, US citizens who have entered the military through the MAVNI program have also gone through the USCIS naturalization process, which also involves extensive vetting. MAVNI is a particularly difficult program to infiltrate because the checking done on MAVNIs is more extensive than the checking done on all other recruits.[4]

As of the date of this report, I have reviewed numerous MAVNI "Counterintelligence" (CI) reports prepared by the DOD on various MAVNI soldiers. Those reports were released to individual MAVNI soldiers pursuant to the Freedom of Information Act and the Privacy Act, and

---

[3] See David Bier, Extreme Vetting of Immigrants: Estimating Terrorism Vetting Failures, Cato Institute Policy Analysis No. 838, April 17, 2018, available at https://www.cato.org/publications/policy-analysis/extreme-vetting-immigrants-estimating-terrorism-vetting-failures ("The United States already practices "extreme vetting." While people of all types—foreign-born or U.S.-born—will always pose certain risks to the country, the country has maxed out its capacity to improve immigration vetting. Fortunately, vetting failures are very rare and pose a small risk to the United States.").

[4] DOD errs in implying that green card holders receive more extensive vetting than MAVNIs. They do not. Green card holders who adjust status in the United States, as most green card holders do, do not undergo any overseas background checks. Moreover, green card holders are permitted to obtain their green card status with waivers of fraud and criminality that are not available to MAVNIs. "Visa fraud" is common in the green card population in the United States. USCIS granted thousands of waivers for fraud and other criminality to green card holders in Fiscal Year 2018 alone. See https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/Quarterly_All_Forms_FY18Q2.pdf. These waivers are simply not available to MAVNIs. And of course, native-born US citizens are not vetted at all by DHS before they enlist in the US Armed Forces.

the soldiers provided the reports to me voluntarily. These reports are not only replete with factual errors, but they contain numerous illogical adverse CI recommendations. For example, one report found that a particular MAVNI soldier was a "major" threat to national security because the adjudicator determined that the MAVNI exhibited "high functioning Asperger's Syndrome" because the MAVNI did not laugh when the CI screener told the MAVNI an apparent joke about illegal drug use. Another report determined that a particular MAVNI soldier who lives in the San Francisco area was a "major" security risk because he and his wife both work, earning more than $15,000 per month between them, and he could not pay all of the household expenses unless his wife works. Yet another MAVNI was deemed a risk because he had served for two years as an enlisted soldier in the Republic of Korea (ROK, or South Korean) Army, although ROK soldiers are routinely embedded with US Army soldiers in South Korea as part of the KATUSA program. Finally, a MAVNI who had a lawful, same-sex marriage to a United States citizen was deemed a security threat—and ineligible for military service—because he is gay. From my review of the CI reports, it appears to me that the reports were often done by "CI" personnel who were inadequately trained and supervised, and there is little quality control in the reports.

I am also aware that MAVNIs continue to naturalize as United States citizens today, as their naturalization applications are being processed to completion by United States Citizenship & Immigration Services (USCIS). Many of them have not yet applied for a security clearance, but will do so in the future as they seek military career opportunities that were foreclosed to them before they became US citizens.

**Facts/Data**

I incorporate by reference the facts, data, and documents previously stated or appended to my affidavits and declarations.

In addition, I am relying on the DOD discovery in this case, various reports by the Center for Naval Analyses, the HumRRO report, the RAND Report, and the Cato Report referenced in my Affidavit.

I also rely on my conversations with dozens of current and former US Government employees and US military members, and my review of dozens of CI reports released under the Freedom of Information Act or the Privacy Act.

**Exhibits**

HumRRo Report

RAND Report

Cato Report

Cached University of North New Jersey Website

**Qualifications/Publications**

See my attached CV.

**Other Testimony in Last 4 Years**

In August 2017 and again in December 2017, I testified at a criminal trial in the case of Commonwealth of Virginia v. Dubey, Case No. 2017-07040117, Arlington, VA.

**Compensation for Study and Testimony in this Case**

I have not been compensated for my time preparing this expert report nor for my testimony in this case. I am providing my time and testimony on a "pro bono" basis.

Signed this 5th day of October, 2018, at Anchorage, Alaska.

_Margaret D Shock_