# EXHIBIT 1

## TO PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION IN LIMINE REGARDING EXPERT MARGARET STOCK

District Court Judge Thomas S. Zilly

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

Kirti Tiwari, Seung Yoon Yang, Amandeep
Singh, Duncan Makau, Valdeta Mehanja, Rui
Zhang, Raj Chettri, Thong Nguyen, Xi Cui,
Rajat Kaushik, Pingyang Liu, Blerta Mehanja,
Mengmeng Cai, Sandeep Singh, Fleury
Ngantchop Keigni Di Satchou, Kaushal
Wadhwani, Angelita Acebes, Kusuma Nio,
and Qi Xiong,

          Plaintiff,

      v.

James Mattis, Secretary, U.S. Department of
Defense, in his official capacity,

          Defendant.

No. 2:17-cv-00242-TSZ

**DECLARATION**
**OF MARGARET D. STOCK**

Pursuant to 28 U.S.C. § 1746, I hereby declare as follows:

1.      Prior to my Army Reserve retirement in June 2010, I was the Army project officer for the MAVNI program. The project officially began with a briefing I gave to the Secretary of the Army in the fall of 2007. After I transferred to the Retired Reserve of the U.S. Army Reserve in 2010, I remained involved with the MAVNI program from

DECLARATION OF MARGARET D. STOCK - 1
Case No. 2:17-cv-00242-TSZ

Cascadia Cross Border Law Group llc
4141 B Street, Suite 205
Anchorage, AK 99503-5940
Tel 907.242.5800

EXHIBIT 1 Page 1

outside the Pentagon. On a daily basis, I am contacted by MAVNI enlistees, current and past MAVNI soldiers, their lawyers, their family members, U.S. military officials (retired and current) who are trying to help MAVNIs, JAG officers who have questions about MAVNIs, journalists writing stories about the MAVNI program, Members of Congress and Senators and their staffers who are assisting MAVNIs and drafting MAVNI-related legislation, and researchers who are analyzing the program. I also keep up with MAVNI-related immigration and Federal Court litigation by reading court pleadings and transcripts.

2. The Army has recognized my ongoing expertise regarding the MAVNI program by inviting myself and Dr. Naomi Verdugo to present a peer-reviewed paper at a 2015 U.S. Army Recruiting Command (USAREC) conference at Ft. Knox, Kentucky. (Exs. 1, 2) Among other issues, that paper and presentation addressed the nature and the extent of security screening for MAVNI recruits. (Ex. 1 pp. 10, 14; Ex. 2 pp. 12 - 17) That paper was subsequently published on USAREC's website, and the video of my presentation to Army officials present at the conference was also published on USAREC's website.

3. On a daily basis, I still receive MAVNI-related telephone calls, emails, Facebook messages, text messages, and LinkedIn messages from current members of the U.S. Armed Forces, including military and civilian lawyers who work for the Department of Defense and the U.S. Armed Forces. I also receive calls and emails from Department of Homeland Security and State Department officials regarding the MAVNI program. These requests for assistance involve all sorts of MAVNI-related issues resulting from the September 2016 Peter Levine memo and subsequent DoD and Army memos. The requestors sometimes ask for documents proving that MAVNIs are eligible for security

DECLARATION OF MARGARET D. STOCK - 2
Case No. 2:17-cv-00242-TSZ

CASCADIA CROSS BORDER LAW GROUP LLC
4141 B Street, Suite 205
Anchorage, AK 99503-5940
Tel 907.242.5800

EXHIBIT 1 Page 2

clearances; other times they ask questions related to the DoD background check process for MAVNIs; how to speed the naturalization of MAVNIs; how to help MAVNIs who are being "held on station" and cannot be sent to a new assignment or training because they are waiting for a background check or a security clearance; how to obtain immigration benefits for MAVNIs; and how to assist the family members of MAVNIs when the family members need immigration benefits that are dependent on the status of the MAVNIs.

4.     As a result of my past experience with the MAVNI program, my legal practice, and my post-retirement informal role as a central source of information about the MAVNI program, I am very familiar the backgrounds of numerous MAVNI recruits and MAVNI soldiers and the extraordinary, class-wide screening procedures (and other discriminatory rules) now being applied to them.  I have also, to date, reviewed more than forty (40) Counter Intelligence (CI) screening reports regarding MAVNI soldiers, all of which were obtained by the soldiers through FOIA/PA requests and provided by the soldiers to me.

5.     Given my background, I am well qualified to address the simultaneously overbroad and underinclusive nature of the screening and continuous monitoring being imposed on naturalized U.S. citizen MAVNI soldiers and the additional factual reasons why the challenged conduct in this case constitutes unreasonable, unjustified, irrational national origin discrimination.

6.     I referred this matter to my husband, Neil O'Donnell, then a litigation attorney at the Anchorage, Alaska law firm of Atkinson, Conway and Gagnon, after I was unable to find other private counsel who would agree to handle the case, which would

DECLARATION OF MARGARET D. STOCK - 3
Case No. 2:17-cv-00242-TSZ

CASCADIA CROSS BORDER LAW GROUP LLC
4141 B Street, Suite 205
Anchorage, AK 99503-5940
Tel 907.242.5800

EXHIBIT 1 Page 3

necessarily have to be undertaken on a *pro bono* basis. Before referring the matter to Mr.

O'Donnell, I had contacted numerous private law firms and several nonprofits to ask them

to take on the litigation, but was unsuccessful at doing so. At the time, most of the law firms

that typically would handle such a case were tied up with other *pro bono* litigation and

represented that the case would be time consuming and they did not have the resources to

litigate it. In the months after DoD issued the September 30, 2016 Peter Levine

memorandum (which, among other things, barred naturalized U.S. citizen MAVNI soldiers

from receiving a security clearance during their first term of enlistment – typically six (6) to

eight (8) years), I was inundated with calls, emails, and other contacts from numerous

MAVNI soldiers, private attorneys, Pentagon officials, and JAG officers who felt the new

DoD rule was either unfair, contrary to the promises DoD made to these MAVNI soldiers

at the time they enlisted, and/or illegal. At the time that I referred this matter to Mr.

O'Donnell, I was already familiar with the case of <u>Huynh v. Carlucci</u>, 679 F. Supp. 61 (D.

D.C. 1998), which had found a similar restriction unconstitutional. Based upon that case

and my knowledge of constitutional law, it was and continues to be my view that DoD's

policy of prohibiting U.S. citizen MAVNI soldiers from obtaining a security clearance during

their first term of enlistment was unconstitutional. I so advised MAVNI soldiers and JAG

officers who contacted me regarding that issue and referred them to Mr. O'Donnell after he

agreed to take the case. I note that DoD declined to defend the constitutionality of the

foregoing policy in this litigation and instead withdrew that rule.

       7. Contrary to DoD's assertion in its motion *in limine*, I have not been a

"shadow attorney" in this litigation nor do I have the time to be a "shadow attorney" in this

DECLARATION OF MARGARET D. STOCK - 4
Case No. 2:17-cv-00242-TSZ

CASCADIA CROSS BORDER LAW GROUP LLC
4141 B Street, Suite 205
Anchorage, AK 99503-5940
Tel 907.242.5800

EXHIBIT 1 Page 4

litigation.  I have not drafted a single pleading, discovery request, discovery response, affidavit, or declaration in this case save my own affidavits and declarations.  I have not communicated with any of the plaintiffs in this case about this litigation once I referred some of the eventual named plaintiffs to Mr. O'Donnell.  I have conducted no legal research for this case, save for reviewing the requirements of Alaska and Washington Rules of Professional Conduct, Rule 3.7 (which are identical) regarding when a lawyer may act as an advocate in a trial in which another lawyer in the lawyer's firm may be called as a witness.  In addition to drafting my own affidavits and declarations, I have reviewed some of the key briefs filed by plaintiffs in this case for factual accuracy (Mr. O'Donnell has never been in the military and has no expertise regarding the MAVNI program) and I have corrected any typos and grammatical errors I observed during that process.  It seems logical that I would have reviewed Plaintiffs' discovery requests to advise on what documents Plaintiffs should request from DoD but I do not recall doing that.  I did review much of DoD's document production.  I also traveled to Seattle for the March 21, 2018 hearing on Plaintiffs' second motion for preliminary injunction at Mr. O'Donnell's request because he was concerned that new military-related issues could come up at the hearing.  I also was (and remain) personally interested in the case in the sense that I believe that DoD was (and is) unconstitutionally discriminating against naturalized U.S. citizen MAVNI soldiers.

8.    I previously set out my qualifications in prior filings.  To provide more background on my training and experience in security-related matters, I note the following additional information. During my time as an Army Reserve Military Police Officer, I served at various times as a Security Officer (with a Top Secret clearance) and Deputy Provost

DECLARATION OF MARGARET D. STOCK - 5
Case No. 2:17-cv-00242-TSZ

CASCADIA CROSS BORDER LAW GROUP LLC
4141 B Street, Suite 205
Anchorage, AK 99503-5940
Tel 907.242.5800

EXHIBIT 1 Page 5

Marshal for United States Forces Japan, where I worked on personnel security issues, many of which involved criminal, counter-terrorism, and personnel security investigations and related issues. Often my duties involving sitting at a desk in SCIF (Sensitive Compartmented Information Facility) at the Headquarters Building in Japan, where I was required to read all manner of classified intelligence documents, including documents related to counterintelligence and foreign threats to the United States, and work with others on the Joint Staff to plan policies to reduce those threats.

9. While I worked with other Pentagon staff on the implementation of the MAVNI program, I often interacted with the military personnel who were doing security screenings of the MAVNIs, and I often discussed specific cases with those personnel. As part of my duties, for example, I had specific discussions with Pentagon officials about the Fort Hood incident, and whether the Fort Hood shooter was a MAVNI or an immigrant. The Fort Hood shooter was a native-born American citizen, but because he had a name that "sounded immigrant" to various Pentagon officials, there was much confusion at the Pentagon. I was asked repeatedly by various officials whether the Fort Hood shooter was a MAVNI, and repeatedly had to correct misinformation on that point. I am aware, however, that the decision after the Fort Hood shooting to do more background screening on MAVNIs was made in part because various Pentagon officials mistakenly believed that the Fort Hood shooter was an immigrant.

10. As an additional note, I have in the past been tasked by National Security Agency (NSA) officials to train NSA employees on immigration and national security issues, and dozens of NSA employees have attended that training, as well as

DECLARATION OF MARGARET D. STOCK - 6
Case No. 2:17-cv-00242-TSZ

CASCADIA CROSS BORDER LAW GROUP LLC
4141 B Street, Suite 205
Anchorage, AK 99503-5940
Tel 907.242.5800

EXHIBIT 1 Page 6

members of the 902nd Military Intelligence Group. I also traveled to Fort Meade while I was the Army project officer for MAVNI to give briefings to Army personnel about the MAVNI program, including security issues related to the MAVNI program, and members of the 902nd were present at those meetings.

11. I was awarded a Joint Service Commendation medal by Admiral Eric Olson of Special Operations Command, in Tampa, Florida. (Ex. 3) The award was given to me for my "exceptionally meritorious service as Special Advisor to the Commander, United States Special Operations Command (USSOCOM), Special Operations Forces Access Recruiting Program (SOFARP) working group" because of my "unique and expert advice in immigration and constitutional law and policy" which "vastly increased Joint Special Operations Forces' ability to pursue national security objectives." While working with USSOCOM personnel, I frequently dealt with personnel security issues and concerns related to personnel security and counterintelligence.

12. While on the faculty at the United States Military Academy at West Point, New York, I was the Course Director and a professor for the National Security Law Seminar, an advanced law class that addressed, among other subjects, issues relating to personnel security, including how military members receive access to classified information, the background checks that military members undergo, counterintelligence issues, and security clearance due process requirements.

13. From 2008 - 2011, I served on the Council on Foreign Relations Independent Task Force on U.S. Immigration Policy, co-chaired by former Florida Governor Jeb Bush and former White House Chief of Staff Thomas F. ("Mack")

DECLARATION OF MARGARET D. STOCK - 7
Case No. 2:17-cv-00242-TSZ

CASCADIA CROSS BORDER LAW GROUP LLC
4141 B Street, Suite 205
Anchorage, AK 99503-5940
Tel 907.242.5800

EXHIBIT 1 Page 7

McLarty III. The Task Force produced a detailed report, which included recommendations related to national security and the MAVNI program. I was also invited to the Council on Foreign Relations to give a briefing on the MAVNI program after I retired, and numerous Pentagon officials attended that program, as well as prominent civilian policymakers.

14.     DoD has adopted increasing levels of extraordinary vetting for MAVNI applicants, MAVNI soldiers, and ultimately naturalized U.S. citizens who entered the military through the MAVNI program, on account of DoD's expressed view that these individuals present security concerns because they are or were foreign nationals who immigrated to the United States. A proper understanding, analysis, and evaluation of DoD's concerns requires a solid understanding of U.S. immigration law, which is highly complex and deeply intertwined with these issues. Factors that are relevant to this inquiry include an understanding of the strict requirements and extensive vetting required for various types of visas and for entry into the United States and for becoming a U.S. citizen; the reporting requirements and ongoing DHS monitoring of certain visa holders while they are in the United States; the pre-enlistment vetting that is done on MAVNI applicants before they are permitted to enlist; the repercussions that may apply to individuals whose country of origin discovers that they have enlisted or attempted to enlist in U.S. Armed Services; and the grounds for denaturalizing a U.S. citizen on account of dishonesty or other misconduct. Immigrants today constitute 13.5% of the United States population. The immigrant population is on average younger than the general population and contains a much higher percentage of individuals who are within the age range that makes them eligible for military service. DoD -- and especially the Army -- is presently facing serious recruiting and

CASCADIA CROSS BORDER LAW GROUP LLC
4141 B Street, Suite 205
Anchorage, AK 99503-5940
Tel 907.242.5800

EXHIBIT 1 Page 8

manpower shortfalls, and the problem is expected to worsen in the future. *See, e.g.*, https://www.nytimes.com/2018/09/21/us/army-recruiting-shortage.html and https://www.heritage.org/defense/report/the-looming-national-security-crisis-young-americans-unable-serve-the-military.

15.     DoD is the largest employer in the country with approximately 3 million employees and an annual budget of $716 billion, which constitutes 3.1% of our GDP.  https://www.defense.gov/Our-Story/  Despite the above facts, DoD remarkably does not employ a single expert immigration and citizenship lawyer (every other major US employer has more than one).  As a result of DoD's lack of knowledge of U.S. immigration and citizenship laws, the policies DoD fashions regarding foreign-born recruits are often ill-conceived, poorly implemented, unproductive, and not cost effective.  I have now also reviewed more than forty (40) CounterIntelligence (CI) screening reports regarding MAVNI soldiers and have seen frequent errors and misconceptions regarding U.S. immigration law; these errors have adversely affected these soldiers' security reviews.  These errors indicate a failure to properly train and supervise these screeners (many of whom are apparently civilian employees of a private defense contractor, which received a sole source contract to perform these screenings).

16.     An example of DoD misunderstanding of immigration law is DoD's repeated assertion that certain MAVNI soldiers have received "fraudulent visas to attend universities that did not exist."  (See, e.g., Roger Smith Declaration, Dkt. 131-1 p. 13)  None of the MAVNI soldiers referred to in this circumstance (nor in any other situation that I am aware of) ever received a "fraudulent visa."  Visas are official travel documents issued by the

DECLARATION OF MARGARET D. STOCK - 9
Case No. 2:17-cv-00242-TSZ

CASCADIA CROSS BORDER LAW GROUP LLC
4141 B Street, Suite 205
Anchorage, AK 99503-5940
Tel 907.242.5800

EXHIBIT 1 Page 9

U.S. Department of State and the validity of all MAVNI visas was always verified by the U.S. Department of Homeland Security prior to the MAVNIs' enlistment, and none of them were found to have a "fraudulent visa."[1]

17.　　I am uniquely qualified to address the critical interplay between immigration law and military security issues having written the only book on the subject of immigration law and the military.  See Margaret D. Stock, Immigration Law & the Military (2nd ed. 2015) (published by the American Immigration Lawyer Association).

18.　　In 2013, I was notified by the John D. and Catherine T. MacArthur Foundation that I had been selected to be a MacArthur Foundation Fellow.  A MacArthur Foundation Fellowship is popularly called a "genius grant" and one cannot apply for one; the nomination and selection process is secret.  I was advised by the MacArthur Foundation that I was given the award in part because of my role in creating and managing the MAVNI program from 2007 to 2010, and my ongoing efforts to assist MAVNIs. In particular, the MacArthur Foundation determined that I have a "singular knowledge of immigration and national security law."  See https://www.macfound.org/fellows/904/

19.　　I continue to maintain my expertise in the fields of immigration and national security law by, among other things, reading pertinent literature including immigration and national security periodicals, immigration and national security blogs and listserves, and relevant books and articles.  I also listen to relevant podcasts and attend professional conferences. For example, I regularly read the Journal of National Security Law

_____

[1] Mr. Smith may be trying to say that the State Department should not have issued a particular visa to a particular MAVNI, or that the MAVNI extended his or her status in the United States in a way that Mr. Smith believes to have involved "fraud," but that does not mean that the visas were "fraudulent." All MAVNIs who had visas were issued valid visas by the United States Department of State and used those valid visas to enter the United States.

DECLARATION OF MARGARET D. STOCK - 10
Case No. 2:17-cv-00242-TSZ

CASCADIA CROSS BORDER LAW GROUP LLC
4141 B Street, Suite 205
Anchorage, AK 99503-5940
Tel 907.242.5800

EXHIBIT 1 Page 10

& Policy, Immigration Briefings, Foreign Affairs, Foreign Policy, DefenseNews, C4ISRNet,

MIT Technology Review, Wired (representative periodicals). Books that I have read recently

include James R. Clapper, "Facts and Fears," Gordon Corera, "Cyberspies;" Glenn L. Carle,

"The Interrogator: An Education;" Yasha Levin, "Surveillance Valley;" Michael Morell, "The

Great War of Our Time;" Bruce Schneier, "Click Here to Kill Everybody: Security and

Survival in a Hyper-Connected World;" and Ben Macintyre, "The Spy and the Traitor,"

among others. I keep up with publications and other materials put out by the American Bar

Association's Standing Committee on Law and National Security, and the Federalist

Society's International & National Security Law Practice Group.

