The Honorable Thomas S. Zilly

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON

KIRTI TIWARI, *et al*.,

              Plaintiffs,

      v.

JAMES MATTIS, Secretary, U.S. Department of Defense, in his official capacity,

              Defendant.

No.: 2:17-cv-00242 (TSZ)

**DEFENDANT'S TRIAL BRIEF**

**U.S. DEPARTMENT OF JUSTICE**
**1100 L Street, NW**
**Washington, DC 20005**
**Tel: (202) 514-3259**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

BACKGROUND .................................................................................................................. 2

    I.   The MAVNI Pilot Program ........................................................................... 2

        1.   Criteria for Determining Security-Clearance Eligibility ..................................... 3

        2.   Security Concerns Presented by the MAVNI Program ...................................... 4

        3.   Suitability and Security-Clearance Eligibility Determinations for MAVNI
           Service Members ................................................................................................ 6

    II.  Procedural History ........................................................................................ 8

ARGUMENT ..................................................................................................................... 10

    I.   Most Plaintiffs Lack Article III Standing to Challenge the NIAC and
       CIFSR/PACSA Initial Screening Requirements, and No Plaintiff Is Entitled to
       Request Nationwide Injunctive Relief. .................................................................. 10

    II.  The Challenged Screening and Vetting Requirements Do Not Discriminate on
       the Basis of National Origin or Any Other Suspect Class, and Are Rationally
       Related to a Legitimate Governmental Interest. ..................................................... 14

    III. The Court Should Defer to DoD's Military Judgment in Implementing the
       Challenged Requirements. ...................................................................................... 18

    IV. Even if the Court Were to Apply Heightened Scrutiny, the Challenged
       Screening and Vetting Requirements Pass Constitutional Muster, as They Are
       Narrowly Tailored to Advancing a Compelling Governmental Interest. ............... 22

        1.   DoD Has a Compelling National Security Interest in Responding to the Threats
           It Has Identified in the MAVNI Pilot Program. ................................................ 23

        2.   The Challenged Screening and Vetting Requirements Are Narrowly
           Tailored to Mitigating the Security Concerns Associated with the MAVNI
           Pilot Program. .................................................................................................... 26

    V.  The Court Should Dissolve the Preliminary Injunction Enjoining DoD from
       Withholding Interim Security Clearances from MAVNI Soldiers, as DoD Has
       No Such Policy, and DoD Has Taken Adequate Steps to Ensure that Its
       Personnel Do Not Mistakenly Enforce This Nonexistent Policy............................ 30

CONCLUSION .................................................................................................................. 33

DEF.'S TRIAL BRIEF - ii

*Tiwari, et al. v. Mattis*, No. 2:17-cv-00242 (TSZ)

**U.S. DEPARTMENT OF JUSTICE**
**1100 L Street, NW**
**Washington, DC 20005**
**Tel: (202) 514-3259**

## TABLE OF AUTHORITIES

**Cases**

*Brazil v. U.S. Dep't of Navy,*
  66 F.3d 193 (9th Cir. 1995) ...................................................................................... 21

*City & Cty. of San Francisco v. Trump,*
  897 F.3d 1225 (9th Cir. 2018) .................................................................................. 14

*DaimlerChrysler Corp. v. Cuno,*
  547 U.S. 332 (2006) .............................................................................................. 12-13

*Dep't of Navy v. Egan,*
  484 U.S. 518 (1988) ................................................................................................... 21

*Dilley v. Alexander,*
  603 F.2d 914 (D.C. Cir. 1979), *as amended*, 627 F.2d 407 (D.C. Cir. 1980) ................... 18-19

*Fisher v. Univ. of Tex.,*
  136 S. Ct. 2198 (2016) .............................................................................................. 29

*Gill v. Whitford,*
  138 S. Ct. 1916 (2018) ......................................................................................... 12-13

*Gilligan v. Morgan,*
  413 U.S. 1 (1973) ...................................................................................................... 18

*Goldman v. Weinberger,*
  475 U.S. 503 (1986) .............................................................................................. 19-20

*Haig v. Agee,*
  453 U.S. 280 (1981) ................................................................................................... 25

*Higgins v. City of Vallejo,*
  823 F.2d 351 (9th Cir. 1987) .................................................................................... 28

*Hood Canal Sand & Gravel, LLC v. Brady,*
  129 F. Supp. 3d 1118 (W.D. Wash. 2015) ............................................................... 18

*Hunt v. Cromartie,*
  526 U.S. 541 (1999) ................................................................................................... 15

*Lee v. City of Los Angeles,*
  250 F.3d 668 (9th Cir. 2001) .................................................................................... 15

*Lewis v. Casey,*
  518 U.S. 343 (1996) .............................................................................................. 12-13

*Marbury v. Madison,*
  5 U.S. (1 Cranch) 137 (1803) ................................................................................... 12

DEF.'S TRIAL BRIEF - iii

*Tiwari, et al. v. Mattis,* No. 2:17-cv-00242 (TSZ)

**U.S. DEPARTMENT OF JUSTICE**
**1100 L Street, NW**
**Washington, DC 20005**
**Tel: (202) 514-3259**

*McDaniels v. Stewart*,
   No. 3:15-CV-05943-BHS-DWC, 2016 WL 499316 (W.D. Wash. Feb. 8, 2016) ................. 15

*Molerio v. FBI*,
   749 F.2d 815 (D.C. Cir. 1984) ........................................................................................ 17

*Monsanto Co. v. Geertson Seed Farms*,
   561 U.S. 139 (2010) ........................................................................................................ 13

*Morris v. USACE*,
   60 F. Supp. 3d 1120 (D. Idaho 2014) ............................................................................ 14

*Nio v. DHS*,
   270 F. Supp. 3d 49 (D.D.C. 2017) ................................................................................. 25

*OPM v. Richmond*,
   496 U.S. 414 (1990) ........................................................................................................ 32

*Orloff v. Willoughby*,
   345 U.S. 83 (1953) .......................................................................................................... 20

*Pitts v. Terrible Herbst, Inc.*,
   653 F.3d 1081 (9th Cir. 2011) ........................................................................................ 10

*Rostker v. Goldberg*, 453 U.S. 57 (1981) ................................................................................ 19

*Sierra Forest Legacy v. Sherman*,
   646 F.3d 1161 (9th Cir. 2011) ........................................................................................ 20

*Snepp v. United States*,
   444 U.S. 507 (1980) ........................................................................................................ 26

*Snoqualmie Indian Tribe v. City of Snoqualmie*,
   186 F. Supp. 3d 1155 (W.D. Wash. 2016) .................................................................... 15

*Solorio v. United States*, 483 U.S. 435 (1987) ........................................................................ 19

*Summers v. Earth Island Institute*,
   555 U.S. 488 (2009) ........................................................................................................ 13

*Thomas v. Anchorage Equal Rights Comm'n*,
   220 F.3d 1134 (9th Cir. 2000) ........................................................................................ 10

*Thomasson v. Perry*,
   80 F.3d 915 (4th Cir. 1996) ............................................................................................ 16

*Tiwari v. Mattis*,
   No. C17-242 TSZ, 2017 WL 6492682 (W.D. Wash. Dec. 19, 2017) ............................. 9

*Tiwari v. Mattis*,
   No. C17-242 TSZ, 2018 WL 1737783 (W.D. Wash. Apr. 11, 2018) ......................... 9, 31

*Town of Chester v. Laroe Estates, Inc.*,
    137 S. Ct. 1645 (2017) ........................................................................................... 12

*Trump v. Hawaii*,
    138 S. Ct. 2392 (2018) ..................................................................................16, 19-20

*United States v. Navarro*,
    800 F.3d 1104 (9th Cir. 2015) ............................................................................... 18

*Warth v. Seldin*,
    422 U.S. 490 (1975) ............................................................................................... 12

*Washington v. Seattle Sch. Dist. No. 1*,
    458 U.S. 457 (1982) ............................................................................................... 15

*Weiss v. United States*, 510 U.S. 163 (1994) ........................................................... 19

*Wenger v. Monroe*,
    282 F.3d 1068 (9th Cir. 2002) ............................................................................... 18

*Zepeda v. INS*,
    753 F.2d 719 (9th Cir. 1985) ................................................................................. 13

## Statutes

8 U.S.C. § 1440 ...................................................................................................... 2, 25

10 U.S.C. § 504 ........................................................................................................... 2

## Secondary Materials

Press Release, Chinese National Arrested for Allegedly Acting Within the United States as an
Illegal Agent of the People's Republic of China (Sept. 25, 2018),
    https://www.justice.gov/opa/pr/chinese-national-arrested-allegedly-acting-within-united-
    states-illegal-agent-people-s ....................................................................................5

DEF.'S TRIAL BRIEF - v

*Tiwari, et al. v. Mattis*, No. 2:17-cv-00242 (TSZ)

**U.S. DEPARTMENT OF JUSTICE**
**1100 L Street, NW**
**Washington, DC 20005**
**Tel: (202) 514-3259**

# INTRODUCTION

Plaintiffs are seventeen U.S. citizen soldiers who enlisted in the Army through the Military Accessions Vital to the National Interest ("MAVNI") pilot program and who challenge the constitutionality of certain screening and vetting requirements put in place by the Department of Defense ("DoD"). At issue for trial are the following questions: first, do the named Plaintiffs, or some subset of them, have standing to challenge these screening and vetting requirements? If so, then second, do the challenged requirements single out MAVNI soldiers on the basis of their national origin? If the requirements do not differentiate on the basis of national origin, are they rationally related to a legitimate governmental interest? If the requirements do differentiate on the basis of national origin, should the Court apply heightened scrutiny, notwithstanding the considerable deference the Court owes to DoD's military judgment in personnel security matters? Finally, if the Court determines that heightened scrutiny should apply, are the challenged requirements narrowly tailored to advance a compelling governmental interest?

