District Court Judge Thomas S. Zilly

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

| | |
|---|---|
| Kirti Tiwari, Seung Yoon Yang, Amandeep Singh, Duncan Makau, Valdeta Mehanja, Rui Zhang, Raj Chettri, Thong Nguyen, Xi Cui, Rajat Kaushik, Pingyang Liu, Blerta Mehanja, Mengmeng Cai, Sandeep Singh, Fleury Ngantchop Keigni Di Satchou, Kaushal Wadhwani, Angelita Acebes, Kusuma Nio, and Qi Xiong,<br><br>Plaintiff,<br><br>v.<br><br>James Mattis, Secretary, U.S. Department of Defense, in his official capacity,<br><br>Defendant. | No. 2:17-cv-00242-TSZ<br><br>**PLAINTIFFS' TRIAL BRIEF** |

This case presents the fundamental question of whether there is second class citizenship in this country. DoD asks the Court to sanction near-perpetual profiling of a class of thousands of naturalized U.S. citizens because it contends these individuals are "statistically" less loyal and trustworthy than other U.S. citizens.[1] There are multiple flaws with DoD's argument, including: **First**, DoD cannot demonstrate that the thousands of

---

[1] DoD Opp. MSJ and Cross Mtn. for MSJ, Dkt. 131 p. 30.

PLAINTIFFS' TRIAL BRIEF - 1
Case No. 2:17-cv-00242-TSZ

CASCADIA CROSS BORDER LAW GROUP LLC
4141 B Street, Suite 205
Anchorage, AK 99503-5940
Tel 907.242.5800

naturalized U.S. citizens who entered the military through the MAVNI program are generally less loyal and trustworthy than other U.S. citizens.  **Second**, even if DoD had such evidence, it is constitutionally impermissible to profile members of a protected suspect class without individual cause.  **Third**, utilizing extraordinary vetting procedures only when applicable to that person's individual circumstance is a less restrictive alternative.  **Fourth**, acceptance of DoD's argument would set a broad and pernicious legal precedent that could not be readily contained.[2]

### A.  DoD has Engaged in a Series of Discriminatory Policies and Practices Towards Naturalized U.S. Citizen MAVNI Soldiers

During the year and nine (9) month pendency of this lawsuit, DoD has engaged in an ever-evolving series of discriminatory DoD policies and practices directed against naturalized U.S. citizens who enlisted in the military through the MAVNI program. Not only were these policies and practices individually unconstitutional, they collectively indicate an animus towards these naturalized citizens.[3]

---

[2] At the March 21, 2019 hearing, the Court noted that <u>both parties</u> agreed that at least the "Continuous Monitoring" claim is a proper class claim and directed the parties to submit further briefing on how to define the "security screening" claim. (Dkt. 117, Tr. p. 77 – 79) The Court stated in its subsequent minute order that "[t]he Court is satisfied that the requirements for class certification have been met, but is not prepared to rule on a class definition." (Dkt. 114)

[3] Although relevant, Plaintiffs are not required to show that some person or group within DoD dislikes immigrants as a prerequisite for triggering strict scrutiny.  Mitchell v. Washington, 818 F.3d 436, 445 – 46 (9th Cir. 2016) ("When the government expressly classifies persons on the bases of race or national origin . . . its action is immediately suspect . . . A plaintiff in such a lawsuit need not make an extrinsic showing of discriminatory animus or a discriminatory effect to trigger strict scrutiny.") (internal quotations omitted).

PLAINTIFFS' TRIAL BRIEF - 2
Case No. 2:17-cv-00242-TSZ

CASCADIA CROSS BORDER LAW GROUP LLC
4141 B Street, Suite 205
Anchorage, AK 99503-5940
Tel 907.242.5800

DoD, through the September 30, 2016 "Peter Levine" memo (Trial Ex. 4), prohibited naturalized U.S. citizen MAVNI soldiers from receiving a security clearance during their first term of enlistment. The Army expanded this policy on January 6, 2017 to prohibit U.S. citizen MAVNI soldier from **applying** for any position or program that required a security clearance during their first term of enlistment. (Trial Ex. 26 p. 2) These policies were directly contrary to prior legal precedent. See e.g., Huynh v. Carlucci, 679 F. Supp. 61, 66 – 67 (D. D.C. 1988); Faruki v. Rogers, 349 F. Supp. 723, 719, 733 (D. D.C. 1972). DoD withdrew these policies in the face of Plaintiffs' first motion for preliminary injunction through the June 21, 2017 "Kurta" memo (Trial Ex. 11).[4]

