UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

KIRTI TIWARI; SEUNG YOON YANG;
AMANDEEP SINGH; DUNCAN MAKAU;
VALDETA MEHANJA; RAJ CHETTRI;
THONG NGUYEN; XI CUI; RAJAT
KAUSHIK; BLERTA MEHANJA;
MENGMENG CAI; SANDEEP SINGH;
FLEURY NGANTCHOP KEIGNI DI
SATCHOU; KAUSHAL WADHWANI;
ANGELITA ACEBES; KUSUMA NIO; and
QI XIONG,

      Plaintiffs,

 v.

JAMES MATTIS, Secretary, United States
Department of Defense, in his official
capacity,[1]

      Defendant.

C17-242 TSZ

ORDER

   THIS MATTER came on for trial on November 26, 2018, before the Court, sitting

without a jury.  Plaintiffs were represented by Neil T. O'Donnell of Cascadia Cross

Border Law Group LLC.  Defendant was sued in his official capacity as the Secretary of

the United States Department of Defense ("DoD") and was represented by Joseph C.

Dugan, Michael F. Knapp, and Nathan M. Swinton, attorneys with the United States

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), the Clerk is DIRECTED to substitute Acting
Secretary Patrick Shanahan for former Secretary Mattis.

ORDER - 1

Department of Justice.  Trial proceeded for five days and ended on November 30, 2018, at which time the Court took the matter under advisement.  Having considered the testimony of the witnesses,[2] the exhibits admitted into evidence,[3] the facts on which the parties have agreed, _see_ Amended Pretrial Order (docket no. 179) [hereinafter "PTO"], and the oral and written arguments of counsel, the Court now enters these Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52(a).[4]

## **Background**

Plaintiffs are seventeen (17) United States citizens who are or were, at the time trial commenced, serving in the United States Army.  They each enlisted through the Military Accessions Vital to the National Interest ("MAVNI") program, which was implemented in fiscal year ("FY") 2009 to address difficulties the DoD had experienced in recruiting individuals with either proficiency in critical foreign languages[5] or

---

[2] The following individuals testified in person:  Naomi B. Verdugo, Ph.D., Sergeant Valdeta Mehanja, Sergeant Sandeep Singh, Sergeant Seung Yoon Yang, Lieutenant Colonel (Retired) Margaret D. Stock, Latrice McSwain, Stephanie Pilcher Miller, Roger Andrew Smith, Jr., and Joseph Alias Simon.  The following individuals testified by deposition, viewed at least in part in video format:  Lieutenant Kirti Kumar Tiwari, Mary J. Dandridge, Curtis Earl Kingsland, and Daniel Edward Purtill.

[3] Plaintiffs' Exhibits 1-2, 4-13, 15-33, 35-39, 42, 46-47, 49-50, 52-53, 58-59, 62-64, 69, 71, 73-86, and 90-98, as well as Defendant's Exhibits 200-225, were admitted into evidence.

[4] Any conclusion of law misidentified as a finding of fact shall be deemed a conclusion of law, and any finding of fact misidentified as a conclusion of law shall be deemed a finding of fact.

[5] According to Dr. Verdugo, in connection with the MAVNI program, between 35 and 45 strategic foreign languages were identified on a list that varied from year to year. Tr. (Nov. 26, 2018) at 30:8-25 (docket no. 187); _see also_ Ex. 29 at 23-24.  The Court finds Dr. Verdugo's testimony, which was primarily factual in nature, credible, and denies the deferred portion of defendant's motion in limine, docket no. 154, to exclude her as an expert witness.

specialized healthcare training. _See_ Ex. 29 at 14 & 23-24; _see also_ Ex. 33 at 17. When they joined the Army, plaintiffs were not United States citizens,[6] but rather had the requisite legal status for the MAVNI program (_i.e._, as an asylee, a refugee, a non-immigrant alien,[7] or a grantee of temporary protected status). Each plaintiff was naturalized as a citizen, pursuant to 8 U.S.C. § 1440,[8] after serving honorably for some period in the Army. _See_ PTO at 4-10, ¶¶ 6-22 (docket no. 179).

---

[6] Every person born within the United States is a citizen of the United States. U.S. CONST. amend. XIV, § 1; _see_ 8 U.S.C. § 1401(a). Individuals who are not born in the United States acquire citizenship and/or nationality by birth or by naturalization only as provided by acts of Congress. _Miller v. Albright_, 523 U.S. 420, 424 (1998); _see_ 8 U.S.C. §§ 1401-1409 (defining citizens and nationals of the United States at birth); _see also_ 8 U.S.C. § 1421 (conferring on the United States Attorney General the authority to naturalize persons as citizens). A person may enlist in an armed force of the United States if he or she is (A) a national of the United States, (B) an alien lawfully admitted for permanent residence, or (C) eligible for certain privileges under one of the compacts of free association relating to the Federated States of Micronesia, the Republic of the Marshall Islands, or Palau. 10 U.S.C. § 504(b)(1). An individual not qualifying under these criteria may nevertheless access into the United States military if authorized by the Secretary of Defense on the basis that he or she "possesses a critical skill or expertise," which is "vital to the national interest" and which will be used in his or her "primary daily duties" as a member of the armed forces. _Id._ at § 504(b)(2) (effective until August 12, 2018). The MAVNI program was developed under § 504(b)(2).

[7] During the years that the MAVNI program existed, nonimmigrant aliens with the following designations were eligible to participate: E, F, H, I, J, K, L, M, O, P, Q, R, S, T, TC, TD, TN, U, and V. Ex. 84 at 4; _see_ Ex. 33 at 105-06 (Table A.1); _see also_ 8 U.S.C. § 1101(a)(15); 8 C.F.R. §§ 214.1(a)(1)&(2). In FY 2014, the MAVNI program was expanded to include individuals who had been granted deferred action by the Department of Homeland Security pursuant to the Deferred Action for Childhood Arrivals ("DACA") program. _See_ Ex. 84 at 4; _see also_ Ex. 33 at 25; Ex. 79.

[8] Any person who, "while an alien or a noncitizen national," has served honorably in the selected reserve or on active duty during a period designated by executive order of the President as one in which the military is engaged in "operations involving armed conflict with a hostile foreign force," is eligible for naturalization. 8 U.S.C. § 1440(a).

The parties agree that plaintiffs are currently being treated differently from other citizens in two ways: (i) plaintiffs are subject to "continuous monitoring," which requires *inter alia* a series of National Intelligence Agency Checks ("NIAC")[9] every two years; and (ii) plaintiffs must have *inter alia* a NIAC that was performed within the last two years to be eligible for a security clearance.[10] *See* PTO at ¶¶ 3 & 5. No person affiliated with the DoD, other than individuals who (like plaintiffs) accessed through the MAVNI program, is required, absent particularized suspicion, to undergo a biennial NIAC. Plaintiffs, however, must endure such periodic screening for the duration of their military service and even after discharge, whenever they work as a civilian for the government or an entity providing supplies or services for the DoD. *See* *infra* note 11.

---

[9] When a NIAC is performed, the following databases are checked: (i) JPAS - Joint Personnel Adjudication System; (ii) DCII - Defense Central Index of Investigations; (iii) Scattered Castles - an intelligence community personnel security database; (iv) CENTS - the Central Intelligence Agency's External Name Trace System; (v) PORTICO - the DoD's counterintelligence database; (vi) FBI NNC - Federal Bureau of Investigation National Name Check; (vii) NCIC - National Crime Information Center; (viii) FTTTF - Foreign Terrorist Tracking Task Force; and (ix) CLIP - Contract Linguist Information Program. Tr. (Nov. 26, 2018) at 63:21-64:12 (docket no. 187); *see* Ex. 97 at 4 n.1; *see also* Ex. 27 at 39.