      20.     I note that my statement at my deposition (cited by DoD in its motion

*in limine*) that I perform a large amount of *pro bono* work and do not make "any money" from

my law practice was a shorthand summary. I do in fact perform a large amount of *pro bono*

work. In 2008, I received the American Immigration Lawyers Association's annual *pro bono*

award for my work creating, volunteering for, and in part supervising the American

Immigration Lawyers Association Military Assistance Program (AILA MAP), which provides

*pro bono* legal services to members of the US Armed Forces, military veterans, and their

families. The amount of my actual and functional *pro bono* work has further dramatically

increased in the last two years as a result of DoD dismantling the MAVNI program and

attempting to discharge and deny citizenship to thousands of MAVNI recruits, leaving them

without any legal status in this country and subject to deportation. In 2017 my total income

from my law practice was $27,141 (although this income was offset as a practical matter by

unreimbursed "member contributions" that I made to the firm which totaled more than

DECLARATION OF MARGARET D. STOCK - 11
Case No. 2:17-cv-00242-TSZ

CASCADIA CROSS BORDER LAW GROUP LLC
4141 B Street, Suite 205
Anchorage, AK 99503-5940
Tel 907.242.5800

EXHIBIT 1 Page 11

$30,000 in 2017). All of my employees, with the exception of Mr. O'Donnell, are paid more than I am paid.[2] My current very high level of *pro bono* work, and my resulting very modest income from my law practice, reflects the fact that I feel an obligation, as a recipient of MacArthur Foundation Fellowship, to provide these ongoing *pro bono* services.[3] I have felt a deep obligation to use my MacArthur grant to assist and represent military members who typically have very little money and have often been left in dire immigration circumstances as a result of recent DoD policies.

21. At the time I referred this matter to Mr. O'Donnell, I had no expectation that his firm would wind up its affairs about a year later. At the time I referred this matter to Mr. O'Donnell, I did expect that I would be asked to serve as an expert witness in the litigation because I believe I am the leading expert on the MAVNI program in the country. At the very least, I know that I am the leading expert on the MAVNI program who is not presently employed by DoD. I note that DoD has not enlisted anyone through the MAVNI program since the fall of 2016, and DoD personnel continue to make inaccurate or confusing statements about the MAVNI program in court filings and in the press, which indicates that they do not have a MAVNI program expert reviewing their court filings or advising their public affairs officers.

22. I agreed to serve as an expert in this case without compensation because I believe that DoD was and is unfairly and unconstitutionally discriminating against

---

[2] Now that Mr. O'Donnell has joined my firm, I pay Mr. O'Donnell $10.00 per hour for 10 hours of work every two weeks regardless of the number of hours he actually works, whereas my firm pays me for 40 hours of work every week and I earn extra money from honoraria and book sales. Mr. O'Donnell does not work at our physical office and sets his own schedule.

[3] The MacArthur Foundation provides Fellows with a five-year grant of $125,000 per year.

DECLARATION OF MARGARET D. STOCK - 12
Case No. 2:17-cv-00242-TSZ

CASCADIA CROSS BORDER LAW GROUP LLC
4141 B Street, Suite 205
Anchorage, AK 99503-5940
Tel 907.242.5800

EXHIBIT 1 Page 12

naturalized U.S. citizen MAVNI soldiers. I note that, as a result of this litigation, DoD has

declined to defend, and now withdrawn, multiple discriminatory DoD policies directed

against naturalized U.S. citizen MAVNI soldiers. My motivation for serving as an expert in

this case has never been based, in whole or in part, on the possibility that I might receive,

directly or indirectly, some benefit from a potential attorney fee award at the end of the

litigation. I further note that my first two affidavits in this case, which set forth my core

views regarding DoD's discriminatory policies towards naturalized U.S. citizen MAVNI

soldiers, were filed in April and May of 2017, long before I had any idea that Atkinson,

Conway and Gagnon, Inc. might wind up its affairs in early 2018. (Dkt. 17 and Dkt. 26)

   23. DoD argues in its motion that I should not be allowed to serve as an

expert in this case because, if the Plaintiffs prevail, I stand to receive "positive publicity and

other accolades." (DoD Mem. p. 3) The possibility that I might receive "positive publicity"

and "other accolades" (whatever those might be) if Plaintiffs prevail in this case is not

remotely a motivating factor for my service as an expert witness in this case. Furthermore,

any additional "publicity" I might receive from this case would be marginal at best. Long

before this case began, I was regularly sought out as an expert on military immigration issues

(and the MAVNI program in particular) by numerous media organizations and legislators

and I have probably been quoted on those subjects in print, radio, and television on more

than 100 occasions that predate this case, or that have nothing to do with this case. A quick

Google search would turn up many of those articles and appearances.

   24. A copy of my current CV is attached as Ex. 4.

DECLARATION OF MARGARET D. STOCK - 13
Case No. 2:17-cv-00242-TSZ

CASCADIA CROSS BORDER LAW GROUP LLC
4141 B Street, Suite 205
Anchorage, AK 99503-5940
Tel 907.242.5800

EXHIBIT 1 Page 13

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct.

DATED this 5<u>th</u> day of November, 2018.

_Margaret D Stock_
MARGARET STOCK

DECLARATION OF MARGARET D. STOCK - 14
Case No. 2:17-cv-00242-TSZ

Cascadia Cross Border Law Group LLC
4141 B Street, Suite 205
Anchorage, AK 99503-5940
Tel 907.242.5800

EXHIBIT 1 Page 14

# EXHIBIT 1


## TO THE DECLARATION OF MARGARET STOCK

# The Impact and Potential of America's Foreign Born Population on Army Recruiting and Force 2025

Naomi Verdugo and Margaret Stock

ABSTRACT - The Nation's foreign born population has increased dramatically over the past 45 years, going from five percent of the population (9.6 million) in 1970 (a record low since these data were first collected in 1850) to 13 percent of the population (41.3 million) in 2013. The foreign born population is projected to increase to 52.4 million by 2025 when they will comprise 15 percent of the population.

Attracting immigrants to military service can be a critical factor in successful recruiting now and into the future because it allows immigrants to begin a tradition of service in future generations. The authors review options for improving the recruitment of highly qualified, highly propensed noncitizens, to include enhancements to the current Military Accessions Vital to the National Interest (MAVNI) program, recruitment of DACAs, and removing barriers to the enlistment of dual citizens and applicants with undocumented spouses or other family members. The authors estimate that these enhancements will increase the recruiting market by over 2.3 million, allowing the services to choose the most qualified from a highly propensed applicant pool.

BODY - The Nation's foreign born population has increased dramatically over the past 45 years, going from five percent of the population (9.6 million) in 1970 (a record low since these data were first collected in 1850) to 13 percent of the population (41.3 million) in 2013 (see Zong and Batalova, 2015). This growth is driven by increased immigration combined with low birth rates among the U.S. born population (Mather, 2012). These factors, as well as the higher birth rates of Hispanics—both immigrants and U.S. born Hispanics—have resulted in a more racially, ethnically, and linguistically diverse U.S. population. Between 2015 and 2025, the foreign born population is projected to increase to by over 9 million to a total of 52.426 million and will comprise 15% of the population (U.S. Census Bureau, December 2014).

Utilizing existing recruiting programs and developing new ones with a focus on attracting immigrants can be a critical factor in successful recruiting now and into the future. Current recruiting efforts could benefit by a greater focus on recent arrivals and future recruiting success may well stem from these efforts. Data show that that there is a strong family connection to military service, with those who have a parent or sibling

EXHIBIT 1 Page 1

who served more likely to themselves serve in the military.[1]  In this way, future recruiting success will be ensured by the development of a tradition of military service starting with America's new arrivals but ultimately including their offspring and subsequent generations.  This paper reviews the success of the recruiting program known as Military Accessions Vital to the National Interest (MAVNI) and suggests new approaches to better attract immigrants to the U.S. Army as both Officers and Enlisted Members, and allow those immigrants to begin a tradition of service in their future generations.

Current Recruiting Challenges

Army recruiting is deemed successful when the Army meets its annual numeric accessions goals and when those persons who are recruited are within DoD-established quality benchmarks.  Those benchmarks are: 1) 90% high school diploma graduates (HSDG), with GED holders not counted as HSDG; 2) 60% scoring in the top half of the Armed Forces Qualification Test (AFQT); and 3) fewer than 4% scoring in the bottom 10-30 percentile of the AFQT.  The Army often tightens quality goals so that recruiting quality minimums are higher than DoD benchmarks when the recruiting market conditions allow for higher standards.  But regardless of market conditions, leaders generally prefer more qualified recruits because an extensive body of research shows that people with more education and higher scores on the military entrance test are less likely to attrite before the end of their term of service and are easier to train.  There is some research that shows that more highly qualified recruits also perform better at their jobs.

Given the longstanding relationship between the unemployment rate and success at achieving the Army's recruiting mission, it is no wonder that all components of the Army (Active, Guard and Reserve) are now experiencing extremely difficult recruiting conditions (Office of the Under Secretary of Defense, Personnel and Readiness).  With unemployment declining to 5.4% in April 2015, the lowest rate since May 2008, recruiting conditions are bound to become more difficult.  In response, policy makers are now wrestling with difficult resource decisions that include the addition of significant advertising and marketing dollars, increases in the number of recruiters, and increased monetary incentives (bonuses) for recruits.  Despite these investments, the percentage of Army recruits with test scores in the upper half of the Armed Forces Qualification Test

---

[1] "Veterans are more than twice as likely as members of the general public to say they have a son or daughter who has served (21% vs. 9%)….Overall, roughly eight-in-ten veterans (79%) have an immediate family member who served in the military.  This compares with 61% among the general public." Source: Office of the Under Secretary of Defense, Personnel and Readiness, page 17.

EXHIBIT 1 Page 2

(AFQT) score distribution remains just above the established DoD minimum benchmark of 60%.

Current recruiting metrics raise particular concerns about the low number of contracts being written this year, which are projected to result in an extremely low entry pool of applicants available to ship at the start of the new fiscal year on October 1, 2015. To ensure a steady flow of trainees to the basic training locations, the Army provides recruits a ship date months into the future. Ideally, the Army begins the fiscal year with 25-35% of its annual accessions already contracted and waiting to ship. While projections of this entry pool for FY16 were as low as 11%, production has improved and we expect to achieve 23-26%. Despite this increase, there is still some risk of failing to fill training seats and failing the accession mission for FY16. There would be even greater risk if not for the existence of a little-known program that allows highly-qualified foreign nationals to enlist in the Army if they are legally in the United States and have been so for at least two years. To date, this fiscal year more than 1,300 such foreign nationals have signed enlistment contracts in the Army, and 1,600 additional are expected to do so before the end of FY15.

The Foreign Born Population as a Source of Military Recruits

A significant high quality source of recruits, both in terms of quality and quantity, resides here in the U.S. yet is largely overlooked – the foreign born population. These individuals have been historically viewed as a key source of military manpower. In fact, non-citizens have served in the Army as far back as 1775. In World Wars I and II, the Korean War and Vietnam, the military service of non-citizens was NOT limited to Lawful Permanent Residents (i.e., green card holders). Today, that is no longer the case, mostly due to a Pentagon-driven change in the law that occurred after the Vietnam War ended. After the Vietnam War. DOD directed a change in policy that limited most recruitment of the foreign born to green card holders; in 2006, that DOD policy became law, so that since 2006, military service has been statutorily limited to U.S. citizens, U.S nationals, green card holders, and individuals described in one of the Compacts (treaties) of Free Association with the Republic of the Marshall Islands, the Federated States of Micronesia or Palau. However, as noted in Title 10, Section 504, any Service Secretary can authorize an individual, regardless of citizenship status, to serve in the military "if the Secretary determines that such enlistment is vital to the national interest."

There are a variety of reasons to permit and even encourage foreign born non-citizens to serve in the military. Chief among these reasons is that the foreign born population is numerous (it numbered over 40 million, comprising 13% of the U.S. population in

EXHIBIT 1 Page 3

2013)[2], with the exception of those from Latin America and the Caribbean, non-U.S. citizens ages 18-24 are much more likely to be enrolled in college[3], has fewer criminal convictions[4] and behavioral problems[5], and is healthier[6].  For example, even taking into account those immigrants from poorer countries, the state of non-citizen health is often as good or better than that of native born Americans, including a lower rate of obesity (Dey and Lucas, 2006 and Buttenheim et al., 2012).   Other reasons include: 1)  the military's unique ability to inculcate American values and integrate immigrants into American society; 2) the ability of the military to defuse at least some of the controversy surrounding immigration, in large measure, by providing an avenue for non-citizens to "earn" their U.S. citizenship; 3) the longstanding expedited path to citizenship for qualified non-citizen service members who would otherwise have little or no opportunity to become U.S. citizens, which makes military service an attractive option for non-citizens; 4) the constant need for the Army to have personnel, preferably in uniform, to speak the range of languages used in the over 150 countries in which the military operates today; 5) enhancing the racial, ethnic, and linguistic diversity of the military by adding foreign born personnel who are likely to bring a greater cultural knowledge for various countries and regions beneficial for all operational units, particularly civil affairs and special operations; and 6) returning a qualified, vetted pool of veterans to America's workforce.   Finally, we have seen that military service often becomes a tradition within families, with a significant percentage of service members reporting that a parent or sibling served previously.  Ensuring that non-citizens and foreign born U.S. citizens are not overlooked by policy makers and military recruiters may help to attract the children and grandchildren of these first generation Americans in the years ahead.

---

[2] "In 2013, approximately 41.3 million immigrants lived in the United States, an all-time high for a nation historically built on immigration," Zong and Batalova, 2015.

[3] Acosta, Larsen and Grieco, 2014 report that 53.6% of 18-24 year olds from Africa, 65.4% from Asia, 54.5% from Europe, and 59.4% from Oceania and Canada were enrolled in college as compared to 41% of American 18-24 year olds as reported in NIH, "Young adults more likely to attend college," July 11, 2014.

[4] Immigration Policy Center, "From Anecdotes to Evidence: Setting the Record Straight on Immigrants and Crime, July 25, 2013 provides data and reports on research showing that immigrants are less likely to be court-involved that US citizens.  Data on US citizens with criminal records can be found in Melanie Hunter, "Lawyer: 68 Million Americans Have Criminal Records—More Than Population of France, July 15, 2014.

[5] Dey and Lucas, 2006.

[6] Dey and Lucas, 2006 and Buttenheim, et al., 2012.

EXHIBIT 1 Page 4

Table 1
Estimates of the Citizen and Non-Citizen Population Under age 35: 2010-2012
(Estimates in thousands.)

| AGE GROUP | CITIZEN | NON-CITIZEN | TOTAL |
|---|---|---|---|
| <18 | 52,700 | 2,057    3.8% | 54,757 |
| 18-24 | 20,900 | 2,568   10.9% | 23,468 |
| 25-34 | 26,400 | 5,722   17.8% | 32,122 |

Source:  U.S. Census Bureau, 2010-2012 American Community Survey

Table 1 shows the significant percentage non-citizens comprise among the population under age 35.  Non-citizens comprise almost 11% of those ages 18-24 and almost 18% of those 25-34 years old.  Given that the foreign born population is a large and growing segment of the 18-34 year old population, it is important to identify ways in which the Army can better attract non-citizen Soldiers and retain them.  Indeed, the percentage of 18-34 year olds who are foreign born has more than doubled since 1980, moving from 6% to 15% today.  Note that the terms "non-citizen" and "foreign born" are not equivalent.  "Foreign born" is a larger number because it includes those who have become naturalized U.S. citizens, 39% of the total foreign born population in 2011 (Pew Research Center, 2013, page 2).[7]

Enlistment statutes have long allowed the enlistment of green card holders and they now comprise about 4-5% of those serving.  However, the number of green cards issued annually has declined in recent years and in 2013 was at the lowest point (990,553) since 2005; due to lengthy waiting periods for green cards, most people issued green cards are older than the typical military recruit.  Green card holders also have a pathway to citizenship and need not serve in the military to become naturalized U.S. citizens.  But for those persons who are unable to obtain green cards or who must wait many years to get a green card, serving in the military is an attractive option because military service is a fast-track to American citizenship.  In this paper we will present approaches for recruiting the resident foreign born segment of the population that has not already naturalized and does not have green cards.  They comprise about 32% of the foreign born who reside in the United States with the remaining 68% being naturalized U.S. citizens or those with green cards.  Excluding the unauthorized immigrants (including those with DACA status) about 1.9 million foreign nationals resided in the U.S. on January 1, 2012, in a long term temporary status, such as with a

---

[7] While most US-born officers and enlisted members enter military service between the ages of 18-24, the non-citizens enter at slightly older ages.  It appears that propensity to enlist does not diminish in relation to age to the extent that it does for US citizens.

EXHIBIT 1 Page 5

work or student visa, comprising about 4-5% of the foreign born population (Zong and Batalova, 2015)[8].

<u>Military Accessions Vital to the National Interest (MAVNI)</u>

Named for the language in Title 10 that authorizes this program, MAVNI was approved by the SECDEF for use by all the Services on November 25, 2008.  The Army began recruiting for the program on February 23, 2009.  There are two categories of people who are recruited through the current MAVNI program: 1) those who speak a critical language (currently there are more than fifty such languages, but not Spanish because many Soldiers already speak Spanish); and 2) those who are fully licensed U.S. health care professionals (HCPs) in critically short specialties.  Without any advertising or market research, but with a careful media strategy that landed front page stories in the New York Times (a story picked up by more than 200 other media outlets), Wall Street Journal, and the Los Angeles Times, among others, the 2009-10 MAVNI program was highly successful.  The Army's first cohort of MAVNIs exceeded all expectations.  Due to an arbitrary[9] cap imposed by the Office of the Secretary of Defense (OSD), the Army could only enlist 789 MAVNIs with critical language skills despite having 14,895 individuals who went to the Army's MAVNI website to fill out a form requesting that a recruiter contact them.  The Army also contracted and shipped 143 U.S. licensed health care professionals (22 Physicians, 19 Dentists, 98 Nurses, and 4 with other specialties).

The MAVNI language enlistees had an average AFQT score of 77 (17 points higher than their non-MAVNI counterparts), two-thirds had a Bachelor's or higher degree, and 48% had tested foreign language fluency of 3/3. (The 3/3 score indicates a high degree of comprehension and speaking, reflecting effective communication in practical, social and professional topics.)  Of particular note, their foreign language proficiency was much higher than the language proficiency achieved by Defense Language Institute (DLI) graduates or graduates of other DOD language training programs.

First term attrition among MAVNI Soldiers was also extremely low, about one-third that of their non-MAVNI counterparts.  Thirty-six month attrition averaged 11% for the MAVNIs but approached 30% for non-MAVNIs.  Unexpectedly, 26.7% of the MAVNIs

---

[8] Estimates come from a variety of data sources, often surveys.  Surveys tend to overrepresent those claiming US citizenship and underreport unauthorized immigrants. Hence, though we cite estimates of the foreign born population of 41.3 million, the number is likely higher if all unauthorized immigrants were accurately counted and included.  Source:  Telephone conversation with Jeanne Batalova of Migration Policy Institute.
[9] We call this cap "arbitrary" because the number was selected without regard to military needs, but rather because Pentagon officials liked the number.