As a threshold matter, and as explained below, most of the named Plaintiffs lack Article III standing to challenge two of the three requirements at issue—specifically, the requirement that MAVNI soldiers must undergo a National Intelligence Agency Check ("NIAC") and the further requirement that MAVNI soldiers must undergo a counterintelligence ("CI")-focused security review ("CIFSR") or a passive analytical CI and security assessment ("PACSA"). Ten Plaintiffs have already satisfied these requirements and been granted security clearances, and it is possible that more will do the same in the coming weeks, such that any related claims are moot. Other Plaintiffs have not yet requested security clearances, such that any related claims are unripe. It is a fundamental principle of constitutional law that moot and unripe claims are not amenable to

DEF.'S TRIAL BRIEF - 1
*Tiwari, et al. v. Mattis*, No. 2:17-cv-00242 (TSZ)

**U.S. DEPARTMENT OF JUSTICE**
**1100 L Street, NW**
**Washington, DC 20005**
**Tel: (202) 514-3259**

adjudication in federal court.  While Plaintiffs may attempt to argue around this threshold defect by characterizing this action as a class action, to date no class has been certified.

Threshold jurisdictional defects aside, the evidence at trial will show that DoD's evidence-based decision to subject MAVNI soldiers, but not other foreign-born soldiers, to additional screening and vetting does not constitute national origin discrimination.  Rather, DoD is differentiating between groups of soldiers on the basis of modes of military accession (*i.e.*, through the MAVNI pilot program or through some other accessions vehicle).  Thus, the challenged requirements should be reviewed for a rational basis only, and the requirements plainly withstand that exceedingly deferential level of review.  The requirements would likewise withstand heightened scrutiny (which should not apply in this context given the deference the Court owes to DoD's military judgment), as the evidence will show that DoD has a compelling interest in addressing identified national security threats presented by the MAVNI pilot program and that the tools DoD selected are precisely tailored to mitigate those threats.  For those reasons, and the reasons discussed more fully below, the Court should enter final judgment in Defendant's favor.

## BACKGROUND

### I.   The MAVNI Pilot Program

In 2008, DoD created the MAVNI pilot program pursuant to 8 U.S.C. § 1440(a) and 10 U.S.C. § 504(b)(2).  The program allows non-immigrant aliens who are licensed health care professionals or who possess critical foreign language skills to enlist in the military in exchange for the opportunity to become naturalized citizens on an expedited basis.  Almost since its inception, the program has presented security concerns that have required DoD to conduct additional security reviews to assure the safety and security of military personnel, equipment, and

DEF.'S TRIAL BRIEF - 2
*Tiwari, et al. v. Mattis*, No. 2:17-cv-00242 (TSZ)

**U.S. DEPARTMENT OF JUSTICE**
**1100 L Street, NW**
**Washington, DC 20005**
**Tel: (202) 514-3259**

operations.  Since 2008, DoD has incrementally increased security measures for the MAVNI pilot program to ensure adequate protection for the nation's secrets and our national security so long as the program continues.

At trial, Defendant will proffer the testimony of several DoD and Army fact witnesses. These witnesses, together with documentary evidence, will explain the MAVNI pilot program, the security concerns presented by the program (in unclassified terms), the process for accession through the program, and the procedures through which the United States protects national security when adjudicating the eligibility of current U.S. citizen MAVNI soldiers to hold a security clearance.  The following discussion summarizes evidence DoD expects to introduce through testimony and documentation.

1. *Criteria for Determining Security-Clearance Eligibility*

The decision concerning whether any soldier (MAVNI or otherwise) is eligible to hold a security clearance is guided by 13 adjudicative criteria, which are used throughout the Government in making determinations about eligibility for access to classified information. Among these criteria are factors such as personal conduct, alcohol consumption, criminal conduct, and foreign influence.  These factors operate as guidelines for the adjudicator making the National Security Determination ("NSD") to assess the risk or probability that an individual might divulge classified information, whether inadvertently, willingly, or under duress.  A determination that a person is ineligible does not mean that the person is not trustworthy or loyal to the United States; the decision is ultimately about the acceptable level of risk.  These risk-based determinations necessarily operate in the realm of uncertainty, and the more information the adjudicator has available to guide the decision the less uncertainty there is.  Too much uncertainty means too much risk; uncertainty alone can be a reason for an unfavorable NSD.

DEF.'S TRIAL BRIEF - 3
*Tiwari, et al. v. Mattis*, No. 2:17-cv-00242 (TSZ)

**U.S. DEPARTMENT OF JUSTICE**
**1100 L Street, NW**
**Washington, DC 20005**
**Tel: (202) 514-3259**

For a variety of reasons, individuals with a foreign nexus present greater security risks than those without such connections.  One reason for that is the difficulty of collecting relevant information concerning foreign contacts, which necessarily increases uncertainty.  It is more difficult for investigators to collect information about a subject regarding the individual's time spent abroad; it is more difficult to collect information about a subject whose relatives live abroad; it is more difficult to assess the financial status of those with foreign bank accounts or financial interests; it is more difficult to access criminal history from abroad.  While the difficulty of obtaining this information varies by country, it is always more difficult than obtaining the information from domestic sources.  A second reason that a person's foreign nexus presents greater security concerns is that some foreign connections can present leverage points for foreign adversaries.  A subject's relatives living abroad might be tools for coercion, bribery, or influence by a foreign government.  A subject's foreign financial interests can be points of influence.  A subject's foreign connections might seek to use their relationship with the subject to harm U.S. interests.  And a foreign person seeking to access into the military may in fact be a witting agent of a foreign power.  It is precisely because of the risk presented by such a foreign nexus that two of the thirteen adjudicative criteria pertain to foreign ties:  "foreign influence" and "foreign preference."

>   2.   *Security Concerns Presented by the MAVNI Program*

MAVNI recruits and soldiers are, by definition, foreign-born.  Before a security background investigation has been initiated, the uncertainty surrounding a MAVNI soldier's foreign connections creates an unacceptable risk to national security.  It is only with thorough investigation and vetting that an NSD adjudicator can obtain the necessary information to assess those connections and determine whether to accept the risk.

DEF.'S TRIAL BRIEF - 4
*Tiwari, et al. v. Mattis*, No. 2:17-cv-00242 (TSZ)

**U.S. DEPARTMENT OF JUSTICE**
**1100 L Street, NW**
**Washington, DC 20005**
**Tel: (202) 514-3259**

There are also risks inherent in the MAVNI pilot program itself.  First, MAVNI soldiers are potential targets for foreign adversaries because many MAVNI soldiers have foreign connections and have only recently become citizens.  While this risk necessarily varies from individual to individual, it exists to some degree for every MAVNI soldier.  A MAVNI soldier's connections abroad—in whatever country—are more susceptible to exploitation by any adversary than the MAVNI soldier's domestic connections.  This is so in part because the United States's ability to monitor and mitigate domestic risks exceeds its ability to do so abroad.  Second, the MAVNI pilot program itself is a potential target for foreign adversaries.  Information available to DoD, some details of which are classified, has revealed that foreign adversaries are trying to exploit the program's expedited path to citizenship—and through citizenship, to a security clearance—to extract our nation's secrets and harm U.S. national security interests.  *See* Press Release, Chinese National Arrested for Allegedly Acting Within the United States as an Illegal Agent of the People's Republic of China (Sept. 25, 2018), https://www.justice.gov/opa/pr/chinese-national-arrested-allegedly-acting-within-united-states-illegal-agent-people-s (discussing a recent criminal complaint filed by the United States against a MAVNI enlistee for "allegedly acting within the United States as an illegal agent of the People's Republic of China").

The full scope of these risks has been illuminated only during the course of the program's existence through intelligence gathering processes and retrospective CI reviews.  At several points, DoD determined that the program presented or continued to present unacceptable risks to national security and accordingly imposed additional security measures to both maintain the program and reduce that risk to acceptable levels.  Plaintiffs challenge certain aspects of the current policy for adjudicating security clearance eligibility for MAVNI soldiers who have become naturalized U.S. citizens.

DEF.'S TRIAL BRIEF - 5
*Tiwari, et al. v. Mattis*, No. 2:17-cv-00242 (TSZ)

**U.S. DEPARTMENT OF JUSTICE**
**1100 L Street, NW**
**Washington, DC 20005**
**Tel: (202) 514-3259**

### 3. *Suitability and Security-Clearance Eligibility Determinations for MAVNI Service Members*

Under current policy, a new MAVNI recruit is subjected to screening before the recruit can enlist in the armed services.  As Defendant's witnesses are expected to testify, and as the documentary evidence will reflect, on September 30, 2016, the Office of the Under Secretary of Defense for Personnel and Readiness ("USD(P&R)") issued a memorandum (the "30 September 2016 Memorandum") prescribing three initial screening requirements for MAVNI recruits.  *See* ECF No. 132-1 at 34.  These requirements were expanded and adjusted by subsequent memoranda issued on October 13, 2017 (the "13 October 2017 Memoranda").  *See* ECF No. 132-1 at 92.  First, MAVNI recruits are subject to a "Tier 5" background investigation equivalent to that of service members seeking a TOP SECRET security clearance.  Second, MAVNI recruits are subject to a NIAC, which consists of a check of seven national security and CI databases.  Third, MAVNI recruits must complete a CIFSR.  A CIFSR starts with a PACSA, which is a document-based review conducted against several classified and unclassified national security and law enforcement databases executed by a trained CI analyst.  The CIFSR also includes having the MAVNI recruit complete a 75-question CI-focused questionnaire and a CI-focused subject interview in which the investigator goes over the responses on the questionnaire in light of the PACSA results to obtain any clarifying facts.