DoD stated in the Kurta "equal treatment" memo that "[e]ffective immediately, individuals enlisted under the MAVNI Pilot Program who have successfully completed basic military training/boot camp . . . and have become naturalized U.S. citizens based on their military service, may be considered for a security clearance **on the same terms, conditions and criteria** as any other U.S. citizen." (Id., emphasis added.) Contrary to this representation, DoD in fact maintained a practice of prohibiting U.S. citizen MAVNI soldiers from obtaining interim clearances. DoD withdrew that discriminatory policy in the face of Plaintiffs' second motion for preliminary injunction and the Court's oral preliminary injunction order of March 21, 2018 and its written preliminary injunction order of April 11, 2018. (Dkt. 122)

---

[4] DoD had first attempted to preserve these unconstitutional policies by issuing "Exceptions to Policy" only to the original named Plaintiffs for no principled reason and then arguing the case was moot. (See Dkt. 23 p. 10 – 13)

PLAINTIFFS' TRIAL BRIEF - 3
Case No. 2:17-cv-00242-TSZ

CASCADIA CROSS BORDER LAW GROUP LLC
4141 B Street, Suite 205
Anchorage, AK 99503-5940
Tel 907.242.5800

The foregoing Kurta "equal treatment" retained one **express** discriminatory requirement for naturalized U.S. citizen MAVNI soldiers seeking a security clearance, namely that they first "have successfully completed basic military training/boot camp." (Trial Ex. 11)  For individuals intending to become commissioned officers – specifically Health Care Professional ("HCP") MAVNIs – DoD advised this requirement "includes all Basic Officer Leaders Courses." (Arendt Dec. 9/5/17, Dkt. 70 p. 35)  Plaintiffs challenged this additional discriminatory policy because it created a classic "Catch-22" – DoD's new policy prohibited MAVNI Health Care Professionals from applying for a security clearance until they first **completed** Basic Officer Leadership Course (BOLC) while DoD simultaneously prohibited officer candidates from **attending** BOLC until they first received a security clearance.  (See Third Amended Complaint Dkt. 63 ¶ 29)  In light of Plaintiffs' motion for summary judgment, DoD finally withdrew this irrational and discriminatory policy on April 27, 2018. (Smith Dec. 4/30/18, Dkt. 131-1 p. 96; see also Dkt. 137 p. 34 – 35).

Plaintiffs next determined that DoD had, at a minimum, failed to inform various military departments of its new ostensible "equal treatment" policy and/or failed to insure compliance with that policy.  For example, both the Army Medical Department (AMEDD) and the Army Reserve Careers Division (ARCD) continued to prohibit U.S. citizen MAVNI soldiers from participating in officer-producing programs during their first term of enlistment <u>regardless of whether they were now allowed to apply for and receive a security clearances</u>.  (Trial Exs. 40 p. 9; 41 p. 9; 44 p. 6- 8)  After further court filings regarding this ongoing discrimination, DoD eventually issued curative instructions reversing this practice.  (St. Clair Dec. 6/29/18, Dkt. 143-4)

PLAINTIFFS' TRIAL BRIEF - 4
Case No. 2:17-cv-00242-TSZ

CASCADIA CROSS BORDER LAW GROUP LLC
4141 B Street, Suite 205
Anchorage, AK 99503-5940
Tel 907.242.5800

Plaintiffs next challenged DoD's practice (as communicated by DoD CAF "Army Division, Manager MAVNI Program" Curtis Kingsland) of requiring naturalized U.S. MAVNI soldiers who passed their initial Military Service Suitability Determination (MSSD) following a favorable SSBI/Tier 5 Top Secret level investigation to undergo another SSBI/Tier 5 level investigation to obtain or renew a standard Secret level clearance where other U.S. citizens only have to undergo a much faster Tier 3 investigation.  (Pl. Reply Br. in Support of Mtn. for Summary 5/21/18 p. 31 – 32, Dkt. 137)  DoD has now apparently corrected this discriminatory policy.  (Smith Dec. 6/29/18 p. 2, Dkt. 143-1)

These repeated and evolving discriminatory policies and practices indicate a DoD animus towards naturalized U.S. citizen MAVNI soldiers.

### B. Discriminatory DoD Policies that Remain for Trial

Plaintiffs eventually determined that, despite DoD's new alleged "equal treatment" policy, that DoD is continuing to apply extraordinary class-based vetting procedures to security clearance applications from naturalized U.S. citizen MAVNI soldiers (that is without any individual cause).  This issue remains for adjudication at trial.