[10] The DoD restricts access to classified information and considers unauthorized disclosure of such material to be harmful to national security. Tr. (Nov. 29, 2018) at 7:7-15 (docket no. 190). To have access to classified documents, a person must have the requisite security clearance and be in a duty position for which the person has a "need to know" the information. *Id.* at 7:24-8:20. Security clearances are issued at different levels, namely "confidential," "secret," "top secret," and "top secret/sensitive compartmented information ("SCI")," with the latter allowing the greatest access to classified information. *See id.* at 7:10-11; *see also* Tr. (Nov. 28, 2018) at 46:2-4 (docket no. 189). A "top secret" clearance is valid for either five or six years, and a "secret" clearance is good for ten or eleven years, depending on the DoD's current policy. *See* Tr. (Nov. 28, 2018) at 48:22-24, 98:16-21 (docket no. 189).

The NIAC requirements are set forth in a memorandum issued on September 30, 2016, by then Acting Under Secretary of Defense for Personnel and Readiness Peter Levine, which states in relevant part:

> All personnel accessed through the MAVNI program since its inception in 2009 must be continuously monitored and accounted for throughout the duration of their affiliation with the Department of Defense (e.g. active duty, Reserve, government civilian, or contractor).[11]
>
> . . . .
>
> The DoD CAF [Consolidated Adjudications Facility] is responsible for adjudicating completed personnel security background investigations to render a determination of each individual's eligibility to access classified information and may require . . . [a] NIAC . . . .

Ex. 4 at 2 & 7; *see also* PTO at ¶¶ 1-5. Pursuant to the Levine memorandum, if a NIAC reveals derogatory information, a counterintelligence ("CI") security interview and/or a polygraph examination may be requested. Ex. 4 at 7. Refusal to comply with such request is grounds for separation from the military. *Id.*[12]

---

[11] The parties agree that "affiliation with the Department of Defense" includes work as a civilian with a private company performing work for the military. *See* Tr. (Nov. 30, 2018) at 6:12-7:19, 40:4-14, 41:5-18, & 50:7-11 (docket no. 191); *see also* Tr. (Nov. 27, 2018) at 101:23-102:3 (docket no. 188); Tr. (Nov. 28, 2018) at 47:4-22 (docket no. 189). According to defendant's witnesses at trial, the "continuous monitoring" requirement would apply to an individual who accessed through the MAVNI program, completed his or her military service, and went to work as a truck driver for the Boeing Company, a defense contractor, even though the person had no access to classified information. Tr. (Nov. 29, 2018) at 156:23-157:1 (docket no. 190); *see* Tr. (Nov. 28, 2018) at 189:22-191:21 (docket no. 189) (indicating that a former MAVNI soldier working for Amazon.com, Inc. on a DoD project would be subject to "continuous monitoring," but non-MAVNI personnel employed in a similar fashion would not undergo such monitoring).

[12] The Levine memorandum implemented certain other discriminatory policies that were later countermanded, including a prohibition on MAVNI soldiers obtaining security clearance or access "until the completion of first enlistment." Ex. 4 at 7. MAVNI personnel are required to serve a total of eight years in the military, in some combination of active duty, a troop program unit, selected reserve, and/or individual ready reserve, depending on whether they were language-skill recruits or healthcare professionals. Ex. 96 at 5. Plaintiffs commenced this

Plaintiffs ask the Court to declare that the NIAC requirements unconstitutionally

discriminate against them on the basis of national origin, and they seek injunctive and

---

lawsuit in February 2017, asserting that the ban on security clearances for MAVNI personnel during their initial terms of enlistment was "crippling their military careers" and constituted unlawful national-origin-based discrimination. Compl. at ¶ 1 (docket no. 1). On June 21, 2017, while a motion for preliminary injunction was pending in this matter, A.M. Kurta, who was then performing the duties of the Under Secretary of Defense for Personnel and Readiness, revoked the embargo on security clearances, stating that, "[e]ffective immediately, individuals enlisted under the MAVNI Pilot Program who have successfully completed basic military training/boot camp . . . , and have become naturalized U.S. citizens based on their military service, may be considered for a security clearance under the same terms, conditions, and criteria as any other U.S. citizen." Exs. 11 & 207. Despite the issuance of the Kurta memorandum, the Court entered a preliminary injunction, in light of evidence indicating that MAVNI soldiers were not in fact being treated the same as other United States citizens with regard to the grant of interim security clearances. *See* Order (docket no. 122). The Court directed the DoD Secretary to consider requests for interim security clearance eligibility for naturalized MAVNI personnel in the same manner as for any other soldier who is a United States citizen. *Id.* at 15. At trial, plaintiffs Lt. Tiwari and Sgts. Mehanja, Singh, and Yang testified about the ways in which the Levine memorandum's short-lived limitation on security clearances for MAVNI personnel has adversely affected their military careers. The Court was impressed with each individual and found all of them credible. Lt. Tiwari explained that the Levine memorandum delayed his commissioning as an officer by roughly eight months, and that others who are behind his date of rank have been (and will likely continue to be) promoted over him. Tr. (Nov. 26, 2018) at 193:16-194:3 (docket no. 187). Sgt. Mehanja, who holds undergraduate and graduate degrees in aeronautics, has various pilot licenses and over 2,000 hours of flight time, has worked as a flight instructor, and has been recognized as soldier of the month, was derailed from achieving her goal of becoming an Army officer and a Black Hawk pilot because the Levine memorandum precluded her from obtaining the requisite security clearance before reaching the maximum age for applying to Officer Candidate School ("OCS") or Warrant Officer School. *Id.* at 114:4-116:22, 117:19-22, 123:19-20, 125:19-25, 128:11-17, 132:2-8, 142:19-23, & 143:1-10. Sgt. Singh, who trained for and successfully endured the grueling 21-day Special Forces Assessment and Selection process, was then unable to attend the Special Forces Qualification Course because the Levine memorandum prevented him from receiving a security clearance in time, and toward the end of his six-year term of active duty, he chose not to re-enlist. Tr. (Nov. 27, 2018) at 11:13-25:25 (docket no. 188). Sgt. Yang's attempts to apply to OCS and the Army's Green-to-Gold program were also frustrated by the Levine memorandum, but he eventually got the necessary security clearance (as a result of this lawsuit), was discharged from active service, and now attends Columbia University on a Reserve Officer Training Corps scholarship through the Green-to-Gold program. *Id.* at 86:13-98:20. Although these and other plaintiffs suffered setbacks traceable to the unequal treatment accorded them under the now defunct provision of the Levine memorandum, plaintiffs make no claim in this matter for any retrospective relief.

equitable relief.[13]  Defendant counters that the DoD's unequal treatment of citizens who were recruited through the MAVNI program survives constitutional challenge because either (i) it is premised on the manner through which the individuals enlisted in the Army rather than on those citizens' national origin; or (ii) if an inherently suspect classification is implicated, the DoD's actions are "necessary" and "precisely tailored" to achieve a "compelling" governmental interest, namely national security.  _See Huynh v. Carlucci_, 679 F. Supp. 61, 66 (D.D.C. 1988) (reciting the "strict scrutiny" standard applicable to inherently suspect classifications (citing _Plyler v. Doe_, 457 U.S. 202, 217 (1982), and _In re Griffiths_, 413 U.S. 717, 721-22 (1973))).

This dispute requires the Court to balance the equal protection rights[14] of highly qualified citizens who have served or continue to serve honorably in the military[15] against

_____

[13] Plaintiffs originally sought attorney's fees and costs under the Equal Access to Justice Act, but they have since waived all such monetary remedies, including any right to expert witness fees. _See_ Tr. (Nov. 16, 2018) at 20:5-13 (docket no. 180); _see also_ Tr. (Nov. 30, 2018) at 26:20-25 (docket no. 191).