EXHIBIT 1 Page 6

reenlisted, on a par with their non-MAVNI counterparts.  A number of MAVNI Soldiers are assigned to Special Operations Forces (SOF) and some have made it through the challenging SOF training and have re-branched into SOF.  MAVNIs have also demonstrated an interest in becoming Commissioned Officers, most commonly through OCS, but also through ROTC (Green to Gold), Direct Commissioning, and even the U.S. Military Academy.

MAVNI Soldiers tend to be much more educated than other enlisted Soldiers, and yet they are eager to join the Army, unlike American citizens of similar educational levels. There is an easy explanation for why MAVNI applicants are eager to enter the Army, despite holding graduate and undergraduate degrees from schools like Harvard and MIT(as well as more ordinary schools), and with a disproportionate percentage having degrees in science, technology, engineering and math (STEM)[10]: The U.S. legal immigration system is broken, and the most talented foreign nationals find that their path to U.S. citizenship has been blocked by a dysfunctional and complex legal immigration system marked by limited quotas and decades-long waiting periods. Military service provides a pathway to U.S. citizenship that is otherwise not available, and they can earn this citizenship rapidly (it is usually conferred at the end of basic training).  Most MAVNI applicants have a student or work visa.  A student visa offers no pathway to U.S. citizenship, and a work visa seldom does and only after a lengthy and costly process, sometimes requiring a two-year wait in one's home country for the green card, after which it is still many years to obtain U.S. citizenship.  A MAVNI Soldier who three months previously held only a short-term student or work visa may become a U.S. citizen without having to first obtain a green card.  So the MAVNI program provides a pathway to U.S. citizenship to those unable to become U.S. citizens any other way, and avoids a typically lengthy and convoluted process for obtaining a green card.

MAVNI Program Recommendations

The MAVNI program has been run as a "pilot" since 2009, and legislation is necessary to make the MAVNI program permanent.  Currently the statute under which the MAVNI program operates is Title 10, Section 504(b)(2), which allows the Service Secretary to enlist someone without regard to his or her citizenship status so long as the person is deemed "vital to the national interest."  By DOD policy, MAVNI applicants must have one of more than a dozen different types of non-immigrant visas or be refugees,

---

[10] While specific data on degrees obtained by MAVNI applicants is not available, "Foreign students disproportionately study STEM and business fields. Two-thirds of foreign students pursuing a bachelor's or higher degree are in science, technology, engineering, mathematics (STEM) or business, management and marketing fields, versus 48 percent of students in the United States" (Ruiz, 2014).

EXHIBIT 1 Page 7

asylees, or Temporary Protected Status beneficiaries.  In September 2014, OSD opened the program to those with Deferred Action for Childhood Arrivals (DACA) status.[11]  None of these individuals are eligible for obtain U.S. citizenship through military service except for the existence of Title 8 United States Code, Section 1440, also known as Immigration and National Act (INA) 329.  This "wartime" naturalization statute allows anyone serving honorably in the military during wartime to obtain U.S. citizenship through military service.  This statute is separate from the statute allowing for a Declaration of National Emergency; INA section 329 is invoked via Presidential Executive Order in times when the U.S. is in conflict with "a hostile foreign force."  Currently, a "stand alone" Executive Order from President George W. Bush allows MAVNIs to naturalize under INA 329.

If and when a future President rescinds this Executive Order, the MAVNI program must be immediately suspended—and those MAVNIs contracted into the entry pool released—because without this Executive Order in place,  there is no way for MAVNIs to earn citizenship through military service.  This odd situation occurs because during peacetime, the law provides that only those with green cards can earn U.S. citizenship through military service.  Accordingly, before the MAVNI program can become permanent, legislation must be passed allowing for MAVNIs to obtain green cards during peacetime.  A bill allowing them to obtain green cards was introduced by Representative Coffman (R-CO) in the last Congress.  The bill failed to pass but the language of the bill could be used as a template for a Legislative Proposal by the Army or DoD staff.

Making the MAVNI program permanent would eliminate the frequent starts and stops of the program, which have been an impediment to building awareness and momentum among the foreign born recruiting pool.  Each time the program is shut down, MAVNI recruiting efforts lose momentum, as desperate applicants lose hope, their status expires, or they age out and are no longer eligible for the program.  And when the

---

[11] DACA is a program, albeit a temporary one, that allows certain unlawfully present immigrants to apply to DHS for "Deferred Action for Childhood Arrivals" status.  They must have arrived in the U.S. before age 16 and before June 2007, must not have been convicted of any felonies or serious misdemeanors, and have either graduated from a U.S. high school or earned a GED.  They must pay a fee to apply and if approved, they are accorded DACA status for two years initially (although it may be renewed). They are provided work authorization, and are freed from the fear of being deported.  At the end of the effective period, recipients must renew their DACA status or lose their authorization to work and again become subject to deportation.  Begun by the Obama Administration in June 2012, DACA program changes announced in November 2014 broadened the eligibility requirements and lengthened the period of DACA coverage from 2 years to 3 years.  The 2014 changes, however, are currently on hold due to an injunction by a District Court judge in Texas.

EXHIBIT 1 Page 8

MAVNI program is reopened after a hiatus, some applicants' documents have expired and must be resubmitted or applicants must be re-tested, starting the lengthy enlistment process again. For a program that has no advertising and very limited marketing (a few information sheets/flyers) and requires lengthy applicant processing, momentum is a necessary ingredient of program success. Yet the momentum of the MAVNI program is severely compromised each time the program is shut down. The program was shut down several times when when OSD-established caps were reached, when Army-established language caps were reached, and when leadership wanted time to develop procedures for screening and monitoring MAVNI applicants. When the program is re-opened we see a reduced number of applicants, some applicants say they thought the program was closed, even some recruiters tell applicants the program is closed. We have been unsuccessful getting interest from major media outlets each time the program re-opens as this is no longer news.

The MAVNI program has been successful by all measures. However, there are policy and process changes that could make it an even more effective recruiting tool. These include:

1) Permitting MAVNIs with undocumented spouses or children to enlist would expand the recruiting pool without creating any problems, because the family members can earn lawful status as soon as the MAVNI enlists. Their family members' immigration status has disqualified some MAVNIs and has discouraged an unknown number of potential applicants from trying to enlist. Yet there is no logical reason for excluding MAVNIs based on a family member's immigration status, because the family member's status can be resolved fairly quickly once the MAVNI has enlisted owing to the "Parole in Place" policy established by Department of Homeland Security. It is unknown to what degree this would expand the pool because applicants with undocumented family members may be failing to apply or choosing to distance themselves from family, spouses or significant others in this situation.

2) Allowing the Army to control the number of MAVNI accessions and the proper distribution among the components without requesting permission from OSD would put MAVNI on the same footing as other recruiting programs where the DCS, G-1 establishes numeric goals by component based on Army requirements. There is great interest among MAVNI applicants in USAR service as it is a natural fit for the majority of MAVNIs who are either attending college or graduate school or working. The first year that the Army was allowed to enlist MAVNIs with critical language skills in the USAR, OSD allowed only 100 spaces. Without advertising or marketing, these spaces were filled within two weeks. MAVNI offers the USAR the potential of obtaining a significant number of highly qualified recruits via the MAVNI program. We know that USAR was in high demand by MAVNI applicants as it allowed them to

EXHIBIT 1 Page 9

combine military service with work or school.  Having an arbitrary quota, controlled by DOD, makes little sense, especially because the quota does not relate to Service needs.  Like other recruiting programs, the Army G-1 should establish appropriate quotas in the Army's mission letter process.

3) MAVNIs are screened extensively—more extensively than any other recruits.  Although only the HCPs receive a security clearance, all contracted MAVNIs are screened using the Single Scope Background Investigation (SSBI).  Prior to undergoing an SSBI, they are screened using more than 65 databases in a security check known as the National Intelligence Agency Check (NIAC).  And in order to get and maintain their visa status, they are screened by Department of State and Department of Homeland Security on regular basis.  There is also a continuous monitoring program to track the MAVNIs throughout their military careers.  These checks, particularly the SSBI, take many months.  Too often the MAVNI applicant must have his ship date pushed back while he awaits completion of these checks.  A more efficient process for screening would be welcome; the Army has been reluctant to pay a premium fee for expediting the process, but paying the additional fee to expedite the screening process (approximately $500) may be worthwhile because faster service would eliminate the need to renegotiate and delay ship dates, which could discourage potential applicants.

4) Delays in other aspects of processing also lengthen the MAVNI enlistment process.  Significant delays occur in processing the G-845 DHS check, scheduling the Oral Proficiency Interview (OPI), and waiting for completion of the SSBI.  The chokepoint for the G-845 seems to occur most often at the recruiting battalion level.  Staff there must be trained on the process, and must undergo periodic refresher training so they understand it is a priority to submit the G-845s received to USAREC headquarters on a daily basis.  Requests for the OPI are submitted through an online system.  These requests may sit with Army staff at MEPS for two to three days before being acted upon.  Often a request goes from MEPS to USAREC HQ to Defense Language Institute Foreign Language Center to their contractor American Council on the Teaching of Foreign Languages and then back again.  Recruiters are notified via email when an OPI has been scheduled.  It is easy to lose track of these requests and notices each step of the way.  Requests for OPI testing often have errors (wrong name, wrong SSN, even wrong language requested).  The OPI scheduling process seems ripe for modernization, which could be done by using the enlistment record to ensure that applicant information is consistent.  If system checks could ensure the information was consistent, Army recruiters may be able to skip some of those steps and more rapidly schedule the OPI with ACTFL.  Speeding the scheduling process is worth some effort.  Delays in the SSBI were discussed above.  There is limited

EXHIBIT 1 Page 10

flexibility on this point other than paying to have MAVNI SSBIs prioritized, but we are not sure how much time would be saved by paying extra fees.

Finally, a big delay in MAVNI processing results from the recruiter being unaware of how to process the MAVNI applicant correctly; MAVNI processing is quite complicated due to the extra DHS checks, security and background checks, and special testing. There is currently little or no recruiter training but training is needed and it must be repeated when new recruiters come onboard; it must also be available to download when needed for those recruiters who seldom process MAVNIs. Brief videos presented by expert recruiters on topics like documents, steps in processing, and more detailed information on each step where MAVNI processing deviates from the processing of other recruits would be helpful. There is also the reality that some recruiters just aren't very responsive to MAVNI applicants. We see this in comments from applicants and in the long time it takes some applicants to move through the enlistment process. Recruiters report that MAVNIs are far more anxious to enlist than other applicants and will pester recruiters and annoy them in ways that other applicants do not. This is understandable because the legal immigration status of most MAVNIs hangs in the balance and their desire to apply for U.S. citizenship creates a desperate situation for many.[12] Recruiters must be well-trained and respond in a timely fashion to this applicant pool.

5) MAVNI processing would also benefit by at least a half-time immigration attorney on USAREC staff. Many MAVNI applicants are disapproved for enlistment due to errors by DHS staff in determining eligibility for the program (specifically, having two continuous years in a MAVNI-eligible visa or other status). The complexity of U.S. immigration law makes it difficult for non-attorney DHS staff to understand the immigration history of many MAVNI applicants. An attorney could more comprehensively review the immigration record to make an informed determination that some of those rejected are actually eligible to enlist. In 2009, when the original MAVNI pilot ran, an immigration attorney reviewed many rejected applicants and worked with DHS to correct DHS errors. An immigration attorney could also be instrumental in training recruiters and conducting outreach to private attorneys to ensure they are informed about the program. Because most non-citizen health care professionals practicing in the U.S. have immigration attorneys, a USAREC immigration attorney could also help to inform these attorneys and in so doing improve MAVNI health care recruiting.

---

[12] For example, a typical MAVNI applicant might be a foreign student whose ability to remain in the United States after graduation is limited. Such a person may be highly motivated to enlist because he or she is facing a deadline to leave the United States if military enlistment is not possible.

EXHIBIT 1 Page 11

MAVNI applicants are highly qualified and highly motivated to serve. Their outcome measures (low DEP loss, low attrition, reenlistment on par with other Soldiers) make them a very worthwhile applicant pool[13]. It is important that OSD, the Army, and USAREC take the steps outlined above to improve the program by making it permanent, ensuring recruiters are trained, and reducing processing bottlenecks.

The authors estimate the size of the 18-34 year old population who were in the U.S. in January 2012 as temporary workers, students or exchange visitors at approximately 842,000[14]. Excluded from this estimate were those in the U.S. as diplomats (that is not a MAVNI-eligible status) and those from North America, South America, and Europe (although such individuals could be eligible for MAVNI if they were health care professionals or spoke one of the eligible MAVNI languages). This is a very large, and previously overlooked, recruiting pool.

<u>Undocumented and Deferred Action for Childhood Arrivals (DACA)</u>

Just as those who are legally present on work or students visas, or in several other statuses, may be eligible for enlistment under the statutory authority used by the MAVNI program, so too could this same legal authority be used to enlist those with DACA status if they are otherwise eligible for service. While the Department of Defense recently opened the MAVNI program to a narrow segment of DACAs, enlistment opportunities could be more broadly available to DACAs using the same legal authority used by the MAVNI program—namely, Title 10, Section 504(b)(2). Using this authority would require the Service Secretary to determine, on a case by case basis, that each DACA enlistment is "vital to the national interest." While OSD has narrowly defined "vital to the national interest" to include only speakers of one of dozens of critical languages (but not Spanish) or U.S. licensed health care professionals, OSD or a Service Secretary could certainly define "vital to the national interest" more broadly. For example, "vital to the national interest" could be defined broadly to include U.S. educated STEM graduates, high quality U.S. high school graduates, or chaplains and other talented individuals with special skills. If it is deemed "vital to the national interest" to fill the military ranks with high quality, American-educated high school graduates, the Services could fill any recruiting shortfalls with DACA applicants who demonstrate high AFQT scores, have a high school diploma or higher degree, and are medically and morally qualified. Under this broader definition of "vital to the national interest," no foreign language skill would be required. Removing the language requirement is a

---

[13] Ani DiFazio, "MAVNI Final Evaluation," briefing for Mr. Jeffrey Mayo, HumRRO, May 21, 2013.
[14] The authors drew on data from Baker, 2014 for this estimate.

EXHIBIT 1 Page 12

significant market expander because DACAs all arrived in the U.S. before age 16 and many arrived well before their teen years, which often means that they have limited fluency in their native tongue. Also, about 80% of the DACAs have origins from Latin America, and thus are not eligible for the DACA enlistment option under the MAVNI program because Spanish is not an eligible MAVNI language.

Today there is no pathway to U.S. citizenship for those who have DACA status. Although the Selective Service System does require DACAs and other undocumented[15] males to register, none of the Services accept undocumented individuals for service. But this was not always the case. During World Wars I and II, the Korean conflict, and the Vietnam Conflict, the Army accepted undocumented applicants if they were otherwise eligible; they earned U.S. citizenship for such service. The rare cases today when such enlistments occur are the result of an error or the applicant misrepresenting his or her status.

The potential lift for military recruiting would be significant, adding approximately 1.489 million to the recruiting pool (based on the expanded DACA program parameters announced in November 2014 but which are currently on hold due to an injunction by a District Court judge)[16]. It is estimated that another 500,000 young people will become eligible for DACA in the future when they reach age 15 (a requirement of the DACA program)[17]. As happened with the MAVNI program, opening enlistment to DACAs would give military recruiters access to a large, highly motivated, U.S. educated and U.S. resident population. The Services could set eligibility requirements very high. Because military service is virtually their only way to earn U.S. citizenship, many will be eager to enlist.[18] Moreover, because they would be naturalized under the expedited military naturalization statute, their U.S. citizenship could be revoked should they fail to serve honorably for 5 years. However, in the absence of new legislation, this pathway

---

[15] The term "undocumented" as used here will refer to those who are not legally present in the U.S. This group can include those who entered the U.S. without proper approvals and documentation or those who initially entered legally but whose status has since expired.

[16] Zong and Batalova, 2015.
[17] Estimate provided by Jeanne Batalova via email correspondence with the authors in March 2015.
[18] Those who enter in a valid status but "overstay" could marry an American and obtain status, potentially resulting in U.S. citizenship eventually. But the marriage must be legitimate because the Department of Homeland Security carefully reviews such claims. Moreover, the immigrant visa process is lengthy and complicated and even those who are married to U.S. citizens do not always qualify for green cards, the first step to obtaining U.S. citizenship for persons who do not serve in the military in wartime.

EXHIBIT 1 Page 13

to U.S. citizenship can only be offered during times in which the U.S. is in conflict with a hostile foreign force as confirmed by an Executive Order.  At other times, military service would not be grounds for U.S. citizenship and the military services must studiously prevent such enlistments so the Services don't end up with undocumented non-citizens in their ranks who have no way to become U.S .citizens.

Note that we do not recommend the enlistment of undocumented individuals.  Although the undocumented are a numerous population, they have not undergone the DHS screening required to obtain DACA status and other legally present non-citizen statuses.  DHS screening is important because DHS will not confer lawful status on anyone who has a serious criminal history, is a gang member, or who represents a threat to public safety or national security.  Requiring recruits to have a valid DHS status provides some measure of screening before the military services conduct their own extensive screening, and so greatly reduces the percentage of applicants who will fail to be favorably adjudicated under the military's screening.  By limiting this expanded market to those with lawful presence prior to enlistment, we are limiting the pool to those who have been screened by DHS.  In so doing, there is also very low risk that these enlistees will be ineligible for immigration benefits such as military naturalization.

Table 2
The number of Initial DACA Requests that were Approved, Denied or Pending from 2012-1[st] Quarter FY15

| Eligible for DACA (est) * | Approved | Denied | Pending |
|---|---|---|---|
| 1,489,000 | 638,897 | 38,597 | 49,670 |

* DACA-eligible estimate from Migration Policy Institute (no date), see References. Sources:  U.S. Citizenship and Immigration Services, "Number of I-821D, Consideration of Deferred Action for childhood Arrivals by Fiscal Year, Quarter, Intake, Biometrics and Case Status: 2012-2015 (December 31).

Table 2 shows that over 630,000 young people have received DACA status yet they represent just under 43% of the population believed eligible for DACA under the expanded DACA program announced by President Obama in November 2014.  The top 20 countries of origin of those applying for DACA status are mostly countries in Latin America and the Caribbean, but South Korea is the sixth-ranked country, the Philippines is 10th, India is 13th, and Pakistan is 20th.