As DoD explained at the summary judgment stage, these initial screening requirements inform both the initial Military Service Suitability Recommendation ("MSSR") and the Military Service Suitability Determination ("MSSD").  A favorable MSSD is required before any recruit— MAVNI or not—is permitted to enlist in the armed services.  Such determinations are made by the relevant Military Department—in this case, all Plaintiffs are in the Army—after review of the MSSR from the DoD Consolidated Adjudications Facility ("DoD CAF").  DoD CAF makes that

1 recommendation based on a review of the information compiled about a MAVNI soldier,

2 including the results of the background investigation, NIAC, and CIFSR.  The relevant Military

3 Department then makes a final determination about the recruit's suitability for service.  Only after

4 receiving a favorable MSSD may the recruit commence active duty.

5      For any service member to obtain a security clearance, that individual must first obtain a

6 favorable NSD.[1]  Unlike with an MSSD, the DoD CAF conducts the final adjudication for an

7 NSD.  For those MAVNI recruits who receive a favorable MSSR, the DoD CAF makes an initial

8 NSD simultaneously with the MSSR, using the same information.[2]  For all soldiers (MAVNI and

9 non-MAVNI alike), the DoD CAF's practice is to wait for the completed results of any pending

10 investigative or security or CI analytical assessments before making an NSD adjudication, so as

11 to have all available information about a subject before making that critical determination.  Thus,

12 the DoD CAF will use the results from a MAVNI soldier's Tier 5 investigation, NIAC, and

13 CIFSR/PACSA when adjudicating the soldier for eligibility to access classified information.

14      Plaintiffs enlisted in the Army before the initial screening requirements were put in place

15 by the 30 September 2016 and 13 October 2017 memoranda.  They were therefore not subject to

16 these screening requirements at the time of the DoD CAF's MSSR or the Army's MSSD.  For

17 this reason, the results of these actions—the required background investigation, the NIAC, and

18 the CIFSR—were not immediately available for review by NSD adjudicators at the DoD CAF for

19 those Plaintiffs who sought a security clearance.[3]  Under current DoD policy, however, DoD CAF

---

[1] A favorable NSD is also required to serve in a national security–sensitive position that does not require access to classified information.

[2] Because MAVNI recruits are not yet citizens at the time of the MSSR, they are not yet eligible for a security clearance even if they obtain a favorable initial NSD and favorable MSSR.

[3] The Army has not formally requested adjudication of eligibility to hold a clearance for all Plaintiffs.

DEF.'S TRIAL BRIEF - 7
*Tiwari, et al. v. Mattis*, No. 2:17-cv-00242 (TSZ)

**U.S. DEPARTMENT OF JUSTICE**
**1100 L Street, NW**
**Washington, DC 20005**
**Tel: (202) 514-3259**

requires a current Tier 5 investigation, a current NIAC, and a current PACSA before it will adjudicate an NSD for a MAVNI soldier who enlisted before September 30, 2016.  As explained above, a PACSA is a document-based review conducted by a trained CI analyst; it is equivalent to the CIFSR now required of new MAVNI recruits except without the completion of the CI-focused questionnaire and subject interview.  Thus, although Plaintiffs enlisted in the Army and accessed into active service without undergoing the initial screening requirements that now apply to MAVNI recruits, Plaintiffs are required to satisfy the challenged security and CI-focused requirements before they may be found eligible to hold a security clearance.

Under current policy, MAVNI soldiers must also be continuously monitored for the duration of their affiliation with DoD.  A variant of the Continuous Evaluation program (a requirement to which all soldiers, not just MAVNI soldiers, are potentially subject), continuous monitoring for MAVNI soldiers has two components: (1) enrollment in the Continuous Evaluation program, and (2) a renewed PACSA and a NIAC every two years.

Plaintiffs now challenge three components of these security procedures.  Specifically, they challenge the requirements that U.S. citizen MAVNI soldiers have an unexpired NIAC and a CIFSR or PACSA to obtain an NSD.  They also challenge the continuous monitoring requirement. Plaintiffs are not challenging any requirement imposed on non-citizen MAVNI recruits and have dropped their challenge to the requirement of a Tier 5 background investigation.

## II.  Procedural History

Plaintiffs filed their initial complaint on February 16, 2017.  In their operative complaint, Plaintiffs broadly seek a declaration that "Defendant's actions that discriminate against naturalized U.S. citizen MAVNI soldiers violate Plaintiffs' rights of equal protection rights [*sic*] as guaranteed by the Due Process clause of the Fifth Amendment," and an injunction "prohibiting

DEF.'S TRIAL BRIEF - 8
*Tiwari, et al. v. Mattis*, No. 2:17-cv-00242 (TSZ)

U.S. DEPARTMENT OF JUSTICE
1100 L Street, NW
Washington, DC 20005
Tel: (202) 514-3259

Defendant from engaging in [such] actions."  Third Am. Compl. for Decl. & Inj. Relief ¶¶ 289-90, ECF No. 63.  On November 17, 2017, Plaintiffs moved for a preliminary injunction enjoining enforcement of what Plaintiffs believed to be a policy or practice barring MAVNI soldiers from obtaining interim security clearances.  The Court thereafter entered two substantive rulings, first denying Defendant's motion to dismiss, *see Tiwari v. Mattis*, No. C17-242 TSZ, 2017 WL 6492682 (W.D. Wash. Dec. 19, 2017), and then granting Plaintiffs' preliminary injunction motion arising from Plaintiffs' claim about an alleged policy or practice of withholding interim security clearances from MAVNI soldiers, *see Tiwari v. Mattis*, No. C17-242 TSZ, 2018 WL 1737783 (W.D. Wash. Apr. 11, 2018); *but see infra* Part IV (arguing that the Court should dissolve the preliminary injunction).

Shortly after the preliminary injunction hearing, Plaintiffs filed a motion for partial summary judgment, which they later converted to a motion for summary judgment.  *See* Mot. for Partial Summ. J. & Perm. Inj., ECF No. 115; Reply Br. in Supp. of Mot. for Partial Summ. J. & Perm. Inj. & Opp'n to DoD's Cross-Mot. for Summ. J., ECF No. 137.  Defendant cross-moved for summary judgment.  *See* Def.'s Cross-Mot. for Summ. J. & Opp'n to Pls.' Mot. for Partial Summ. J. & Perm. Inj., ECF No. 131.  The Court denied both cross-motions in a September 4, 2018, Minute Order, stating that "genuine disputes of material fact preclude granting summary judgment in favor of either side."  Minute Order at 1, ECF No. 144.  During a September 12, 2018, telephonic status conference, the Court identified two core issues to resolve at trial: (1) whether the applicable standard of review for the challenged screening and vetting requirements is rational basis review or strict scrutiny; and (2) if strict scrutiny applies, whether the challenged requirements are narrowly tailored to advancing a compelling governmental interest.  *See* Tr. of 9/12/18 Telephone Conf. at 15, 19, attached hereto as Exhibit A.  Although

DEF.'S TRIAL BRIEF - 9
*Tiwari, et al. v. Mattis*, No. 2:17-cv-00242 (TSZ)

**U.S. DEPARTMENT OF JUSTICE**
**1100 L Street, NW**
**Washington, DC 20005**
**Tel: (202) 514-3259**

DoD intends to present evidence at trial supporting its legitimate and, indeed, compelling national security interest, it does not appear that Plaintiffs seriously question that interest; rather, the focus of the parties' dispute to date has been, and likely will continue to be, whether the challenged requirements are narrowly tailored to serve indisputably compelling national security interests.

## ARGUMENT

**I. Most Plaintiffs Lack Article III Standing to Challenge the NIAC and CIFSR/PACSA Initial Screening Requirements, and No Plaintiff Is Entitled to Request Nationwide Injunctive Relief.**

While Plaintiffs have abandoned most of the claims that they previously raised, *see generally* Pls.' Pretrial Statement, attached hereto as Exhibit B, they maintain their challenge to DoD's continuous monitoring requirement for U.S. citizen MAVNI soldiers. Plaintiffs also continue to challenge the requirements that U.S. citizen MAVNI soldiers must undergo a NIAC and a CIFSR or PACSA before they may be found eligible to hold a security clearance. Yet the vast majority of individual Plaintiffs lack Article III standing to challenge these requirements, either because they have already received a security clearance (such that their claims are moot) or because they have not yet requested one (such that their claims are unripe). Mootness and lack of ripeness are independent, jurisdictional reasons for the Court to decline to adjudicate a claim. *Compare Pitts v. Terrible Herbst, Inc.*, 653 F.3d 1081, 1086 (9th Cir. 2011) ("The doctrine of mootness, which is embedded in Article III's case or controversy requirement, requires that an actual, ongoing controversy exist at all stages of federal court proceedings."), *with Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1139 (9th Cir. 2000) ("Whether the question is viewed as one of standing or ripeness, the Constitution mandates that prior to our exercise of jurisdiction there exist a constitutional 'case or controversy,' that the issues presented are 'definite and concrete, not hypothetical or abstract.'" (citation omitted)).