Specifically, DoD is requiring every naturalized U.S. citizen who entered the military through the MAVNI program and who applies for a **Secret** security clearance to undergo the following investigations, which a natural born citizen does not have to undergo: a Single Scope Background Investigation ("SSBI") (now called a Tier 5 Investigation) (a natural born citizen would only have to undergo a Tier 3 Investigation), a Counter-Intelligence (CI) screening, and National Intelligence Agency Check (NIAC).  DoD requires every naturalized U.S. citizen who entered the military through the MAVNI program who

PLAINTIFFS' TRIAL BRIEF - 5
Case No. 2:17-cv-00242-TSZ

CASCADIA CROSS BORDER LAW GROUP LLC
4141 B Street, Suite 205
Anchorage, AK 99503-5940
Tel 907.242.5800

applies for a **Top Secret** security clearance to undergo the following investigations that a natural-born citizen does not have to undergo: a Counter-Intelligence (CI) screening and a National Intelligence Agency Check (NIAC).  These discriminatory, delay-producing investigations are required regardless of whether the naturalized U.S. citizen is first applying for a security clearance 1, 5, 10, 20 or 30 years after he or she enlists.

Notably, Plaintiffs <u>are not challenging</u> the nature or extent of the vetting that DoD subjects MAVNI applicants or soldiers <u>prior to the time they become U.S. citizens</u>. Because Plaintiffs believe that all the named Plaintiffs and class members underwent an SSBI/Tier 5 investigation **before** they naturalized, and since DoD now says that, upon renewal of their security clearances, they need only meet the level of adjudication appropriate for the level of security clearance they seek (Tier 3 Investigation for Secret Clearance, Tier 5 Investigation for Top Secret Clearance),[5] Plaintiffs do not believe there is any issue before the Court concerning the constitutionality of the SSBI/Tier 5 investigation requirement.

Plaintiffs are challenging DoD's discriminatory requirement that (1) every naturalized U.S. citizen MAVNI soldier must undergo a delay-producing counter intelligence (CI) screening (either a "CI Focused Security Review" or "CIFSR" (which includes a face-to-face interview) or a "Passive Analytical Counter Intelligence Security Assessment" or "PACSA") and (2) have a current (typically meaning new) National Intelligence Agency Check (NIAC) in order to receive a security clearance.[6]  If DoD has individualized cause for

---

[5] <u>See</u> Roger Smith Dec. 6/29/19 Dkt. 143-1.

[6] The Deputy Director of DoD CAF, Daniel Purtill, acknowledged at his deposition that, despite DoD's representations in the June 21, 2017 "Kurta" memo, DoD is still not considering naturalized U.S. citizen MAVNI soldiers for security clearances "under the same

PLAINTIFFS' TRIAL BRIEF - 6
Case No. 2:17-cv-00242-TSZ

CASCADIA CROSS BORDER LAW GROUP LLC
4141 B Street, Suite 205
Anchorage, AK 99503-5940
Tel 907.242.5800

such additional vetting, DoD can and should conduct such additional vetting.  DoD discriminatory **class-based** vetting of thousands of naturalized U.S. citizens, however, is based on the constitutionally "<u>impermissible assumption</u> that naturalized citizens **as a class** are less reliable and bear less allegiance to this country than the native born." <u>Schneider v. Rusk</u>, 377 U.S. 163, 168 (1964) (emphasis added).[7] [8]

      Plaintiffs are also challenging DoD's discriminatory policy of subjecting thousands of naturalized U.S. citizens who entered military service through the MAVNI program to "Continuous Monitoring" for "the duration of their affiliation with the Department of Defense (e.g., active duty, Reserve, government civilian, or contractor.)" (Trial Ex. 4 p. 2)  For example, a surgeon still serving in the Army thirty (30) years from now, or a civilian mechanical engineer working on a defense-related project for Boeing thirty

---

terms, conditions and criteria as any other U.S. citizen."  (Dkt. 50; Purtill Dep. Tr. 78) ("I would say yes, I think I'd probably agree with that, that criteria is different.")