[14] "The liberty protected by the Fifth Amendment's Due Process Clause contains within it the prohibition against denying to any person the equal protection of the laws." _United States v. Windsor_, 570 U.S. 744, 774 (2013) (citing _Bolling v. Sharpe_, 347 U.S. 497, 499-500 (1954), and _Adarand Constructors, Inc. v. Pena_, 515 U.S. 200, 217-18 (1995)).

[15] Plaintiffs were born in several different countries, including the Republic of Cameroon, the People's Republic of China, the Republic of India, the Republic of Indonesia, the Republic of Kenya, the Republic of Korea, the Republic of Kosovo, the Federal Democratic Republic of Nepal, the Republic of the Philippines, and the Socialist Republic of Vietnam.  PTO at ¶¶ 6-22. Many plaintiffs speak multiple languages, most have undergraduate degrees, and some have graduate degrees. _Id._; _see also_ Plas.' Affs. (docket nos. 9-13, 16, 32-34, 36-38, & 53).  These credentials are consistent with the statistics concerning MAVNI enlistees, who generally possess greater language capabilities, have more education, test higher, and have lower attrition rates than other recruits. _See_ Ex. 32 at 14-15 (indicating that more than 95% of MAVNI soldiers maintained a level 2 or better capability in a language other than English, while 91.5% of non-MAVNI personnel spoke no additional language, that 65.8% of individuals accessing through the

the DoD's concerns about foreign operatives infiltrating the MAVNI program or potentially converting MAVNI soldiers into assets for our country's adversaries. It involves the constant tension between individual rights and national interests, and it reminds us that, when the asserted governmental interests appear the most compelling, courts must be the most vigilant because "grave threats to liberty often come in times of urgency, when constitutional rights seem too extravagant to endure." *See Hassan v. N.Y.C.*, 804 F.3d 277, 306-07 (3d Cir. 2015) (quoting *Skinner v. Ry. Labor Execs.' Ass'n*, 489 U.S. 602, 635 (1989) (Marshall, J., dissenting)). For the reasons explained in this Order, the Court concludes that the DoD's challenged policies discriminate on the basis of national origin, and that defendant has not carried the burden of proving that the biennial NIACs required in connection with "continuous monitoring" and security clearance eligibility, which are imposed on citizens who accessed through the MAVNI program but not on other citizens affiliated with the DoD, survive strict scrutiny.

**Discussion**

When this lawsuit began, plaintiffs sought relief with respect to additional aspects of the "continuous monitoring" program and the security clearance protocols applied to

---

MAVNI program had completed a post-secondary degree, while only 8.9% of other enlistees had schooling beyond high school or the equivalent, and that the attrition rate over the first three years of service was about 8% for MAVNI soldiers, compared with roughly 32% for other service members); *see also* Ex. 33 at Table 3.1 (reporting that the average MAVNI soldier has 15.4 years of education and achieved 74.2 on the Armed Forces Qualification Test ("AFQT"), while the average non-MAVNI service member has only 12.4 years of schooling and an AFQT score of 63.8).

MAVNI personnel,[16] but as a result of the evidence presented at trial, plaintiffs narrowed their claim to encompass only the periodic NIAC requirements of continuous monitoring and security clearance procedures.[17]  With respect to the biennial NIAC mandated for

---

[16] Each plaintiff in this matter enlisted after February 16, 2012, when the Under Secretary of Defense for Intelligence issued a memorandum requiring all MAVNI applicants to undergo a Single Scope Background Investigation, also known as a Tier 5 Background Investigation ("SSBI/Tier 5"), a NIAC, and a Counterintelligence-Focused Security Review ("CIFSR").  *See* Exs. 78, 97, & 203; *see also* Ex. 84 at 5-6; Ex. 204 at ¶¶ 3-4.  The SSBI/Tier 5, NIAC, and CIFSR results were to be considered in making a Military Service Suitability Determination ("MSSD"), and failure to obtain a favorable MSSD rendered a MAVNI recruit ineligible for enlistment or continued military service.  Ex. 84 at 6.  In this case, plaintiffs have not challenged the heightened screening protocol applied to them upon enlistment into the Army, when they were not yet United States citizens.  They did, however, assert claims regarding two other policies, namely (i) the requirement that they undergo a Passive Analytical CI and Security Assessment ("PACSA") as part of the "continuous monitoring" program, which was imposed in a memorandum dated October 13, 2017, on all "incumbent" MAVNI soldiers (like plaintiffs), meaning service members who completed security and suitability screening before the Levine memorandum was issued on September 30, 2016, *see* Ex. 49; and (ii) the requirement that anyone affiliated with the DoD who accessed through the MAVNI program be subjected to a CIFSR in connection with the adjudication of security clearance eligibility.  Neither the PACSA nor the CIFSR is routinely performed on other personnel, even those seeking or holding the highest level of security clearance.  On the fourth day of trial, Roger Smith, Chief of Personnel Security for the DoD, and Joseph Simon, Senior Counterintelligence Advisor to the Army G2 and to the Chief of Staff of the Army, each testified that PACSAs and/or CIFSRs have been completed for all MAVNI personnel.  Tr. (Nov. 29, 2018) at 57:2-11, 134:8-135:21 (docket no. 190).  During closing argument, based on his understanding that the DoD has "no plans to repeat these investigations," plaintiffs' counsel conceded that the constitutionality of compelling a PACSA in connection with continuous monitoring, or a CIFSR when a MAVNI enlistee is being considered for "top secret" or "secret" clearance, is now moot.  Tr. (Nov. 30, 2018) at 2:6-12 (docket no. 191).

[17] Because the only investigative tool that remains in dispute in this litigation is the NIAC, the Court has consolidated its analysis of the "continuous monitoring" program and the security clearance protocols for MAVNI personnel, both of which involve a biennial NIAC.  The Court is satisfied that defendant's arguments regarding standing do not require differentiation between continuous monitoring and security clearance requirements.  Defendant asserts that, with respect to the up-to-date NIAC needed for security clearance, all but seven plaintiffs' claims are moot because they have already received "top secret/SCI" or "secret" clearance, and that two other plaintiffs' claims are unripe because no request for security clearance has been made on their behalf.  These contentions do not, however, establish a lack of standing because security clearances expire and must be renewed, *see* *supra* note 10, plaintiffs with only "secret" clearance might soon need a higher level of clearance, and plaintiffs who have not yet sought clearance

individuals who accessed through the MAVNI program and remain affiliated with the DoD, the questions before the Court are as follows: (i) whether the disparate treatment constitutes national-origin-based discrimination, and is therefore subject to strict scrutiny, or is merely related to the manner in which the soldiers entered the military (*i.e.*, via the MAVNI program), and thus, must withstand only rational basis review; and (ii) whether the MAVNI-focused policies at issue bear the requisite relationship to the government's interest (*i.e.*, national security).

**A.    Level of Review**

The Court concludes that strict scrutiny must be applied to the challenged DoD policies. Government action that distinguishes among citizens on the basis of national origin is inherently suspect and subject to "strict scrutiny." *See Huynh*, 679 F. Supp. at 66 (citing *Graham v. Richardson*, 403 U.S. 365, 372 (1971), and *Korematsu v. United States*, 323 U.S. 214, 216 (1944), *abrogated on other grounds by Trump v. Hawaii*, 138 S. Ct. 2392 (2018)). To satisfy strict scrutiny, (i) the use of a suspect classification must bear a close relationship to the promotion of a "compelling" governmental interest, (ii) the use of such classification must be "necessary" to achieve such interest, and

---

might in the near future need to do so. Plaintiffs have a "reasonable expectation" that they will (again or for the first time) be subject to the challenged NIAC policy, and they might receive the requested security clearance before the merits of their claim can be addressed. Plaintiffs have therefore presented the type of situation "capable of repetition yet evading review" that establishes the "case or controversy" necessary for Article III jurisdiction. *See*, *e.g.*, *Am. Civil Liberties Union of Nev. v. Lomax*, 471 F.3d 1010, 1016-17 (9th Cir. 2006). Moreover, at the time of trial, at least four plaintiffs were still awaiting the results of security clearance adjudications, *see* PTO at ¶¶ 11, 12, 16, & 22, and as to those plaintiffs, defendant does not contest the ripeness of the claim that MAVNI personnel should not be subjected to an additional NIAC when they seek a security clearance.