<u>Remaining Barriers</u>

EXHIBIT 1 Page 14

Understanding U.S. immigration law and policy today helps us understand the ways in which the dysfunctional legal immigration system has reduced the military manpower pool. That pool can be increased if the Services reduce immigration-related barriers to service. Even simpler than the policy changes required to permit undocumented persons or DACAs to enlist in the Army would be to eliminate the barriers to enlistment that currently exist for U.S. citizens and others who have undocumented spouses or other family members. U.S. citizens who have undocumented family members should be permitted to enlist, and so should MAVNIs and DACAs. The Army began an unwritten prohibition on the enlistment of anyone who has undocumented relatives for the first time in history in 2011, but the prohibition has never been written into law or Army regulations. Why the Army began this prohibition in 2011 is unclear to the authors, but in light of the Parole in Place (PIP) policy for undocumented family members of U.S. military members, which Department of Homeland Security announced in November 2013, the problem of undocumented family members can now be resolved fairly quickly. We also see no reason that MAVNIs and DACAs can't also access the PIP remedy for their out of status family members. Because MAVNIs and DACAs may become naturalized U.S. citizens rapidly after entering military service, often by the end of basic training (only during wartime however), they too ought to be able to enlist despite having undocumented family members; the status of their family members can be resolved fairly quickly after the service member obtains U.S. citizenship. Given DHS policy on PIP, there should be no bar to the enlistment of U.S. citizens or non-citizens with undocumented family members.

It is unknown how many such persons this proposed policy change would impact, but data from Migration Policy Institute (no date) indicate over 825,000 undocumented persons in the U.S. are married to U.S. citizens, 698,000 are married to green card holders, and 2.768 million are married to others (those who are neither U.S. citizens nor green card holders). These data are not displayed by age group, but those ages 16-34 comprise 57% of the estimated undocumented population.

Further, once the family member is Paroled in Place, there is no reason that these service members can't be considered for occupations requiring clearances. We do offer one caution on PIP: A November 20, 2014 memorandum from Jeh Charles Johnson, Secretary, Department of Homeland Security, subject: "Families of US Armed Forces Members and Enlistees" could be problematic. This memo states that at the request of the Department of Defense, USCIS staff should plan to offer PIP to the family members of U.S. citizens and green card holders who "seeking to enlist" in the military. We fear that this new benefit could be "gamed" by persons who have no real intention of enlisting, but who "seek to enlist" merely to legalize their family members. Such persons will likely become a DEP loss once their family member has received PIP

EXHIBIT 1 Page 15

status.  This new DHS initiative will potentially waste recruiter time with people who do not truly want to serve in the military.  It is better and easier to allow such persons to enlist knowing that the family members can be Paroled in Place once the individual completes basic training or is naturalized.

Another immigration-related issue is the failure of military officials to understand the laws relating to dual citizenship.  The Army has recently and inexplicably barred dual citizens from most Army jobs, for the first time in American history.  Though actual numbers are not known, it has been estimated that about 14 percent of the US population is eligible for dual citizenship.  In some cases, ridding oneself of the dual the non-US citizenship can even be impossible.  Dual citizenship and the requirement to renounce the non-U.S. citizenship can pose a barrier as the ability to renounce it is governed by the foreign nation.  It is not something the U.S. government controls.  There should be no prohibition on dual citizens serving in the military, even in cleared occupations, so long as they are "willing" to renounce and they are favorably adjudicated for a clearance.  Further, the practice of directing the individual to go back to the embassy, or worse yet, the country of origin, and renounce the citizenship raises the potential for security breaches.  Also, destroying the foreign passport, a common practice of some security officers, is also inadvisable and does not nullify the dual citizenship.

Legislation like that included in the Appendix will not only make the MAVNI program permanent in peacetime as well as times of war, but opens opportunities for those with DACA status.  If such legislative language were included in the National Defense Authorization Act, the recruiting market (ages 18-34) would expand by about 4.9% (over 2.3 million today, growing to about 2.8 million as more unauthorized immigrants reach age 15 and are eligible to apply for DACA status).[19]  High quality and highly propensed populations of significant size, such as legally present non-citizens who are in the U.S. on work or student visas, as well as DACA recipients, could all be added to the recruiting market.  While this legislation is unlikely to pass on its own, an Army or DoD-initiated legislative proposal with the same language will have a better chance of being included in the National Defense Authorization Act than a standalone bill introduced by a Member of Congress or a Senator.

Advantages of the proposed legislation include the inclusion of lawfully present persons only, including anyone who has been in a lawful immigration status in the U.S. for at

---

[19] This number is the authors' estimate of legally present non-citizens ages 18-34, including those believed eligible for DACA status, but excluding undocumented individuals not eligible for DACA, using data from Migration Policy Institute (no date) and Baker, 2014.

EXHIBIT 1 Page 16

least two years or who has been granted DACA status by the Department of Homeland Security.  The bill does not allow unauthorized immigrants to enlist, which reduces the degree of controversy of this bill and ensures that all applicants have been pre-screened by DHS for criminality, terrorism, and other reasons when they applied for their legal status and prior to enlistment.  Under the terms of this bill, enlistees would be eligible to apply for Lawful Permanent Resident status (i.e., a green card) immediately upon enlistment, and this status will allow them to maintain a lawful status in the United States and eventually provide them with a pathway to citizenship.[20]  Their "green card" status—like their citizenship status—could be rescinded by the Secretary of Homeland Security if the person is separated from the armed forces under other than honorable conditions before the person served for a period or periods aggregating five years.[21]

Conclusion

Our current operational environment needs high quality, multi-lingual, culturally and ethnically diverse Soldiers – both enlisted members and officers.  The MAVNI program has already demonstrated the ability to attract highly motivated and highly qualified applicants by expanding the recruiting market to a segment of the foreign born population.  Making permanent our ability to recruit the foreign born population and expanding the market to include DACAs, will yield similar results.  By setting the

---

[20] Under current law, persons who do not have a green card are only permitted to obtain U.S. citizenship through military service in wartime.  In peacetime, they are ineligible to naturalize unless they can somehow obtain a green card.

[21] Because today the U.S. military is an all-volunteer force, every person who enlists signs a contract and incurs a specific obligation that is detailed in the enlistment contract. Typical enlistment contracts call for two, three, four, or more years of active-duty service, depending on the job for which the person enlists.  In addition to the contractual obligation, all persons who join the U.S. military (including U.S. citizens) are subject to a six– to eight-year statutory military service obligation that requires them to remain on the military rolls for six to eight years total, even if they are no longer on active duty or in a Selected Reserve unit.  After completing their minimum contractual enlistment period, enlistees may serve any remaining statutory military service obligation in the Selected Reserve, inactive National Guard, or Individual Ready Reserve.  The six– to eight-year statutory obligation applies to every person who joins the U.S. military. Thus, if a noncitizen joins the Army today and signs a contract to serve on active duty for four years, he or she may be released from active duty when the four years are over—but he or she must then typically remain in reserve status for four additional years.  Congress separately has provided that anyone who naturalizes through military service must serve five years honorably in order to keep his or her citizenship.  This five year obligation can be any type of military service; it need not be active duty.

EXHIBIT 1 Page 17

standard sufficiently high[22], Army can greatly increase the chances that these new populations will be as successful as other immigrant populations in the United States have been in the past.

---

[22] As is done with the MAVNI applicants, a minimum educational attainment of a high school diploma, Armed Forces Qualification Test Scores of 50 or higher, and no conduct waiver, is likely to yield similarly positive outcomes.

EXHIBIT 1 Page 18

# References

Acosta, Yesenia D., Larsen, Luke J., and Grieco, Elizabeth M., "Noncitizens Under Age 35: 2010-2012," American Community Survey Briefs, U.S. Census Bureau, ACSBR/12-06, Issued February 2014.

Baker, Bryan, "Estimates of the Size and Characteristics of the Resident Nonimmigrant Population in the United States: January 2012," Population Estimates, U.S. Department of Homeland Security, February 2014.

Buttenheim AM, Pebley AR, Hsih K, Chung CY, Goldman N, "The shape of things to come? Obesity prevalence among foreign-born vs. U.S.-born Mexican youth in California," Social Science & Medicine, February 2012.

Dey, Achintya N. and Lucas, Jacqueline Wilson, "Physical and Mental Health Characteristics of U.S. and Foreign-Born Adults: United States, 1998–2003, " CDC Advance Data, Number 369, March 1, 2006.

DiFazio, Ani, ""MAVNI Final Evaluation," briefing for Mr. Jeffrey Mayo, HumRRO, May 21, 2013.

Hunter, Melanie, "Lawyer: 68 Million Americans Have Criminal Records—More Than Population of France," CNSNews.com, July 15, 2014.

Immigration Policy Center, "From Anecdotes to Evidence: Setting the Record Straight on Immigrants and Crime," July 25, 2013.

Johnson, Jeh Charles, Secretary, Department of Homeland Security. Memorandum to Leon Rodriguez, Director, U.S, Citizenship and Immigration Services, dated November 20, 2014, "Families of U.S. Armed Forces Members and Enlistees." http://www.dhs.gov/sites/default/files/publications/14_1120_memo_parole_in_place.pdf

Mather, Mark, "Fact Sheet: The Decline in U.S. Fertility," World Population Data Sheet 2012, Population Reference Bureau, July 2012.

Migration Policy Institute, "Profile of the Unauthorized Population: United States," no date, http://www.migrationpolicy.org/data/unauthorized-immigrant-population/state/US#deferred .

NIH, "Young adults more likely to attend college," July 11, 2014.

EXHIBIT 1 Page 19

Office of the Under Secretary of Defense, Personnel and Readiness, "Population Representation in the Military Services: Fiscal Year 2013 Summary Report."

Pew Research Center, Hispanic Trends, "Recent Trends in Naturalization, 2000-2011," February 4, 2013.

Pew Research Center, Social & Demographic Trends, "The Military-Civilian Gap: Fewer Family Connections," November 23, 2011.

Ruiz, Neil G., "The Geography of Foreign Students in U.S. Higher Education: Origins and Destinations."  Brookings, August 29, 2014.

U.S. Census Bureau, Population Division, "Table 2. Projections of the Population by Nativity for the United States: 2015 to 2060," NP2014-T2, December 2014.

Zong, Jie and Batalova, Jeanne, "Frequently Requested Statistics on Immigrants and Immigration in the United States," Migration Policy Institute, www.migrationpolicy.org, February 26, 2015.

EXHIBIT 1 Page 20

**Appendix**

To amend title 10, United States Code, to authorize the enlistment in the Armed Forces of additional persons who are residing in the United States and to lawfully admit for permanent residence such enlistees when they are not citizens or other nationals of the United States.

> *Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

SECTION 1. SHORT TITLE.

This Act may be cited as the "Military Enlistment Opportunity Act of 2015".

SEC. 2. QUALIFICATIONS FOR ENLISTMENT IN THE ARMED FORCES.

(a) ADDITIONAL QUALIFIED PERSONS.—Paragraph (1) of subsection (b) of section 504 of title 10, United States Code, is amended—

(1) by redesignating subparagraph (C) as subparagraph (E); and

(2) by inserting after subparagraph (B) the following new subparagraphs:

"(C) A person who, at the time of enlistment in an armed force, has resided continuously in a lawful status in the United States for at least two years.

"(D) A person who entered the United States before reaching 16 years of age and who,

at the time of enlistment in an armed force, has been lawfully present in the United States for at least two years.".

(b) Admission to Permanent Residence of Certain Enlistees.—Such section is further amended by adding at the end the following new subsection:

"(c) Admission to Permanent Residence of Certain Enlistees.—(1) A person described in subsection (b) who, at the time of enlistment in an armed force, is not a citizen or other national of the United States or lawfully admitted for permanent residence shall be adjusted to the status of an alien lawfully admitted for permanent residence under the provisions of section 249 of the Immigration and Nationality Act (8 U.S.C. 1259), except that the alien need not—

"(A) establish that he or she entered the United States prior to January 1, 1972; and

"(B) comply with section 212(e) of such Act (8 U.S.C. 1182(e)).

"(2) The Secretary of Homeland Security shall rescind the lawful permanent resident status of a person whose status was adjusted under paragraph (1) if the person is separated from the armed forces under other than honorable conditions before the person served for a period or periods aggregating five years. Such grounds for rescis-

sion are in addition to any other provided by law. The fact that the person was separated from the armed forces under other than honorable conditions shall be proved by a duly authenticated certification from the armed force in which the person last served. The service of the person in the armed forces shall be proved by duly authenticated copies of the service records of the person.

"(3) Nothing in this subsection shall be construed to alter the process prescribed by sections 328, 329, and 329A of the Immigration and Nationality Act (8 U.S.C. 1439, 1440, 1440–1) by which a person may naturalize through service in the armed forces.".

(c) CLERICAL AMENDMENTS.—

(1) SECTION HEADING.—The heading of such section is amended to read as follows:

**"§ 504. Persons not qualified; citizenship or residency requirements; exceptions".**

(2) TABLE OF SECTIONS.—The table of sections at the beginning of chapter 31 of such title is amended by striking the item relating to section 504 and inserting the following new item:

''504. Persons not qualified; citizenship or residency requirements; exceptions.''.

EXHIBIT 1 Page 23

# EXHIBIT 2

## TO THE DECLARATION OF MARGARET STOCK

# Impact & Potential of Recruiting the Foreign Born
## Briefing to Recruiting 2025 Forum



Naomi Verdugo, OASA(M&RA)
Margaret Stock, LTC (ret.), USAR

EXHIBIT 2 Page 1



# Program Overview

| | |
|---|---|
| • Native born citizens<br>• Naturalized citizens<br>• Nationals<br>• Green Card Holders | **Traditional recruiting pool** |
| • Non-immigrant legal aliens<br>• Refugees<br>• Asylees<br>• Temporary Protected Status | **MAVNI recruiting pool** |

•*NEW* – DACA per USD(P&R) memo 25 SEP 14 memo

• Market expander
• Highly motivated, highly propensed applicant pool
• Highly qualified applicant pool
• No advertising required

3

EXHIBIT 2 Page 2



# What is MAVNI

A recruiting program, authorized under Title 10 § 504b(2), allows the enlistment of legal non-citizens including certain visa holders, asylees, refugees and those on Temporary Protected Status, if they are "Vital to the National Interest."

OSD defined "vital to the national interest" as applicants

1. Proficient in strategic foreign languages
   – Enlisted Members
   – May serve in RA or USAR
2. Health Care Professionals (HCPs)
   – Officers
   – May serve in RA or USAR



# Eligibility Criteria

- Foreign language proficiency 2/2 or higher or a licensed healthcare professional in a critically short specialty
- 2+ years residence in US in a MAVNI eligible status
- Minimum of a high school diploma
- TSC I-IIIA (50+ on AFQT)
- Meet enlistment requirements with <u>no conduct waivers</u>
- HCP Only:  Score 2+/2+ in English proficiency test

- All MAVNI: Must receive favorable enhanced security screenings (National Intelligence Agency Checks and Single Scope Background Investigation)



# Term of Service & Citizenship

- Language enlistees:
  - Must enlist for 4 years of active duty (+ 4 years in TPU or IRR) –OR-
  - 6 years in TPU (+2 years in IRR)
  - Not initially placed in MOS that requires security clearance

- HCPs:
  - Must enlist for 3 years of active duty (5 years in TPU/IRR) or 6 years in the Selected Reserve (2 years in the IRR)

- ALL:
  - Apply for expedited U.S. citizenship during BCT

> Citizenship can be revoked if the enlistee fails to serve honorably for total of five years

EXHIBIT 2 Page 5



ARMY STRONG℠

# Impact of Uncharacterized Discharge on the MAVNI Soldier

- The MAVNI Soldier typically enters the military with a work or student visa. By entering the military the terms of that visa are no longer valid because the individual no longer works for Employer X or goes to school at College Y.

- The individual is not returned to that status at discharge. He is out-of-status, can't work legally, in many states he is unable to get state-issued identification and therefore can't fly commercially.



ARMY STRONG℠

# EVALUATION RESULTS

EXHIBIT 2 Page 7



# <u>Evaluation Results - Enlisted</u>

ARMY STRONG℠

- Higher AFQT scores (17 points on average) , Avg MAVNI AFQT is 75 vs 58.4 non-MAVNI - FY13
- Higher levels of education (4 years on average)
  - More likely to hold degrees beyond HSDG (71% vs. 8% for FY09 cohort, 84% for FY13)
- Serve in SOF units (29%)
- Lower Delayed Entry Program (DEP) loss rate (5.4% vs. 10.7% for FY09)
- Lower attrition rates (6, 12, 18, 24, 30, 36-month)
  - MAVNI rate is between 30% (6-month) and 42% (24-month) of the non-MAVNI attrition



- Reenlistment rate of 27% for FY09 cohort to date, on par with non-MAVNIs

EXHIBIT 2 Page 8



# Program Highlights

- 2012 Soldier of the Year was a MAVNI – Then SGT (now 2LT) Shrestha commissioned via OCS

- 2012 Finance Soldier of the Year was a MAVNI

- 30 from the FY09 cohort reenlisted into 35P

- 31 from the original cohort have become officers, mostly through OCS but also Direct Commission and ROTC. One is a Warrant Officer in Aviation.  Several others, not included in the 31, are enrolled in ROTC as "Green to Gold," one is at USMA, and several were selected for and enrolled in medical school

- SOF currently has 92 MAVNI assigned, including
- 23 have converted to SOF ( CMF 18 - 11, 37F - 6, and 38B - 6)
- 2 have converted to officers and 1 is pending a class date to attend OCS.
- 4 are in SOF school now  (PMOS 38B -2, PMOS 18X -1 and PMOS 37F -1)

- A MAVNI who enlisted in the first cohort came to Army with a Master's Degree from Harvard University. He reenlisted, passed selection for Psychological Operations, completed Airborne school and is now attending SFAS for PSYOPS.  See link to an article he wrote about his experience for a magazine published by Harvard's School of Education:  http://www.gse.harvard.edu/news-impact/2011/05/not-the-war-umesh-sharma-expected/?issue=15

- Not a single MAVNI HCP in the USAR has been coded as an unsatisfactory participant (absent from drill without prior approval)

- A MAVNI nurse was selected to become a Nurse Anesthetist.  She had a summary of her life's story published in a book called Green Card Stories



ARMY STRONG℠









EXHIBIT 2 Page 10



# BACK-UP

EXHIBIT 2 Page 11



# CI-Focused Security Review

| CURRENT |
|---|

- Dept of State (DoS) and Department of Homeland Security (DHS) immigration checks to obtain visa
- Pre-screen for accession
  - Sex offender query
  - Fingerprints sent to FBI (day of entry into delayed entry program)
  - Police checks and law court documents
  - SSN sent to Social Security Administration for confirmation
  - Immigration documents sent to DHS for verification
- National Intelligence Agency Checks (NIACs)
  - Includes 67 intelligence and law enforcement database checks
- SSBI—10 yr background check includes:
  - Personal subject interview (SI)
  - Neighborhood and reference interviews
- Foreign Terrorism Tracking Task Force (67 databases) – Daily & Career-long coverage
- Issue-oriented CI polygraph & interview, as applicable