DEF.'S TRIAL BRIEF - 10
*Tiwari, et al. v. Mattis*, No. 2:17-cv-00242 (TSZ)

**U.S. DEPARTMENT OF JUSTICE**
**1100 L Street, NW**
**Washington, DC 20005**
**Tel: (202) 514-3259**

The below chart, drawn from the parties' admitted facts in their proposed pretrial order, reflects the current status for each of the named Plaintiffs who remain in the case.

| | *Army requested clearance?* | *Received security clearance?* |
|---|---|---|
| Kirti Tiwari | Yes | Yes (TS/SCI) |
| Seung Yoon Yang | Yes | Yes (SECRET) |
| Amandeep Singh | Yes | Yes (SECRET) |
| Duncan Makau | Yes | Yes (SECRET) |
| Valdeta Mehanja | Yes | Yes (TS/SCI) |
| Raj Chettri | Yes | Request in adjudication |
| Thong Nguyen | No | N/A |
| Xi Cui | No | No[*] |
| Rajat Kaushik | Yes | Yes (TS/SCI) |
| Blerta Mehanja | Yes | Yes (SECRET) |
| Mengmeng Cai | Yes | Request in adjudication |
| Sandeep Singh | Yes | Yes (TS/SCI) |
| Keigni di Satchou | Yes | Yes (TS/SCI) |
| Kaushal Wadhwani | Yes | Request in adjudication |
| Angelita Acebes | No | N/A[**] |

[*] In 2017, Plaintiff Xi Cui received an unfavorable MSSD recommendation. Because of that unfavorable recommendation, the DoD CAF will adjudicate Cui's eligibility for a security clearance only if (1) the Army requests such an adjudication and (2) the Army either mitigates the derogatory information leading to the unfavorable MSSD recommendation or waives the MSSD standards.

[**] The Army has not formally requested that the DoD CAF adjudicate Acebes's eligibility to hold a security clearance.

DEF.'S TRIAL BRIEF - 11
*Tiwari, et al. v. Mattis*, No. 2:17-cv-00242 (TSZ)

**U.S. DEPARTMENT OF JUSTICE**
1100 L Street, NW
Washington, DC 20005
Tel: (202) 514-3259

| | | |
|---|---|---|
| *Kusuma Nio* | Yes | Yes (SECRET) |
| *Qi Xiong* | Yes | Request in adjudication |

This dispute about Plaintiffs' individual standing is not academic. All litigants must satisfy the threshold requirements of Article III and maintain them throughout the case. To establish Article III standing, a plaintiff "must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 (2006) (citation omitted). "[S]tanding is not dispensed in gross," and the plaintiff must establish standing "separately for each form of relief sought." *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017) (citations omitted); *see also Warth v. Seldin*, 422 U.S. 490, 499 (1975) ("The Art. III judicial power exists only to redress or otherwise to protect against injury to the complaining party, even though the court's judgment may benefit others collaterally."); *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 170 (1803) ("The province of the court is, solely, to decide on the rights of individuals, not to enquire how the executive, or executive officers, perform duties in which they have a discretion.").

The Supreme Court recently reaffirmed these principles in *Gill v. Whitford*, 138 S. Ct. 1916 (2018), concluding that a set of voters had not demonstrated standing to challenge alleged statewide partisan gerrymandering of Wisconsin legislative districts. The plaintiffs alleged that voters who shared their political views were disadvantaged by the way district lines were drawn statewide, and that they were therefore entitled to challenge the entire state map. *Gill*, 138 S. Ct. at 1924-25. But the Court concluded that a "plaintiff's remedy must be 'limited to the inadequacy that produced [his] injury in fact,'" and that a voter's "harm [from] the dilution of [his] vote[] . . . is district specific" because it "results from the boundaries of the particular district in which he resides." *Id.* at 1930 (quoting *Lewis v. Casey*, 518 U.S. 343, 357 (1996)). Accordingly, the Court

DEF.'S TRIAL BRIEF - 12
*Tiwari, et al. v. Mattis*, No. 2:17-cv-00242 (TSZ)

**U.S. DEPARTMENT OF JUSTICE**
**1100 L Street, NW**
**Washington, DC 20005**
**Tel: (202) 514-3259**

1    held that "the remedy that is proper and sufficient lies in the revision of the boundaries of the

2    individual's own district," not the broader remedy of "restructuring all of the State's legislative

3    districts." *Id.* at 1930-31. And the Court "caution[ed]" that, on remand, "'standing is not

4    dispensed in gross': A plaintiff's remedy must be tailored to redress the plaintiff's particular

5    injury." *Id.* at 1934 (quoting *Cuno*, 547 U.S. at 353).

6           Likewise, in *Summers v. Earth Island Institute*, 555 U.S. 488 (2009), the Supreme Court

7    held that the plaintiffs lacked standing to challenge Forest Service regulations after the parties had

8    resolved the controversy regarding the application of the regulations to the project that had caused

9    the plaintiffs' alleged injury.  Noting that the plaintiffs' "injury in fact with regard to that project

10   ha[d] been remedied," *Summers*, 555 U.S. at 494, the Court held that to allow the plaintiffs to

11   challenge the regulations "apart from any concrete application that threatens imminent harm to

12   [their] interests" would "fly in the face of Article III's injury-in-fact requirement." *Id.*; *see also*

13   *Lewis*, 518 U.S. at 357 ("The actual-injury requirement would hardly serve [its] purpose . . . if

14   once a plaintiff demonstrated harm from one particular inadequacy in government administration,

15   the court were authorized to remedy all inadequacies in that administration.").

16          These cases make clear that where no class has been certified, no justiciable controversy

17   exists once the injury to the actual plaintiffs has been remedied.  *See Monsanto Co. v. Geertson*

18   *Seed Farms*, 561 U.S. 139, 163 (2010) (the plaintiffs "d[id] not represent a class, so they could

19   not seek to enjoin [an agency] order on the ground that it might cause harm to other parties");

20   *Zepeda v. INS*, 753 F.2d 719, 727 (9th Cir. 1985) ("[An] injunction must be limited to apply only

21   to the individual plaintiffs unless the district judge certifies a class of plaintiffs.  A federal court

22   may issue an injunction if it has personal jurisdiction over the parties and subject matter

23   jurisdiction over the claim; it may not attempt to determine the rights of persons not before the

DEF.'S TRIAL BRIEF - 13
*Tiwari, et al. v. Mattis*, No. 2:17-cv-00242 (TSZ)

**U.S. DEPARTMENT OF JUSTICE**
**1100 L Street, NW**
**Washington, DC 20005**
**Tel: (202) 514-3259**

court." (citation omitted)); *cf. City & Cty. of San Francisco v. Trump*, 897 F.3d 1225, 1244 (9th Cir. 2018) (discussing limited circumstances in which nationwide injunctions may be appropriate to give prevailing parties the relief to which they are entitled); *Morris v. USACE*, 60 F. Supp. 3d 1120, 1125 (D. Idaho 2014) (crafting narrow injunction to address injury to named plaintiffs).

As discussed below, and as the Government will establish at trial, there is no basis for the Court to accord *any* relief to *any* Plaintiff, as the challenged screening and vetting requirements should survive whatever level of judicial scrutiny the Court determines should apply.  But even if the Court were to side with Plaintiffs on the merits of one or more of their claims, any remedy should be carefully crafted so that it addresses only the particular harm to particular named Plaintiffs who have Article III standing to bring such a claim.

## II. The Challenged Screening and Vetting Requirements Do Not Discriminate on the Basis of National Origin or Any Other Suspect Class, and Are Rationally Related to a Legitimate Governmental Interest.

The initial screening requirements and continuous monitoring policy that remain at issue in this case are generally described in the 30 September 2016 Memorandum and 13 October 2017 Memoranda, which will be offered into evidence at trial.   These memoranda reference security-related reviews of the MAVNI pilot program that led to enhancements in MAVNI screening and vetting protocols, including the NIAC and CIFSR/PACSA requirements.   The memoranda do not attribute these security concerns to the soldiers' national origin or any other suspect classification.   Moreover, the challenged screening and vetting requirements do not apply to all naturalized or non-U.S.-born soldiers but instead only to those soldiers who enter the military through the MAVNI pilot program.   On their face, then, the challenged requirements

distinguish between groups of soldiers based on their modes of military accession (MAVNI or otherwise) rather than their national origin.