[7] DoD also provides no authority for the proposition that it can subject a protected suspect class to extraordinary vetting and monitoring procedures because, "statistically" speaking, members of that particular class are allegedly less loyal to the United States than other U.S. citizens.  Analogously, police cannot justify racial profiling by proving that a particular minority group engages in criminal behavior at a statistically higher rate than the general population.  <u>U.S. Montero-Camargo</u>, 208 F.3d 1122, 1131 (9th Cir. 2000) ("reasonable suspicion cannot be based 'on broad profiles which cast suspicion on entire categories of people without any individualized suspicion of the particular person to be stopped.'") (quoting <u>United States v. Rodriguez-Sanchez</u>, 23 F.3d 1488, 1492 (9th Cir. 1994)).

[8] DOD is now requiring a completed Tier 5 investigation, CI screening and NIAC <u>before</u> allowing new MAVNI soldiers to ship to basic training (and thus well before they naturalize). The issue of the constitutionality of requiring CI screenings and NIACs arises in this case because DoD is attempting to "retroactively" apply these new additional screening requirements to earlier MAVNI soldiers who passed the applicable screenings when they enlisted (an SSBI/Tier 5 investigation), became naturalized U.S. citizens, continue to honorably serve their country (as reflected in the supporting command letters that are required to apply for a security clearance), and are now seeking a security clearance.

PLAINTIFFS' TRIAL BRIEF - 7
Case No. 2:17-cv-00242-TSZ

CASCADIA CROSS BORDER LAW GROUP LLC
4141 B Street, Suite 205
Anchorage, AK 99503-5940
Tel 907.242.5800

(30) years from now, will still be subject to discriminatory "Continuous Monitoring" simply because they are naturalized U.S. citizens who happened to have enlisted in the military decades earlier through the MAVNI program. As the Court noted in its order recognizing Plaintiffs' standing to pursue this case, "each Plaintiff specifically alleges that the counter intelligence and <u>continuous monitoring policies</u> have treated him or her as second-class citizens. Thus, Plaintiffs allege a stigmatic injury suffered as a direct result of having been subject to these policies." (Dkt. 82 p. 14 – 15)[9]

To reiterate, Plaintiffs are not contesting DoD's ability to apply whatever investigative tools DoD believes appropriate to particular individuals based <u>on individual cause</u>. Plaintiffs do object, however, to being perpetually designated as a member of a class of "suspicious" people simply because they are naturalized U.S. citizens who at some point entered the military through the MAVNI program.

### C. Plaintiffs Do Not Have to Prove Individual Harm

DoD witness will likely testify that DoD's discriminatory conduct is appropriate because Continuous Monitoring is done in the "background" without the U.S.

---

[9] Because the Plaintiffs are challenging <u>distinct</u> polices, the court should <u>separately analyze</u> the constitutionality of each policy. The additional security clearance screening requirements (NIAC and CIFSR/PACSA) apply the first time that naturalized U.S. citizens who entered the military through the MAVNI program apply for a security clearance (DoD represents these additional screening requirements do not apply to clearance renewals, <u>see</u> Smith Dec. 6/29/18 p. 2, Dkt. 143-1). DoD's distinct Continuous Monitoring program applies to all MAVNI soldiers (including those who never seek a security clearance) and continues for the length of the individual's association with DoD — potentially for decades. (<u>See</u> Trial Ex. 4, 9/30/16 Levine Memo ("<u>[a]ll personnel</u> accessed through the MAVNI program . . . must be continuously monitored . . . <u>throughout the duration</u> of their affiliation with the Department of Defense (e.g., active duty, Reserve, government civilian, or contractor.") (emphasis added).

PLAINTIFFS' TRIAL BRIEF - 8
Case No. 2:17-cv-00242-TSZ

CASCADIA CROSS BORDER LAW GROUP LLC
4141 B Street, Suite 205
Anchorage, AK 99503-5940
Tel 907.242.5800

citizen MAVNI knowing when it is being performed. While naturalized U.S. citizen MAVNIs may not know when his or her specific investigation is actually occurring, MAVNIs do know they have been singled out for "Continuous Monitoring" (even though they may not be clear on what that specifically entails) because DoD somehow believes that, as a group, they are more suspicious and less trustworthy than other Americans.[10]

In any event, the constitutionality of discriminatory surveillance or investigation of a suspect class does not depend on whether the subjects are aware they are being investigated or have suffered discrete individual "harm."[11] It is also presently unclear what happens when DoD fails to timely complete its scheduled biennial CI screenings and

---

[10] As Plaintiffs noted in prior pleadings, Plaintiffs do not challenge DoD's distinct "Continuous Evaluation" program which DoD states is being generally applied to DoD personnel and is therefore not discriminatory. (See e.g., Plaintiffs' Reply Br. in Support of Mtn. for Summary Judgment, Dkt. 137 p. 3)