(iii) the means or procedures used must be "precisely tailored" to serve such interest. *Id.* (citing *Plyler*, 457 U.S. at 217, and *In re Griffiths*, 413 U.S. at 721-22). The requirement that MAVNI personnel undergo NIAC screening every two years as part of either the "continuous monitoring" program or the security clearance approval process makes remaining a soldier or DoD affiliate and/or obtaining a security clearance more onerous for citizens born outside the United States than for other citizens, and therefore constitutes discrimination on the basis of national origin. *See Faruki v. Rogers*, 349 F. Supp. 723, 726-27 (D.D.C. 1972) (three-judge district court).

In *Faruki*, the plaintiff challenged a provision of the Foreign Service Act of 1946, which prohibited a person from being appointed as a foreign service officer unless he or she was "a citizen of the United States and has been such for at least ten years." *Id.* at 725 (quoting 22 U.S.C. § 910 (1970)). The *Faruki* Court concluded that the statute treated persons who were citizens at birth more favorably than and discriminated against individuals who had been born abroad and then naturalized. *Id.* at 725-27. In striking down the durational requirement of § 910, the three-judge panel warned against scenarios in which the government "grants citizenship to an immigrant and then, solely on the basis of his original foreign status, proceeds to give him second-class, more burdensome treatment." *Id.* at 729. The additional screening imposed upon plaintiffs, who gained citizenship through the MAVNI program, has the same "odor of prejudice" as the foreign service eligibility criterion held violative of equal protection guarantees in *Faruki*. *See id.* at 729-35.

## 1. **Contemporaneous Discrimination Against Foreign Nationals**

In attempting to persuade the Court to apply rational basis review[18] rather than strict scrutiny, defendant alleges, based on classified material that was not offered or admitted as evidence at trial, _see infra_ § B(1), that the MAVNI program is itself a target or magnet for our country's enemies, and that the heightened scrutiny to which plaintiffs are or will be subjected is not because of their national origin but because their means of enlistment (which is the only way, given their national origin, that they could have joined the Army) poses a potential national security threat.[19]  Defendant's assertion that national origin has played no role is contradicted by the DoD's modifications to its policies

---

[18] If a classification does not burden a fundamental right or target a protected group, then it will be upheld as long as it bears a "rational" relationship to some "legitimate" governmental purpose.  _Romer v. Evans_, 517 U.S. 620, 631 (1996).  Under the "rational basis" standard, the government's actions are accorded a strong presumption of validity, and courts must accept the generalizations articulated in support of the challenged policy even when the fit between means and ends is imperfect.  _Heller v. Doe_, 509 U.S. 312, 320-21 (1993).  Rational basis review is not, however, "toothless."  _Golinski v. U.S. Office of Pers. Mgmt._, 824 F. Supp. 2d 968, 996 (N.D. Cal. 2012) (quoting _Mathews v. de Castro_, 429 U.S. 181, 185 (1976)).  It requires that the regulation (i) not be enacted for arbitrary or improper reasons, (ii) be relevant to interests that the government has authority to implement, and (iii) be logically related to the purpose it purports to advance.  _Id._ (citing _Romer_, 517 U.S. at 632-33, and _City of Cleburne v. Cleburne Living Ctr._, 473 U.S. 432, 441 (1985)).

[19] Defendant's argument is reminiscent of an assertion made by the then Governor of Indiana in support of the State's refusal to pay for certain services provided to refugees whose country of origin was Syria, to which the Seventh Circuit responded:

> He argues that his policy of excluding Syrian refugees is based not on nationality and thus is not discriminatory, but is based solely on the threat he thinks they pose to the safety of residents of Indiana.  But that's the equivalent of his saying (not that he does say) that he wants to forbid black people to settle in Indiana not because they're black but because he's afraid of them, and since race is therefore not his motive he isn't discriminating.  But that of course would be racial discrimination, just as his targeting Syrian refugees is discrimination on the basis of nationality.

_Exodus Refugee Immigration, Inc. v. Pence_, 838 F.3d 902, 904-05 (7th Cir. 2016).

concerning another group, namely aliens who are lawful permanent residents, which were implemented contemporaneously with the current iteration of the "continuous monitoring" program. *See* Ex. 49; *supra* note 16. In October 2017, the DoD announced new protocols that prevented lawful permanent residents from entering active, reserve, or guard service until their background investigations were completed. *See Kuang v. U.S. Dep't of Defense*, 340 F. Supp. 3d 873 (N.D. Cal. 2018) (issuing a preliminary injunction and requiring the DoD to return to pre-October 2017 practices for the accession of lawful permanent residents).

All military personnel must undergo background investigations (which do not involve NIACs), but the October 2017 policy treated lawful permanent residents and citizens differently, allowing the latter, but not the former, to ship to basic training before completion of the required investigations. *Id.* at 889 & 919. The DoD's stated purpose for the disparate treatment of lawful permanent residents was "to facilitate process efficiency and the appropriate sharing of information for security risk based suitability and security decisions for the accession of ***foreign nationals***." *See* AR at 1 (docket no. 57 at 5) (emphasis added) in *Kuang v. U.S. Dep't of Defense*, N.D. Cal. Case No. 3:18-cv-3698-JST; *see also Kuang*, 340 F. Supp. 3d at 889. Given the DoD's explicit reference to nationality in a similar policy simultaneously announced, defendant's contention that the DoD was concerned *solely* about the targeting of the MAVNI program lacks credibility. The Court concludes plaintiffs have shown all that they need to prove, specifically that national origin was "**a** motivating factor" in the

DoD's disparate treatment of MAVNI recruits.  *See* *Martin v. Int'l Olympic Comm.*, 740 F.2d 670, 678 (9th Cir. 1984) (emphasis added).

## 2.  **Discrimination Against Less Than All Members of the Class**

Defendant also argues that the NIAC requirements applied only to MAVNI personnel are facially neutral because they do not extend to aliens who are lawful permanent residents or to naturalized citizens who did not enlist through the MAVNI program, and they therefore distinguish on the basis of military accession as opposed to national origin.  In essence, defendant asserts that, because the discrimination is not complete, it is not subject to strict scrutiny, but defendant cites no authority to support this proposition, which runs contrary to equal protection jurisprudence.  *See* *Juarez v. Nw. Mut. Life Ins. Co.*, 69 F. Supp. 3d 364, 369-74 (S.D.N.Y. 2014) (observing that a defendant is not insulated from liability for discrimination against some members of a protected class merely because not every member of the class is a victim of the discrimination); *see also* *Nyquist v. Mauclet*, 432 U.S. 1, 9 (1977) ("The fact that the statute is not an absolute bar does not mean that it does not discriminate against the class."); *Huynh*, 679 F. Supp. at 67.

In *Huynh*, the plaintiffs challenged a DoD regulation that denied security clearance to naturalized citizens who were born or resided for a significant period in one of 29 or 30 countries, unless they had been United States citizens for five years or United States residents for ten years.  679 F. Supp. at 63.  In granting a preliminary injunction enjoining enforcement of the regulation, the *Huynh* Court concluded that strict scrutiny was proper, even though the regulation applied to only a subset of naturalized citizens, namely those

from the enumerated countries who had not yet satisfied the chronological requirements. *Id.* at 66-67. *Huynh* undermines defendant's contention that rational basis review is appropriate in this matter, not only because it contradicts defendant's assertion that discrimination against a subset of a protected class should receive less scrutiny than discrimination against all members of the class, but also because it belies defendant's suggestion that the MAVNI policies at issue are somehow outliers in the DoD's approach to restricting eligibility for security clearances. The Court finds that, contrary to defendant's denials, the DoD focused on MAVNI status as a proxy for national origin.