**Integrates Army counterintelligence & personnel security authorities and Functions for comprehensive vetting**

| Accession eligibility based on favorable results |
|---|

7

EXHIBIT 2 Page 12



# DOS/DHS Checks

**DOS screening**
- CLASS check
- Security Advisory opinions
- Name check
- Review of applicant's information on DOS forms
- Local investigations

**DHS screening**
- APIS - Advance Passenger Information System
- IAFIS/IDENT - Automated Fingerprint Identification System/Biometric Fingerprint Identification
- US VISIT - Tracks biometrics of international travelers; checks digital fingerprints and photo against watch list of known/suspected terrorists, criminals, immigration violators; checks database to database if person is using an alias or fraudulent ID; checks ID document to ensure it belongs to the person presenting it
- IBIS - Interagency Border Integration Systems; links names with other identifying info; airlines much check passenger and crew lists in IBIS
- NCIC - checks available records in the National Crime Information Center
- CLASS - Consular Lookout and Support System; identifies ineligible passports (re false claims to US citizenship) and visas
- BATF - Bureau of Alcohol, Tobacco & Firearms
- NAILS - National Automated Immigration Lookout System; names people not entitled to admittance to US
- TECS II - US Treasury Enforcement Communications System; collection from non-immigrants' Form I-94; lists "bad guys" and those crossing US borders, but is only as accurate as what they put on the form
- FBI name check
- Review of applicant's information on DHS forms
- Local investigations

**Army-initiated MAVNI-specific checks**
- USCIS/SAVE - Systemic Alien Verification for Entitlement program; used for determining immigration status
- Fingerprinting
- Name check

13

EXHIBIT 2 Page 13



# National Intelligence Agency Checks (NIACs)

- CLIP (Contract Linguist Information Program)
- CENTS (CIA External Name Trace System)
- PORTICO (Army CI Information Warehouse)
- NCIC (National Crime Information Center)
- DCII  (Defense Central Index of Investigations)
- JPAS (Joint Personnel Adjudication System)
- FBI NNC (National Name Check) and FBI Foreign Terrorism Tracking Task Force (FTTTF) checks

14

EXHIBIT 2 Page 14



# Foreign Terrorism Tracking Task Force (FTTTF) Checks

Sixty-seven (67) databases including:

- ACS:  FBI's system of records
- IDW:  FBI Data Warehouse
- QTIP:  FTTTF Data mart; quiries FBI's system of records, third party information, commercial databases

**Specific Subsets of ACS, IDW or QTIP**

- Intelligence Community IIRs (CIA, DIA, FBI, etc.)
- FBI Major Cases (records not in ACS or IDW)
- FBI Terrorism Financing Operations Section
- Secure Automated Messaging Network (SAMNet) & AutoDIN  (Message traffic between certain agencies)
- Department of State (Travel VISAs, lost passport, other information)
- FINCENs Data
- TSA/Federal Air Marshal Information) – Aircraft/baggage incidents
- Treasury Enforcement Communications System (Customs & Border Patrol - port crossings into or out of the U.S.)
- Terrorist Screening Center Database (If there is a hit, Terrorist Identities Data Mart Environment (TIDE) is checked under NCTC)
- Violent Gang/Terrorist Organization File (VGTOF)
- Multiple Watch Lists (DOS, TSA, Customs, No Fly, etc…)
- FBI Telephone Applications (Telephone numbers associated with criminal or terrorism cases contained in ACS)
- Open Source
- I-94 Forms (form denoting the Arrival-Departure Record of particular foreigners used by U.S. Customs)
- Foreign Student and Visitor Information databases
- DOD Cornerstone – tracks foreign visitors in the U.S that visit military units/installations
- Lexis/Nexis or other commercial databases

LAW ENFORCEMENT SENSITIVE – DO NOT DISTRIBUTE OUTSIDE OF U.S. ARMY

EXHIBIT 2 Page 15



# OPM FBI Name and Fingerprint Checks

- Integrated Automated Fingerprint Identification System (IAFIS)
- Interstate Identification Index (III)
- iDENT
  - Central Index System (CIS)
  - Computer Linked Application Information Management System (Claims)
  - Deportable Alien Control System (DACS)
  - Student Exchange Visitor Information System (SEVIS)
  - Re-Designed Naturalization Application Casework System (RNACS)
  - Refugee, Asylum, and Parole System (RAPS)
  - Treasury Enforcement Communications System (TECS)
  - Operation Predator
- National Crime Information Center (NCIC)
  - Deported Felon File
  - Foreign Fugitive File
  - Identity Theft File
  - Protection Against Abuse (PFA)
  - Sex Offender Registry
  - Supervised Release File
  - Unidentified Person File
  - Missing Person File
  - Wanted Person File
  - Violent Gang and Terrorist Organization File (VGTOF)
  - Immigration Violators File (IVF)
  - U.S. Secret Service File
- Automated Case System (ACS)
  - Universal Index (UNI)
  - Electronic Case File (ECF)
  - Bureau Personnel Management System (BPMS)
  - Facility Security System (FSS)
  - Terrorist Screening Database (TSDB)

EXHIBIT 2 Page 16



ARMY STRONG

# Single Scope Background Investigation (SSBI)

- **Basic Coverage Period: 10 Years**
- **Personal Coverage Period: 7 Years**
- Used for military, civilians and contractors, Top Secret/SCI clearance or critical sensitive positions
- OPM Security/Suitability Investigations Index (SII)
- FBI Identification (Criminal History)
- FBI Records Management Division (Investigations)
- Defense Clearance and Investigations Index (DCII)
- Credit (National Credit Bureaus)
- Personal Subject Interview (PRSI)
- Employment/ Self-employment/ Unemployment coverage (7 years)
- Education (Personal/Record coverage 7 years, Inquiry to highest degree outside 7 years)
- Residence (3 years)
- Reference Contacts (4 including at least 2 developed)
- State/Local Law Enforcement Checks (appropriate jurisdictions for all locations of 6 months or more) (10 years)
- Former Spouse(s) (any divorced 10 year period)
- Court Records (verification of civil/criminal actions 10 years)
- Security File and Official Personnel Folder  (if applicable)
- Selective Service (if applicable)
- Military Personnel Record Search (if applicable)
- Citizenship Verification (if subject born outside of US; legal status of foreign-born immediate family members)
- Central Intelligence Agency Security and/or Operations Check (if applicable) (subject is foreign born or if placed on the agency use block (AUB) as a "F" under extra coverage)
- Spouse/Cohabitant NAC Searches

17

EXHIBIT 2 Page 17

# EXHIBIT 3

## TO THE DECLARATION OF MARGARET STOCK

## CITATION

## TO ACCOMPANY THE AWARD OF

## THE JOINT SERVICE COMMENDATION MEDAL

## TO

## LIEUTENANT COLONEL MARGARET D. STOCK
## UNITED STATES ARMY RESERVE

Lieutenant Colonel Margaret D. Stock, United States Army Reserve, distinguished herself by exceptionally meritorious achievement as Special Advisor to the Commander, United States Special Operations Command (USSOCOM), Special Operations Forces Access Recruiting Program (SOFARP) working group, United States Special Operations Command, MacDill Air Force Base, Florida, from 1 May 2008 to 30 September 2009. During this period, Colonel Stock's outstanding leadership coupled with her superior intellect resulted in vastly increased Joint Special Operations Forces' ability to pursue national security objectives. Her unique and expert advice in immigration and constitutional law and policy provided unparalleled and uncommon support to the SOFARP working group. Her efforts directly increased SOF's operational capabilities and capacity in language, culture, and micro-regional expertise. As a direct result, USSOCOM has created the building blocks to an enduring program that will leverage immigrant and non-immigrant populations who will contribute their unique talents to the Global War on Terrorism. Colonel Stock's untiring and selfless contributions are a reflection of joint coordination and teamwork. She is a consummate professional and a true Soldier who exemplifies the SOF ethos. The distinctive accomplishments of Lieutenant Colonel Stock reflect great credit upon her, the United States Special Operations Command, the United States Army Reserve, and the Department of Defense.

EXHIBIT 3

# EXHIBIT 4

## TO THE DECLARATION OF MARGARET STOCK

# Margaret D. Stock

Cascadia Cross Border Law Group, LLC
4141 B Street, Suite 205
Anchorage, Alaska 99503-5940
Phone: (907) 242-5800
E-mail: mstock@cascadialawalaska.com

**Civilian Education**

1988 – 1992  Harvard Law School & the John F. Kennedy School of Government, Cambridge, MA

*J.D. with honors (1992), M.P.A. (2001)*

- Teaching Fellow, Harvard University (International Conflicts in the Modern World, The Administrative State); Teaching Assistant (Microeconomics)
- Recipient, Harvard University Certificates of Distinction in Teaching (three years)
- Proctor & Academic Advisor, Harvard-Radcliffe Colleges (four years)
- Third Year Paper: Criminal Misconduct by United States Status of Forces Agreement (SOFA) Civilians and Dependents in Japan
- Editor-in-Chief, Harvard Journal of Law & Public Policy

1982 – 1985  Harvard & Radcliffe Colleges, Cambridge, MA

*A.B. with honors in Government (International Relations)*

- Undergraduate honors thesis: Measuring the Combat Capability of the Army Reserve Components

1980 – 1982  Boston University, Boston, MA

- Battalion Commander, Reserve Officer Training Corps Cadet Battalion
- Commissioned as second lieutenant in the Military Police Corps at end of sophomore year after completing the full ROTC program in two years (Early Commissioning Program)

**Military Education**

U.S. Army War College, Carlisle, PA, Division of Distance Education, Class of 2006 (awarded Master of Strategic Studies degree)

Advanced Joint Professional Military Education Course, Joint Forces Staff College

U.S. Army War College, Defense Strategy Course

Reserve Component National Security Issues Seminar

Reserve Components Combined Arms Services & Staff School

EXHIBIT 4 Page 1

(CAS3) Staff Group Leader Course

United States Army Command & General Staff College (CGSC) Faculty Development Course

United States Army Command & General Staff College (CGSC)

Combined Arms Services and Staff School (CAS3)

Judge Advocate General's School – Judge Advocate Officer Basic Course

Military Police School - Officer Basic and Advanced Courses

Dynamics of International Terrorism Course

Airload Planner's Course

Basic Airborne Course

**Civilian professional experience**

2013 – present    Cascadia Cross Border Law Group, LLC, Anchorage, AK

*Owner/Member/Attorney*

- Engaged primarily in immigration and citizenship law and litigation practice.
- Speaker on immigration, citizenship, and national security law issues at numerous public events and Continuing Legal Education events.
- Quoted as expert by print, radio & television media on immigration-related issues. Expert testimony in court on immigration issues. Testimony before Congress and various state legislatures.
- MacArthur Foundation Fellow, Class of 2013, John D. & Catherine T. MacArthur Foundation ("genius grant" recipient, immigration & national security issues)
- "AV" rated by Martindale-Hubbell, Avvo rating of 10.0, Alaska Super Lawyer in the area of immigration law (2013, 2014, 2015, 2016, 2017, 2018).
- Best Lawyers in America
- Top Ten of Who's Who International Corporate Immigration Lawyers, 2014

EXHIBIT 4 Page 2

2011 – 2013    Lane Powell, LLC, Anchorage, AK
*Counsel to the Firm*
- Engaged primarily in immigration and citizenship law and litigation practice.
- Speaker on immigration, citizenship, and national security law issues at numerous public events and Continuing Legal Education events.
- Quoted as expert by print, radio & television media on immigration-related issues. Testimony before Congress and various state legislatures.

2010 – 2012    Department of Political Science, University of Alaska Anchorage, Anchorage, AK
*Adjunct Instructor*
- Taught "Introduction to American Government," "National Security Law & Policy," "Constitutional Law," "Comparative Politics," and "International Relations." Also guest-lecturer in the Senior Seminar and 49th State Fellows Programs.

September-December 2009  Border Policy Research Institute, Western Washington University, Bellingham, WA
*Visiting Fellow*
- Researched Integrated Border Enforcement Teams (IBETs)
- Guest Lecturer at public events and in WWU business school and undergraduate classes

2001 – 2006  Department of Law, United States Military Academy, West Point, NY
*Associate Professor, 2004-2006; Assistant Professor, 2001-2004*
- Course Director and Professor, National Security Law Seminar
- Professor, Constitutional & Military Law
- Additional teaching responsibilities in International Law (Immigration, Asylum, Citizenship law, Death Penalty); Comparative Law (Asian and Japanese Law); Human Rights Law (nine sessions on Asylum and Refugee Law); Cyberlaw (High Tech Worker issues); Criminology; and Law of War (International Humanitarian Law)
- Chairperson and Member, Academic Excellence Committee, Faculty Council

EXHIBIT 4 Page 3

1998 - 2001     Stock & Moeller, LLC, Anchorage, AK
*Owner/Partner/Attorney*
- Managing and senior partner at small (3-5 attorney) law firm. Engaged primarily in immigration law and litigation practice. Successfully handled large constitutional rights class action against the State of Alaska, as well as numerous federal court cases in U.S. District Court & the Ninth Circuit Court of Appeals.
- Speaker on immigration law issues at numerous public events and Continuing Legal Education events.
- Quoted as expert by print, radio & television media on immigration-related issues. Expert testimony in court on immigration issues.
- "AV" rated by Martindale-Hubbell at first "rating" opportunity in 2000.

1992 - 1998     Atkinson, Conway & Gagnon, Anchorage, AK
*Associate Attorney*
- Associate attorney at 13-attorney trial practice and litigation firm. Engaged primarily in immigration law and litigation practice, but also handled or participated in admiralty, products liability, professional malpractice defense, commercial, civil rights, and personal injury matters.

**Most Recent Military Assignment**

Lieutenant Colonel, U.S. Army Military Police Corps, U.S. Army Reserve. Drilling Individual Mobilization Augmentee (DIMA) (Associate Professor), Department of Social Sciences, United States Military Academy, West Point, New York.

Detailed to Undersecretary of Defense (Personnel & Readiness) to work on reorganization Task Force (March 2010).

Detailed to US Army Accessions Command and Assistant Secretary of the Army for Manpower & Reserve Affairs as Project Officer for Military Accessions Vital to the National Interest (MAVNI) program (Fall of 2007 until retirement in June 2010).

Also served as Special Advisor to Commander, US Special Operations Command (May 2008 to September 2009).

**Significant Cases**

State of Alaska, Dep't of Revenue v. Martha Andrade, 23 P.3d 58 (Alaska 2001) (class action, equal protection; awarded more than $100K in attorneys' fees).

EXHIBIT 4 Page 4

<u>Rosario Gallo-Alvarez v. John Ashcroft</u>, 266 F.3d 1123 (9th Cir. 2001) (habeas corpus, reinstatement of removal).

<u>Meng Li v. Robert C. Eddy</u>, 259 F.3d 1132 (9th Cir. 2001) (habeas corpus, expedited removal).

<u>Matter of U— I— S—</u>, Immigration Court, Anchorage, AK (December 19, 1996) (female genital mutilation asylum case), available at http://www.uchastings.edu/cgrs/law/ij/54.html.

**Selected Conference Presentations & Speaking Events**

Panelist, *Naturalization Actions,* 2018 AILA Federal Court Conference and Webcast: Removal Litigation, Washington, D.C., September 20, 2018

Panelist, *How to run for Office (and Win!),* Harvard Law School Celebrating 65 years of Alumnae, Cambridge, MA, September 15, 2018

Speaker, *Ethical Consideration in Worksite Enforcement Practice,* 2018 AILA Employer Compliance and Worksite Enforcement Conference, Boston, MA, August 11, 2018

Speaker, *The Effects of Corporate Structure,* 2018 AILA Employer Compliance and Worksite Enforcement Conference, Boston, MA, August 11, 2018

Panelist, *Immigration Issues for Members of the Military, Veterans, and Their Families,* AILA San Francisco Annual Conference on Immigration Law, San Francisco, CA, June 15, 2018

Speaker, *Complex Naturalization Issues,* Immigration Law Conference; Memphis, TN, May 18, 2018

Speaker, *Immigration 101,* Alaska Export Council May Board Meeting; Anchorage, AK, May 10, 2018

Speaker, *Immigration- Discharges and Security Issues,* 2018 GI Rights Hotline Annual Conference: Teleconference, May 5, 2018

Speaker, *Immigrants in the U.S. Military,* 2018 World Issues Forum, Bellingham, WA, February 14, 2018

Panelist, *Lessons Across Borders: What the U.S. and Canada Can Teach One Another About Establishing a Successful Immigration and Asylum Policy,* 2018 ABA Midyear Meeting, Vancouver, Canada, February 3, 2018

Speaker, *Lessons Learned from Running for the U.S. Senate*, 49 Moons, Anchorage, AK, January 17, 2018

EXHIBIT 4 Page 5

Speaker, *Navy Immigration Law Training*, Navy CLE, Silverdale, WA, November 15, 2017

Panelist, *The Incomplete or Untimely FOIA: How to Get the Information You Need!*, 30th Annual AILA California Chapters Conference, Hollywood, CA, November 10, 2017

Panelist, *Immigration Law and the Military*, AILA Central Florida Chapter's 31st Annual Immigration Law Conference, Orlando, FL, October 26, 2017

Speaker, *Immigration for Defense Lawyers: Asking the Right Questions*, Alaska Association of Criminal Defense Lawyers CLE, Anchorage, AK, September 7, 2017

Speaker, *Military Issues and Immigration Law*, Washington Chapter Monthly Meeting, Seattle, WA, August 7, 2017

Speaker, *Welcoming Immigrants, Fighting Deportation*, Alaska Unitarian Fellowship Forum, Anchorage, AK, June 25, 2017

Speaker, *National Security Implications of Immigration Law and Policy*, 25th National Security Law Institute, Charlottesville, VA, June 15, 2017

Panelist, *Naturalization Litigation in Federal in Federal Court: Risks and Benefits of Taking the Case to U.S. District Court*, 2017 Immigration Law Conference, Denver, CO, May 12, 2017

Panelist, *Visas, Visits, and Vision: The Changing Immigration Landscape & Class of 1992 Reunion Engagement Committee*, Harvard Law School Spring Reunion, Cambridge, MA, April 6, 2017

Speaker, *Immigration Enforcement*, Immigration Training Session with Alaska Public Defender Agency, April 28, 2017 (Teleconference)

Speaker, *Citizenship and Immigration*, "Kotatsu Series" Community Discussions #3, Anchorage, AK, April 23, 2017

Speaker, *Refugees & National Security*, Immigration & Nationality Law Review Conference, Davis, CA, March 16, 2017

Speaker, *Advanced Naturalization*, AILA Midwest Regional Conference, Chicago, IL, March 13, 2017

Speaker, *Immigration Law in Today's World*, Many Voices, Shared Vision, Kenai, AK, March 9, 2017

EXHIBIT 4 Page 6

Speaker, *Parole—What is it and how does it work?*, 2017 Pacific NW Immigration Law Conference, Portland, OR, March 2, 2017

*Across the Line: Advocacy at U.S. Ports of Entry,* Sound Immigration, February 2017 (webcast)

Speaker, *DACA and the Military*, Immigration: DACA and Beyond, Houston, TX, November 18, 2016

Speaker, *Immigration Law & the Military,* US Navy Legal Training, Whidbey Island, WA, November 16, 2016

Speaker, *The Elephant on Deck: Federal Elections and Higher Education*, National Association of Foreign Student Advisors Conference, Anchorage, AK, October 14, 2016

Speaker, *Immigration Law and the Military*, National Association of Immigration Judges Annual Meeting, 2016, Washington DC, August 16, 2016

Speaker, *Immigration Issues Re the Military*, 2016 AILA Annual Conference on Immigration Law, 2016, Las Vegas, NV, June 24, 2016

Speaker, *National Security Implications of Immigration Law and Policy*, 24th National Security Law Institute, 2016, Charlottesville, VA, June 8, 2016

Speaker, *Military Immigration Issues*, Annual Chapter Meeting Minnesota/Dakotas Chapter, 2016, Minneapolis, MN, May 25, 2016

Speaker, *The Politics of Domestic Violence in Alaska*, 2016, Alaska Women for Political Action, 2016, Anchorage, AK, May 3, 2016

Speaker, *Pitfalls in the Naturalization Process,* 19th Annual Federal Bar Association Immigration Law Conference, 2016, New Orleans, LA, May 13, 2016.