To be sure, a policy that is facially neutral as to any particular class but that works a disparate impact on such a class can still be found to violate the equal protection component of the Fifth Amendment.  But as this Court has recognized, the "mere fact that a facially neutral policy has a 'foreseeably disproportionate impact' on a protected group, without more, does not rise to the level of an equal protection violation."  *McDaniels v. Stewart*, No. 3:15-CV-05943-BHS-DWC, 2016 WL 499316, at *7 (W.D. Wash. Feb. 8, 2016) (quoting *Lee v. City of Los Angeles*, 250 F.3d 668, 687 (9th Cir. 2001)); *see also Hunt v. Cromartie*, 526 U.S. 541, 546 (1999) ("A facially neutral law . . . warrants strict scrutiny only if it can be proved that the law was motivated by a racial purpose or object, or if it is unexplainable on grounds other than race." (citations and internal quotation marks omitted)); *Snoqualmie Indian Tribe v. City of Snoqualmie*, 186 F. Supp. 3d 1155, 1164 (W.D. Wash. 2016) ("[D]isparate impact alone cannot show intentional discrimination absent a 'stark' and 'clear' pattern, 'unexplainable on grounds other than [suspect class].'" (citation omitted)).  That must be so, as the Supreme Court has long recognized that "*purposeful discrimination* is the condition that offends the Constitution," *Washington v. Seattle Sch. Dist. No. 1*, 458 U.S. 457, 484 (1982) (emphasis added) (citations and internal quotation marks omitted).

Further, it is essential for courts to limit strict scrutiny to those circumstances in which the Government truly has drawn a classification on the basis of a protected trait, since strict scrutiny imposes a high bar and often—though not always—results in the invalidation of a government program.  Separation-of-powers concerns would arise if a court were to apply this rigorous form of judicial review to classifications other than those that the Supreme Court has deemed inherently

DEF.'S TRIAL BRIEF - 15
*Tiwari, et al. v. Mattis*, No. 2:17-cv-00242 (TSZ)

**U.S. DEPARTMENT OF JUSTICE**
**1100 L Street, NW**
**Washington, DC 20005**
**Tel: (202) 514-3259**

suspect. *See Thomasson v. Perry*, 80 F.3d 915, 928 (4th Cir. 1996) ("[B]ecause heightened scrutiny requires an exacting investigation of legislative choices, the Supreme Court has made clear that 'respect for the separation of powers' should make courts reluctant to establish new suspect classes.  This reluctance has even more force when the intense judicial scrutiny would be applied to the 'specialized society' of the military." (citations omitted)); *see also Trump v. Hawaii*, 138 S. Ct. 2392 (2018) (courts "cannot substitute [their] own assessment for the Executive's predictive judgments on [national security] matters, all of which 'are delicate, complex, and involve large elements of prophecy,' and the "Executive's evaluation of the underlying facts is entitled to appropriate weight, particularly in the context of litigation involving 'sensitive and weighty interests of national security and foreign affairs'" (citations omitted)).

In this case, while Plaintiffs have frequently disparaged the MAVNI screening and vetting requirements as "discriminatory," Plaintiffs have never come forward with any evidence that DoD adopted these requirements *because* MAVNI soldiers were born overseas, and it does not appear from their trial plan that Plaintiffs are likely to finally carry their burden to adduce any such evidence at trial.  The vast majority of Plaintiffs' identified witnesses are individual Plaintiff soldiers who could not possibly offer credible testimony on the rationales underlying DoD's policy determinations.  Nor are Plaintiffs' purported expert witnesses qualified to comment on these rationales, as neither Dr. Naomi Verdugo (a retired demographer who once worked for the Army) nor Plaintiffs' counsel's wife and law partner, Margaret Stock, played any role whatsoever in the 2016 security review or the decisionmaking surrounding the policies announced in the 30 September 2016 Memorandum and 13 October 2017 Memoranda.

Instead, the trial record will establish that DoD adopted the challenged screening and vetting requirements because of demonstrable threats to national security associated with the

DEF.'S TRIAL BRIEF - 16
*Tiwari, et al. v. Mattis*, No. 2:17-cv-00242 (TSZ)

**U.S. DEPARTMENT OF JUSTICE**
**1100 L Street, NW**
**Washington, DC 20005**
**Tel: (202) 514-3259**

MAVNI pilot program.[4]  As explained, the program has been vulnerable to targeting by foreign adversaries because of, *inter alia*, MAVNI soldiers' significant foreign contacts and extensive periods of residency overseas.  Restricting access to military facilities and national security information by a group with extensive foreign contacts or foreign preference does not amount to national origin discrimination.  *See Molerio v. FBI*, 749 F.2d 815, 823 (D.C. Cir. 1984) (Scalia, J.) (in Title VII context, the "mere fact that [national security clearance] requirements impose special disabilities on the basis of connection with particular foreign countries is not alone evidence of discrimination").  Indeed, as the trial evidence will show, both the Standard Form 86 ("SF 86") (the form that all security clearance applicants must complete to initiate a background investigation) and the 13 national security adjudicative guidelines are drafted in contemplation of the fact that foreign influence and foreign preference may render *any* applicant (MAVNI or otherwise) ineligible for a security clearance.  The trial evidence also will show that the particular group of enhanced screening and vetting requirements that apply to the MAVNI pilot program do not apply to other populations of non-U.S.-born soldiers, reinforcing Defendant's contention that the requirements were implemented because of security concerns linked to the MAVNI pilot program itself and the MAVNI population rather than foreign-born soldiers *per se*.

Because Plaintiffs cannot demonstrate that the NIAC, CIFSR/PACSA, and continuous monitoring requirements were implemented because of national origin considerations, the Court should review these requirements under the rational basis framework.  The requirements plainly withstand that deferential review.  While the "government . . . has no obligation to provide evidence to sustain the rationality of a classification," as the "burden is on the plaintiff 'to negative

---

[4] Certain information about these security threats is contained in classified reports that should be protected pursuant to the Military and State Secrets Privilege, as Defendant has elsewhere argued.  *See* Def.'s Mot. *in Limine* for a Prot. Order.

every conceivable basis which might support' the classification," *Hood Canal Sand & Gravel, LLC v. Brady*, 129 F. Supp. 3d 1118, 1126 (W.D. Wash. 2015) (citation omitted), Defendant is prepared to offer testimony by DoD and Army personnel who will explain the genesis of the challenged requirements, MAVNI-related security concerns (in unclassified terms), and the reasons why DoD determined that NIACs, CIFSRs/PACSAs, and continuous monitoring mitigate those concerns.  Defendant's explanations, which would carry Defendant's burden even if heightened scrutiny were to apply, are more than adequate to show that these screening and vetting requirements are rationally related to a legitimate national security interest.  *See United States v. Navarro*, 800 F.3d 1104, 1114 (9th Cir. 2015) ("[R]ational-basis review allows for decisions based on rational speculation unsupported by evidence or empirical data. . . . [A]ll that is needed is some rational connection between the rule and the governmental interest . . . ." (citations and internal quotation marks omitted)).

### III. The Court Should Defer to DoD's Military Judgment in Implementing the Challenged Requirements.

Because this case concerns DoD policies crafted in response to identifiable security threats within the military ranks, heightened judicial scrutiny of those policies is improper.  Instead, the Court should defer to DoD's exercise of its military judgment in the arena of personnel security.  "The complex[,] subtle, and professional decisions as to the composition, training, equipping, and control of a military force are essentially professional military judgments, subject always to civilian control of the Legislative and Executive branches.  The ultimate responsibility for these decisions is appropriately vested in branches . . . which are periodically subject to electoral accountability." *Gilligan v. Morgan*, 413 U.S. 1, 10 (1973); *see also Wenger v. Monroe*, 282 F.3d 1068, 1076 (9th Cir. 2002) (citing *Dilley v. Alexander*, 603 F.2d 914, 919 (D.C. Cir. 1979), *as*

DEF.'S TRIAL BRIEF - 18
*Tiwari, et al. v. Mattis*, No. 2:17-cv-00242 (TSZ)

**U.S. DEPARTMENT OF JUSTICE**
**1100 L Street, NW**
**Washington, DC 20005**
**Tel: (202) 514-3259**

1  *amended*, 627 F.2d 407 (D.C. Cir. 1980), for the proposition that "deference to military discretion

2  is at its height when personnel decisions . . . are challenged").

3      Deference applies even in cases involving claims of discrimination on the basis of suspect

4  classifications.  *See Rostker v. Goldberg*, 453 U.S. 57 (1981) (deferring to Congress's judgment

5  in upholding Military Selective Service Act that requires men, but not women, to register, in the

6  face of an equal protection challenge); *see also id.* at 64-65 ("The case arises in the context of

7  Congress' authority over national defense and military affairs, and perhaps in no other area has

8  the Court accorded Congress greater deference.").  Such deference applies to the military's *means*

9  as well as its *ends*.  *See id.* at 68 ("Congressional judgments concerning registration and the draft

10 are based on judgments concerning military operations and needs, and the deference

11 unquestionably due the latter judgments is necessarily required in assessing the former as well."

12 (citation omitted)).  Thus, while there is no question that the armed forces are subject to

13 constitutional constraints, the Supreme Court has stressed that "the tests and limitations to be

14 applied may differ because of the military context."  *Id.* at 67.  Judicial "review of military

15 regulations challenged on First Amendment grounds," for instance, "is far more deferential than

16 constitutional review of similar laws or regulations designed for civilian society," *Goldman v.*

17 *Weinberger*, 475 U.S. 503, 507 (1986), and the same can be said for "rights of servicemembers"

18 more generally, including those under the Due Process Clause, *Weiss v. United States*, 510 U.S.