[11] As stated in Hassan v. City of New York, 804 F.3d 277, 291 - 292 (3rd Cir. 2015):

> Unequal treatment is "a type of personal injury [that] ha[s] long [been] recognized as judicially cognizable," Heckler v. Mathews, 465 U.S. 728, 738 (1984), and virtually every circuit court has reaffirmed — as has the Supreme Court — that a "discriminatory classification is itself a penalty," Saenz v. Roe, 526 U.S. 489, 505 (1999), and thus qualifies as an actual injury for standing purposes, where a citizen's right to equal treatment is at stake. See also Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, 508 U.S. 656, 657 (1993) ("The 'injury in fact' ... is the denial of equal treatment...."). . . . After all, "[t]he fundamental concern of discrimination law is to redress the dignitary affront that decisions based on group characteristics represent, not to guarantee specific economic expectancies." Sandberg v. KPMG Peat Marwick, L.L.P., 111 F.3d 331, 335 (2d Cir.1997). . . . Because Plaintiffs in this case claim to be the very targets of the allegedly unconstitutional surveillance, they are unquestionably "affect[ed] ... in a personal and individual way." Lujan [v. Defenders of Wildlife], 504 U.S. [555] at 560 n. 1 [1992].

PLAINTIFFS' TRIAL BRIEF - 9
Case No. 2:17-cv-00242-TSZ

CASCADIA CROSS BORDER LAW GROUP LLC
4141 B Street, Suite 205
Anchorage, AK 99503-5940
Tel 907.242.5800

NIAC investigations of thousands naturalized U.S. citizen MAVNIs. DoD has a consistent history of failing to timely complete the extraordinary vetting requirements it has imposed in recent years on MAVNI applicants, non-citizen MAVNI soldiers, and naturalized U.S. citizens who entered the military through the MAVNI program.

### D. DoD is Engaged in National Origin Discrimination

DoD maintains it is not discriminating based on national origin but rather on account of MAVNIs not having lived in the country long enough for DoD to properly investigate their backgrounds. This argument is unpersuasive. By the nature of the MAVNI program, the defining characteristic of U.S. citizen MAVNI soldiers is that they are naturalized U.S. citizens who came from a foreign country. Their defining characteristic cannot be, as DoD contends, that they have not lived in the U.S. long enough for DoD to properly investigate their backgrounds and therefore all pose some unacceptable security risk.[12] Some MAVNIs have lived in the United States for 15 to 20 years. They have

---

[12] The Sixth Circuit recently rejected this argument in Exodus Refugee Immigration, Inc. v. Pence, 838 F.3d 902, 904 – 05 (6th Cir. 2016). There then Indiana Governor Pence argued he was not engaged in national origin discrimination because he was not excluding Syrian refugees because they were immigrants but rather because of the danger he concluded these immigrants posed to the citizens of Indiana. Writing for the court, Judge Posner stated:

> [Governor Pence] argues that his policy of excluding Syrian refugees is based not on nationality and thus is not discriminatory, but is based solely on the threat he thinks they pose to the safety of residents of Indiana. But that's the equivalent of his saying (not that he does say) that he wants to forbid black people to settle in Indiana not because they're black but because he's afraid of them, and since race is therefore not his motive he isn't discriminating. But that of course would be racial discrimination, just as his targeting Syrian refugees is discrimination on the basis of nationality.

PLAINTIFFS' TRIAL BRIEF - 10
Case No. 2:17-cv-00242-TSZ

CASCADIA CROSS BORDER LAW GROUP LLC
4141 B Street, Suite 205
Anchorage, AK 99503-5940
Tel 907.242.5800

obtained undergraduate and then advanced degrees here and, over many years of residency, married and started families here. Many Deferred Action for Childhood Arrival ("DACA") MAVNIs have lived in this country since they were little children.[13] Despite the large variance in the time periods that U.S. citizen MAVNIs have lived in this country, the one characteristic they all share <u>and cannot change</u> is that they are naturalized U.S. citizens and therefore remain permanently subject to DoD's discriminatory security clearance and near perpetual monitoring requirements.[14]

The centrality of Plaintiffs' immutable status as naturalized U.S. citizens (as opposed to DoD's stated concern about insufficient time in the United States for proper vetting) is dramatically illustrated by DoD's near perpetual "Continuous Monitoring"