### 3.  Proof of Discriminatory Animus Not Required

In a different approach aimed at receiving the benefit of rational basis review, defendant asserts that, absent proof of discriminatory animus or motive, the NIAC components of continuous monitoring and security clearance protocols merely have a disproportionate impact on a protected group and cannot rise to the level of an equal protection violation. Defendant's analysis is flawed because it assumes, without demonstrating, that the continuous monitoring and more rigorous security clearance requirements are facially neutral, and it therefore relies on inapposite authorities.[20]

---

[20] Defendant's reliance on *McDaniels v. Stewart*, 2016 WL 499316 (W.D. Wash. Feb. 8, 2016), is particularly misplaced. In *McDaniels*, in declining to authorize service of a pro se prisoner's equal protection claim, the court concluded that, although the plaintiff might have sufficiently alleged an intent to discriminate, he had failed to plead facts linking any of the named defendants to the alleged civil rights violation. *Id.* at *7-*8. In contrast, in this matter, the Secretary of Defense has essentially conceded that he is the proper defendant, and *McDaniels* is of no relevance. Defendant's reference to *Hunt v. Cromartie*, 526 U.S. 541 (1999), is equally off the mark. In *Hunt*, the United States Supreme Court reiterated that when suspect classifications are explicit, strict scrutiny applies without any inquiry into legislative purpose. *See id.* at 546. In *Hunt*, however, because North Carolina's redistricting plan merely classified "tracts of land,

When the government classifies persons on the basis of race, national origin, or similar immutable characteristic, a plaintiff challenging such action in a lawsuit "need not make an extrinsic showing of discriminatory animus . . . to trigger strict scrutiny." *Mitchell v. Washington*, 818 F.3d 436, 445-46 (9th Cir. 2016). Moreover, strict scrutiny applies even when the reason for the differential treatment is "benign," for example, preferences in academic admissions, government contracting, election redistricting, as well as when the protected attribute is just one of several factors in a government decision. *Id.* at 444-45. Finally, a suspect classification need not be stated explicitly to warrant strict scrutiny. *See Washington v. Seattle Sch. Dist. No. 1*, 458 U.S. 457 (1982).

In the *Seattle School District* case, the voter initiative at issue, Initiative 350, provided that "no school board . . . shall directly or indirectly require any student to attend a school other than the school which is geographically nearest or next nearest the student's place of residence . . . and which offers the course of study pursued by such student." *Id.* at 462. Although Initiative 350 nowhere mentioned "race," the United States Supreme Court struck it down because it reallocated governmental power in a non-neutral fashion, inhibiting local decision makers from attempting to racially integrate

---

precincts, or census blocks," and was therefore facially race neutral, strict scrutiny would apply only if the district at issue (District 12) was drawn with an impermissible racial motive or was unexplainable on grounds other than race. *See id.* at 546-47. The Supreme Court acknowledged that the evidence tended to support an inference that District 12 was formed with the requisite racial animus, but concluded that the district court improperly granted summary judgment because the legislative intent involved genuine disputes of material fact. *Id.* at 548-54. Unlike *Hunt*, the case before the Court does not involve either a facially neutral policy or a motion for summary judgment; the matter has been tried, and the Court is authorized to resolve all questions of fact.

their schools.  *Id.* at 471-87.  Similarly, although the continuous monitoring and security

clearance policies at issue do not expressly target individuals on the basis of national

origin, they use the equivalent classification of MAVNI status, which is synonymous

with birth outside the United States.

Indeed, an internal DoD document, which has become public, Tr. (Nov. 28, 2018)

at 202:10-11, 204:4-12 (docket no. 189), supports the conclusion that the DoD itself

correlated MAVNI status with national origin.  In an "Action Memo" prepared in

May 2017 by Stephanie Miller, Director of Accessions Policy for the Office of the Under

Secretary of Defense for Personnel and Readiness, who was called by defendant as a

witness at trial, the Secretary of Defense was informed that, with respect to MAVNI

personnel who (like plaintiffs) had been naturalized as citizens, "[t]here are significant

legal constraints to subjecting this population to enhanced screening without an

individualized assessment of cause."  Ex. 59 at 2; *see also* Tr. (Nov. 28, 2018) at 130:2-4,

197:22-198:20 (docket no. 189).  This evidence shows that the DoD was aware of the

equal protection violations that would arise if naturalized MAVNI soldiers were treated

differently from other citizens,[21] but it nevertheless persisted in the discrimination.

_____

[21] When asked at trial whether the memorandum she had drafted expressed her concern that "standardized extraordinary screenings" on MAVNI soldiers who were United States citizens might be unconstitutional, Ms. Miller replied, "I would not characterize it that way," and explained, "We recognized that some may view that there was litigation risk."  Tr. (Nov. 28, 2018) at 202:17-21 (docket no. 189).  The Court finds this testimony less than forthcoming, particularly in light of the wording of the document, which described the "legal constraints" as "significant."  *See* Ex. 59 at 2.

### 4.     The Evidence Establishes Any Required Animus

Under both _Mitchell_ and the _Seattle School District_ case, strict scrutiny must be applied in this case because the policies at issue are not facially-neutral rules that merely disproportionately impact a protected class, but rather affect every MAVNI enlistee affiliated with the DoD who is a United States citizen,[22] and who was, by definition, born outside the United States.  Even if, however, the NIAC requirements could be considered facially neutral, defendant would not be entitled to rational basis review.  As recognized in a case cited by defendant, the Supreme Court has non-exhaustively outlined the sources of evidence that might reveal whether a facially-neutral governmental action was taken for invidious purposes.  _See Snoqualmie Indian Tribe v. City of Snoqualmie_, 186 F. Supp. 3d 1155, 1164-65 (W.D. Wash. 2016) (citing _Vill. of Arlington Heights v. Metro. Housing Dev. Corp._, 429 U.S. 252 (1977)).

In _Arlington Heights_, faced with a challenge to the Village's denial of a rezoning request, the Supreme Court observed that, when a discriminatory purpose has been a motivating factor in a decision, the legislative or administrative body is no longer entitled to judicial deference.  429 U.S. at 265-66.  Determining whether an improper animus played a role in the official action "demands a sensitive inquiry" into the available direct

---

[22] A limited number of individuals were allowed to enlist in the Army through the MAVNI program each year.  _See_ Ex. 33 at 18.  The annual caps remained steady in FYs 2009-2010, increased in FYs 2013-2016, and decreased in FY 2017.  _Id._; _see also_ Ex. 205.  Before the MAVNI program expired on September 30, 2017, _see_ Ex. 206, it was the mechanism by which a total of 10,892 soldiers were recruited into the Army, _see_ Ex. 38.  Defendant's witnesses did not know how many of these service members have been naturalized, but plaintiffs estimate that over 5,000 individuals who accessed through the MAVNI program are now citizens.  _See_ Tr. (Nov. 28, 2018) at 11:10-13, 198:21-199:1 (docket no. 189); Tr. (Nov. 29, 2018) at 53:21-54:9, 153:17-21 (docket no. 190).

and circumstantial evidence, which may include whether one race (or protected group) is more "heavily" impacted than another.  *See id.* at 266.  This factor alone might be determinative (as in the case of the MAVNI-centric policies at issue), but if not, courts may look to other evidence.  *See id.*  Among other considerations of possible relevance are (i) the historical background of the decision at issue, (ii) the specific sequence of events leading up to the challenged action, (iii) departures from normal procedures, (iv) substantive departures, particularly when the factors usually considered important would strongly favor a decision contrary to the one reached, and (v) legislative or administrative history, especially statements made contemporaneously with the allegedly unconstitutional decision, meeting minutes, or reports.  *Id.* at 267-68.