Speaker, *Immigration Law Cases: Clearing the Backlog,* Southwest Border Security Week Conference, 2016, McAllen, TX, April 1, 2016.

Speaker, *Tax Issues in Adjustment of Status and Naturalization Proceedings,* 2016 Northwest Regional Immigration Law Conference, Seattle, WA, March 17, 2016.

Speaker, *Hot Immigration Topics Where Progress can be Made Without Immigration Reform,* Immigrants' List Civic Action Spring CLE, 2016, Los Angeles, CA, March 18, 2016.

EXHIBIT 4 Page 7

Speaker, *Welcoming Anchorage Initiative,* University of Alaska: Anchorage, Anchorage, AK, February 10, 2016.

Speaker, *Top 5 Tax Issues That You Need to Know as a Removal Practitioner,* 2016 AILA Midwinter CLE- Leading Edge Business and Removal Practice Issues, Paradise Island, Nassau, Bahamas, January 22, 2016.

Speaker, *Refugee Issues,* Alaska World Affairs Council, Alaska World Affairs Council Luncheon, Anchorage, AK, December 4, 2015.

Speaker, *Attitudes on Immigrants and Refugees,* Alaska Public Media, Hometown Alaska, Anchorage, AK, December 2, 2015.

Speaker, *The Changing Landscape of Parole,* US Dep't of Homeland Security, Office of the Citizenship & Immigration Services Ombudsman Fifth Annual Conference, Washington, DC, November 5, 2015.

Speaker, *Immigration Law, MacArthur Genius Grant Program,* Rapport Center for Law & Public Policy Program at Boston College Law School, Boston, MA, October 8, 2015.

Speaker, *Parole in Place,* University of Texas School of Law 39th Annual Conference on Immigration and Nationality Law, Austin, TX, October 6-7, 2015.

Speaker, *Parole in Place,* CIL Continuing Legal Education Webinar, September 30, 2015.

Speaker, *How Immigration Enriches Alaska,* Anchorage Unitarian Universalist Fellowship, Anchorage, AK, September 27, 2015.

Moderator, Everything You Need to Know About H-2A and H-2B Visas*,* American Immigration Lawyers Association, Webinar, September 1, 2015.

Speaker, *Immigration Law and the US Military,* Humanitarian Immigration Law Clinic 5th Annual Immigration Law Seminar, Elon, NC, July 31, 2015.

Speaker, *MAVNI (Military Accessions Vital to the National Interest) Legal Issues,* National Association of Foreign Student Advisors (NAFSA) Information Webinar, July 30, 2015.

Speaker, *Immigration Law & the Military,* US Navy Legal Training, Whidbey Island, WA, July 15, 2015.

EXHIBIT 4 Page 8

Speaker, *The Future of Immigration Reform in the US,* Needham Task Force Area Immigration & Justice Group, Needham, MA, June 8, 2015.

Speaker, *Impact & Potential of Recruiting the Foreign Born: Briefing to Recruiting 2025 Forum,* America's Army: The Strength of the Nation Recruiting 2025 Forum, United States Army, Fort Knox, KY, June 2-3, 2015.

Speaker, *Executive Order—U.S. Citizenship and Immigration Services (USCIS) Hot Topics Panel,* Federal Bar Association Immigration Law Conference, Memphis, TN, May 15-16, 2015.

Speaker, *Counseling Corporate Compliance in a Time of Administrative Transition,* Federal Bar Association Worksite Enforcement Seminar, Chicago, IL, April 29, 2015.

Speaker, *Citizenship in the United States,* Naturalization Oath Ceremony, Anchorage, AK, April 24, 2015.

Panelist, *Humanitarian Parole, Parole in Place and 204 (I) Cases,* 2015 American Immigration Lawyers Association Northwest Regional Immigration Law Conference, Seattle, WA, March 19, 2015.

Speaker, *Immigration & Diversity,* State of Our City Forum, Anchorage, AK, March 17, 2015.

Speaker, *Immigration Law Update,* Federal Bar Association Alaska Chapter Meeting, Anchorage, AK, February 12, 2015.

Speaker, *Immigration in America*, Wright State University's Multicultural Millennium Event 2015, Dayton, Ohio, January 23, 2015.

Speaker, *Commencement Address*, Nine Star Graduation Ceremony, Anchorage, AK, January 20, 2015.

Speaker, *Criminal Sentencing & Immigration*, Federalist Society Teleforum, December 15, 2014.

Speaker, *Executive Overreach on Immigration*, Federalist Society Teleforum, December 3, 2014.

Speaker, *Advanced Family Immigration Issues*, American Immigration Lawyers Association 27th Annual California Chapter Conference, San Jose, CA, November 13, 2014.

EXHIBIT 4 Page 9

Speaker, *Immigration Reform & the U.S. Military*, Council on Foreign Relations, Washington, DC, November 11, 2014.

Speaker, *Horror Stories from Both Sides of the Front Line*, Stanford Law School's 4th Annual Worksite Immigration Compliance Symposium, Stanford, CA, October 28, 2014.

Speaker, *Naturalization & Immigration Issues for Military Members*, New York State Veterans Legal Taskforce Training Event, New York, NY, October 14, 2014.

Speaker, *Can A Lawyer Be A Genius?*, University of Pennsylvania Law School Chapter of the Federalist Society, Philadelphia, PA, October 1, 2014.

Speaker, *Bartering for Citizenship: Malta & MAVNI*, Global Citizenship Conference, Federal Bar Association, Rome, Italy, September 22, 2014.

Speaker, *Local Government's Immigration Responsibilities*, 2014 International Municipal Lawyers Association's Annual Conference, International Municipal Lawyers Association, Baltimore, MA, September 10, 2014.

Speaker, *Executive Action & Legal Immigration*, Release of New Research on Impact of President Obama's Executive Action on Legal and Illegal Immigration, Telephonic News Conference for Working Press, September 4, 2014.

Speaker, *Executive Power in Immigration Law*, Homeland Security Institute, American Bar Association, Washington, DC, August 22, 2014. Rebroadcast on CSPAN.

Speaker, *Navy & Marine Corps Immigration Training*, Whidbey Island, WA, July 16, 2014.

Speaker, *Parole in Place (PIP), Adjustment of Status, & Naturalization Issues for Military Members*, American Immigration Lawyers Association's 2014 Annual Conference on Immigration Law, Boston, MA, June 21, 2014.

Speaker, *Harvard Immigration & Refugee Clinical Program: 30 Years of Social Change Lawyering*, Cambridge, MA, June 17, 2014.

Speaker, *Scialabba v. Cuellar de Osorio – Post-Decision SCOTUScast*, Podcast, The Federalist Society, Washington, DC, June 17, 2014.

EXHIBIT 4 Page 10

Speaker, *Territorial Access to Asylum,* Center for Migration Studies Symposium on US Refugee Protection System, New York, NY, June 3, 2014.

Speaker, *Immigration Law & the Military,* Immigration Professors Workshop, Irvine, CA, May 22, 2014.

Speaker, *Patriots or Invaders? — Immigrants in the Military in Modern America,* Princeton Center for Migration and Development Conference, Princeton, NJ, May 20, 2014.

Speaker, *A Primer on the Top 10 Items a City Council Would Look for to Help With Immigration Issues,* IMMLA's Mid-Year Seminar, Anchorage, AK, May 19, 2014.

Speaker, *Cutting Edge Asylum TRIG: Terrorism Related Inadmissibility Grounds (Including Persecutor Bar, Material Support, and National Security),* Federal Bar Association Immigration Seminar, Memphis, TN, May 17, 2014.

Speaker, *Worksite Enforcement: Criminal and Civil Litigation,* Federal Bar Association Immigration Seminar, Memphis, TN, May 17, 2014.

Speaker, *Citizenship in a Global Era: A Report from Rome,* Federal Bar Association Immigration Seminar, Memphis, TN, May 16, 2014.

Speaker, *Military Immigration Issues,* 2014 Upper Midwest Immigration Law Conference, St. Paul, MN, May 9, 2014.

Speaker, *Myth, Traps, and Absurdities in Our Immigration Laws,* 2014 Alaska Bar Annual Convention, Anchorage, AK, May 7, 2014.

Speaker, *Immigration Reform- Dreams, Possibilities, and Promises,* Harvard Club Meeting, Anchorage, AK, May 6, 2014.

Speaker, *Remarks at the Naturalization Ceremony,* District of Alaska Naturalization Ceremony, Anchorage, AK, April 25, 2014.

Speaker, *Courting Disaster: The Perils of Ethical Dilemmas in International Law Practice,* 2014 ABA New York Spring Meeting, New York City, NY, April 3, 2014.

Speaker, *Refugee Protection and Barriers to Territorial Access,* Center for Migration Studies, New York City, NY, April 2, 2014.

Speaker, *Immigration and National Security,* Columbia Law School, New York City, NY, April 1, 2014.

EXHIBIT 4 Page 11

Speaker, *Immigration and National Security,* Alaska Center-Right Coalition, Anchorage, AK, March 31, 2014.

Speaker, *Immigration Issues Related to the Military,* Orange County Bar Association Immigration Law Section, March 4, 2014.

Speaker, *FOIA Litigation*, 2014 AILA Federal Court Immigration Litigation CLE Practicum, February 28, 2014.

Speaker, *Exploring the Myths, Traps, and Absurdities of Immigration Law*, 2014 Pacific NW Immigration Law Conference, February 20, 2014.
Speaker, *Immigration Issues Faced by American Military Members and their Families*, Texas Bar Association Advanced Immigration Law Course, February 3, 2014.

Speaker, *Business Immigration Ethics*, Texas Bar Association Advanced Immigration Law Course, February 4, 2014.

Speaker, *Top 10 Best Practices*, Texas Bar Association Advanced Immigration Law Course, February 3, 2014.

Speaker, *Immigration in America's Future*, Alaska Women for Political Action, February 1, 2014.
Speaker, *Immigration and National Security*, Bartlett Democratic Club, January 2, 2014.

Discussion Leader *Need to Know Taxation Issues for Noncitizens*, Webinar, American Immigration Lawyers Association, December 19, 2013.

Discussion Leader, *Parole in Place*, Podcast, American Immigration Lawyers Association, December 11, 2013.

Speaker, *Immigration Issues involving Military Service*, Webinar, Anchorage, AK, December 3, 2013.

Speaker, *The Business Case for Immigration Reform*, Make it Monday Forum- Anchorage Chamber of Commerce, Anchorage, AK, December 2, 2013.

Speaker, *Immigration and National Security*, Alaska Association for Justice Annual Dinner, Anchorage, AK, November 13, 2013.

Speaker, *Immigration and National Security*, Retired Public Employees of Alaska, Anchorage, AK, November 12, 2013.

Speaker, *Immigration and National Security*, Ave Maria Law School, Naples, FL, November 6, 2013.

EXHIBIT 4 Page 12

Speaker, *Immigration and National Security*, Florida State University School of Law, Tallahassee, FL, November 5, 2013.

Speaker, *Immigration and National Security*, University of Kansas School of Law, Lawrence, KS, October 24, 2013.

Speaker, *Immigration and National Security*, Washburn School of Law, Topeka, KS, October 23, 2013.

Speaker, *Counseling Corporate Compliance in a Time of Legislative Change*, Federal Bar Association Workplace Enforcement and Immigration Symposium, Chicago, IL, October 22, 2013.

Speaker, *Immigration and Workforce Development in Alaska*, Fairbanks Industry Update Forum, Fairbanks, AK, October 18, 2013.

Speaker, *Exclusive Citizenship Doctrines*, Federal Bar Association Immigration Law Section, Rome, Italy, October 7, 2013.

Speaker, *The Republican Case for Immigration Reform*, Military Officers Association of America Dinner Social, Anchorage, AK, September 26, 2013.

Speaker, *Military Immigration Issues*, American Immigration Lawyers Association Monthly Business Meeting and CLE, Denver, CO, August 13, 2013.

Speaker, *The Republican Case for Immigration Reform*, Midnight Sun Republican Woman's Club Program, Anchorage, AK, July 30, 2013.

Speaker, *The Freedom of Information Act: Update*, Federalist Society for Law & Public Policy, Webinar & Podcast, July 15, 2013.

Discussion Leader, *Use of False Documents: How They Complicate A Case*, American Immigration Lawyers Association Annual Conference, San Francisco, CA, June 29, 2013.

Speaker, *FOIA Requests–The Search for Transparency*, American Immigration Lawyers Association Webinar, May 23, 2013.

Speaker, *Worksite Enforcement: Employer Verification Obligations*, 10th Annual Federal Bar Association Immigration Law Seminar, Memphis, TN, May 18, 2013.

Speaker, *The Republican Case for Immigration Reform,* Republican National Lawyers Association, Washington, DC, Apr. 26, 2013.

Speaker, *Compliance Strategies for General Counsels and Other Corporate Officers: Avoiding Fines, Headlines, Litigation, and Jail Time*, Worksite Enforcement Symposium, Stanford Law School, Palo Alto, CA, Apr. 19, 2013.

EXHIBIT 4 Page 13

Speaker, *Restoring Discretion to the Immigration System*, Capitol Hill Briefing, Washington, DC, Mar. 26, 2013.

Speaker, *Tax Issues Relating to Immigrants and Citizens*, 2013 American Immigration Lawyers Association Washington Chapter Continuing Legal Education Annual Conference, Seattle, WA, Mar. 22, 2013.

Speaker, *The Republican Case for Immigration Reform,* Anchorage Republican Women's Club, Anchorage, AK, Mar 14, 2013.

Speaker, *First Steps on Immigration Reform? The Military Enlistment Opportunity Act of 2013*, Teleforum, Federalist Society, Washington, DC, Feb. 8, 2013.

Speaker, *Parole in Place for Military Families*, Webinar, Fort Carson, CO, Jan. 25, 2013.

Speaker, *Arizona v. United States: Immigration Policy & the Economy*, 2012 Federalist Society National Lawyers Convention, Washington, DC, Nov. 15, 2012.

Speaker, *Special Populations Within the Military*, Veterans Justice Symposium, New York Law School, New York, NY, November 14, 2012.

Speaker, *The Path to Citizenship for Military Family Members*, American Immigration Lawyers Association California Chapter Conference, San Diego, CA, Nov. 10, 2012.

Speaker, *Be All That You Can Be: Military Issues for the Immigration Lawyer,* American Immigration Lawyers Association Fall Joint Texas and Mid-South Chapter Conference, New Orleans, LA, Nov. 3, 2012.

Speaker, *Supporting Our Troops – How Interagency Coordination Helps Members of the Military and Their Families*, Office of the Citizenship and Immigration Services Ombudsman, Second Annual Conference, Washington, DC, Oct. 18, 2012.

Speaker, *Expedited Citizenship & Preserving Continuity of Residence*, American Immigration Lawyers Association Rome Chapter Fall Conference, London, England, United Kingdom, Oct. 5, 2012.

Speaker, *How Employers Can Use U.S. Immigration Laws to Their Advantage*, Alaska 2012: 74th Annual Northwest Human Resource Management Association Conference and Tradeshow, Anchorage, AK, Oct. 2, 2012.

EXHIBIT 4 Page 14

Moderator, *Immigration, Race, & Incarceration in the United States*, American Bar Association Annual Meeting, Chicago, IL, Aug. 5, 2012.

Discussion Leader, *Subregulatory Guidance: How to Use It Wisely*, American Immigration Lawyers Association Annual Conference, Nashville, TN, June 14, 2012.

Speaker, *Citizenship in a Global Era*, Global Citizenship Conference, Federal Bar Ass'n, Rome, Italy, May 25, 2012.

Speaker, *Arizona versus the United States of America*, Federalist Society Teleforum, Apr. 27, 2012.

Speaker, *American Birthright Citizenship Rules and the Exclusion of Outsiders from the Political Community*, Boston College Citizenship Symposium, Dover, MA, Apr. 20, 2012.

Speaker, *Immigration 101 for Alaska Human Resource Managers*, Anchorage Society for Human Resource Managers, Anchorage, AK, Mar. 27, 2012.
Speaker, *Immigration Issues Related to Military Service*, New York Immigration Coalition, New York, NY, Mar. 21, 2012.

Speaker. *Parole in Place for Military Families*, American Immigration Lawyers Association Webinar, Mar. 20, 2012.

Discussion Leader, *Tax and Expatriation Issues*, American Immigration Lawyers Association Northwest Continuing Legal Education Conference, Seattle, WA, Mar. 16, 2012.

Speaker, *E-Verify: Friend or Foe?* Skagit Community College, Skagit, WA, Mar. 15, 2012.

Speaker, *Is Military Justice to Justice As Military Music is to Music?* Saint Thomas University School of Law, Minneapolis, MN, Mar. 12, 2012.

Speaker, *Immigration Challenges Facing the Western States*, Federalist Society Western States Conference, Simi Valley, CA, Jan. 28, 2012.

Speaker, *Birthright Citizenship & the 14th Amendment: Facts, Consequences & Policy Considerations,* NAPABA Convention, Atlanta, GA, Nov. 18, 2011.

Speaker, *Breaching Borders Symposium*, Washburn University School of Law, Topeka, KS, Oct. 21, 2011.