19 163, 177 (1994); *see Solorio v. United States*, 483 U.S. 435, 448 (1987) (listing "variety of

20 contexts" where deference applied).  The Supreme Court reaffirmed this point just last Term,

21 when it declined to import "the *de novo* 'reasonable observer' inquiry" under the Establishment

22 Clause into "the national security . . . context," which includes "military actions."  *Hawaii*, 138

DEF.'S TRIAL BRIEF - 19
*Tiwari, et al. v. Mattis*, No. 2:17-cv-00242 (TSZ)

**U.S. DEPARTMENT OF JUSTICE**
**1100 L Street, NW**
**Washington, DC 20005**
**Tel: (202) 514-3259**

S. Ct. at 2420 n.5 (2018).  The Court instead applied "rational basis review" and stressed that judicial "inquiry into matters of . . . national security is highly constrained."  *Id.* at 2420.

This deference to military judgment is a natural outgrowth of the separation of powers and the relationship between coequal branches of government.  Unlike the military, with its peculiar national security expertise and its thorough understanding of its own security needs, courts are poorly positioned to decide matters such as which soldiers or groups of soldiers may pose an elevated risk or otherwise require closer scrutiny.  *See Orloff v. Willoughby*, 345 U.S. 83, 94 (1953) ("The military constitutes a specialized community governed by a separate discipline from that of the civilian.  Orderly government requires that the judiciary be as scrupulous not to interfere with legitimate Army matters as the Army must be scrupulous not to intervene in judicial matters.").  Courts should therefore be exceedingly cautious about second-guessing such inherently military judgments.  *Goldman*, 475 U.S. at 508 ("Not only are courts ill-equipped to determine the impact upon discipline that any particular intrusion upon military authority might have, but the military authorities have been charged by the Executive and Legislative Branches with carrying out our Nation's military policy." (citation omitted)); *see also Hawaii*, 138 S. Ct. at 2419-20 ("Any rule of constitutional law that would inhibit the flexibility of the President to respond to changing world conditions should be adopted only with the greatest caution, and our inquiry into matters of entry and national security is highly constrained." (citation and internal quotation marks omitted)).  If courts are generally ill-suited to second-guess the military's national security judgments, courts are particularly ill-suited to second-guess those judgments where—as here—they pertain to the "internal functioning of the military," which is within the Government's "unique expertise."  *Sierra Forest Legacy v. Sherman*, 646 F.3d 1161, 1185 (9th Cir. 2011).

This need for deference is all the greater given that Plaintiffs are urging the Court to intervene in matters involving the granting of access to classified national security information. In the landmark case of *Department of Navy v. Egan*, 484 U.S. 518 (1988), the Supreme Court held that "the protection of classified information must be committed to the broad discretion of the agency responsible, and this must include broad discretion to determine who may have access to it."  484 U.S. at 529; *see also Brazil v. U.S. Dep't of Navy*, 66 F.3d 193, 196 (9th Cir. 1995) ("At the core of *Egan*'s deference to the national security mission is the recognition that security clearance determinations are 'sensitive and inherently discretionary' exercises, entrusted by law to the Executive." (citation omitted)).  Plaintiffs' claims put at issue delays in the process by which DoD decides whether U.S. citizen MAVNI soldiers are eligible for a security clearance.  Such claims draw perilously close to a complaint about whether or when a security clearance should have been granted, which obviously would be foreclosed by *Egan*, as even Plaintiffs have acknowledged.  *See, e.g.*, Pls.' Opp'n to Def.'s Mot. to Dismiss Third Am. Compl. at 23, ECF No. 73.

Even after Defendant highlighted this problem at the summary judgment stage—citing to Plaintiffs' discovery responses to show that their purported policy-based claims are tantamount to a complaint over perceived delays in their own background investigations and security clearance adjudications—Plaintiffs' claims continue to put at issue delays in obtaining a security clearance.  Individual plaintiff-witnesses are expected to testify about "how the lack of, and delay in receiving, [a] security clearance[] harmed and continues to harm [their] military career," Pls.' Witness List at 1-6, attached hereto as Exhibit C.  But the principles underlying *Egan* make clear that a person should not be able to secure judicial review because his background investigation is extensive and taking a long time to complete.  Deference to DoD's discretion and judgment as to

DEF.'S TRIAL BRIEF - 21
*Tiwari, et al. v. Mattis*, No. 2:17-cv-00242 (TSZ)

**U.S. DEPARTMENT OF JUSTICE**
**1100 L Street, NW**
**Washington, DC 20005**
**Tel: (202) 514-3259**

*who* can get a security clearance necessarily extends to the processes DoD believes are needed to decide *whether* or not a person is a security risk and thus whether a clearance should be granted. And if the measures DoD determines are needed to decide whether a person is qualified for a clearance are foreclosed, then the natural outcome is that DoD will have less adequate means to obtain information and make a decision as to whether a particular MAVNI soldier is eligible for access to classified information, contrary to the clear discretion on granting clearances recognized in *Egan*.

To be sure, DoD would not be required to grant a security clearance to anyone even if the investigative procedures Plaintiffs challenge are no longer available to DoD.  (Indeed, one potential outcome if the challenged requirements are enjoined is that MAVNI soldiers may not get a security clearance *at all* if DoD cannot adequately screen MAVNI soldiers to determine security-clearance eligibility.)  But the question of *who* can get access, a determination to which deference is indisputably owed under *Egan*, is plainly intertwined with *how* to decide access.  For this reason, the Court should defer to DoD's judgment as to how to adequately gather information needed to make security clearance determinations.

### IV. Even if the Court Were to Apply Heightened Scrutiny, the Challenged Screening and Vetting Requirements Pass Constitutional Muster, as They Are Narrowly Tailored to Advancing a Compelling Governmental Interest.

Even if the Court were to determine that heightened scrutiny should apply, the challenged policies are constitutionally sound.  They are narrowly tailored to furthering the Government's indisputably compelling interest in national security and, more precisely, to preventing bad actors from obtaining security clearances and access to military facilities and national security information.  Indeed, DoD chose not to adopt more restrictive policies, such as declining to

DEF.'S TRIAL BRIEF - 22
*Tiwari, et al. v. Mattis*, No. 2:17-cv-00242 (TSZ)

U.S. DEPARTMENT OF JUSTICE
1100 L Street, NW
Washington, DC 20005
Tel: (202) 514-3259

1  authorize the MAVNI pilot program in the first instance[5] or refusing to grant security clearances

2  to MAVNI soldiers.  Instead, DoD has permitted thousands of MAVNI soldiers to enlist, and

3  these soldiers (once they naturalize) may qualify for a security clearance pursuant to the same 13

4  adjudicative guidelines that inform the decision whether to grant a clearance to any applicant.

5  The only requirements unique to the MAVNI pilot program—and the sole basis for Plaintiffs'

6  equal protection challenge—are the information-gathering and monitoring tools that DoD has

7  implemented to ensure that this high-risk population, with its extensive foreign contacts and

8  vulnerability to targeting by foreign powers, does not pose an undue threat to the security of the

9  nation.  Those modest requirements are narrowly tailored and eminently reasonable; Plaintiffs

10  have offered no persuasive reason for the Court to conclude otherwise.

11           1.   *DoD Has a Compelling National Security Interest in Responding to the Threats It Has Identified in the MAVNI Pilot Program.*

12          DoD implemented the challenged screening and vetting requirements against the backdrop

13  of evidence showing that the MAVNI pilot program presents an elevated national security risk.

14  DoD's trial witnesses are expected to testify in unclassified terms that program reviews in recent

15  years revealed that some MAVNI enlistees may have engaged in pre-enlistment criminal activity

16  or other misconduct or have foreign contacts or associations that raise significant national security

17  concerns.  Examples of such conduct include failing to report contacts with foreign intelligence

18  officials; failing to report a father who had worked for a foreign intelligence service; receiving

19  fraudulent student visas; attending and falsifying transcripts from universities owned by a foreign

20  national security agency and a state-sponsored intelligence organization; professing support for

21  the 9/11 terrorists and stating a desire to voluntarily support China in a crisis situation; failing to

---

[5] The Military Departments are not currently enlisting new MAVNI recruits.

list foreign contacts from Eastern Europe and Russia (even where a recruit's father and brother-in-law were employed by the military department of a foreign factory and a foreign political party); working for a company with ties to foreign intelligence collection activities; possessing over $2 million in unexplained cash; failing to list attendance at a foreign university that has known ties with a foreign intelligence service; seeking to elevate access levels to classified information for which there was no official requirement; working for a foreign company owned by the MAVNI soldier's father, which has known ties to a foreign intelligence service; and failing to cooperate during a CIFSR by refusing to provide foreign contacts or foreign travel dates and locations or explain the source of over $750,000 in cash.  DoD thus has documented examples of MAVNI soldiers who present national security concerns due to their significant foreign connections, past acts of fraud, or other concerning behavior.[6]

DoD's periodic reviews of the MAVNI pilot program have revealed additional information to support its determination that the program presents an elevated risk.  DoD's witnesses are expected to testify that, since 2013, more than 76 MAVNI enlistees have become the subjects of DoD and/or FBI CI and/or criminal investigations.  And as of November 2018, there were 28 open CI investigations involving MAVNI soldiers.  Notwithstanding that MAVNI soldiers occupy just 0.6 percent of the national security positions within DoD (11,000 MAVNI soldiers out of a total population of 2.7 million national security positions), they are the subjects of approximately 19.5 percent of open DoD CI investigations.  These figures demonstrate that MAVNI soldiers present CI risks at a significantly greater rate than do other service members.