---

[13] One in eight MAVNI enlistment contracts are DACA contracts. (Rand Report, Trial Ex. 33 p. 36) The <u>upper</u> age limit to qualify for the DACA program is 15 years old. A qualifying individual must also have lived continuously in the United States since June 15, 2007. https://www.dhs.gov/xlibrary/assets/s1-exercising-prosecutorial-discretion-individuals-who-came-to-us-as-children.pdf. In addition, to enroll in the DACA program, an individual must provide biometric data and clear multiple Government security checks. (Dkt 115-29 p. 5)

[14] DoD witnesses will also apparently contend that DoD is justified in conducting class-based extraordinary vetting on thousands of naturalized U.S. citizens who entered the military through the MAVNI program because the MAVNI program allegedly presents a "tempting target" for infiltration or recruitment by certain hostile foreign governments. DoD has approved enlistment of foreign language MAVNIs who speak approximately 50 qualifying languages. (Trial Exs. 4 p. 5, 84 p. 16) There are substantially more than 50 countries where these languages are spoken. (<u>See</u> <u>Id.</u>) Most of these countries are not arguably "hostile" to the United States. Similarly, Health Care Professional ("HCP") MAVNIs (who must already hold appropriate U.S. medical licenses) may have originally come from anywhere in the world (<u>i.e.</u>, Canada, Mexico, South Africa, Belgium, Philippines, India, South Korea, <u>etc.</u>). (<u>See</u> Trial Ex. 4 p. 4) Again, DoD can conduct additional investigations where individually warranted in light of the individual MAVNI's country of origin. In any event, a large class of U.S. citizens should not be required to submit to otherwise unconstitutional profiling because <u>some third party</u> will allegedly attempt to entice some of members of the class to engage in improper behavior.

PLAINTIFFS' TRIAL BRIEF - 11
Case No. 2:17-cv-00242-TSZ

CASCADIA CROSS BORDER LAW GROUP LLC
4141 B Street, Suite 205
Anchorage, AK 99503-5940
Tel 907.242.5800

program.  DoD is imposing "Continuous Monitoring" on thousands of naturalized U.S. citizens who entered the military through the MAVNI program for "the duration of their affiliation with the Department of Defense (e.g., active duty, Reserve, government civilian, or contractor)" – potentially for decades.  (Trial Ex. 4 p. 2)  Admiral Hyman Rickover, the "Father of the Nuclear Navy," emigrated from Poland and served as an active duty Navy officer for 63 years.[15]  Had Admiral Rickover entered military service through a MAVNI-type program, DoD would still have been "Continuously Monitoring" him six decades into his naval career.  Clearly, the central and immutable characteristic of the individuals subject to DoD's "Continuous Monitoring" is that they are naturalized U.S. citizens, not whether they have lived in the United States long enough for DoD to properly vet them.  In short, DoD is advancing the **very reason** for treating national origin as a suspect class – the fact that immigrants are a minority group with the immutable characteristic of being foreign-born and are often viewed with suspicion – as the alleged reason why DoD is supposedly not engaged in national origin discrimination.  This is fallacious circular reasoning.  A naturalized U.S. citizen may accumulate decades of residency in the U.S., and decades of honorable military service, yet she will remain subject to DoD's discriminatory "Continuous Monitoring" until she eventually retires from the military or retires from her DoD-related civilian employment.  This is class-based national origin discrimination.[16]

---

[15] https://en.wikipedia.org/wiki/Hyman_G._Rickover

[16] DoD does not have to simultaneously discriminate against every naturalized U.S. citizen for its discriminatory polices towards naturalized U.S. citizens who entered the military through the MAVNI program to constitute national origin discrimination.  Hawai'i v. Trump, 241 F.Supp.3d 1119, 1135 (D. Hawaii), *aff'd in part, vacated in part, on other grounds*, 859 F.3d 741 (9th Cir.), *vacated and remanded on other grounds*, 138 S.Ct. 377 (October 24, 2017), ("The notion that one can demonstrate animus toward any group of people only by targeting

PLAINTIFFS' TRIAL BRIEF - 12
Case No. 2:17-cv-00242-TSZ

CASCADIA CROSS BORDER LAW GROUP LLC
4141 B Street, Suite 205
Anchorage, AK 99503-5940
Tel 907.242.5800