While raising the specter of *Arlington Heights*, defendant did not, in his trial brief or closing argument, conduct the necessary inquiries, and the Court cannot take seriously defendant's assertion that the continuous monitoring and security clearance policies at issue are entitled to the type of judicial deference accorded under rational basis review.  Contrary to defendant's suggestion, even if the Court found that the challenged DoD policy is facially neutral, the equal protection analysis would not end.  Rather, the Court would proceed to evaluate whether the *Arlington Heights* factors evidence an improper motive warranting strict scrutiny.

Having performed the additional work required by *Arlington Heights*, the Court concludes that the considerations articulated by the Supreme Court do not support defendant's view that, assuming the MAVNI regulations at issue are facially neutral, they were implemented without any of the motives that would give rise to strict scrutiny.

Indeed, the historical background of the biennial NIAC requirements and the sequence of events leading up to the Levine memorandum indicate that national origin was at least "**a** motivating factor" in the DoD's actions.[23]  The DoD's procedural and substantive departures from the protocols applicable to non-MAVNI personnel and the administrative history[24] likewise weigh in favor of applying strict scrutiny.  For all of the foregoing

_____

[23] According to Lt. Col. (Ret.) Margaret Stock, the mass shooting that occurred in November 2009 at Fort Hood, Texas, which was perpetrated by Nidal Malik Hasan, an Army psychiatrist, forced the MAVNI program into a two-year hiatus. Tr. (Nov. 27, 2018) at 159:3-23 & 161:3-5 (docket no. 188).  Although Hasan was an American at birth, many people thought he was a MAVNI soldier because he had a foreign-sounding name. _Id._ at 159:6 & 15-18.  In advance of trial, defendant sought to exclude Lt. Col. Stock as a witness on several grounds, including self-interest, impermissible coaching by plaintiffs' counsel, and failure to qualify as an expert or offer appropriate expert testimony under Federal Rule of Evidence 702, _see_ Def.'s Mot. in Limine (docket no. 158), and the Court denied defendant's motion without prejudice, _see_ Minutes (docket no. 175).  Having observed Lt. Col. Stock's demeanor on the witness stand and during the course of the trial, the Court finds her testimony, which was primarily factual in nature, credible and consistent with the documents admitted as evidence and the historical events about which the Court may take judicial notice, _see_ Fed. R. Evid. 201.  Although the DoD and the Army certainly needed to conduct a thorough investigation following the incident at Fort Hood, in an effort to prevent repetition of the episode, the Court is persuaded that, if Hasan had had a surname common in the United States (Smith, Johnson, Williams, Jones, etc.), the horrific acts that he committed might not have affected the MAVNI program so singularly and significantly. As a result of the temporary suspension, no individuals enlisted through the MAVNI program in FY 2011 or FY 2012.  _See_ Ex. 33 at 18.  In FY 2013, when the MAVNI program was reinstated, individuals attempting to join the Army through the MAVNI program had to submit to the more rigorous vetting process articulated in the February 2012 memorandum issued by the Under Secretary of Defense for Intelligence, which required an SSBI/Tier 5, a NIAC, and a CIFSR at the time of enlistment.  _See_ _supra_ note 16.  In September 2016 (FY 2017), the Levine memorandum appended to these heightened screening protocols the "continuous monitoring" program now being challenged.  _See_ Ex. 4.

[24] In addition to the internal "Action Memo" acknowledging the "significant legal constraints" associated with subjecting naturalized MAVNI soldiers to enhanced screening without individualized cause, Ex. 59, the administrative record includes two reports touting the benefits of the MAVNI program and the superior quality of MAVNI recruits.  The Army commissioned both the Human Resources Research Organization ("HumRRO") and the RAND Corporation to evaluate the MAVNI program.  _See_ Exs. 29 & 33.  HumRRO produced an interim evaluation in November 2011 and a final assessment in February 2013. Ex. 29 at 1 & 15.  The RAND report was issued in July 2017.  Ex. 33 at 1.  The HumRRO study focused on whether the Army was

reasons, the Court concludes that defendant must bear the burden of proving the use of the suspect classification (*i.e.*, national origin) promotes a compelling interest, the classification is necessary, and the means at issue are precisely tailored to achieve the governmental interest.  *See Johnson v. California*, 543 U.S. 499, 505 (2005).

**B.    Applying Strict Scrutiny**

**1.    Compelling Interest**

Plaintiffs do not quarrel with the concept that national security is a compelling governmental interest, but they have cast doubt on the value of certain evidence on which defendant has relied in alleging a threat to national security.  In a declaration filed in connection with motion practice, the DoD's Chief of Personnel Security, Roger Smith, indicated that "a number of individuals accessed into the military [through the MAVNI program] based on receiving fraudulent visas to attend universities that did not exist." Smith Decl. at ¶ 25 (docket nos. 131-1 & 132-1).  The only example Mr. Smith could provide at trial concerned the University of Northern New Jersey, *see* Tr. (Nov. 29, 2018) at 60:14-23 (docket no. 190), which was a fake school created by the Department of Homeland Security as part of a "sting" operation aimed at trapping brokers who were

---

meeting its goals for the MAVNI program, how MAVNI recruits compared with other soldiers, and whether the attitudes of MAVNI personnel changed over time. Ex. 29 at 15-22.  The RAND investigation was aimed at analyzing the relative performance and relative cost of MAVNI and non-MAVNI service members, estimating the size of the future pool of potential MAVNI recruits, and assessing the security risk associated with the MAVNI program.  Ex. 33 at 21. Defendant has attempted to undermine the conclusions stated in the RAND report by indicating that the RAND researchers were not given access to classified information, *see* Miller Decl. at ¶¶ 4-5 (docket nos. 141-3 & 159-2), but this criticism applies to the examination of security risk, and does not diminish the credibility of either the HumRRO or the RAND report regarding the cost-effectiveness of the MAVNI program in producing high-quality Army enlistments.

unlawfully referring foreign students to academic institutions for a fee, _see_ Tr. (Nov. 27, 2018) at 173:10-17 (docket no. 188). The Court is unimpressed with any assertion that MAVNI recruits who were deceived by an agency of the United States into believing that they were enrolled in, or engaged in either curricular or optional practical training through, a legitimate school constituted a threat to national security.[25]

Mr. Smith's declaration also referenced a MAVNI enlistee who said he would "voluntarily help China in a crisis situation." Smith Decl. at ¶ 25 (docket nos. 131-1 & 132-1). During trial, Mr. Smith agreed that this individual was the subject of a DoD PowerPoint slide, which indicated that this person declined to become a naturalized United States citizen (and thus, is not similarly situated to plaintiffs), admitted to being a communist and loving socialism, identified himself as Josef Stalin, wore old foreign military (Nazi) apparel, and was removed from campus housing and suspended from a university after a search revealed several non-functioning firearms and a bayonet. _See_ Ex. 98 at 11; Tr. (Nov. 29, 2018) at 66:20-67:14 (docket no. 190). While this person (and others like him) might pose a risk to community safety, defendant has not shown how he or similar individuals would escape detection through the MAVNI, or even the more lax non-MAVNI, enlistment protocols, and thus, defendant's reliance on this example as evidence that MAVNI soldiers constitute a national security threat is unpersuasive.

At trial, defendant's witnesses were asked about Chaoqun Ji, a Chinese national who attempted to access through the MAVNI program, but did not advance out of the

_____

[25] Nothing prevented the DoD or the Army from investigating on an individual basis the MAVNI service members who were duped by the Government's "sting" operation.