EXHIBIT 4 Page 15

Speaker, *Immigration Issues Related to Military Service*, American Immigration Lawyers Association Washington Chapter Meeting, Seattle, WA, Oct. 3, 2011.

Speaker, *The 9/11 Effect and Its Legacy on U.S. Immigration Laws,* Pennsylvania State University Law Campus, University Park, PA, Sept. 16, 2011.

Speaker, *Showcase Program: The Battle over Birthright Citizenship: History, International Perspectives, and the Path Ahead,* American Bar Association 2011 Annual Meeting, Toronto, Ontario, Canada, Aug. 4, 2011.

Speaker, *Immigration Issues Related to Military Service*, New York Immigration Coalition, New York, NY, Apr. 6, 2011.

Speaker, *The Efficacy of Integrated Border Enforcement Teams (IBETs)*, Perimeter Security Conference, Seattle, WA, Jun. 20, 2011.

Speaker, *Military Issues for the Immigration Practitioner*, 2011 American Immigration Lawyers Association Annual Conference, San Diego, CA, Jun. 15, 2011.

Speaker, *Was It Legal to Kill Osama Bin Laden?* Public Interest Law Network Summer School, Wuhan University School of Law, Wuhan, China, Jun. 7, 2011.

Speaker, *Immigration Issues Related to Military Service*, New York Immigration Coalition, New York, NY, Apr. 6, 2011.
Speaker, *True Claims to US Citizenship*, American Immigration Lawyers Association Webinar, Washington, DC, Mar. 29, 2011.

Speaker, *Immigration Issues for Human Resources Professionals*, Anchorage Society of Human Resources Managers, Anchorage, AK, Mar. 22, 2011.

Keynote Speaker, *The Constitution, the Fourteenth Amendment, and Birthright Citizenship: Modern Challenges to a Longstanding Rule*, Symposium on Immigration & Homeland Security Law, Northern Illinois University College of Law, DeKalb, IL, Mar. 3, 2011.

Speaker, *Birthright Citizenship: Origins, Constitutional Status, and the Current Debate*, 27th Annual Fordham Debate, S.J. Quinney College of Law, The University of Utah, Salt Lake City, UT, Jan. 31, 2011.

Speaker, *The US Supreme Court, Congress, and the Guantánamo Detainees*, Guantánamo and The Response: A Film Screening and Panel Discussion, Alaska Bar Association, Anchorage, AK, Dec. 14, 2010.

EXHIBIT 4 Page 16

Panelist, *Immigration, the Arizona Statute, and E Pluribus Unum*, Federalist Society 2010 National Lawyers Convention, Washington, DC, Nov. 18, 2010.

Speaker, *National Security, Immigration, & the Rule of Law*, American Bar Association Section of International Law 2010 Fall Meeting, Paris, France, Nov. 4, 2010.

Speaker, *Birthright Citizenship & the Battle Over Illegal Immigration*, Cato Institute Capitol Hill Briefing, Washington, DC, Oct. 25, 2010.

Speaker, *Immigration, Citizenship, & Security: The Current Debate*, Hamilton College, Hamilton, NY, Oct. 21, 2010.

Speaker, *The Constitution & Citizenship: Modern Day Challenges to the Founders' Ideals*, Constitution Day Polaris Lecture, University of Alaska Anchorage, Anchorage, AK, Sept. 17, 2010.

Speaker, *Military-Related Immigration Issues*, 2010 Joint Services Immigration & Naturalization Symposium, Naval Legal Service Office Mid-Atlantic, Norfolk, VA, Aug. 27, 2010.

Discussion Leader & Speaker, *Advanced Issues in Citizenship & Naturalization*, American Immigration Lawyers Association Annual Conference, National Harbor, MD, July 3, 2010.

Speaker, *Military Spouses, Widows, and Substitute Sponsors*, American Immigration Lawyers Association Midwest Regional Conference, Chicago, IL, Apr. 9, 2010.

Speaker, *Military Accessions Vital to the National Interest*, USCIS District 23 Military Summit, Los Angeles, CA, Mar. 23, 2010.

Speaker, *The American Immigration Lawyers Association Military Assistance Program,* American Immigration Lawyers Association San Diego Chapter, San Diego, CA, Jan. 19, 2010.

Speaker, *Immigration Issues Related to Military Service*, New York Immigration Coalition, New York, NY, Dec. 3, 2009.

Speaker, *From F-1 or J-1 Directly to U.S. Citizenship: The U.S. Army's MAVNI Pilot Program,* 2009 NAFSA Region VIII Conference, Washington, DC, Nov. 14, 2009.

EXHIBIT 4 Page 17

Speaker, *Immigration Reform: What's At Stake for the Northern Border,* Border Policy Research Institute, Western Washington University, Bellingham, WA, Nov. 12, 2009.

Speaker, *Immigration Issues in the Workplace*, Fundamentals of Employment Law in Alaska Continuing Legal Education Conference, Anchorage, AK, Oct. 29, 2009.

Speaker, *Advanced Issues in Naturalization & Citizenship*, University of Texas 33rd Annual Conference on Immigration & Nationality Law, San Antonio, TX, Oct. 22, 2009.

Speaker, *Immigrants and the Military*, National Immigration Project of the National Lawyers Guild, August, 2009.

Presenter, *Military-Related Immigration Issues*, Naval Legal Services Office Northwest, Whidbey Island, WA, June 16, 2009.

Discussion Leader & Speaker, *Non-Citizens and the US Military*, American Immigration Lawyers Association Annual Conference on Immigration Law, Las Vegas, NV, June 5, 2009.

Speaker, *National Security Aspects of Immigration Law*, 17th National Security Law Institute, Center for National Security Law, University of Virginia, Charlottesville, VA, June 3, 2009.

Panelist, *Policies & Attitudes Towards Immigrant Civic & Political Participation, & Dual Citizenship, In The European Union & North America,* Migration Policy Institute, Washington, DC, May 15, 2009.

Panelist, *Citizenship & Naturalization: Proving Citizenship, Medical Waivers for Naturalization & the U.S. Army's New MAVNI Program,* AILA Upper Midwest Conference, Minneapolis, MN, Apr. 30, 2009.

Speaker, *Actions That Affect Applications for U.S. Citizenship*, ABA Teleconference, Mar. 25, 2009.

Speaker, *Immigration Issues Related to Military Service*, New York Immigration Coalition, New York, NY, Jan. 28, 2009.

Panelist, *Burdens of Proof, Production, & Persuasion in Immigration Court: Getting the Differences Down & Creating The Record to Win for Judicial Review & Mock Cross-Examination: Taking It to the Mat*, AILA Fall Topics CLE Conference: Moving Beyond the Basics, New Orleans, LA, Dec. 11, 2008.

Speaker, *Immigration Issues Related to Military Service*, New York Immigration Coalition, New York, NY, Dec. 1, 2008.

EXHIBIT 4 Page 18

Speaker, *Toward a More Perfect Union: The Second Founding and Reconstruction Amendments*, American Constitution Society for Law and Policy, Washington, DC, November 21, 2008.

Discussion Leader, *Freedom of Information Act Update*, American Immigration Lawyers Association Teleconference, September 4, 2008.

Discussion Leader, *Advanced Issues in Naturalization*, American Immigration Lawyers Association Annual Conference, Vancouver, BC, Canada, June 27, 2008.

Panelist, *Liberty v. Security: A Critical Balance*, Columbia College, New York, NY, May 31, 2008.

Panelist, *Nationality, Political Membership, Citizenship, and Immigration Policy*, 5th Annual Immigration Law & Policy Conference, Georgetown University Law Center, May 20, 2008.

Speaker, *The Intersection of Immigration and National Security*, McCormick Tribune Conference Series, Wheaton, IL, April 28, 2008.

Speaker, *US Immigration Policy in a Climate of Fear*, University of Cincinnati, Cincinnati, OH, April 15, 2008.

Moderator, *The Other Detainees: Immigration Detainees in the United States*, American Bar Association Section of International Law, Spring Meeting, New York, NY, April 4, 2008.

Speaker, *Immigration, Border Security, & the Rule of Law*, University of Kansas Law School, Lawrence, KS, March 27, 2008.

Panelist, *Emerging Issues: The National Security Constitution: New Threats, New Rules?* St. John's University School of Law, Queens, NY, February 29, 2008.

Speaker, *Human Rights & the "War on Terror"—Does TV Persuade Us That Torture's Okay?* World Affairs Council of Northern California, University of California at Berkeley, Berkeley, CA, February 28, 2008.

Speaker, *Immigration & National Security*, Industrial College of the Armed Forces, Washington, DC, February 6, 2008.

Panelist, *Boumediene, the Military Commissions Act, & Habeas Corpus*, New York State Bar Association Annual Meeting, New York, NY, January 31, 2008.

EXHIBIT 4 Page 19

Speaker, *Beyond Guantanamo: Administering Justice and Protecting National Security*, New York City Bar Association Symposium, New York City, NY, December 13, 2007.

Speaker, *Removal Defense Crash Course*, American Immigration Lawyers Association 2007 Worksite Enforcement Conference, Scottsdale, AZ, December 1, 2007.

Speaker, *Defining "American:" Birthright Citizenship & the Fourteenth Amendment*, 19th Annual National Asian Pacific American Bar Association Convention, Las Vegas, NV, November 17, 2007.

Speaker, *Immigrants & The Military*, American Immigration Lawyers Association Mid-South Fall Chapter Conference, Louisville, KY, November 2, 2007.

Speaker, *When the Administrative Winds Go Against You: Litigating the Business Immigration Case*, American Immigration Lawyers Association Alaskan Cruise Conference, August 11, 2007.

Speaker, *Immigration Program: Should They Stay or Should They Go?* Women's Bar Association of the State of New York Convention, Rio Grande, PR, June 2, 2007.

Speaker, *Birthright Citizenship & the Fourteenth Amendment*, American Bar Association Section of Administrative Law & Regulatory Practice Spring Meeting, Austin, TX, May 18, 2007.

Moderator, *Trusted Travelers or Terrorists? A Comparative Perspective on Global Travel Security Programs*, American Bar Association Section of International Law, Spring Meeting, Washington, DC, May 2, 2007.

Panelist and Keynote Speaker, *Immigration and National Security*, Immigration Advocacy Training, Stanford University, Stanford Law School, Palo Alto, CA, February 24, 2007.

Panelist, *Immigration & National Security,* Denver University Law Review Symposium, University of Denver Sturm College of Law, Denver, CO, February 16, 2007.

Speaker, *Birthright Citizenship: International Trends & Policies*, American Bar Association Midyear Meeting, Los Angeles, CA, February 7, 2007.

Speaker, *Cross-Border Legislation: Consequences for Trade & Travel*, Bellingham Chamber of Commerce, Bellingham, WA, October 26, 2006.

EXHIBIT 4 Page 20

Panelist, *Should They Stay Or Should They Go?* Pace Law School Center for Continuing Legal Education, White Plains, NY, October 24, 2006.

Speaker, *Immigration Reform Debate*, Hartford Chapter of the Federalist Society for Law & Public Policy, Hartford, CT, October 18, 2006.

Speaker, *Fortress America—Is It Possible, & At What Price?* American Immigration Lawyers Association Fall Conference, New York, NY, September 14, 2006.

Speaker, *Birthright Citizenship: A Debate,* Federalist Society Houston Lawyers Chapter, Houston, TX, August 30, 2006.

Speaker, *Beyond the Politics of Fear: The Real Effects of Immigration on Wages, Employment, & National Security*, American Immigration Lawyers Association Annual Conference, San Antonio, TX, June 24, 2006.

Speaker, *US Immigration Policy & Reform*, Keynote Address, 2006 Faculty Workshop, Shenandoah University, Winchester, VA, May 17, 2006.

Speaker, *Turning Our Backs?: Rethinking Our Treatment of Illegal Immigrants*, Americans for Informed Democracy, Bowdoin College, Brunswick, ME, May 8, 2006.

Speaker, *Employment Issues & the Military: Returning Veterans, Reserve Duty, Private Employment Abroad, and More . . .,* National Employment Lawyers Association Spring Conference 2006, Yale Club of New York City, May 5, 2006.

Speaker, *In the War Zone: Does Gender Matter?* Harvard Club of New York City, New York, NY, April 26, 2006.

Moderator, *Comprehensive Immigration Reform: Evaluating the Options*, American Bar Association Teleconference, March 30, 2006.

Speaker, *Migrants, Minorities, and the National Security State: Crimefighting or War on Terror?* Citizenship & Security Program, Berlin, Germany, March 23, 2006.

Speaker, *Border Security: Immigration, Smuggling, & Trafficking*, NSA Homeland Security Course, US Foreign Policy Institute, Linthicum, MD, January 23, 2006.

EXHIBIT 4 Page 21

Speaker, *Does President Bush's Guest Worker Proposal Threaten National Security? A View From The Capitol Hill Trenches*, Harvard Club of Alaska, Anchorage, AK, January 3, 2006.

Speaker, Senate Briefing, *National Security & Comprehensive Immigration Reform*, Capitol Building, Washington, DC, December 7, 2005.

Speaker, *Detainees in the War on Terrorism & the Abu Ghraib Incident*, Fordham Law School, New York, NY, November 29, 2005.

Speaker, *Immigration Law Issues for Military Members & Their Families*, New York Immigration Coalition, New York, NY, November 17, 2005.

Speaker, *Debate on the USA PATRIOT Act*, Pace Law School, White Plains, NY, September 28, 2005.

Speaker, *Judicial Review & the Border Fence*, New York Law School, New York, NY, September 26, 2005.

Speaker, *Debate: Janis Karpinski—Victim or Violator of the Rule of Law?*, Thomas Jefferson Law School, San Diego, CA, September 7, 2005.

Commentator, *Secure Borders, Open Doors: Visa Procedures in the Post-September 11 Era*, Migration Policy Institute, Washington, DC, August 18, 2005.

Speaker, *Immigration: The Media, Message, & Messenger*, American Immigration Lawyers Association, Salt Lake City, UT, June 25, 2005.

Speaker, *Teaching About Law and Terrorism at the United States Military Academy: Program and Curriculum Design* and *Workers, Aliens, or Immigrants? The History and Future of Global Temporary Workers,* Law & Society Annual Meeting, Las Vegas, NV, June 2-5, 2005.

Speaker, *National Security & Immigrant Rights*, Catholic Legal Immigration Network, Inc. ("CLINIC") Annual Convening, Portland, OR, May 14, 2005.

Speaker, *The Role of Borders in Enhancing Security*, Border Policy Research Institute, Western Washington University, Bellingham, WA, April 26, 2005.

Moderator, *Law of War & the Global War on Terrorism*, Second Annual Law & Terrorism Conference, West Point, NY, April 15, 2005.

Speaker, *National Security vs. Individual Liberties: The USA PATRIOT Act*, Albany Law School, Albany, NY, April 7, 2005.

EXHIBIT 4 Page 22

Speaker, *National Security & President Bush's Guestworker Proposal*, Thomas Jefferson School of Law, San Diego, CA, April 1, 2005.

Speaker, *When Your Client Fights for Uncle Sam: Foreign Citizen Soldiers & Expedited Citizenship*, United States Army Regional Defense Counsel Continuing Legal Education Conference, Cambridge, NY, March 4, 2005.

Speaker, *National Security & Drivers' Licenses*, Congressional briefing, Capitol Building, Washington, DC, January 27, 2005.

Moderator, *Immigration Law for Matrimonial & Family Law Attorneys*, Association of the Bar of the City of New York, New York, NY, January 25, 2005.

Speaker, *Guestworker Programs: Proposals and Perspectives*, Association of American Law Schools Annual Meeting, San Francisco, CA, January 5, 2005.

Discussion Leader, *Consular Processing—Overcoming Obstacles at the Consulates*, 7th Annual New York Chapter Symposium, American Immigration Lawyers Association, New York, NY, December 3, 2004.

Speaker, *The Emergence of a New Civil Rights Agenda*, Federalist Society National Lawyers Convention, Washington, DC, November 13, 2004.

Speaker, *Security & Liberty*, 9/11 Security and Liberty Fellowships Conference, USC Annenberg Institute for Justice & Journalism, Los Angeles, CA, November 9, 2004.

Speaker, *Immigration & National Security: Post 9/11 Challenges for the United States*, International Security and Strategic Studies conference, Washington, DC, October 29, 2004.

Speaker, *Getting Smart About Information: Checks Used By Consular Posts and Ports of Entry*, 2004 Fall Conference, American Immigration Lawyers Association, Chicago, IL, October 15, 2004.

Speaker, *Noncitizens &the US Military*, Harvard Immigration & Refugee Clinic 20th Anniversary Roundtable, Harvard Law School, October 17, 2004, Cambridge, MA.

Speaker, *"The Hot Seat:" Immigration & Security, From the Consulates to Our Ports-of-Entry and Beyond*, American Immigration Lawyers Association Annual Conference, Philadelphia, PA, June 12, 2004.

EXHIBIT 4 Page 23

Speaker, *Immigration & National Security*, Law & Terrorism Conference, Department of Law, US Military Academy, West Point, NY, April 2004.

Speaker, *Just War Theory & Preemption Doctrine*, LLM Conference, Cornell Law School, Ithaca, NY, April 2004.

Speaker, *Security Databases & Clearance Issues*, American Immigration Lawyers Association Conference on Travel for Work and Business: Visa Application, Admission, Reentry with Post-9/11 Security Clearances, Deer Valley, Park City, Utah, February 10, 2004.

Speaker, *Smart Borders: Developing Secure & Sensible Immigration Policies*, Capitol Building, Washington, DC, December 15, 2003.

Speaker, *Immigration & National Security,* New York Appellate Judges Conference, West Point, NY, October 24, 2003.

Speaker, *Universal Jurisdiction as a Threat to US National Security,* Northwestern University School of Law, Chicago, IL, October 13, 2003.

Speaker, *Becoming an Immigration Lawyer*, Celebration 50, Harvard Law School, Cambridge, MA, May 2003.

Speaker, *Structural Security*, Harvard Club of Alaska, Anchorage, AK, January 2003.

Speaker, *Legal Approaches to State-Sponsored Terrorism*, Institute for Humanitarian Law, San Remo, Italy, October 2002.

Moderator, *Evaluating the Rights of Non-Citizens Post 9/11: A View From the Trenches*, New York City Bar Association, New York, NY, Sept. 18, 2002.

Speaker, *Federal Courts & Torts for the Immigration Lawyer*, Association of the Bar of the City of New York, February 18, 2002.

Moderator, *Homeland Security 101*, American Immigration Lawyers Association Conference on Entry Issues, Detroit, MI, April 2002.

Speaker, *Military Tribunals & Military Justice*, Harvard Club, Anchorage, AK, January 2002.