---

[6] Classified information that played an important role in the decisionmaking processes underlying the policies outlined in the 30 September 2016 and 13 October 2017 memoranda cannot be disclosed in a public proceeding.  *See* Def.'s Mot. *in Limine* for a Prot. Order, ECF No. 157.

DEF.'S TRIAL BRIEF - 24
*Tiwari, et al. v. Mattis*, No. 2:17-cv-00242 (TSZ)

**U.S. DEPARTMENT OF JUSTICE**
**1100 L Street, NW**
**Washington, DC 20005**
**Tel: (202) 514-3259**

DoD's program reviews have also revealed certain vulnerabilities inherent in the MAVNI pilot program.  To begin, traditional background investigation tools (*e.g.*, a Tier 3 investigation) proved insufficient to collect information needed to make MSSDs and NSDs for MAVNI soldiers.  In most cases, background investigations for MAVNI soldiers were lacking information about the subject's residency, employment, and character references—deficiencies attributable both to the limited amount of time many MAVNI soldiers have spent in the United States and to DoD's inability to verify information volunteered by the subject due to a lack of information-sharing agreements with other countries.  More troubling, the program reviews have shown that some MAVNI soldiers were given favorable MSSDs and access to classified information without first undergoing sufficient background investigations.  In addition, MAVNI soldiers present attractive targets for exploitation by foreign powers due to their ability to become naturalized U.S. citizens on an expedited basis and serve in the U.S. military, where they are likely to have access to sensitive—and potentially classified—information.

Collectively, these program reviews provided concrete information about MAVNI soldiers who presented significant national security risks and demonstrated that MAVNI soldiers share common characteristics that make them more vulnerable to foreign influence while at the same time less susceptible to vetting by traditional means.  The military's urgent need to address the threats presented by the MAVNI pilot program satisfies the compelling interest prong of strict scrutiny.  *See Haig v. Agee*, 453 U.S. 280, 307 (1981) ("It is obvious and unarguable that no governmental interest is more compelling than the security of the Nation." (citations and internal quotation marks omitted)); *cf. Nio v. DHS*, 270 F. Supp. 3d 49, 64 (D.D.C. 2017) (denying request to preliminarily enjoin the requirement that MAVNI soldiers undergo DoD's heightened vetting protocols prior to naturalizing under 8 U.S.C. § 1440, based in part on recognition "that enlistment

DEF.'S TRIAL BRIEF - 25
*Tiwari, et al. v. Mattis*, No. 2:17-cv-00242 (TSZ)

**U.S. DEPARTMENT OF JUSTICE**
**1100 L Street, NW**
**Washington, DC 20005**
**Tel: (202) 514-3259**

of foreign nationals in the military implicates national security concerns"). The Government's interest is especially strong here because the challenged policies concern in part whether a soldier may obtain access to classified information. *See Snepp v. United States*, 444 U.S. 507, 509 n.3 (1980) ("The Government has a compelling interest in protecting both the secrecy of information important to our national security and the appearance of confidentiality so essential to the effective operation of our foreign intelligence service.").

2. *The Challenged Screening and Vetting Requirements Are Narrowly Tailored to Mitigating the Security Concerns Associated with the MAVNI Pilot Program.*

To address the above-described security concerns, DoD selected additional information-gathering tools to compensate for shortcomings when MAVNI soldiers were evaluated using traditional screening tools. All MAVNI soldiers must undergo a Tier 5 background investigation, because the scope of that investigation provides additional information about foreign contacts and the potential for the subject to be susceptible to foreign influence, two issues central to the security concerns associated with the MAVNI pilot program. While Plaintiffs challenged the Tier 5 investigative requirement at the summary judgment stage, they are no longer pursuing that claim. *See generally* Pls.' Pretrial Statement.

Other initial screening tools for MAVNI soldiers, which Plaintiffs continue to challenge (though many lack Article III standing to do so, *see supra* Part I) likewise yield additional information necessary to address the specific threats presented by MAVNI soldiers. As DoD's witnesses are expected to testify, a NIAC, which consists of a check of a minimum of seven national intelligence and law enforcement databases, is considered to be the most efficient way to learn about intelligence or law enforcement threats for individuals who have spent considerable time outside the United States and to quickly identify red flags which may warrant follow up. Importantly for MAVNI soldiers, a NIAC includes a check of a soldier's foreign travel. The

results of the Tier 5 investigation and NIAC, as well as additional checks of other intelligence and open-source databases and military records, are then reviewed by a trained CI analyst as part of the CIFSR.  The CIFSR also includes an interview with the subject in which a CI agent uses a standard list of questions to obtain more information about a soldier's background from the soldier directly.[7]  This interview also gives the soldier the opportunity to explain any discrepancies and to address any derogatory information discovered during the background investigation.  The analyst then generates a comprehensive analytical assessment from the results of the various checks and interview, which in turn enables DoD CAF adjudicators to conduct a more thorough risk assessment about an individual soldier.

DoD's continuous monitoring policy, which Plaintiffs also challenge, and which consists of enrollment in DoD's Continuous Evaluation program (a requirement to which all soldiers, not just MAVNI soldiers, are potentially subject) and a biennial NIAC and PACSA, was established to address a related concern:  the fact that MAVNI soldiers may become more attractive targets to foreign adversaries after they enlist in the military and gain access to sensitive information.  Continuous monitoring also helps determine whether there is any new derogatory information about a soldier that may impact his or her ability to safeguard properly classified information.

Individually or collectively, these screening and vetting tools are properly and narrowly tailored to the specific national security threats presented by the MAVNI pilot program.  The tools are minimally intrusive; of the challenged procedures, only the CIFSR (an interview with a CI

---

[7] The interview is not required for MAVNI soldiers who enlisted prior to September 30, 2016.  Instead, these soldiers undergo a PACSA, which involves a review of the information obtained from the various database checks and Tier 5 investigation but not a subject interview. All Plaintiffs enlisted prior to that date, but some Plaintiffs were subjected to a CIFSR, either pursuant to now-rescinded policies or because information obtained during the adjudication process warranted additional measures.

DEF.'S TRIAL BRIEF - 27
*Tiwari, et al. v. Mattis*, No. 2:17-cv-00242 (TSZ)

**U.S. DEPARTMENT OF JUSTICE**
**1100 L Street, NW**
**Washington, DC 20005**
**Tel: (202) 514-3259**

agent) requires the subject to volunteer information by default.  Moreover, no Plaintiff, and no MAVNI soldier who enlisted prior to September 30, 2016, will be automatically subjected to a CIFSR simply by virtue of their participation in the MAVNI pilot program.  Defendant declined to impose more onerous requirements, such as mandating that all MAVNI soldiers complete a polygraph examination (which is currently ordered only on a case-by-case basis), subjecting all soldiers to a CIFSR (rather than requiring only a PACSA for those soldiers who enlisted prior to September 30, 2016), conducting intelligence checks of family members or close associates, reviewing financial statements and tax records, or even canceling the MAVNI pilot program altogether.  The fact that DoD selected a small number of information-gathering and screening tools it deemed necessary from the larger array of tools that are available to it reinforces the conclusion that the challenged policies are narrowly tailored to advancing DoD's compelling national security interest.  Narrow tailoring requires the Government to consider whether there may be "less intrusive means of accomplishing similar purposes," *Higgins v. City of Vallejo*, 823 F.2d 351, 359 (9th Cir. 1987) (citation omitted).  The Government's implementation of a subset of all available screening and security mechanisms is evidence that the Government has deployed the least burdensome means to accomplish its compelling ends.

In addition, DoD's narrowly tailored screening requirements may be properly applied to *all* MAVNI soldiers.  Even if a MAVNI soldier has been in the United States for many years and lacks the extensive foreign contacts typical of more recent immigrants, the soldier's participation in the MAVNI pilot program *in and of itself* could make the soldier vulnerable to exploitation.  This critical point addresses a concern the Court raised during the September 12, 2018, telephonic conference:

> [L]et's assume, hypothetically, that a person was born outside of the United States . . . but born a United States citizen . . . but has never lived in the United States.

DEF.'S TRIAL BRIEF - 28
*Tiwari, et al. v. Mattis*, No. 2:17-cv-00242 (TSZ)

**U.S. DEPARTMENT OF JUSTICE**
**1100 L Street, NW**
**Washington, DC 20005**
**Tel: (202) 514-3259**

And that person, even if they were born and lived in the Middle East, in some country, all their lives, would come in, they're not a MAVNI because they don't have to be naturalized, they're a citizen, they would only go through [a Tier 3 investigation] in order to get their security clearance, even though they're from . . . the same country as a MAVNI soldier, who . . . maybe lived in the United States most of their life, and has been naturalized through this program, [but] has to go through additional scrutiny.

Tr. of 9/12/18 Telephone Conf. at 20.  It is true that the heightened requirements that Plaintiffs challenge—NIACs, CIFSRs/PACSAs, and continuous monitoring—would not apply by default to the natural-born U.S. citizen soldier in the Court's hypothetical.  However, DoD's analysis of the MAVNI pilot program revealed that foreign adversaries may target MAVNI soldiers specifically because they enlist through the MAVNI program:  in other words, the program *itself* has captured the attention and interest of U.S. adversaries.  Thus, the additional screening protocols must apply to all program participants—even those who may appear to present less of a security risk—because of the unique nature of the program and the target it presents.