### E. DoD Has Not Met Its Difficult Burden of Proving a Narrowly Tailored, Compelling State Interest

Suspect class discrimination "can be upheld only upon an extraordinary justification." Washington v. Seattle Sch. Dist. No. 1, 458 U.S. 457, 485 (1982). Under strict scrutiny, discrimination "can only be allowed to continue if it 'advance[s] a compelling state interest by the least restrictive means available.'" Smith v. South Dakota, 781 F. Supp.2d 879, 884 (D.S.D. 2011) (quoting Bernal v. Fainter, 467 U.S. 216, 219 (1984)). Thus "the means chosen to accomplish the [government's] asserted purpose must be specifically and narrowly framed to accomplish that purpose." Grutter v. Bollinger, 539 U.S. 306, 333 (2003). "The purpose of the narrow tailoring requirement is to ensure that 'the means chosen 'fit' th[e] compelling goal so closely that there is little or no possibility that the motive for the classification was illegitimate racial prejudice or stereotype.'" (Id., quoting Richmond v. J.A. Croson Co., 488 U.S. 469, 493 (1989) (emphasis added)). Here DoD remains free to apply whatever investigatory tools it believes appropriate on an individual basis. That is exactly what DoD does with natural-born U.S. citizens, including natural-born citizens who have lived their entire life abroad before returning to the United States and enlisting in the military.[17]

---

all of them at once is fundamentally flawed." See also Aziz v. Trump, 234 F. Supp.3d 724, 737 (E.D. Virginia) (same). The court in Swift v. U.S., 649 F. Supp. 596, 601 n.4 (D.D.C. 1986), similarly stated in the context of an equal protection claim that "nothing in Doe [v. Casey, 796 F.2d 1508 (D.C. Cir. 1986),] suggests that while uniform discrimination against homosexuals on the basis of their sexual orientation is arguably illegal, random discrimination on the same basis is somehow permissible."

[17] Likewise, DoD cannot demonstrate a compelling state interest for its near perpetual, class-based, Continuous Monitoring program. Indeed, DoD is apparently having difficulty even deciding whether this monitoring should be continuous. The Court asked DoD counsel at the March 21, 2018 preliminary injunction hearing: "THE COURT: . . . let's take

PLAINTIFFS' TRIAL BRIEF - 13
Case No. 2:17-cv-00242-TSZ

CASCADIA CROSS BORDER LAW GROUP LLC
4141 B Street, Suite 205
Anchorage, AK 99503-5940
Tel 907.242.5800

### F. Strict Scrutiny Applies Regardless of the Involvement of National Security or Military Issues

As noted in Hassan v. City of New York, 804 F.3d 277, 306 - 07 (3rd Cir. 2015):

> No matter how tempting it might be to do otherwise, we must apply the same rigorous standards even where national security is at stake. We have learned from experience that it is often where the asserted interest appears most compelling that we must be most vigilant in protecting constitutional rights. "[H]istory teaches that grave threats to liberty often come in times of urgency, when constitutional rights seem too extravagant to endure."

(Id. at 306 – 07, quoting Skinner v. Ry. Labor Execs.' Ass'n, 489 U.S. 602, 635 (1989) (Marshall, J. dissenting)). In response to the same "military deference" argument DoD makes here, this Court stated:

> there is not and must never be a "military exception" to the Constitution. Indeed, courts have been willing to defer to the military only within the confines of ordinary constitutional analysis. . . . This principle applies with even greater force to equal protection claims since it has traditionally been the domain of the federal courts to scrutinize classifications challenged on equal protection grounds.

Cammermeyer v. Aspin, 850 F. Supp. 910, 915 (W.D. Wash. 1994), app. dismissed and remanded, 97 P.3d 1235 (9th Cir. 1996).[18]

---

the person who goes to Boeing and wants to work on aircraft and needs some sort of security clearance. Is there going to be continuous monitoring of that person? MR. SWINTON: I don't believe so. **And from what I was told, again by the DoD officials I spoke with in advance of today, that's not the case**." (Dkt 117 Tr. p. 67, emphasis added.) A month later, however, DoD counsel advised the Court he had been "subsequently informed that this was not the case and that the policy is intended to apply for the duration of a soldier's affiliation with DoD." (Dkt 128 p. 6 n.3 , emphasis added.)

[18] The "military deference" cases DoD has previously cited typically involve individual personnel determinations, non-constitutional claims and/or claims challenging the non-justiciable merits of an individual security clearance determination. (See e.g., Dkt 131 p. 23 – 24, 26, 33.) As the court stated in a challenge to a Marine Corps personnel regulation in Downen v. Warner, 481 F.2d 642, 643 (9th Cir. 1973), "[r]esolving a claim founded solely upon a constitutional right is singularly suited to a judicial forum." See also Dilley v.