ORDER - 22

Delayed Entry Program or ship to basic training.  *See* Tr. (Nov. 29, 2018) at 45:1-5,

45:19-20, 153:2-7 (docket no. 190).  Mr. Ji was arrested and is currently facing

prosecution, as a result of an investigation dating back to 2015 or 2016, conducted by the

Federal Bureau of Investigation.  *Id.* at 46:4-6, 143:17-144:2.  Although the charges

against Mr. Ji seem to support some alarm about the efforts of other governments to

infiltrate the United States military, the record also reflects that Mr. Ji was unsuccessful

in avoiding detection, even before extraordinary screening protocols were set in motion

by the Levine memorandum.  In addition, defendant's witnesses acknowledged that **<u>no</u>**

MAVNI soldier who has become a naturalized citizen has ever been charged or convicted

of espionage or any other criminal offense or been denaturalized.  *See* Tr. (Nov. 28,

2018) at 186:4-187:2 (docket no. 189); Tr. (Nov. 29, 2018) at 54:10-55:18 (docket

no. 190); *see also* 8 U.S.C. § 1440(c) (indicating that the citizenship granted under

§ 1440(a) may be revoked if a separation from the military occurs on other than

honorable conditions before the individual has served at least five years).

  Although plaintiffs have managed to combat the unclassified materials on which

defendant has relied, neither they nor the Court is in a position to question whether the

DoD's concerns about infiltration of the MAVNI program or the co-opting of MAVNI

enlistees by foreign operatives are justified by information that remains classified and is

not part of the record in this matter.  During the course of this litigation, defendant has

mentioned, but has not produced to plaintiffs or offered as evidence, a 2017 DoD

Inspector General "classified review," a 2017 Defense Intelligence Agency "classified

assessment," and a 2016 DoD classified "security review" concerning the MAVNI

program.  Miller Decl. at ¶ 4 (docket nos. 141-3 & 159-2); Smith Decl. at ¶ 24 (docket nos. 131-1 & 132-1); _see_ Tr. (Nov. 29, 2018) at 33:19-34:1 (docket no. 190).  At trial, defendant's witnesses summarized these classified documents as bringing to the DoD's attention "direct threats for espionage within the [MAVNI] program," including attempts by "hostile governments" to either "place known assets into the program to access into the military" or "develop assets who had accessed into the program."  Tr. (Nov. 28, 2018) at 144:18-22, 145:3-9 (docket no. 189); _see_ Tr. (Nov. 29, 2018) at 17:4-20, 38:25-40:8, 42:7-15, 119:10-17, 121:3-10 (docket no. 190).  According to Stephanie Miller, the DoD also learned from these classified reports that the investigatory tools it had been using might not be sufficient or might not have been consistently applied with respect to individuals who accessed through the MAVNI program.  Tr. (Nov. 28, 2018) at 144:23-145:1, 148:2-17 (docket no. 189).  Ms. Miller further indicated that the classified information raised concerns about aggressive attempts to obtain security clearances, unusual questions about equipment and information technology, deliberate omissions about foreign travel, unexplained wealth, and unreported contacts with persons identified as intelligence operatives or members of foreign governments.  _Id._ at 147:5-16.

After hearing the testimony of defendant's witnesses and the closing arguments of counsel, the Court decided not to request that the classified documents at issue be provided for _in camera_ review, expressing concerns about such _ex parte_ presentation of evidence, as well as the probability that the materials would offer an incomplete understanding of the national security situation.  _See_ Tr. (Nov. 30, 2018) at 53:14-22 (docket no. 191); _see also_ Tr. (Nov. 29, 2018) at 38:7-16, 177:20-25 (docket no. 190).

The Court remains persuaded that it need not examine the DoD's undisclosed materials

regarding the MAVNI program or determine whether they demonstrate the types of

vulnerabilities to which defendant's witnesses generally alluded at trial because, even if

defendant has carried his burden of establishing a compelling governmental interest, the

NIAC policies challenged in this litigation do not satisfy the "necessary" and "precisely

tailored" prongs of the strict scrutiny standard.

## 2.    <u>Neither Necessary Nor Precisely Tailored</u>

Plaintiffs contend that the "continuous monitoring" program and the enhanced

security clearance protocols for MAVNI personnel are both overbroad and under-

inclusive, and thus, do not bear a sufficiently narrow relationship to national security.

The Court agrees.  The Court notes that plaintiffs, who all accessed after February 2012,

already underwent investigations that were beyond what anyone else seeking the highest

levels of security clearance must endure,[26] and they did so just to enlist and obtain a

favorable Military Service Suitability Determination.  *See* *supra* note 16.  Defendant has

offered no statistical basis or other evidence to support a theory that a subsequent biennial

---

[26] For example, to be deemed eligible for "top secret" clearance, non-MAVNI personnel (*e.g.*, individuals who were United States citizens at birth) must successfully complete an SSBI/Tier 5, but not a NIAC or a CIFSR, and to be eligible for "secret" clearance, a non-MAVNI soldier must pass only a Tier 3 review (formerly called a National Agency Check with Law and Credit), which requires responses to a questionnaire known as Standard Form 86 (or SF 86), an exemplar of which was admitted into evidence as Exhibit 22.  *See* Tr. (Nov. 26, 2018) at 38:15-39:6 (docket no. 187); Tr. (Nov. 28, 2018) at 96:5-9, 98:11-14 (docket no. 189).  In contrast, a MAVNI recruit who enlisted after February 2012 needed an SSBI/Tier 5, a NIAC, and a CIFSR, *supra* note 16; *see also* Ex. 27 at 17, and to obtain either "secret" or "top secret" clearance, an individual who accessed at any time through the MAVNI program must also undergo all three investigations, *see* Tr. (Nov. 28, 2018) at 95:25-96:4, 98:6-10 (docket no. 189); *see also* PTO at ¶ 3.

NIAC (as part of a continuous monitoring system or a security clearance application) would reveal national security concerns somehow left unexposed by the SSBI/Tier 5, NIAC, and CIFSR performed upon recruitment.  Moreover, defendant has provided no explanation for engaging in flagrant profiling, *i.e.*, equating MAVNI status with national security risk, rather than justifying on a case-by-case basis the heightened monitoring or screening that the DoD wishes to conduct.  Indeed, as conceded by defendant's witnesses, no citizen who accessed into the Army through the MAVNI program has ever been charged or convicted of any criminal offense or been denaturalized, and defendant has offered no evidence that espionage or similar activity is so rampant among MAVNI personnel who have attained citizenship that a departure from the usual standard of particularized suspicion is necessary.  *See* Tr. (Nov. 29, 2018) at 144:6-14 (docket no. 190) (indicating that the Army can "investigate anyone" it has "reason to believe" might be "involved in a national security crime").

In this litigation, plaintiffs do not question the DoD's authority to conduct additional security investigations on an individualized basis, *see* Tr. (Nov. 28, 2018) at 188:3-12 (docket no. 189), and the issues before the Court concern only whether the DoD may, without any indication of wrongdoing or cause for concern, routinely subject a group of citizens born outside the United States to a higher level of scrutiny than other citizens.  More vetting and more monitoring will certainly reveal more information, *see* Tr. (Nov. 29, 2018) at 159:13-16 (docket no. 190), but the DoD's approach, which is, according to defendant's witness Stephanie Miller, to obtain the information first and then decide whether individualized review is warranted, *see* Tr. (Nov. 28, 2018) at

199:16-200:22, 201:15-18 (docket no. 189), puts the proverbial cart before the horse.

Defendant simply has not shown why the DoD needs to conduct a NIAC every two years,

as a matter of course, on the entire MAVNI population, and therefore, has not refuted

plaintiffs' challenge of overbreadth.