Speaker, *Asylum Law: Mock Trial*, American Immigration Lawyers Association Annual Conference, Boston, MA, June 2001.

EXHIBIT 4 Page 24

Speaker, *Immigration Issues for Criminal Defense Attorneys*, Alaska Association of Trial Lawyers, Girdwood, AK, April 2001.

Moderator, *Immigration in a High-Tech Age*, Federalist Society National Lawyers Convention, Washington, DC, November 2000.

Moderator & Speaker, *Habeas Corpus & Coram Nobis*, American Immigration Lawyers Association Annual Conference, Chicago, IL, June 2000.

Speaker, *Immigrant & Non-immigrant Waivers*, Northwest Regional Immigration Seminar, Seattle, WA, February 2000.

Speaker, *Habeas Corpus & Mandamus Remedies*, American Immigration Lawyers Litigation Conference, Miami, FL, October 1999.

Speaker, *Getting Attorneys Fees from the Government*, American Immigration Lawyers Association Annual Conference, Seattle, WA, June 1999.
Moderator & Speaker, *Representing Immigrants Affected By the Nicaraguan & Central American Relief Act*, Alaska Bar Association, March 1999.

Speaker, *Citizenship: N600s & Passport Applications*, Northwest Regional Immigration Seminar, Portland, OR, February 1999.

Speaker, *Citizenship/Naturalization/Maintaining Permanent Residence*, Northwest Regional Immigration Seminar, Seattle, WA, February 1998.

Speaker, *Immigrant Visa Issues*, Northwest Regional Immigration Seminar, Seattle, WA, February 1997.

Speaker, *Recent & Radical Immigration Law Changes: What Every Criminal and Family Law Lawyer Needs To Know*, Alaska Bar Association, October 1996.

Speaker, *Great Decisions 1995: Immigration, An End to Open Doors?* Alaska World Affairs Council, Anchorage, AK, Mar. 3, 1995.

**Selected Publications**

*Passing a solution for Dreamer strengthen our military*, The Hill, January 30, 2018.

Author, *Refugees and National Security*, Immigration and Nationality Law Review Keynote Address, Immigration and Nationality Law Review, Vol. xxxvii, March 16, 2017.

EXHIBIT 4 Page 25

Author, *American Birthright Citizenship Rules and the Exclusion of "Outsiders" from the Political Community*, chapter 10 in the book Citizenship in Question- Evidentiary Birthright and Statelessness, Duke University Press, January 2017.

*Parole in Place and Other Immigration Benefits for Military Family Members: An Update,* Immigration Briefings, Issue 16-02, February 2016.

*Is Birthright Citizenship Good for America?,* New York Times, August 24, 2015.

*MAVNI Connects Immigrants to Military Service— and Citizenship,* Perspectives, Volume 24, No. 1, August 2015, American Bar Association.

*Immigration Law & the Military, Second Edition* (American Immigration Lawyers Association 2015) (book).

*Immigration Law & National Security*, National Security Law & Policy, Carolina Academic Press, 2015, at 1265-1314 (book chapter).

*Immigration & the Separation of Powers,* Washington Times, July 7, 2015.

*The Impact & Potential of America's Foreign Born Population on Army Recruiting and Force 2025*, U.S. Army Recruiting Forum at Fort Knox, June 2015 (Paper co-authored with Naomi Verdugo).

*What Every Lawyer Needs to Know about Non-Citizens & the United States Military,* in What Every Lawyer Needs to Know About Immigration Law, American Bar Association, Section of Administrative Law & Regulatory Practice (2014) (book chapter).

*Left Behind: Iraqis and Afghans Caught in a Sea of SIV Red Tape*, Co-Authored with Dan Berger, Mollie McGurk, Rose Olson, & Hannah Oldenburg, Inside Immigration, Volume 5, Issue 6, June 2014, American Immigration Lawyers Association.

*MAVNI (Military Accessions Vital to the National Interest),* Immigration Practice Pointers Tips for Handling Complex Cases, American Immigration Lawyers Association, June, 2014.

*Military Naturalization Under INA §§328, 329, and 329A*, AILA's Guide to U.S. Citizenship & Naturalization Law, American Immigration Lawyers Association, 2014, at 153-182 (book chapter).

*Congress Must Act and Stop Deporting Our Veterans,* Roll Call, May 15, 2014.

EXHIBIT 4 Page 26

*Saying 'No Thanks' to 87,500 High-Skill Workers,* Wall Street Journal, May 7, 2014.

*Recent Developments in Military Enlistment and Naturalization Law,* Immigration Briefings, Issue 14-03, January 2014.

*Parole in Place: What It Is and What It Isn't,* The Hill, December 19, 2013.

*DHS Clarifies Immigration Benefits for Family Members of Active-Duty Military, Selected Reservists, and Veterans,* 18 Bender's Immigration Bulletin, December 15, 2013.

*DHS Clarifies Immigration Benefits for Family Members of Selected Reserve and Veterans,* Reserve Officers Association Law Review 13161, December 2013.

*Military Immigration Issues,* American Bar Association GPSOLO Magazine Vol. 30, No. 5 (September/October 2013).

*Use of False Documents: How They Can Complicate a Case,* 2013 AILA Immigration Practice Pointers at 751-763 (American Immigration Lawyers Association, 2013).
*Sessions Amendment Harms Military Families,* The Hill's Congress Blog, May 20, 2013.

*Path to Citizenship,* Los Angeles Lawyer, Co-Author, November 2012.

*Immigration Law and the Military* (American Immigration Lawyers Association 2012) (book).

*A Path to Citizenship for Undocumented Military Family Members,* Immigration Briefings, No. 12-07, July 2012.

*Subregulatory Guidance in Immigration Matters: How to Use It Wisely,* 2012 AILA Practice Pointers at 697-701 (American Immigration Lawyers Association, 2012).

*Practical Problems with Attempts to Change the Fourteenth Amendment Through an Interstate Birth Certificate Compact,* Bender's Immigration Bulletin, Vol. 17, No. 9 (May 1, 2012).

*The Cost to Americans of Ending Birthright Citizenship,* National Foundation for American Policy, March 2012.

*Is Birthright Citizenship Good for America?* Cato Journal, Vol. 32, No. 1, Winter 2012.

EXHIBIT 4 Page 27

*Book Review: The Canadian Forces & Arctic Sovereignty: Debating Roles, Interests and Requirements, 1968-1974*, American Review of Canadian Studies, Vol. 42, No. 1 (2012), 120-122.

*S.B. 1070: The Unconstitutional and Inefficient Law that May Just Fix Immigration,* Regent University Law Review, Vol. 23, No. 2 (2010-11), 363-373.

*Military Service As An Option for Foreign Health Care Professionals*, The Physician Immigration Book, 2011-12 ed, at 519-527.

*Parole in Place for Military Families*, Immigration Practice Pointers: Tips for Handling Complex Cases, American Immigration Lawyers Association, 2011-12 ed., at 603-611.

*Recent Developments in Military Enlistment & Naturalization Law*, Immigration Briefings No. 11-03 (March 2011).

*Arizona's Attempt to Enforce Federal Immigration Law: "Force Multiplier," or "Ball and Chain"?* 11 Engage: The Journal of the Federalist Society's Practice Groups 3 at 75-79 (November 2010).

*Citizenship & Computers*, 15 Bender's Immigration Bulletin 1143-1144 (Aug. 15, 2010).

*Essential to the Fight: Immigrants in the Military, Eight Years After 9/11,* Special Report, Immigration Policy Center, American Immigration Council, November 2009.

*Policy Arguments in Favor of Retaining America's Birthright Citizenship Law*, Made in America: Myths & Facts About Birthright Citizenship, Immigration Policy Center Perspectives (September 2009).

*Professionals: A Matter of Degree (5th Ed.)* (co-authored with Martin J. Lawler) (AILA 2009).

*Advanced Issues in Naturalization: Practical Problems & Solutions,* Immigration & Nationality Law Handbook 2008-2009 at 607-17.

*Birthright Citizenship: The Policy Arguments,* Administrative & Regulatory Law News, Vol. 33, No. 1, Fall 2007.

*National Security & Immigration Policy: Reclaiming Terms, Measuring Success, & Setting Priorities,* The Homeland Security Review, Vol. 1, No. 3, Fall 2007 (co-authored with Donald Kerwin).

EXHIBIT 4 Page 28

*Book Review: The Founders on Citizenship & Immigration: Principles & Challenges for America,* 8 Engage: The Journal of the Federalist Society's Practice Groups 4 at 155-57 (October 2007).

*Immigration & Naturalization Law (Year in Review)*, The International Lawyer, Vol. 41, No. 2 (Summer 2007).
*The Role of Immigration in A Coordinated National Security Policy,* Georgetown Immigration Law Journal, Vol. 21, No. 3 (Spring 2007) (co-authored with Donald Kerwin).

*Book Review: Richard A. Posner's Not A Suicide Pact,* 8 Engage: The Journal of the Federalist Society's Practice Groups 1 (February 2007).

*Essential to the Fight: Immigrants in the Military, Five Years After 9/11,* Immigration Policy in Focus, Vol. 5, Issue 9, Immigration Policy Center, American Immigration Law Foundation, November 2006.

*Providing Material Support to a Foreign Terrorist Organization: The Pentagon, the Department of State, the People's Mujahedin of Iran, & the Global War on Terrorism,* Bender's Immigration Bulletin (Jun. 1, 2006) (forthcoming) (available in PDF format upon request).

*Five Questions Debate: Immigration Reform* (on-line debate with Professor John Eastman), Federalist Society for Law & Public Policy, May 2006, *available at* http://www.fed-soc.org/pdf/immigrationreform4.pdf.

*He Intended Well But General's Order Is Bad For Military*, Voice of the Times, Anchorage Daily News, April 20, 2006 (co-authored with John Winn).

Immigration & National Security: Post-9/11 Challenges for the United States, in Homeland Security: Protecting America's Targets, Vol, 1, Borders & Points of Entry, at 117-143 (2006).

*Eskimo Scouts*, in Women & War: A Historical Encyclopedia From Antiquity to the Present, Volume 1, at 170-171 (2006).

*The DREAM Act: Tapping An Overlooked Pool of Home-Grown Talent to Meet Military Enlistment Needs,* 6 Engage: The Journal of the Federalist Society's Practice Groups 2 at 99-103 (October 2005); reprinted in 11 Bender's Immigration Bulletin 63 (Jan. 15, 2006).

*International Legal Developments in Review, 2004: Immigration & Naturalization Law*, 39 Int'l Lawyer 2, at 429-447 (Summer 2005).

EXHIBIT 4 Page 29

*Unintelligent Intelligence Reform: Federal Control of Driver's Licensing,*
American Immigration Lawyers Association, <u>Immigration &
Nationality Law Handbook</u>, 2005-2006 edition (co-authored with
Denise Hammond).

*The "Real ID" Act—A Real Nightmare for DoD,* <u>The Officer</u> (April
2005), at 12-13; *reprinted in* 151 Cong. Rec. S3978-79 (daily ed. April
20, 2005); and *reprinted in* Immigration Daily at
http://www.ilw.com/lawyers/articles/2005,0502-stock.shtm.

*Driver Licenses & National Security: Myths and Reality,* 10 <u>Bender's
Immigration Bulletin</u> 422 (Mar. 1, 2005), *reprinted in* Stephen H.
Legomsky, <u>Immigration & Refugee Law & Policy</u> 1261-1264
(Foundation Press, 2005).

<u>Guide to Criminal Law in New York</u> (2d. ed.) (Wadsworth, 2004)
(Co-authored with Timothy Bakken & Mark Welton).

*Considera Riesgo Suspensión Licencias/Driver's License Debate Sharpens,* The
Immigrant Times, Septembre 2004/September 2004, at 9.

*Social Insecurity: Aliens, Employers, and Social Security Requirements,*
American Immigration Lawyers Association, <u>Immigration &
Nationality Law Handbook</u>, 2004-2005 edition, volume 2 (co-
authored with Denise Hammond, Andrew Galeziowski, and Joanna
Lee Carson).

*Crackdown Wrong Approach: Driver's Licenses Aren't Terror Tools, Real
Immigration Reforms Are Better Means of Identifying Potential Future
Attackers,* Newsday, August 27, 2004, at A49.

*Book Note: Mexican Americans & the Law: El Pueblo Unido Jamas Sers
Veneido (The Mexican American Experience),* Human Rights & Human
Welfare, August 2004, available at
http://www.du.edu/gsis/hrhw/booknotes/index.html.

*The Road Less Traveled: Becoming An Immigration Attorney,* <u>Harvard
Women's Law Journal</u> (Celebration 50 issue, May 2004).

*The Lessons of 9/11: A Failure of Intelligence, Not Immigration Law,*
<u>Immigration Policy Focus</u>, Vol. 2, Issue 3, Immigration Policy
Center, American Immigration Law Foundation, December 2003.

*Two Years of Policy Revamping,* <u>National Law Journal</u> (Dec. 15, 2003).

*When Your Client Fights for Uncle Sam: "No Card" Soldiers and Expedited
Citizenship,* <u>Bender's Immigration Bulletin</u>, Vol. 8, No. 24 (Dec. 15,
2003).

EXHIBIT 4 Page 30

*Foreign War Crimes Lawsuits Against American Soldiers Threaten National Security*, <u>Legal Backgrounder</u>, Washington Legal Foundation, Vol. 18, No. 35 (Aug. 22, 2003).

*Detainees in the Hands of America: New Rules for a New Kind of War*, <u>Terrorism & International Law: Challenges and Responses</u> (Int'l Inst. For Humanitarian Law, San Remo, Italy, July 2003).

*Essential Workers or Guests? A New Twist on an Old Debate*, 3 <u>Engage: The Journal of the Federalist Society's Practice Groups</u> 1 at 97 (April 2002).

*Immigration Law in a World of Terror*, <u>National Security White Paper</u>, Federalist Society, December 2001.

*Reflections: Equal Justice for Non-citizens*, <u>Trial</u> Magazine, July 1999, at 104-105.

*Federal Judicial Authority to Increase Local Taxes*, 14 <u>Harvard Journal of Law & Public Policy</u> 1 at 270 (Winter 1991).

**Selected Testimony**    House Committee on the Judiciary, Subcommittee on Immigration Policy & Enforcement, *Hinder the Administration's Legislation Temptation Act ("HALT Act")*, July 26, 2011, Washington, DC.

Senate Judiciary Committee, Subcommittee on Immigration, Refugees, and Border Security, *The Development, Relief, and Education for Alien Minors (DREAM) Act*, Jun. 28, 2011, Washington, DC.

House Judiciary Committee, Subcommittee on Immigration, Citizenship, Refugees, Border Security, and International Law, *Immigration Needs of America's Fighting Men and Women*, May 20, 2008, Washington, DC.

Senate Armed Services Committee, *The Contributions of Immigrants to the Military*, July 10, 2006, Miami, FL.

House Committee on International Relations, Subcommittee on Oversight & Investigations; *Visa Overstays: Can We Bar the Terrorist Door?*, May 11, 2006, Washington, DC.

Alaska State Legislature, House State Affairs Committee Hearing on SB189, An Act Relating to the Issuance of Identification Cards and Driver's Licenses, April 27, 2006, Juneau, AK (by telephone).

EXHIBIT 4 Page 31

Senate Judiciary Committee, Subcommittees on Immigration, Border Security & Citizenship and Terrorism, Technology & Homeland Security; *The Need for Comprehensive Immigration Reform: Strengthening Our National Security*, May 17, 2005, Washington, DC.

New York State Legislature, Hearings on Driver's License Issues, August 19, 2004, New York, NY.

Senate Judiciary Committee, Subcommittee on Immigration, Border Security, and Citizenship; *Securing Our Borders Under A Temporary Guest Worker Program*, April 1, 2004, Washington, DC.

Maryland Governor's Task Force on Drivers' License Issues, March 29, 2004, Annapolis, MD.

**Bar & Professional Memberships**

Alaska Bar Association
U.S. District Court for the District of Alaska
Ninth Circuit Court of Appeals
American Bar Association
American Immigration Lawyers Association
Association of the Bar of the City of New York
Federalist Society for Law & Public Policy
Republican National Lawyers Association
Association of the United States Army
Reserve Officers Association
Federal Bar Association

**Additional professional & academic activities**

Alaska Advisory Committee, U.S. Civil Rights Commission, May 2017-present.
Prince William Sound Science Center Board Member, October 2014-present. Treasurer 2016-2018.
Federal Bar Association Immigration Law Section Board Member, October 2014- Present.
Phi Kappa Phi.
Master Teacher, United States Military Academy Master Teacher Program.
Personnel & Readiness Task Force, Office of the Undersecretary of Defense, Personnel & Readiness (April 2010).
President, Harvard Club of Alaska, 2009-2012.
Fellow, American Bar Foundation, 2005-present. Co-Chair of Alaska Fellows of the American Bar Foundation, 2011-present.
Member, Council on Foreign Relations Immigration Policy Task Force, 2008-2011.

EXHIBIT 4 Page 32

American Bar Association Commission on Immigration, 2008-2012.
Editorial Board, Bender's Immigration Bulletin, 2007-present.
Chair, International Security Affairs Committee, The Association of the Bar of the City of New York, 2006-2010.
Chair, Border Security Advocacy Committee, American Immigration Lawyers Association, 2005-2006.
Co-Chair, Immigration Litigation Committee, Section of Litigation, American Bar Association, 2005-2008.
Co-Chair, Joint Subcommittee on International Refugee Law of the Immigration & Naturalization Committee & the International Human Rights Committee of the Section of International Law, American Bar Association, 2006-2007.
Co-Chair and Vice-Chair, Immigration & Naturalization Committee, Section of International Law, American Bar Association, 2004-2008.
Member, Alaska Rules of Professional Conduct Committee, Alaska Bar Association, 1998-2001.
President, Alaska Chapter of the Federalist Society for Law & Public Policy, 1993-2001.
International Law & Security Section, Federalist Society, 1999-present.
President, Young Lawyers Section, Anchorage Bar Association, 1994-95.
Founding Chairperson, Immigration Law Section, Alaska Bar Association.

**Awards & Recognition**

Military Awards include the Legion of Merit, Joint Service Commendation Medal, Meritorious Service Medal, Army Commendation Medal, and the Military Outstanding Volunteer Service Medal, among others.

2008 Michael Maggio Pro Bono Award, American Immigration Lawyers Association.

2005 Advocacy Award, American Immigration Lawyers Association.

Alaska Super Lawyer, 2007, 2009, 2013, 2014, 2015, 2016, 2017, 2018

MacArthur Foundation Fellow, 2013

Immigration Law Professor of the Year, 2013

Alaska Bar Association International Law Section's Human Rights Award, 2014

Best Lawyers in America, 2015, 2016, 2017, 2018

EXHIBIT 4 Page 33