Absent these additional information-gathering tools, DoD would in many cases be unable to verify critical information about a MAVNI soldier's background, including information about citizenship, education, residence, loyalty, and good character, for purposes of adjudicating a MAVNI soldier's request for a security clearance.  There is no reasonable, less burdensome way for DoD to obtain the information that it needs about the MAVNI population, and thereby to further its compelling national security interests, apart from the narrow suite of tools it has deployed (a suite that excludes some more intrusive mechanisms, such as mandatory polygraph examinations).  The fact that DoD could not adequately investigate MAVNI soldiers without NIACs, CIFSRs/PACSAs, and continuous monitoring is further evidence that these tools are narrowly tailored. *See Fisher v. Univ. of Tex.*, 136 S. Ct. 2198, 2208 (2016) (narrow tailoring does "not require exhaustion of every conceivable []neutral alternative" but does impose on

DEF.'S TRIAL BRIEF - 29
*Tiwari, et al. v. Mattis*, No. 2:17-cv-00242 (TSZ)

**U.S. DEPARTMENT OF JUSTICE**
**1100 L Street, NW**
**Washington, DC 20005**
**Tel: (202) 514-3259**

Government the burden of showing that any "available" and "workable" alternatives "do not suffice" (citations and internal quotation marks omitted)). An adjudicator who is unable to fill these and other informational gaps about a soldier is significantly more likely to recommend against the soldier having access to classified information (or even to be found suitable for military service). Plaintiffs' legal challenge that would deprive DoD of the ability to use these additional tools could thus have the perverse effect of depriving MAVNI soldiers from qualifying for a security clearance, which could in turn inhibit their ability to serve at all, an outcome that is desired by neither party.

In sum, DoD did not implement the challenged policies based on stereotypes or assumptions about persons of foreign origin. Rather, DoD conducted a thorough review of the MAVNI pilot program and determined that (1) MAVNI enlistees are more likely than other groups of soldiers to maintain extensive foreign contacts and/or harbor foreign allegiance or preference, which may disqualify them from holding security clearances; (2) in specific instances, bad actors have infiltrated the ranks through the MAVNI pilot program because they were not subject to adequate screening and vetting; and (3) even well-intentioned MAVNI soldiers may be vulnerable to exploitation by foreign adversaries who view the program as an attractive target. Even if strict scrutiny were properly applicable, *but see supra* Parts I-II, the challenged screening and vetting requirements pass muster because they are narrowly tailored to addressing demonstrated security issues with the program.

## V. The Court Should Dissolve the Preliminary Injunction Enjoining DoD from Withholding Interim Security Clearances from MAVNI Soldiers, as DoD Has No Such Policy, and DoD Has Taken Adequate Steps to Ensure that Its Personnel Do Not Mistakenly Enforce This Nonexistent Policy.

As the Court is aware, throughout this litigation Plaintiffs have challenged a variety of policies and practices associated with the MAVNI pilot program, some of which have since been

DEF.'S TRIAL BRIEF - 30

*Tiwari, et al. v. Mattis*, No. 2:17-cv-00242 (TSZ)

**U.S. DEPARTMENT OF JUSTICE**
**1100 L Street, NW**
**Washington, DC 20005**
**Tel: (202) 514-3259**

superseded and others of which never existed in the first place.  In their pretrial statement, however, Plaintiffs made clear that they intend to challenge only three policies at trial:  (1) the requirement that MAVNI soldiers must undergo a CIFSR/PACSA before they may qualify for a security clearance, (2) the further requirement that MAVNI soldiers must undergo a NIAC before they may qualify for a security clearance, and (3) the requirement that MAVNI soldiers are subject to continuous monitoring for the duration of their affiliation with DoD.  *See* Pls.' Pretrial Statement at 4.  Accordingly, DoD does not intend to address Plaintiffs' abandoned claims at trial, and it does not discuss those claims in this brief.

However, DoD respectfully maintains, as it argued at summary judgment, that the Court should dissolve the preliminary injunction that the Court entered earlier this year, *see generally Tiwari*, 2018 WL 1737783.  The preliminary injunction was premised on the Court's concern that DoD had not effectively revoked a superseded policy, which had barred MAVNI soldiers from holding clearances during their first terms of enlistment, as it applied to interim security clearance requests.  The Court preliminarily found that, notwithstanding curative guidance issued by both DoD and the Army, "Plaintiffs have presented evidence demonstrating that, as recently as March 8, 2018, MAVNI soldiers have still been unable to advance in their military careers because they cannot obtain interim security clearances under the same terms, conditions, or criteria as non-MAVNI soldiers." *Id.* at *6.

The evidence on which Plaintiffs relied at the preliminary injunction stage was in the nature of one-off incidents involving lower-ranking Army security managers and others who were misinformed about prevailing policy.  Yet, in the months following entry of the injunction, Plaintiffs' counsel has not brought to Defendant's attention any additional incidents in which U.S. citizen MAVNI soldiers were allegedly denied interim security clearances on the basis of their

DEF.'S TRIAL BRIEF - 31
*Tiwari, et al. v. Mattis*, No. 2:17-cv-00242 (TSZ)

U.S. DEPARTMENT OF JUSTICE
1100 L Street, NW
Washington, DC 20005
Tel: (202) 514-3259

status as MAVNI soldiers.  Nor are Defendant's counsel aware of any such incidents.  Moreover, subsequent to the Court's preliminary injunction Order, the Army took further, decisive action to ensure that personnel are adequately informed about the correct policy.  *See* Decl. of Elizabeth Ahlersmeyer, Ex. 4, 4/20/18 All Army Activities ("ALARACT") E-mail, ECF No. 132-5, at 200 ("[DOD] SHALL CONSIDER REQUESTS FOR INTERIM SECURITY CLEARANCE ELIGIBILITY FOR U.S. CITIZEN MAVNI SOLDIERS IN THE SAME MANNER AS IT WOULD FOR ANY OTHER SOLDIER WHO IS A U.S. CITIZEN.").

Even assuming that the preliminary injunction was appropriate in the first instance—a position with which DoD respectfully disagrees[8]—there is no reason for the injunction to remain in place.  In fact, Plaintiffs themselves assert in their pretrial statement that DoD withdrew the purported policy precluding MAVNI soldiers from holding interim clearances "in the face of Plaintiffs' second motion for preliminary injunction and the Court's oral preliminary injunction order of March 21, 2018 and written preliminary injunction order of April 11, 2018."  Pls.' Pretrial Statement at 2.  At this point, no Plaintiff contends that the long-superseded ban on first-term clearances for MAVNI soldiers (whether interim or final clearances) remains in place.

Thus, under Federal Rule of Civil Procedure 60(b)(5)-(6), the Court should dissolve the preliminary injunction, as it is no longer necessary, appropriate, or equitable for the Court to

---

[8] As Defendant previously argued, the Court should not subject an agency as massive and diffuse as DoD to an injunction on the basis of misstatements made by a small number of lower-level employees who had no authority to speak on behalf of the agency.  *See OPM v. Richmond*, 496 U.S. 414, 420 (1990) ("Of this it is enough to say that the United States is neither bound nor estopped by acts of its officers or agents in entering into an arrangement or agreement to do or cause to be done what the law does not sanction or permit." (citation omitted)).

DEF.'S TRIAL BRIEF - 32
*Tiwari, et al. v. Mattis*, No. 2:17-cv-00242 (TSZ)

**U.S. DEPARTMENT OF JUSTICE**
**1100 L Street, NW**
**Washington, DC 20005**
**Tel: (202) 514-3259**

1   enforce it.  DoD and the Army have taken reasonable steps to address any misunderstanding of

2   current policy by officials tasked with making security clearance determinations.

3                                  **CONCLUSION**

4         For the foregoing reasons, the Court should dissolve the preliminary injunction and enter

5   final judgment in Defendant's favor.

6

7   DATED:  November 9, 2018                    Respectfully submitted,

8                                              JOSEPH H. HUNT
                                               Assistant Attorney General
9
10                                             ANTHONY J. COPPOLINO
                                               Deputy Branch Director, Federal Programs Branch
11
                                               */s/ Joseph C. Dugan*
12                                             NATHAN M. SWINTON
                                               JOSEPH C. DUGAN
13                                             MICHAEL F. KNAPP
                                               Trial Attorneys
14                                             U.S. Department of Justice
                                               Civil Division, Federal Programs Branch
15                                             1100 L Street, NW, Ste. 11212
                                               Washington, DC 20005
16                                             Tel: (202) 514-3259
                                               Fax: (202) 616-8460
17                                             Email: Joseph.Dugan@usdoj.gov
18
19                                             *Attorneys for Defendant*

20

21

22

23

24

25

26

DEF.'S TRIAL BRIEF - 33
*Tiwari, et al. v. Mattis*, No. 2:17-cv-00242 (TSZ)

**U.S. DEPARTMENT OF JUSTICE**
**1100 L Street, NW**
**Washington, DC 20005**
**Tel: (202) 514-3259**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 9, 2018, a copy of the foregoing document was electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

DATED this 9th day of November, 2018

                                        */s/ Joseph C. Dugan*
                                        JOSEPH C. DUGAN

DEF.'S TRIAL BRIEF - 34

*Tiwari, et al. v. Mattis*, No. 2:17-cv-00242 (TSZ)

**U.S. DEPARTMENT OF JUSTICE**
**1100 L Street, NW**
**Washington, DC 20005**
**Tel: (202) 514-3259**