PLAINTIFFS' TRIAL BRIEF - 14
Case No. 2:17-cv-00242-TSZ

CASCADIA CROSS BORDER LAW GROUP LLC
4141 B Street, Suite 205
Anchorage, AK 99503-5940
Tel 907.242.5800

### G. DoD's Argument, if Accepted, Would Sanction New and Expansive Forms of Discrimination Against Naturalized U.S. Citizens

DoD argues that it could have alternatively decided to adopt "additional [classed-based screening] measures . . . includ[ing] a polygraph examination, psychological evaluations, [and] reviews of financial statements and tax records . . ." (Smith Dec. 4/30/18 p. 28, Dkt. 131-1)  If DoD is correct in its contention that it can constitutionally impose <u>class-based</u> discriminatory security and monitoring procedures on thousands of naturalized citizens without any individual cause, then it is indeed hard to see how a court could subsequently start parsing various levels of permissible and impermissible class-based screening.  Rather, a very dangerous precedent will have been set, specifically that there are now different classes of citizenship in this country.[19]

### H. Conclusion

DoD internally recognized the doubtful constitutionally of its conduct: "[t]here are significant legal constraints to subjecting this population to enhanced screening **<u>without an individualized assessment of cause</u>**." (Trial Ex. 59 p. 2, Dkt #64-1 p. 3, emphasis added.)  DoD nevertheless chose to proceed in disregard of those legal constraints.  The Court should find that DoD's conduct violates Plaintiffs' equal protection rights as

---

<u>Alexander</u>, 603 F.2d 914, 920 (D.C. Cir. 1979) ("[t]his logic [of military deference] is wholly inappropriate, however, when a case presents an issue that is amenable to judicial resolution. Specifically, courts have shown no hesitation to review cases in which a violation of the Constitution . . . is alleged.")

[19] "Citizenship obtained through naturalization is not second-class citizenship.  It has been said that citizenship carries with it all of the rights and prerogatives of citizenship obtained by birth in this country, save that of eligibility to be President."  <u>Knauer v. United States</u>, 328 U.S. 654, 658 (1946).

PLAINTIFFS' TRIAL BRIEF - 15
Case No. 2:17-cv-00242-TSZ

CASCADIA CROSS BORDER LAW GROUP LLC
4141 B Street, Suite 205
Anchorage, AK 99503-5940
Tel 907.242.5800

1  guaranteed by the Due Process Clause of the Fifth Amendment of the U.S. Constitution.

2  The Court should also permanently enjoin the challenged policies.

3          DATED this 9th day of November, 2018.

                              CASCADIA CROSS BORDER
                              LAW GROUP LLC
                              Attorneys for Plaintiffs

                              By: *s/Neil T. O'Donnell*
                              Neil T. O'Donnell, Esq.
                              4141 B Street, Suite 205
                              Anchorage, AK 99503-5940
                              Phone: (907) 242-5800
                              Email: nodonnell@cascadialawalaska.com

                              Alaska Bar No. 8306049
                              *Pro Hac Vice Attorney*

                              MACDONALD HOAGUE & BAYLESS
                              Attorneys for Plaintiffs, *Local Counsel*

                              By: *s/Joseph R. Shaeffer*
                              Joseph R. Shaeffer, WSBA #33273
                              1500 Hoge Building
                              705 Second Avenue
                              Seattle, Washington  98104
                              Phone (206) 622-1604
                              Fax:  (206) 343-3961
                              joe@mhb.com

PLAINTIFFS' TRIAL BRIEF - 16
Case No. 2:17-cv-00242-TSZ

CASCADIA CROSS BORDER LAW GROUP LLC
4141 B Street, Suite 205
Anchorage, AK 99503-5940
Tel 907.242.5800

**CERTIFICATE OF SERVICE**

I hereby certify that on the 9th day of November, 2018, I filed the foregoing and all documents in support thereof, with the Clerk of Court using the CM/ECF System which will send notification of such filing to the following:

**Nathan Swinton, Esq.**
Nathan.M.Swinton@usdoj.gov

**Joseph C. Dugan, Esq.**
Joseph.Dugan@usdoj.gov

**Michael Knapp, Esq.**
Michael.Knapp@usdoj.gov

/s/ *Neil T. O'Donnell*
Neil T. O'Donnell

PLAINTIFFS' TRIAL BRIEF - 17
Case No. 2:17-cv-00242-TSZ

**CASCADIA CROSS BORDER LAW GROUP LLC**
4141 B Street, Suite 205
Anchorage, AK 99503-5940
Tel 907.242.5800