Defendant has instead provided a meaningless comparison, indicating that 13% of

MAVNI soldiers had been deemed unsuitable for military service **or** ineligible to have

access to classified information, while only 1% of the non-MAVNI population were

denied a security clearance.  _See_ Smith Decl. at ¶ 27 (docket nos. 131-1 & 132-1); _see_

_also_ Tr. (Nov. 29, 2018) at 51:25-52:4 (docket no. 190).  When asked by the Court at

trial, Roger Smith conceded that he was unable to recite **separate** figures for (i) the

number or percentage of MAVNI recruits who (unlike all but one[27] of the plaintiffs in

this matter) received unfavorable MSSDs and were required to leave the armed forces,

and (ii) the number or percentage of MAVNI soldiers who had not received a requested

security clearance.  Tr. (Nov. 29, 2018) at 51:10-24 (docket no. 190).  In the absence of

the "specific metrics" that Mr. Smith could not supply at trial, _id._ at 52:11, the attempted

juxtaposition of a 13% figure for MAVNI personnel against a dissimilar 1% statistic for

the non-MAVNI population was a pointless exercise.  _Cf. Kuang_, 340 F. Supp. 3d. at 919

("[T]he record provides no indication of the risk that LPRs [lawful permanent residents]

pose compared to U.S. citizens.  Curiously, DoD contends that it need not have made

such a comparison.  But the precise policy change at issue is that the DoD began to treat

---

[27] Plaintiff Xi (Tracy) Cui, a native of China, who enlisted on May 15, 2015, and was naturalized on March 10, 2016, received an unfavorable MSSD on September 22, 2017.  PTO at ¶ 13.

ORDER - 27

LPRs as presumptive security risks, while presuming that U.S. citizens did not pose such a risk. If there was no evidence that LPRs posed a greater security risk, this policy change is by definition arbitrary and capricious." (citations omitted)).

Defendant has offered no reason for believing that MAVNI personnel who have successfully navigated the rigorous enlistment requirements (_i.e._, received a favorable MSSD based on SSBI/Tier 5, NIAC, and CIFSR results), and who have become United States citizens, constitute any higher risk to national security than other members of the DoD population. Nevertheless, defendant requires all MAVNI soldiers, even those who have no access to classified information, to undergo biennial NIACs, while imposing no similar condition on the maintenance of "secret," "top secret," or even "top secret/SCI" clearance by non-MAVNI personnel. Defendant does not subject any other members of the military to the MAVNI level of monitoring,[28] even those with equivalent or perhaps greater ties to other nations than the typical MAVNI soldier.

For example, in the absence of individualized suspicion, no periodic NIAC is performed on individuals who were United States citizens or nationals at birth, but never resided in the United States before joining the military, on aliens who were lawful permanent residents at the time of their enlistment, or on persons who remain citizens of the Federated States of Micronesia, the Republic of the Marshall Islands, or Palau during

---

[28] To be clear, all individuals affiliated with the DoD who hold a security clearance must, by the end of 2021, be enrolled in the "continuous evaluation" system. Tr. (Nov. 29, 2018) at 29:21-31:2 (docket no. 190). Continuous evaluation is one of the three components of continuous monitoring, _id._ at 31:16-18, but because continuous evaluation applies uniformly to all members of the military, plaintiffs make no equal protection claim with respect to continuous evaluation.

their entire career in the armed forces.  *Cf. Faruki*, 349 F. Supp. at 731 (observing that, under the unconstitutional statute at issue, "foreign-born American citizens at birth who have never set foot in America face no similar barrier when they decide to come here, perhaps for the first time, to take the Foreign Service entrance examinations").  The Court concludes that the challenged NIAC requirement is under-inclusive and not "precisely tailored" to the interest of national security.

The imposition of a NIAC every two years displays a general lack of trust and a concomitant desire to monitor MAVNI soldiers without needing to identify a basis for suspicion.  The Court agrees with plaintiffs that this stigmatizing persistent vetting protocol constitutes impermissibly unequal treatment of United States citizens on the basis of national origin.  It is inconsistent with the representations made to plaintiffs upon their enlistment that they would be "treated like any other Soldier" and that they would enjoy "all the same opportunities afforded to . . . any other Soldier" in the United States Army, *see* Ex. 15 at §§ E & R; Exs. 69 & 90 at §§ E & Q; Ex. 71 at §§ E & P, and it violates the military's own principles against discrimination based on immutable characteristics like national origin, *see* Ex. 37 at ¶ 3(e) ("The DoD shall not discriminate nor may any inference be raised on the basis of race, color, religion, sex, national origin, disability, or sexual orientation."); *see also* Ex. 36 at § 3.1(c) (Exec. Order No. 12,968).  It deals unfairly with citizens who have volunteered to serve their nation by enduring extreme hardships and lengthy deployments, during which they are often separated from family and friends, and by preparing each and every day to make the "ultimate sacrifice of their lives if necessary" to protect our country, its people, and the constitutional rights

we hold so dear.  *See Kuang*, 340 F. Supp. 3d at 921-22 (quoting *Doe 1 v. Trump*, 2017 WL 6553389 at *3 (D.D.C. Dec. 22, 2017)).  It is unconstitutional, and it must be enjoined.

**Conclusion**

The Court hereby summarizes its findings of fact and conclusions of law and ORDERS relief as follows:

(1)  The United States Department of Defense requires all individuals who enlisted in the United States Army through the Military Accessions Vital to the National Interest program and who remain affiliated with the DoD (on active duty, in a reserve position, as a government-employed civilian, or while working for a private defense contractor) to participate in "continuous monitoring," defined as being enrolled in the continuous evaluation system and being subject to a series of National Intelligence Agency Checks every two years and to either a Passive Analytical Counterintelligence and Security Assessment or a Counterintelligence-Focused Security Review;

(2)  The DoD requires all MAVNI personnel to have an up-to-date NIAC (*i.e.*, a NIAC performed within the prior two years), among other prerequisites, before their security clearance eligibility will be adjudicated;

(3)  Plaintiffs joined the Army through the MAVNI program after February 12, 2012, and before September 30, 2016, have been naturalized as United States citizens, and were still affiliated with the DoD as of the date that trial commenced;

(4)     United States citizens and/or nationals who were recruited into the Army in a manner other than the MAVNI program are not subject to the biennial NIAC requirements related to continuous monitoring and security clearance determinations;

(5)     The NIAC components of the DoD's "continuous monitoring" program and security clearance protocols discriminate against plaintiffs on the basis of national origin;

(6)     Defendant has not met his burden of proving that using the suspect classification of MAVNI status, which is synonymous with having a national origin outside the United States, is both "necessary" and "precisely tailored" to serve the articulated compelling governmental interest of national security;

(7)     The Court ENTERS the following permanent injunction:  Defendant and the United States Department of Defense are hereby ENJOINED from requiring, in the absence of individualized suspicion, a biennial series of National Intelligence Agency Checks for continuous monitoring or security clearance eligibility purposes with respect to any citizen affiliated with the DoD who accessed into the United States Army through the Military Accessions Vital to the National Interest program after February 12, 2012, and before September 30, 2016;[29] and

_____

[29] The Court is satisfied that entry of this permanent injunction will operate in favor of all MAVNI personnel who are similarly situated to plaintiff.  The Court therefore DECLINES to certify a class.  *See* *DiFrancesco v. Fox*, 2019 WL 145627 at *2-*3 (D. Mont. Jan. 9, 2019) (ruling that, because "all potential class members . . . would benefit from an injunction issued on behalf of the individually named plaintiffs," certification of a class would serve "[n]o useful need or purpose," and that "[t]he costs and complexities associated with maintaining a class action outweigh the benefits class certification is intended to provide" (citing *James v. Ball*, 613 F.2d 180, 186 (9th Cir. 1979), *rev'd on other grounds*, 451 U.S. 355 (1981))); *see also* *Davis v. Smith*, 607 F.2d 535, 540 (2d Cir. 1978).

(8)     The Clerk is DIRECTED to enter judgment consistent with this Order, to send a copy of the Judgment and this Order to all counsel of record, and to CLOSE this case.

IT IS SO ORDERED.

Dated this 31st day of January, 2019.

Thomas S. Zilly
United States District Judge